# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| STEPHANIE JONES, JONESWORKS LLC, | Index No.: |
| Plaintiffs, | **SUMMONS** |
| -against- | Date Index No. Purchased: |
| JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10 | The basis for venue is that Jonesworks LLC's principal offices are in New York County and because a substantial part of the events giving rise to the claims at issue occurred in New York County. |
| Defendants. | Plaintiff's address is 211 E 43rd St, New York, NY 10017. |

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis for venue is that Plaintiff Jonesworks LLC's principal offices are in New York County and because a substantial part of the events giving rise to the claims at issue occurred in New York County. Plaintiff Jonesworks LLC's address is: 211 E 43rd St, New York, NY 10017.

Dated: New York, New York
December 24, 2024

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By:    /s/  *Kristin Tahler*

*Kristin Tahler*
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
kristintahler@quinnemanuel.com

*Attorneys for Plaintiffs*

To:

Jennifer Abel
119 N. Swall Drive
Beverly Hills, CA 90211

Melissa Nathan
2039 Paramount Drive
Los Angeles, CA 90068

Justin Baldoni
1302 Ojai Road
Santa Paula, CA 93060

Wayfarer Studios LLC
c/o. Corporation Trust Co.
1209 Orange Street
Wilmington, DE 19801

2

Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 4 of 61

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| Stephanie Jones, Jonesworks LLC, | Index No.: _____ |
| Plaintiffs, | **COMPLAINT** |
| -against- | Jury Trial Demanded |
| Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios LLC, and JOHN DOES 1-10, | |
| Defendants. | |

Plaintiffs Stephanie Jones and Jonesworks LLC, by and through their undersigned counsel, bring this Complaint against Defendants Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios, LLC, and John Does 1-10 and respectfully allege as follows:

<u>**NATURE OF THE CASE**</u>

1.      Defendants Abel and Nathan secretly conspired for months to publicly and privately attack Jones and Jonesworks, to breach multiple contracts and induce contractual breaches, and to steal clients and business prospects.  Behind Jones's back, they secretly coordinated with Baldoni and Wayfarer to implement an aggressive media smear campaign against Baldoni's film co-star, and then used the crisis as an opportunity to drive a wedge between Jones and Baldoni, and to publicly pin blame for this smear campaign on Jones—when Jones had no knowledge or involvement in it.  To this day, Abel and Nathan continue to point the finger falsely at Jones now that their own misconduct is coming to light, and to defame and attack Jones in the industry.  Baldoni and Wayfarer, who have since parted ways with Jonesworks, have repudiated their contractual obligations with Jonesworks and rebuffed Jones's efforts to settle this dispute privately in arbitration.  Defendants will not stop attacking Jones, and have refused any efforts to resolve these issues out of court.  This lawsuit seeks to finally put a stop to their continued

misconduct and to compensate Jones and Jonesworks for the damage Defendants' conduct and scheme has inflicted.

2.       Stephanie Jones is a highly respected public relations expert who focuses on corporate and personal publicity.  Through her company, Jonesworks, she has represented many high-profile celebrities, athletes, companies, and business people.  Among Jonesworks's clients were Baldoni, a well-known actor, director and producer, and Wayfarer, his movie production company.

3.       Baldoni produced, directed, and co-starred in the film *It Ends With Us* (the "Film"). In connection with the Film's release in August 2024, Baldoni began to fear that the media might report on allegations of misogynistic and toxic on-set behavior and that the fallout would be harmful to his reputation and career.  Determined to protect his reputation, Baldoni and Wayfarer's CEO Jamey Heath turned to Abel, who had become the point person at Jonesworks on the Baldoni and Wayfarer account.  Abel brought on crisis-fixer Melissa Nathan to help her manage the situation.  Together, Abel and Nathan, with Heath's active encouragement, conspired to shut Jones out of the process and keep their strategy hidden from her.

4.       Abel and Nathan sprang into action, scheming to "bury" and "destroy" co-star Blake Lively to protect Baldoni. Their plan was covert, deliberately concealed from Jones, and went far beyond the legitimate scope of Abel's employment.  At the same time, Abel and Nathan were pursuing a far more selfish purpose:  Tearing down Jones's reputation to take her clients and enrich themselves upon Abel's planned departure from Jonesworks:



[…]



5.      Avarice, not any sincere appreciation for Baldoni, was Nathan and Abel's

motivation.  Abel's candid communications revealed that she in fact held Baldoni personally in

extremely low regard:



[…]



6.     Months earlier Abel had voiced the same opinion in connection with a filmed

kissing scene between Baldoni and Lively, which was described to Abel as "so gross" and revealed

that Abel was well aware of Lively's on-set complaints about Baldoni's behavior:



4

7.      At the same time as Abel and Nathan were working to protect Baldoni from negative press attention, they were actively working their media contacts to plant negative stories about Jones and Jonesworks.  Central to Abel and Nathan's personal vendetta against Jones was an August 2024 *Business Insider* article titled, "Who's Afraid of Stephanie Jones?" that Abel and Nathan coordinated with a friendly reporter.  Indeed, as early as July 29, 2024, Abel and Nathan were coordinating their outreach to Katie Warren, the *Business Insider* reporter who eventually published the article attacking Jones:



8.      Conversations between Abel and Nathan show close coordination with Warren, including, numerous lengthy phone calls between Abel and Warren between July 30 and August 12.  Abel also facilitated Warren's outreach to former clients of Jones in order to further disrupt Jonesworks' business and negatively influence the coverage.  This included putting Warren in touch with a client with whom Jones had worked closely for years, bringing her from obscurity to prominence, and who terminated her contract with Jones as a direct result of Abel's encouragement and deliberate interference:



9.      On the eve of the article's release, Nathan boasted about the destructive effect this story would have on Jones, mocking Jones in a text to Abel and jokingly suggesting that Abel should tell Jones:

From:                    Melissa Nathan
To:                       Jennifer Abel (owner)
Stephanie
Are you aware there is a KILL STORY dropping this week on you and if you hadn't of blown us up we would not of been in such a bad place.
Priority: Normal
14/08/2024 01:23.15(UTC+0)

10.     Abel and Nathan's conspiracy to take down Jones was virulent and effective, which they themselves recognized was fueled by society's natural willingness to tear down successful women, and they capitalized on this for their own gain:

From:                    Melissa  Nathan
To:                       Jennifer Abel (owner)
It's actually sad because it just shows you have people really want to hate on women
Priority: Normal
10/08/2024 18:41:38(UTC+0)

6



11.     As her planned departure neared, Abel boasted to Nathan about the damage she was doing to Jonesworks, her then-current employer, and Nathan goaded her on:



12.     Abel and Nathan also conspired to ensure that Wayfarer and Baldoni would leave Jonesworks and come with Abel to her planned new firm:



From: Melissa Nathan
To: Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and she needs to also not do anything and my last conversation with her was last Wednesday or so

And then I couldn't help myself

Priority: Normal

19/08/2024 04:49:55(UTC+0)

From: Melissa Nathan
To: Jennifer Abel (owner)

I ended it with

Priority: Normal

19/08/2024 04:50:00(UTC+0)

From: Melissa Nathan
To: Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her.

Don't kill me, okay bye

Priority: Normal

19/08/2024 04:50:28(UTC+0)

From: Jennifer Abel (owner)
To: Melissa Nathan

Hahahaha omg love you

Priority: Normal

19/08/2024 05:02:12(UTC+0)

From: Jennifer Abel (owner)
To: Melissa Nathan

Thanks for chatting with him

Priority: Normal

19/08/2024 05:02:19(UTC+0)

13.     By the time Jones became aware of the plot in August 2024 and terminated Abel, it was too late and the damage was done. Abel had already stolen more than 70 proprietary and sensitive business documents and additional client leads from Jonesworks. Beyond those documents, Abel left Jonesworks with Baldoni and Wayfarer in tow and immediately opened shop at her own competing firm, which she had set up while still working at Jonesworks. She further sought to poach employees in violation of the noncompete and non-solicitation provisions in her contract. And for their part encouraging Abel and leaving with her, Wayfarer and Baldoni breached their own contract with Jonesworks and then poured salt in the wound by baselessly refusing to pay the remaining amount owed.

