**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE JONES, JONESWORKS LLC, <br><br>                        Plaintiffs, <br><br> v. <br><br> JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10, <br><br>                        Defendants. | Civ. Action No. 1:25-cv-00779-LJL <br> rel. 1:24-cv-10049-LJL <br> (Consolidated for pretrial purposes with <br> 1:25-cv-00449-LJL) <br><br> **DEFENDANT JENNIFER ABEL'S** <br> **ANSWER TO COMPLAINT,** <br> **COUNTERCLAIMS,** <br> <u>**AND JURY TRIAL DEMAND**</u> |

Defendant Jennifer Abel ("Abel" or "Defendant"), by and through her undersigned counsel, hereby answers, for herself alone and no others, the Complaint of Plaintiffs Stephanie Jones ("Jones") and Jonesworks LLC ("Jonesworks") (together with Jones, "Plaintiffs") as follows:

## THE COMPLAINT'S ALLEGATIONS

1.      Answering the allegations in paragraph 1 of the Complaint, Defendant denies such allegations.

2.      Answering the allegations in paragraph 2 of the Complaint, Defendant admits that Jones is engaged in the field of public relations; and that Jonesworks has represented Justin Baldoni ("Baldoni") and Wayfarer Studios LLC ("Wayfarer"). As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

3.      Answering the allegations in paragraph 3 of the Complaint, Defendant admits that Baldoni produced, directed, and co-starred in the film *It Ends With Us*; that Defendant oversaw the Baldoni and Wayfarer accounts while employed at Jonesworks; and that Defendant

recommended the engagement of Melissa Nathan ("Nathan") for crisis public relations. As to all remaining allegations, Defendant denies such allegations.

4.     Answering the allegations in paragraph 4 of the Complaint, Defendant admits the allegation that she received Nathan's communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

5.     Answering the allegations in paragraph 5 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

6.     Answering the allegations in paragraph 6 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

7.     Answering the allegations in paragraph 7 of the Complaint, Defendant admits that she and Nathan were working to protect Baldoni from negative press attention; and that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

8.     Answering the allegations in paragraph 8 of the Complaint, Defendant admits the allegation that she spoke with Katie Warren ("Warren") between July 30, 2024, and August 12, 2024; and that she sent communications containing the text set forth in that paragraph. Defendant

denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

9.      Answering the allegations in paragraph 9 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

10.      Answering the allegations in paragraph 10 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

11.      Answering the allegations in paragraph 11 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

12.      Answering the allegations in paragraph 12 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

13.      Answering the allegations in paragraph 13 of the Complaint, Defendant denies such allegations.

14.      Answering the allegations in paragraph 14 of the Complaint, Defendant denies such allegations.

15.    Answering the allegations in paragraph 15 of the Complaint, Defendant states that no response is required because the allegations assert a legal conclusion, to the extent Plaintiffs allege that Defendant has defamed Jones. As to all remaining allegations, Defendant denies such allegations.

16.    Answering the allegations in paragraph 16 of the Complaint, Defendant denies such allegations.

17.    Answering the allegations in paragraph 17 of the Complaint, Defendant admits the allegation that Jonesworks is a Delaware limited liability company; and that it was founded in and has its principal place of business in New York, New York. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

18.    Answering the allegations in paragraph 18 of the Complaint, Defendant admits such allegations.

19.    Answering the allegations in paragraph 19 of the Complaint, Defendant admits the allegation that she resides in Beverly Hills, California; and that she was employed by Jonesworks from approximately July 2020 to August 2024. To the extent Plaintiffs allege that Abel was terminated for cause by Jonesworks, no response is required because the allegation asserts a legal conclusion. As to all remaining allegations, Defendant denies such allegations.

20.    Answering the allegations in paragraph 20 of the Complaint, Defendant admits the allegation that Nathan offers crisis management and communications services. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

21.     Answering the allegations in paragraph 21 of the Complaint, Defendant admits the allegation that Baldoni is a professional actor and director, and is a co-founder and co-chairman of Wayfarer; and that Baldoni was the director and co-star of the film *It Ends With Us*. Defendant denies that Baldoni was a producer of the Film and, as to all remaining allegations, lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

22.     Answering the allegations in paragraph 22 of the Complaint, Defendant admits such allegations.

23.     Answering the allegations in paragraph 23 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations except to the extent they merely state a legal conclusion and require no response.

24.     Answering the allegations in paragraph 24 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

25.     Answering the allegations in paragraph 25 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

26.     Answering the allegations in paragraph 26 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

27.     Answering the allegations in paragraph 27 of the Complaint, Defendant admits the allegation that Jones is engaged in the field of public relations and that Jones is the founder, president, and owner of Jonesworks. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

28.     Answering the allegations in paragraph 28 of the Complaint, Defendant admits such allegations.

29.     Answering the allegations in paragraph 29 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Abel NDA and its contents are characterized accurately in the Complaint.

30.     Answering the allegations in paragraph 30 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Employment Agreement and its contents are characterized accurately in the Complaint.

31.     Answering the allegations in paragraph 31 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Employment Agreement and its contents are characterized accurately in the Complaint.

32.     Answering the allegations in paragraph 32 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

33.     Answering the allegations in paragraph 33 of the Complaint, Defendant admits such allegations.

34.     Answering the allegations in paragraph 34 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

35.     Answering the allegations in paragraph 35 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

36.     Answering the allegations in paragraph 36 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

37.     Answering the allegations in paragraph 37 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

38.     Answering the allegations in paragraph 38 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

39.     Answering the allegations in paragraph 39 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations

in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

40.      Answering the allegations in paragraph 40 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

41.      Answering the allegations in paragraph 41 of the Complaint, Defendant admits that she worked on the Baldoni and Wayfarer accounts while employed at Jonesworks; and that she worked closely with Jamey Heath ("Heath"), who currently serves as Wayfarer's CEO. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

42.      Answering the allegations in paragraph 42 of the Complaint, Defendant admits such allegations.

43.      Answering the allegations in paragraph 43 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

44.      Answering the allegations in paragraph 44 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

45.      Answering the allegations in paragraph 45 of the Complaint, Defendant admits such allegations.

46.      Answering the allegations in paragraph 46 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations.

47.      Answering the allegations in paragraph 47 of the Complaint, Defendant admits that Baldoni began production on the film adaptation of *It Ends With Us* in 2023 (the "Film"); and that Baldoni was the director and male lead of the film. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

48.     Answering the allegations in paragraph 48 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

49.     Answering the allegations in paragraph 49 of the Complaint, Defendant admits that the Film was released in August 2024; and that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

50.     Answering the allegations in paragraph 50 of the Complaint, Defendant denies such allegations.

51.     Answering the allegations in paragraph 51 of the Complaint, Defendant denies such allegations.

52.     Answering the allegations in paragraph 52 of the Complaint, Defendant admits the allegation that Baldoni was provided with the confidential scenario planning memorandum set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the document and its context are characterized accurately in the Complaint.

53.     Answering the allegations in paragraph 53 of the Complaint, Defendant denies such allegations, and specifically denies that the document and its context are characterized accurately in the Complaint.

54.     Answering the allegations in paragraph 54 of the Complaint, Defendant admits the allegation that she sent a communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

55.     Answering the allegations in paragraph 55 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph.

Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

56.    Answering the allegations in paragraph 56 of the Complaint, Defendant denies such allegations.

57.    Answering the allegations in paragraph 57 of the Complaint, Defendant admits that the Film was released in August 2024; and that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

58.    Answering the allegations in paragraph 58 of the Complaint, Defendant denies such allegations.

59.    Answering the allegations in paragraph 59 of the Complaint, Defendant admits the allegation that she received Tera Hanks's ("Hanks") communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

60.    Answering the allegations in paragraph 60 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

61.    Answering the allegations in paragraph 61 of the Complaint, Defendant denies such allegations.

62.    Answering the allegations in paragraph 62 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph.

Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

63.     Answering the allegations in paragraph 63 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

64.     Answering the allegations in paragraph 64 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

65.     Answering the allegations in paragraph 65 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

66.     Answering the allegations in paragraph 66 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

67.     Answering the allegations in paragraph 67 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

68.    Answering the allegations in paragraph 68 of the Complaint, Defendant admits that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

69.    Answering the allegations in paragraph 69 of the Complaint, Defendant admits the allegation that she received Josh Greenstein's ("Greenstein") communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

70.    Answering the allegations in paragraph 70 of the Complaint, Defendant admits that she denied being the source. Defendant denies all of the remaining allegations in this paragraph.

71.    Answering the allegations in paragraph 71 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph. as set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

72.    Answering the allegations in paragraph 72 of the Complaint, Defendant admits the allegation that she received Heath's and Jones's communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

73.    Answering the allegations in paragraph 73 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

74.     Answering the allegations in paragraph 74 of the Complaint, Defendant admits that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

75.     Answering the allegations in paragraph 75 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

76.     Answering the allegations in paragraph 76 of the Complaint, Defendant denies such allegations.

77.     Answering the allegations in paragraph 77 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

78.     Answering the allegations in paragraph 78 of the Complaint, Defendant admits the allegation that she spoke with Warren between July 30, 2024, and August 12, 2024. Defendant denies all of the remaining allegations in this paragraph.

79.     Answering the allegations in paragraph 79 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

80.     Answering the allegations in paragraph 80 of the Complaint, Defendant denies encouraging the client to terminate their contract with Jones or intentionally interfering with Jones'

relationship with the client. As to the remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

81.     Answering the allegations in paragraph 81 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

82.     Answering the allegations in paragraph 82 of the Complaint, Defendant admits the allegation that she received Warren's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

83.     Answering the allegations in paragraph 83 of the Complaint, Defendant admits such allegations.

84.     Answering the allegations in paragraph 84 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

85.     Answering the allegations in paragraph 85 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

86.     Answering the allegations in paragraph 86 of the Complaint, Defendant admits the allegation that she received Warren's communication containing the text set forth in that

paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

87.    Answering the allegations in paragraph 87 of the Complaint, Defendant admits that she texted a link to Nathan to *Business Insider* article referenced in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

88.    Answering the allegations in paragraph 88 of the Complaint, Defendant admits that *Business Insider* published the article cited in that paragraph. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

89.    Answering the allegations in paragraph 89 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

90.    Answering the allegations in paragraph 90 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

91.    Answering the allegations in paragraph 91 of the Complaint, Defendant admits that *Business Insider* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

92.    Answering the allegations in paragraph 92 of the Complaint, Defendant denies that she acted in concert with John Does 1-10. As to the remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

93.    Answering the allegations in paragraph 93 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

94.    Answering the allegations in paragraph 94 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

95.     Answering the allegations in paragraph 95 of the Complaint, Defendant admits that she filed articles of organization with the State of California, Office of the Secretary of State, on or about July 19, 2024. Defendant denies all of the remaining allegations in the paragraph.

