**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Stephanie Jones, Jonesworks LLC, | Case No.: Civ. Action No. 1:25-cv-00779-LJL |
| *Plaintiffs*, | |
| v. | |
| Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios LLC, and John Does 1-10, | |
| *Defendants*. | |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS WAYFARER STUDIOS LLC'S AMENDED COUNTERCLAIMS**</u>

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 4

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT ..................................................................................................................... 8

I.    Wayfarer's Breach of Contract Counterclaims Should Be Dismissed for Failure to State a Claim ........................................................................................................................ 8

    A.    Wayfarer Fails to Plausibly Allege Plaintiffs Breached the Agreement ................ 8

    B.    Wayfarer Fails to Plausibly Allege Any Harm It Suffered ................................. 12

    C.    The Speak Out Act Bars Enforcement of the Confidentiality Clause ................. 14

    D.    Wayfarer Has Not Alleged a Material Breach Excusing Its Own Performance ... 16

II.    Wayfarer's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing Must Be Dismissed as Duplicative of Its Breach of Contract Claims ............... 18

III.    Wayfarer's Defamation Counterclaim Must Be Dismissed............................................. 20

    A.    The Alleged Statement is Constitutionally Protected Opinion ............................ 20

    B.    Wayfarer Fails to Allege that Plaintiffs Made a False Statement ........................ 21

    C.    Wayfarer Fails to Plead that Plaintiffs Acted with Actual Malice ....................... 22

        1.    Wayfarer is a Public Figure ..................................................................... 22

        2.    Wayfarer Fails to Allege Actual Malice ................................................... 24

IV.    Plaintiffs are Entitled to Attorneys' Fees Under New York's Anti-SLAPP Law ............ 24

CONCLUSION ................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*215 W. 84th St Owner LLC v. Bailey*,
    191 N.Y.S.3d 368 (N.Y. App. Div. 2023) ..............................................................25

*Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*,
    55 N.Y.S.3d 54 (N.Y. App. Div. 2017) ...................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................8, 17, 18, 21

*Awards.com, LLC v. Kinko's, Inc.*,
    834 N.Y.S.2d 147 (N.Y. App. Div. 2007) .............................................................14

*Bausch & Lomb Inc. v. Bressler*,
    977 F.2d 720 (2d Cir. 1992)..................................................................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................7

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013).............................................................23, 24

*Bluffs Homeowners' Ass'n v. Frador Mktg., Inc.*,
    809 N.Y.S.2d 329 (N.Y. App. Div. 2006) .............................................................17

*Bobulinski v. Tarlov*,
    758 F. Supp. 3d 166 (S.D.N.Y. 2024)....................................................................25

*Broughty v. Bouzy*,
    2023 WL 5013654 (D.N.J. Aug. 7, 2023) .............................................................21

*Canzona v. Atanasio*,
    989 N.Y.S.2d 44 (N.Y. App. Div. 2014) .................................................................8

*Carroll v. Trump*,
    685 F. Supp. 3d 267 (S.D.N.Y.)......................................................................20, 21

*Celle v. Filipino Rep. Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000)..................................................................................24

*Coleman v. Grand*,
    523 F. Supp. 3d 244 (E.D.N.Y. 2021) ...................................................................25

*Cordero v. Transamerica Annuity Serv. Corp.*,
   211 N.E.3d 663 (N.Y. 2023) ........................................................................19

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013) .........................................................................19

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
   551 F. Supp. 3d 320 (S.D.N.Y. 2021) ...........................................................22

*Foltz v. Moore-McCormack Lines*,
   189 F.2d 537 (2d Cir. 1951) .........................................................................20

*Germain v. M & T Bank Corp.*,
   111 F. Supp. 3d 506 (S.D.N.Y. 2015) ...........................................................20

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ................................................................................22, 23

*Gordon v. Dino De Laurentiis Corp.*,
   529 N.Y.S.2d 777 (N.Y. App. Div. 1988) .......................................................9

*Harris v. Provident Life & Acc. Ins. Co.*,
   310 F.3d 73 (2d Cir. 2002) ...........................................................................18

*Harvey v. Cable News Network, Inc.*,
   520 F. Supp. 3d 693 (D. Md. 2021) ..............................................................21

*Heilbut v. Cassava Scis., Inc.*,
   2025 WL 919654 (S.D.N.Y. Mar. 26, 2025) .................................................25

*Int'l Bus. Machines Corp. v. Dale*,
   2011 WL 4012399 (S.D.N.Y. Sept. 9, 2011) .................................................13

*Joshi v. Trs. of Columbia University in New York*,
   515 F. Supp. 3d 200 (S.D.N.Y. 2021) ...........................................................14

*Kenford Co. v. Erie Cnty.*,
   493 N.E.2d 234 (N.Y. 1986) .........................................................................13

*Lamoureux v. Trustco Bank*,
   592 F. Supp. 3d 14 (N.D.N.Y. 2022) ............................................................12

*Lan Sang v. Ming Hai*,
   951 F. Supp. 2d 504 (S.D.N.Y. 2013) ...........................................................11

*Lerman v. Flynt Distrib. Co., Inc.*,
   745 F.2d 123 (2d Cir. 1984) .........................................................................23

*Lively v. Wayfarer Studios LLC et al.*,
No. 1:24-cv-10049-LJL ..................................................................................1, 22

*Markatos v. Citibank, N.A.*,
2024 WL 5154487 (S.D.N.Y. Dec. 18, 2024) ........................................................10

*Marom v. Pierot*,
2020 WL 6572509 (S.D.N.Y. Aug. 30, 2020) ........................................................21

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
392 F.3d 520 (2d Cir. 2004) ..................................................................................13

*Northwell Health, Inc. v. Lexington Ins. Co.*,
550 F. Supp. 3d 108 (S.D.N.Y. 2021) ....................................................................11

*Oakley v. Morton*,
11 N.Y. 25 (1854) ..................................................................................................17

*Parker Waichman LLP v. Squier, Knapp & Dunn Commc'ns, Inc.*,
28 N.Y.S.3d 603 (N.Y. App. Div. 2016) ...............................................................10

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)......................................................................................8

*Piuggi v. Good for You Prods. LLC*,
2025 WL 588316 (S.D.N.Y. Feb. 24, 2025) ..........................................................13

*Qureshi v. St. Barnabas Hosp.*,
430 F. Supp. 2d 279 (S.D.N.Y. 2006) ....................................................................21

*Reeves v. Associated Newspapers, Ltd.*,
218 N.Y.S.3d 19 (N.Y. App. Div. 2024) ...............................................................25

*Schifanelli v. Queen Anne's Cnty. Board of Comm'rs.*,
2021 WL 3681157 (D. Md. Aug. 18, 2021) ..........................................................21

*Sebro Packaging Corp. v. S.T.S. Indus.*,
461 N.Y.S. 2d 812 (N.Y. App. Div. 1983) ............................................................11

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
864 F.3d 236 (2d Cir. 2017)....................................................................................21

*Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*,
706 F. Supp. 3d 409 (S.D.N.Y. 2023)....................................................................14

