UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__10/3/2025__
```

------------------------------------------------------------------X
:
STEPHANIE JONES, et al.,                               :
:
                              Plaintiffs,              :
:
                                                      :          25-cv-779 (LJL)
                 -v-                                   :
:          OPINION AND ORDER
JENNIFER ABEL, et al.,                                :
:
                              Defendants.             :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

   Counterclaim-Defendants Stephanie Jones ("Jones") and Jonesworks LLC

("Jonesworks," and, together with Jones, the "Jones Parties") move, pursuant to Federal Rule of

Civil Procedure 12(b)(6), to dismiss the counterclaims of Counterclaim-Plaintiff Jennifer Abel

("Abel").  Dkt. No. 55.

   For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

   This case arises out of a dispute between Blake Lively ("Lively") and Justin Baldoni

("Baldoni"), among others, that is at issue in related litigation before this Court.  *See Lively v.*

*Wayfarer Studios LLC*, No. 24-cv-10049 (S.D.N.Y. filed Dec. 31, 2024).  Familiarity with the

proceedings is presumed.  For the purposes of this motion, the Court assumes as true the well-

pleaded allegations of the counterclaims.  *See* Dkt. No. 50 (the "Amended Counterclaims" or

"Am. Countercl.").

   Jonesworks is a New York public relations firm founded by Stephanie Jones, who serves

as its CEO.  Am. Countercl. ¶ 10.  Jonesworks is a Delaware limited liability company located in

New York, New York, *id.* ¶ 3, and Jones is a resident of Connecticut, *id.* ¶ 2.  Jones hired

Beverly Hills resident Abel, an experienced star publicist, in early July of 2020, with a mandate to oversee Jonesworks' talent department and to grow the firm's Los Angeles office. *Id.* ¶¶ 13, 17. Jones recruited Abel to join Jonesworks by offering her a higher salary and the opportunity to lead her own team. *Id.* ¶ 14.

Public relations jobs require extensive mobile phone usage. *Id.* ¶ 26. Accordingly, when Abel joined Jonesworks, Jones offered to switch Abel's Android phone to a Joneworks-issued iPhone, which meant that Abel had to "port" her existing, long-time phone number to the Jonesworks company phone plan. *Id.* Abel agreed to do so if she could retain ownership of her phone number and keep it with her should she leave Jonesworks. *Id.* Although Jonesworks owned the physical device, it was configured with Abel's personal Apple ID and populated with all of her personal email accounts, photos, text messages, and third-party apps. *Id.*

Jonesworks did not have a human resources department or dedicated human resources personnel but relied on business affairs personnel and Jones' various chiefs of staff to handle any personnel-related matters. *Id.* ¶ 24. Jonesworks also lacked written internal policies, including ones regarding the use of electronic devices, and an employee handbook. *Id.* ¶ 25. Jonesworks also did not have any internal policies prohibiting the use of a company-issued phone for personal purposes; giving Jonesworks the right to monitor the use of its company-issued phones; or divesting employees of a reasonable expectation of privacy in relation to their use of company-issued phones. *Id.*¶ 27. Abel used her Jonesworks-issued cell phone freely and as her sole mobile device, a practice common in the industry, and neither Jones nor anyone else at Jonesworks advised her against doing so. *Id.* ¶ 26.

When she joined Jonesworks, Abel signed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "2020 Employment Agreement") as a condition of

her employment. *Id.* ¶ 18. Under the agreement, she was required to maintain the confidentiality of and not disclose "Confidential Information." *Id.* ¶ 20. The 2020 Employment Agreement had a California choice of law provision. *Id.* ¶ 21. In November of 2021, Abel entered into a modified employment agreement with Jonesworks, which changed her from an at-will employee to a contractual employee (the "2021 Employment Agreement"). *Id.* ¶ 28. This modified agreement also had a confidentiality provision, but unlike the prior agreement, it had a New York choice of law provision. *Id.* ¶¶ 30–31.

Jones has had a successful career in the entertainment industry, representing clients such as Dwayne "The Rock" Johnson, Jeff Bezos, Lauren Sanchez, Venus Williams, Tom Brady, and Chris Hemsworth. *Id.* ¶ 11. Abel alleges, however, that the work environment at Jonesworks was toxic. *Id.* ¶ 24. She alleges that before she joined Jonesworks, she was cautioned that Jones had a well-deserved reputation for treating people poorly. *Id.* ¶ 15. After she joined Jonesworks, Abel observed that morale amongst Jonesworks employees was "abysmal," and departures were often acrimonious. *Id.* ¶ 23. Within a few weeks of Abel's on-boarding, Jonesworks faced a "mass exodus" of employees in its New York office. *Id.* ¶ 22.

In April 2023, Dwayne Johnson dropped Jonesworks after clashes between Jones and Johnson's team. *Id.* ¶ 45. In the following months, Jonesworks was also dropped by Bezos, Sanchez, and others. *Id.* In addition, word spread that Business Insider was contacting Jones' former and current clients and employees concerning a forthcoming article, causing other clients to cut their ties with Jones. *Id.* ¶ 36. On May 8, 2024, a website called "Stephanie Jones Leaks" went live, along with an X.com account, a Facebook page, a Reddit account, and a Pinterest page, all with negative allegations about Jones' behavior and business practices. *Id.* ¶ 37. On August 17, 2024, Business Insider published an article entitled "Who's Afraid of Stephanie

Jones," reporting on the allegedly toxic workplace that Jones had fostered at Jonesworks. *Id.* ¶¶ 39, 42. Abel was not responsible for the website or the article. *Id.* ¶¶ 38, 40.

The discord in the office affected the relationship between Abel and Jones. By 2024, Jones had become increasingly hostile towards Abel. *Id.* ¶ 47. Abel came to have concerns about Jones' ability to function professionally and with what she believed was Jones' "downward spiral," which involved Jones behaving erratically and pitting employees against one another. *Id.* ¶ 48. On or about July 10, 2024, Abel notified Jones of her plan to leave Jonesworks. *Id.* ¶ 53. She confirmed her decision on July 26, 2024, and communicated her intention to start her own business. *Id.* Abel offered a six-week transition period, with an end date of August 23, 2024. *Id.*

During her nearly four years of employment at Jonesworks, Abel managed the company's work with Wayfarer Studios ("Wayfarer") and Baldoni (together, the "Wayfarer Parties") out of the Los Angeles office. *Id.* ¶ 71. Baldoni was the producer, director, and co-star of the film *It Ends With Us* (the "Film"), which was released in August 2024. Dkt. No. 50 (the "Answer") ¶ 3. He is also the co-founder and co-chairman of Wayfarer. *Id.* ¶ 21.[1] Lively was the co-star of the Film. At all times during Wayfarer's four-year engagement with Jonesworks, Abel was the point person on the account, as Jones devoted her attention to clients she perceived as having higher prestige. Am. Countercl. ¶ 72.

In the summer of 2024, Baldoni and Wayfarer were in the midst of a PR crisis involving tensions between Lively and Baldoni with regard to the Film. *Id.* ¶ 74. Abel recommended that Wayfarer and Baldoni hire Melissa Nathan ("Nathan"), a crisis public relations expert, to deal

---

[1] The answer admits at Paragraph 3 that Baldoni was a producer of *It Ends With Us*, but it denies that allegation at Paragraph 21. *See* Dkt. No. 50. The difference is immaterial to this decision.

with the situation.  *Id.* ¶ 75.  Jones was not happy with Abel's recommendation of Nathan and attempted to convince Wayfarer not to move forward with Nathan.  *Id.* ¶ 76.

Abel's departure announcement affected Jonesworks' relationship with the Wayfarer Parties.  *Id.* ¶¶ 76–79.  When Jones learned that Business Insider was working on an unflattering article about her to be published in August, she grew concerned that the Wayfarer Parties would leave Jonesworks alongside Abel.  *Id.* ¶ 73.  Disputes arose between Abel and Jones regarding the management of the Wayfarer/Baldoni account, including regarding Abel's recommendation that Wayfarer and Baldoni hire Nathan.  *Id.* ¶ 75.  In early August 2024, Jones "inserted herself into the mix," seeking to box out Nathan and Abel.  *Id.* ¶ 78.  But after Jones contacted a reporter from the Daily Mail on August 8, 2024, about a story it had published regarding Baldoni and Lively, Wayfarer instructed Jones to cease all activities on its behalf for the time being and to let Abel and another Los Angeles-based Jonesworks employee handle Baldoni's public relations crisis alongside Nathan.  *Id.* ¶¶ 81, 83.  Wayfarer and Baldoni expressed that they had lost all trust in Jones.  *Id.* ¶ 85.  Moreover, while Wayfarer and Baldoni—with the assistance of Abel and Nathan—continued their efforts to promote the Film started threatening to sue, demanding payment for work not done, and protesting that she had done a good job.  *Id.* ¶ 88.

In her final week, Abel contacted Jones' chief of staff, Gordon Duren ("Duren"), concerning the release of her phone number and transfer of her personal data upon her departure.  *Id.* ¶ 57.  He assured her that Jonesworks would cooperate and abide by their agreement to return her phone number to her.  It was against this backdrop that, on August 21, 2024, two days before her scheduled last day, Abel was led into conference room at the Jonesworks office in Beverly Hills with Duren, a security guard, an extractions technical expert from Edgeworth Security Services, and an attorney affiliated with the law firm Frankfurt Kurnit Klein & Salz.  *Id.* ¶ 59.

