# EXHIBIT A

Page 1

```
 1
 2   ** C O N F I D E N T I A L **
 3   * CONTAINS ATTORNEYS' EYES ONLY MATERIAL *
 4   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 5   Case No. 1:24-CV-10049-LJL
     (Consolidated with 1:25-cv-00449-LJL)
 6   --------------------------------x
     BLAKE LIVELY,
 7            Plaintiff,
 8       - against -
 9   WAYFARER STUDIOS LLC, a Delaware
     Limited Liability Company, JUSTIN
10   BALDONI, an individual, JAMEY HEATH, an
     individual, STEVE SAROWITZ, an individual,
11   IT ENDS WITH US MOVIE LLC, a California
     Limited Liability Company, MELISSA
12   NATHAN, an individual, THE AGENCY
     GROUP PR LLC, a Delaware Limited Liability
13   Company, JENNIFER ABEL, an individual,
     JED WALLACE, an individual, and STREET
14   RELATIONS INC., a California Corporation,
               Defendants.
15   --------------------------------x
                (Caption continued)
16             September 5, 2025
               9:10 a.m.
17
18       Videotaped Deposition of KATHERINE
19   CASE, taken by Plaintiff, pursuant to
20   Subpoena, held at the offices of Willkie
21   Farr & Gallagher LLP, 787 Seventh Avenue,
22   New York, New York, before Todd DeSimone, a
23   Registered Professional Reporter and Notary
24   Public of the State of New York.
25
```

Page 2

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Civ. Action No. 1:25-cv-779

5    -----------------------------------x

     STEPHANIE JONES and JONESWORKS LLC,

6

                        Plaintiffs,

7

8             - against -

9

     JENNIFER ABEL, MELISSA NATHAN,

10   JUSTIN BALDONI, WAYFARER STUDIOS LLC,

     and JOHN DOES 1-10,

11

                        Defendants.

12

     -----------------------------------x

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2   A P P E A R A N C E S :
 3   WILLKIE FARR & GALLAGHER LLP
     1875 K Street NW
 4   Washington D.C. 20006
             Attorneys for Blake Lively
 5   BY:     KRISTIN BENDER, ESQ.
               kbender@willkie.com
 6           MICHAEL GOTTLIEB, ESQ (Via Zoom)
               mgottlieb@willkie.com
 7
 8          - and -
 9
     WILLKIE FARR & GALLAGHER LLP
10   787 Seventh Avenue
     New York, New York 10019
11   BY:  MELISSA TAUSTINE, ESQ.
             mtaustine@willkie.com
12           AARON E. NATHAN, ESQ.
               anathan@willkie.com
13
14
15   MANATT, PHELPS & PHILLIPS LLP
     2049 Century Park East
16   Suite 1700
     Los Angeles, California 90067
17           Attorneys for Blake Lively
     BY:     STEPHANIE ROESER, ESQ. (Via Zoom)
18             sroeser@manatt.com
19
20
21
22
23
24
25
```

