# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Stephanie Jones, Jonesworks LLC, | Civil Action No. 1:25-cv-779 |
| Plaintiffs, | **AMENDED COMPLAINT** |
| -against- | Jury Trial Demanded |
| Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios LLC, Jamey Heath, and JOHN DOES 1-10, | |
| Defendants. | |

Plaintiffs Stephanie Jones and Jonesworks LLC, by and through their undersigned counsel, bring this Amended Complaint against Defendants Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios, LLC, Jamey Heath, and John Does 1-10, and respectfully allege as follows:

## NATURE OF THE CASE

1.     Discovery has revealed a growing list of attack websites from the same band of conspirators.   Among other revelations, discovery has uncovered that Melissa Nathan, her "hired gun" Jed Wallace, and others engage in a regular practice of creating highly offensive and negative online content against individuals—often influential women, including Jones and Jonesworks— with the clear intent of destroying those individuals' reputations.   This Amended Complaint conforms to the recently-discovered evidence and identifies the Doe Defendant responsible for the smear websites and social media accounts targeting Jones and Jonesworks and scores more.

2.     The Jones Parties now know that before Nathan and Abel engaged Wallace to run a retaliatory media smear campaign against Blake Lively surrounding the release of the film *It Ends With Us*, they had employed the same underhanded tactics against Jones, causing an astronomical and wholly unfounded spike in negative rumors, online chatter, and media articles unlike anything Jones had experienced in her career and resulting in severe reputational damage.

This lawsuit seeks to finally put a stop to their continued misconduct and to compensate Jones and Jonesworks for the damage Defendants' conduct and scheme has inflicted.

3.      Stephanie Jones is a highly respected public relations expert who focuses on corporate and personal publicity.  Through her company, Jonesworks, she has represented many high-profile celebrities, athletes, companies, and business people.  Among Jonesworks' clients were Baldoni, a well-known actor, director, and producer, and Wayfarer, his movie production company.  Among Jonesworks' former employees was Abel, who, unbeknownst to Jones, had been groomed by Nathan to turn against Jones.  Together, Nathan and Abel conspired with others—including Roza Kalantari and her company Skyline Agency, and Wallace and his company Street Relations—to unlawfully disparage Jones and harm Jones.

4.      The attacks against Jones and Jonesworks included the publication of multiple websites and social media accounts smearing Jones and placing traditional media articles amplifying these lies.  Jones has consistently maintained that this smear campaign was a calculated and deliberate effort to severely damage her business and reputation.  Suspicions have now been validated.  Among other things, discovery has revealed that Nathan directed a then-employee (the "Former Employee") to write copy and coordinated with frequent collaborator Wallace to create and publish numerous websites and social media accounts containing ugly false statements about Jones and Jonesworks.

5.      Defendants have denied their involvement in the Jones websites.  But the pattern has repeated too many times to be coincidence.  It is now apparent that Nathan and Wallace—and on information and belief, often in connection with litigation and sometimes with the assistance of Kalantari and her agency Skyline—run a clandestine cottage industry of creating false smear websites and social media accounts targeting their adversaries and those of their clients.  The Jones

website is not an isolated incident.  On information and belief, this pattern has repeated itself many times over.  And their frequent collaborations to create and publish strikingly similar derogatory and offensive websites and social media handles about others only further corroborates their hand in the Jones website.

6.    For example, Nathan and Wallace directed that the copy for the website

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

7.    They did the same for ████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

8.    The list goes on.  Similarities in these and other websites corroborate that the creators of the Jones website and of the websites amandaghostsucks.com and alexanderbrothersextorted.com likely also created many more derogatory websites of a similar nature, including on information and belief:

    a.    https://www.alexanikolas.net attacking Alexa Nikolas, who had filed a sexual assault lawsuit against Michael Milosh.

    b.    https://lookbackfraud.com accusing Joe Dunn of conspiring to make accusations against Michael Milosh.

    c.    A social media account attacking Christian Lanng, whom a Jane Doe had sued for allegedly forcing her into a slave contract.

d.    https://minheejin.net attacking Min Hee-jin, the former CEO of South Korean recording label ADOR.

e. https://paigejimenez.com attacking Paige Jimenez, an influencer and OnlyFans model.

f.    https://www.leadsafemamaexposed.com attacking Tamara Rubin, also known as The Lead Safe Mama, an activist, researcher and filmmaker who was the executive director of Lead Safe America from 2011-2016.

9.    At the same time, Nathan, Kalantari, and others—including later Abel—also coordinated closely with reporters at *Business Insider* to facilitate and plant a highly negative media story about Jones and Jonesworks, buoyed in part by the existence of the same false and defamatory websites that Nathan and Wallace had created.  So strong was their desire to generate negative media coverage against Jones that ███████████████████████

███████████████████



10.    Nathan and Kalantari conspired to ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

11.    Nathan and others ████████████████████████████████████
████████████████████████████████████████████████. They
plainly intended to use the publication of this negative article to harm Jones, ██████████
████████████████████████████████████████████.

12.    On the eve of the article's release, Nathan boasted about the destructive effect this
story would have on Jones, mocking Jones in a text to Abel and jokingly suggesting that Abel
should tell Jones:



13.    Abel and Nathan's conspiracy to take down Jones was virulent and effective, which
they themselves recognized, in connection with Lively, was fueled by society's natural willingness
to tear down successful women, and they capitalized on this for their own gain:



[…]





14.    Indeed, Abel and Nathan's animosity against Jones was so great that they ▉



15.    Nor was this the only time Abel, Nathan, and Wallace had used these tactics to tear down female adversaries.  In July 2024, behind Jones's back, Abel and Nathan also secretly coordinated with Baldoni and Wayfarer to implement an equally aggressive media smear campaign on Baldoni's and Wayfarer's behalf.  In connection with the release of *It Ends With Us* (the "Film") in August 2024, Baldoni began to fear that the media might report on allegations of

misogynistic and toxic on-set behavior and that the fallout would be harmful to his reputation and career. Determined to protect his reputation, Baldoni and Wayfarer's CEO Jamey Heath turned to Abel, who had become the point person at Jonesworks on the Baldoni and Wayfarer account. Over Jones's express objections, Abel brought on crisis-fixer Melissa Nathan to help her manage the situation. Together, Abel and Nathan, with Heath's active encouragement, conspired to shut Jones out of the process and keep their strategy hidden from her.

16.    Abel and Nathan sprang into action, scheming to "bury" and "destroy" co-star Blake Lively to protect Baldoni. Their plan was covert, deliberately concealed from Jones, and went far beyond the legitimate scope of Abel's employment. Indeed, discovery has revealed that Nathan and Abel offered to Baldoni and Wayfarer (without Jones's knowledge) a "website" and "full social take down" of Lively—exactly what Nathan, Wallace, and others had done to attack and disparage Jones and others including ████████████████████████████████. At the same time, Abel and Nathan were pursuing a far more selfish purpose: Tearing down Jones's reputation to take her clients and enrich themselves upon Abel's planned departure from Jonesworks:



From: ████████ Melissa  Nathan
To: ████████ Jennifer Abel (owner)
I know.
And once you are gone - we will be on accounts together and make really good money and be happy
Priority: Normal

29/07/2024 15:03:05(UTC+0)

[…]



17.     Avarice, not any sincere appreciation for Baldoni, was Nathan and Abel's motivation. Abel's candid communications revealed that she in fact held Baldoni personally in extremely low regard:

> **From:** Jennifer Abel (owner)
> **To:**
> I can't stand him. He's so pompous. A men's retreat during release, is he crazy?! And being off the grid for the summer because he's just so overworked… like calm down. You're not that important and nobody gives a shit how hard your life is.
> **Priority:** Normal
> 14/01/2024 18:57:29(UTC+0)

> **From:** Jennifer Abel (owner)
> **To:**
> He doesn't need a retreat. He needs to be humbled. When this movie flops, he's going to try to blame every person around him for it
> **Priority:** Normal
> 14/01/2024 19:00:38(UTC+0)

[…]

> **From:** Jennifer Abel (owner)
> **To:**
> He may fire us because even if we put together an amazing campaign, it's not going to change the fact that he's so unlikable and unrealistic as a leading man, there's no chemistry with him and Blake, you and I both know that she will be resistant to promote this movie, and press will be reluctant to do anything with Justin without Blake being part of it. So there. Those are my thoughts.
> **Priority:** Normal
> 14/01/2024 19:02:38(UTC+0)

18.    Abel had voiced the same opinion in connection with a filmed kissing scene between Baldoni and Lively, which was described to Abel as "so gross" and revealed that Abel was well aware of Lively's on-set complaints about Baldoni's behavior:



[…]

19.    Nathan and Abel then used the crisis as an opportunity to drive a wedge between Jones and Baldoni, and to publicly pin blame for this smear campaign on Jones—when Jones had no knowledge or involvement in it, conspiring to ensure that Wayfarer and Baldoni would leave Jonesworks and come with Abel to her planned new firm:



From: [redacted]    Melissa  Nathan
To: [redacted]    Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and she needs to also not do anything and my last conversation with her was last Wednesday or so

And then I couldn't help myself

Priority: Normal

19/08/2024 04:49:55(UTC+0)

From: [redacted]    Melissa  Nathan
To: [redacted]    Jennifer Abel (owner)

I ended it with

Priority: Normal

19/08/2024 04:50:00(UTC+0)

From: [redacted]    Melissa  Nathan
To: [redacted]    Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her.