14.     Abel and Nathan's covert take down and smear campaigns were revealed in black and white on Abel's company-issued phone following her termination, which Jonesworks forensically preserved and examined in detail after receiving a subpoena for the phone's contents. Jones discovered the breadth and intensity of Abel and Nathan's duplicity from these records, including that Abel was actively encouraging other Jonesworks clients and employees to leave Jonesworks while Abel was still employed there.

15.     Abel continues to this day to defame and point the finger at Jones, seeking to dodge the inevitable fallout from her own actions and behavior coming to light.

16.     Jones has tried in good faith to resolve this dispute out of court, but those efforts have been met with a complete lack of accountability and stonewalling. And Defendants' finger pointing and smear campaign against Jones still continues. Jones anticipates that she will be subject to even more retaliation and negative attacks from Defendants for filing this lawsuit and revealing the truth. But she has been left with no choice but to seek to vindicate her rights through litigation and put a stop to Defendants' harassing and damaging behavior against her.

## PARTIES

17.     Plaintiff Jonesworks LLC is a Delaware limited liability company that is an internationally recognized public relations firm.  It was founded in and has its principal place of business in New York, New York.

18.     Plaintiff Stephanie Jones is an individual who resides in Greenwich, Connecticut. Jones is the founder and CEO of Jonesworks.

19.     Defendant Jennifer Abel is an individual who resides in Beverly Hills, California. From approximately July 2020 to August 2024, Abel was an employee of Jonesworks.  In August 2024, Abel was terminated for cause by Jonesworks and established RWA Communications, of which she is the founder and CEO.

20.     Defendant Melissa Nathan is an individual who resides in Los Angeles, California. Nathan offers crisis management and communications services. During a portion of the relevant period, Nathan lived in Brooklyn, New York.  In approximately January 2024, Nathan launched The Agency Group PR LLC.

21.     Defendant Justin Baldoni is an individual who resides in Ojai, California.  Baldoni is a professional actor and director, and is a co-founder and co-chairman of Wayfarer Studios, an independent studio and production company.  Baldoni was the director, co-star, and producer of the film *It Ends With Us*.

22.     Defendant Wayfarer Studios LLC is a Delaware limited liability company with its principal place of business in Beverly Hills, California.   It operates as an independent entertainment production studio and develops, produces, and finances feature films and other original media content.  It was co-founded by current co-Chairman Justin Baldoni and is led by CEO Jamey Heath.

10

23.     John Does 1-10 are unknown individuals who created and published the defamatory websites www.stephaniejonesleaks.com and www.stephaniejoneslies.com, as well as more than a dozen fake social media accounts and dark web accounts that defamed Jones and Jonesworks.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this dispute and over Defendants Abel, Nathan, Baldoni, and Wayfarer Studios pursuant to New York's Civil Practice Law and Rules ("CPLR") Section 301 because all Defendants systematically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York.  This Court further has personal jurisdiction over each pursuant to CPLR Section 302, including because, upon information and belief, all Defendants transact and solicit business within the State, have committed the tortious acts described in this Complaint within the State, or have committed such acts outside of the State causing injury to Jonesworks and Jones within the State.  As just one example, Baldoni and Heath met in person in New York with Lively regarding Baldoni's on-set misconduct that started the sequence of events leading to this suit.

25.     This Court also has jurisdiction over Defendants Abel, Baldoni, and Wayfarer Studios because each is a party to a contract with Jonesworks that requires that disputes will be resolved in New York, New York, subject to New York law.

26.     Venue is proper in this Court pursuant to CPLR Section 503, because Jonesworks' principal offices are in New York County and because a substantial part of the events giving rise to the claims at issue occurred in New York County.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND ON THE PARTIES AND THEIR CONTRACTS

#### A.     Jones and Jonesworks

27.     Jones is a highly regarded leader in the field of public relations and the founder, president, and owner of Jonesworks, an Emmy award-winning marketing and communications agency.

#### B.     Jennifer Abel

28.     In July 2020, Jonesworks hired Abel to work as a publicist with the title Vice President.   On July 9, 2020, Abel and Jonesworks executed two contracts: an offer letter establishing Abel's compensation and a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "Abel NDA").

29.     The Abel NDA contained several provisions relevant to this Complaint: Abel agreed to keep confidential any and all of Jonesworks' proprietary information, including strategies, plans, and financial information as well as information relating to Jonesworks' clients. Abel agreed that any Work Product she created was the property of Jonesworks.  She also agreed that she would not prepare or assist in the preparation of any articles about Jonesworks without Jonesworks' express permission, would not disparage Jonesworks in any communications with any reporter or any Jonesworks client, and would not attempt to persuade any Jonesworks client to stop doing business with Jonesworks.

30.     On November 22, 2021, Jonesworks and Abel executed an Employment Agreement adjusting the terms of her employment.  Under the Employment Agreement, Jonesworks granted Abel the title "Vice President, Talent" and provided her with compensation tied to the company's performance, including a bonus based on distributions made by the company and a payment equal to 1% of any net proceeds in the event of the sale of Jonesworks.

31. Under the Employment Agreement, Abel agreed again that she would not use any Jonesworks' proprietary information for any purpose other than benefiting the company, that the products of her work were the sole property of Jonesworks, that she would not directly or indirectly compete with Jonesworks for business during her employment or for a period of six months after her departure, that she would not solicit any business from Jonesworks' clients, that she would not solicit any Jonesworks employees to depart the company, and that she would only notify clients of her departure from Jonesworks with Jones' approval. Abel also expressly agreed that she owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of the Company."

32. The Employment Agreement included a New York choice of law provision and a New York forum selection clause. Abel expressly agreed to submit to the jurisdiction of any state or federal court sitting in New York, New York for any disputes under the Agreement.

33. Shortly after executing the Employment Agreement, Jonesworks began referring to Abel as a "Partner," but Abel remained at all times an employee of Jonesworks and never held any partnership interest in the company.

**C.    Wayfarer and Justin Baldoni**

34. Jonesworks began providing public relations services to Baldoni in approximately 2017. When Baldoni founded Wayfarer in 2019, Jonesworks also began representing that company.

35. In May 2020, Jonesworks executed a contract to memorialize the terms of its provision of public relations services to Wayfarer (the "Wayfarer Agreement"). The Wayfarer Agreement provided that Jonesworks would provide "strategic communications services" "in a

professional manner." In exchange for these services, Wayfarer agreed to pay Jonesworks $20,000 per month plus expenses, a 20% commission for any speaking engagements Jonesworks procured, and a 10% commission for any third-party agreements Jonesworks facilitated. The Wayfarer Agreement provided that if Wayfarer requested additional services, the parties would negotiate an additional fee for those services.

36.     Wayfarer agreed not to solicit any Jonesworks employees or attempt to induce any Jonesworks employees to terminate her employment during the term of the Wayfarer Agreement or for one year thereafter.

37.     The Wayfarer Agreement provided that either party could terminate it only if the other party materially breached its terms and failed to cure those material breaches within ten days of receiving notice.

38.     The Wayfarer Agreement is governed by New York law. Any disputes under the Wayfarer Agreement were to be resolved through binding arbitration in New York, New York. Wayfarer, through counsel, subsequently repudiated this arbitration provision.

39.     The contract had a one-year term that automatically renewed for additional one-year periods unless either party gave notice ninety days before such a renewal. Neither Jonesworks nor Wayfarer ever gave notice under this provision. The contract most recently renewed for a one-year period on May 7, 2024, and will expire on May 6, 2025.