96.     Answering the allegations in paragraph 96 of the Complaint, Defendant denies such allegations.

97.     Answering the allegations in paragraph 97 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

98.     Answering the allegations in paragraph 98 of the Complaint, Defendant admits that Jonesworks disabled her access to Jonesworks' servers; and that she and Alicia Jessop ("Jessop") sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

99.     Answering the allegations in paragraph 99 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

100.    Answering the allegations in paragraph 100 of the Complaint, Defendant admits that she was terminated by Jonesworks on or about August 21, 2024. Defendant denies all of the remaining allegations in the paragraph.

101.    Answering the allegations in paragraph 101 of the Complaint, Defendant denies such allegations.

102.    Answering the allegations in paragraph 102 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

103.    Answering the allegations in paragraph 103 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

104.    Answering the allegations in paragraph 104 of the Complaint, Defendant denies such allegations.

105.    Answering the allegations in paragraph 105 of the Complaint, Defendant denies such allegations.

106.    Answering the allegations in paragraph 106 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

107.    Answering the allegations in paragraph 107 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

108.    Answering the allegations in paragraph 108 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

109.    Answering the allegations in paragraph 109 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

110.    Answering the allegations in paragraph 110 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

111.    Answering the allegations in paragraph 111 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

112.    Answering the allegations in paragraph 112 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

113.    Answering the allegations in paragraph 113 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

114.    Answering the allegations in paragraph 114 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

115.    Answering the allegations in paragraph 115 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

116.    Answering the allegations in paragraph 116 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

117.    Answering the allegations in paragraph 117 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

118.    Answering the allegations in paragraph 118 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

119.    Answering the allegations in paragraph 119 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

120.    Answering the allegations in paragraph 120 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

121.    Answering the allegations in paragraph 121 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

122.    Answering the allegations in paragraph 122 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

123.    Answering the allegations in paragraph 123 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

124.    Answering the allegations in paragraph 124 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

125.    Answering the allegations in paragraph 125 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

126.    Answering the allegations in paragraph 126 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

127.    Answering the allegations in paragraph 127 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

128.    Answering the allegations in paragraph 128 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

129.    Answering the allegations in paragraph 129 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

130.    Answering the allegations in paragraph 130 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

131.    Answering the allegations in paragraph 131 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

132.    Answering the allegations in paragraph 132 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

133.    Answering the allegations in paragraph 133 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

134.    Answering the allegations in paragraph 134 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

135.    Answering the allegations in paragraph 135 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

136.    Answering the allegations in paragraph 136 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

137.    Answering the allegations in paragraph 137 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

138.    Answering the allegations in paragraph 138 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

139.    Answering the allegations in paragraph 139 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

140.    Answering the allegations in paragraph 140 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

141.    Answering the allegations in paragraph 141 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

142.    Answering the allegations in paragraph 142 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

143.    Answering the allegations in paragraph 143 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

144.    Answering the allegations in paragraph 144 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

145.    Answering the allegations in paragraph 145 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

146.    Answering the allegations in paragraph 146 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

147.    Answering the allegations in paragraph 147 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

148.    Answering the allegations in paragraph 148 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

149.    Answering the allegations in paragraph 149 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

150.    Answering the allegations in paragraph 150 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

151.    Answering the allegations in paragraph 151 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

152.    Answering the allegations in paragraph 152 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

153.    Answering the allegations in paragraph 153 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

154.    Answering the allegations in paragraph 154 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

155.    Answering the allegations in paragraph 155 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

156.    Answering the allegations in paragraph 156 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

157.    Answering the allegations in paragraph 157 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

158.    Answering the allegations in paragraph 158 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

159.    Answering the allegations in paragraph 159 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

160.    Answering the allegations in paragraph 160 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

161.    Answering the allegations in paragraph 161 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

162.    Answering the allegations in paragraph 162 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

163.    Answering the allegations in paragraph 163 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

164.    Answering the allegations in paragraph 164 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

165.     Answering the allegations in paragraph 165 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

166.     Answering the allegations in paragraph 166 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

167.     Answering paragraph 167 of the Complaint, the paragraph requires no response as it states relief sought and is not an allegation. To the extent the paragraph requires a response, Defendant denies.

168.     Answering paragraph 168 of the Complaint, the paragraph requires no response as it states relief sought and is not an allegation. To the extent the paragraph requires a response, Defendant denies.

## AFFIRMATIVE AND OTHER DEFENSES

By alleging the following affirmative and other defenses, Defendant is not in any way agreeing or conceding that she has the burden of proof or burden of persuasion on any of these issues. As separate and distinct defenses to Plaintiffs' Complaint, and each purported cause of action contained therein, Defendant alleges as follows:

## FIRST DEFENSE

169.     The Complaint, and each claim alleged therein, fails to state facts sufficient to constitute any claim for relief against Defendant.

## SECOND DEFENSE

170.     The Complaint, and each claim alleged therein, is barred as Plaintiffs lack standing to sue.

**THIRD DEFENSE**

171.    The Complaint, and each claim alleged therein, is barred as Plaintiffs have waived their claims.

**FOURTH DEFENSE**

172.    The Complaint, and each claim alleged therein, is barred as Plaintiffs are estopped from asserting their claims.

**FIFTH DEFENSE**

173.    The Complaint, and each claim alleged therein, is barred as Plaintiffs acted and continues to act with unclean hands.

**SIXTH DEFENSE**

174.    The Complaint, and each claim alleged therein, is barred as Plaintiffs have not been damaged in any way or at all as a result of any alleged acts or omissions of Defendant.

**SEVENTH DEFENSE**

175.    The Complaint, and each claim alleged therein, is barred in whole or in part by the First Amendment of the Constitution of the United States of America.

**EIGHTH DEFENSE**

176.    The Complaint, and each claim alleged therein, is barred by reason of Plaintiffs' consent.

**NINTH DEFENSE**

177.    The Complaint, and each claim alleged therein, is barred as Plaintiffs have failed to undertake reasonable measures to mitigate the damages they claim to have incurred. Any recovery by Plaintiffs must be diminished to the extent that any alleged damages could have been avoided if such measures had been undertaken.

**TENTH DEFENSE**

178.    Defendant is informed and believes, and on that basis alleges, that Plaintiffs would be unjustly enriched if recovery were to be had on this Complaint.

**ELEVENTH DEFENSE**

179.    Plaintiffs have not been damaged in any amount alleged, or in any amount whatsoever, and are not entitled to any general, compensatory, statutory, punitive, or other damages or any other relief as a result of any of the allegations set forth in the Complaint.

**TWELFTH DEFENSE**

180.    The acts and/or omissions of Plaintiffs excused any alleged act or alleged failure to act on the part of Defendant.

**THIRTEENTH DEFENSE**

181.    If Defendant had any alleged obligations or legal dues, which Defendant hereby expressly denies, Defendant has appropriately, completely, and fully performed and discharged any alleged obligations and any alleged legal duties arising out of the matters alleged in the Complaint.

**FOURTEENTH DEFENSE**

182.    The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the acts or omissions of individuals or entities other than Defendant. The acts and omissions of such other individuals or entities are superseding or intervening causes of loss or damages, if any, suffered by Plaintiffs. As a consequence thereof, Plaintiffs are barred from recovery against Defendant herein.

## FIFTEENTH DEFENSE

183.    The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the reckless, negligent, and wrongful conduct of individuals or entities other than Defendant. As a consequence thereof, Plaintiffs are barred from recovery herein.

## SIXTEENTH DEFENSE

184.    The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the intentional misconduct of individuals or entities other than Defendant. As a consequence thereof, Plaintiffs are barred from recovery herein.

## SEVENTEENTH DEFENSE

185.    The Complaint fails to state facts sufficient to permit an award of punitive damages, and any such award would violate due process.

## EIGHTEENTH DEFENSE

186.    The Complaint, and each and every cause of action alleged therein, fails to state any facts supporting any claim for punitive or exemplary damages.

## NINETEENTH DEFENSE

187.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part because at all material times, Defendant acted in good faith and without malice based upon all relevant facts and circumstances known by Defendant at the time.

## TWENTIETH DEFENSE

188.    Plaintiffs, and their agents, servants, and employees, have failed to bring the causes of action alleged in the Complaint in a timely manner and are therefore barred from recovery against Defendant, in whole or in part, by the equitable doctrine of laches.

## TWENTY-FIRST DEFENSE

189.    Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be solely based upon a derivative, vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of others, and as such the legal liability of Defendant would be proximately caused by the acts or omissions of others and therefore Defendant is entitled to recover contribution from them.

## TWENTY-SECOND DEFENSE

190.    Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be based solely upon a derivative, vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of others, and as such the legal liability of Defendant would be proximately caused by acts or omissions of others and therefore, Defendant is entitled to recover total and complete implied and/or comparable indemnity from them.

## TWENTY-THIRD DEFENSE

191.    Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be based solely upon a derivative vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of others, and as such the legal liability of Defendant would be proximately caused by acts or omissions of others and therefore, Defendant is entitled to recover total and complete equitable indemnity from them.

**TWENTY-FOURTH DEFENSE**

192.    Any injury or damage to Plaintiffs, which Defendant specifically denies, was proximately caused by the negligence, recklessness, or intentional conduct of others who acted as one or more of the Plaintiffs' legal counsel, agents, or representatives. Accordingly, if any liability is found on the part of Defendant, then Defendant's liability to Plaintiffs shall be reduced on the basis of comparative fault.

**TWENTY-FIFTH DEFENSE**

193.    Any injury or damage to Plaintiffs, which Defendant specifically denies, was proximately caused by the negligence of Plaintiffs.

**TWENTY-SIXTH DEFENSE**

194.    Plaintiffs' alleged damages are too speculative to permit recovery in this case.

**TWENTY-SEVENTH DEFENSE**

195.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by the doctrine of *in pari delicto*.

**TWENTY-EIGHTH DEFENSE**

196.    The Complaint, and each and every cause of action alleged against Defendant therein, fails to allege facts sufficient to allow recovery of attorneys' fees from Defendant.

**TWENTY-NINTH DEFENSE**

197.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Labor Code Section 925.

**THIRTIETH DEFENSE**

198.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Business & Professions Code Section 16600.

## THIRTY-FIRST DEFENSE

199.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Government Code Section 12964.5.

## RESERVATION OF ADDITIONAL DEFENSES

200.    Defendant presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated affirmative or other defenses available. Defendant reserves the right to assert additional defenses in the event that discovery indicates they would be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Jennifer Abel prays for relief as follows:

1.    That the Complaint be dismissed with prejudice, and Plaintiffs take nothing herein;

2.    That judgment be entered in favor of Defendant and against Plaintiffs;

3.    For costs of suit incurred in this action; and

4.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Defendant demands a jury trial on all causes of action so triable.