*Trump v. Trump*,
189 N.Y.S.3d 430 (N.Y. Sup. Ct. 2023) ................................................................25

*VFS Fin., Inc. v. Falcon Fifty LLC,*
  17 F. Supp. 3d 372 (S.D.N.Y. 2014)...............................................................16

*Zink v. Mark Goodson Prods., Inc.,*
  689 N.Y.S.2d 87 (N.Y. App. Div. 1999) .......................................................13

*Zurich American Life Insurance Co. v. Nagel,*
  590 F. Supp. 3d 702 (S.D.N.Y. 2022)...........................................................12

**<ins>Rules / Statutes</ins>**

42 U.S.C. § 19401–4 (2022) ...............................................................................2, 14

42 U.S.C. § 19401(6) ...............................................................................................15

42 U.S.C. § 19402(1) ...............................................................................................15

42 U.S.C. § 19403(a) ..........................................................................................15, 16

N.Y. Civ. Rights Law § 70-a ...................................................................................25

N.Y. Civ. Rights Law § 70-a(1)(a) ..........................................................................24

N.Y. Civ. Rights Law § 76-a(1) ..............................................................................25

Fed. R. Civ. P. 8 ......................................................................................................20

Fed. R. Civ. P. 12(b)(6)...............................................................................3, 7, 12, 14

**<ins>Other Authorities</ins>**

168 Cong. Rec. .........................................................................................................15

## PRELIMINARY STATEMENT

Wayfarer's amended counterclaims are, like their predecessors, devoid of any footing in law or reality, and serve only as a transparent vehicle to vent Wayfarer's anger over the lawful exposure of its co-founder Justin Baldoni's sexual harassment of co-star Blake Lively, and his and Wayfarer's retaliatory, vindictive smear campaign that followed. Irate not at Baldoni's wrongdoing, but that it was widely covered in the press, Wayfarer now seeks to punish Jonesworks and its founder Stephanie Jones, masking lawful process with defamatory cries of "leaks." There were no leaks and Wayfarer is not a victim. Instead, it was a principal actor not only in the Lively campaign, but also in a covert, calculated scheme to sabotage Jonesworks from within and flout irrefutably plain contractual commitments. Wayfarer's amended counterclaims fare no better than their first attempt, falling far short of stating any viable claim for relief.

Wayfarer's breach of contract counterclaim primarily rests on specious allegations that Jones and Jonesworks improperly divulged confidential information. This fails on numerous fronts. First, "Confidential Information" as defined in the agreement excludes "information [] which is or later becomes publicly available through no wrongful act of Company." Dkt. 51-1 at 3. That is precisely what happened here: information was produced and made public pursuant to a lawful subpoena, which after months of cries of phantom subpoenas, even Wayfarer finally accepts. Dkt. 51 ¶ 63; *see also* Complaint, Dkt. 1-1 ¶ 14; Complaint, *Lively v. Wayfarer Studios LLC et al.*, No. 1:24-cv-10049-LJL, Dkt. 1 ¶ 9 n.3. Second, Wayfarer alleges that the information produced was "*Abel's private communications*," not Wayfarer confidential information, which is self-defeating of Wayfarer's breach of contract claim.[1] Dkt. 51 ¶ 53. Third, Wayfarer's false

---

[1] As Jones and Jonesworks' contemporaneously filed motion to dismiss the Abel counterclaims makes clear, Abel had no right or expectation of privacy in the communications from her company phone, nor did the communications revealing the defendants' smear campaigns in the course of Abel's employment constitute "private" or "personal" communications.

allegations are hopelessly vague, failing to identify any purported "confidential" information with any specificity. This lack of detail is for good reason, as under no construction could information exposing a vindictive sexual harassment and retaliation conspiracy constitute Wayfarer information subject to protection. Finally, Wayfarer's amended counterclaims attempt to wield the confidentiality provision of the services agreement between Jonesworks and Wayfarer to suppress disclosures concerning Lively's harassment at the hands of Wayfarer's co-founder, as well as the company's own role in the ensuing retaliation campaign—while punishing Jones and Jonesworks for cooperating with a legal process that brought those facts to light. This effort is squarely prohibited by the federal Speak Out Act, which precludes enforcement of pre-dispute nondisclosure clauses in matters involving sexual harassment and retaliation, and, accordingly, renders the confidentiality clause of the Wayfarer agreement unenforceable.

Wayfarer also alleges that Jones "failed to render services 'in a professional manner and in accordance with [Wayfarer's] goals.'" Not so. The amended counterclaims themselves reveal that Jones worked tirelessly on Baldoni and Wayfarer's behalf to pursue a positive agenda in seeking to counteract negative press about Baldoni—press that stemmed from Baldoni's own wrongdoing. Wayfarer's breach of contract claim also fails because it unilaterally—and wrongfully—purported to terminate the very agreement it now accuses Jones and Jonesworks of breaching. In August 2024, months before the agreement's end date, Wayfarer purported to cut ties with Jonesworks without providing the requisite notice or opportunity to cure, and then ceased paying its monthly fees to Jonesworks in blatant violation of its contractual obligations. Its counterclaim hinges on the legally untenable theory that its own non-performance was excused, despite offering no factual allegations establishing a material breach by Jones or Jonesworks that could justify termination or

non-performance. In short, Wayfarer has failed to plausibly plead a breach of contract claim to withstand a Rule 12(b)(6) motion to dismiss.

Wayfarer's implied covenant of good faith and fair dealing counterclaim fares no better. It is duplicative of its breach of contract claim, premised on the exact same factual allegations, and invents an implied duty that does not exist. Wayfarer has not alleged that the agreement was not performed in good faith. Instead, Wayfarer has alleged a misguided breach of contract claim, which fails for the parade of reasons set forth above and herein. Under well-settled New York law, a separate implied covenant claim must be dismissed.

Finally, Wayfarer's new defamation counterclaim collapses under minimal scrutiny. For one, Wayfarer's amended counterclaims are bereft of any allegations that the allegedly defamatory statement—regarding a "smear campaign" to destroy Lively's reputation as retaliation for Lively's purported complaints about sexual harassment on set"—is false. In fact, the amended counterclaims are rife with allegations that confirm the truth of the statement. And falsity aside, the purported statement that Wayfarer's crusade against Lively was a "smear campaign" is a quintessential protected opinion, protected under well-established First Amendment principles. Moreover, as a public figure, Wayfarer was required to allege that the statement was made with actual malice. It does not, providing yet another basis for dismissal. Wayfarer's defamation counterclaim is not only suspect in its tardy unveiling (despite knowing the purported facts underlying the claim as of its first counterclaims), but also fails as a matter of law and is so baseless that it warrants an award of attorneys' fees under New York's anti-SLAPP statute.

Wayfarer's amended counterclaims are not just meritless—they are retaliatory. They are yet another effort at a smokescreen transparently leveraged to shift the limelight from Wayfarer and its founder's bad acts. Wayfarer breached its contract with Jonesworks and participated in a

campaign to take down Jones and the business she spent years building. Wayfarer must be held to account absent the distraction of faulty amended counterclaims. Its continuing gambit should not be countenanced, and the Court should dismiss the amended counterclaims with prejudice.