After signing documents presented to her by Jonesworks' lawyer, Abel turned over her personal laptop in response to the attorney's demand. *Id.* ¶ 63. The Edgeworth contractor then conducted a forensic search of her system that turned up nothing. *Id.* The attorney then accused Abel of having illicitly accessed and stolen approximately ten documents, and Abel denied the accusation. *Id.* Duren demanded that Abel turn over her phone and provide the passcode, which she was told was solely to facilitate the release of her phone number. *Id.* ¶ 64. Abel provided her passcode for the limited purpose of facilitating the transfer of her phone number. *Id.* ¶ 65. After express confirmation from Duren and the Jonesworks attorney that they would release the phone number if she went straight to the Verizon store, Abel handed them the phone and was ushered out of the building. *Id.*

Abel went to the Verizon store a short distance away. *Id.* ¶ 66. But although Duren assured Abel and Verizon that Jonesworks was in the process of effectuating the release and to bear with them a few minutes, Abel never heard from him again, and after four hours, she left the store without the phone number having been transferred. *Id.*

Abel's communications on her work phone showed that by the time of the Film's premiere, she and others in Wayfarer's circle held Lively in deep disdain. *Id.* ¶ 92. With Abel's iPhone in hand, Jones and Jonesworks were able to access Abel's iCloud account and bypass the password protection that would otherwise bar their access to obtain her private communications. *Id.* ¶ 90. No later than August 21, 2024, Jones allegedly disclosed to Lively, her husband Ryan Reynolds, and her public relations consultant Leslie Sloane (together, the "Lively Parties") private communications drawn largely from Abel's iCloud account, which were accessible through her confiscated iPhone. *Id.* Shortly thereafter, Abel asserts that Jones took the further

step of transmitting Abel's stolen communications directly to Sloane, Lively, and Reynolds.  *Id.* ¶ 91.

Abel alleges that Jones and Jonesworks provided the communications to Lively through what Abel characterizes as a "sham lawsuit."  *Id.* ¶ 95.  On September 27, 2024, the Lively Parties and their counsel filed a breach of contract lawsuit in New York state court on behalf of an inactive corporate entity allegedly affiliated with Lively and Reynolds named Vanzan Inc. ("Vanzan") against several John Does.  *Id.* ¶ 95.  Once the lawsuit was filed, the Lively Parties used it to issue a subpoena to Jonesworks for all data stored on Abel's phone, including private communications from her iCloud and email accounts, as well as potentially privileged information.  *Id.* ¶ 98.  Since there were no identifiable parties and no party had been served, the subpoenas were issued without notice, depriving Abel of any knowledge of the subpoena, much less the opportunity to object.  *Id.*  The same day the lawsuit was filed, Jones warned a departing employee not to work for Abel because "her business wouldn't be around much longer."  *Id.* ¶ 97.  Upon receipt of the subpoena, on or about October 1, 2024, Jones and Jonesworks surrendered the entire contents of Abel's iPhone communications to Lively.  *Id.* ¶ 100.  Vanzan never requested the assignment of a judge, never substituted the Doe defendants for named parties, and never served the complaint on any defendant.  *Id.* ¶ 96.  The only docket entries for the case are the complaint and a notice of dismissal filed on December 19, 2024, the day before Lively filed her complaint against the Wayfarer Parties.  *Id.* ¶ 96.

Abel alleges that as a result, Jones and the Lively Parties now possess the full contents of her iCloud and email accounts, including her photos, text messages, and emails.  *Id.* ¶ 103.

## PROCEDURAL HISTORY

On December 24, 2024, Jones and Jonesworks filed a complaint against Abel, Nathan, Baldoni, Wayfarer, and John Does 1–10 (collectively, "Defendants") in New York County

Supreme Court.  Dkt. No. 1-1.  The complaint alleges that Abel stole proprietary business documents and clients from the company.  Dkt. No. 1-1 ¶ 13.  On January 27, 2025, Defendants removed the case to this Court under 28 U.S.C. § 1441.  Dkt. No. 1.

On March 20, 2025, Abel filed an answer to the complaint with several counterclaims. Dkt. No. 36.  She filed an amended answer with counterclaims on April 24, 2025.  Dkt. No. 50. Her counterclaims include several causes of action: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*; (2) violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*; (3) violation of the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*; (4) violations of California Penal Code § 502; (5) invasion of privacy; (6) false light; (7) conversion; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; and (10) promissory fraud.  Dkt. No. 50.

The Jones Parties moved to dismiss Abel's amended counterclaims with an accompanying memorandum of law on May 8, 2025.  Dkt. Nos. 55–56.  Abel submitted her own memorandum of law in opposition to the motion to dismiss on May 22, 2025.  Dkt. No. 57.  The Jones Parties replied to the opposition on May 29, 2025.  Dkt. No. 61.

## LEGAL STANDARD

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020) (citing *Orientview Techs. LLC v. Seven for All Mankind, LLC*, 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)); *see also Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir.

2004).  This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must therefore offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  At the motion to dismiss stage, the Court considers only "the four corners of the complaint" and "look[s] only to the allegations contained therein."  *Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497, at *5 (S.D.N.Y. Feb. 28, 2013) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

In evaluating Abel's counterclaims, the Court "is limited to the facts alleged in the [pleading] and any documents attached . . . or incorporated by reference."  *Rombach*, 335 F.3d at 169.  Abel has not incorporated the Jones Parties' original complaint by reference in her counterclaims; her counterclaims do not reference the original complaint, and "[t]o be incorporated by reference, the complaint must make 'a clear, definite, and substantial reference to the [external] document[]'".  *DeLuca v. AccessIT Grp.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)).  Although the counterclaims were filed in response to the Jones Parties' original complaint, that

complaint is "not properly considered on a motion to dismiss counterclaims." *Kumaran v. Northland Energy Trading, LLC*, 2025 WL 1982945, at *15 n.10 (S.D.N.Y. July 29, 2025).

## DISCUSSION

### I.    Federal Claims

#### A.    The Computer Fraud and Abuse Act

Abel's first counterclaim asserts liability under the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030.  The CFAA makes it illegal for an individual to "intentionally access[] a computer without authorization or [to] exceed[] authorized access, and thereby obtain . . . information from any protected computer." *Id.* § 1030(a)(2)(C).[2]  "Although 'initially enacted solely as a criminal statute to address the then-novel problem of computer hacking,' the statute was later amended to provide a private civil cause of action." *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 89 (S.D.N.Y. 2022) (quoting *Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 418 (S.D.N.Y. 2018)).  The private cause of action is for "[a]ny person who suffers damage or loss as a result of this section . . . against the violator," so long as the conduct involves one of a number of additional factors set out in Section 1030(c)(4)(A), *see* 18 U.S.C. § 1030(g).  "[T]he scope of the civil actions permitted under . . . Section 1030(g), however, has always been limited." *Hancock v. County of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018).  To survive a motion to dismiss, the plaintiff must allege that the defendants "intentionally accesse[d] a protected computer without authorization, and as a result of such conduct, cause[d] damage and loss." 18 U.S.C. § 1030(a)(5)(C).  The damages alleged must be, collectively and "during any 1-year period," of "at least $5,000 in value." *Id.* § 1030(c)(4)(A)(i)(I), (g).

---

[2] There is no dispute in this case that the phone qualifies as a "protected computer" under the CFAA.  *See* 18 U.S.C. § 1030(e)(2)(B).

The Jones Parties argue that Abel has not adequately alleged damages under the CFAA. Dkt. No. 56 at 12–13.  Abel alleges that "during a one-year period within the relevant timeframe," her losses "including the loss of her privacy and reputational interest in and control over her personal data, the expenditure of funds to regain control over her accounts, and legal expenses arising directly from the CFAA violation, exceeded $5,000 in aggregate."  Am. Countercl. ¶ 117.

These allegations are deficient.  "Damage" is defined in the statute as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  And "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  *Id.* § 1030(e)(11). The Supreme Court has recently interpreted that statutory language and held that the "loss[es]" and "damage[s]" contemplated by the statute "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data."  *Van Buren v. United States*, 593 U.S. 374, 392 (2021).  "Both before and after the Supreme Court's decision in *Van Buren*, 'courts in this District have interpreted the CFAA to require loss related to damage or impairment of the target computer itself.'"  *Rekor Sys., Inc. v. Loughlin*, 2022 WL 789157, at *11 (S.D.N.Y. Mar. 14, 2022) (quoting *El Omari v. Buchanan*, 2021 WL 5889341, at *14 (S.D.N.Y. Dec. 10, 2021)).

Abel's only relevant allegation as to damages is that she expended funds "to regain control over her accounts."  Am. Countercl. ¶ 117.  But that claim is conclusory and merely parrots the statutory language of the CFAA.  Abel alleges no facts about what those expenses

were, or when and how they were incurred. *See, e.g.*, *Deutch v. Human Res. Mgmt. Inc.*, 2020 WL 1877671, at *5 (S.D.N.Y. Apr. 15, 2020) (finding plaintiff's allegations that "loss and destruction" of her property caused "loss in excess of $5,000" conclusory); *L. Firm of Omar T. Mohammedi, LLC v. Comput. Assisted Prac. Elec. Mgmt. Sols.*, 2019 WL 3288390, at *7 (S.D.N.Y. July 22, 2019) (noting that "courts within this District have dismissed CFAA claims for failing to sufficiently quantify damages" and collecting cases).  Abel's allegations do not state how the Jones Parties' conduct "impaired or otherwise affected [her] computers, data or files," and their "mere access to and use of information obtained from a computer system does not equate to damage to the computer redressable by the CFAA." *William Gottlieb Mgmt. Co., LLC v. Carlin*, 2024 WL 1311854, at *4 (S.D.N.Y. Mar. 26, 2025).

Likely because of the deficiency in her pleadings, Abel has abandoned her CFAA claim in her brief in response to the Motion to Dismiss.  Courts "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Felix v. City of New York*, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018).  The Court therefore dismisses count one of Abel's Amended Counterclaims with prejudice.

### B.    The Stored Communications Act

Abel's next federal cause of action is from the Stored Communications Act ("SCA") as amended by the Electronic Communications Privacy Act ("ECPA"), which was enacted to "prevent hackers form obtaining, altering or destroying certain stored electronic communications." *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 507 (S.D.N.Y. 2001).  It contains a civil cause of action "against persons who gain unauthorized access to communications facilities and thereby access electronic communications stored incident to their transmission." *Id.*  Title II specifically defines the relevant prohibited conduct as follows:

> (a) Offense. Except as provided in subsection (c) of this section whoever—(1) intentionally accesses without authorization a facility through which an electronic information service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2701(a). "Thus, a person violates the SCA if she accesses an electronic communication service, or obtains an electronic communication while it is still in electronic storage, without authorization." *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008).