```
                                              Page 4

 1
 2    A P P E A R A N C E S: (Continued)
 3    QUINN EMANUEL URQUHART & SULLIVAN LLP
      865 South Figueroa Street
 4    10th Floor
      Los Angeles, California 90017
 5         Attorneys for Stephanie Jones and
           Jonesworks, LLC
 6    BY:  KRISTIN N. TAHLER, ESQ.
             kristintahler@quinnemanuel.com
 7
 8              - and -
 9
      QUINN EMANUEL URQUHART & SULLIVAN LLP
10    295 Fifth Avenue
      9th Floor
11    New York, New York 10016
      BY:   MORGAN ANASTASIO, ESQ.
12          morgananastasio@quinnemanuel.com
13
14
      MEISTER SEELIG & FEIN PLLC
15    125 Park Avenue
      7th Floor
16    New York, New York 10017
            Attorneys for Wayfarer Studios
17          LLC, Justin Baldoni, Jamey
            Heath, Steve Sarowitz, It Ends With
18          Us Movie LLC, Melissa Nathan,
            Jennifer Abel, and The Agency Group
19          PR LLC
      BY:   MITCHELL SCHUSTER, ESQ.
20           ms@msf-law.com
            KEVIN A. FRITZ, ESQ. (Via Zoom)
21           kf@msf-law.com
22
23
24
25
```

Page 5

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   LINER FREEDMAN TAITELMAN + COOLEY, LLP
     1801 Century Park West
 4   5th Floor
     Los Angeles, California 90067
 5           Attorneys for Wayfarer Studios
             LLC, Justin Baldoni, Jamey
 6           Heath, Steve Sarowitz, It Ends With
             Us Movie LLC, Melissa Nathan,
 7           Jennifer Abel, and The Agency Group
             PR LLC
 8   BY:     BRYAN FREEDMAN, ESQ.
              bfreedman@lftcllp.com
 9           KIM S. ZELDIN, ESQ. (Via Zoom)
              kzeldin@lftcllp.com
10           SUMMER BENSON, ESQ. (Via Zoom)
              sbenson@lftcllp.com
11
12
     AHOURAIAN LAW
13   9465 Wilshire Boulevard
     Suite 300
14   Beverly Hills, California 90210
             Attorneys for Wayfarer Studios
15           LLC, Justin Baldoni, Jamey
             Heath, Steve Sarowitz, It Ends With
16           Us Movie LLC, Melissa Nathan,
             Jennifer Abel, and The Agency Group
17           PR LLC
     BY:     MITRA AHOURAIAN, ESQ. (Via Zoom)
18
19
20   JACKSON WALKER LLP
     1401 McKinney Street
21   Suite 1900
     Houston, Texas 77010
22           Attorneys for Jed Wallace and
             Street Relations Inc.
23   BY:     TORY EMERY, ESQ.
              temery@jw.com
24
25
```

Page 6

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   PRYOR CASHMAN LLP
     7 Times Square
 4   New York, New York 10036
             Attorneys for The Witness
 5   BY:   MAXWELL BREED, ESQ.
               mbreed@pryorcashman.com
 6           DANIEL POHLMAN, ESQ.
              dpohlman@pryorcashman.com
 7
 8
     ALSO PRESENT:
 9
         JUSTIN BALDONI (Via Zoom)
10
         JENNIFER ABEL (Via Zoom)
11
         JAMEY HEATH (Via Zoom)
12
         ZACH CZERENDA, Concierge Tech (Via Zoom)
13
         COREY WAINAINA, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

1        K. CASE - CONFIDENTIAL

2            THE VIDEOGRAPHER:  Good morning

3        everyone.  We are going on the record

4        at 9:10 a.m. on Friday, September 5th,

5        2025.  Please note that the microphones

6        are sensitive and may pick up

7        whispering and private conversations.

8            This is media unit one of the

9        video-recorded deposition of Katherine

10        Case in the matter of Blake Lively

11        versus Wayfarer Studios LLC, et al.

12        This is filed in the United States

13        District Court, Southern District of

14        New York, the case number is

15        1:24-CV-10049-LJL.

16            My name is Corey Wainaina

17        representing Veritext Legal Solutions

18        and I am the videographer.  The court

19        reporter is Todd DeSimone also from the

20        firm Veritext Legal Solutions.  I am

21        not authorized to administer an oath, I

22        am not related to any party in this

23        action, nor am I financially interested

24        in the outcome.

25            Please be aware that all

Page 8

```
 1          K. CASE - CONFIDENTIAL
 2       appearances and affiliations will be
 3       noted on the stenographic record, and
 4       will the court reporter please swear in
 5       the witness.
 6            *    *    *
 7  K A T H E R I N E   C A S E,
 8  called as a witness, having been first duly
 9  sworn, was examined and testified
10  as follows:
11  EXAMINATION BY MS. BENDER:
12       Q.      Good morning, Ms. Case.
13       A.      Good morning.
14       Q.      Can you please state your full
15  name and address for the record.
16       A.      Katherine Hastings Case, ███████
    ████████████████████████████████████████
18       Q.      And have you ever been deposed
19  before?
20       A.      No.
21       Q.      And do you understand that you
22  are under oath during this deposition?
23       A.      Yes.
24       Q.      Okay.  Do you understand that
25  your testimony today carries the same
```

Page 156

1           K. CASE - CONFIDENTIAL
2    KCASE-000003856.
3              You can put that document
4    aside.  You are being handed what has been
5    marked Case Exhibit 8.
6              (Case Exhibit 8 marked for
7    identification.)
8              MR. FREEDMAN:  Did you mark
9         this as 7?
10             MS. BENDER:  It was marked as
11        7, but we are going to discuss Case
12        Exhibit 8.
13        Q.    Okay.  This is Bates stamped
14   KCASE-000004949, a text ranging from August
15   5th to August 6th, 2024.
16             Ms. Case, do you recognize this
17   document?
18        A.    I do.
19        Q.    What is it?
20        A.    It seems to be a text thread
21   between myself and Melissa.
22        Q.    Do you have any reason to think
23   this document is not as it was when it was
24   created?
25        A.    No.