Don't kill me, okay bye

Priority: Normal

19/08/2024 04:50:28(UTC+0)

From: [redacted]    Jennifer Abel (owner)
To: [redacted]    Melissa  Nathan

Hahahaha omg love you

Priority: Normal

19/08/2024 05:02:12(UTC+0)

From: [redacted]    Jennifer Abel (owner)
To: [redacted]    Melissa  Nathan

Thanks for chatting with him

Priority: Normal

19/08/2024 05:02:19(UTC+0)

20.     By the time Jones became aware of the plot in August 2024 and terminated Abel, it was too late and the damage was done.  Abel had already stolen more than 70 proprietary and sensitive business documents and additional client leads from Jonesworks.  Beyond those documents, Abel left Jonesworks with Baldoni and Wayfarer in tow and immediately opened shop at her own competing firm, which she had set up while still working at Jonesworks.  She further sought to poach employees in violation of the noncompete and non-solicitation provisions in her contract.  And for their part encouraging Abel and leaving with her, Wayfarer and Baldoni breached their own contract with Jonesworks and then poured salt in the wound by baselessly refusing to pay the remaining amount owed.

21.     Abel and Nathan's covert take down and smear campaigns were revealed in black and white on Abel's company-issued phone following her termination, which Jonesworks forensically preserved and examined in detail after receiving a subpoena for the phone's contents. Jones discovered the breadth and intensity of Abel and Nathan's duplicity from these records, including that Abel was actively encouraging other Jonesworks clients and employees to leave Jonesworks while Abel was still employed there.

22.     To this day, Abel and Nathan blame, attack, and disparage Jones in an effort to detract from their own misconduct as it continues to come to light. So, too, do Baldoni and Wayfarer, who have since parted ways with Jonesworks, have repudiated their contractual obligations with Jonesworks, and have enabled and encouraged Abel's and Nathan's rampant misconduct against Jones.  Jones has tried in good faith to resolve this dispute out of court, but those efforts were met with a complete lack of accountability and stonewalling.  And Defendants' finger pointing and smear campaign against Jones still continues.  Jones has been subject to even more retaliation and negative attacks from Defendants for filing this lawsuit and revealing the

truth. But she has been left with no choice but to seek to vindicate her rights through this litigation and put a stop to Defendants' continued harassing and damaging behavior against her.

**PARTIES**

23.     Plaintiff Jonesworks LLC is a Delaware limited liability company that is an internationally recognized public relations firm. It was founded in and has its principal place of business in New York, New York. All members of Jonesworks are citizens of the State of Connecticut.

24.     Plaintiff Stephanie Jones is an individual who resides in Greenwich, Connecticut. Jones is the founder and CEO of Jonesworks.

25.     Defendant Jennifer Abel is an individual who resides in Beverly Hills, California. From approximately July 2020 to August 2024, Abel was an employee of Jonesworks. Abel established RWA Communications, of which she is the founder and CEO, in July 2024, while still employed by Jonesworks. In August 2024, Abel was terminated for cause by Jonesworks.

26.     Defendant Melissa Nathan is an individual who resides in Los Angeles, California. Nathan offers crisis management and communications services. During a portion of the relevant period, Nathan lived in Brooklyn, New York. In approximately January 2024, Nathan launched The Agency Group PR LLC.

27.     Defendant Justin Baldoni is an individual who resides in Ojai, California. Baldoni is a professional actor and director, and is a co-founder and co-chairman of Wayfarer Studios, an independent studio and production company. Baldoni was the director, co-star, and producer of the film *It Ends With Us*.

28.     Defendant Wayfarer Studios LLC is a Delaware limited liability company with its principal place of business in Beverly Hills, California. It operates as an independent entertainment production studio and develops, produces, and finances feature films and other

12

original media content.  It was co-founded by current co-Chairman Baldoni and is led by Defendant CEO Jamey Heath.

29.    Defendant Jamey Heath is an individual who resides in Los Angeles, California. Heath has been the Chief Executive Officer of Wayfarer since March 2024 and was President of Wayfarer during production of the Film.

30.    John Does 1-10 are unknown additional individuals who created and published the defamatory websites www.stephaniejonesleaks.com and www.stephaniejoneslies.com, as well as more than a dozen fake social media accounts and dark web accounts that defamed Jones and Jonesworks.

## JURISDICTION AND VENUE

31.    This Court has diversity jurisdiction over the claims for relief asserted in this complaint pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no defendant is a citizen of the same State as Plaintiffs.

32.    This Court has personal jurisdiction over Defendants pursuant to New York's Civil Practice Law and Rules ("CPLR") Section 301 because each of the aforementioned systematically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York.  This Court further has personal jurisdiction over each Defendant pursuant to CPLR Section 302, including because, upon information and belief, all Defendants transact and solicit business within the State, have committed the tortious acts described in this Complaint within the State, or have committed such acts outside of the State causing injury to Jonesworks and Jones within the State.  As just one example, Baldoni and Heath met in person in New York with Lively regarding Baldoni's on-set misconduct that started the sequence of events leading to this suit.  Abel and Nathan also targeted

New York by communicating with journalists based in New York City in their effort to damage the reputation of Jones and Jonesworks and conceal Baldoni's on-set behavior.

33.     This Court also has jurisdiction over Defendants Abel, Baldoni, and Wayfarer Studios because each is a party to a contract with Jonesworks that requires that disputes will be resolved in New York, New York, subject to New York law.

34.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Jonesworks' principal offices are in this District and because a substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTUAL ALLEGATIONS

## I.     BACKGROUND ON THE PARTIES AND THEIR CONTRACTS

### A.     Jones and Jonesworks

35.     Jones is a highly regarded leader in the field of public relations and the founder, president, and owner of Jonesworks, an Emmy award-winning marketing and communications agency.

### B.     Jennifer Abel

36.     In July 2020, Jonesworks hired Abel to work as a publicist with the title Vice President.     On July 9, 2020, Abel and Jonesworks executed two contracts: an offer letter establishing Abel's compensation and a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "Abel NDA").

37.     The Abel NDA contained several provisions relevant to this Complaint: Abel agreed to keep confidential any and all of Jonesworks' proprietary information, including strategies, plans, and financial information as well as information relating to Jonesworks' clients. Abel agreed that any Work Product she created was the property of Jonesworks.  She also agreed that she would not prepare or assist in the preparation of any articles about Jonesworks without

Jonesworks' express permission, would not disparage Jonesworks in any communications with any reporter or any Jonesworks client, and would not attempt to persuade any Jonesworks client to stop doing business with Jonesworks.

38.     On November 22, 2021, Jonesworks and Abel executed an Employment Agreement adjusting the terms of her employment.  Under the Employment Agreement, Jonesworks granted Abel the title "Vice President, Talent" and provided her with compensation tied to the company's performance, including a bonus based on distributions made by the company and a payment equal to 1% of any net proceeds in the event of the sale of Jonesworks.

39.     Under the Employment Agreement, Abel agreed again that she would not use any Jonesworks' proprietary information for any purpose other than benefiting the company, that the products of her work were the sole property of Jonesworks, that she would not directly or indirectly compete with Jonesworks for business during her employment or for a period of six months after her departure, that she would not solicit any business from Jonesworks' clients, that she would not solicit any Jonesworks employees to depart the company, and that she would only notify clients of her departure from Jonesworks with Jones' approval.  Abel also expressly agreed that she owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of the Company."