40.     In June 2020, a month after executing the Wayfarer Agreement, and upon Wayfarer and Baldoni's specific request, the parties—including Baldoni—agreed to incorporate public relations services for Baldoni personally into that contract in exchange for an additional payment of $5,000 per month. Since that time, at Wayfarer and Baldoni's request, Jonesworks has issued

14

a single invoice each month for $25,000 to both Wayfarer and Baldoni. Until the dispute described in this Complaint, Wayfarer and Baldoni paid those invoices each month.

41. Shortly after commencing employment at Jonesworks, Abel began working with Baldoni and Wayfarer. As time passed, Jones grew confident in Abel's abilities and Abel ultimately was entrusted as the primary Jonesworks point of contact for Baldoni and Wayfarer. In that capacity, Abel also worked closely with Jamey Heath, who previously served as Vice President of Impact and Culture and Co-Chief Operating Officer of Wayfarer, and currently serves as Wayfarer's President and Chief Executive Officer. In this capacity, Heath played a hands-on role in overseeing Wayfarer's projects and communications strategies. Baldoni, Wayfarer, Heath and others accepted Jonesworks' consistent performance of its contractual services.

### D. Melissa Nathan

42. Melissa Nathan is a long-time crisis manager who has previously worked at several public relations firms.

43. In 2022, Nathan and Jonesworks engaged in negotiations regarding Nathan potentially joining Jonesworks. The negotiations progressed significantly, including Jonesworks agreeing to hire, and actually hiring, two of Nathan's colleagues upon Nathan's insistence. Ultimately, however, negotiations with Nathan failed and she was not retained by Jonesworks.

44. In 2023, Jones witnessed Nathan's approach to handling clients' crises when they worked for a mutual client. Nathan's tactics went far over the line. Jones recommended that the client terminate its relationship with Nathan, which was separate and independent from Jones and Jonesworks. Jones herself further resolved that she would not collaborate with Nathan for clients in the future. Nathan has seemed to harbor significant animus toward Jones and Jonesworks ever since.

45.     In January 2024, Nathan launched her own firm, The Agency Group PR.  The Agency Group provides crisis management services to celebrities and other high-profile individuals and companies.

## II.    ABEL AND NATHAN'S SCHEME TO USE BALDONI'S CRISIS TO ATTACK JONES'S REPUTATION AND STEAL JONESWORKS'S BUSINESS

46.     In 2019, Baldoni and Wayfarer acquired the film rights to the bestselling novel *It Ends With Us*, written by Colleen Hoover, an author whose books enjoy a vast and devoted following, especially among young women.

47.     In 2023, Baldoni began production on the film adaptation of *It Ends With Us* (the "Film").  Wayfarer was a co-producer of the Film and Baldoni owned the rights to its source material.  Baldoni named himself as the director and male lead of the Film, an abusive partner to the female main character played by Lively.  Later reports emerged that, during production, women on set, including Lively, made complaints about Baldoni's behavior toward them, including comments of a sexual nature and inappropriate touching.

48.     Jones later learned that the tensions on-set had reached such a point that, after the Screen Actors Guild strike halted production from July to early November 2023, Lively had only agreed to return to production if Wayfarer implemented additional measures to prevent further improper behavior on set by Baldoni.

49.     The Film was released in August 2024.  In connection with the release, the press began reporting on tensions between Baldoni and the female cast and crew on set.  According to reports, Baldoni had acted in a controlling, demeaning, and "borderline abusive" manner towards the cast and crew, especially toward women.  The press specifically identified Lively and Hoover as having "clashed" with Baldoni during filming, and speculated on the unusual circumstance that

16

neither Lively nor Hoover was photographed promoting the film together with Baldoni as evidence of tension.[1]

50.    As the August 2024 release neared, Baldoni began to fear that the increased attention being paid to him and the Film would cause reports of allegations about his on-set misbehavior to come out. Abel and Nathan—with encouragement from Heath, and without Jones' knowledge or approval—began to formulate a no-holds-barred strategy to discredit and suppress any potential revelations about Baldoni's on set behavior.

51.    Jones, having entrusted the management of the Baldoni and Wayfarer relationship to Abel, trusted that any plan Abel formulated on behalf of Jonesworks would appropriately reflect the company's integrity and ethos. Unfortunately, the opposite turned out to be true. Behind Jones's back, Abel went around Jones to arrange for Baldoni and Wayfarer to retain Nathan and launch a smear campaign against Lively. On information and belief, Nathan took advantage of this opportunity to encourage Abel to leave Jonesworks, to conspire with Abel to steal Baldoni and Wayfarer as clients from Jonesworks, and to smear Jones and Jonesworks in the press. On information and belief, Nathan did so because she believed, among other things, that Abel would encourage Nathan's own burgeoning relationship with these and other Jonesworks clients, while Jones would not. This scheme ultimately inflicted serious damage on Jones and Jonesworks.

---

[1]    *See, e.g.*, Sara Nathan, *Truth behind 'It Ends With Us' feud rumors: Justin Baldoni made Blake Lively 'uncomfortable,' sources say*, N.Y. POST, Aug. 9, 2024, https://www.pagesix.com/2024/08/09/entertainment/justin-baldoni-made-blake-lively-uncomfortable-sources; James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.

17

A. **Abel and Nathan Devise A Smear Campaign Against Lively To Benefit Baldoni and Wayfarer**

52.     Nathan and Abel's strategy for Baldoni was set forth, in part, in a four-page memorandum sent to Baldoni (but kept secret from Jones) that outlined "several potential scenarios at play here which we should be prepared for, should BL [Lively] and her team make her grievances public":

<div style="border:1px solid black; padding:1em;">

**\*\*CONFIDENTIAL\*\***

**SCENARIO PLANNING – IT ENDS WITH US**

**OBJECTIVE**

Protect the reputation of Justin Baldoni, Jamey Heath, and Wayfarer Studios in the lead up, during, and following the premiere of It Ends with Us, underscore the achievement and efforts of the Wayfarer team in bringing this movie to life, and emphasize Justin and the studio's commitment to their team and making the broader industry a more inclusive space.

**OVERVIEW**

Though there are several potential scenarios at play here which we should be prepared for, should BL and her team make her grievances public – via a blatant story or subtle leak. Given she was made to compromise with the premiere, we feel she will move forward with doing so.

</div>

53.     The memo—which, along with the overall strategy, was kept secret from Jones—explicitly recommended weaponizing Baldoni's perceived history as a "longtime activist and advocate of and for women in Hollywood" to be used against Lively, and at the same time sought to discredit Lively's negative on-set experiences with Baldoni by painting her in the press as the one who had "weaponized feminism" for her own benefit:

- JB has been a longtime activist and advocate of and for women in Hollywood, speaking out about challenges his colleagues faced before the Me Too movement even began (TED 2017).

- These pieces will likely come out following any potential hit piece and/or coverage from the premiere. Our recommended approach would be to provide reporters who reach out for comment, should it be obvious she's referring to you, with the appropriate background information (listed in Scenario 1) to ensure their stories are balanced and the speculation can be turned to another one of the many people she's had issues working with (Leighton Meester, Anna Kendrick, Ben Affleck, etc.).

- As part of this, our team can also explore planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to "bully" into getting what they want.

54.    Yet this aggressive strategy was apparently still not tough enough for Baldoni, who texted Abel and Heath that he was: "Not in love with the document [Nathan] sent – Not sure I'm feeling the protection I felt on the call." Abel relayed Baldoni's concerns to Nathan, telling Nathan that Baldoni needed a stronger showing of strength, explaining:



From:        Jennifer Abel (owner)
To:          Melissa  Nathan

You can of course do that but I do think he needs to know. I'm going to confidentially send you something he's texting me and Jamey on the side just to arm you before this call. I think you guys need to be tough and show the strength of what you guys can do in these scenarios. He wants to feel like she can be buried..