## COUNTERCLAIMS OF JENNIFER ABEL

Jennifer Abel ("Abel" or "Counterclaimant"), by and through undersigned counsel, as and for her counterclaims against Stephanie Jones (Jones") and Jonesworks LLC ("Jonesworks") (together, "Jonesworks"), alleges as follows based on knowledge as to her own conduct and activities and on information and belief as to all other matters except where otherwise alleged:

## PARTIES

1.      Defendant/Counterclaimant Jennifer Abel is, and at all times relevant was, an individual residing in Beverly Hills, California.

2.      Plaintiff/Counterclaim-Defendant Stephanie Jones is, and at all times relevant was, an individual residing in Greenwich, Connecticut.

3.      Plaintiff/Counterclaim-Defendant Jonesworks LLC is, and at all times relevant was, a Delaware limited liability company with its principal place of business in New York, New York. None of Jonesworks' members are citizens of California.

4.      There exists, and at all times herein mentioned there existed, a unity of interest between Jonesworks and Jones such that any individuality and separateness has ceased, and Jonesworks is the alter ego of Jones.

5.      At all relevant times herein, each of Jones and Jonesworks was the agent, servant, employee, employer, joint-venturer, partner, and/or alter ego of the other and was at all times operating and acting within the purpose and scope of said agency, service, employment, joint venture, partnership, and/or alter ego. Each of Jones and Jonesworks has rendered substantial assistance and encouragement to the other, acting in concert knowing that her/its conduct was wrongful and/or unlawful, and each of Jones and Jonesworks has ratified and approved the acts of the other.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over the claims for relief asserted in this counterclaim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no Counterclaim-Defendant is a citizen of the same state as Counterclaimant. This Court also has supplemental jurisdiction over the claims for relief asserted in this counterclaim pursuant to 28 U.S.C. § 1367(a) because such claims are so related to claims in the action that they form part of the same case or controversy under Article III of the U.S. Constitution.

7.      This Court may exercise personal jurisdiction over the Counterclaim-Defendants pursuant to Section 301 of the New York Civil Practice Law and Rules because all of them systemically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York.

8.      This Court may exercise personal jurisdiction over the Counterclaim-Defendants pursuant to CPLR 302 because all of them transact and solicit business within the State of New York and have committed the tortious acts described herein within the State of New York.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Counterclaim-Defendants are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

### A.      Abel Joins Jonesworks

10.     Jonesworks is a well-known New York-based public relations firm founded by Stephanie Jones, who serves as its CEO.

11.     Long known within the public relations industry for her disarming Southern twang,

brass-knuckle tactics, and high turnover of clients and employees, Stephanie Jones has had a successful career in the entertainment industry. Her firm, Jonesworks, has represented, at various times, Dwayne "The Rock" Johnson, Jeff Bezos, Lauren Sanchez, Venus Williams, Tom Brady, and Chris Hemsworth.

12.    Jones is married to Jason Hodes ("Hodes"), a partner at William Morris Endeavor ("WME"), Hollywood's most powerful talent agency. Between her perch atop Jonesworks and his partnership at WME, Jones and Hodes are a bona fide Hollywood power couple.

13.    When Jones poached Jennifer Abel, Abel was an up-and-coming star publicist at R&CPMK, a storied 70-year-old public relations arm of Interpublic Group, a 53,000-employee publicly-traded multinational marketing behemoth. At the time of her departure from R&CPMK, Abel had worked there for nearly 12 years and held the title of Vice President.

14.    In or around late spring 2020, at the height of the COVID-19 pandemic, Jones, through a recruiter, reached out to Abel via LinkedIn about joining Jonesworks. Although Abel was content at R&CPMK and not actively looking for a new job, Jones offered her a higher salary and, critically, the opportunity to lead her own team.

15.    When Abel announced her intention to join Jonesworks, she was met with a parade of concern from across her professional network. An array of well-respected public relations professionals from across the entertainment industry reached out to Abel to caution her against working for Stephanie Jones. Jones, they warned, had a well-deserved reputation for treating people horribly. Jones had recently become embroiled in a dispute with another public relations firm for stealing its clients using deceptive and unscrupulous means.

16.    Excited by the new opportunity and not personally familiar with Jones or Jonesworks, Abel decided to make the jump in spite of the admonitions from her peers.

17.     On or about July 9, 2020, Abel was hired by Jonesworks as Vice President. Her mandate was to oversee Jonesworks' talent department and grow its nascent Los Angeles office, which at the time had only four employees.

**B.    Abel's Employment Agreements**

**1.    *The 2020 Employment Agreement***

18.     In connection with and as a condition of her employment, Abel signed a so-called Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "2020 Employment Agreement").

19.     Abel was not represented by counsel in connection with the negotiation or execution of the 2020 Employment Agreement.

20.     The 2020 Employment Agreement provided that Abel was an "at-will" employee whose employment was "exclusive" to Jonesworks during the period of her employment.

21.     The 2020 Employment Agreement contained a confidentiality clause pursuant to which Abel was required to maintain the confidentiality of and not disclose "Confidential Information," as the term is (expansively) defined therein.

> 1.      Confidential Information
>         (a)      Agency Information.    In the course of your employment, you will have access to information relating to the Agency, its clients, former clients and prospective clients and other third parties that is non-public, confidential or proprietary in nature ("Confidential Information"). Confidential Information specifically includes, without limitation, any data or information that is proprietary to the Company and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries and affiliated companies; (ii) plans for products or services; (iii) Company's accounts, customers and clients; (iv) any scientific or technical information, invention, design, process,

procedure, formula, improvement, technology or method; (iv) any concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets; and (v) any other information that should reasonably be recognized as confidential information of the Company including but not limited to any advertising, marketing or communications campaigns and content on which the Company works that has not been released to the public with the Company's client's authorization. Confidential Information does not include information which is in the public domain other than by breach of this Employee Agreement on the part of Employee. Employee agrees that, except as required in the lawful performance of employment duties to the Agency, Employee will not disclose to others, including, without limitation, privately, on the internet, via text message, on any blog, or on any social networking website, tool or device (such as Twitter, YouTube, Facebook, Pinterest, Instagram, etc.) or any other public forum, use for Employee's own benefit or for the benefit of anyone other than the Agency, or otherwise appropriate or copy, Confidential Information, whether or not developed by Employee and whether disclosed to Employee by the Agency, its clients to other third parties, either directly or indirectly, in writing or orally, or learned by Employee by observation or creation in the course of Employee's duties, whether or not during working hours. Employee will also take all reasonable measures, in accordance with the Agency's policy and instructions from Employee's supervisor, to protect Confidential Information from any accidental, unauthorized, or premature use, disclosure, or destruction. Employee's obligation to protect Confidential Information will continue throughout Employee's employment with the Agency, and remain in effect after the termination of Employee's employment. If Employee is ordered by a competent court of law, governmental body, or pursuant to subpoena, to disclose any Confidential Information, Employee agrees to provide Agency with prompt notice, prior to any disclosure, so that Agency may seek other legal remedies to maintain the confidentiality of such Confidential Information, and Employee agrees to comply with any applicable protective order or equivalent.

22.    The 2020 Employment Agreement also contained provisions purporting to restrict

Abel's ability to speak about Jones or Jonesworks.

**4.    Interviews, Speeches or Writings about Agency.**
Pursuant to Section 4: Except in the performance of Employee's authorized duties for Agency, consistent with Agency's policies, Employee shall obtain the express authorization of the

Agency before (i) giving any speeches or interviews; or (ii) preparing or assisting any person or entity in the preparation of any books, articles, radio broadcasts, electronic communications, television or motion picture productions or other creation, in any case concerning Agency, its affiliates, parent Agency or clients or any of their respective officers, directors, agents or employees. Employee may provide notice to the public of Employee's separation from the Company, so long as such notice is done in a manner normal and customary in the PR community, however any notification to the Agency's clients must be pre-approved by Stephanie Jones.

**5.    Non-Disparagement.** Employee shall not, directly or indirectly, in any communications with any reporter, author, producer or any similar person or entity, the press or other media, or any customer, client or supplier of Agency, criticize, ridicule or make any statement that disparages or is detrimental to Agency, its affiliates, parent Agency or clients or any of their respective officers, directors, agents or employees.

23.    The 2020 Employment Agreement also required Abel to submit to a host of restrictive covenants, non-solicitation restrictive covenants.

**11.    Restrictions.**

(a)    <u>Agency's Business</u>.    Employee acknowledges (i) that the business and the industry in which the Agency competes is highly competitive; (ii) that as part of Employee's employment with the Agency, Employee will participate in the servicing of current clients and the solicitation of prospective clients, and in connection with these services, the Agency will disclose to Employee, and Employee will obtain, Confidential Information of the Agency, including, without limitation, knowledge of the proprietary methods, business practices, operations, prices and costs of the Agency; (iii) that Employee's employment requires the performance of services that are special, unique, extraordinary and intellectual in character; and (iv) in the course of Employee's employment with the Agency, Employee may develop a personal relationship with the clients of the Agency and a knowledge of those clients' affairs and requirements, and, during the course of Employee's employment, the relationship of the Agency with its clients will be placed in Employee's hands by the Agency in confidence and trust> Employee consequently agree[] that it is a legitimate interest of the Agency, and reasonably and necessary for the protection of the Agency's valuable Confidential Information, goodwill and business, that Employee make the covenants contained in this Employee Agreement.

(b)    <u>Restriction</u>. Accordingly, Employee agrees that, for

as long as Employee is employed by the Agency and for a period of twelve (12) months thereafter, Employee will not, directly or indirectly, individually, or through an entity, except on behalf of the Agency, (i) hire, engage or solicit (or attempt to hire, engage or solicit) any person who is, or at any time during the preceding six (6) months was, an employee, exclusive consultant or freelancer of the Company with whom Employee worked or became aware of during Employee's employment; (ii) use any Company Confidential Information in order to solicit business from, or in any way render services to, any Client (as defined below), or persuade any Client to cease to do business or to reduce the amount of business which such Client has customarily done or contemplates doing with the Company. The time period during which Employee is prohibited from being engaged in certain business practices pursuant to Section 11 shall be extended by any length of time during which Employee is in breach of such covenant.

(c)     Client. As used in this Section 11, the term "Client" means any person, firm, corporation or other entity (i) that is, or at any time during the preceding one year period was< a client of the Agency's or a prospective client to which the Agency made a presentation or other offering of services during the preceding one year period; or (ii) that is a prospective client to which the Agency made a new business presentation (or similar offering of services) at any time within six (6) months after the date of termination of Employee's employment, if, during Employee's employ with the Agency, Employee was involved with the preparation of, or the strategy or discussions with respect to, such new business presentation (or other similar offering of services).