## FACTUAL BACKGROUND

Jonesworks LLC ("Jonesworks") is a public relations agency founded by Stephanie Jones, who is also its CEO. Dkt. 51 ¶ 10.[2] Jonesworks has represented a variety of entertainment clients, including Wayfarer Studios LLC ("Wayfarer") and its co-founder, Justin Baldoni. *Id.* ¶¶ 11, 13, 18. Wayfarer is a movie studio "devoted to producing world-class entertainment with a mission-driven purpose." *Id.* ¶ 18. Wayfarer has produced several widely distributed films and, in 2019, it acquired the film rights to the "explo[sively] popular[]" novel *It Ends With Us*. *Id.* ¶ 19. Wayfarer produced the film, for which Baldoni was the male lead, director, and executive producer, and co-financed and distributed it alongside Sony. *Id.* ¶ 20-21. *It Ends With Us* had a passionate, large fan base, largely attributable to the novel's popularity on TikTok. *Id.*

In May 2020, Wayfarer and Jonesworks entered into a written services agreement (the "Agreement"). Dkt 51-1. Wayfarer agreed to pay Jonesworks $20,000 per month in exchange for Jonesworks' PR and communications services, and an additional $5,000 per month for services provided to Baldoni. Dkt 51 ¶¶ 13, 14; Dkt. 51-1 at 1. The Agreement states that Jonesworks will be Wayfarer's "exclusive public relations counsel to provide strategic communications services," including "[p]osition[ing] and utiliz[ing] Wayfarer Studios key executives as thought-leaders and change agents in the film and television industry," "[c]onduct[ing] proactive feature pitching to top-tier print, broadcast and online media outlets." Dkt. 51-1 at 1, 5. The Agreement further sets

---

[2]    Unless expressly indicated, citations to Dkt. 51 and the paragraphs therein will refer to Wayfarer's amended counterclaims.

forth that "[Jonesworks] shall provide the Services in a professional manner and in accordance with the goals mutually established by [Wayfarer] and [Jonesworks]." *Id.* at 1.

The Agreement also provides:

> Throughout [Wayfarer's] engagement of [Jonesworks] hereunder, [Wayfarer] may disclose or provide [Jonesworks] with confidential, proprietary and/or sensitive information about [Wayfarer], its customers or other related parties ("Confidential Information"). [Jonesworks] shall use reasonable and diligent efforts to keep Confidential Information confidential provided that [Jonesworks] may disclose such information to third parties to the extent necessary to fulfill its obligations under this Agreement or to its legal representatives. [Jonesworks] shall not use such information for any purpose beyond the performance of [Jonesworks'] services hereunder unless otherwise required by law or a court of competent jurisdiction . . . Notwithstanding the foregoing, [Jonesworks] is not liable for any third party's disclosure of [Wayfarer's] Confidential Information so long as such third party did not obtain the Confidential Information as a result of [Jonesworks'] breach or failure to uphold its obligations hereunder.

*Id.* at 3.

The Agreement does not require that Jonesworks notify Wayfarer in the event it receives a subpoena compelling the disclosure of information potentially relating to Wayfarer.

In mid-2024, Jonesworks and Jones were providing PR services for Wayfarer and Baldoni in connection with *It Ends With Us*. Dkt. 51 ¶¶ 19, 32. As the premiere drew closer, Wayfarer and Baldoni found themselves in a PR crisis, with news outlets speculating about possible tension between Lively and Baldoni. *Id.* ¶ 32. Jonesworks employee Jennifer Abel was its point person on the Wayfarer account, entrusted with the role due to her seniority and experience. *Id.* ¶ 27. Although not running point, Jones regularly participated in meetings, calls, and written correspondence. *Id.* ¶¶ 10–11, 13, 27, 32, 40. As Baldoni's harassing misdeeds began to appear in the media, Wayfarer and Baldoni engaged crisis PR expert Melissa Nathan. *Id.* ¶ 33. Jones advocated positivity; however, unbeknownst to her, Abel and Nathan were running a shadow campaign for Wayfarer and Baldoni to destroy and bury Lively. *Id.* ¶ 46.

On August 8, 2024, a *Daily Mail* reporter told Abel and Jones that she was "working on a story surrounding the recent rumors that there was a feud between It Ends With Us costars Blake Lively and Justin Baldoni." *Id.* ¶ 40. Jones received this message after the story was published but offered to work with the reporter to "get this fixed" since "she's been very nice in past." *Id.* Jones emailed Wayfarer CEO Jamey Heath and Baldoni that she "left word" for the reporter, having returned a missed called believed to be (but not in fact) the reporter's. *See id.* Jones never called or connected with the *Daily Mail* reporter. *See id.* ¶ 45.

Naturally, Jones' press strategy focusing on "promot[ing] positive narratives" was not aligned with Wayfarer's secret agenda of taking down Lively. *Id.* ¶ 46. Accordingly, Wayfarer and Baldoni told Jones to stand down, while Abel and Nathan falsely informed Sony and Sloane that Jones had leaked information and was "communicat[ing] negatively to media." *Id.* ¶ 40–41. This was abjectly false, as Jones confirmed at the time to Wayfarer's president, Tera Hanks: she never leaked *any information* about Baldoni or Wayfarer to the *Daily Mail* or *any other outlet*. *Id.* ¶ 45. Nevertheless, falsely accused and seeking to quash the perpetuation of a false narrative, Jones naturally contacted Sony to inform them that she did not do so. *Id.* ¶ 43.

Throughout August 2024, as coverage of the strained relationship between Baldoni and the *It Ends With Us* cast mounted, Jones continued to advise Wayfarer on a positive approach in navigating the PR fallout, particularly given that, in her view, Baldoni was "not being represented in these stories," so they had "to fight for every story, " as she informed Hanks. *Id.* ¶ 45. Jones even sent Hanks her phone records to show that she did not call the *Daily Mail* or any other media source. *Id.* Jones reiterated that her goal was "to help [Baldoni] and Wayfarer." *Id.*

Consistent with the Agreement and the Services provided by Jonesworks thereunder, on August 14, Jones emailed Heath a recommended media strategy. Jones proposed, among other

things, "Flood[ing] the Zone with Positives" to "ensure that we promote positive narratives that media outlets cannot ignore." *Id.* ¶ 46. And as word of Baldoni's harassment towards Lively continued to spread—including in an August 14, 2024 TMZ article titled "Blake Lively Felt Justin Baldoni Fat-Shamed Her, Kissed Too Long During Scene"—Jones offered to contact Harvey Levin, the founder of TMZ, "to get this story fixed/removed if [Nathan] cannot" in furtherance of the goal of "work[ing] as [a] team and collectively to tackle the influx the stories…." *Id.*

Wayfarer, whose "circles held Lively in deep disdain and, to a certain extent, regarded her self-immolation with a degree of schadenfreude," adopted the opposite covert strategy to smear Lively. *Id.* ¶ 57. Heath, having signed on to this strategy, rejected Jones' recommendations and emailed Jones instructing that she "not respond, contact, or do anything as it pertains to Justin or Wayfarer" all the while keeping Jones in the dark. *Id.* ¶ 46.