Jones argues that Abel's cause of action under the SCA must be dismissed because she provides only conclusory assertions that her messages were accessed while in "electronic storage" as required by the statute. 18 U.S.C. § 2701(a). The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," or "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17)(A), (B). Abel responds that her allegations that Jonesworks accessed her communications through cloud-based servers owned by Apple are sufficient. *See* Am. Countercl. ¶ 69 ("Jones and Jonesworks retained access to Abel's iCloud account for multiple months thereafter, monitoring and intercepting her private communications in real-time."); *id.* ¶ 90 (communications disclosed from Abel's phone "were drawn largely from Abel's iCloud, which was accessible through the confiscated iPhone").

Whether or when cloud-based services such as iCloud qualify as "electronic storage" in the context of text exchanges is a novel question. The important distinction for the purposes of the SCA is between those communications that are stored or downloaded on a device, which are not covered by the Act, and those that are accessed while stored in a covered electronic storage

facility, which are. "Thus, information that an Internet provider stores to its servers or information stored with a telephone company—if such information is stored temporarily pending delivery or for purposes of backup protection—are examples of protected electronic storage under the statute." *Garcia v. City of Laredo*, 702 F.3d 788, 793 (5th Cir. 2012). "But information that an individual stores to his hard drive or cell phone is not in electronic storage under the statute." *Id.* Put differently, the "allegedly improper *use*" of messages downloaded onto a device "does not implicate the SCA" because such messages are not "in electronic storage within the meaning of the statute." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 242 (2d Cir. 2020). But conversely, "emails stored on an electronic communication service provider's systems after it has been delivered, as opposed to emails stored on a personal computer, are stored communications subject to the SCA." *Obeid ex rel. Gemini Real Est. Advisors LLC v. La Mack*, 2017 WL 1215753, at *9 (S.D.N.Y. Mar. 31, 2017); *see Pure Power Boot Camp*, 587 F. Supp. 2d at 555–56 (obtaining emails while they are in storage on service providers' systems rather than a company computer's memory triggers applicability of SCA). It is not self-evident that, as with emails that must be actively downloaded from a server, an iMessage received through access to the cloud is not immediately downloaded onto a device upon receipt.

Even accepting that accessing messages from a cloud storage facility such as iCloud would be covered by the Act, Abel has not plausibly alleged that Jonesworks accessed her messages in that way. Abel's relevant allegations are conclusory and do not make plausible the inference that the messages accessed were in electronic storage. She pleads that Jones was "monitoring and intercepting her private communications in real-time" via "iCloud," Am. Countercl. ¶ 69, and that messages produced to the Lively Parties were "drawn largely from Abel's iCloud," *id.* ¶ 90. But Abel references no messages or communications she believes to

have been obtained in that manner. Her own allegations support the contrary inference that Jonesworks accessed historical messages via the phone itself, and not messages via the cloud. She alleges that Jonesworks was able to access the communications "through the confiscated iPhone . . . with the iPhone in hand," *id.* ¶ 90, and that the unrestricted access that Jones had was to "everything stored on Abel's iPhone," *id.* ¶ 67. "[I]t is entirely non-controversial that e-mail messages downloaded and stored on, and subsequently accessed solely from, a user's personal computer do not fall within the SCA's definition of electronic storage." *Goodman v. Goodman*, 2022 WL 17826390, at *20 (S.D.N.Y. Dec. 21, 2022) (citing *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 337 (D.D.C. 2011)). Abel also points to no messages that might have been accessed only by some other method (other than through the physical phone itself); the only specific messages referenced by Abel in her counterclaims are from *before* Jonesworks recovered her phone. Am. Countercl. ¶ 67 (screenshot from August 22 in which Jonesworks employee reveals that they have observed messages stored on Abel's phone which was retained by the company the day before). That makes any inference that a message was accessed via the cloud even less plausible. *See Yukos Cap.*, 977 F.3d at 232 (holding that employee's emails downloaded onto employer's computers, as opposed to those stored in ISP systems, were not "in electronic storage" under the SCA); *Kornotzki v. Jawad*, 2020 WL 2539073, at *3 (S.D.N.Y. May 19, 2020) (accepting allegations as sufficient to state a claim where "nothing in the Counterclaim Complaint indicates the messages were stored locally"). Although "the court must generally accept as true all of the factual assertions in the complaint," it need not do so where the allegations are conclusory or where they "are contradicted by the complaint itself." *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (summary order).

Count two of the Amended Counterclaims is therefore dismissed without prejudice.

### C.    The Federal Wiretap Act

Abel also brings a claim under the Federal Wiretap Act, as amended by the ECPA, 18 U.S.C. §§ 2510–2511.  That statute "creates criminal sanctions and a civil cause of action against persons who 'intercept' electronic communications."  *Pure Power Boot Camp*, 587 F. Supp. 2d at 556.  The Federal Wiretap Act and the SCA differ primarily with respect to the communications to which they are addressed.  The Wiretap Act "governs unauthorized interception of electronic communications, 18 U.S.C. §§ 2510–2522, and [the SCA]. . . governs unauthorized access to stored communications."  *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 503 (2d Cir. 2005).  The former applies to "the *continued receipt* of e-mail messages," while the latter applies to "the acquisition of *previously stored* electronic communication."  *Id.* at 504 n.1.

The key to liability under the Wiretap Act is the term "intercept."  The ECPA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C.§ 2510(4).  Courts have construed "intercept" narrowly "to require that the interception of an electronic communication be contemporaneous with the transmission of that communication."  *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 446 (S.D.N.Y. 2019) (quoting *Tantaros v. Fox News Network, LLC*, 2018 WL 2731268, at *7 (S.D.N.Y. May 18, 2018)); *see also Zaratzian v. Abadir*, 2014 WL 4467919, at *6 (S.D.N.Y. Sept. 2, 2014) ("Although no such requirement appears explicitly in the Act, several circuit courts of appeals have concluded on the basis of statutory interpretation and legislative history that an interception of an electronic communication must be 'contemporaneous' with the transmission of the communication to violate Section 2511."); *Snyder v. Fantasy Interactive, Inc.*, 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012) ("Courts addressing the meaning of 'intercept' narrowly define it to include only 'acquisitions of communication contemporaneous

16

with transmission, not storage,'" and "[w]hile the Second Circuit has not addressed this issue, the . . . reason for maintaining the narrow definition is sound, and this Court adopts it.") (citations omitted)).

Jones moves to dismiss the claim on the basis that Abel has not alleged any contemporaneous interception as required by the statute, as she alleges that Jones viewed the messages after they were already in her accounts.  Courts have held that the statutory scheme requires interception to occur while the communication is "in flight," because "[o]nce the transmission of the communication has ended, the communication ceases to be a communication at all.  The former communication instead becomes part of 'electronic storage.'  And at that point a person cannot 'intercept' the former communication because the term 'intercept' . . . does not apply to electronic storage."  *Luis v. Zang*, 833 F.3d 619, 627 (6th Cir. 2016); *see also United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002); *Pure Power Boot Camp*, 587 F. Supp. 2d at 557.  Abel responds that her allegations that Jones read the messages through iCloud in real time are sufficient to state a claim.  She cites to *Zaratzian*, in which the court found that "the auto-forwarding of emails received by [plaintiff's] email account to [defendant's] email account" satisfied the "narrow definition" of intercept.  2014 WL 4467919, at *7.  The opinion in *Zaratzian* relied on a Seventh Circuit opinion, *United States v. Szymuszkiewicz,* in which that circuit determined that a Microsoft Outlook rule "that directed Outlook to forward to [the defendant] all messages [his supervisor] received" was contemporaneous interception under the Wiretap Act.  622 F.3d 701, 703 (7th Cir. 2010).  The court clarified that it was "[t]he copying *at the server*" that "was the unlawful interception, catching the message 'in flight.'"  *Id.* at 704; *see also Zaratzian*, 2014 WL 4467919, at *7 ("[W]hether it was the server or Zaratzian's computer that made the copies that

were transmitted[,] . . . those copies were made 'within a second of each message's arrival and assembly,'" and "each would have received the message 'with no more than an eyeblink in between.'") (quoting *Szymuszkiewicz*, 622 F.3d at 706)).

Abel has alleged that Jones and Jonesworks "monitor[ed] and intercept[ed] her private communications in real time." Am. Countercl. ¶ 69. But unlike email forwarding, Abel has not alleged that Jones or Jonesworks captured any message before it reached its intended destination. Abel has not alleged that there was any point, whether on a server or elsewhere, that a "duplicate" was created of an original intended for a single destination. Nor has Abel provided any factual allegations to lend plausibility to her claim that the messages were actually intercepted. Her only relevant allegation, that the messages were monitored and intercepted in real time, is conclusory and tracks the requirement of the statute itself. *See Tantaros*, 2018 WL 2731268, at *8 ("Plaintiff's allegations at most support an inference that Defendants had the *capability* to intercept her communications."). She alleges only that Jones was "intercepting and monitoring all of her text exchanges, including not only with her clients, fiancé, doctors, parents, and friends but also with the undersigned counsel." Am. Countercl. ¶ 70. Abel does not include any allegations as to which messages were intercepted and when, or by which means they were accessed on the cloud and not from the phone itself. The sole communication she references in her pleading predates Jones taking over her phone and thus tends to undermine her claim that messages were being intercepted in real time. *Id*. ¶ 67.[3] Even if Abel had plausibly alleged that Jones or Jonesworks was reading the messages in real time as they reached her phone, that would

---

[3] In her Answer, Abel admits to the veracity of many text messages included by the Jones Parties in their complaint. Even the latest of these messages, which are not included in Abel's Amended Counterclaims, is from the morning of August 21, 2024—again before the phone was taken. *See* Dkt. No. 1 ¶ 102, Answer ¶ 102.

not be sufficient under the statute as those would already be downloaded onto the physical device, per her own allegations.  Without any plausible basis for the assertion that Jones was "intercepting" her messages as the SCA narrowly defines that term, Abel's allegations do not cross the line from possible to plausible.  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

Count three of Abel's Counterclaims is dismissed without prejudice.