Page 157

```
 1          K. CASE - CONFIDENTIAL
 2      Q.      If you turn a few pages to
 3  where the Bates stamp ends in 53.  At 1:58
 4  Melissa says to you "I have to drive to
 5  this fucking meeting.  Do you think you'll
 6  have that copy for Jed today?"
 7              Do you see that?
 8      A.      I do.
 9      Q.      Is that referring to Jed
10  Wallace?
11      A.      Yes.
12      Q.      What copy were you drafting for
13  Jed Wallace?
14      A.      I believe this is in regards to
15  a client.
```

23      Q.      Okay.  On the next page, at
24  4:46 p.m., Melissa says "Jed and Bryan
25  asking me for copy lol kill me."

Page 158

1          K. CASE - CONFIDENTIAL

2               Do you see that?

3     A.     I do.

4     Q.     Who is Bryan?

5     A.     I believe Bryan Freedman.

11    Q.     You worked on the copy that

12 Melissa was requesting for that account,

13 correct?

14    A.     This was a one-off request.

15    Q.     So you did some work on that

16 account, correct?

17    A.     Specifically I assisted with

18 this copy.

19    Q.     And you knew that Jed and Bryan

20 were working together asking for the copy

21 that you were preparing for that account,

22 correct?

23          MR. BREED:  Objection.

24          MR. FREEDMAN:  Objection.

25    A.     Melissa alerted me at that

Page 231

                    K. CASE - CONFIDENTIAL
 1
 2   item.
 3          Q.      So your plan was to flag it to
 4   them?
 5          A.      Yes.
 6          Q.      And you probably did?
 7                  MR. BREED:  Objection.
 8          A.      I most likely shared it with
 9   Jed.
10          Q.      And on the next page, you
11   indicate that you would share additional
12   content, correct?
13          A.      Yes.
14          Q.      And that's sharing with Jed?
15          A.      Yes.
16          Q.      And at the very least you would
17   ask Jed for engagement in the comments?
18                  MS. EMERY:  Objection.
19          A.      Yes.
20          Q.      Did you make that request of
21   Jed?
22          A.      I believe so.
23          Q.      I'm handing you what is being
24   marked as Case Exhibit 18.
25                  (Case Exhibit 18 marked for

Page 232

1              K. CASE - CONFIDENTIAL

2      identification.)

3          Q.      This is Bates stamped

4      KCASE-000003320 dated August 12th, 2024.

5              Ms. Case, do you recognize this

6      document?

7          A.      I do.

8          Q.      What is it?

9          A.      It seems to be a text thread

10     between Breanna, Carolina, myself and

11     Melissa.

12         Q.      Any reason to think that this

13     has been altered since it was originally

14     created?

15         A.      I don't believe so.

16         Q.      And if you turn to the document

17     number Bates stamped 3322, Ms. Nathan

18     advises at 2:52 p.m. that they called Jed.

19     Is this referring to the Wayfarer clients?

20         A.      I'm not sure.

21         Q.      You respond that "He's done a

22     wonderful job."