40.     The Employment Agreement included a New York choice of law provision and a New York forum selection clause.  Abel expressly agreed to submit to the jurisdiction of any state or federal court sitting in New York, New York for any disputes under the Employment Agreement.

41.     Shortly after executing the Employment Agreement, Jonesworks began referring to Abel as a "Partner," but Abel remained at all times an employee of Jonesworks and never held any partnership interest in the company.

### C.    Wayfarer and Justin Baldoni

42.     Jonesworks began providing public relations services to Baldoni in approximately 2017.   When Baldoni founded Wayfarer in 2019, Jonesworks also began representing that company.

43.     In May 2020, Jonesworks executed a contract to memorialize the terms of its provision of public relations services to Wayfarer (the "Wayfarer Agreement").   The Wayfarer Agreement provided that Jonesworks would provide "strategic communications services" "in a professional manner."   In exchange for these services, Wayfarer agreed to pay Jonesworks $20,000 per month plus expenses, a 20% commission for any speaking engagements Jonesworks procured, and a 10% commission for any third-party agreements Jonesworks facilitated.   The Wayfarer Agreement provided that if Wayfarer requested additional services, the parties would negotiate an additional fee for those services.

44.     Wayfarer agreed not to solicit any Jonesworks employees or attempt to induce any Jonesworks employees to terminate their employment during the term of the Wayfarer Agreement or for one year thereafter.

45.     The Wayfarer Agreement provided that either party could terminate it only if the other party materially breached its terms and failed to cure those material breaches within ten days of receiving notice.

46.    The Wayfarer Agreement is governed by New York law.  Any disputes under the Wayfarer Agreement were to be resolved through binding arbitration in New York, New York. Wayfarer, through counsel, subsequently repudiated this arbitration provision.

47.    The contract had a one-year term that automatically renewed for additional one-year periods unless either party gave notice ninety days before such a renewal.  Neither Jonesworks nor Wayfarer ever gave notice under this provision.  The contract most recently renewed for a one-year period on May 7, 2024, and expired on May 6, 2025.

48.    In June 2020, a month after executing the Wayfarer Agreement, and upon Wayfarer and Baldoni's specific request, the parties thereto—including Baldoni—agreed to incorporate public relations services for Baldoni personally into that contract in exchange for an additional payment of $5,000 per month.  Since that time (and through the end of the Agreement's term), at Wayfarer and Baldoni's request, Jonesworks issued a single invoice each month for $25,000 to both Wayfarer and Baldoni.  Until the dispute described in this Complaint, Wayfarer and Baldoni paid those invoices each month.

49.    Shortly after commencing employment at Jonesworks, Abel began working with Baldoni and Wayfarer.  As time passed, Jones grew confident in Abel's abilities and Abel ultimately was entrusted as the primary Jonesworks point of contact for Baldoni and Wayfarer.  In that capacity, Abel also worked closely with Jamey Heath, who previously served as Vice President of Impact and Culture and Co-Chief Operating Officer of Wayfarer, and currently serves as Wayfarer's Chief Executive Officer.  In this capacity, Heath played a hands-on role in overseeing Wayfarer's projects and communications strategies.  Baldoni, Wayfarer, Heath and others accepted Jonesworks' consistent performance of its contractual services.

### D.     Melissa Nathan

50.     Melissa Nathan is a long-time crisis manager who has previously worked at several public relations firms.

51.     Jones and Nathan have worked alongside each other in the publicity industry for many years.  At times, they have shared mutual clients, and for many years Jones would seek to work collaboratively with Nathan and refer her business.

52.     Jones's goodwill towards Nathan went so far that in 2022, Nathan and Jonesworks engaged in negotiations regarding Nathan potentially joining Jonesworks.  The negotiations progressed significantly, including Jonesworks agreeing to hire, and actually hiring, two of Nathan's colleagues upon Nathan's insistence. Ultimately, however, negotiations with Nathan failed and she was not retained by Jonesworks.

53.     In 2023, Jones witnessed Nathan's approach to handling clients' crises when they worked for a mutual client.  Nathan's tactics went far over the line.  Jones recommended that the client terminate its relationship with Nathan, which was separate and independent from Jones and Jonesworks.  Jones herself further resolved that she would not collaborate with Nathan for clients in the future.  Nathan has seemed to harbor significant animus toward Jones and Jonesworks ever since.

54.     In January 2024, Nathan launched her own firm, The Agency Group PR.  The Agency Group provides crisis management services to celebrities and other high-profile individuals and companies.

## II.   NATHAN CONSPIRES WITH OTHERS TO DISPARAGE JONES AND JONESWORKS

55.    Jones and Nathan's once collegial relationship soured after the 2023 incident in which Jones experienced Nathan's unethical tactics.  After that incident, Jones stopped referring clients to Nathan, and Nathan began expressing extreme animosity toward Jones, especially regarding clients the two shared.

56.    By late 2023, shortly before the formal launch of Nathan's new agency, Nathan and Jones were working for a mutual client.  During the course of that business relationship, Nathan had become increasingly frustrated regarding what she perceived as that mutual client's deference to Jones and refusal to permit Nathan to unilaterally determine strategy for that client.

57.    Nathan regularly expressed her frustration regarding having to work with Jones for a mutual client and disparaged Jones and Jonesworks to others, ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

### B.   Nathan and Abel Conspire With Others to Place and Facilitate *Business Insider* "Kill Story" Against Jones and Jonesworks

58.    Nathan and Kalantari then conceived a plan to publicly attack Jones's and Jonesworks' reputations for the purpose of ████████████████████████████████

████████████████ and also causing other existing and potential clients to refuse to do business with Jones and Jonesworks.

59.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████

60. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████

61. ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████

62. ████████████████████████████████████████
███████████████████████████████████████

63. ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████



64.

65.    Later, in or around July 2024, Abel—while still employed at Jonesworks—joined Nathan and her co-conspirators' support and facilitation of the *Business Insider* article to attack Jones.

66.    Indeed, as early as July 29, 2024,



67.     In the subsequent two weeks, Abel and Nathan fed information to Warren to ensure that she moved forward with the article and that it was sufficiently critical of Jones.  The contact between Abel and Warren included, at a minimum, a 27-minute phone call on July 30, and several phone calls on August 1 and August 12.

68.     Abel also facilitated Warren's outreach to former clients of Jones to further disrupt Jonesworks' business:



69.     This client, with whom Jones had worked closely for years bringing her from obscurity to prominence, terminated her contract with Jones as a direct result of Abel's encouragement and deliberate interference.

70.     For her part,

71.     In addition, on August 9, 2024, Abel suggested and asked for Heath's approval to try to get *Business Insider* to remove reference to a letter of support for Jones that Baldoni had previously written, and to falsely tell Warren that Baldoni and Wayfarer had terminated their relationship with Jonesworks (when they had not):

> From: ▮▮▮▮▮  Jennifer Abel (owner)
> To: ▮▮▮▮▮  Jamey Heath
> Just thought about something… should I try to get Justin's letter removed from business insider.
> Priority: Normal
> 09/08/2024 20:45:57(UTC+0)

> From: ▮▮▮▮▮  Jennifer Abel (owner)
> To: ▮▮▮▮▮  Jamey Heath
> I would need to tell her on background that both Justin and wayfarer have severed ties
> Priority: Normal
> 09/08/2024 20:46:23(UTC+0)

> From: ▮▮▮▮▮  Jennifer Abel (owner)
> To: ▮▮▮▮▮  Jamey Heath
> So not sure if your lawyers would recommend that as she would need to print that and not sure if that would cause any issues
> Priority: Normal
> 09/08/2024 20:46:56(UTC+0)

72.     On August 12, 2024, just three days before the article was published, *Business Insider's* Warren asked Abel to call her back:



> From ▮▮▮▮▮  Katie Warren
> To: ▮▮▮▮▮  Jennifer Abel (owner)
> HI, would you mind giving me a call back when you have a minute? Just have a quick question
> Priority: Normal
> 12/08/2024 19:46:49(UTC+0)

73.     Abel called Warren eleven minutes later.

74.    The day before the article was published, Nathan texted Abel boasting about the destructive effect it would have on Jones and mockingly suggested that Abel should tell Jones:



From:          Melissa Nathan
To:              Jennifer Abel (owner)
Stephanie
Are you aware there is a KILL STORY dropping this week on you and if you hadn't of blown us up we would not of been in such a bad place.
Priority: Normal
14/08/2024 01:23:15(UTC+0)

75.    Immediately before the article was published, Nathan texted Abel that she "just got a text from my source to say that article is going live imminently." When Abel asked which article Nathan was referencing, Nathan responded, "I just shook my head at your response. The only article." Abel responded: "OH SHIT" "THAT ARTICLE."