Priority: Normal

02/08/2024 13:47:25(UTC+0)

55.    Nathan immediately responded:



From:        Melissa  Nathan
To:          Jennifer Abel (owner)

Of course- but you know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble

Priority: Normal

02/08/2024 13:47:55(UTC+0)

19



[. . .]

56.     In the days that followed, Baldoni and Heath made clear to Abel that they expected

Abel and Nathan's strategy to include a social media activation plan, and Abel and Nathan

immediately complied in its implementation.[2] Nathan and Abel's behind-the-scenes efforts for

Baldoni and Heath also included frantically working to squash emerging media reports about

---

[2]     For example, on August 5, 2024, Baldoni sent Abel a screenshot of an attack campaign against
Hailey Bieber painting her as having a "history of bullying many women," and told Abel, "This is
what we would need" against Lively.

certain human resources complaints that had been filed against Baldoni in connection with the Film.

57.    On information and belief, Nathan and Abel also used their industry connections to plant negative articles about Lively in press outlets including the *Daily Mail* and the *New York Post's Page Six*, and leveraged their teams to create and perpetuate negative content about Lively on social media platforms such as Reddit and TikTok.[3]  For example, Abel closely coordinated with *Page Six* reporter Sara Nathan—Melissa Nathan's sister—to publish an article hostile toward Lively's role in the production of the Film.

58.    Nathan and Abel enthusiastically supported the strategy that Baldoni and Heath wanted, and deliberately hid it from Jones, in order to ingratiate themselves with Baldoni and Heath, drive a wedge between Baldoni and Jones, and ultimately to steal Baldoni and Wayfarer from Jonesworks as clients.

59.    For her part, Jones—who was kept in the dark about this coordinated strategy and was not aware that Wayfarer had actively approved and participated in it—objected to Wayfarer's hiring of Nathan and advocated a positive press strategy instead.   Wayfarer's President immediately reported Jones' comments to Abel:

---

[3]    *See* Alanah Kholsa and Jo Tweedy, *Is Blake Lively set to be CANCELLED? String of 'hard to watch' videos that have surfaced following 'tone deaf' Q&A to promote It Ends With Us could tarnish 36-year-old star's golden Hollywood image for good*, DAILY MAIL, Aug. 16, 2024; Sara Nathan, *Blake Lively approved final cut of 'It Ends with Us' amid feud with co-star director Justin Baldoni*, PAGE SIX, Aug. 13, 2024, https://pagesix.com/2024/08/13/celebrity-news/blake-lively-approved-final-cut-of-it-ends-with-us-amid-feud/.



60.    Excluding Jones from the conversation, Heath flatly rejected any pivot to a positive strategy in a text to Abel. Suggesting that Jones should be shut out for "undermining" their strategy, he called Jones' influence on the situation "poison":



### B.    Abel and Nathan Drive a Wedge Between Jones and Baldoni, And Attack Jones's Reputation in the Press

61.    At the same time as pandering to Baldoni and Heath's desire to discredit Lively, Abel and Nathan were also furthering their own profit-driven agenda to attack and disparage Jones, using many of the same tactics they were using against Lively, in order to eliminate Jones as a competitor and siphon away her clients for themselves.

62.    Ironically, Abel and Nathan recognized that their success on both fronts reflected a societal desire to tear down successful women like Lively and Jones, but they remained undeterred in their agenda:

22



63.    Abel's trashing of women even extended to Nathan herself, whom she had privately

bad-mouthed just months before cynically hitching her star to Nathan to steal from Jones:



23



64. Working together, Nathan and Abel's stated goal in all of this was to position themselves to be able to steal Wayfarer, Baldoni and other clients from Jonesworks to the new firm Abel was planning to form, so that those clients could then be serviced jointly by both Abel's and Nathan's new firms, instead of Jonesworks:



65. Abel and Nathan explicitly discussed their plan to steal Wayfarer and Baldoni away from Jonesworks:





66.     As Nathan made plain, "really good money" was the motivating force behind this scheme, not any special affection for Baldoni or Wayfarer.   Indeed, Abel's candid communications, outside of Baldoni's and Heath's view, made clear that at the same time as she was working to salvage Baldoni's reputation and steal his business, she actually held Baldoni personally in extremely low regard.  For example, when a colleague described an article about a kissing scene between Baldoni and Lively as "so gross," Abel responded:

[…]



67.    Then, months later, Abel was even more explicit in her disdain for Baldoni:



68.    To further their plan, Abel and Nathan contrived to plant stories in media outlets including the *Daily Mail* and *Business Insider* to trash Jones' and Jonesworks' reputations publicly and to their clients. They also back-channeled with Wayfarer and Baldoni to paint Jones in a negative light. For example, following the premiere of the Film, the *Daily Mail* published an

article reporting on tensions between Baldoni and Lively.[4] That article relied exclusively on social media posts that had been identified for Abel earlier that same day: either a shocking coincidence or confirmation that Abel had planted the story. On information and belief, Abel and Nathan conspired to plant this story in the *Daily Mail* in pursuit of dual objectives. First, the negative story cemented Baldoni's need for Nathan's crisis management services, ensuring herself an ongoing paycheck. Second, they arranged for Baldoni and Wayfarer to believe that Jones was the cited "insider" and also created a false story that Jones had publicly blamed Lively for the article, thus sowing discord between Baldoni and Wayfarer on the one hand and Jones on the other.

69.    The scheme worked. When the article was published, at first, key players in the Film's release—including Josh Greenstein, the President of Sony Pictures' Motion Picture Group—believed (correctly) that Abel was the person responsible for the story:



From:            Josh Greenstein
To:               Jennifer Abel (owner)
Hi Jen - been informed you have been speaking to sites about bad blood between Blake and Justin. He was good on today show / if a negative story breaks it would hurt the movie.
Josh Greenstein
Priority: Normal

08/08/2024 16:00:56(UTC+0)

70.    But Abel denied being the source and instead falsely told Sony's communications team that Jones was the leak.

71.    This false allegation stuck. Rumors that Jones was behind the article began to make their way back to Wayfarer, causing Heath to respond with hostility:

---

[4]    Lillian Gissen, *It Ends With Us fans are convinced there's a huge feud between Blake Lively and Justin Baldoni - here's why*, DAILY MAIL, Aug. 8, 2024, https://www.dailymail.co.uk /femail/article-13723621/blake-lively-justin-baldoni-feud-drama.html.



72.    When Jones stated her intent to contact Sony to correct this misimpression, Heath

instructed her to stand down:



73. Heath went a step further and threatened Jones directly that he would issue a public press release stating that Baldoni and Wayfarer had terminated Jonesworks if she took any steps to contact Sony or others to clear her name, menacingly reminding her that she didn't need that kind of negative publicity for herself or her business.

74. On August 9, 2024, the *Daily Mail* published another article, this time reporting on Baldoni's abusive on-set behavior, citing "insiders" as the source for the article.[5] On information and belief, Abel and Nathan conspired to plant this story in further pursuit of their goal to cement Baldoni's and Wayfarer's needs for Nathan's services and turn them against Jones.

75. Heath and Abel bragged about the success of this strategy, jokingly referring to "the Leak" as being "the best decision" of a press trip that Abel and Nathan were accompanying Heath and Wayfarer on, and which Jones did not attend:

> From:          Jamey Heath
> To:            Jennifer Abel (owner)
> Best decision of this whole trip.  20 rows separated from "the Leak"
> Priority: Normal
>                                              10/08/2024 01:27:29(UTC+0)

76. In parallel with their efforts in the *Daily Mail*, on information and belief, Abel and Nathan contrived to have *Business Insider* publish a hostile article about Jones which was intended to encourage Wayfarer and Baldoni (and other Jonesworks clients) to want to end their relationship with Jonesworks and to weaken Jonesworks' business.