(d)     Reasonable.   Employee further acknowledges and agrees that, because of the nature of the business engaged in by the Agency and the fact that Clients can be and are serviced by the Agency wherever located, the restrictions set forth in this Section 11 of this Employee Agreement are reasonable and necessary to protect the Agency's legitimate business interests; provided, however, that if a court determines that the restrictions set forth herein are unreasonably based upon length of time, geographic scope or for other reason, the parties contemplate that such court shall modify, apply and enforce such restrictions to the maximum extent allowed by law, without affecting the validity of any other provision of this Employee Agreement. Employee also acknowledges that the restrictions set forth in this Employee Agreement will not prevent Employee from earning a livelihood or otherwise supporting yourself after employment with the Agency and/or during the term of the restrictions.

(e)     Notice to Third Parties. Employee agrees that during the periods of time during which Employee is restricted in taking

38

certain actions by the terms of this Employee Agreement, Employee shall inform any entity or person with whom Employee may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of Employee's contractual obligations under this Employee Agreement. Employee also understands and agrees that the Agency may, with or without prior notice to Employee and during or after the term of this Employee Agreement, notify third parties of Employee's agreements and obligations under this Employee Agreement.

(f)    Other Covenants.  The restrictions set forth herein shall be in addition to (and not in lieu of) the restrictions set forth in any other agreement entered into between you and the Company.

24.    Section 13 of the 2020 Employment Agreement provides that "[it] has been made and shall be interpreted in accordance with the laws of the State of California without regard to conflicts of law principles."

## 2.    *The 2021 Employment Agreement*

25.    On or about November 22, 2021, Jonesworks required Abel to enter into a modified employment agreement (the "2021 Employment Agreement") changing her employment from at-will to a contractual term, adjusting her title and compensation, and subjecting her to a variety of novel restrictions intended to deter her from leaving Jonesworks and inhibiting her ability to remain in her chosen field if she were to do so.

26.    Abel was not represented by counsel in connection with the negotiation or execution of the 2021 Employment Agreement.

27.    The 2021 Employment Agreement contains an expansively drafted confidentiality provision.

6.1. Confidentiality.

6.1.1.  Employee acknowledges and agrees that prior to and during the term of this Agreement, Employee has learned and will continue to learn and obtain information, tangible or intangible, relating to: (i) the Company and its respective owners (collectively, the "Company Parties"); (ii) employees or independent contractors of the Company; (iii) the customers and clients of the Company; and/or

39

(iv) the business, operations, prospects and condition (financial or otherwise) of the Company, such employees, independent contractors, customers and clients (collectively, "Proprietary Information"). Proprietary Information includes, but is not limited to, any and all written or electronic research, developments, trade secrets, know-how, inventions, techniques, processes, customer lists, financial data, sales, marketing plans, specifications, designs, budgets, schedules, drawings, tapes, notes, and the like.

6.1.2. Employee agrees to hold all Proprietary Information (whether received prior to or during the Employment Term) in strict confidence and trust for the sole benefit of the Company and not to, directly or indirectly, disclose, use, copy, publish, or summarize any Proprietary Information, except or unless (i) during Employee's service to the Company, to the extent necessary to carry out Employee's responsibilities under this Agreement; (ii) after termination of this Agreement, as specifically authorized in writing by the Company or as required by any law, court order, or similar process or proceeding (in which event Employee shall promptly consult with the Company on the advisability of taking legally available steps to resist or narrow such request or requirement, and if disclosure is required, disclose any such information which Employee is advised by legal counsel is legally required to be disclosed and exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment shall be accorded); (iii) such Proprietary Information is or becomes publicly known through lawful means; (iv) the Proprietary Information was rightfully in Employee's possession or part of Employee's general knowledge prior to employment with the Company and Employee did not learn of it, directly or indirectly, from the Company, its agents or employees; or (v) such Proprietary Information is disclosed to Employee without confidential or proprietary restriction by a third party who rightfully possesses such Proprietary Information (without confidential or proprietary restriction) and did not learn of it, directly or indirectly, from the Company, its agents or employees. Employee agrees that all Company-related business opportunities and plans made known to Employee while employed by Company, are and shall remain the permanent and exclusive property of the Company. Upon termination of this Agreement for any reason, Employee shall return to the Company all books, records, notes, manuals, recordings, technology equipment, and other personal property and tangible Proprietary Information obtained or prepared by Employee during the course of employment with the Company, or otherwise belonging to the Company.

28.    The 2021 Employment Agreement also expands the restrictions on Abel's activities

after her separation from Jonesworks.

6.2. Non-Competition. During the Employment Term, Employee shall not perform any professional services for any other person or entity, other than the Company or an affiliate of Company, except as permitted by Section 3 herein. Employee acknowledges that an employer is entitled to its employees' undivided loyalty during the period of employment and an employee may not transfer such employee's loyalty to a competitor during such period of employment. This duty of loyalty is breached if an employee acts against the best interests of Company during such period of employment. In addition, while employed by the Company and for six (6) months following Employee's date of termination, regardless of the reason for the employment termination, Employee shall not compete with the Company, or engage in or participate in any business that is in direct competition in any manner whatsoever with the Company, either as an employee, Company consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity.

6.3. Non-Solicitation and Business Relationships. Employee agrees that during Employee's employment by the Company and for two (2) years following Employee's date of termination, regardless of the reason for the employment termination, Employee shall not, directly or indirectly

6.3.1. solicit, induce, or attempt to solicit or induce, any officer, director, employee, consultant, agent or joint venture partner of the Company or any of its affiliates to terminate his, her or its employment or other relationship with the Company or any of its affiliates for the purpose of associating with any competitor of the Company or any of its affiliates, or otherwise encourage any such person to leave or sever his, her or its employment or other relationship with the Company or any of its affiliates for any other reason, or authorize the taking of such actions by any other person or entity, or assist or participate with any such person or entity in taking such action; or

6.3.2. use any Company formula, practice, process, design, instrument, pattern, commercial method, or compilation of information that derives independent economic value, actual or potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy in order to, solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts so long as the Company carries on its same business in the county of

New York or Los Angeles. Nothing shall restrict Employee from notifying the public of Employee's separation from the Company, so long as such notice is done in a manner normal and customary in the PR community, however such notification to the Company's clients must be pre-approved by Stephanie Jones.

29.     Section 11.7 of the 2021 Employment Agreement provides: "This Agreement and the performance of the Parties' obligations hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles."

### C.     Abel's Employment Agreements Are Laden with Unlawful Terms

#### 1.     *California Labor Code Section 925*

30.     California has a strong public policy that disputes between California employees and employers be decided under the laws of California in a forum located in California. As a legislative expression of this fundamental public policy, the California Legislature enacted California Labor Code Section 925, which provides:

> (a) An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:
> > (1) Require the employee to adjudicate outside of California a claim arising in California.
> > (2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.
> (b) Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.
> (c) In addition to injunctive relief and any other remedies available, a court may award an employee who is enforcing his or her rights under this section reasonable attorney's fees.
> (d) For purposes of this section, adjudication includes litigation and arbitration.
> (e) This section shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be

adjudicated or the choice of law to be applied.
(f) This section shall apply to a contract entered into, modified, or extended on or after January 1, 2017.

31.    At all times during Abel's employment at Jonesworks, Abel was a resident of the County of Los Angeles, State of California; was based out of Jonesworks' Los Angeles office, and performed the overwhelming majority of her work within the State of California. Abel has lived and worked in California for the entirety of her adult life. Since graduating from college, Abel has maintained virtually no connection to the State of New York. She has not lived there, maintained a residence there, performed any significant amount of work there, or even travelled there more than a handful of times. She was, at all times, a California resident and California employee entitled to the protections of the laws of the State of California. Apart from infrequent business travel, Abel performed no work for Jonesworks in the State of New York.

32.    The 2021 Employment Agreement, which Jonesworks required Abel to sign as a condition of continued employment, violates Labor Code Section 925 in that it purports to require Abel to adjudicate outside of California claims that arose in California and deprives her of the substantive protection of California law with respect to a controversy arising in California.

33.    This dispute arises out of and directly relates to Abel's employment at Jonesworks. Specifically, Jonesworks and Jones assert claims for, among other things, breach of the 2021 Employment Agreement, faithless servant (in connection with her employment), and breach of fiduciary duty (also in connection with her employment). At all times relevant, Abel was a California employee residing in the County of Los Angeles and based out of Jonesworks' Los Angeles office. She is, therefore, entitled to invoke the protections of Labor Code Section 925, and thereby void the choice of law and forum selection provisions upon which this pending action is predicated. She did so in accordance with the statute on or about March 17, 2025.

### 2.    *California Business & Professions Code Section 16600*

34.    California also has a long-established and fundamental public policy against restraints of trade reflecting a deliberate decision of the California Legislature favoring free competition and employee mobility over the competitive interests of former employers.

35.    If employees and competitors had to incur the risk and expense of protracted litigation when they wished to continue their careers with another in the same field, or each time they recruited a competitor's employees, Californians would be far less likely to switch employment, employers would be far less likely to offer them employment, and California would lose the benefits of free and open competition and employee mobility. California courts refer to this as the "*in terrorem* effect" of contractual restraints of trade, which has been explained as follows:

> [E]ven if [employees] strongly suspect that a non-compete clause is unenforceable, such employees will be reluctant to challenge the legality of the contractual terms and risk the deployment of [the former employer]'s considerable legal resources against them. Thus, the in terrorem effect of the Agreement will tend to secure employee compliance with its illegal terms in the vast majority of cases. Prospective future employers, too, may be reluctant to hire [the former employer]'s workers; even if secure in the knowledge of the unenforceability of [the] non-compete clause, these employers may well wish to avoid the expense and energy of defending a lawsuit in which they are likely to be joined.

*Latona v. Aetna United States Healthcare, Inc.*, 82 F.Supp.2d 1089, 1096-97 (C.D. Cal. 1999).

36.    The California Legislature long ago addressed this problem and declared contracts in restraint of trade void and unenforceable. *See* California Business & Professions Code § 16600. The Legislature specified the only type of post-employment covenants not to compete that are lawful and permitted in California. There are three: (1) covenants arising out of the sale of goodwill of a business or ownership interest in or operating assets of an entity (Cal. Bus. & Prof. Code § 16601); (2) covenants arising out of the dissolution or dissociation of a partnership (Cal. Bus. &

Prof. Code § 16602); and (3) covenants arising out of the dissolution or sale of a limited liability company (Cal. Bus. & Prof. Code § 16602.5).

37.    None of the exceptions to Section 16600 are relevant to the instant matter.

38.    California's public policy against restraints of trade, which is protected by Section 16600, is enforceable against employers who violate it by way of California's Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq.* and actions for declaratory and injunctive relief.