On August 21, 2024, Jonesworks terminated Abel. *Id.* ¶ 48. In August 2024, Wayfarer purported to unilaterally terminate the Agreement (and with it the clause requiring that matters be arbitrated), advising Jonesworks that the termination would be effective "as of the end of August." *Id.* ¶ 52. Wayfarer's notice to Jonesworks did not provide a legitimate reason for terminating the Agreement, or cite to any provision of the Agreement that was purportedly breached by Jonesworks in justifying the termination. *Id.* They did not because they could not. By September 2024, Wayfarer had engaged Abel's new firm to provide PR services. *Id.* ¶ 49.

Pursuant to a subpoena, Jonesworks produced documents. *Id.* ¶ 63.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege facts which, when taken as true, contain sufficient matter "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Furthermore, allegations that are nonsensical, as well as assertions that omit critical facts, do not have to be accepted on a motion to dismiss. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013) ("Determining whether a complaint states a plausible claim for relief [is]…a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." (citation omitted)).

## ARGUMENT

### I.    Wayfarer's Breach of Contract Counterclaims Should Be Dismissed for Failure to State a Claim

Wayfarer's breach of contract claims fail to adequately allege a material breach by Jones or Jonesworks, fail to identify any specific misconduct undergirding any such breach, and rely on speculative and conclusory assertions unsupported by well-pleaded facts, so must be dismissed.

### A.    Wayfarer Fails to Plausibly Allege Plaintiffs Breached the Agreement

Wayfarer's first breach of contract counterclaim—asserting that Plaintiffs breached the Wayfarer Agreement's confidentiality provision—fails because it does not specify how Jones or Jonesworks purportedly breached the parties' Agreement. To sufficiently state a breach of contract claim, a plaintiff must allege both "the provisions of the contract that were breached" and how those provisions were violated. *Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47 (N.Y. App. Div. 2014).

Wayfarer fails on both fronts. In its amended counterclaims, Wayfarer includes several new paragraphs outlining a purported scheme through which Jones and Jonesworks somehow improperly disclosed Wayfarer's confidential information to Sloane, Lively, Lively's husband Ryan Reynolds and, eventually, media outlets including the *New York Times* via a ***lawful*** subpoena. These are hollow accusations lacking in any support whatsoever. For one, Wayfarer never states ***what***, exactly, this purportedly "confidential information" was. This alone is fatal to

its breach of contract claim. *See, e.g.*, *Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*, 55 N.Y.S.3d 54, 55 (N.Y. App. Div. 2017) (dismissing claim asserting breach of a confidentiality agreement where plaintiff did "not identify what confidential information was allegedly misused"); *Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (N.Y. App. Div. 1988) (dismissing breach of contract confidentiality claim where plaintiffs failed to identify the substance of "any confidential information imparted to defendant" and "conclusory allegations [were] insufficient").

Wayfarer makes no serious attempt to argue that Jones acted improperly in responding to a subpoena and producing documents.[3] That silence is telling, as not only did Jones act properly, but she was legally obligated to comply. Wayfarer's lone assertion of impropriety is that Jonesworks did not "provide notice of the subpoena to Wayfarer or its representatives." Dkt. 51 ¶ 63. But the Agreement contains no such obligation. Dkt. 51-1 at 3. Having never negotiated nor agreed to such a provision, Wayfarer cannot now conjure a truly phantom clause to support it faulty claim.

Wayfarer also baselessly attempts to suggest that Jones disclosed Abel's text messages to Sloane before receiving a subpoena. Other than this conclusory allegation, Wayfarer fails to allege what these purported text messages actually contained, when and how they were purportedly disclosed, how—if at all—they involved confidential information relating to Wayfarer, or how messages that support Sloane's purported statement that "Nathan could expect to be sued" could be "Confidential Information" under the Agreement. Instead, the amended counterclaims allege that Wayfarer's co-defendant Nathan said that Sloane had told Nathan that Sloane "had [] seen" (the counterclaims conveniently employ passive voice here) Abel's unspecified text messages.

---

[3] Plaintiffs respectfully directs the Court to Plaintiffs' motion to dismiss Abel's amended counterclaims for further discussion concerning the subpoena as it implicates Abel.

Dkt. 51 ¶ 54. This game of telephone is nothing more than hopeless speculation, not even purporting to involve Jones or Wayfarer directly, and cannot support the conclusion that Jones must have leaked confidential information about Wayfarer to Sloane, nor suffice as a plausible basis for a legal claim. *See Parker Waichman LLP v. Squier, Knapp & Dunn Commc'ns, Inc.*, 28 N.Y.S.3d 603, 603 (N.Y. App. Div. 2016) ("The complaint's boilerplate allegations that defendants disclosed confidential information, thereby causing harm, are too vague and conclusory to sustain a breach of contract cause of action.").

Wayfarer also fails to tether any alleged disclosure to the language of the Agreement. This is for good reason. The Agreement's confidentiality provision is narrowly drawn: it obligates Jonesworks only to "use reasonable and diligent efforts to keep Confidential Information confidential," and expressly permits disclosure "to third parties to the extent necessary to fulfill its obligations under this Agreement or to its legal representatives." Dkt. 51-1 at 3. Wayfarer never alleges that any disclosure fell outside these limits. It does not contend that the information disclosed was not "necessary to fulfill" Jonesworks' obligations, or that it was shared for a prohibited or illegal purpose, or that it was not already known to third parties. *Id.* Nor does it allege that any information even qualified as "Confidential Information" as defined under the Agreement,[4] or that it was not excused per the Agreement, which excludes form the definition of "Confidential Information," material "(a) which is or later becomes publicly available through no wrongful act of Company." Courts routinely dismiss breach of contract claims where, as here, the pleading fails to connect allegations of wrongdoing to the operative contract's actual terms. *See Markatos v. Citibank, N.A.*, 2024 WL 5154487, at *10 (S.D.N.Y. Dec. 18, 2024) (dismissing

---

[4]  Dkt. 51-1 at 3 (defining "Confidential Information" as "confidential, proprietary and/or sensitive information about Client, its customers or other related parties").

breach of contract cause of action where plaintiff's claim that defendant breached the at-issue agreement was "a legal conclusion couched as a factual allegation, and the Complaint does not provide factual allegations sufficient to infer that Defendant breached said duty"); *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 115 (S.D.N.Y. 2021) ("[A]llegations that merely parrot the language of the contractual provisions alleged to be breached without providing supporting facts are not presumed true.").