## II.    State Law Claims

In exercising jurisdiction over Abel's state law claims, this Court must determine which state's law is to be applied.  The Jones Parties argue that Abel's second contractual choice of law provision controls, and that New York law must therefore be applied.  This Court applies the forum state's choice of law rules, in this case New York's, to determine the validity and scope of a contractual law provision.  *AEI Life LLC v. Lincoln Ben. Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018).  "New York courts typically apply the law selected in contractual choice-of-law clauses only to causes of action sounding in contract unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties."  *Stevens & Co. LLC v. Espat*, 2025 WL 950989, at *10 (S.D.N.Y. Mar. 28, 2025) (quoting *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *16 (S.D.N.Y. June 6, 2022)).  Here, the 2021 Employment Agreement states: "This Agreement and the performance of the Parties' obligations hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles."  Am. Countercl. ¶ 31.  That language applies only to the "obligations hereunder" and does not contemplate that the agreement covers "the broader relationship between the parties," and so this "narrow choice of law provision is not broad enough to reach tort claims incident to

the contractual relationship or other non-contractual causes of action." *Espat*, 2025 WL 950989, at *10.

Although that contractual provision does not apply, the Court nevertheless must determine whether New York or California law applies to Abel's claims. On two of Abel's counterclaims, those for invasion of privacy and false light, the parties argue that there is a conflict of law. Applying the forum state's choice of law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Kenser v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 167 (S.D.N.Y. 2021) (quoting *Matter of Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993)). At least one conflict here is obvious: California recognizes invasion of privacy and false light claims, whereas New York does not. *Compare De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 865 (2018), *with DeIuliss v. Engel*, 2021 WL 4443145, at *9 (S.D.N.Y. Sept. 27, 2021). Given such conflict and the lack of any controlling contractual provision, "[i]n the absence of an applicable choice of law provision, 'New York has adopted an interest analysis, which requires that the law of the jurisdiction having the greatest interest in the litigation be applied.'" *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quoting *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993)).

To make that determination, New York courts ask "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the law purpose of the law is to regulate conduct or allocate loss." *Id.* (quoting *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994)). A conduct-regulating law is one that "people use as a guide to govern their primary conduct." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012). False light and invasion of privacy claims are conduct-regulating torts. *Catalanello*

*v. Kramer*, 18 F. Supp. 3d 504, 511–13, 518–19 (S.D.N.Y. 2014).  "In all interest analysis, 'the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'"  *Id.* at 646 (quoting *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992)).  "Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws."  *Id.*  "The locus of a tort is generally defined as the place of the injury."  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 313 (S.D.N.Y. 2010) (quoting *Devore v. Pfizer Inc.*, 867 N.Y.S.2d 425, 428 (1st Dep't 2008)).  As to Abel's false light claims, however, that rule does "not always" apply.  *Kinsey v. New York Times Co.*, 991 F.3d 171, 177 (2d Cir. 2021).  Her false light allegation is that the Jones Parties "publicly disclosed information or material regarding Abel's moral character and personal and professional life which shoed Abel in a false light."  Am. Countercl. ¶ 166.  In *Kinsey*, the Second Circuit explained that under New York law, where the allegedly false information is published nationally, there is only a "presumptive rule that the law of the plaintiff's domicile applies," which may be overcome if "some other state has a more significant relationship to the issues or the parties."  *Id.*  To make that determination, courts look to "where [the] plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply."  *Id.*

Here, Abel has not alleged that the false narrative crafted by the Jones Parties emanated from a New York publisher, or that the conduct from which the allegedly false statements emanated took place primarily in New York.  Nor have the Jones Parties made any argument that New York law should apply besides pointing to the choice of law provision in Abel's employment contract and that the "tortfeasors are located in New York."  *See* Dkt. No. 61 at 7

n.3.  The factors that might therefore overcome the "presumptive rule" that the locus of the tort is

Abel's domicile in California do not exist as alleged here.  *See Lively v. Wayfarer Studios, LLC*,

2025 WL 1637019, at *21 (S.D.N.Y. June 9, 2025).  Therefore, this Court will apply California

law to the invasion of privacy and false light tort claims.

As to the remaining tort claims, Abel argues that California law applies, Dkt. No. 57 at

13–14, and the Jones Parties argue that the claims should be dismissed under either New York or

California law, Dkt. No. 561 at 7 n.3.  "In the absence of a strong countervailing public policy,

the parties to litigation may consent by their conduct to the law to be applied."  *Flatiron*

*Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 2019 WL 1244294, at *6 (S.D.N.Y. Mar. 18,

2019) (quoting *Walter E .Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir.

1984)); *see Pac. Indem. Co. v. Kiton Corp.*, 2022 WL 4237092, at *2 (S.D.N.Y. Sept. 14, 2022);

*Fleetwood Servs.*, 2022 WL 1997207, at *8; *DM Manager LLC v. Fid. Nat'l Info. Servs., Inc.*,

2024 WL 1347724, at *5 n.5 (S.D.N.Y. Mar. 29, 2024).  The Court therefore applies California

law not just to the invasion of privacy and false light claims, but to the remaining state law

causes of action as well.

A.       **California Penal Code Section 502**

California Penal Code Section 502(c) imposes liability on whoever "[k]knowingly

accesses and without permission . . . uses any data, computer, computer system, or computer

network in order to . . . wrongfully control or obtain money, property, or data."  Cal. Penal Code

§ 502(c)(1).[4]  That Section was designed to "combat computer crime and hacking," *Heiting v.*

---

[4] Abel alco cites Section 502(c)(2) and 502(c)(6)–(7) in a footnote to her memorandum of law in
opposition to the motion.  Dkt. No. 57 at 10 n. 2.  "An argument 'relegated to a footnote,'
however, 'does not suffice to raise an issue.'"  *Medacist Sols. Grp., LLC v. CareFusion Sols.,*
*LLC*, 2021 WL 293568, at *5 (S.D.N.Y. Jan. 28, 2021) (quoting *Pirnik v. Fiat Chrysler Autos,*
*N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (citing cases)).  The Court therefore does not
address those sections.

*Taro Pharms. USA Inc.*, 709 F. Supp. 3d 1007, 1020 (C.D. Cal. 2023), and has been described as a "state analogue[]" to the CFAA, 1 Data Sec. & Priv. L. § 9:3 (2024–2025 ed.). "Access" is defined by the statute as "to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1). Unlike the CFAA, however, "the California statute does not require *unauthorized* access. It merely requires *knowing* access." *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015). Section 502(e) clarifies that to bring a civil suit under section 502, which is otherwise a criminal statute, a plaintiff must plead that she "suffers damage or loss" due to the violation. Cal. Penal Code § 502(e). Section 502 "does not impose a minimum of $5,000 in damages" like the CFAA. *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260 (N.D. Cal. 2022) (citation omitted).

Jones first argues that Abel has failed to state a claim because she has not alleged a "scheme and artifice to defraud" as required by the statute. Dkt. No. 61 at 5. That argument is without merit. The statute clarifies in Section 502(c)(1) that liability is imposed for accessing data to "*either* (A) devise or execute any scheme or artifice to defraud," "*or* (B) wrongfully control or obtain . . . data." Cal. Penal Code § 502(c)(1) (emphasis added). That Abel has not alleged a scheme to defraud says nothing about whether she has sufficiently alleged, as contemplated in part (B), whether the Jones Parties accessed her phone to wrongfully obtain or control her data.

The Jones Parties argue also that Abel's allegations under the California Penal Code must be dismissed because she had not alleged a sufficient connection to California. Dkt. No. 56 at 14. In support of their argument, they cite to Section 27 of the California Penal Code, which

states that the code applies only to those "who commit, in whole or in part, any crime within this state." Cal. Penal Code § 27(a)(1).  Abel responds that she is a California resident, that the phone was seized and its data accessed in California, and that therefore the acts occurred at least "in part" in California.  Dkt. No. 57 at 11 (citing Am. Countercl. ¶¶ 32, 64–65, 90, 104).  It is true that, as the Jones Parties argue, the cited paragraphs do not specifically state that her phone data was accessed in California.  Dkt. No. 61 at 7.  But at the motion to dismiss stage, the Court is required to make "all reasonable inferences in [the Plaintiff's] favor."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  It is a plausible inference from Abel's counterclaims that data on her phone was accessed without permission from California.  *See* Am. Countercl. ¶ 67 (showing a correspondence with a colleague soon after Abel's departure from Jonesworks indicating that Abel's messages had been shared with the office).[5]

The Jones Parties argue also that Abel has not alleged the kind of damages required by the statute.  Compensatory damages contemplated by the statue include but are not limited to "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was not altered, damaged, or deleted by the access."  Cal. Penal Code § 502(e)(1).  Abel's allegations as to damages include that "[a]s a result of Jones' malicious scheme, Abel's life has been turned upside down.  Her

---

[5] To the extent the Jones Parties' argument is one of personal jurisdiction, "[a] court sitting in diversity applies the law of the forum state in determining whether it has personal jurisdiction over the defendants."  *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996).  The Jones Parties have made no argument under New York law, nor provided any argument against Abel's jurisdictional statement that they "systematically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York."  Am. Countercl. ¶ 7.  This Court possesses personal jurisdiction over Jonesworks as a New York company, *id.* ¶ 3, and over Jones as one who, though a domiciliary of Connecticut, runs her business out of New York.  *See* C.P.R.L. § 301; *United States v. Wolin*, 2024 779056, at *5 (E.D.N.Y. Feb. 26, 2024).

career and reputation has been destroyed, her private information leaked, and her email inbox and social media pages filled with a daily stream of death threats and abuse." Am. Countercl. ¶101; *see id.* ¶ 152 ("As a direct result of Jones and Jonesworks' acts in violation of California Penal Code § 502(c), Abel has suffered damages in an amount to be proven at trial."). That is sufficient. *See Biden v. Ziegler*, 737 F. Supp. 3d 958, 976 (C.D. Cal. 2024). Abel here has also more concretely alleged that she has spent "time restoring" her phone number and iCloud information, and "investigating" the unauthorized access. *Mintz v. Mark Bartelstein and Assocs., Inc.*, 906 F. Supp. 2d 1017, 1032 (C.D. Cal. 2012). *See* Am. Countercl. ¶ 68.