23              Do you see that?

24         A.      Yes.

25         Q.      Was it your belief at this

```
 1            K. CASE - CONFIDENTIAL
 2    point that Mr. Wallace had done a wonderful
 3    job in connection with the Wayfarer
 4    account?
 5         A.     It was my assumption.
 6         Q.     Based on the online
 7    conversation?
 8         A.     Based in the shift that we had
 9    seen.
10         Q.     And based on your
11    communications with Mr. Wallace?
12                MR. BREED:   Objection.
13         A.     Simply based on the shift that
14    we had seen.
15         Q.     What issue was Ms. Nathan
16    referring to here?
17         A.     I don't remember.
18         Q.     Did she ever tell you?
19         A.     I'm sure she did.  We had a lot
20    of other client needs at this time.  I
21    don't remember what this was referring to
22    specifically.
23         Q.     It sounds like the client
24    reached out directly to Jed.  Is that a
25    fair characterization?
```

```
 1            K. CASE - CONFIDENTIAL
 2                MR. BREED:  Objection.
 3       A.    No.
 4       Q.    What do I have wrong about
 5   that?
 6       A.    We didn't advise him to double
 7   down.
 8       Q.    Teeing up a U.K. person, that
 9   is referring to a journalist, correct?
10       A.    I believe so.
11       Q.    Is that the reference to
12   Allison that you see here?
13       A.    I'm sorry, I don't see where
14   Allison is.
15       Q.    At 12:43 p.m. and 12:44 p.m.
16       A.    Oh, thank you.  Yes.
17       Q.    So in lieu of an apology,
18   Ms. Butler was proposing to tee up a U.K.
19   journalist regarding Ms. Lively's promotion
20   of the film, correct?
21       A.    No.
22       Q.    What do I have wrong about
23   that?
24       A.    It wasn't in lieu of.  This was
25   a conversation being had at the same time.
```

```
                                       Page 374

 1            K.  CASE - CONFIDENTIAL

 2   prep that they had spoken to anyone

 3   representing the Wayfarer parties prior to

 4   your preparation?

 5        A.      I can't say.

 6        Q.      Ms. Case, are you aware of

 7   various websites and social media accounts

 8   that are disparaging of Ms. Jones?

 9            MR. BREED:  Objection.

10        A.      I am aware of websites about

11   Ms. Jones.

12        Q.      Did you create any of the

13   websites that are disparaging of Ms. Jones?

14        A.      No.

15        Q.      Who did?

16        A.      I don't know.

17        Q.      How did you become aware of the

18   websites that are disparaging of Ms. Jones?

19            MR. BREED:  Objection.

20            MR. FREEDMAN:  Objection.

21        Q.      How did you become aware of the

22   websites disparaging Ms. Jones?

23        A.      I received a call from Melissa

24   in early May.  It was communicated to me

25   that a website had been requested.
```

Page 375

1          K. CASE - CONFIDENTIAL

2     Q.      A website had been requested?

3     A.      The creation of a website had

4  been requested.



Page 376

1                 K.  CASE - CONFIDENTIAL



Page 377

```
 1              K.  CASE - CONFIDENTIAL
 2       Q.       By Ms. Nathan?
 3       A.       The conversation was with her,
 4  yes.
 5       Q.       It was a conversation?
 6       A.       Yes.
 7       Q.       Did Ms. Nathan send you any
 8  written communications about this?
 9       A.       Not about the language to be
10  used, no.
11       Q.       Generally about the websites?
12       A.       At that time, no.
13       Q.       At any time?
14       A.       There was conversation about
15  the copy that I had written based on the
16  information provided, I redrafted and sent
17  back to her.
18       Q.       Did you draft the copy for the
19  website about Ms. Jones?
20       A.       Based on the conversation and
21  the language provided to me, I provided
22  copy.
23       Q.       So yes, you provided -- you
24  wrote the copy that was -- that became the
25  website of Ms. Jones?
```

Page 378

```
 1              K. CASE - CONFIDENTIAL
 2                  MR. FREEDMAN:  Objection.
 3       A.      Based on the language that I
 4  was instructed to use.
 5       Q.      Did anyone else provide you
 6  with that language besides Ms. Nathan?
 7                  MR. BREED:  Objection.
 8       A.      No.
 9       Q.      And Ms. Nathan provided all of
10  this language to you orally?
11                  MR. FREEDMAN:  Objection.
12                  MR. BREED:  Objection.
13       A.      She provided language to
14  reference over the phone, yes.
15       Q.      Did she put anything in writing
16  about the language to be used in the
17  website?
18       A.      No.
19       Q.      What happened -- did she send
20  an audio message?
21                  MR. BREED:  Objection.
22       A.      No.
23       Q.      What happened after you
24  provided Ms. Nathan with the copy?
25       A.      I don't know.
```