76.    Warren then texted Abel the minute the article was published to alert her that it had gone live:

From:          Katie Warren
To:              Jennifer Abel (owner)
Story is up! Thanks again for your help.
Priority: Normal
15/08/2024 16:22:35(UTC+0)

From:          Katie Warren
To:              Jennifer Abel (owner)
https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos
Priority: Normal
15/08/2024 16:22:36(UTC+0)

77.    Immediately after the article was published, Abel texted Nathan a link to it. Abel also sent the article directly to numerous industry contacts including many of Jones's clients and employees, and several of Abel's industry friends and other industry publicists.

78.     The article, published by *Business Insider* on August 15, 2024, was highly critical of Jones, including by referencing and amplifying the anonymous disparaging website "stephaniejonesleaks.com" which had been recently posted online by Nathan and Wallace, and accusing Jones of having a reputation for aggression and having recently been dropped by high-profile clients.[1]  Given that Wayfarer and Baldoni were long-time clients of Jonesworks, the clear (and false) implication of the article was that Jones was responsible for the aggressive media tactics that were being employed by Baldoni against Lively.

79.     Unsurprisingly, the negative article about Jones shared a strikingly similar tone with the negative coverage against Lively appearing in the press at the same time.  In the same vein as the gendered "mean girl" coverage about Lively that followed the "weaponizing feminism" script set out in the strategy memo, the Jones article was premised on the same principles, manifesting an equally sexist critique of Jones, who was cast as a "tyrannical boss" who could "quickly turn combative," rather than a successful executive in a high-profile and high-pressure role.

80.     Nathan, desperate to for the article to have maximum negative impact, ██████

████████████████████████████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████████████

---

[1]     *See* Katie Warren and Jack Newsham, *Who's Afraid of Stephanie Jones?*, BUSINESS INSIDER, Aug. 15, 2024.

81.     This article had serious negative repercussions on Jones's business and negatively impacted Jones's standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel.

82.     To this day, despite notice of falsities contained in the article and despite the growing proof that the article was planted and deliberately slanted to harm Jones, the *Business Insider* article remains publicly available and has not been retracted or corrected.

**C.      Nathan and Her Co-Conspirators Fabricate Defamatory Websites to Attack Jones and Jonesworks**

83.     Nathan's tactics for attacking Jones and Jonesworks ran deeper and were more insidious than just the *Business Insider* "kill story."

84.     In or around early May of 2024, Nathan, acting in concert with Wallace and, upon information and belief Kalantari and Skyline, published two false and defamatory websites about Jones and Jonesworks (the "Websites").

85.     In May of 2024, Nathan instructed the Former Employee, who was by then working for Nathan, to draft the copy of the contemplated website attacking Jones.  Nathan directed the Former Employee specifically as to what the website was to say: ███████████████████ ██████████████████████████████████████████████████████  The Former Employee did as instructed and sent the requested draft content back to Nathan and Wallace.  On May 6, 2024, Wallace and Nathan published the false and defamatory website about Jones and Jonesworks at the webpage www.stephaniejonesleaks.com.  After Jones objected to the website domain hosting service about the defamatory and abusive nature of the website, the service took the website down.

86.     Then, just days later, Wallace and Nathan, created and posted identical content at the webpage www.stephaniejoneslies.com, which was hosted by a different company.  This website remained online and accessible until the summer of 2025.

87.     These individuals published the Websites under the name of an innocent uninvolved former Jonesworks employee in order to hide their tracks and to perpetuate a false narrative regarding the genesis of the Websites.

88.     Knowing that the websites needed more to generate the desired traffic, Nathan and Wallace also instructed the Former Employee to write content for several disparaging social media posts about Jones and Jonesworks, that would promote the Websites and further disparage and defame Jones.

89.     The Former Employee complied and provided draft language for those posts to Wallace via the disappearing messaging app Signal.  This content was subsequently published on X (formerly known as Twitter) via the handle @LeakyStephJones. Additional derogatory X accounts were also created, as well as Pinterest, Reddit, Gab, AnyFlip, and Facebook accounts that all sought to boost traffic to the Websites.

90.     The Websites contain or contained substantially identical false, harassing, and defamatory statements about Jones and Jonesworks including but not limited to statements that:

    a.     Jones bullied Jonesworks employees.

    b.     Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

    c.     Jones and Jonesworks leaked confidential client information.

    d.     Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e.    Jones and Jonesworks interfere with their clients' ability to do business.

91.    Each of these statements is false.  On information and belief, Nathan, Wallace, Kalantari, Skyline, and the Doe Defendants published the defamatory statements on the Websites with knowledge of their falsity or, at a minimum, with reckless disregard for the truth with the specific intent to harm Jones and Jonesworks in their business by causing them to incur reputational harm and lose clients.

92.    On information and belief, Nathan, Wallace, Kalantari, Skyline, and the Doe Defendants then engaged in search engine optimization efforts to promote the Websites and drive web traffic to them, including through the use of backlinks.  That is, links to the Jones Defamatory Websites were planted throughout the internet on seemingly unrelated websites, such as colibris-wiki.org and fleurslocales.eu, to influence search engine rankings and elevate the Jones Defamatory Websites in online search results for Stephanie Jones or Jonesworks.

93.    Nathan specifically intended the Websites to be severely damaging to Jones and Jonesworks' reputation.  She succeeded.  Indeed, Nathan boasted in her filings before this Court that the Websites "severely damaged" Jones's reputation following a "surge of negative publicity" and left Jonesworks in "utter turmoil" that caused it to "bleed[] clients and personnel" (*Lively v. Wayfarer Studios, et al.*, Civ. Action No. 1:24-cv-10049-LJL, ECF No. 50 ¶¶ 202, 225).

94.    In fact, Nathan used the Websites to drum up interest among reporters in the

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████



95.     Nathan and Wallace have denied involvement in the Websites, however, the pattern has repeated too many times to be a coincidence. Indeed, Nathan and Wallace, working at times with others, appear to have developed a cottage industry of creating and publishing smear websites against adversaries (or adversaries of their clients), often attendant to actual or prospective litigation.

96.     For example, Nathan and Wallace also directed copy to be drafted, created, and caused to be published on a website on behalf of ████████████████████████

█████████████████████████████████████

████████████

97.    █████████████████████████████████

98.    Following their Jones playbook, Nathan instructed the Former Employee to draft

content for a website requested ████████████████████████████████████

███████████████████████████



99.    Nathan also ████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████.

100.    Amandaghostsucks.com launched ████████████████████

███████████████████████████: that Ghost is the "Indian Ghislaine Maxwell,"

"procuring young women for the pleasure of the extremely wealthy," and highlighting her

"lethalness." Like with Jones, multiple parallel social media profiles appeared online at the same

time to promote web traffic to the website. And multiple backlinks also appeared—including from

the very same accounts responsible for the Jones backlinks.  Ghost has since sued Nathan for her role in creating and publishing this derogatory and defamatory site.

101.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████.  And once again, backlinks appeared in online content including ones authored by the same accounts that authored content highlighting the Jones and Amanda Ghost websites.

102.    The connection between these websites is not speculative.  To the contrary, recent forensic analysis of the Jones, Amanda Ghost, and Alexander Brothers websites has determined that those websites and the promotion of them share certain digital fingerprints, including boosting their placement in search engine results by using backlinks (that is, links to the websites from third party websites, social media accounts, and blogs) created by similar authors.  This forensic evidence supports only one conclusion:  these websites were created by the same individual or coordinated set of individuals, *i.e.*, Nathan and Wallace.

103.    It doesn't end there.  Further investigation reveals that a lengthy trail of other similar attack websites and social media pages, including on information and belief at least the following:

a.  https://www.alexanikolas.net attacking Alexa Nikolas, who had filed a sexual assault lawsuit against Michael Milosh.

b.  https://lookbackfraud.com accusing Joe Dunn of conspiring to make accusations against Michael Milosh.

c.    A social media account attacking Christian Lanng, whom a Jane Doe had sued for allegedly forcing her into a slave contract.

d.    https://minheejin.net attacking Min Hee-jin, the former CEO of South Korean recording label ADOR.

e.    https://paigejimenez.com attacking Paige Jimenez, an influencer and OnlyFans model.

f.    https://www.leadsafemamaexposed.com attacking Tamara Rubin, also known as The Lead Safe Mama, an activist, researcher and filmmaker who was the executive director of Lead Safe America from 2011-2016.