77. Indeed, as early as July 29, 2024, Abel and Nathan were coordinating their outreach to Katie Warren, the *Business Insider* reporter who eventually published the article attacking Jones.

---

[5]    James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.



78.     On information and belief, in the subsequent two weeks, Abel and Nathan fed

information to Warren to ensure that she moved forward with the article and that it was sufficiently

critical of Jones.  The contact between Abel and Warren included, at a minimum, a 27-minute

phone call on July 30, and several phone calls on August 1 and August 12.

79.     Abel also facilitated Warren's outreach to former clients of Jones to further disrupt

Jonesworks' business:



30

Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 34 of 61

80.     This client, with whom Jones had worked closely for years bringing her from obscurity to prominence, terminated her contract with Jones as a direct result of Abel's encouragement and deliberate interference.

81.     In addition, on August 9, 2024, Abel suggested and asked for Heath's approval to try to get *Business Insider* to remove reference to a letter of support for Jones that Baldoni had previously written, and to falsely tell Warren that Baldoni and Wayfarer had terminated their relationship with Jonesworks (when they had not):



82.     On August 12, 2024, just three days before the article was published, *Business Insider's* Warren asked Abel to call her back:

Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 35 of 61



83.    Abel called Warren eleven minutes later.

84.    The day before the article was published, Nathan texted Abel boasting about the destructive effect it would have on Jones and mockingly suggested that Abel should tell Jones:



85.    Immediately before the article was published, Nathan texted Abel that she "just got a text from my source to say that article is going live imminently." When Abel asked which article Nathan was referencing, Nathan responded, "I just shook my head at your response. The only article." Abel responded: "OH SHIT" "THAT ARTICLE."

86.    Warren then texted Abel the minute the article was published to alert her that it had gone live:



Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 36 of 61



From: Katie Warren
To: Jennifer Abel (owner)
https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos
Priority: Normal

15/08/2024 16:22:36(UTC+0)

87.     Immediately after the article was published, Abel texted Nathan a link to it. Abel also sent the article directly to numerous industry contacts including many of Jones's clients and employees, and several of Abel's industry friends and other industry publicists.

88.     The article, published by *Business Insider* on August 15, 2024, was highly critical of Jones, including by referencing and amplifying the anonymous disparaging website "stephaniejonesleaks.com" which had been recently posted online by the John Doe Defendants, and accusing Jones of having a reputation for aggression and having recently been dropped by high-profile clients.[6] Given that Wayfarer and Baldoni were long-time clients of Jonesworks, the clear (and false) implication of the article was that Jones was responsible for the aggressive media tactics that were being employed by Baldoni against Lively.

89.     Unsurprisingly, the negative article about Jones shared a strikingly similar tone with the negative coverage against Lively appearing in the press at the same time. In the same vein as the gendered "mean girl" coverage about Lively that followed the "weaponizing feminism" script set out in the strategy memo, the Jones article was premised on the same principles, manifesting an equally sexist critique of Jones, who was cast as a "tyrannical boss" who could "quickly turn combative," rather than a successful executive in a high-profile and high-pressure role.

---

[6]    *See* Katie Warren and Jack Newsham, *Who's Afraid of Stephanie Jones?*, BUSINESS INSIDER, Aug. 15, 2024.

33

90.     This article had serious negative repercussions on Jones' business and negatively impacted Jones' standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel.

91.     Just days later, on August 25, 2024, *Business Insider* turned the media storm surrounding Baldoni and Jones more pointedly to Nathan's advantage, publishing a second article that favorably touted Baldoni's hiring of Nathan to shepherd him through this crisis.  The article, which on information and belief was again orchestrated by Nathan, noted that the negative attention on Lively was a "gift" to Baldoni.[7]

92.     In parallel with these articles, John Does 1-10, who, on information and belief, were acting in concert with Abel and Nathan, published two false and defamatory websites about Jones and Jonesworks (the "Websites").  First, in the summer of 2024, the Doe Defendants created and posted the webpage www.stephaniejonesleaks.com, which was hosted by Hostinger International Ltd.  Then, after that website was taken down, in or around September 2024, the Doe Defendants created and posted the webpage www.stephaniejoneslies.com, which is hosted by NameCheap, Inc., and still remains publicly available.  Both Websites were viewed, and continue to be viewed, by numerous third parties, including residents of New York County.

93.     Both Websites contain or contained substantially identical false, harassing and defamatory statements about Jones and Jonesworks, including but not limited to statements that:

---

[7]     Eve Crosbie, *The Blake Lively backlash has been 'a gift' for Justin Baldoni after he was forced to hire a PR-crisis manager amid rumored 'It Ends With Us' feud, PR expert says*, BUSINESS INSIDER, Aug. 25, 2024, https://www.businessinsider.com/blake-lively-justin-baldoni-it-ends-with-us-crisis-pr-2024-8.

34

INDEX NO. 659849/2024
RECEIVED NYSCEF: 12/26/2024
Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 38 of 61

a.    Jones bullied Jonesworks employees.

b.    Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c.    Jones and Jonesworks leaked confidential client information.

d.    Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e.    Jones and Jonesworks interfere with their clients' ability to do business.

94.    Each of these statements is false.  On information and belief, the Doe Defendants published the defamatory statements on the Websites with knowledge of their falsity or, at a minimum, with reckless disregard for the truth with the specific intent to harm Jones and Jonesworks in their business by causing them to incur reputational harm and lose clients.

95.    All the while, Abel had been making arrangements to leave Jonesworks with confidential information and clients in tow.  On July 19, 2024, while still employed by Jonesworks, Abel filed paperwork to create RWA Communications LLC, the competing public relations agency she intended to start upon her departure from Jonesworks.  Abel had also created a website and social media accounts for her new competing firm, all while still employed by and under contract with Jonesworks.

96.    At least as early as July 22, 2024, Abel had created a new email account, jennifer@rwacommunications.com, to which she forwarded dozens of proprietary messages from Jonesworks, including client information, Jonesworks's work product, and information specifically regarding Jonesworks's work for Wayfarer and Baldoni.  Abel successfully hid her theft of confidential documents and information.  Abel surreptitiously continued stealing

Case 1:25-cv-00779-LJL   Document 1-1   Filed 01/27/25   Page 39 of 61

documents and client information while also secretly contacting Jonesworks's clients to pave the way for her departure.

97.     As her planned departure neared, Abel boasted to Nathan about the damage she was doing to Jonesworks, her then-current employer, and Nathan goaded her on:



98.     Indeed, when Jonesworks' information technology personnel disabled Abel's access to Jonesworks' servers after discovering her unauthorized downloading activity, Abel boasted that she was still able to steal all of the documents and information she needed to form her own competing firm:

36



99.    Abel further coordinated with Nathan and Baldoni to ensure that Wayfarer and

Baldoni would leave Jonesworks and come with her as clients for her newly created RWA

Communications:

From:            Melissa  Nathan
To:              Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and
she needs to also not do anything and my last conversation with her was last Wednesday
or so

And then I couldn't help myself

Priority: Normal

19/08/2024 04:49:55(UTC+0)

From:            Melissa  Nathan
To:              Jennifer Abel (owner)

I ended it with

Priority: Normal

19/08/2024 04:50:00(UTC+0)

From:            Melissa  Nathan
To:              Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so
loyal she loves you so much and you have to go with her and he was like oh my God of
course course I'm going with her.

Don't kill me, okay bye

Priority: Normal

19/08/2024 04:50:28(UTC+0)



100.    On or about August 21, 2024, Jones learned about Abel's ongoing efforts to steal dozens and dozens of Jonesworks proprietary documents, including sensitive client and business information that Abel had no legitimate reason to access, including for major brand and clients that Abel had never worked on. Abel went so far as to download and copy the Jonesworks client contract form, except that she replaced the Jonesworks logo with the logo for her own newly-formed business. Jonesworks immediately terminated Abel.