39.    Requiring a California resident to sign a post-employment covenant not to compete as a condition of employment in California violations California's unfair competition laws and public policy against restraints of trade. Among other things, it improperly deters competition in California for the services of qualified employees, and significantly increases the risks borne by employees seeking new employment in California.

40.    As set forth above, Abel's 2020 and 2021 Employment Agreements contain unlawful restraints of trade in the form of express non-competition and non-solicitation provisions as well as in the form of unduly expansive confidentiality provisions. These are unlawful and void *ab initio* under California law.

## D.    **Abel's Tumultuous and Traumatic Tenure at Jonesworks**

41.    Within a few weeks of Abel's on-boarding, Jonesworks faced a mass exodus of employees in its New York office. While Abel was understandably concerned, Jones assured her that all of the departing employees were "horrible" at their jobs and were going to be fired regardless. Little did Abel then know that turnover of that magnitude was typical at Jonesworks, which routinely faced large-scale departures by disgruntled and demoralized employees. What Abel did quickly realize is that morale amongst Jonesworks employees was outright abysmal,  that such departures were invariably acrimonious, and that departing employees and current employees

alike were extremely tight-lipped and fearful of engaging in any sort of discussion about their experience at Jonesworks.

42.    Abel observed that morale among Jonesworks employees was inversely correlated with physical proximity to Jones. Thus, the Los Angeles office was generally a more positive environment than the New York office.

43.    At no point during Abel's first few years was there a proper human resources representative. Instead, Jones relied on business affairs personnel and her various chiefs of staff to handle human resources matters. In part due to the lack of a human resources department or grievance reporting structure and fear of backlash from Jones, Jonesworks had a toxic workplace culture in which employees, lacking an outlet or meaningful recourse, constantly gossiped and complained amongst themselves and leaned on senior employees for solutions to workplace issues.

44.    Notwithstanding the continued large-scale departures from the Jonesworks New York office, Abel quickly became a leader of the California operation. Within two years, Abel had grown the Los Angeles headcount from 4 employees to 12. All the while, Abel wore an array of hats, working tirelessly without a commensurate increase in compensation.

45.    By Abel's second year, Jones appeared to be deteriorating. Abel began to harbor increasing concerns about her mental stability and ability to manage client and employee relations.

46.    At around this time, Jones started making FaceTime calls to Abel and other employees at notably odd hours. Jones' communications frequently tracked through the night and into the next morning, suggesting that she had not been sleeping at all. Concurrently (and likely relatedly), Jones became noticeably paranoid and irascible, often accusing Abel and others of plotting against her. It became more difficult to communicate with Jones, settle her nerves, or even track her train of thought.

47.     Due to extremely draconian NDAs, Jones' threats, and the climate of fear pervading (past and present) Jonesworks employees and clients alike, Jones' worst excesses were largely hidden from view until in or around May 2024, when Puck reported that Sanchez and Johnson had dropped Jones as their publicist. While these were among the most prominent and publicly reported departures, a cascade of Jonesworks clients began to cut ties with Jones, especially after word had spread that Business Insider was contacting Jones' former and current clients and employees concerning a forthcoming article about her sordid behavior.

48.     On May 8, 2024, a website called "Stephanie Jones Leaks" went live, along with an X.com account, a Facebook page, a Reddit account, and a Pinterest page. These platforms disclosed a litany of highly disturbing allegations about Jones' behavior and business practices, many concerning Jones' mistreatment of Jonesworks employees and clients.

49.     Abel had no involvement of any kind in "Stephanie Jones Leaks."

50.     These revelations caused a firestorm in Hollywood, resulting in a surge of negative publicity regarding Jones, including the publication of the Business Insider piece entitled "Who's Afraid of Stephanie Jones." See Katie Warren and Jack Newsham, "Who's Afraid of Stephanie Jones," Business Insider (Aug. 17, 2024), https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos.

51.     Abel was not responsible for the Business Insider piece and learned of it for the first time from Jones herself in or around early-July 2024.

52.     The Business Insider piece shed more light on the real Jones. Always a volatile personality, Jones had become noticeably more paranoid, erratic, and cruel in recent years.

53.     The Business Insider story also shed light on the toxic workplace Jones had fostered at Jonesworks. At the office, Jones would regularly turn on deafening music so that she could

berate her employees free from scrutiny. "I don't think there was one day in the office that someone wasn't crying," said a former employee.

54.     Jones also pried into her employees' private lives without invitation. As detailed by Business Insider, when employees called in sick, Jones would FaceTime them to confirm they were actually sick. In at least one instance, an employee who had taken a personal day to attend a funeral received a FaceTime call from Jones during the ceremony. Jones was apparently suspicious of his whereabouts.

55.     As discussed above but disclosed publicly by Business Insider, turnover rates at Jonesworks were extraordinary. These departures included not only junior employees—who often left after less than a year—but also senior executives who managed client accounts. Jones seldom allowed them to go amicably, often enlisting attorneys to threaten and intimidate them into agreeing not to disparage Jones.

56.     In April 2023, Dwayne "The Rock" Johnson dropped Jonesworks after clashes between Jones and Johnson's team. Jonesworks had handled Johnson's personal PR, as well as that of his production company, tequila brand, clothing company, and business partner, Dany Garcia. This was a big loss for Jones and one that she kept under wraps from media in order to leverage opportunities for other clients. In the following months, Jones was also dropped by Bezos, Sanchez, Lainey Wilson, Chris Hemsworth, Wheels Up, Ocean Spray, and Partake Foods.

57.     Through it all, Abel remained loyal to Jones, sticking with her through thick and thin despite growing doubts about Jones' ability to function professionally.

58.     By 2024, however, Jones had become increasingly embittered and hostile towards Abel. Jones frequently criticized Abel's management, manifested extreme paranoia about Abel's close relationships with clients and partners, and went out of her way to reprimand, demean, and

embarrass Abel in front of junior employees she oversaw.

59.    Over time, Abel's concern about Jones' obvious downward spiral was heightened by the reality that there was no bottom in sight. In the final months of Abel's tenure, Jones had become even more erratic, clearly not sleeping, calling at all hours of the night in a frenzied state, senselessly pitting her own employees against each other, focusing her energy on "catching" employees in perceived acts of disloyalty, lowering morale still further, and torching her relationships with remaining Jonesworks clients.

60.    Although Jones had always been volatile, she now appeared to be actively unraveling. Abel was often on the receiving end of her (often bizarre) outbursts. In one instance, Jones announced to Abel's subordinates that she had learned through psychic readings that Abel was an alcoholic and a gambling addict. Even if these statements were true, Jones' public announcement would be (at best) highly inappropriate. Here, however, the accusations are not remotely true! They have literally no basis in reality, and the employees to whom Jones made her pronouncement were well aware of that. While Jones presumably intended to undermine Abel's credibility, she had actually significantly undermined her own and raised alarm about whether Jones was in the midst of a mental breakdown. On a different occasion, Jones announced, again per her psychic, that Abel would soon be pregnant with twins, humiliating and infuriating Abel, who—Jones knew—had struggled with fertility issues.

61.    Abel was also disgusted by Jones' pattern and practice of creating fake social media accounts to troll former employees and journalists she deemed hostile, including Puck News' Matt Belloni. Jones was obsessed with Belloni, in particular. Abel also witnessed Jones working with journalists to plant and contribute to negative stories about former Jonesworks clients who had fired Jonesworks/Jones.

62.     When Abel requested that Jonesworks offer its Los Angeles employees a modest 2% cost of living raise, Jones—who spent obscene amounts of Jonesworks money on lunches, champagne, and manicures—told her that if that were to happen, it would have to come from Abel's paycheck.

63.     Already pushed to the brink, Abel finally had enough when Jones demanded she corroborate falsified accusations about a senior Jonesworks employee in an effort to drive him out. When Abel refused to go along with it, Jones responded with mockery, calling her a "12-year-old drama queen."

**E.      Abel Resigns from Jonesworks and Jones Ambushes Abel, Steals Her Personal Data, and Tries to Ruin Her Life**

64.     On or about July 10, 2024, Abel notified Jones of her departure from Jonesworks. Abel later confirmed her decision on July 26, 2024, and communicated her intention to start her own business. Abel offered a six-week transition period, with an end date of August 23, 2024.

65.     Predictably, Jones took the news poorly, to say the least. Consistent with her increasingly erratic behavior, Jones swung from extreme to extreme, one minute desperately attempting to convince Abel to stay, then next berating her and cutting her out.





**From:** Jennifer Abel ▉▉▉▉▉▉
**Sent:** Friday, July 26, 2024 4:06 PM
**To:** Stephanie Jones ▉▉▉▉▉▉▉▉
**Subject:** Thank You

Hi Steph—

First of all, I wanted to say thank you for the call we had a couple days ago. I know it wasn't easy, and I'm so appreciative that you trust me enough to be vulnerable, honest and for us to have a real conversation about our working relationship. I know you are currently going through a lot with work, personal life and your health and the last thing I want to do is to add to that— I hope you know me well enough by now that no matter how dramatic I can be (😜) I really do strive to make work life easier on you and take as much as possible off of your plate.

Since I resigned, I have been doing a lot of thinking about what I want with my career. I may have quit under unforeseen circumstances, but these past two weeks I have really taken a step back to reevaluate what I want for next steps. I really do believe that everything happens for a reason, and I wanted to really reflect on why things continue to escalate between the two of us and why I was constantly feeling like I was letting you down. I take full responsibility for my part in all of this. I'm not proud of how emotional I get in these situations, or the way I choose to step away when I feel like we are not making progress in our conversations. I know I have things to work on as well with my communication, and this whole situation has been a good learning moment for me on the ways I need to improve how I get my point across.

With all of this said, the facts remain—I respect you immensely. I feel so grateful for the opportunities you have given me with your premiere clients and how you have lifted me up as your partner. I would not have had the opportunity to be in many of the rooms that I have been in without you opening the door. This company you have built is exceptional, and I hold our teams with the highest regard. I know I didn't do it by myself, but I do take pride in what I have contributed to your LA office and the team I have been building and managing over the past four years, along with the new clients and opportunities I have procured.

I do feel it's necessary at this point that I continue to move forward with my resignation. I say this with heavy heart, yet with the excitement that I can take everything that I have learned from you as I start on this new path with my own business. I know this path won't be easy, but I hope I can keep you in my life as a mentor, a friend and a close confidant because I truly view you as family and would be lost without your support. I want to assure you however I can, that unlike those who have burned you in the past, that there is not one ounce of ill will here. I have left a company before with grace and with my relationships intact, and that's what I fully plan on, and hope for. In order to plan, I will need to stick with my previously communicated end date of August 23rd which I hope is plenty of time to ensure a smooth transition for all.

I thank you again for the most amazing time here at JW and I look forward to our relationship continuing in this new capacity.