Wayfarer's second breach of contract counterclaim—alleging that Jones and Jonesworks somehow breached the Agreement by failing to "follow instructions"—fares no better. This counterclaim offers no detail about what "instructions" were purportedly given, who gave them, when or in what context, how Jones or Jonesworks did not "follow" them, and how this constituted a breach of the Agreement. *Id.* ¶¶ 26. Indeed, Wayfarer does not point to a single provision in the Agreement that required Jonesworks to obey its "instructions" at all—because no such obligation exists. Instead, the Agreement requires that Jonesworks provide services to Wayfarer "in a professional manner and in accordance with the goals mutually established by [Wayfarer] and [Jonesworks]." Dkt. 51 ¶ 15; Dkt. 51-1 at 1. Wayfarer does not allege any facts intimating that Jonesworks failed to perform its services in a professional manner, or that it disregarded any mutually established goals. Nor does it identify a single metric of performance that Jonesworks allegedly failed to meet. *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 527 (S.D.N.Y. 2013) ("Without stating which specific terms of the contract have been breached, a complaint fails to provide the defendant with sufficient notice to defend the claim."); *Sebro Packaging Corp. v. S.T.S. Indus.*, 461 N.Y.S. 2d 812, 812 (N.Y. App. Div. 1983) (dismissing breach of contract claim where "complaint failed to set forth the nature of the contractual obligation alleged to have been violated…or the nature of the claimed breach."). To the contrary, Wayfarer's amended

counterclaims themselves allege numerous facts showing Jones and Jonesworks acting in furtherance of the Services set forth in the Agreement—many of which involve developing and executing a press strategy—including where Jones offers to contact multiple reporters authoring potentially negative stories about Baldoni, and where she sends Wayfarer a multi-point strategy to combat Baldoni's unfavorable media coverage.[5] Dkt. 51 ¶¶ 40, 46.

In short, Wayfarer's breach of contract counterclaims, even after amended, persist in being devoid of any factual allegations that would support a breach of any enforceable contractual duty. Courts routinely find that claims as these, built on speculation, inference, and generalities—alleging a breach not of the Agreement, but of vague, ambiguous, and ever-shifting requirements not actually in the contract, are not enough. *See Lamoureux v. Trustco Bank*, 592 F. Supp. 3d 14, 36–37 (N.D.N.Y. 2022) (dismissing claim where party failed to link conduct to contract terms). Wayfarer's amended counterclaim must be dismissed under Rule 12(b)(6).

### B.    Wayfarer Fails to Plausibly Allege Any Harm It Suffered

Even if Wayfarer had identified a breach of the Agreement—which it has not—it still fails to allege any non-speculative damages resulting from that alleged breach. Under New York law, a plaintiff must plead not only a cognizable contractual breach, but also that it suffered actual, proximate, and non-conclusory damages flowing from that breach. *See Zurich American Life Insurance Co. v. Nagel*, 590 F. Supp. 3d 702, 718 (S.D.N.Y. 2022) ("To establish actual damages, plaintiffs must come forward with evidence to establish the existence of actual damages that they suffered that were directly and proximately caused by [defendant's] breach. Speculative or

---

[5] To the extent Wayfarer suggests that Jones and Jonesworks' breach was premised on Jones not "following instructions" to not speak with certain press outlets, the counterclaims do not ever allege that Jones actually spoke with any reporter. To the contrary, the only allegation concerning Jones' purported interactions with the media in the counterclaims is Jones' text message to Hanks, in which she expressly informs Hanks that she did not speak with any media outlet and provides phone records to prove as much. Dkt. 51 ¶ 45.

conjectural theories of damage are insufficient." (citing *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004)).

Nowhere in the counterclaims does Wayfarer allege any concrete harm stemming from the purported disclosure of (unspecified) confidential information, let alone the disclosure of any such information. The amended counterclaims do not identify a single news item containing any allegedly harmful information. They do not allege how any content was purportedly false, damaging, disseminated, or even traceable to Jones or Jonesworks. And Wayfarer does not allege any actual consequence—financial, reputational, or otherwise—suffered by Wayfarer as a result. This is not enough. *Int'l Bus. Machines Corp. v. Dale*, 2011 WL 4012399, at *2 (S.D.N.Y. Sept. 9, 2011) ("[A]an allegation that defendant 'suffered damages' without particular facts as to how she was damaged does not satisfy *Twombly* and *Iqbal*."). Instead, Wayfarer relies on inference built atop inference: that Jones or Jonesworks must have been the source of some unspecified harm simply because they complied with a lawful subpoena, and that this harm must have flowed from a contractual breach. But courts routinely reject damages that are not "capable of proof with reasonable certainty." *Kenford Co. v. Erie Cnty.*, 493 N.E.2d 234, 235 (N.Y. 1986); *cf. Piuggi v. Good for You Prods. LLC*, 2025 WL 588316, at *12 (S.D.N.Y. Feb. 24, 2025) (dismissing breach of NDA claim where "[e]ven assuming that [defendant] 'shar[ing] information about [plaintiff's] show...with [third party]'" was a breach, plaintiff "does not explain how this breach harmed him"). Allegations as these grounded in conjecture, speculation, and post hoc assumptions cannot substitute for facts, particularly where the claimed harm involves media narratives and third-party conduct—factors well beyond the parties' contractual framework and outside the scope of Jonesworks' obligations. *See, e.g.*, *Zink v. Mark Goodson Prods., Inc.*, 689 N.Y.S.2d 87, 88 (N.Y.

App. Div. 1999) (affirming dismissal of plaintiffs' claim for lost profits since it was predicated upon assumptions and conjecture).

Even more telling is what Wayfarer does not allege: it does not claim lost revenue, lost opportunities, increased costs, reputational decline tied to specific events, or any other identifiable economic or actual injury. These omissions are dispositive. *See, e.g.*, *Joshi v. Trs. of Columbia University in New York*, 515 F. Supp. 3d 200, 220 (S.D.N.Y. 2021) ("In this case, the plaintiff does not allege any specific business opportunities lost as a result of his allegedly damaged reputation….Such a claim is insufficient to obtain damages on a breach of contract claim.") (citations omitted)); *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 153–54 (N.Y. App. Div. 2007), *aff'd*, 925 N.E.2d 926 (N.Y. 2010) ("Even if plaintiffs could show that the parties had, in fact, at the time of contracting, contemplated liability for lost profits damages, their claim for such damages would still have been properly dismissed because of its purely speculative nature.").

Ultimately, in addition to the amended counterclaims' failure to plead how, when, or where any alleged disclosure might have occurred, Wayfarer has also failed to allege any facts connecting a supposed disclosure to any cognizable harm. That failure is independently dispositive. *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, 706 F. Supp. 3d 409, 441 (S.D.N.Y. 2023) ("Under New York law, '[c]ausation is an essential element of damages' for breach of contract claims. . . . Damages must be 'directly traceable to the breach, not remote or the result of other intervening causes.") (quotations omitted)). A breach without harm is not a claim; it is a grievance, and one that cannot survive a motion to dismiss under Rule 12(b)(6).