The Jones Parties finally argue that Abel has not alleged that they accessed the computer "in a manner that overcomes technical or code-based barriers." *Heiting v. Taro Pharms. USA*, 709 F. Supp. 3d 1007, 1020 (C.D. Cal. 2023) (quoting *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1217 (N.D. Cal. 2014)). That limitation comes not from the statute itself, but from several decisions addressing the statute in California. *See Perkins*, 53 F. Supp. 3d at 1217–18 (collecting cases). That language can be traced back to *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750 (N.D. Cal. July 20, 2010), in which that court determined that "applying the technical skill necessary to overcome such a barrier will almost always" indicate that an alleged violator gained access in an "unauthorized" manner (as opposed to where the access was done contrary to the website's terms of service). *Id.* at *11. The opinion addressed the inapposite circumstance in which Facebook users permitted a third-party, Power Ventures, to "manipulate their user content on the Facebook website." *Id.* at *12.[6] Where, as alleged here, the Jones Parties accessed and

---

[6] The *Power Ventures* analysis has not been uniformly applied. "Although most courts have followed *Power Ventures*, 'there is a split of authority in [the Northern District of California] concerning the appropriate scope of the 'without permission' language" in Section 502. *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 966 (N.D. Cal. 2014) (quoting *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1054 n.19 (N.D. Cal. 2014)).

used data on Abel's phone without permission, it makes little sense to assess their knowledge in reference to the overcoming of a technical barrier as contrasted with doing so in violation of the terms of service. The more apt authority is *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 967 (N.D. Cal. 2014), in which that court addressed Section 502 claims "based on allegations that an individual used technically-operable log-in information to access portions of a computer system which the individual knew he was not permitted to access." *Id.* at 967. The court therefore concluded that "at least at the pleading phase, such allegations may support a claim under Section 502 that a person 'knowingly' and 'without permission' accessed or used a computer." *Id.*; *see also Weingard v. Harland Fin. Sols., Inc.*, 2012 WL 2327660, at * (N.D. Cal. June 19, 2012) (similar). That understanding also better accords with the Ninth Circuit's decision in *Christensen*, which held that "logging into a database with a valid password and subsequently taking, copying or using the information in the database improperly" violates Section 502(c)(2). 828 F.3d at 789. That same analysis applies equally to Section 502(c)(1), which "similarly applies in relevant part to a person who 'without permission . . . uses any data in order to . . . wrongfully control or obtain . . . property or data.'" *Karma Auto. LLC v. Lordstown Motors Corp.*, 2022 WL 17886045, at *6 (N.D. Cal. Nov. 18, 2022) (citing Cal. Penal Code § 502(c)(1)(B)).

Abel has adequately alleged knowledge on behalf of the Jones Parties that their access to her phone was without permission. She alleges that she provided her passcode for only the "limited purpose of facilitating the transfer of her number," Am. Countercl. ¶ 65, and that afterwards, the Jones Parties could access her phone only because they retained access to her iCloud account without her permission, *id.* ¶ 70. Furthermore, she alleges that because they had "the iPhone in hand," the Jones Parties "could bypass the password protection that would

otherwise bar their access." *Id.* ¶ 90.  Those allegations must be read together, too, with others in her counterclaim.  For example, that using a personal phone at a public relations job is common practice, and that Jonesworks had no policies that "gave it the right to monitor" her phone.  *Id.* ¶ 26.  And that her willingness to port her personal phone number into her work phone was "predicated on her reasonable expectation that she would retain sole and exclusive access to its contents and her private data and accounts." *Id.* ¶ 58; *see also id.* ¶ 64 (Abel "had no reason to believe Jonesworks would attempt to access such data, or she would not have turned the device over without making prior arrangements to secure it"); *id.* ¶ 90 ("Despite lacking Abel's consent to access, review, or disseminate these communications, Jones and Jonesworks were able to do so.")  Taken together, these allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 664.

The Jones Parties' motion to dismiss the fourth cause of action is therefore denied.

## B.    Invasion of Privacy

Abel next claims that Jonesworks and Jones violated her privacy by hacking into her personal communications without authorization.  To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that "(1) a defendant 'intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy[,]' and (2) the intrusion 'occur[red] in a manner highly offensive to a reasonable person.'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009)).  "Intrusion" under California law means that the defendant "penetrated some zone of physical or sensory privacy . . . or obtained access to data by electronic or other covert means, in violation of the law or social norms." *Hernandez*, 47 Cal. 4th at 286 (citation omitted).  And the expectation in privacy must be one that is "objectively reasonable." *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200,

232 (1998).  An invasion of privacy claim under California law is treated similarly and requires a

plaintiff to show that they had a (1) legally protected privacy interest, (2) maintained a

reasonable expectation of privacy, and (3) the intrusion is highly offensive.  *Hernandez*, 47 Cal.

4th at 286.  Since the claims are similar, "courts consider the claims together and ask whether:

(1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive."

*In re Facebook*, 956 F.3d at 601.

The Jones Parties argue that there can be no tort here because there was no reasonable

expectation of privacy; Abel voluntarily ported her personal cell phone number into her work

phone, which was a company-owned device.  Dkt. No. 56 at 16 (citing Am. Countercl. ¶ 57).  "A

plaintiff pursuing an invasion of privacy action must have conducted himself or herself in a

manner consistent with an actual expectation of privacy, i.e., he or she must not have engaged in

conduct which manifests a voluntary consent to the invasive actions of the defendant."  *Sunbelt*

*Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1034 (N.D. Cal. 2014) (citing *Hill v. Nat'l*

*Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 26 (1994)).  Although Abel consented to porting her

phone number to and using the work phone, it is nevertheless plausible that employees in the

public relations industry similarly situated to Abel objectively retain a privacy expectation in the

content of a work phone.  "Even in cases involving an employer's search of an employee's work

computer, courts have held that, under certain circumstances, employees have a reasonable

expectation of privacy in the contents of their work computer."  *PurePower Boot Camp*, 587 F.

Supp. 2d at 560.  Such situations include, for example, where the employee had a "private

office" and "exclusive use of the computer," *Leventhal v. Knapeck*, 266 F.3d 64, 74 (2d Cir.

2001), or where the messages on that device were with the employee's wife that he expected "to

be private," *Quon v. Arch Wireless*, 529 F.3d 892, 908 (9th Cir. 2008).  The expectation of

privacy is informed by "an examination of the customs, practices, and physical settings surrounding particular activities, as well as the opportunity to be notified in advance of the intrusion." *Hernandez*, 47 Cal. 4th at 287; *see Barbee v. Household Auto. Fin. Corp.*, 113 Cal. App. 4th 525, 532 (2003) ("The extent of a privacy interest is not independent of the circumstances.").

Abel explains that it is common practice for public relations firms to "assume the costs of their employees' phones and phone usage." Am. Countercl. ¶ 26. And unlike a standard work phone or a work computer, Abel's work phone was "configured" with her "personal Apple ID and populated with all of her personal email accounts, photos, text messages, third party apps, etc." *Id.* Further, she alleges that Jonesworks had no "internal policies that prohibited" such personal use and she had "no reason whatsoever to believe that Jonesworks' ownership of the physical device would or could in any way compromise her right to privacy in the personal data or accounts stored or accessible from it." *Id.* There was nothing that "divested employees of a reasonable expectation of privacy in relation to such use." *Id.* She also alleges that "[a]t no point during her tenure did Abel consent to anyone at Jonesworks accessing, reviewing, or monitoring the contents of the device. Jonesworks did not have a policy in place affording them the right to do so." *Id.* ¶ 57. Jones and Jonesworks focus on the fact that Abel provided the phone and its passcode to Jonesworks upon her leaving. But again, she did so only under the alleged promise that they would use the passcode to release her phone number. *Id.* ¶ 64. According to her allegations, she did not at that point voluntarily surrender the personal data contained on the phone; she operated under the "assurances" of Jonesworks' employees that they would "uphold their agreement" that upon her termination, her personal phone number would be returned even though the physical phone would remain. *Id.* ¶ 57. In sum, Plaintiff has at least

raised a plausible inference that she had a protected privacy interest in the relevant communications.

The Jones Parties argue next that even if she had a reasonable expectation of privacy in her work phone, her allegations as to the use of those messages was not sufficiently offensive. The "relevant factors" in making a determination as to the offensiveness of an invasion of privacy in any given case include "the degree and setting of the intrusion, and the intruder's motives and objectives." *Hernandez*, 47 Cal. 4th at 287. There is no "bright line," as "each case must be taken on its facts." *Shulman*, 18 Cal. 4th 237. They must be "highly offensive" to a reasonable person, and "sufficiently serious and unwarranted as to constitute an egregious breach of social norms." *Hernandez*, 47 Cal. 4th at 295 (citations omitted). "Offensiveness" is "an indispensable part of the privacy analysis," as it "reflects the reality that 'no community could function if every intrusion into the realm of private action' gave rise to a viable claim." *Id.* (quoting *Hill*, 7 Cal. 4th at 37).