Page 383

1          K. CASE - CONFIDENTIAL
2    with the copy for Exhibit 35, did you have
3    any other discussions with Ms. Nathan about
4    websites regarding Ms. Jones?
5                MR. FREEDMAN:  Objection.
6        A.      Websites, plural, no.  I was
7    asked to help alongside her to draft a
8    handful of tweets for the Twitter page, and
9    I was asked, again, based on language that
10   I was provided to extrapolate that into
11   updates to the website.
12       Q.      You referred to the Twitter
13   page.  What is the Twitter page?
14       A.      I don't recall the specific
15   handle.  I was told that at the time the
16   site went public there was a corresponding
17   Twitter page.
18       Q.      Was that Twitter handle
19   @LyingStephJones?
20               MR. FREEDMAN:  Objection.
21       A.      I'm not sure.  I don't recall
22   what the Twitter page was.
23       Q.      Melissa told you that there was
24   a corresponding Twitter handle?
25       A.      She asked if I could assist in

```
 1          K. CASE - CONFIDENTIAL
 2   drafting tweets, so I inferred that the
 3   Twitter handle was related.
 4        Q.    Did she tell you that the
 5   tweets that you had drafted had in fact
 6   been posted?
 7        A.    She did not communicate that,
 8   no.
 9        Q.    Did you form an understanding
10   that they had been posted?
11             MR. FREEDMAN:  Objection.
12        A.    Yes.
13        Q.    Based on what?
14        A.    Seeing them on the Twitter
15   page.
16        Q.    How many tweets did you prepare
17   for the Twitter page?
18        A.    Roughly five or six.
19        Q.    How did you provide those to
20   Ms. Nathan?
21        A.    I believe maybe Signal.  I
22   don't really recall.
23        Q.    Do you recall communicating
24   with Ms. Nathan on Signal regarding
25   Ms. Jones?
```

```
                                          Page 385
 1           K.  CASE - CONFIDENTIAL
 2      A.      In relation to the tweet
 3   drafts, yes.
 4      Q.      Do you still have those Signal
 5   messages today?
 6      A.      No.
 7      Q.      Why did you communicate with
 8   her on Signal?
 9      A.      I don't know.
10      Q.      Did you frequently communicate
11   with Ms. Nathan on Signal?
12      A.      No.
13      Q.      You communicated with
14   Ms. Nathan to make sure that the messages
15   would disappear, correct?
16              MR. BREED:  Objection.
17              MR. FREEDMAN:  Objection.
18      A.      No.
19      Q.      Was there any other reason to
20   communicate on Signal?
21      A.      To my knowledge, no.
22              (Case Exhibit 36 marked for
23   identification.)
24      Q.      You are reviewing what has been
25   marked as Exhibit 36.  It is a Twitter
```

```
                                              Page 387
 1           K.  CASE - CONFIDENTIAL
 2      A.     There was never a formal
 3   explanation.  I was simply asked to draft
 4   tweets.
 5      Q.     Do you know whether Melissa had
 6   any other assistance in this?
 7      A.     I don't know.
 8      Q.     Do you know whether she worked
 9   with Jed Wallace on this?
10           MR. FREEDMAN:  Objection.
11      A.     I spoke with Jed in conjunction
12   to Melissa as it related to the tweets.
13      Q.     And what did you and Jed
14   discuss?
15           MR. FREEDMAN:  Objection.
16           MS. EMERY:  Objection.
17      A.     The tweets.
18      Q.     What about the tweets?
19      A.     I provided them via Signal.
20      Q.     Was it your understanding that
21   Jed was going to post the tweets?
22           MR. FREEDMAN:  Objection.
23           MR. BREED:  Objection.
24           MS. EMERY:  Objection.
25      A.     I don't know.
```

Page 505

1        K. CASE - CONFIDENTIAL

2    not exactly sure what she did; is that

3    correct?

4         A.    That's correct.

5         Q.    Do you have any ill will of

6    Melissa Nathan?

7         A.    No.



Page 506

1              K. CASE - CONFIDENTIAL



23        Q.      Did you do any other work on
24    the side?
25                MS. TAHLER:   Objection.

Page 519

1

2            CERTIFICATION

3

4     I,  TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do hereby

6   certify:

7     That the witness whose testimony as

8   herein set forth, was duly sworn by me; and

9   that the within transcript is a true record

10   of the testimony given by said witness.

11     I further certify that I am not related

12   to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15     IN WITNESS WHEREOF, I have hereunto set

16   my hand this 6th day of September, 2025.

17

18

19        TODD DESIMONE

20

21

22

23

24

25