104.    Upon information and belief, Nathan and Wallace and others acted in concert to create and publish numerous derogatory attack websites and social media sites and accounts that share identical features, playbook, and digital fingerprints with the derogatory websites and social media accounts they created and published to attack Jones.

## III.    ABEL AND NATHAN'S SCHEME TO USE BALDONI'S CRISIS TO ATTACK JONES'S REPUTATION AND STEAL JONESWORKS' BUSINESS

105.    Nathan's attacks against Jones, often in coordination with Abel, did not stop there. Instead, around the same time as Nathan was conspiring with Wallace and others to create defamatory websites and social media accounts against Jones, and was conspiring with Abel and others to ensure publication of the negative *Business Insider* article against Jones, Nathan and Abel began conspiring to undermine Jonesworks from within, and to steal Jonesworks clients and confidential information upon Abel's planned departure from Jonesworks.

106.    Among the clients that Abel and Nathan conspired to steal from Jonesworks were Baldoni and Wayfarer.

107.    In 2019, Baldoni and Wayfarer acquired the film rights to the bestselling novel *It Ends With Us*, written by Colleen Hoover, an author whose books enjoy a vast and devoted following, especially among young women.

108.    In 2023, Baldoni began production on the film adaptation of *It Ends With Us* (the "Film").  Wayfarer was a co-producer of the Film and Baldoni owned the rights to its source material.  Baldoni named himself as the director and male lead of the Film, an abusive partner to the female main character played by Lively.  Later reports emerged that, during production, women on set, including Lively, made complaints about Baldoni's behavior toward them, including comments of a sexual nature and inappropriate touching.

109.    Jones later learned that the tensions on-set had reached such a point that, after the Screen Actors Guild strike halted production from July to early November 2023, Lively had only agreed to return to production if Wayfarer implemented additional measures to prevent further improper behavior on set by Baldoni.

110.    The Film was released in August 2024.  In connection with the release, the press began reporting on tensions between Baldoni and the female cast and crew on set.  According to reports, Baldoni had acted in a controlling, demeaning, and "borderline abusive" manner towards the cast and crew, especially toward women.  The press specifically identified Lively and Hoover as having "clashed" with Baldoni during filming, and speculated on the unusual circumstance that neither Lively nor Hoover was photographed promoting the film together with Baldoni as evidence of tension.[2]

---

[2]    *See, e.g.*, Sara Nathan, *Truth behind 'It Ends With Us' feud rumors: Justin Baldoni made Blake Lively 'uncomfortable,' sources say*, N.Y. POST, Aug. 9, 2024, https://www.pagesix.com/2024/

111.    As the August 2024 release neared, Baldoni began to fear that the increased attention being paid to him and the Film would cause reports of allegations about his on-set misbehavior to come out.  Abel and Nathan—with encouragement from Heath, and without Jones's knowledge or approval—began to formulate a no-holds-barred strategy to discredit and suppress any potential revelations about Baldoni's on set behavior.

112.    Jones, having entrusted the management of the Baldoni and Wayfarer relationship to Abel, trusted that any plan Abel formulated on behalf of Jonesworks would appropriately reflect the company's integrity and ethos.  Unfortunately, the opposite turned out to be true.  Behind Jones's back, Abel went around Jones to arrange for Baldoni and Wayfarer to retain Nathan and launch a smear campaign against Lively.  Baldoni and Wayfarer admittedly hired Nathan at Abel's recommendation and over Jones's objections and despite her warnings about Nathan.

113.    On information and belief, Nathan took advantage of this opportunity to encourage Abel to leave Jonesworks, to conspire with Abel to steal Baldoni and Wayfarer as clients from Jonesworks, and to smear Jones and Jonesworks in the press.  On information and belief, Nathan did so because she believed, among other things, that Abel would encourage Nathan's own burgeoning relationship with these and other Jonesworks clients, while Jones would not.  This scheme ultimately inflicted serious damage on Jones and Jonesworks.

### A.    Abel and Nathan Devise A Smear Campaign Against Lively To Benefit Baldoni and Wayfarer

114.    Nathan and Abel's strategy for Baldoni was set forth, in part, in a four-page memorandum sent to Baldoni (but kept secret from Jones) that outlined "several potential scenarios

---

08/09/entertainment/justin-baldoni-made-blake-lively-uncomfortable-sources; James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.

at play here which we should be prepared for, should BL [Lively] and her team make her grievances public":

**\*\*CONFIDENTIAL\*\***

**SCENARIO PLANNING – IT ENDS WITH US**

**OBJECTIVE**

Protect the reputation of Justin Baldoni, Jamey Heath, and Wayfarer Studios in the lead up, during, and following the premiere of It Ends with Us, underscore the achievement and efforts of the Wayfarer team in bringing this movie to life, and emphasize Justin and the studio's commitment to their team and making the broader industry a more inclusive space.

**OVERVIEW**

Though there are several potential scenarios at play here which we should be prepared for, should BL and her team make her grievances public – via a blatant story or subtle leak. Given she was made to compromise with the premiere, we feel she will move forward with doing so.

115.    The memo—which, along with the overall strategy, was kept secret from Jones— explicitly recommended weaponizing Baldoni's perceived history as a "longtime activist and advocate of and for women in Hollywood" to be used against Lively, and at the same time sought to discredit Lively's negative on-set experiences with Baldoni by painting her in the press as the one who had "weaponized feminism" for her own benefit:

- JB has been a longtime activist and advocate of and for women in Hollywood, speaking out about challenges his colleagues faced before the Me Too movement even began (TED 2017).

- These pieces will likely come out following any potential hit piece and/or coverage from the premiere. Our recommended approach would be to provide reporters who reach out for comment, should it be obvious she's referring to you, with the appropriate background information (listed in Scenario 1) to ensure their stories are balanced and the speculation can be turned to another one of the many people she's had issues working with (Leighton Meester, Anna Kendrick, Ben Affleck, etc.).

- As part of this, our team can also explore planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to "bully" into getting what they want.

116.    Yet this aggressive strategy was apparently still not tough enough for Baldoni, who texted Abel and Heath that he was: "Not in love with the document [Nathan] sent – Not sure I'm feeling the protection I felt on the call."  Abel relayed Baldoni's concerns to Nathan, telling Nathan that Baldoni needed a stronger showing of strength, explaining:



From:            Jennifer Abel (owner)
To:              Melissa  Nathan
You can of course do that but I do think he needs to know. I'm going to confidentially send you something he's texting me and Jamey on the side just to arm you before this call. I think you guys need to be tough and show the strength of what you guys can do in these scenarios. He wants to feel like she can be buried...
Priority: Normal
02/08/2024 13:47:25(UTC+0)

117.    Nathan immediately responded:

From:            Melissa  Nathan
To:              Jennifer Abel (owner)
Of course- but you know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble
Priority: Normal
02/08/2024 13:47:55(UTC+0)

> **From:** Melissa Nathan
> **To:** Jennifer Abel (owner)
> We can't write it down to him
> We can't write we will destroy her. We will go to this. We will do this. We will do this. We will do this.
> **Priority:** Normal
>
> 02/08/2024 13:48:24(UTC+0)

> **From:** Jennifer Abel (owner)
> **To:** Melissa Nathan
> Of course not. But I told him that's the point of talking through
> **Priority:** Normal
>
> 02/08/2024 13:48:42(UTC+0)

> **From:** Melissa Nathan
> **To:** Jennifer Abel (owner)
> He has to look at it as an information document for us to be armed with
> That's all . Imagine if a document saying all the things that he wants ends up in the wrong hands.
> **Priority:** Normal
>
> 02/08/2024 13:49:03(UTC+0)

[. . .]

> **From:** Melissa Nathan
> **To:** Jennifer Abel (owner)
> you know we can bury anyone
> But I can't write that to him
> I will, I'll be very tough
> **Priority:** Normal
>
> 02/08/2024 13:50:10(UTC+0)

118.    In the days that followed, Baldoni and Heath made clear to Abel that they expected Abel and Nathan's strategy to include a social media activation plan, and Abel and Nathan immediately complied in its implementation.[3]  Nathan and Abel's behind-the-scenes efforts for Baldoni and Heath also included frantically working to squash emerging media reports about

---

[3]    For example, on August 5, 2024, Baldoni sent Abel a screenshot of an attack campaign against Hailey Bieber painting her as having a "history of bullying many women," and told Abel, "This is what we would need" against Lively.

certain human resources complaints that had been filed against Baldoni in connection with the Film.