101.    As part of her termination paperwork, Abel falsely signed a statement purporting to confirm that she had not removed any electronic confidential information from Jonesworks. But, of course, she had, and this signed statement was untrue.

102.    The damage was done. With the encouragement and assistance of Nathan, Baldoni, and Heath, Abel stole Wayfarer and Baldoni as clients, targeted other Jonesworks clients to leave, and launched the long-planned and competing RWA Communications. As a result, Wayfarer and Baldoni ceased working with Jonesworks and, despite being under contract with Jonesworks, refused to pay Jonesworks what they contractually owed for its services. Even on the day she

38

departed Jonesworks, Abel proudly admitted to Nathan that she was shaking Jones down to extract as much as she could from the company before her departure.

> From: [redacted] Jennifer Abel (owner)
> To: [redacted] Melissa Nathan
> Btw I'm having my off boarding this morning with our chief of staff (a joke) because Steph won't face me. And you should see the list I made of things to bring up
> Priority: Normal
> 21/08/2024 15:26:17(UTC+0)

[…]

> From: [redacted] Melissa Nathan
> To: [redacted] Jennifer Abel (owner)
> I need the list
> Priority: Normal
> 21/08/2024 15:26:30(UTC+0)

> From: [redacted] Jennifer Abel (owner)
> To: [redacted] Melissa Nathan
> Holding them hostage
> Priority: Normal
> 21/08/2024 15:26:32(UTC+0)

> From: [redacted] Jennifer Abel (owner)
> To: [redacted] Melissa Nathan
> It's WILD
> Priority: Normal
> 21/08/2024 15:27:04(UTC+0)

> From: [redacted] Melissa Nathan
> To: [redacted] Jennifer Abel (owner)
> Exactly . How business should be done
> Priority: Normal
> 21/08/2024 15:27:05(UTC+0)

103.    Nor was Abel content only to steal documents, clients, and confidential information from Jonesworks.  On August 14, 2024, Abel also attempted to encourage Nathan to poach a valuable Jonesworks' employee:



[...]

104.    Abel also encouraged at least six other Jonesworks employees working for her in the Los Angeles office—almost half of Jonesworks's employees at that office—to leave the company, including by bad-mouthing Jones to those employees and sending the employees'

40

resumes to competing public relations firms.  As a direct result of these actions, two of these employees ended their contracts with Jonesworks and left to work for competitors.

105.    On    information    and    belief,    since being terminated from Jonesworks, Abel  has  continued  attacking  Jones  within  the  industry,  using  her  tried-and-true  playbook  to preemptively discredit any sources that might shed light on her own misdeeds.  Abel has falsely stated to other participants in the public relations industry that Jones was attempting to distribute doctored text messages purporting to be from Abel as retaliation for Abel's departure.  She has also tried again to point the finger at Jones as cover for her own role in the campaign against Lively becoming public.  But Jones has never doctored any text messages, and has no reason to do so.  Abel's text messages were forensically extracted directly from the company phone that Abel used during her employment at Jonesworks and voluntarily returned to Jonesworks upon her termination in the presence of an employment lawyer, Jonesworks's Chief of Staff and an IT specialist, and have been preserved in their original state.  And as has become glaringly apparent, the text messages are themselves enough to condemn Abel and Nathan without any need for doctoring.

106.    The misconduct by Abel, Nathan, Baldoni, and Wayfarer has had a significant negative effect on Jones's and Jonesworks's business and reputation.  And Jones's good-faith efforts to resolve this out of court have been met with resistance, and the campaign of misinformation against her has not stopped.  As a result, Jones and Jonesworks have been left with no choice but to bring this lawsuit to seek redress for this misconduct and to remedy the damage done.

## FIRST CAUSE OF ACTION
## Breach of Contract – Abel Employment Agreement
## (Against Defendant Jennifer Abel)

107.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

108.    Jonesworks and Abel are parties to the Abel Employment Agreement, which is a valid and enforceable contract.

109.    Under the Abel Employment Agreement, Abel agreed, among other things, that: (1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential and proprietary information, and that all business and plans made known to her while employed by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any Company proprietary information to solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts; (3) during her employment and for six months following the date of any termination, she would not compete with Jonesworks, or engage in or participate in any business that is in direct competition in any manner whatsoever with Jonesworks; and (4) during the employment term, Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

110.    Abel breached the Abel Employment Agreement through her actions as described in this complaint, including by, among other things: (1) failing to hold in confidence confidential information for the sole benefit of Jonesworks, and by soliciting confidential information from at least one Jonesworks employee after her termination; (2) using confidential information to solicit, induce, or attempt to solicit or induce, business from Jonesworks clients and business contacts; (3) directly competing with Jonesworks in the six months following her departure from Jonesworks, including by starting a competing company and poaching and attempting to poach Jonesworks clients; (4) soliciting and inducing, and using confidential information to solicit or

42

induce, other Jonesworks employees to leave Jonesworks and/or become employed by her or other

competing firms; and (5) breaching her duty of loyalty to Jonesworks by working against the

interests of Jones and Jonesworks during her period of employment.

111.     Jones and Jonesworks have substantially performed the Abel Employment

Agreement or were excused from doing so because of the actions of Abel.

112.     Abel's breaches of the Abel Employment Agreement proximately and directly

caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Tortious Interference With Contract – Abel Employment Agreement
### (Against Defendants Melissa Nathan, Wayfarer and Justin Baldoni)

113.     Jones and Jonesworks incorporate each and every allegation set forth above as if

they were fully set forth herein.

114.     Jonesworks and Abel are parties to the Abel Employment Agreement, which is a

valid and enforceable contract.

115.     Under the Abel Employment Agreement, Abel agreed, among other things, that:

(1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential

and proprietary information, and that all business and plans made known to her while employed

by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any

Company proprietary information to solicit, induce, or attempt to solicit or induce, any business

from any of the Company's existing clients, employees, referral sources, or business contacts;

(3)  during her employment and for six months following the date of any termination, she would

not compete with Jonesworks, or engage in or participate in any business that is in direct

competition in any manner whatsoever with Jonesworks; and (4) during the employment term,

Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

116.    Nathan, Wayfarer, and Baldoni were aware that Abel was employed by Jonesworks and, on information and belief, were aware that Abel's employment was governed by a contract containing industry-standard terms such as those described above.

117.    Nathan, Baldoni, and Wayfarer induced, encouraged, and procured Abel's breach of the Abel Employment Agreement without justification, including by, among other things: (1) breaching her duty of loyalty to Jonesworks by working against the best interest of Jones and Jonesworks during her period of employment; and (2) encouraging and inducing Abel to violate the non-compete, non-solicitation, and confidentiality provisions of the Agreement.

118.    Nathan, Baldoni, and Wayfarer, in bad faith, intentionally procured, caused, and facilitated Abel's breaches of the Abel Employment Agreement.  But for the misconduct of Nathan, Baldoni, and Wayfarer, Abel would not have breached the Abel Employment Agreement.

119.    Jones and Jonesworks have substantially performed the Abel Employment Agreement or were excused from doing so because of the actions of Nathan, Wayfarer, and Baldoni.

120.    The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

121.    The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Breach of Contract – Wayfarer Agreement
### (Against Defendants Wayfarer Studios and Justin Baldoni)

122.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

123.    Jonesworks, Wayfarer, and Baldoni are parties to the Wayfarer Agreement, which is a valid and enforceable contract.    Jones is Jonesworks's designee under the Wayfarer Agreement.

124.    Under the Wayfarer Agreement, in exchange for services provided by Jonesworks, Wayfarer and Baldoni agreed to pay Jonesworks a sum of $25,000 per month.

125.    Additionally, Wayfarer and Baldoni agreed, among other things, that during the term of the contract, and for one year following its expiration or termination they would not solicit or attempt to solicit for employment any officer, employee or agent of Jonesworks, or to employ or attempt to employ, or otherwise induce or attempt to induce any employee of Jonesworks to terminate such employee's employment or engagement with Jonesworks, without prior written consent.