Thank you again for understanding and for your support— With LOVE!

-Jennifer

66.    While Abel was resolute about leaving, she had every intention of doing so amicably, a sentiment she repeatedly conveyed to Jones.

67.    However, as Abel's end date drew closer, Jones grew more combative. With several weeks left in her tenure and innumerable client matters to handle, Abel found that she had been removed from client email distribution lists and left in the dark about meetings, calls, and events she was expected to attend. It was clear to Abel that Jones was trying to embarrass Abel and tarnish her professional reputation in advance of her departure.





68.    In her final week, Abel contacted Jones' chief and staff concerning the release of

her phone number. When Abel joined Jonesworks in 2020, she ported her existing phone number

(which she had used since high school) and switched to a Jonesworks-issued iPhone. Knowing

that she would have to turn over the physical device upon her departure, Abel arranged for her

phone number to be "released" so she could port it to a new device and retain decades worth of personal contacts, photos, private conversations with friends and family, and confidential financial data and access accounts protected by two-factor authentication. Jonesworks' chief of staff assured her multiple times in writing that Jonesworks would cooperate and uphold their agreement.

69.      On August 21, 2024, two days before her last day, Abel pulled up to the Jonesworks office in Beverly Hills. There, she was confronted by a physically imposing security guard, a forensic data extraction technical expert, and an attorney sitting at a conference table awash in documents. On information and belief, the attorney was affiliated with the firm Frankfurt Kurnit Klein & Selz, and the security and technology personnel were from Edgeworth Security Services. Also present was Jones' chief of staff, Gordon Duren, who had flown in unannounced from New York.

70.      Apart from Jones' chief of staff, Abel had never seen any of them before. After being ushered into the conference room, Abel noticed that the security guard was posted just outside its doors, positioned between the conference room and the office entrance, blocking the exit.

71.      There, the attorney gestured at the documents and instructed Abel to review and sign them. The attorney stated that Jonesworks suspected Abel had retained proprietary information on her personal laptop. Abel was told that Jonesworks would have grounds to sue if she did not allow them access.

72.      Caught completely off guard by the hostile and intimidating display, Abel fell into a state of shock. Having never experienced anything like this, she had no idea what to do. Fearful that she would burst into tears and humiliate herself (which she knew was what Jones wanted), Abel dissociated. Knowing she had done nothing wrong and desperate to get out of there, Abel

signed the documents without digesting their contents.

73.    Afterward, the lawyer demanded that Abel hand over her personal laptop, which Abel did. The Edgeworth contractor then conducted a forensic search of her system that turned up *nothing*. Thereafter, the attorney furnished a list of approximately 10 documents and accused Abel of having illicitly accessed and stolen them. Abel adamantly denied the accusation, and a further forensic examination of her computer again turned up nothing.

74.    Following the fruitless search of Abel's laptop, the attorney demanded that Abel hand over her phone, after which security would escort her out of the building.

75.    Still utterly shell-shocked and desperate to get out of there, Abel agreed to hand over her phone so long as they would confirm that Jonesworks would immediately release her personal cell phone number, which would enable Jonesworks to take possession of the physical device without gaining unrestrained access to its contents. It would also allow Abel to get a new phone and move on with her life without undue disruption. After express confirmation from the Jonesworks chief of staff and attorney that they would release the phone number if she went straight to the Verizon store, Abel handed them the phone and was ushered out of the building as her colleagues watched in disbelief. Seeing that Abel had been stripped of her phone (and therefore had no way to contact anyone), some current Jonesworks employees reached out to Abel's partner, family, friends, and former co-workers to let them know what had happened.

76.    Abel went straight to a Verizon store a short distance away. Once there, Verizon contacted Jonesworks to coordinate the release and transfer. The Jonesworks chief of staff assured Abel and Verizon that they were in the process of effectuating the release and to bear with them for a few minutes. Abel never heard from him again. After four hours of desperate (unanswered) calls, Abel left Verizon in panic and despair. Abel realized Jones had double-crossed her—in a

very serious way. By refusing to release Abel's phone number, Jonesworks had usurped her

contact information and cut off Abel's access to critical accounts protected by two-factor

authentication linked to that phone number. As a result, Abel lost access to her iCloud (including

all her text messages, photos, and contacts), bank accounts, utilities, insurance, and virtually every

other sensitive account. By contrast, Jones now had unrestricted access to everything stored on

Abel's phone—her text messages, emails, personal photos. Jones could read her communications

with her fiancé, parents, friends—everyone. Jones was acting purely out of spite.



77.     It took Abel over a month to regain control over all her accounts. Meanwhile, she

learned that Jones had been sharing her private text messages with the entire office, mocking and

disparaging her. Having torched Abel's privacy and dignity, Jones started boasting that Abel's

business was next. In or around early September 2024, Jones warned a departing employee not to

work for Abel because "her business wouldn't be around much longer."



**F.    Stephanie Jones Falls Out with Wayfarer and Baldoni**

78.    For almost four years, Abel largely managed Jonesworks' work for Wayfarer

Studios and Justin Baldoni out of its Los Angeles office. Over time, Abel developed a close and

trusting relationship with Baldoni, Wayfarer CEO Jamey Heath, and the rest of the Wayfarer team, particularly as their strategic communications needs became ever more complex in relation to *It Ends With Us*.

79.    At all times during Wayfarer's four-year engagement with Jonesworks, Abel was the point person on the account. It was very clear to Wayfarer—and Jones largely did not hide— that Jones considered them to be a "lower prestige" client and devoted her attention to clients such as Jeff Bezos and Tom Brady.

80.    But Jonesworks was in utter turmoil by July 2024. Already bleeding clients and personnel, Jones learned that Business Insider was working on an unflattering story about her set to be published sometime in August. Jones felt that her reputation had been severely damaged by the "Stephanie Jones Leaks" website and social media accounts. Jones was desperate to keep her remaining clients. Given Abel's close relationship with Wayfarer and Baldoni, Jones was undoubtedly concerned they would leave Jonesworks alongside her. And she wanted to make sure that did not happen.

81.    At the time, Wayfarer and Baldoni were in the midst of a massive PR crisis, as news stories began to trickle out speculating about possible tension between Lively and Baldoni (largely due to the cast no longer following him on social media) just as the Film was about to premiere. Jones started participating in meetings, calls, and written correspondence to reassert her authority over the account and convey her engagement to Wayfarer.

82.    Wayfarer and Baldoni asked Abel to recommend a crisis management specialist. After consulting with Jones, who had no viable ideas, Abel recommended that Wayfarer and Baldoni engage crisis PR expert Melissa Nathan to assist in navigating these choppy waters. Abel had confidence in Nathan, as they had worked together extensively in connection with a different

Jonesworks client. The need for crisis PR expertise was particularly acute due to Lively's demand that Baldoni not be permitted to attend the premiere and the threat that Baldoni would be excluded from the press junket with the rest of the cast. Abel learned during her initial discussion with Nathan that, per her media contacts, a negative story was already being "shopped" around to multiple outlets, positioning Baldoni's religion as a "cult" and accusing Baldoni of having "fat shamed" Lively after he asked her personal trainer in private about her weight due to his history of severe back pain.

83.     Even though Abel felt strongly that Nathan was the right choice, she knew that Jones would be unhappy with the recommendation. Jones viewed Nathan as a competitor and had a history of bad-mouthing her to anyone who would listen, including to Nathan's own clients. Out of sensitivity for these considerations, Abel advised the Wayfarer team to remain open to other possible options and to decide after meeting Nathan themselves. Abel feared backlash from Jones but felt strongly that Nathan was the best option. When Jones learned that Wayfarer was considering retaining Nathan, she was furious and immediately lashed out at Abel, pressuring her to disparage Nathan as a demonstration of loyalty to Jones. After initially pushing back, Abel eventually relented after Jones called her crying and screaming and engaged in some "light" disparaging of Nathan to placate Jones. Jones then attempted to derail the engagement and exploited confidential client information to convince Wayfarer not to move forward with Nathan.

84.     While Heath, Wayfarer's CEO, acknowledged Jones' position, he told her Wayfarer would make its own decision after meeting Nathan.

85.     Jones inserted herself into the mix in early August 2024, seeking to box out Nathan and Abel. The problem, however, was that Jones had chosen not to be privy to Wayfarer leadership's communications strategy or internal decision-making, having long claimed to be too

busy with higher-profile clients. Wayfarer was fine with Jones' disengagement, as Abel was their trusted advisor, and they had no interest in being a pawn in Jonesworks office politics. In addition, Jones had chosen to take a lengthy vacation in Europe during this critical period of the press campaign and premiere of the Film. Even from afar, Jones' efforts were ham-fisted, unwelcome, and sporadic given her distance from Wayfarer's day-to-day business. As Jones tried to stir up drama and undermine Abel's authority, Wayfarer and Baldoni were focused solely on managing the crisis in front of them.

86.    At the time, Lively's and Baldoni's teams had negotiated an uneasy truce in which neither side would participate in negative coverage of the other. Lively's team had already broken that truce, but the Wayfarer team did not know that then. As far as they were concerned, it was best for Baldoni, Lively, and the Film if both sides agreed to keep the peace, though Wayfarer's team had to date been acting only in defense in responding to press inquiries.

87.    But on August 8, 2024, Jones, in another desperate attempt to re-insert herself, contacted a Daily Mail reporter about a story they had published about Baldoni and Lively. She did so in direct violation of Abel's instruction not to talk to the press given the truce with Lively's team. Nonetheless, Jones bragged to Wayfarer about "trading calls" with the Daily Mail in an effort to appear engaged on the account. Nathan and Abel were left to deal with the fallout.

88.    This blatant disregard of Wayfarer's strategy sparked a chain of unfortunate developments. Sloane and Sony learned that, purportedly, "someone from Baldoni's team had been communicating negatively to media." It was clearly Jones, and Wayfarer's leadership was livid. As was Sony. All parties were desperate to prevent an all-out slugfest between Lively and Baldoni just as the Film was about to be released to the world. With her reckless and unauthorized activities, Jones had made that scenario much more likely. In response, Wayfarer instructed Jones to cease

all activities on behalf of Wayfarer and Baldoni for the time being and to let Abel and another Los Angeles-based Jonesworks employee, Matthew Mitchell, handle the crisis alongside Nathan.

89.    At this time, Nathan started hearing from other journalists that Sloane was planting negative stories about Baldoni and was under the impression that Baldoni's camp had broken the truce. Anxious Sony executives began reaching out to Wayfarer seeking clarity.