## C.    The Speak Out Act Bars Enforcement of the Confidentiality Clause

Assuming arguendo that Wayfarer has plausibly alleged a breach of the Agreement's confidentiality provision, which it has not, including because there was a subpoena, its claim fails as a matter of law because enforcement of that provision is barred under the Speak Out Act, 42

U.S.C. §§ 19401–4 (2022) (the "Act"). The Act provides: "With respect to a dispute involving sexual assault or sexual harassment, no nondisclosure clause or nondisparagement clause agreed to before the dispute arises shall be judicially enforceable." *Id.* § 19403(a). This reflects Congress's determination that such provisions "punish the survivor and protect the perpetrator, who is set free to abuse and abuse and abuse again." 168 Cong. Rec. H8519 (daily ed. Nov. 16, 2022).[6]

The Act is designed not only to protect direct victims, but to ensure that witnesses, employees, and third parties are not contractually gagged from participating in investigations, complying with subpoenas, or exposing retaliatory conduct that seeks to chill lawful speech about abuse. 42 U.S.C. § 19401(6) ("Nondisclosure and nondisparagement provisions in agreements . . . can perpetuate illegal conduct by silencing those who are survivors of illegal sexual harassment and assault or illegal retaliation, ***or have knowledge of such conduct***, while shielding perpetrators and enabling them to continue their abuse.") (emphasis added); *see also* 168 Cong. Rec. H8518 (legislative history confirming Congress' purpose in broadly removing barriers to the disclosure of information regarding sexual harassment).

What Wayfarer seeks to do here is precisely what the statute prohibits: punish Jones and Jonesworks for complying with legal process and bringing to light the extent of Baldoni's harassment of Lively and Wayfarer's role in retaliating against Lively. Wayfarer's amended counterclaims themselves establish that its dispute with Plaintiffs arises from Baldoni's own misconduct on the set of *It Ends With Us*, including his sexual harassment of co-star Lively, conceding that, during a period of intense public scrutiny, Wayfarer faced press inquiries into

---

[6] "Nondisclosure clause" is broadly defined to mean any "provision in a contract or agreement that requires the parties to the contract or agreement not to disclose or discuss conduct, the existence of a settlement involving conduct, or information covered by the terms and conditions of the contract or agreement." 42 U.S.C. § 19402(1). "Sexual harassment dispute" is likewise broadly defined to mean any "dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.* § 19402(4).

Baldoni's behavior, including accusations that he "fat-shamed" Lively, kissed her too long during a scene, and acted inappropriately. Dkt. 51 ¶¶ 33, 40, 46. These allegations were at the core of a reputational crisis—one Wayfarer tried to suppress.

Wayfarer does not deny that Baldoni was facing public scrutiny due to his mistreatment of women; nor does it deny Baldoni, Wayfarer, Nathan, and Abel's smear campaign against Lively in the wake of such mistreatment. It does not deny that the information that was ultimately reported in the press related to that scrutiny, mistreatment, and smear campaign. Angry not at Baldoni's gross mistreatment of Lively, but instead that it came to light, Wayfarer seeks to punish Jones and Jonesworks under the Agreement's commercial confidentiality clause, claiming that Wayfarer's misdeeds and retaliation should have never been disclosed. This effort to chill disclosure, shift blame, and distance itself from its own conduct and its co-founder's blatant harassment is repugnant and should be dismissed out of hand.

The amended counterclaims reveal that what Wayfarer truly objects to is not any breach of business confidentiality, but rather that material was ultimately disclosed that evidenced a retaliation campaign orchestrated by Wayfarer and its coconspirators against Lively. According to the amended counterclaims, Sloane contacted Nathan and said that she had seen Nathan's text messages and she should expect to get sued. Dkt. 51 ¶ 54. That is, Nathan would be sued—and now, has been sued—for administering the campaign of retaliation against Lively for reporting harassment by Baldoni. Disclosure of information revealing the basis for such claims is precisely what the Act is designed to protect and what it in fact protects here. 42 U.S.C. § 19403(a).

## D.    Wayfarer Has Not Alleged a Material Breach Excusing Its Own Performance

Under New York law, a party must perform under a contract; their performance is excused only where the other party has materially breached the agreement—that is, where the breach is "so substantial that it defeats the object of the parties in making the contract." *VFS Fin., Inc. v. Falcon*

16

*Fifty LLC*, 17 F. Supp. 3d 372, 379–80 (S.D.N.Y. 2014). To sufficiently excuse their non-performance, the party must allege specific facts of the material breach and the excuse. *See Oakley v. Morton*, 11 N.Y. 25, 33 (1854) ("[I]f an excuse was relied upon, [plaintiff] should have averred his readiness to perform, and the particular circumstances which constituted such excuse.").

Wayfarer did not plead a material breach on Jones or Jonesworks' behalf excusing it from performing under the Agreement. Wayfarer merely claims that it "advised Jones that they were terminating the Jonesworks Agreement as of the end of August" 2024, and follows with the conclusory allegation that this was justified and excused due to Jonesworks' material breach. Dkt. 51 ¶ 52. First, this is a quintessential example of a barebones allegation of simply the legal standard, which is routinely disregarded as insufficient by courts. *Iqbal*, 556 U.S. at 663. Second, as discussed *supra* Section 1.A, the amended counterclaims do not (because they cannot) plead a material breach of the Agreement on Jonesworks' part that would excuse Wayfarer from performing. Failing to allege any concrete instances of purported conduct warranting non-performance (which under no construction could be alleged to constitute a breach) defeats any claim by Wayfarer that they were aware of any, let alone had sufficiently pleaded any, breach substantial enough to justify immediate termination. Wayfarer cannot retroactively manufacture a material breach based on speculation or events allegedly discovered later, or to justify improperly leaving Jonesworks to jump ship to Abel's new firm. *Bluffs Homeowners' Ass'n v. Frador Mktg., Inc.*, 809 N.Y.S.2d 329, 330 (N.Y. App. Div. 2006) ("Plaintiff was also required to establish in support of its motion that defendant breached a material term of the agreement, inasmuch as that was a condition precedent to plaintiff's right to terminate the agreement." (citations omitted)).

In reality, Wayfarer itself breached the Agreement when it claimed to terminate without complying with the notice-and-cure provision requiring Wayfarer to provide Jonesworks with

notice of any breach and a ten-day period to cure such breach prior to terminating the Agreement. Dkt. 51-1 at 3 ("Either party may terminate this Agreement upon the other party's material breach of this Agreement provided that the non-breaching party shall furnish notice of such breach to the breaching party and the breaching party shall have ten (10) days from receipt of such notice to cure the breach."). Under New York law, failing to comply with a notice-and-cure provision in and of itself is a material breach of an agreement. *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (holding that party materially breached agreement by failing to comply with notice-and-cure provision). And this is precisely what happened, as demonstrated by Wayfarer's own amended counterclaims: Wayfarer fails to allege that it ever provided Jonesworks written notice of any breach or afforded Jonesworks the contractually mandated ten-day opportunity to cure. Wayfarer only offers the conclusory claim that it "substantially performed the Agreement or was excused from doing so." *Id.* ¶¶ 69, 78. But, again, merely parroting the legal standard for excusing performance is not sufficient for Wayfarer to state a claim or absolve itself of its own obvious breach of the Agreement. *Iqbal*, 556 U.S. at 687 (2009).

## II.    Wayfarer's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing Must Be Dismissed as Duplicative of Its Breach of Contract Claims

Wayfarer's counterclaim for breach of the implied covenant of good faith and fair dealing is not an independent cause of action—it is a repackaged contract claim, based on the same conduct and obligations already at issue in its breach of contract counterclaim. Under well-settled New York law, such duplicative claims are not permitted.