Taking into account "all of the pertinent circumstances," *Sanchez-Scott v. Alza Pharms.*, 86 Cal. App. 4th 365, 377 (2001), Abel has failed to state a claim. She argues that the "accessing, reading, and disseminating of [her] private communications and personal data for the purpose of humiliation and harm" could be found by a jury to be highly offensive. Dkt. No. 57 at 15. However, she does not plead facts to support her conclusions. "The possibility that [Jonesworks] may have reviewed text messages sent to a cell phone which it owned and controlled—without more—is insufficient to establish an offensive use." *Sunbelt Rentals*, 43 F. Supp. 3d at 1036. Abel alleges that "at least some" of the communications were shared with the Lively Parties, Am. Countercl. ¶ 90, and that some messages were released pursuant to a sham subpoena, *id.* ¶ 100. However, she does not allege facts to support that the contents of the

messages that were viewed or shared were private—those messages are conversations with coworkers and clients that pertain to her public relations work stored on her work phone. The most specific allegation in Abel's complaint on this issue is at Paragraph 67, which includes a screenshot of a communication between Abel and a fellow employee. But the content of that message indicates that the Jones Parties shared with the employee what Abel had been saying to others about working with the employee. Am. Countercl. ¶ 67. That message does lead to the inference that the Jones Parties viewed or shared intimate information about Abel or information about Abel's personal life. Moreover, the "common law invasion of privacy by public disclosure of private facts requires that the actionable disclosure be widely published and not confined to a few persons or limited circumstances." *Hill*, 7 Cal. 4th at 27 (citing Restatement (Second) of Torts § 652D). Abel's unsupported allegation that they were disseminated in the office is not alone sufficiently offensive. Although offensive "use" of the private information accessed is not an absolute requirement under California law, merely pointing to a "risk" that others had access to her personal messages does not state a claim. *Lindsay-Stern v. Garamszegi*, 2016 WL 11745948, at *7–8 (C.D. Cal. Oct. 13, 2016); *see Big 5 Sporting Goods Corp. v. Zurich Am. Ins. Co.*, 957 F. Supp. 2d 1135, 1154 (C.D. Cal. 2013); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1026 (N.D. Cal. 2012).

Abel's allegations as to offensiveness are also not consistent with those California courts have found to constitute an invasion of privacy. *See, e.g., Sanchez-Scott*, 86 Cal. App. 4th at 377–78 (highly offensive conduct where a male drug salesperson was present without disclosing his identity during a cancer patient's breast exam); *Shulman*, 18 Cal. 4th at 237–38 (same where a microphone was placed on a medical rescuer to intercept private communications with an injured patient). At base, Abel does not "specify what information" was accessed and read from

her work phone.  In the absence of such allegations, the Court cannot infer that the sharing went beyond what would be permissible under the circumstances in which the information was shared and thus that the Jones Parties' intrusion "would be highly offensive to a reasonable person." *Taylor v. Five Keys Sch. & Programs*, 2024 WL 4634061, at *17 (N.D. Cal. Oct. 29, 2024).

Abel also brings a false light invasion of privacy tort claim.  "False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed."  *Price v. Operating Eng'rs Loc. Union No. 3*, 195 Cal. App. 4th 962, 970 (2011).  "A 'false light' claim, like libel, exposes a person to hatred, contempt, ridicule, or obloquy and assumes the audience will recognize it as such."  *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 636 (2001).  Abel argues in her brief responding to the Motion to Dismiss that the Jones Parties "selectively disclosed her private communications to create a misleading impression of Abel's involvement in a supposed smear campaign, which Jonesworks *knew was false.*"  Dkt. No. 57 at 16.  However, her counterclaims contain no such allegation.  The closest they come is at Paragraph 93, in which Abel alleges that the messages revealed were modified with "slicing, dicing, cherry-picking, massaging, and in some cases outright alteration."  Am. Countercl. ¶ 93.  Absent any non-conclusory allegation as to the false light cast on Abel, she cannot state a claim.

Abel's fifth and sixth cause of action is therefore dismissed without prejudice.

### C.    Conversion

For her Seventh Cause of Action, Abel alleges that she has a possessory interest in her phone number, which she provided to Jonesworks with the understanding that she would retain use of it and that it would revert back to her upon her departure from the company.  Am.

32

Countercl. ¶ 176. Abel continues that Jones and Jonesworks committed the tort of conversion when they took possession of the phone number and refused to release it to Abel when she demanded its return upon her termination from Jonesworks. Am. Countercl. ¶¶ 176–77. The Jones Parties argue that Abel had no cognizable ownership interest in her phone number that could give rise to a conversion claim, that she voluntarily transferred the phone number to a phone owned by Jonesworks and to a Jonesworks phone plan, and that she suffered no damages. Dkt. No. 56 at 19–20.

The tort of conversion under California law involves "the wrongful exercise of dominion over personal property of another." *Voris v. Lampert*, 7 Cal. 5th 1141, 1150 (2019) (quoting 5 Witkin's Summary of Cal. L. § 816 (11th ed. 2017) (hereinafter "Witkin")). "As it has developed in California, the tort comprises three elements: '(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages.'" *Id.* (quoting 5 Witkin § 810); *see also L.A. Fed. Credit Union v. Madatyan*, 209 Cal. App. 4th 1383, 1387 (2012); *Burlesci v. Peterson*, 68 Cal. App. 4th 1062, 1066 (1998).[7] Property as defined in California encompasses "every tangible benefit and prerogative susceptible of possession or disposition." *Downing v. Mun. Ct.*, 88 Cal. App. 2d 345, 350 (1948) (citation omitted).

On the first of the three requirements to state a conversion claim, courts have only just begun to address whether a telephone number is something to which a possessory interest attaches. To determine whether such a property right exists, California courts make a three-part inquiry: "First, there must be an interest capable of precise definition; second, it must be capable

---

[7] New York law similarly recognizes that a conversion claim may lie where a plaintiff has a "possessory right or interest in the property." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).

of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *G.S. Rasmussen & Assocs. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 902–03 (9th Cir. 1992).  As alleged, Abel's phone number satisfies these three criteria. First, the phone number is "well-defined" in that it is singular and the unique identifying digits correspond only to that phone number.  Applying the California property test to a domain name, the Ninth Circuit in *Kremer v. Cohen*, 337 F.3d 1024 (9th Cir. 2003), reached a similar conclusion, holding that "[s]omeone who registers a domain name decides where on the Internet those who invoke that particular name . . . are sent." *Id.* at 1030.  Second, a phone number is also capable of exclusive possession or control.  Jones alleges that she "has a possessory interest in the phone number," and that upon joining Jonesworks in 2020, "she had owned, controlled, and used the phone number for approximately 20 years."  Am. Countercl. ¶ 176.  Giving out one's phone number, particularly where one does so for both their personal and professional activities, "informs others that the [number] is the registrant's and no one else's." *Kremen*, 377 F.3d at 1030.[8]  To that end, Abel has established also that she has a legitimate claim to exclusivity; nowhere in their briefing do the Jones Parties argue that while Abel's number was ported onto the company phone it could somehow be used by anyone other than Abel or was affiliated with anyone other than Abel.

A number of other courts have similarly determined that a telephone number is "property" that can be subject to a conversion claim.  In *Express Cos., Inc. v. Mitel Technologies, Inc.*, 2013 WL 5462334 (S.D. Cal. Sept. 30, 2013), the court, interpreting California law, denied

---

[8] Under federal law, wireless consumers can switch between wireless carriers and retain the same phone number.  *See* 47 U.S.C. § 153(37) (Number portability is "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another.").

a motion to dismiss a similar conversion claim where the plaintiff alleged a "right of possession" of their telephone number. *Id.* at \*8.  And in *Boris v. Perez*, 2012 WL 13013038 (C.D. Cal. Aug. 16, 2012), the court (again interpreting California law) noted that although the parties "have not addressed whether intangible property, such as a website or phone number, can be subject to conversion," it would be a "logical extension" of *Kremer* to "find that a phone number may also be subject to conversion." *Id.* at \*5 n.5.  Elsewhere, other courts have reached the same conclusion.  *See Action Sec. Serv., Inc. v. Am. Online, Inc.*, 2005 WL 8167630, at \*1 (M.D. Fla. Mar. 23, 2005) (applying Florida law, court held that a "telephone number assigned to and accepted by one who contracts for telephone services becomes a valuable business asset in the hand of the subscriber, to which he is entitled as a matter of contract, and he cannot be deprived thereof without just cause depending on the facts and circumstances in each case"); *T2 Techs., Inc. v. Windstream Comms., Inc.*, 2016 WL 9735763, at \*8 (D. Colo. Sept. 26, 2016) ("[S]ubscribers to whom the telephone numbers are assigned have either a possessory interest or the right to control the telephone number."); *Cmty. Voice Line, LLC v. Great Lakes Comms. Corp.*, 18 F. Supp. 3d 966, 982–83 (N.D. Iowa 2014) (plaintiff was not required to show that they owned the telephone number, but just that they had a "possessory right" in the number); *Se. Wholesale Corp. v. Cox Comm's Hampton Rds., LLC*, 2013 WL 21447478, at \*3–4 (E.D. Va. May 14, 2013) (denying motion to dismiss on conversion claim as to a toll-free telephone number); *Staton Holdings, Inc. v. First Data Corp.*, 2005 WL 1164179, at \*5–6 (N.D. Tex. May 11, 2005) (cause of action in conversion may lie where plaintiff plead that "this particular telephone number was of immense value to Plaintiff's business because it had the potential to be highly visible and recognizable to customers").

The Jones Parties point to several courts that have considered whether a phone number is

property and have found that it is not. These cases, which do not interpret California law, do not

change this Court's conclusion.[9] The Jones Parties cite the Seventh Circuit's decision in *In re*

*StarNet, Inc.*, 355 F.3d 634 (7th Cir. 2004), but that court addressed only competing interests

involving "an intermediary between local networks and the Internet" and "Internet Service

Providers" that "maintain a network . . . that will accept local calls and transfer the data to ISPs

over high-speed lines." *Id.* at 635. The Seventh Circuit's resolution of that conflict, that "[n]o

one has a property interest in a phone number," *id.* at 637, has no bearing on whether an end user

like Abel can state a claim for conversion under California law where she has at least a

possessory interest in her phone number that was then interfered with by another end user. *See*

*B&z Galvanized Indus., Inc. v. Innovative Fabrication, LLC*, 2023 WL 11835516, at *2 (C.D.