119.    On information and belief, Nathan and Abel also used their industry connections to plant negative articles about Lively in press outlets including the *Daily Mail* and the *New York Post's Page Six*, and leveraged their teams to create and perpetuate negative content about Lively on social media platforms such as Reddit and TikTok.[4]  For example, Abel closely coordinated with *Page Six* reporter Sara Nathan—Melissa Nathan's sister—to publish an article hostile toward Lively's role in the production of the Film.

120.    Nathan and Abel enthusiastically supported the strategy that Baldoni and Heath wanted, and deliberately hid it from Jones, in order to ingratiate themselves with Baldoni and Heath, drive a wedge between Baldoni and Jones, and ultimately to steal Baldoni and Wayfarer from Jonesworks as clients.

121.    All parties involved in this nefarious strategy have subsequently confirmed that Jones was intentionally excluded from the plan and was not privy to email, Signal, or other communications about it.

122.    For her part, Jones—who was kept in the dark about this coordinated strategy and was not aware that Wayfarer had actively approved and participated in it—objected to Wayfarer's hiring of Nathan and advocated a positive press strategy instead.  Wayfarer's President immediately reported Jones' comments to Abel:

---

[4]    *See* Alanah Kholsa and Jo Tweedy, *Is Blake Lively set to be CANCELLED? String of 'hard to watch' videos that have surfaced following 'tone deaf' Q&A to promote It Ends With Us could tarnish 36-year-old star's golden Hollywood image for good*, DAILY MAIL, Aug. 16, 2024; Sara Nathan, *Blake Lively approved final cut of 'It Ends with Us' amid feud with co-star director Justin Baldoni*, PAGE SIX, Aug. 13, 2024, https://pagesix.com/2024/08/13/celebrity-news/blake-lively-approved-final-cut-of-it-ends-with-us-amid-feud/.



123.    Excluding Jones from the conversation, Heath flatly rejected any pivot to a positive strategy in a text to Abel.  Suggesting that Jones should be shut out for "undermining" their strategy, he called Jones' influence on the situation "poison":



## B.    Abel and Nathan Drive a Wedge Between Jones and Baldoni, And Attack Jones's Reputation in the Press

124.    At the same time as pandering to Baldoni and Heath's desire to discredit Lively, Abel and Nathan were also furthering their own profit-driven agenda to attack and disparage Jones, using many of the same tactics they were using against Lively, in order to eliminate Jones as a competitor and siphon away her clients for themselves.

125.    Ironically, Abel and Nathan recognized that their success on both fronts reflected a societal desire to tear down successful women like Lively and Jones, but they remained undeterred in their agenda:



126.    Abel's trashing of women even extended to Nathan herself, whom she had privately

bad-mouthed just months before cynically hitching her star to Nathan to steal from Jones:





127.    Working together, Nathan and Abel's stated goal in all of this was to position themselves to be able to steal Wayfarer, Baldoni and other clients from Jonesworks to the new firm Abel was planning to form, so that those clients could then be serviced jointly by both Abel's and Nathan's new firms, instead of Jonesworks:



128.    Abel and Nathan explicitly discussed their plan to steal Wayfarer and Baldoni away from Jonesworks:





129.    As Nathan made plain, "really good money" was the motivating force behind this scheme, not any special affection for Baldoni or Wayfarer.    Indeed, Abel's candid communications, outside of Baldoni's and Heath's view, made clear that at the same time as she was working to salvage Baldoni's reputation and steal his business, she actually held Baldoni personally in extremely low regard.    For example, when a colleague described an article about a kissing scene between Baldoni and Lively as "so gross," Abel responded:



[…]



130.    Abel was even more explicit in her disdain for Baldoni:



131.    To further their plan, Abel and Nathan contrived to plant stories in media outlets including the *Daily Mail* and *Business Insider* to trash Jones's and Jonesworks' reputations publicly and to their clients.  They also back-channeled with Wayfarer and Baldoni to paint Jones in a negative light.  For example, following the premiere of the Film, the *Daily Mail* published an

article reporting on tensions between Baldoni and Lively.[5]  That article relied exclusively on social media posts that had been identified for Abel earlier that same day: either a shocking coincidence or confirmation that Abel had planted the story.  On information and belief, Abel and Nathan conspired to plant this story in the *Daily Mail* in pursuit of dual objectives.  First, the negative story cemented Baldoni's need for Nathan's crisis management services, ensuring herself an ongoing paycheck.  Second, they arranged for Baldoni and Wayfarer to believe that Jones was the cited "insider" and also created a false story that Jones had publicly blamed Lively for the article, thus sowing discord between Baldoni and Wayfarer on the one hand and Jones on the other.

132.    The scheme worked.  When the article was published, at first, key players in the Film's release—including Josh Greenstein, the President of Sony Pictures' Motion Picture Group—believed that Abel was the person responsible for the story:



133.    But Abel denied being the source and instead falsely insinuated to Sony's communications team that Jones was the leak.

134.    This false allegation stuck.  Rumors that Jones was behind the article began to make their way back to Wayfarer, causing Heath to respond with hostility:

---

[5]    Lillian Gissen, *It Ends With Us fans are convinced there's a huge feud between Blake Lively and Justin Baldoni - here's why*, DAILY MAIL, Aug. 8, 2024, https://www.dailymail.co.uk /femail/article-13723621/blake-lively-justin-baldoni-feud-drama.html.



135.    When Jones stated her intent to contact Sony to correct this misimpression, Heath

instructed her to stand down:



136.    Heath went a step further and threatened Jones directly that he would issue a public press release stating that Baldoni and Wayfarer had terminated Jonesworks if she took any steps to contact Sony or others to clear her name, menacingly reminding her that she didn't need that kind of negative publicity for herself or her business.

137.    Abel facilitated and encouraged Heath's attacks and threats against Jonesworks—her then-current employer.  On or about August 8, 2024, Abel surreptitiously participated in a phone call between Heath and Jones.  Hiding her presence, Abel fed statements to Heath that he then repeated to Jones.  Heath, who was in Illinois at the time of this phone call, secretly recorded the call, simultaneously violating Illinois criminal law and memorializing his abusive threats and Abel's treachery.

138.    On August 9, 2024, the *Daily Mail* published another article, this time reporting on Baldoni's abusive on-set behavior, citing "insiders" as the source for the article.[6]  On information and belief, Abel and Nathan conspired to plant this story (or at minimum, knew it was forthcoming and allowed it to be published) in further pursuit of their goal to cement Baldoni's and Wayfarer's needs for Nathan's services and turn them against Jones.

139.    Heath and Abel bragged about the success of this strategy, jokingly referring to Abel—who was sitting 20 rows away from Heath on the airplane on a press junket trip that they and Nathan attended without Jones—as "the Leak" that was "the best decision of this whole trip":

---

[6]    James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.



140.    In parallel with their efforts in the *Daily Mail*, Abel joined in Nathan's longstanding effort to plant negative stories about Jones, including in *Business Insider* as detailed above at Paragraphs 59-78.

141.    Just days after the "kill story" against Jones that Nathan and Abel had facilitated, on August 25, 2024, *Business Insider* turned the media storm surrounding Baldoni and Jones more pointedly to Nathan's advantage, publishing a second article that favorably touted Baldoni's hiring of Nathan to shepherd him through this crisis.  The article, which on information and belief was again orchestrated by Nathan, noted that the negative attention on Lively was a "gift" to Baldoni.[7]

142.    All the while, Abel had been making arrangements to leave Jonesworks with confidential information and clients in tow.  On July 19, 2024, while still employed by Jonesworks, Abel filed paperwork to create RWA Communications LLC, the competing public relations agency she intended to start upon her departure from Jonesworks.  Abel had also created a website and social media accounts for her new competing firm, all while still employed by and under contract with Jonesworks.