126.    In May 2024, the Wayfarer Agreement automatically renewed. At no time in the required 90 days before the automatic renewal did either party provide notice of termination.  Nor did Wayfarer or Baldoni provide notice of any material breach of the Wayfarer Agreement.  The agreement has therefore not validly terminated, and Wayfarer and Baldoni are obligated to pay Jonesworks $25,000 per month through May 6, 2025, and are similarly obligated to comply with the full terms of the Wayfarer Agreement through May 2025.

127.    On or about August 30, 2024, a representative of Wayfarer informed Jones that Wayfarer and Baldoni would no longer require Jonesworks' services, and thereafter refused to pay all amounts owed under the Wayfarer Agreement.

Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 49 of 61

128.    Wayfarer and Baldoni have breached the Wayfarer Agreement through their actions as described in this complaint, including by, among other things: (1) failing to pay the amounts contractually owed under the Agreement, (2) soliciting and inducing Abel to depart Jonesworks, and (3) employing Abel following her departure from Jonesworks.

129.    Jonesworks has substantially performed the Wayfarer Agreement or was excused from doing so because of the actions of Wayfarer and Baldoni.

130.    Wayfarer and Baldoni's breaches of the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Tortious Interference With Contract – Wayfarer Agreement**
**(Against Defendants Jennifer Abel and Melissa Nathan)**

131.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

132.    Jones, Jonesworks, Baldoni, and Wayfarer are parties to the Wayfarer Agreement, which is a valid and enforceable contract.  Among other things, the Wayfarer Agreement requires Wayfarer and Baldoni to pay Jonesworks $25,000 per month, including from May 2024 through May 2025.

133.    Additionally, Wayfarer and Baldoni agreed that during the term of the contract, and for one year following its expiration or termination, they would not solicit or attempt to solicit for employment any Jonesworks employee.

134.    Abel and Nathan were aware of the Wayfarer Agreement, and each induced, encouraged, and procured Wayfarer's and Baldoni's breach of the Wayfarer Agreement without justification, including by encouraging Wayfarer and Baldoni to cease paying Jonesworks and, instead, hire Abel and Nathan, and by encouraging Wayfarer and Baldoni to violate the non-solicitation provision of the Agreement.

46

Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 50 of 61

135.    Abel and Nathan, in bad faith, intentionally procured and facilitated Wayfarer's and Baldoni's breaches of the Wayfarer Agreement.  But for the misconduct of Abel and Nathan, Wayfarer and Baldoni would not have breached the Wayfarer Agreement.

136.    Abel's and Nathan's intentional interference with the Wayfarer Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

137.    Abel's and Nathan's intentional interference with the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Faithless Servant
### (Against Defendant Jennifer Abel)

138.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

139.    Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks a duty of loyalty.

140.    Abel breached her duty of loyalty to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting, inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

141.    This conduct was intended to, and did in fact, advance Abel's own interests to the detriment of Jones and Jonesworks.

142.    The foregoing breaches were willful, wanton, and in bad faith.

143.    Abel's faithless service proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Defendant Jennifer Abel)

144.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

145.    Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of [Jonesworks]." Abel Employment Agreement ¶ 9.2.

146.    Abel breached her fiduciary duties to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting, inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

147.    Abel's breaches of her fiduciary duties proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION
### Defamation
### (Against Defendant Jennifer Abel)

148.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

149.    Between September and December 2024, Abel made statements to certain third parties, including participants in the public relations industry in which she and Jones work,

asserting, among other things, that Jones had doctored and falsified text messages purporting to be from Abel and was attempting to distribute them to third parties in order to harm Abel and paint Abel in a false light.

150.   These statements are false and untrue.

151.   These statements are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

152.   Abel made these statements with knowledge that they were false, with reckless disregard for their truth of falsity, or, at a minimum, negligently.

153.   Abel's statements enjoyed no privilege or authorization.

154.   Abel's false and defamatory statements caused harm to Jones and Jonesworks' reputation in the public relations industry and among potential clients.

155.   The defamatory statements made by Abel proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

<u>**EIGHTH CAUSE OF ACTION**</u>
<u>**Defamation**</u>
<u>**(Against Defendants John Doe 1-10)**</u>

156.   Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

157.   John Does 1-10 published the Websites.

158.   The Websites were viewed by numerous third parties, including, on information and belief, residents of New York County.

159.   The Websites included numerous statements regarding Jones and Jonesworks, including the following:

a.   Jones bullied Jonesworks employees.

49

b.      Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c.      Jones and Jonesworks leaked confidential client information.

d.      Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e.      Jones and Jonesworks interfere with their clients' ability to do business.

160.    These false statements included:

a.      Accusing Jones of "years of non-stop verbal and emotional abuse" and "horrific treatment in the workplace;"

b.      Jones "doesn't understand how to truly do PR outside of leaking her own clients' secrets;"

c.      Jones "does not fight for her clients but, she does fight with them. Crying, screaming, keeping them hostage;"

d.      "Stephanie Jones takes clients hostage;"

e.      "Not only does she break confidentiality, she willingly does regardless of the possible damage this kind of behavior might cause;"

f.      Implying that Jones was "hacking" the defamatory websites.

161.    These statements are false.

162.    The false statements published on the Websites are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

163.    John Does 1-10 made these statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at a minimum, negligently.

Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 54 of 61

164.    The false statements published on the Websites enjoyed no privilege or authorization.

165.    The false statements published on the Websites caused harm to the reputations of Jones and Jonesworks in the public relations industry and among potential clients.

166.    The defamatory statements published on the Websites proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

## PRAYER FOR RELIEF

### WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:

167.    Entry of judgment in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including:

a.    In respect of each of the First Cause of Action, Second Cause of Action, Third Cause of Action, Fourth Cause of Action, Fifth Cause of Action, Sixth Cause of Action, Seventh Cause of Action, and Eighth Cause of Action, entry of judgment in favor of Plaintiffs awarding damages in an amount to be proven at trial;

b.    Reasonable attorneys' fees and costs for this action as allowed by law and the parties' contracts;

c.    Punitive damages;

d.    Pre-judgment and post-judgment interest; and

e.    Such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

168.    Jones and Jonesworks request a jury trial on all issues so triable.

DATED: December 24, 2024

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:

_____

Kristin Tahler
Maaren A. Shah
295 5th Avenue
New York, New York  10017
(212) 849-7000

*Attorneys for Plaintiffs Stephanie*

*Jones and Jonesworks, LLC*

52

UCS-840
(rev. 02/01/2024)

# REQUEST FOR JUDICIAL INTERVENTION
## Supreme Court, County of New York

Index No: _____    Date Index Issued: **12/24/2024**

| For Court Use Only: |
| --- |
| IAS Entry Date |
| Judge Assigned |
| RJI Filed Date |

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

Stephanie Jones, Jonesworks LLC

Plaintiff(s)/Petitioner(s)

-against-

Jennifer Abel, Melissa Nathan, Justin Baldoni, and Wayfarer Studios LLC

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING**    Check only one box and specify where indicated.

**COMMERCIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ● Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (*specify*): _____
  NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.

**TORTS**
- ○ Asbestos
- ○ Environmental (*specify*): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (*specify*): _____
- ○ Other Negligence (*specify*): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ○ Child-Parent Security Act (*specify*): ○Assisted Reproduction ○Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration  [see **NOTE** in **COMMERCIAL** section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (*specify*): ○Initial ○Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (*specify*): _____
- ○ Other Special Proceeding (*specify*): _____

**MATRIMONIAL**
- ○ Contested
  NOTE: If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI ADDENDUM (UCS-840M)**.
  For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**).