90.    Yet Jones, panicked about being blamed, refused to be sidelined, insisting that she *needed* to contact Sony's and Lively's PR teams to clarify that she had not planted any negative stories about Lively. Heath told her not to do that, to which Jones responded that she could do "whatever she wants" to clear her name and that Wayfarer could not stop her from making calls. Desperate to salvage her reputation with Lively and Sony, Jones emailed a number of key Sony executives working on the Film to declare that she was in Europe with "her husband, partner at WME Jason Hodes" and placing all blame on "her team." In her attempt to save face, Jones ruptured her relationship with Wayfarer and Baldoni.

91.    Although Jones ultimately agreed to stand down, Wayfarer and Baldoni expressed that they had lost all trust in her. After parachuting in for self-interested reasons, nearly blowing up the truce with Lively's team, and lashing out when told to stop, Jones became a magnet for drama when it was least needed.

92.    Notably, on the same day Abel was terminated, August 21, 2024, just *hours* after Abel's phone was seized, Leslie Sloane called Melissa Nathan. During that call, Sloane told Nathan that Sloane had seen Nathan's text messages (which could only have come from Abel's phone) and that Nathan should expect to be sued.

93.    As September drew near, Wayfarer and Baldoni—with the assistance of Abel and Nathan—continued their tireless efforts to promote the Film, put out fires, and see the project

through to the finish line. Stewing in jealousy towards Abel and resentment towards Wayfarer/Baldoni, Jones clearly saw the writing on the wall. Knowing she would soon be terminated, Jones started taking steps transparently intended to make it harder to cut her loose. Those steps included sending email after unwelcome email to Heath and others—long after their relationship had irrevocably ruptured—to lay the groundwork to contest that she had been detached and nonresponsive for years. This was especially galling, as Jones had been in Europe and largely incommunicado—save for a few texts of support to Baldoni prior to the premiere and then her disastrous efforts at self-preservation—for weeks during the critical month of August when the Film premiered.

94.     In contrast with Abel, who was loyal, trusted, and even-tempered while working around the clock through the crisis, Jones seemed to be a walking disaster whose self-absorption, disloyalty, and insubordination had been a significant headache.

95.     Rather than accepting the end of the Wayfarer relationship with professionalism and decorum, Jones started threatening to sue, demanding exorbitant payment for work not done, and protesting that she had done an amazing job.

96.     On information and belief, Jones stewed in resentment and indignity, unable to bear the loss of another Jonesworks client. She set out to take revenge on Abel, Wayfarer, Baldoni, and Nathan, exploiting the data she had unlawfully accessed and stolen from Abel's phone.

97.     On information and belief, Jones turned over the contents of Abel's phone to Lively and her team—without a subpoena—so they could slice and dice her communications to to construct a false narrative about the source of Lively's bad publicity.

98.     In turning over these materials to Lively, Jones knew full well that the blowback would engulf not only Abel but also her clients, Wayfarer and Baldoni. As a result of Jones'

malicious scheme, Abel's life has been turned upside down. Her career and reputation have been destroyed, her private information leaked, and her email inbox and social media pages filled with a daily stream of death threats and abuse.

99.     The backlash against Wayfarer and Baldoni has been equally devastating, with Baldoni wrongfully labeled as a sex pest, his accolades rescinded, and his future projects thrown into doubt.

100.    Jones still has all of Abel's private photos, text messages, and personal data, which Abel has every reason to believe Jones will further exploit to nefarious ends. Abel lives in fear of what Jones has in store for her and for what other client confidences Jones is willing to divulge in her fit of pique at Abel. All of this because Abel dared to leave Jonesworks.

101.    Jones and Jonesworks' conduct is not only tortious in its own right but also a brazen affront to the employment and labor laws of the State of California, which governed Abel's employment relationship with Jonesworks and the termination thereof and, as a result, this very dispute.

## **FIRST CAUSE OF ACTION**

### **(Declaratory Relief – Cal. Lab. Code § 925)**

### **Against Jones and Jonesworks**

102.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

103.    An actual controversy has arisen and now exists between Abel, on the one hand, and Jonesworks, on the other hand, as to the legality, validity, and enforceability of contractual choice of law and forum selection provisions in Abel's 2021 Employment Agreement that directly contravene California Labor Code § 925, which provides:

(a) An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:

(1) Require the employee to adjudicate outside of California a claim arising in California.

(2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.

(b) Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.

(c) In addition to injunctive relief and any other remedies available, a court may award an employee who is enforcing his or her rights under this section reasonable attorney's fees.

(d) For purposes of this section, adjudication includes litigation and arbitration.

(e) This section shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be adjudicated or the choice of law to be applied.

(f) This section shall apply to a contract entered into, modified, or extended on or after January 1, 2017.

104.    As a condition of Abel's employment and as part of the 2021 Employment Agreement, Jonesworks required Abel to agree that New York law would apply to disputes relating to and arising out of her employment at Jonesworks and that such disputes would be adjudicated in the State of New York.

105.    Abel was at all times relevant a California resident and employee based out of Jonesworks' Los Angeles office. She lived and worked in California for the entirety of her employment at Jonesworks.

106.    Abel was not represented by counsel in connection with the negotiation or execution of the 2021 Employment Agreement.

107.    On or about March 17, 2025, Abel unequivocally informed Jonesworks that she had elected to void the 2021 Employment Agreement's choice of law and forum selection provisions that violated Section 925.

108.    On information and belief, Jonesworks contends that the restrictive covenants in her 2021 Employment Agreement are legal, valid, and enforceable because of the application of New York law, whereas such restrictive covenants are flatly unlawful under the laws of the State of California.

109.    Pursuant to California Labor Code § 925, Abel requests a declaratory judgment that the choice of law and forum selection provisions violative of Section 925 are void and that this matter "be adjudicated in California and California shall govern the dispute." Cal. Lab. Code § 925.

## SECOND CAUSE OF ACTION

### (Violation of Cal. Lab. Code § 925)

### Against Jones and Jonesworks

110.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

111.    As discussed hereinabove, the choice of law and forum selection provisions in the 2021 Employment Agreement violate California Labor Code § 925.

112.    On or about March 17, 2025, Abel unequivocally informed Jonesworks that she had elected to void the 2021 Employment Agreement's choice of law and forum selection provisions that violated Section 925.

113.    Pursuant to California Labor Code § 925, Abel requests that the Court adjudge the foregoing unlawful provisions void and order that this matter be adjudicated in California and that such proceedings be governed by the laws of California.

114.    Because Abel has been forced to bring this action to secure her rights under Section 925, Abel is entitled to injunctive relief and an award of reasonable attorneys' fees in connection with these proceedings.

### THIRD CAUSE OF ACTION

**(Declaratory Relief – Restraints of Trade)**

***Against Jones and Jonesworks***

115.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

116.    An actual controversy exists between Abel, on the one hand, and Jonesworks and Jones, on the other hand, as to the legality, validity, and enforceability of contractual restraint of trade imposed by Jonesworks on Abel under the 2020 Employment Agreement and 2021 Employment Agreement, including without limitation the non-competition and non-solicitation provisions.

117.    Abel in good faith believes the contractual restraints of trade imposed by Jonesworks on her are void *ab initio* and that Jonesworks' conduct is unlawful.

118.    The 2020 Employment Agreement and 2021 Employment Agreement containing post-employment restrictive covenants, including without limitations non-competition and non-solicitation provisions, unlawfully restrain Abel's right to pursue lawful employment with other companies, including her own, and to participate economically in her chosen field.

119.    On information and belief, Jonesworks contends that the restrictive covenants contained in the 2020 and 2021 Employment Agreements are lawful and enforceable, as evidenced by the initiation of the instant litigation.

120.    However, California law is clear that restrictive covenants of the kind contained in the 2020 and 2021 Employment Agreements are void and unenforceable and impermissibly interfere with Abel's ability to engage in her chosen lawful profession, trade, or business and participate freely in the economy.

121.    California Business & Professions Code § 16600 provides, in pertinent part: "[E]very contract by which anyone is restrain from engaging in a lawful profession, trade, or business of any kind is to that extent void."

122.    Because Abel is a California resident who lived and worked in California for the entirety of the employment relationship from which this matter arises and pursuant to Labor Code § 925, the laws of California govern this dispute.

123.    Accordingly, Abel requests a declaratory judgment to the effect that the contractual restraints of trade imposed on Abel by the 2020 and 2021 Employment Agreements are void *ab initio* and that Abel may participate freely in her chosen profession of public relations unencumbered by restraints of trade inhibiting her activities, including without limitation the solicitation of clients.

124.    A judicial declaration is necessary and appropriate at this time and under the circumstances to determine Abel's rights and obligations given Jonesworks' initiation of litigation against her with respect thereto.

**FOURTH CAUSE OF ACTION**

**(Unfair Competition – California Business & Professions Code §§ 17200)**

*Against Jones and Jonesworks*

125.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

126.    For the reasons discussed hereinabove, Jones and Jonesworks are bound by the laws of the State of California with respect to the employment of Abel and other California-based employees.

127.    California Business & Professions Code § 16600 provides, in pertinent part: "[E]very contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

128.    California Business and Professions Code §§ 17200 *et seq.* prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business acts or practices.

129.    The violations of these laws and regulations and of fundamental public policies protecting the rights of California employees serve as unlawful predicate acts and practices for the purpose of California Business & Professions Code §§ 17200 *et seq.*

130.    The acts and practices described above constitute unfair and unlawful business practices and unfair competition within the meaning of California Business and Professions Code § 17200 *et seq.* Among other ways, these acts and practices have enabled Jonesworks and Jones to gain an unfair competitive advantage over law-abiding employers and competitors.

131.    Jonesworks' and Jones' use of illegally contractual provisions, including without limitation the above-described restraints of trade, unlawfully restrains Jonesworks' California employees from seeking or accepting employment elsewhere.

132.    Abel contends that Jones' and Jonesworks' acts and practices have harmed her in that she was required to submit to an out-of-state choice of law and forum in violation of the laws of California and has been unduly burdened in the exercise of her right to participate in her lawful chosen profession, including the increased risk and expense of such participation.

133.    Jonesworks' and Jones' actions as described herein constitute an unfair, unlawful, and/or fraudulent business practice under California Business and Professions Code § 17200 *et seq.*

134.    Abel has lost money or property as a result of Jonesworks' and Jones' actions as described herein, including without limitation the legal fees and costs associated with her own defense in this litigation.

135.    Abel seeks restitution of all amounts wrongfully obtained by Jonesworks and Jones as a result of the aforementioned conduct.

136.    On information and belief, Jonesworks and Jones have engaged in and are continuing to engage in unfair competition prohibited by California Business and Professions Code §§ 17200 *et seq.*, including without limitation, by the aforementioned acts and practices, which are patently unfair, fraudulent, unlawful, substantially injurious to the general public, and offensive to public policy.

137.    As a direct and proximate result of Jonesworks' and Jones' actions, Abel is entitled to injunctive relief against Jonesworks and Jones and all those acting in concert with them to enjoin the aforementioned conduct and for restitution according to proof.