The Second Circuit is unequivocal: New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). "[W]hen a complaint alleges both a breach of contract and a breach of the

implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

That is precisely the case here. Wayfarer's implied covenant claim (Dkt. 51 ¶¶ 81–86) is predicated on the same allegations—often verbatim—that underpin its breach of contract claims (*id.* ¶¶ 66–80): that Jonesworks allegedly disclosed confidential information (*id.* ¶¶ 70, 84) and/or "act[ed] against Wayfarer's interests" (*id.* ¶¶ 77, 84), and that Wayfarer substantially performed the Agreement or was excused from doing so (*id.* ¶¶ 69, 78, 83). These allegations all fall squarely within the scope of the plain language of the Agreement, which sets out the confidentiality terms and scope of services. Dkt. 51-1 at 1, 3. There is no allegation of misconduct that falls outside the contract, no facts suggesting any bad faith distinct from the alleged breach itself, and no separate duty owed beyond those enshrined in the Agreement.

The deficiency runs deeper than duplication. Wayfarer does not ever actually allege that Jonesworks acted in bad faith in performing the Agreement—it alleges only that Jonesworks breached it. Wayfarer's sole, conclusory allegation that Jonesworks and Jones "maliciously" disclosed confidential information "for the specific purpose of harming Wayfarer and Baldoni," Dkt. 51 ¶ 84, does not, alone, support Wayfarer's claim for breach of the implied covenant of good faith and fair dealing because, notwithstanding the allegation's dramatic flair, it does not allege some separate conduct that had "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023). Indeed, the amended counterclaims contain no allegations showing that Jones or Jonesworks did anything other than perform the Agreement in good faith and reasonably until Wayfarer's clear breach. *See, e.g.*, Dkt. 51 ¶¶ 40, 46.

Because Wayfarer alleges no additional facts that could give rise to a distinct implied covenant claim, its implied covenant counterclaim is duplicative and must be dismissed.

## III.    Wayfarer's Defamation Counterclaim Must Be Dismissed

Wayfarer's new defamation counterclaim—which is inherently suspect given that it is based on alleged facts well-known to Wayfarer at the time of its original counterclaims—unsurprisingly also fails. To state a defamation claim, public figures like Wayfarer "must show that the statements [it] complains of were (1) of and concerning [the plaintiffs], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either knowledge of falsity or reckless disregard of the truth." *Carroll v. Trump*, 685 F. Supp. 3d 267, 274 (S.D.N.Y.). Here, Wayfarer (falsely) alleges a single allegedly defamatory statement: on information and belief, Jones purportedly told Sloane on August 21, 2024 that "Wayfarer, along with Abel and Nathan had orchestrated a malicious 'smear campaign' to destroy Lively's reputation as retaliation for Lively's purported complaints about sexual harassment on set."[7] Dkt. 51 ¶ 54–55. Wayfarer's claim does not plausibly allege that the challenged statement was factual, false, or published with actual malice. This counterclaim must be dismissed.

### A.    The Alleged Statement is Constitutionally Protected Opinion

First, the alleged statement that Wayfarer engaged in a "smear campaign" is a constitutionally protected opinion that, "[u]nder both New York and federal law…[is] not

---

[7]   Wayfarer may not assert that its defamation claim is premised on any other statement. A defamation claim "must at least identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 537 (S.D.N.Y. 2015) (quotation marks omitted). Wayfarer's pleading fails to identify with specificity any other alleged defamatory statements made, merely speculating about an unspecified "statement" or "statements" to unnamed "persons" "including without limitation Leslie Sloane, Blake Lively, and Ryan Reynolds," untethered to time, place, or content. Dkt. 51 ¶ 88–94. Such conjecture does not satisfy Rule 8. *See Foltz v. Moore-McCormack Lines*, 189 F.2d 537, 539 (2d Cir. 1951) ("It is true that in actions for libel or slander the false and defamatory matter should be pleaded *in haec verba*.").

actionable as defamation." *See Qureshi v. St. Barnabas Hosp.*, 430 F. Supp. 2d 279, 288 (S.D.N.Y. 2006). Courts have routinely found that this precise phrase—"smear campaign"—is a protected opinion. *See, e.g.*, *Broughty v. Bouzy*, 2023 WL 5013654, at *7 (D.N.J. Aug. 7, 2023) (tweets that plaintiff participated in "smear campaign" were opinions); *Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693, 718 (D. Md. 2021) (accusation of engagement in "smear campaign" is opinion); *Schifanelli v. Queen Anne's Cnty. Board of Comm'rs.*, 2021 WL 3681157, at *7 (D. Md. Aug. 18, 2021), *aff'd*, WL 3918679 (4th Cir. June 9, 2023) (same). Because statements of opinion cannot serve as the basis for a defamation claim, Wayfarer's claim must be dismissed.

### B.    Wayfarer Fails to Allege that Plaintiffs Made a False Statement

Second, Wayfarer does not allege facts supporting a conclusion that the alleged statement was false. "[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017). "[W]hen falsity is an element of a state defamation claim, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false." *Carroll*, 685 F. Supp. 3d at 274 (citing *Tannerite*, 864 F.3d at 247)). "[A] plaintiff asserting a claim of defamation must not only identify the allegedly defamatory statement, but also the respect in which it was allegedly false." *Marom v. Pierot*, 2020 WL 6572509, at *4 (S.D.N.Y. Aug. 30, 2020), *report and recommendation adopted*, 2020 WL 6565199 (S.D.N.Y. Nov. 9, 2020) (internal citations omitted).

Here, Wayfarer alleges no facts as to ***how*** the alleged statement that Wayfarer had engineered a retaliatory "smear campaign" against Lively was false. Dkt. 51 ¶ 55. Absent any allegations as to this essential element, all that is left is an "unadorned, the defendant-unlawfully-harmed-me accusation" claim that must be dismissed. *See Iqbal*, 556 U.S. at 678. And what is more, Wayfarer's own counterclaims establish that it was, in fact, engaged in a "smear campaign"

against Lively. For example, Wayfarer concedes that, on the eve of the *It Ends With Us* premiere, media was reporting tension between Lively and Baldoni. Dkt. 51 ¶¶ 32, 33, 40, 46. Those reports demanded immediate "crisis PR expertise" from Nathan. *Id.* ¶ 33. Wayfarer even admits that people in its "circle held Lively in deep disdain," and "regarded her self-immolation with a degree of schadenfreude," which was the "natural result of the Wayfarer Parties' first-hand knowledge of Lively's vicious behavior and malignant persona." *Id.* ¶ 57.

Taken together, those allegations admit the core of the alleged statement: Wayfarer executed a coordinated media offensive to discredit Lively. Even by its own telling, Wayfarer marshaled crisis PR resources and harbored overt hostility towards Lively—all fully consistent with the alleged description to Sloane. *See Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.,* 551 F. Supp. 3d 320, 327 (S.D.N.Y. 2021) ("The phrase 'false smear campaign,' which is alleged to be defamatory, perfectly encapsulates what the Plaintiffs did. It is, therefore, substantially true and completely non-defamatory."). Wayfarer's defamation claim thus fails and should be dismissed.