Cal. July 20, 2023) (a conversion claim can be brought by "the person who has the right to

possess the property"). And in *Freedom Finance Co. v. New York Telephone Co.*, 285 N.Y.S.2d

163 (2d Dep't 1967), published before the advent of the cell phone, the Second Department

without explanation cited to the Second Circuit in *Slenderella Systems of Berkeley, Inc. v. Pacific

Telephone & Telegraph Co.*, 286 F.2d 488, 490 (2d Cir. 1961), for the proposition that the

plaintiff "had no propriety and legal right to retain its present number." 285 N.Y.S. 2d at 163–

64. In *Slenderella*, the Second Circuit addressed only whether the respondent had the right to

dispossess the debtor in possession of certain telephone numbers. Because the specific contract

at issue in the bankruptcy "provide[d] in clear language that 'The Subscriber has no proprietary

right in the number,'" the court held that the "telephone numbers were thus not property of each

---

[9] In *Rostein v. Cable & Wireless, Inc.*, 2002 WL 691458 (Cal. Ct. App. Apr. 24, 2002), the Court of Appeals, Fourth Division addressed whether a telephone number could be the subject of a conversion claim and found that it could not be. That case, however, is unpublished. Pursuant to the California Rules of Court, Rule 8.1115, an unpublished opinion "must not be cited or relied on by a court or a party in any other action."

debtor". 286 F.2d at 490. Again, that decision does not speak to whether an end user with a possessory interest in a telephone number can state a claim for conversion. Finally, the citation to *Business Edge Group, Inc. v. Champion Mortgage Co.*, 519 F.3d 150, 154 (3d Cir. 2008) and *In the Matter of Toll Free Services Access Codes*, 2005 WL 2138620, at *2 (F.C.C. Sept. 2, 2005) are inapposite because they addressed toll free numbers, which "are a public resource."[10]

Even if a telephone claim could qualify as a property right subject to a conversion claim, the Jones Parties argue that Abel's claim nevertheless fails because she transferred the phone number to Jonesworks voluntarily. Dkt. No. 61 at 8. That argument is inconsistent with the facts as pleaded. Abel alleges that she ported her personal phone number onto her work phone on the understanding that it would revert to her upon her departure. Am. Countercl. ¶ 176. She made clear that upon her departure she no longer consented to having her personal number ported to her work phone, and requested that it be returned to her as soon as possible. *Id.* ¶ 65. Abel's porting of her personal number onto her work phone can thus be conceived as a bailment, which under California law is the "deposit of personal property with another, usually for a particular purpose." *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1052 (N.D. Cal. 2025) (quoting *United States v. Alcaraz-Garcia*, 79 F.3d 769, 774 n.11 (9th Cir. 1996)). Abel ported

---

[10] The Jones Parties also allude to an argument that a phone number cannot be the subject of a conversion claim because it is not tangible property. Dkt. No. 56 at 19. But as the Ninth Circuit in *Kremen* carefully explained, although tort law once drew a distinction "between tangible and intangible property," "[v]irtually every jurisdiction . . . has discarded this rigid limitation to some degree." 337 F.3d at 1030. Some jurisdictions maintain a requirement that conversion may only exist for intangible interests where they are "merged" into a tangible document. *Id.* (citing the Restatement (Second) of Torts § 242 (1965)). However, "the leading California Supreme Court case rejects the tangibility requirement altogether." *Kremen*, 337 F.3d at 1031 (citing *Payne v. Elliot*, 54 Cal. 339 (1880)). California courts "routinely apply the tort to intangibles without inquiring whether they are merged in a document and, while it is often possible to dream up *some* document the intangible is connected to in some fashion, it's seldom one that represents the owner's property interest." *Id.* at 1033. The Jones Parties do not mention this argument in their reply brief. Dkt. No. 61.

her number to her work phone for the "particular purpose" of its use thereon until she departed the company. And at the point Jonesworks retained that number in violation of that permission, it was a conversion of the bailment. "If a bailee, having no authority to use the thing bailed, uses it, or, having authority to use it in a particular way, uses it in a different way, unauthorized by the terms of the bailment, or to a greater extent than authorized such unauthorized use constitutes a conversion of the chattel, rendering the bailee liable even for the loss or damage which due care could not have prevented." *Hollywood Motion Picture Equip. Co. v. Furer*, 16 Cal. 2d 184, 189 (1940) (citation omitted). Therefore, even though Abel did permit her phone number to be ported into the work phone for a specific purpose, when that purpose was exceeded, the "bailee in possession" of the bailment is "liable to his bailor for its conversion." *Cerelux v. Yue Shao*, 2017 WL 10544072, at *3 (C.D. Cal. June 13, 2017) (quoting Restatement (First) of Torts § 232 (1934)).

Finally, the Jones Parties argue that Abel has only conclusorily alleged damages, noting that she has "suffered damages in an amount to be proven at trial." Am. Countercl. ¶ 179. Under California law, "damages" are an element which must be alleged to "state a cause of action for conversion." *Franklin v. Mun. Ct.*, 26 Cal. App. 3d 884, 901 (1972). Although state law governs this claim, the Federal Rules of Civil Procedure still govern in federal court, and thus the damages element of the conversion claim need be pleaded under the standard from Rule 8. *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (procedural requirements in federal court are governed by federal procedural law). Abel alleges that her inability to access her phone number "cut off [her] access to critical accounts protected by two-factor authentication," Am. Countercl. ¶ 66, and that it took her "over a month to regain control over all her accounts," *id.* ¶ 68. However, "[c]onversion damages are calculated based on the detriment caused to the plaintiff,"

and are presumed to be the "value of the property at the time of conversion, with interest from that time." *Greif v. Sanin*, 74 Cal. App. 5th 412, 449 (2022) (quoting Cal. Civ. Code § 3336). They can also be calculated as "fair compensation for the time and money properly expended in pursuit of the property." Cal Civ. Code § 3336. Emotional damages may be available too "in appropriate circumstances." *Voris*, 7 Cal. 5th at 1151 (citing *Spates v. Dameron Hosp. Ass'n.*, 114 Cal. App. 4th 208, 221 (2003)). It is a plausible inference from the counterclaims that Abel expended time and money in pursuit of retrieving her phone number.

The Jones Parties' motion to dismiss the seventh cause of action for conversion is therefore denied.

### D.    Emotional Distress Claims

Abel's eighth and ninth causes of action are for the intentional and negligent infliction of emotional distress. To state a claim for the intentional infliction of emotional distress, Abel is required to allege that there has been "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff has suffered severe or extreme emotional distress; and (3) the defendant's outrageous conduct was the actual and proximate causation of the emotional distress." *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1265 (2017) (citing *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009)). "A defendant's conduct is 'outrageous' when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* And "the defendant's conduct must be 'intended to inflict injury or engaged in with the realization that injury will result.'" *Id.* (quoting *Hughes*, 46 Cal. 4th at 1050–51). "Liability for intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* (citation omitted). And "severe emotional distress" means "emotional

distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Hughes*, 46 Cal. 4th at 1051.[11]

"The negligent infliction of emotional distress, on the other hand, is not an independent tort but the tort of negligence." *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 588 (1989) (quoting 6 Witkin § 838 (9th ed. 1988)). Therefore, "[t]he traditional elements of duty, breach of duty, causation, and damages apply." *Slaughter v. Legal Process & Courier Serv.*, 162 Cal.App.3d 1236, 1249 (1984). "Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against imposition of liability." *Id.*

The Jones Parties argue that Abel has not met the high bar for emotional distress necessary to plead either its negligent or intentional infliction. Abel alleges that she was in "panic and despair" after Jonesworks failed to release her telephone number. Am. Countercl. ¶ 66. She alleges too that her "life has been turned upside down," *id.* ¶ 101, and that she "lives in fear of what is to come, given the vast troves of personal data in the possession of these hostile actors," *id.* ¶ 103. As a result, she alleges suffering "extreme emotional distress and mental anguish." *Id.* ¶ 184; *see* Dkt. No. 57 at 19.

The allegations are not sufficient to state a claim. First, it is not sufficient that Abel subjectively experienced emotional distress. The test has an objective component. The emotional distress must be "of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Hughes*, 46 Cal. 4th at 1051.

---

[11] The standard is very similar to that for an intentional infliction of emotional distress claim under New York law. In New York, a plaintiff must plead that the conduct was "extreme and outrageous," such that it goes "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Blanco v. Success Acad. Charter Schs., Inc.*, 722 F. Supp. 3d 187, 216–17 (S.D.N.Y. 2024).

Here, Abel cites the revelation of messages concerning internal work relationships and her professional engagements with Jonesworks clients. *See* Am. Countercl. ¶¶ 67, 90–92. These are not far outside the realm of what might be expected in civilized society. As to messages with her fiancé, doctor, or legal counsel, Jones makes no plausible allegations these messages were viewed by the parties internally or shared publicly. *Id.* ¶ 70 (simply stating that Jones had been "intercepting and monitoring" such messages with further development). The alleged disclosure of those work messages is not sufficient under the exacting standard for emotional distress claims. *See Hughes*, 46 Cal. 4th at 1051 ("[D]iscomfort, worry, anxiety, upset stomach, concern, and agitation" are not sufficient to state a claim); *Doe v. Diagnostic Pathology Med. Grp., Inc.*, 2025 WL 546276, at *10 (Cal. Ct. App. Feb. 19, 2025) (feelings of "fright, shock, nervousness, anxiety, horror, grief, mortification, humiliation, embarrassment, indignity, apprehension, fear, terror, and ordeal" are not sufficient because they were not accompanied by further detail); *cf. Schrauwers v. Roy*, 2023 WL 7036229, at *3 (Cal. Ct. App. Oct. 26, 2023) (sufficient that after nude photos and videos were taken of plaintiffs in the bathroom without their knowledge, they alleged that they felt "no one can take away the anxiety of having to live with the fact that the photos and videos could be further disseminated," and that "they now check for cameras, examine the walls for odd holes, and check vents and air returns when they have to disrobe in public places," and "could lose their jobs if the recordings come to light," and "sought counseling.")

Jones and Jonesworks argue also that even if she could meet the objective standard of distress, Abel has failed to allege that she was subject to sufficiently outrageous conduct to state a claim under California law. Abel alleges that Jones and Jonesworks had access to everything stored on her phone, and "shar[ed] her private messages with the entire office, mocking and

disparaging her."  Am. Countercl. 67–68.  She alleges too that Jonesworks monitored her

communications, *id.* ¶ 69, and that she "lives in fear knowing that they have access to that data,"

*id.* ¶ 103.  She further alleges that Jones "humiliated" Abel by announcing "per her psychic" that

Abel would "soon be pregnant with twins," *id.* ¶ 49, and that she referred to Abel as a "12-year-

old drama queen."  *Id.* ¶ 52.  Finally, Abel alleges that it was only under "duress" that she signed

documents given to her by lawyers that would permit them to access her laptop.  *Id.* ¶ 61–62.