143.    At least as early as July 22, 2024, Abel had created a new email account, jennifer@rwacommunications.com, to which she forwarded dozens of proprietary messages from Jonesworks, including client information, Jonesworks' work product, and information specifically

---

[7]    Eve Crosbie, *The Blake Lively backlash has been 'a gift' for Justin Baldoni after he was forced to hire a PR-crisis manager amid rumored 'It Ends With Us' feud, PR expert says*, BUSINESS INSIDER, Aug. 25, 2024, https://www.businessinsider.com/blake-lively-justin-baldoni-it-ends-with-us-crisis-pr-2024-8.

regarding Jonesworks' work for Wayfarer and Baldoni. Abel successfully hid her theft of confidential documents and information. Abel surreptitiously continued stealing documents and client information while also secretly contacting Jonesworks' clients to pave the way for her departure.

144. Indeed, when Jonesworks' information technology personnel disabled Abel's access to Jonesworks' servers after discovering her unauthorized downloading activity, Abel boasted that she was still able to steal all of the documents and information she needed to form her own competing firm:



145. Abel further coordinated with Nathan and Baldoni to ensure that Wayfarer and Baldoni would leave Jonesworks and come with her as clients for her newly created RWA Communications:



From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and she needs to also not do anything and my last conversation with her was last Wednesday or so

And then I couldn't help myself

Priority: Normal

19/08/2024 04:49:55(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

I ended it with

Priority: Normal

19/08/2024 04:50:00(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her.

Don't kill me, okay bye

Priority: Normal

19/08/2024 04:50:28(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Hahahaha omg love you

Priority: Normal

19/08/2024 05:02:12(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Thanks for chatting with him

Priority: Normal

19/08/2024 05:02:19(UTC+0)

146.    On or about August 21, 2024, Jones learned about Abel's ongoing efforts to steal dozens and dozens of Jonesworks proprietary documents, including sensitive client and business information that Abel had no legitimate reason to access, including for major brand and clients that Abel had never worked on.  Abel went so far as to download and copy the Jonesworks client contract form, except that she replaced the Jonesworks logo with the logo for her own newly-formed business.  Jonesworks immediately terminated Abel.

147.    As part of her termination paperwork, Abel falsely signed a statement purporting to confirm that she had not removed any electronic confidential information from Jonesworks. But, of course, she had, and this signed statement was untrue.

148.    The damage was done.  With the encouragement and assistance of Nathan, Baldoni, and  Heath, Abel stole Wayfarer and Baldoni as clients, targeted other Jonesworks clients to leave, and launched the long-planned and competing RWA Communications.  As a result, Wayfarer and Baldoni ceased working with Jonesworks and, despite being under contract with Jonesworks, refused to pay Jonesworks what they contractually owed for its services.  Even on the day she departed Jonesworks, Abel proudly admitted to Nathan that she was shaking Jones down to extract as much as she could from the company before her departure.



[…]



149.    Nor was Abel content only to steal documents, clients, and confidential information from Jonesworks.  On August 14, 2024, Abel also attempted to encourage Nathan to poach a valuable Jonesworks' employee:





[…]



150.    Abel also encouraged at least six other Jonesworks employees working for her in the Los Angeles office—almost half of Jonesworks' employees at that office—to leave the company, including by bad-mouthing Jones to those employees and sending the employees' resumes to competing public relations firms.  As a direct result of these actions, two of these employees ended their contracts with Jonesworks and left to work for competitors.

151.    Since being terminated from Jonesworks, Abel has continued attacking Jones within the industry, using her tried-and-true playbook to preemptively discredit any sources that might shed light on her own misdeeds.  Abel has falsely stated to other participants in the public relations industry that Jones was attempting to distribute doctored text messages purporting to be from Abel as retaliation for Abel's departure.  She has also tried again to point the finger at Jones as cover for her own role in the campaign against Lively becoming public.  But Jones has never

doctored any text messages, and has no reason to do so. Abel's text messages were forensically extracted directly from that company phone that Abel used during her employment at Jonesworks and voluntarily returned to Jonesworks upon her termination in the presence of an employment lawyer, and have been preserved in their original state. And as has become glaringly apparent, the text messages are themselves enough to condemn Abel and Nathan without any need for doctoring.

152.    So desperate were Nathan, Abel and the Wayfarer Parties to discredit the text messages that they cannot deny they wrote, that immediately after the filing of a legal complaint against them by Lively, they reactivated their publicity smear machine to discredit Jones and turn focus away from the damning content of the text messages by fabricating a wholly concocted story that they were obtained illicitly. On information and belief, they sent these false statements to reporters, some of whom published them in substance or idea, furthering their longstanding defamation against Jones.

153.    As intended, the misconduct by Defendants has had a significant negative effect on Jones's and Jonesworks' business and reputation. And the campaign of misinformation against her has not stopped. As a result, Jones and Jonesworks have been left with no choice but to bring this lawsuit to seek redress for this misconduct and to remedy the damage done.

**FIRST CAUSE OF ACTION**
**Breach of Contract – Abel Employment Agreement**
**(Against Defendant Jennifer Abel)**

154.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

155.    Jonesworks and Abel are parties to the Abel Employment Agreement, which is a valid and enforceable contract.

156.    Under the Abel Employment Agreement, Abel agreed, among other things, that: (1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential

and proprietary information, and that all business and plans made known to her while employed by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any Company proprietary information to solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts; (3) during her employment and for six months following the date of any termination, she would not compete with Jonesworks, or engage in or participate in any business that is in direct competition in any manner whatsoever with Jonesworks; and (4) during the employment term, Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

157.    Abel breached the Abel Employment Agreement through her actions as described in this complaint, including by, among other things: (1) failing to hold in confidence confidential information for the sole benefit of Jonesworks, and by soliciting confidential information from at least one Jonesworks employee after her termination; (2) using confidential information to solicit, induce, or attempt to solicit or induce, business from Jonesworks clients and business contacts; (3) directly competing with Jonesworks in the six months following her departure from Jonesworks, including by starting a competing company and poaching and attempting to poach Jonesworks clients; (4) soliciting and inducing, and using confidential information to solicit or induce, other Jonesworks employees to leave Jonesworks and/or become employed by her or other competing firms; and (5) breaching her duty of loyalty to Jonesworks by working against the interests of Jones and Jonesworks during her period of employment.

158.    Jones and Jonesworks have substantially performed the Abel Employment Agreement or were excused from doing so because of the actions of Abel.

159.    Abel's breaches of the Abel Employment Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**Tortious Interference With Contract – Abel Employment Agreement**
**(Against Defendants Melissa Nathan, Wayfarer and Justin Baldoni)**

160.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

161.    Jonesworks and Abel are parties to the Abel Employment Agreement, which is a valid and enforceable contract.

162.    Under the Abel Employment Agreement, Abel agreed, among other things, that: (1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential and proprietary information, and that all business and plans made known to her while employed by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any Company proprietary information to solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts; (3) during her employment and for six months following the date of any termination, she would not compete with Jonesworks, or engage in or participate in any business that is in direct competition in any manner whatsoever with Jonesworks; and (4) during the employment term, Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

163.    Nathan, Wayfarer, and Baldoni were aware that Abel was employed by Jonesworks and, on information and belief, were aware that Abel's employment was governed by a contract containing industry-standard terms such as those described above.

164.    Nathan, Baldoni, and Wayfarer induced, encouraged, and procured Abel's breach of the Abel Employment Agreement without justification, including by, among other things: (1) breaching her duty of loyalty to Jonesworks by working against the best interest of Jones and Jonesworks during her period of employment; and (2) encouraging and inducing Abel to violate the non-compete, non-solicitation, and confidentiality provisions of the Agreement.

165.    Nathan, Baldoni, and Wayfarer, in bad faith, intentionally procured, caused, and facilitated Abel's breaches of the Abel Employment Agreement.  But for the misconduct of Nathan, Baldoni, and Wayfarer, Abel would not have breached the Abel Employment Agreement.

166.    Jones and Jonesworks have substantially performed the Abel Employment Agreement or were excused from doing so because of the actions of Nathan, Wayfarer, and Baldoni.

167.    The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

168.    The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Breach of Contract – Wayfarer Agreement
### (Against Defendants Wayfarer Studios and Justin Baldoni)

169.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

170.    Jonesworks, Wayfarer, and Baldoni are parties to the Wayfarer Agreement, which is a valid and enforceable contract.  Jones is Jonesworks' designee under the Wayfarer Agreement.

171.    Under the Wayfarer Agreement, in exchange for services provided by Jonesworks, Wayfarer and Baldoni agreed to pay Jonesworks a sum of $25,000 per month.