**REAL PROPERTY**    Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (*specify*): ○Residential ○Commercial
  Property Address: _____
  NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.
- ○ Partition
  NOTE: Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.
- ○ Tax Certiorari (*specify*):    Section:_____ Block:_____ Lot:_____
- ○ Tax Foreclosure
- ○ Other Real Property (*specify*): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution  [see **NOTE** in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (*specify*): _____

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

|  | YES | NO |  |
| --- | --- | --- | --- |
| Has a summons and complaint or summons with notice been filed? | ● | ○ | If yes, date filed: **12/24/2024** |
| Has a summons and complaint or summons with notice been served? | ○ | ● | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ● | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion    Relief Requested: _____    Return Date: _____
- ○ Notice of Petition    Relief Requested: _____    Return Date: _____
- ○ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ○ Other Ex Parte Application    Relief Requested: _____
- ○ Partition Settlement Conference
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ● Other (specify): Request for Assignment to the Commercial Division

1 of 2

**RELATED CASES**   List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES**   For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Stephanie Jones<br>Role(s): Plaintiff | Kristen Tahler; Maaren Shah; Quinn Emanuel Urquhart & Sullivan; 295 5th Avenue, New York, New York 10017; kristentahler@quinnemanuel.com; maarenshah@quinnemanuel.com | ○ YES  ○ NO | |
| ☐ | Name: Jonesworks LLC<br>Role(s): Plaintiff | Kristen Tahler; Maaren Shah; Quinn Emanuel Urquhart & Sullivan; 295 5th Avenue, New York, New York 10017; kristentahler@quinnemanuel.com; maarenshah@quinnemanuel.com | ○ YES  ○ NO | |
| ☒ | Name: Jennifer Abel<br>Role(s): Defendant | 119 N. Swall Dr., Beverly Hills, CA 90211, jennifer.n.abel@gmail.com | ○ YES  ○ NO | |
| ☒ | Name: Melissa Nathan<br>Role(s): Defendant | 2039 Paramount Drive, Los Angeles, CA 90068, 718-406-1098, melissa@tagpr.com | ○ YES  ○ NO | |
| ☐ | Name: Justin Baldoni<br>Role(s): Defendant | Schuyler M. Moore; Greenberg Glusker; 2049 Century Park E #2600, Los Angeles, CA 90067; (310) 201-7559; smoore@ggfirm.com | ○ YES  ○ NO | |
| ☐ | Name: Wayfarer Studios LLC<br>Role(s): Defendant | Schuyler M. Moore; Greenberg Glusker; 2049 Century Park E #2600, Los Angeles, CA 90067; (310) 201-7559; smoore@ggfirm.com | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES  ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: ___12/24/2024___

_____ Signature

#4147039

Kristin Tahler

Attorney Registration Number          Print Name



**New York State Unified Court System**    [nycourts.gov](https://nycourts.gov)

## Request for Judicial Intervention
## Commercial Division Addendum

**UCS-840C** (04/2024)
Page **1** of **2**
[nycourthelp.gov](https://nycourthelp.gov)

**Supreme Court**
**County of** NEW YORK

**Plaintiff/Petitioner** (persons/entities that started the case):

Stephanie Jones, Jonesworks LLC

**Index #:**

_____

**Defendant/Respondent** (persons/entities the case is against):

Jennifer Abel, Melissa Nathan, Justin Baldoni, and Wayfarer Studios LLC

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; technology transactions and/or commercial disputes involving or arising out of technology; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code, excluding those concerning individual cooperative or condominium units

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions (without consideration of the monetary threshold)

☐ Commercial class actions (without consideration of the monetary threshold)

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g., directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures (without consideration of the monetary threshold)

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues (where the applicable agreement provides for the arbitration to be heard outside the United States, the monetary threshold set forth in 22 NYCRR 202.70(a) shall not apply)

**ADA Accommodations**    **Spoken or Sign Language Interpreters**    COURT Help    **1-800-COURT-NY**
[ada@nycourts.gov](mailto:ada@nycourts.gov)    [interpreter@nycourts.gov](mailto:interpreter@nycourts.gov)    **(268-7869)**

1 of 2

Case 1:25-cv-00779-LJL    Document 1-1    Filed 01/27/25    Page 59 of 61

**UCS-840C** (12/2023)          Page **2** of **2**          **Index #:** _____

Plaintiff/Petitioner's claim for compensatory damages, excluding punitive damages, interest, costs, and counsel fees claimed: $ **5,000,000.00** _____

Plaintiff/Petitioner's claim for equitable or declaratory relief [brief description]:

N/A

Defendant/Respondent's counterclaims, including claims for monetary relief [brief description]:

N/A

I request that this case is assigned to the Commercial Division. I certify that the case meets the Commercial Division's jurisdictional requirements as set forth in 22 NYCRR 202.70(a), (b) and (c).

Dated: _____**12/24/2024**_____

_____
Signature

**Kristin Tahler**
_____
Print Name

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------- x

STEPHANIE JONES and JONESWORKS LLC,    :

                         : Index No. 659849/2024

           Plaintiffs,      :

                        : **ADMISSION**

    -against-          : **OF SERVICE**

                        :

JENNIFER ABEL, MELISSA NATHAN, JUSTIN   :
BALDONI, WAYFARER STUDIOS LLC and JOHN  :
DOES 1 - 10,             :

                        :

          Defendants.      :

--------------------------------------------------------------------- x

       Kevin Fritz, Esq., an attorney duly licensed and admitted to practice law within the State

of New York, affirms the following to be true under the penalties of perjury:

       1.      I am a partner of the law firm of Meister Seelig & Fein PLLC, attorneys for the

defendants in the above-captioned action.

       2.      Pursuant to CPLR 306(e), I admit that on January 24, 2025, I accepted service of

the Summons and Complaint filed herein, as set forth in the email attached hereto.


Date:  New York, New York         **MEISTER SEELIG & FEIN PLLC**
       January 25, 2025


                                __/s/ Kevin Fritz_____
                                Mitchell Schuster, Esq.
                                Kevin Fritz, Esq.
                                125 Park Avenue, 7th Floor
                                New York, NY 10017
                                (212) 655-3500
                                ms@msf-law.com
                                kaf@msf-law.com

1

| | |
|---|---|
| **From:** | Kevin A. Fritz |
| **To:** | kristintahler@quinnemanuel.com |
| **Subject:** | RE: 659849/2024 Stephanie Jones et al v. Jennifer Abel et al |
| **Date:** | Friday, January 24, 2025 3:33:00 PM |
| **Attachments:** | image001.png |

Counselor:

My firm represents the defendants in this action. Effective today, I accept service of the Summons and Complaint herein, which I will download from NYSCEF.



**Kevin A. Fritz**
Partner

125 Park Avenue │ 7th Floor │ New York, NY │ 10017
Direct (212) 655-3570 │ Firm (212) 655-3500 │ Fax (646) 564-4819 │ kaf@msf-law.com
New York    │    New Jersey    │    Connecticut    │    California │ Website

IMPORTANT NOTICES: NOTICE UNDER E-SIGN ACT: Unless specifically set forth herein, the transmission of this communication is not intended to be a legally binding electronic signature, and no offer, commitment or assent on behalf of the sender or its client is expressed or implied by the sending of this facsimile, or any attachments hereto.
NOTICE OF ATTORNEY'S CONFIDENTIALITY: The material submitted herewith contains, and is intended to be a confidential transmission of information or documents from MEISTER SEELIG & FEIN PLLC which is legally privileged. The materials or information enclosed are intended only for the use of the individual or entity named in this transmission sheet. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this telecopy transmission in error, please notify us by telephone immediately, so that we can arrange for the return of the original documents to us at our cost.
IRS CIRCULAR 230 DISCLOSURE: As required by U.S. Treasury Regulations governing tax practice, you are hereby advised that any written tax advice contained herein was not written or intended to be used (and cannot be used) by any taxpayer for the purpose of avoiding penalties that may be imposed under the U.S. Internal Revenue Code.