138.    An injunction is necessary and appropriate to prevent Jonesworks and Jones from continuing their practice of using unlawful contractual provisions, including non-competition and non-solicitation clauses, as a weapon to restrain the mobility of their employees.

## FIFTH CAUSE OF ACTION

### (Violation of California Labor Code § 432.5)

### *Against Jones and Jonesworks*

139.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

140.    California Labor Code § 432.5 provides: "No employer, or agent, manager, superintendent, or officer thereof, shall require any employee or application for employment to agree, in writing, to any term or condition which is known by such employer, or agent, manager, superintendent, or officer thereof to be prohibited by law."

141.    As alleged hereinabove, Jones and Jonesworks required Abel, as a condition of employment and continued employment, to submit to contractual terms violative of California law.

142.    On information and belief, Jones and Jonesworks are familiar with the requirements of California laws that govern their activities and employment relationships. As such, Jones and Jonesworks knew that provisions in the 2020 and 2021 Employment Agreements, including without limitation the restrictive covenants, choice of law, and forum selection provisions, were violative of California law when they required Abel to agree to such terms. In doing so, Jones and Jonesworks violated California Labor Code § 432.5.

143.    As a direct and proximate result of the foregoing violations, Abel has been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (Invasion of Privacy – Intrusion Upon Seclusion)

### *Against Jonesworks and Jones*

144.    Abel hereby incorporates each and every allegation set forth above as if set forth

fully herein.

145.    Jones and Jonesworks intentionally invaded the private affairs of Abel by accessing, copying, disseminating, and publicizing the contents of her personal cell phone, including without limitation her private communications, personal photos, contact list, financial information, and other personal electronic data.

146.    Jones and Jonesworks should have known that Abel had a reasonable expectation of privacy such that the contents of her personal cell phone would remain private and not be accessed, copied, disseminated, and publicized.

147.    Abel did not consent to such acts or authorize the intrusion by Jones and Jonesworks.

148.    Jones' and Jonesworks' invasion of Abel's privacy was highly offensive and objectionable to a reasonable person of ordinary sensibilities.

149.    As a direct and proximate result of the above-described wrongful conduct by Jones and Jonesworks, Abel has suffered damages in an amount to be proven at trial.

150.    Upon information and belief, Jones and Jonesworks were aware that the other planned to commit the tort of intrusion upon seclusion against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of intrusion upon seclusion by reason of their conspiracy to commit the tort.

151.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**(Invasion of Privacy – False Light)**

***Against Jonesworks and Jones***

152.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

153.    As alleged herein, Jones and Jonesworks publicly disclosed information or material regarding Abel's moral character and personal and professional life which showed Abel in a false light.

154.    The false light created by these disclosures was highly offensive and objectionable to a reasonable person in Abel's position in that it made Abel an object of scorn, pity, ridicule, humiliation, and other suffering.

155.    Jones and Jonesworks knew the public disclosure would create a false impression about Abel or acted with reckless disregard for the truth.

156.    As a direct and proximate result of the said publicity and false and misleading disclosures, Abel sustained harm to her business and personal and professional reputation.

157.    Abel has also suffered and continue to suffer from grief and anxiety as a result of the wanton destruction of her public reputation and character.

158.    `As a further direct and proximate result of the above-described disclosures, Abel has suffered a loss of income and interference with future income.

159.    The conduct of Jones and Jonesworks described herein was a substantial factor in causing Abel's harm, constituted a serious invasion of her right to privacy, and was an egregious breach of social norms that shocks the conscience.

160.    Upon information and belief, Jones and Jonesworks were aware that the other

planned to commit the tort of false light invasion of privacy against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of false light invasion of privacy by reason of their conspiracy to commit the tort.

161.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

### *Against Jonesworks and Jones*

162.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

163.    The misconduct of Jones and Jonesworks and its officers, directors, employees, and agents described herein was outrageous and extreme and transcended the bounds of human decency.

164.    Jones and Jonesworks and its officers, directors, employees, and agents intended to cause Abel emotional distress or acted with reckless disregard for the probability of causing her emotional distress.

165.    Abel suffered severe or extreme emotional distress and mental anguish as a result of the above-described conduct of Jones and Jonesworks and its officers, directors, employees, and agents.

166.    The outrageous conduct of Jones and Jonesworks and its officers, directors, employees, and agents was a substantial factor in causing Abel's severe emotional distress and

was the direct proximate cause of the emotional distress.

167.    Upon information and belief, Jones and Jonesworks were aware that the other planned to commit the tort of intentional infliction of emotional distress against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of intentional infliction of emotional distress by reason of their conspiracy to commit the tort.

168.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

### *Against Jonesworks and Jones*

169.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

170.    The misconduct of Jones and Jonesworks and its officers, directors, employees, and agents described herein was outrageous and extreme and transcended the bounds of human decency.

171.    Jones and Jonesworks and its officers, directors, employees, and agents intended to cause Abel emotional distress or acted with reckless disregard for the probability of causing her emotional distress.

172.    As an employee under their supervision, Abel was owed a duty of care by Jones and Jonesworks.

173.    At all times relevant, it was reasonably foreseeable that Abel would suffer harm if Jones and Jonesworks engaged in the above-described conduct.

174.    Jones and Jonesworks breached their duty of care to Abel and affirmatively contributed to and caused Abel's injuries.

175.    These breaches constitute negligence on the part of Jones and Jonesworks.

176.    Abel suffered severe or extreme emotional distress and mental anguish as a result of Jones' and Jonesworks' negligent conduct.

177.    The negligence of Jones and Jonesworks was at least a substantial factor in causing Abel's severe or extreme emotional distress and mental anguish.

178.    As a direct and proximate result of the above-described conduct, Abel was harmed.

## TENTH CAUSE OF ACTION

### (Promissory Fraud)

#### *Against Jonesworks and Jones*

179.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

180.    As alleged hereinabove, Abel joined Jonesworks during the COVID-19 pandemic when Jonesworks' physical offices were closed. Since it was expected that Abel's personal cell phone would be utilized for work-related activities, Abel requested that Jonesworks port her personal cell number to the Jonesworks cellular plan to cover the costs, especially given the number of international clients on whose behalf she would be working. Jones agreed, but due to Jonesworks' exclusive use of iPhones, Abel was required to replace her personal Android with a company-issued iPhone.

181.    However, Jones and Jonesworks promised Abel that, notwithstanding her use of a Jonesworks-issued cell phone, Abel would retain possession of the actual phone number, which, upon her departure, would ensure her continued and exclusive access to the private and personal information contained on her phone.

182.    After Abel announced her intention to resign in or around July 2024, Jones and Jonesworks repeatedly re-iterated their promise that upon Abel's departure and return of her iPhone, Jonesworks would immediately release her personal phone number and facilitate and ensure Abel's continued and exclusive access to her personal information and data, including without limitation, private communications, contacts, personal photos, and financial information.

183.    On the date of Abel's surprise termination and in advance of her return of the device, Jonesworks and its agents re-iterated the same promise.

184.    Abel reasonably relied on the promise made by Jones and Jonesworks that they would not take control of Abel's personal phone number; access, copy and disseminate the personal information and private data accessible thereon; and exclude Abel from such information and data.

185.    On information and belief, Jones and Jonesworks never intended to perform the promise when they made and re-iterated it repeatedly, instead intending to dupe Abel into giving them exclusive access to and control over her personal information and private data.

186.    Jones and Jonesworks did not perform in accordance with their promise.

187.    As a direct and proximate result of the above-described conduct, Abel was harmed.

188.    Abel's reliance on Jones' and Jonesworks' promise was a substantial factor in causing her harm.

189.    Upon information and belief, Jones and Jonesworks were aware that the other planned to commit the tort of promissory fraud against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of promissory fraud by reason of their conspiracy to commit the tort.

190.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**

**(False Imprisonment)**

***Against Jonesworks and Jones***

191.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

192.    Jonesworks and its officers, directors, employees, and agents deprived Abel of freedom of movement by use of physical barrier, force, threat of force, menace, and/or unreasonable duress, as alleged herein. As a result, Abel was restrained, confined, and detained from leaving Jonesworks' Los Angeles office for an appreciable time.

193.    Abel did not at any time consent, expressly or impliedly, to Jonesworks' restraint, confinement, or detention of her.

194.    As a direct and proximate result of the above-described conduct of Jonesworks and its officers, directors, employees, and agents, Abel suffered severe or extreme emotional distress and mental anguish.

195.    Upon information and belief, Jones and Jonesworks were aware that the other planned to commit the tort of false imprisonment against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of false imprisonment by reason of their conspiracy to commit the tort.

196.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant Jennifer Abel prays for the following relief:

1.    For a declaratory judgment and injunctive relief against Jones and Jonesworks to the effect that:

    a.    The contractual restraints imposed on Abel, including without limitation the non-competition and non-solicitation provisions in the 2020 and 2021 Employment Agreements, are void *ab initio* and unenforceable;

    b.    Abel is free to work without restriction in her chosen profession;

    c.    Abel has not violated any contractual, statutory, or common law obligation or duty to Jonesworks or Jones by seeking employment, participating in her chosen profession, and soliciting and representing clients of her choosing without restriction;

    d.    California Labor Code Section 925 applies to this dispute and necessitates that it be adjudicated under the laws of California in a forum located in California;

2.        For monetary damages in an amount according to proof;

3.        For restitution of all money, property, profits, and other benefits acquired by Jones

and Jonesworks by means of their unlawful business practices;

4.        For pre- and post-judgment interest;

5.        For punitive damages according to proof;

6.        For attorneys' fees and costs incurred by Abel, as applicable; and

7.        For such other legal and equitable relief as the Court deems appropriate.

### **DEMAND FOR JURY TRIAL**

Abel demands a jury trial on all causes of action so triable.


Respectfully submitted,

**MEISTER SEELIG & FEIN PLLC**

Dated:  March 20, 2025
        New York, NY

By:____*/s/ Mitchell Schuster*_____
        Mitchell Schuster
        Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@msf-law.com
        kaf@msf-law.com


Dated:  March 20, 2025
        Los Angeles, CA

**LINER FREEDMAN TAITELMAN + COOLEY, LLP**

By:____*/s/ Bryan Freedman*_____
        Bryan J. Freedman (*pro hac vice*)
        Miles M. Cooley (*pro hac vice*)
        Theresa M Troupson (*pro hac vice*)
        Summer Benson (*pro hac vice*)
        Jason Sunshine
1801 Century Park West, 5th Floor
Los Angeles, CA 90067

Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
        mcooley@lftcllp.com
        ttroupson@lftcllp.com
        sbenson@lftcllp.com
        jsunshine@lftcllp.com

*Attorneys for Defendant and Counterclaimant*