### C.   Wayfarer Fails to Plead that Plaintiffs Acted with Actual Malice

As a public figure, Wayfarer must allege "actual malice"—knowledge of falsity or reckless disregard, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974)—yet its counterclaim pleads no facts that even gesture toward that standard.

### 1.   Wayfarer is a Public Figure

Wayfarer, a movie studio run by Baldoni—who admits he is a public figure, Dkt. 162 at 23, *Lively v. Wayfarer Studios LLC*, No. 1:24-cv-10049-LJL (S.D.N.Y. Apr. 3, 2025)—and that is responsible for the hugely popular film at the heart of this dispute, is plainly a public figure.

Wayfarer is a general purpose public figure. It produced the popular movie at issue in this case. Its co-founder Baldoni is an internationally recognized actor and podcaster whose public

persona is inseparable from Wayfarer, which he positioned as a mission-driven production company tackling societal issues. Wayfarer thus has "general fame or notoriety in the community and pervasive involvement in ordering the affairs of society." *Gertz,* 418 U.S. at 352.

Even if it were somehow not a general purpose public figure, Wayfarer is a limited purpose public figure under the Second Circuit's four-part test, *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir. 1984):

First, Wayfarer sought public attention to influence public opinion, *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), including by acquiring the film rights to Hoover's bestselling novel *It Ends With Us*, partnering with Sony, negotiating charitable-giving provisions, casting its co-founder and well-known actor Baldoni opposite Lively, and engaging PR firms to broadcast its views to the public. Dkt. 51 ¶¶ 18–22; Dkt. 51-1 at 5 (positioning Wayfarer executives as "thought-leaders").

Second, Wayfarer voluntarily thrust itself into the public controversy, *Biro*, 963 F. Supp. 2d at 272, by proactively engaging PR and crisis management firms including to  engage in "Proactive Outreach," pitch Wayfarer "to top-tier print, broadcast, and online media outlets," "drive awareness" of Wayfarer's brand, and align on "the strongest press angles." Dkt. 51-1 at 5. Wayfarer also worked alongside Nathan and Abel to devise media strategies to counteract reputational threats, deliberately jumping into the media fray. Dkt. 51 ¶ 39.

Third, Wayfarer has played—and continues to play—a prominent, non-trivial role in the controversy, *Biro*, 963 F. Supp. 2d at 275, by financing, producing, and marketing the film; engaging multiple PR firms in connection with promoting the film and Wayfarer and its executives specifically, having its founder direct and star in the film; negotiating publicity with Sony and

Lively's team; and running the movie set on which Lively's mistreatment occurred. Dkt. 51 ¶¶ 18–23, 39; Dkt. 51-1 at 5.

<u>Fourth</u>, Wayfarer has substantial and ongoing access to effective channels of communication "and hence ha[s] a more realistic opportunity to counteract false statements then private individuals normally enjoy." *Biro*, 963 F. Supp. 2d at 275. Wayfarer has employed multiple PR firms (Dkt. 51-1, Dkt. 51 ¶ 33), coordinated with Sony's global media team (Dkt. 51 ¶ 21), devised strategies involving third-party surrogates (*id.* ¶ 33), and fielded multiple press inquiries (*id.* ¶ 39). Its counsel continues to appear on and be quoted in various media outlets and even created a website specifically to disseminate information about this case.

Wayfarer is thus a public figure and must plead actual malice, which it has not done here.

### 2.     Wayfarer Fails to Allege Actual Malice

Wayfarer's counterclaims fall far short of alleging actual malice, *i.e.*, non-conclusory facts establishing that Jones was aware "of either [the] falsity or probable falsity of [her] statement, or acted with reckless disregard of its truth or falsity." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 182–83 (2d Cir. 2000). The pleadings are devoid of any allegation that Jones possessed contrary information, ignored known facts, or otherwise acted with the requisite "subjective awareness of falsity or probable falsity." *Celle*, 209 F.3d at 182–83. Indeed, Wayfarer's own pleading concedes that it engaged in extensive media messaging and crisis PR "acting…in defense" of itself and Baldoni—an implicit admission that a public campaign was underway. Dkt. 51 ¶ 39. These allegations do not refute the existence of a smear campaign; they confirm one.

## IV.   Plaintiffs are Entitled to Attorneys' Fees Under New York's Anti-SLAPP Law

New York law requires that "costs and attorney's fees ***shall be recovered*** upon a demonstration…that [an action involving public petition and participation]…was commenced or continued without a substantial basis in fact and law." N.Y. Civ. Rights Law § 70-a(1)(a)

(emphasis added). Wayfarer's defamation counterclaim qualifies. It involves public petition and participation. *See* Dkt. 51 ¶¶ 57–60 (alleging involvement of *The New York Times*); N.Y. Civ. Rights Law § 76-a(1) ("action involving public petition and participation" is one based on "any communication in a place open to the public or a public forum in connection with an issue of public interest"); *id.* § 76-a(1)(d) (public interest is "any subject other than a purely private matter"); *Reeves v. Associated Newspapers, Ltd.*, 218 N.Y.S.3d 19, 27 (N.Y. App. Div. 2024) (media is "the quintessential public forum"); *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021) (issues of "sexual impropriety and power dynamics" in the entertainment industry are "indisputably [issues] of public interest").

Wayfarer's defamation counterclaim was also commenced "without a substantial basis in fact or law." Wayfarer's threadbare claims of defamation—not only as stemming from the alleged statement in Paragraph 55, but also as stemming from various other unspecified phantom statements (plural) as baselessly asserted in Paragraphs 88–94—are legally and factually insufficient, and a finding that an action was commenced without "substantial basis in fact and law" is "certainly triggered by the failure to state a claim." *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 184–85 (S.D.N.Y. 2024). Accordingly, Jones is entitled to attorney's fees.[8]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to dismiss Wayfarer's counterclaims with prejudice.

---

[8] N.Y. Civ. Rights Law § 70-a is substantive in nature and thus may be applied by a federal court sitting in diversity. *See, e.g.*, *Bobulinski*, 758 F. Supp. 3d at 186–88; *Heilbut v. Cassava Scis., Inc.*, 2025 WL 919654, at \*9 (S.D.N.Y. Mar. 26, 2025); *see also Coleman*, 523 F. Supp. 3d at 258. Additionally, state and federal courts in New York permit defendants to seek fees pursuant to N.Y. Civ. Rights Law § 70-a without commencing a separate action. *See, e.g.*, *Bobulinski*, 758 F. Supp. 3d at 188–89; *215 W. 84th St Owner LLC v. Bailey*, 191 N.Y.S.3d 368, 369 (N.Y. App. Div. 2023); *Trump v. Trump*, 189 N.Y.S.3d 430, 445–46 (N.Y. Sup. Ct. 2023).

DATED:    May 8, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Kristin Tahler*

Kristin Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com

Maaren A. Shah
Danielle Lazarus
295 5th Avenue
New York, New York 10016
(212) 849-7000
maarenshah@quinnemanuel.com
daniellelazarus@quinnemanuel.com

Nicholas Inns (*pro hac vice*)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Plaintiffs*
*Stephanie Jones and Jonesworks, LLC*