        As discussed elsewhere in this opinion, Abel's allegations as to interception and

monitoring are conclusory; without any further elaboration on what was monitored by who or

when, or what was intercepted by who or when, this Court cannot "draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 556).  Her allegations collectively are also insufficient.  As California

courts have held, "[i]t [is] not . . . enough that the defendant has acted with an intent to inflict

emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of

aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has

been found only where the conduct has been so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community."  *Jackson*, 10 Cal. App. 5th at 1266 (quoting

Restatement (Second) of Torts § 46 cmt. d); *see also KOVR-TV, Inc. v. Sup. Ct.*, 31 Cal. App. 4th

1023, 1028 (1995).  To that end, California courts have found that allegations that an "employee

had falsely accused [a] fellow employee of committing a sexual assault in a report to a nurse and

the employer's human resources department insufficient to constitute extreme and outrageous

conduct."  *Id.* (citing *Comstock v. Aber*, 212 Cal. App. 4th 931, 954 (2012)); *see also Lawler v.*

*Montblanc N. Am.*, 704 F.3d 1235, 1245 (9th Cir. 2013) ("[G]ruff, abrupt, and intimidating

conduct" are not sufficient, and while the boss "may have inconsiderately and insensitively communicated his dissatisfaction of [the employees] managerial performance, this is not conduct from which California tort law protects employees.").

Abel's eighth and ninth causes of action are therefore dismissed without prejudice.[12]

### E.    Promissory Fraud

Abel's tenth and final cause of action is for promissory fraud. "Promissory fraud permits a plaintiff to state a cause of action in tort when a defendant fraudulently induces him to enter into a contract." *Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1152 (S.D. Cal. 2001) (citing *Lazar v. Sup. Ct.*, 12 Cal. 4th 631, 638 (1996)). As a "subspecies of fraud and deceit," *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 973 (1997), promissory fraud requires proof of "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e]." *Gruber v. Gruber*, 48 Cal. App. 5th 529, 540 (2020) (quoting *Behnke v. State Farm Gen. Ins. Co.*, 196 Cal. App. 4th 1443, 1453 (2011). Per Federal Rule of Civil Procedure 9(b), allegations of fraud must be stated "with particularity," other than the "conditions of a person's mind[, which] may be alleged generally." Fed. R. Civ. P. 9(b). "The specificity requirement means a plaintiff must allege facts

---

[12] Because Abel has not plausibly alleged emotional distress, the Court has no occasion to reach the question of whether the Jones Parties had a duty to Abel to "exercise reasonable care in protecting her sensitive information." Dkt. No. 57 at 20. The one California case she cites for that duty, however, discusses only whether there exists a "special relationship" between a "file transfer company and the company whose information is being transferred." *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 632 (N.D. Cal. 2024). Abel does not argue that such a "special relationship" existed between Jonesworks or Jones and herself.

showing how, when, where, to whom, and by what means" the fraud occurred. *Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982, 1008 (2016).

Abel's fraud claim is based on her allegations that Jonesworks induced her to hand over her company phone on August 21, 2024 on the promise that it would return her personal phone number to her, but that Jonesworks breached that promise. She alleges that "Jonesworks never intended to perform the promise when it was made," and that the company "intended to—and did—dupe Abel into giving up the iPhone and passcode so as to access, copy, and disseminate without authorization the private data stored on the device and information from accounts accessible from the device." Am. Countercl. ¶ 201. The Jones Parties argue that Abel could not have been "duped" into returning the iPhone, as it was a device owned by the company. *Id.* ¶ 26. That argument is a red herring. Abel acknowledges that "Jonesworks owned the physical device," *id.*, but her claim is that she was duped into returning the iPhone in advance of wiping the personal information from her phone, de-registering her personal iCloud and email accounts, and securing her personal and private data, *id.* ¶ 64. Abel does not allege that she owned the phone, but rather that absent Jonesworks' promise, she would have only returned the phone after removing her personal data from it.

Jones next argues that Abel's claims as to promissory fraud are fatally vague. A plaintiff "must plead facts explaining why the statement was false when it was made." *Hodgson v. Roper*, 2020 WL 5039405, at *10 (E.D. Cal. Aug. 26, 2020) (quoting *Smith*, 160 F. Supp. 2d at 1152–53). In other words, "fraudulent intent cannot be proven . . . by simply pointing to the defendant's subsequent failure to perform as promised." *Smith*, 160 F. Supp. 2d at 1152; *see also Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30–31 (1985) (noting that it has "never been[] a correct statement of the law" that the "subsequent failure to perform as promised warrants the

44

inference that defendant did not intend to perform when she made the promise"). Abel here alleges just that "Jonesworks never intended to perform the promise." Am. Countercl. ¶ 201. Alone, that allegation would, for the reasons given above, likely be conclusory. However, she also alleges that the promise was repudiated almost immediately after it was made: she states that Jonesworks gave "express confirmation" that it "would release the phone number if she went straight to Verizon," but that it did not do so and after hours she left the store in "panic and despair." *Id.* 65–66. California courts have found that such "hasty repudiation of the promise," or a "failure to even attempt performance," is the kind of "circumstantial evidence" that a court may rely on in making inferences in the plaintiff's favor. *Tenzer*, 39 Cal. at 30. The Court may also draw such an inference from the fact that Jonesworks "assured Abel and Verizon that they were in the process of effectuating the release and to bear with them for a few minutes" upon her arrival at the Verizon store. Am. Countercl. ¶ 66. That allegation is indicative of "continued assurances after it was clear that" Jonesworks would not perform. *Tenzer*, 39 Cal. 3d at 30. In sum, Abel does more than "pointing to a defendant's [action], noting that the content of the [action] conflicts with the current state of affairs, and then concluding that the statement in question was false when made." *Smith*, 160 F. Supp. 2d at 1153. At least at the pleading stage, she has alleged enough to push from possible to plausible the inference that Jonesworks intended to repudiate the promise when making it.

Finally, the Jones Parties argue that Abel has not sufficiently alleged damages as required for promissory fraud. "Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1064 (2012) (quoting *Patrick v. Alacer Corp.*, 167 Cal. App. 4th 995, 1016–17 (2008)). "If the existence—and not the amount—of damages alleged in a fraud pleading is 'too

remote, speculative, or uncertain,' then the pleadings cannot state a claim for relief." *Small v. Fritz Cos.*, 30 Cal. 4th 167, 202 (2003) (quoting *Block v. Tobin*, 45 Cal. App. 3d 214, 219 (1975)). "[I]t is not enough for the complaint to allege damage was suffered." *Beckwith*, 205 Cal. App. 4th at 1064. It must also allege that the damages "were caused by actions [the plaintiff] took in reliance on the defendant's misrepresentations." *Id.* (citing *Goehring v. Chapman Univ.*, 121 Cal. App. 4th 353, 364–65 (2004)). The moving party must be "left in worse circumstances than those in which he would have found himself had he not been lied to." *Magpoli v. Farmers Grp., Inc.*, 48 Cal. App. 4th 471, 480 (1996).

As discussed, Jonesworks owned the physical phone, so Abel cannot claim damages based on the value of the phone itself. Instead, she alleges just that "[a]s a direct and proximate result" of the alleged promissory fraud, "Abel was harmed." Am. Countercl. ¶ 203. In her brief in opposition to the Jones Parties' motion, she points also to her allegations that the lack of a phone number cut her off from accounts protected by two-factor authentication, *id.* ¶ 66, and that Jonesworks' retention of her phone gave it access to her personal information, *id.* ¶ 67. The allegations as to loss are largely conclusory, as Abel does not point to any specific losses caused by the fact that she could not use two factor authentication. And as she alleges, the proximate cause of public disclosure of any messages that resulted in damages was the subpoena issued in conjunction with the alleged "sham" lawsuit. *Id.* ¶ 99; *see Rossberg v. Bank of Am., N.A.*, 219 Cal. App. 4th 1481, 1499 (2013) (explaining that "no liability attaches if the damages sustained were otherwise inevitable or due to unrelated causes" (citation omitted)). Abel's allegations do not permit the Court to make a plausible inference that she suffered damages "caused by the actions [she] took in reliance on the defendant's misrepresentations." *Beckwith*, 205 Cal. App. 4th at 1065. If Jonesworks was not going to return the phone number to Abel promptly, nothing

about the promise that induced her to turn over the physical phone could change that.  Abel would have been required to turn over the company-owned phone regardless.  Thus, Abel "would have suffered the alleged damage even in the absence of the fraudulent inducement," and so "causation cannot be alleged and a fraud cause of action cannot be sustained." *Rutherford Holdings, LLC v. Plaza Del Rey*, 166 Cal. App. 4th 221, 235 (2014) (quoting *Beckwith*, 205 Cal. App. 4th at 1064); *see also Patrick v. Alacer Corp.*, 167 Cal. App. 4th 995, 1017 (2008) (no fraud where damages were caused by an action defendant "could have taken anyway").

Plaintiff's tenth cause action is accordingly denied without prejudice.

## CONCLUSION

The motion to dismiss is GRANTED in part and DENIED IN PART.  The Jones Parties' motion to dismiss the first cause of action is granted with prejudice.  Their motion to dismiss the second, third, fifth, sixth, eight, ninth, and tenth causes of action is granted without prejudice.  Their motion is denied as to the fourth and seventh causes of action.  Abel has until October 31, 2025 to replead the dismissed causes of action addressing the deficiencies elaborated in this opinion.

The Clerk of Court is respectfully directed to close Dkt. No. 55.


SO ORDERED.


Dated: October 3, 2025
         New York, New York
_____
              LEWIS J. LIMAN
           United States District Judge

47