172.    Additionally, Wayfarer and Baldoni agreed, among other things, that during the term of the contract, and for one year following its expiration or termination they would not solicit or attempt to solicit for employment any officer, employee or agent of Jonesworks, or to employ or attempt to employ, or otherwise induce or attempt to induce any employee of Jonesworks to

terminate such employee's employment or engagement with Jonesworks, without prior written consent.

173.    In May 2024, the Wayfarer Agreement automatically renewed.  At no time in the required 90 days before the automatic renewal did either party provide notice of termination.  Nor did Wayfarer or Baldoni provide notice of any material breach of the Wayfarer Agreement.  The agreement has therefore not validly terminated, and Wayfarer and Baldoni are obligated to pay Jonesworks $25,000 per month through May 6, 2025, and are similarly obligated to comply with the full terms of the Wayfarer Agreement through May 2025.

174.    On or about August 30, 2024, a representative of Wayfarer informed Jones that Wayfarer and Baldoni would no longer require Jonesworks' services, and thereafter refused to pay all amounts owed under the Wayfarer Agreement.

175.    Wayfarer and Baldoni have breached the Wayfarer Agreement through their actions as described in this complaint, including by, among other things: (1) failing to pay the amounts contractually owed under the Agreement, (2) soliciting and inducing Abel to depart Jonesworks, and (3) employing Abel following her departure from Jonesworks.

176.    Jonesworks has substantially performed the Wayfarer Agreement or was excused from doing so because of the actions of Wayfarer and Baldoni.

177.    Wayfarer and Baldoni's breaches of the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### Tortious Interference With Contract – Wayfarer Agreement
### (Against Defendants Jennifer Abel and Melissa Nathan)

178.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

179.    Jones, Jonesworks, Baldoni, and Wayfarer are parties to the Wayfarer Agreement, which is a valid and enforceable contract.  Among other things, the Wayfarer Agreement requires Wayfarer and Baldoni to pay Jonesworks $25,000 per month, including from May 2024 through May 2025.

180.    Additionally, Wayfarer and Baldoni agreed that during the term of the contract, and for one year following its expiration or termination, they would not solicit or attempt to solicit for employment any Jonesworks employee.

181.    Abel and Nathan were aware of the Wayfarer Agreement, and each induced, encouraged, and procured Wayfarer's and Baldoni's breach of the Wayfarer Agreement without justification, including by encouraging Wayfarer and Baldoni to cease paying Jonesworks and, instead, hire Abel and Nathan, and by encouraging Wayfarer and Baldoni to violate the non-solicitation provision of the Agreement.

182.    Abel and Nathan, in bad faith, intentionally procured and facilitated Wayfarer's and Baldoni's breaches of the Wayfarer Agreement.  But for the misconduct of Abel and Nathan, Wayfarer and Baldoni would not have breached the Wayfarer Agreement.

183.    Abel's and Nathan's intentional interference with the Wayfarer Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

184.    Abel's and Nathan's intentional interference with the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## Tortious Interference With Prospective Business Relations
## (Against Defendant Melissa Nathan)

185.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

186.    Beginning in at least December 2023, ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████.

187.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

188.    Nathan and her co-conspirators (and acting in concert with Wallace) further created and disseminated derogatory attack websites and social media pages about Jones and Jonesworks and then engaged in search engine optimization efforts to drive maximum traffic to the Websites.

189.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

190.    Nathan and her co-conspirators engaged in the aforementioned conduct with the sole purpose to harm Jones and Jonesworks, ████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

191.    Jones and Jonesworks were severely damaged as a result of Nathan's and her co-conspirators' conduct. Among other harm, the *Business Insider* article and derogatory attack Websites negatively impacted Jones's standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel. As a result, Jonesworks' lost client relationships, ████████████████████████ that would have renewed or entered into agreements with Jonesworks if not for Defendants' wrongful conduct.

### SIXTH CAUSE OF ACTION
### Faithless Servant
### (Against Defendant Jennifer Abel)

192.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

193.    Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks a duty of loyalty.

194.    Abel breached her duty of loyalty to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting, inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

195.    This conduct was intended to, and did in fact, advance Abel's own interests to the detriment of Jones and Jonesworks.

196.    The foregoing breaches were willful, wanton, and in bad faith.

197.    Abel's faithless service proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against Defendant Jennifer Abel)**

198.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

199.    Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of [Jonesworks]." Abel Employment Agreement ¶ 9.2.

200.    Abel breached her fiduciary duties to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting, inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

201.    Abel's breaches of her fiduciary duties proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**Defamation**
**(Against Defendant Jennifer Abel)**

202.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

203.    Between September and December 2024, Abel made statements to certain third parties, including participants in the public relations industry in which she and Jones work,

asserting, among other things, that Jones had doctored and falsified text messages purporting to be from Abel and was attempting to distribute them to third parties in order to harm Abel and paint Abel in a false light.

204.    These statements are false and untrue.

205.    These statements are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

206.    Abel made these statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at a minimum, negligently.

207.    Abel's statements enjoyed no privilege or authorization.

208.    Abel's false and defamatory statements caused harm to Jones and Jonesworks' reputation in the public relations industry and among potential clients.

209.    The defamatory statements made by Abel proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

## NINTH CAUSE OF ACTION
### Defamation
### (Against Defendants Melissa Nathan and John Doe 1-10)

210.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

211.    John Does 1-10 and Nathan published or caused to be published the Websites.

212.    The Websites were viewed by numerous third parties, including, on information and belief, residents of New York County and in the Southern District of New York.

213.    The Websites included numerous false statements regarding Jones and Jonesworks, including the following:

a.    Jones bullied Jonesworks employees.

b.       Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c.       Jones and Jonesworks leaked confidential client information.

d.       Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e.       Jones and Jonesworks interfere with their clients' ability to do business.

214.       These false statements included:

a.       Accusing Jones of "years of non-stop verbal and emotional abuse" and "horrific treatment in the workplace;"

b.       Jones "doesn't understand how to truly do PR outside of leaking her own clients' secrets;"

c.       Jones "does not fight for her clients but, she does fight with them. Crying, screaming, keeping them hostage;"

d.       "Stephanie Jones takes clients hostage;"

e.       "Not only does she break confidentiality, she willingly does regardless of the possible damage this kind of behavior might cause;"

f.       Implying that Jones was "hacking" the defamatory websites.

215.    These statements are false.

216.    The false statements published on the Websites are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

217.    John Does 1-10 and Nathan made these statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at a minimum, negligently.

218.    The false statements published on the Websites enjoyed no privilege or authorization.

219.    The false statements published on the Websites caused harm to the reputations of Jones and Jonesworks in the public relations industry and among potential clients.

220.    The defamatory statements published on the Websites proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

**TENTH CAUSE OF ACTION**
**Violation of Illinois Consolidated Statutes Chapter 720 §§ 5/14-2 and 5/14-6**
**(Against Defendant Heath)**

221.    Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

222.    On or about August 8, 2024, Heath was a party to a telephone conversation with Stephanie Jones.

223.    During the phone call, Heath was located in Chicago, Illinois.

224.    The phone call was a private conversation between Heath and Jones.

225.    Heath recorded this phone call with Jones.

226.    Heath did not inform Jones that he was recording the conversation and did not request or receive her consent to record the conversation.

**PRAYER FOR RELIEF**

**WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:**

227.    Entry of judgment in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including:

a.    In respect of each of the First Cause of Action, Second Cause of Action, Third Cause of Action, Fourth Cause of Action, Fifth Cause of Action, Sixth Cause of Action, Seventh Cause of Action, Eighth Cause of Action, Ninth Cause of Action, and Tenth Cause of

Action, entry of judgment in favor of Plaintiffs awarding damages in an amount to be proven at trial;

        b.     Reasonable attorneys' fees and costs for this action as allowed by law and the parties' contracts;

        c.     Punitive damages, including but not limited to pursuant to Illinois Consolidated Statutes 14-6;

        d.     Pre-judgment and post-judgment interest; and

        e.     Such other and further relief that the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

228.    Jones and Jonesworks request a jury trial on all issues so triable.

DATED: December 8, 2025          By:

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kristin Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com

Maaren A. Shah
Morgan L. Anastasio
295 5th Avenue
New York, New York 10016
(212) 849-7000
maarenshah@quinnemanuel.com
morgananastasio@quinnemanuel.com

Nicholas Inns (admitted *pro hac vice*)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Plaintiffs Stephanie
Jones and Jonesworks LLC*