UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

Stephanie Jones, et al.,

                    Plaintiffs,

        -v-

Jennifer Abel, et al.,

                    Defendants.

------------------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/26/2026

25-cv-779 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiffs and Counterclaim Defendants Stephanie Jones ("Jones") and Jonesworks LLC ("Jonesworks" and with Jones, the "Jones Parties") move, pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the counterclaims asserted by Defendant Wayfarer Studios LLC ("Wayfarer") in its Amended Answer to Complaint, Counterclaims, and Jury Trial Demand (the "Counterclaims"). Dkt. No. 53. For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

The Court assumes the truth of the well-pleaded allegations of the Counterclaims for purposes of this motion only.

Wayfarer is a motion picture studio devoted to producing world-class entertainment with a mission-driven purpose. Dkt. No. 51 (the "Counterclaims") ¶ 18. It was founded by Justin Baldoni ("Baldoni"). *Id.* Jonesworks is a well-known New York-based public relations firm. *Id.* ¶ 10. It was founded by Jones, who also serves as its Chief Executive Officer. *Id.*

Wayfarer and Jonesworks are parties to a written services agreement, effective as of May 7, 2020, pursuant to which Jonesworks agreed to serve as Wayfarer's "exclusive public relations

counsel" and to "provide strategic communications services" to Wayfarer (the "Agreement").  *Id.*

¶ 13; *see* Dkt. No. 51-1.  The services (the "Services") Jonesworks agreed to provide are defined

in a Schedule A to the Agreement and include the following: (i) the management of media and

press communications; (ii) advice on marketing and campaign strategies; (iii) efforts to position

and utilize the key executives of Wayfarer as thought-leaders and change agents in the film and

television industry; (iv) the development of a media and communications strategy to drive

awareness; and (v) to measure and evaluate progress through clip and service media and to

maintain a media library on behalf of Wayfarer.  Dkt. No. 51-1 Schedule A.  Jonesworks agreed

to "provide the Services in a professional manner and in accordance with the goals mutually

established by [Wayfarer] and [Jonesworks]."  *Id.* at 1.[1]  In exchange, Wayfarer agreed to pay

Jonesworks $20,000 per month for Jonesworks' public relationships and communications

services, Counterclaims ¶ 14.  The Agreement is for an initial one-year term commencing on

May 7, 2020, automatically renewing thereafter unless terminated.  *Id.* ¶ 13.

The Agreement also contains a confidentiality provision, which provides in pertinent part

as follows:

> Throughout [Wayfarer's] engagement of [Jonesworks] hereunder, [Wayfarer] may
> disclose or provide [Jonesworks] with confidential, proprietary and/or sensitive
> information about [Wayfarer], its customers or other related parties ('Confidential
> Information').  [Jonesworks] shall use reasonable and diligent efforts to keep
> Confidential Information confidential provided that [Jonesworks] may disclose
> such information to third parties to the extent necessary to fulfill its obligations
> under this Agreement or to its legal representatives.  [Jonesworks] shall not use
> such information for any purpose beyond the performance of [Jonesworks']
> services hereunder unless otherwise required by law or a court of competent
> jurisdiction. . . For the avoidance of doubt, Confidential Information shall not
> include information (a) which is or later becomes publicly available through no
> wrongful act of [Jonesworks], (b) known by [Jonesworks] prior to [Wayfarer's]
> disclosure to [Jonesworks] in connection with this Agreement or (c) independently
> developed by Company without reliance on information disclosed by Client.

---

[1] Citations to docket entries use ECF pagination except as to citations to the parties' briefing.

Notwithstanding the foregoing, [Jonesworks] is not liable for any third party's disclosure of [Wayfarer's] Confidential Information so long as such third party did not obtain the Confidential Information as a result of [Jonesworks'] breach or failure to uphold its obligations hereunder.

*Id.* ¶ 16; Dkt. No. 51-1 at 3.

In 2019, Wayfarer acquired the film rights to *It Ends With Us*, a popular novel published in 2016 (the "Film"). Counterclaims ¶ 19. Soon thereafter, it partnered with Sony Entertainment to co-finance and distribute the Film. *Id.* ¶ 21. Baldoni played the lead male role of Ryle in the Film and Blake Lively ("Lively") played the lead female role of Lily Bloom. *Id.* ¶¶ 20, 23.

For almost four years, Jonesworks' work for Wayfarer was managed out of Jonesworks' Los Angeles office by Jennifer Abel ("Abel"), with whom Wayfarer had developed "a close and trusting relationship[.]" *Id.* ¶ 27. By the summer of 2024, however, Wayfarer and Baldoni were in the midst of a public relations crisis in connection with the Film. *Id.* ¶¶ 25, 32. Lively demanded that Baldoni not be permitted to attend the premiere and threatened that he would be excluded from the "press junket" with the rest of the cast. *Id.* ¶ 33. News stories began to trickle out about possible tension between Lively and Baldoni just as the Film was about to premiere. *Id.* ¶ 32. Around the same time, Abel gave notice to Jones and Jonesworks that she intended to resign and later that she intended to start her own firm. *Id.* ¶ 30. Jones started participating in meetings, calls, and written correspondence to reassert her authority over the account and convey her engagement to Wayfarer. *Id.* ¶ 32. Wayfarer alleges that Jonesworks and Jones tried to undermine Abel's authority and to "box" her out of the Wayfarer's account at Wayfarer's expense. *Id.* ¶¶ 36, 38.

When Wayfarer and Baldoni asked Abel to recommend a crisis management specialist to help with fallout from the breakdown of relations between Baldoni and Lively, Abel recommended public relations expert Melissa Nathan ("Nathan"), with whom Abel had worked

3

extensively in connection with a different Jonesworks client.  *Id.* ¶ 33.  But Jones, who viewed Nathan as a competitor, lashed out at Abel and pressured her to disparage Nathan as a demonstration of loyalty to Jones.  *Id.* ¶ 34.

Leading up to the Film's premiere, Lively and Baldoni's teams negotiated an uneasy truce in which neither side would participate in negative coverage of the other.  *Id.* ¶ 39. However, on August 8, 2024, allegedly in direct violation of an instruction of Wayfarer (conveyed through Abel) not to talk to the press, Jones traded calls with a reporter from the publication the Daily Mail who had published a story about Baldoni and Lively.  *Id.* ¶ 40.  When Lively's publicist, Leslie Sloane, and Sony learned that someone from Baldoni's team had been communicating negatively with the press, Wayfarer was "livid" and instructed Jones to cease all activities on behalf of Wayfarer and Baldoni for the time being and to let Abel and another Jonesworks employee handle the public relations crisis alongside Nathan.  *Id.* ¶ 41.  Jones wanted to contact the public relations teams for Sony and Lively to clarify that she had not planted any negative stories about Lively, but Wayfarer told her not to do that.  *Id.* ¶ 43.  Jones violated that instruction and emailed a number of key Sony executives working on the Film to declare that she was in Europe with her husband, who was an executive at William Morris Enterprises, and to put the blame on "her team."  *Id.*

On August 21, 2024, in the midst of the public relations crisis, Wayfarer learned that Jonesworks had terminated Abel's employment.  *Id.* ¶¶ 48–51.  Wayfarer's CEO immediately reached out to Jones and expressed "extreme concern."  *Id.* ¶ 48.  Jones responded that she had been deeply involved in the engagement with Wayfarer until she had been instructed to stop communicating on its behalf on August 9, 2024, and stated "We have an EXCLUSIVE contract with you through May 2025 . . . If you would now like us to help with [crisis PR] we absolutely

can and will.  Please let me know how." *Id.*  In response, Wayfarer advised Jones that it was terminating the Agreement as of the end of August.  *Id.* ¶ 52.

Wayfarer alleges that at some point the Jones Parties devised a plan to "take revenge" on Abel, Baldoni, and Wayfarer.  *Id.* ¶ 53.  When Abel was terminated, Jonesworks confiscated her iPhone.  It then accessed and copied her private communications with Wayfarer and disclosed at least some of the communications to Lively, her husband Ryan Reynolds ("Reynolds"), and Sloane.  *Id.* ¶¶ 53–54, 56.  Wayfarer also alleges, upon information and belief, that Jones falsely told Sloane that Abel and Nathan had orchestrated a malicious smear campaign to destroy Lively's reputation as retaliation for complaints Lively had purportedly made about sexual harassment on set.  *Id.* ¶ 55.  On the same day that Abel was fired, Sloane called Nathan and told her that she should anticipate a lawsuit based on text messages Sloane had seen between Nathan and Abel on Abel's cellphone.  *Id.* ¶ 54.  Jones continued discussions with the Lively Parties over the subsequent months, reiterating the false allegation that Wayfarer had orchestrated a retaliatory "smear campaign."  *Id.* ¶ 59.  Wayfarer alleges that while the contents of Abel's communications do not support the existence of an untraceable smear campaign, they do show that by the time of the Film's premiere, Abel and others in Wayfarer's circle held Lively in deep disdain.  *Id.* ¶ 57.

On or about October 1, 2024, Jones and Jonesworks turned over the entire contents of Abel's iPhone and cloud-stored communications a second time to the Lively Parties, and through the Lively Parties, to the New York Times.  *Id.* ¶ 63.  Jones and Jonesworks allegedly did so through a "sham" subpoena generated to create a "veneer of legitimacy."  *Id.* ¶¶ 60–61.  The Lively Parties and their counsel, working with the Jones Parties, initiated a sham lawsuit in New York state court, *id.* ¶¶ 61–62, and then used that lawsuit to generate a subpoena pursuant to

which the communications were turned over, *id.* ¶ 63.  The New York Times then used the information to generate an "explosive" article which caused Wayfarer and Baldoni to become objects of public scorn and derision.  *Id.* ¶ 64.

## PROCEDURAL HISTORY

The Jones Parties instituted this action by complaint filed in New York State Supreme Court on December 24, 2024.  Dkt. No. 1 ¶ 1; Dkt. No. 1-1.  The complaint alleges that Abel breached her employment contract with Jonesworks and that Nathan, Baldoni, and Wayfarer tortiously interfered with Abel's employment contract with Jonesworks.  Dkt. No. 1-1 ¶¶ 107–21.  It also alleges that Wayfarer and Baldoni breached the Agreement with Jonesworks and that Abel and that Nathan tortiously interfered with the Agreement.  Dkt. No. 1-1 ¶¶ 122–37.  The Jones Parties also assert claims for faithless servant, breach of fiduciary duty, and defamation against Abel, *id.* ¶¶ 138–55, and for defamation against John Does 1–10, *id.* ¶¶ 156–66.

On January 27, 2025, Wayfarer and Defendants Abel, Nathan, and Baldoni removed the action to this Court under 28 U.S.C. §§ 1332, 1441 and 1446.  Dkt. No. 1.  Wayfarer filed an answer and counterclaims on March 20, 2025, Dkt. No. 39, and the operative Counterclaims on April 24, 2025, Dkt. No. 51.  In its counterclaims, Wayfarer alleges two claims for breach of contract, Dkt. No. 51 ¶¶ 66–73, 74–80, a claim for breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 81–86, and a claim for defamation per se, *id.* ¶¶ 87–94.

The Jones Parties filed this motion to dismiss Wayfarer's counterclaims on May 8, 2025.  Dkt. No. 53.  They also filed a memorandum of law in support of the motion.  Dkt. No. 54.  Wayfarer filed a memorandum of law in opposition to the motion to dismiss on May 22, 2025.  Dkt. No. 58.  On May 29, 2025, the Jones Parties filed a reply memorandum of law in further support of their motion to dismiss.  Dkt. No. 60.

## LEGAL STANDARD

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020) (quoting *Orientview Techs. LLC v. Seven for All Mankind, LLC*, 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)); *see also Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible reasonable inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must therefore offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011). At the motion to dismiss stage, the Court considers only "the four corners of the complaint" and "look[s] only to the allegations contained therein." *Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497, at *5 (S.D.N.Y. Feb. 28, 2013) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

**DISCUSSION**

The Jones Parties argue that Wayfarer's counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation must each be dismissed for failure to state a claim for relief.  The Court discusses each in turn.

## I.    Breach of Contract

Wayfarer alleges two distinct theories of breach of contract.  First, it alleges that the Jones Parties breached the Agreement by failing to abide by the confidentiality provision contained therein.  Second, it argues that the Jones Parties breached the agreement by failing to perform their services in a professional manner as required by the Agreement.  Neither party disputes that the contract is valid and enforceable.  The Court applies New York law to the breach of contract claims in accordance with the choice of law provision contained in the agreement.  Dkt. No. 51-1 at 4.

### A.    Breach of the Confidentiality Provision

Wayfarer's first counterclaim alleges that the Jones Parties breached the confidentiality provision of the Agreement.  Counterclaims ¶¶ 66–73.  Wayfarer alleges that the Agreement requires Jonesworks to use its reasonable and diligent efforts to preserve the confidentiality of Wayfarer's "confidential, proprietary and/or sensitive information" and that Jonesworks breached that obligation by disclosing Wayfarer's confidential information to third parties including Sloane, Lively, and Reynolds.  *Id.* ¶ 70.  The Jones Parties argue that Wayfarer's claim for breach of the confidentiality provision fails because (i) Wayfarer has not identified any confidential information that was disclosed (and, in fact, has pleaded that the information was "Abel's private communications"); (ii) the allegations are barred by the federal Speak Out Act; and (iii) Wayfarer has not pleaded damages.  Dkt. No. 54 at 1–2.

The elements of breach of contract under New York law are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 616 (S.D.N.Y. 2024) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)). "A sufficient pleading for breach of contract must 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'" *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)); *see Caro Cap., LLC v. Koch*, 2021 WL 1595843, at \*6 (S.D.N.Y. Apr. 23, 2021), *on reconsideration*, 2021 WL 2075481 (S.D.N.Y. May 24, 2021) (same). "New York courts require plaintiffs to 'plead the provisions of the contract upon which the claim is based'— in other words, 'a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.'" *Anders v. Verizon Commuc'ns*, 2018 WL 2727883, at \*8 (S.D.N.Y. June 5, 2018) (quoting *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899, at \*3 (S.D.N.Y. Aug. 12, 1993)); *see also Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) ("New York law and the *Twombly–Iqbal* standards of federal pleading require a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached. Otherwise, the complaint must be dismissed").

"To plead a claim for disclosure of confidential information, a plaintiff must allege facts showing that there was confidential information belonging to him that was disclosed, identify the information, and plead sufficient facts that a reasonable inference can be drawn that the defendant was the source of the information." *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 102

9

(S.D.N.Y. 2020); *see also Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*, 55 N.Y.S.3d 54, 55 (1st Dep't 2017) (affirming dismissal where plaintiff "does not identify what confidential information was allegedly misused by defendant during the two year confidentiality period"); *Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (1st Dep't 1988) (dismissing breach of confidentiality claim where plaintiff "ha[d] not identified any confidential information imparted to defendant"); *KSFB Mgmt., LLC v. Focus Fin. Partners, LLC*, 225 N.Y.S.3d 606 (N.Y. Sup. Ct. 2025) (dismissing breach of contract claim where plaintiff did not "identify what, if any, confidential information was disclosed"); *Golub Cap. LLC v. NB Alternatives Advisers LLC*, 2022 WL 540653, at *13 (S.D.N.Y. Feb. 22, 2022).[2]

Wayfarer's claim for breach of the confidentiality provision fails because Wayfarer does not allege any information that was protected by that provision that was improperly disclosed by the Jones Parties. The definition of Confidential Information under the Agreement is carefully drawn. The information must have been "disclose[d] or provide[d]" by Wayfarer to Jonesworks. Dkt. No. 51-1 at 3. There would therefore be no breach of the confidentiality provision if the information disclosed does not reveal information disclosed or provided *by* Wayfarer. Additionally, the Confidential Information, as defined, must be "confidential, proprietary, and/or sensitive," and must concern Wayfarer, "its customers or other related parties." *Id.* The

---

[2] Sitting in diversity, the federal pleading standards apply. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017). The standard to state a claim in New York courts "is more lenient than the 'plausibility' standard applicable in federal courts." *Williams v. Citigroup Inc.*, 659 F.3d 208, 215 n.4 (2d Cir. 2011) (comparing *Iqbal*, 556 U.S. at 678, with *ABN AMRO Bank, N.V. v. MBIA Inc.*, 952 N.E.2d 463, 474–75 (N.Y. 2011)). In New York, "[c]ourts must 'accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory.'" *ABN AMRO*, 952 N.E.2d at 474 (citation omitted). Therefore, a New York's courts determination that facts were insufficient to state a claim is instructive, as failure to meet the lower burden in those courts is indicative of a similar failure to meet the more stringent plausibility standard in federal court.

Agreement is express that such Confidential Information does not include information "which is or later becomes publicly available through no wrongful act of" Jonesworks, or information "independently developed by [Jonesworks] without reliance on information disclosed by [Wayfarer]." *Id.* It notes too that Jonesworks "is not liable for any third party's disclosure of Client's Confidential Information so long as such third party did not obtain the Confidential Information as a result of Company's breach or failure to uphold its obligations hereunder." *Id.*

In their briefing in opposition to the motion to dismiss, Wayfarer relies primarily on allegations with respect to messages taken from Abel's iPhone that were shared with the Lively Parties and the media. Counterclaims ¶¶ 53–54. Drawing all inferences from the facts pleaded in the Counterclaims in favor of Wayfarer, it could be inferred that the contents of Abel's iPhone included information that revealed that Abel and others in Wayfarer's circle held Lively in deep disdain. *Id.* ¶ 57. It further might be inferred that the contents included information about the public relations campaign proposed by Abel to Wayfarer. But none of those allegations indicate that the information the Jones Parties disclosed was Confidential Information as is defined in the Agreement. Aside from the insufficient conclusory allegation that it was "Confidential Information (as defined in the Agreement)," *id.* ¶ 70, Plaintiff makes no allegation that any of the information on Abel's iPhone was, in fact, disclosed or provided by Wayfarer to Jonesworks. To the contrary, as alleged those messages were "Abel's private communications with individuals in the Wayfarer circle," and were *not* communications provided to Jonesworks by Wayfarer within the terms of the Agreement. *Id.* ¶ 53.

Wayfarer highlights too its allegations that Jones "falsely told Sloane that Wayfarer, along with Abel and Nathan, had orchestrated a malicious 'smear campaign' to destroy Lively's reputation" as evidence of disclosure of Confidential Information. *Id.* ¶ 55. Again, however,

11

Wayfarer does not allege that this communication contained any information provided by Wayfarer to Jonesworks. Instead, the allegation maintains that such communication did not reveal information disclosed or provided by Wayfarer because Jones "knew full well that Wayfarer was scarcely engaging with the press at all." *Id.* In other words, Wayfarer alleges that such "smear campaign" never took place and could not have been the subject of communications with Jonesworks. An allegation that Jones told Sloane false information about Wayfarer's actions cannot also be an allegation that Jones revealed confidential communications.

Wayfarer has not alleged that any Jones or Jonesworks disclosed any Confidential Information as contained in the Agreement. Accordingly, the motion to dismiss Count I of the Counterclaims is granted. As this claim is dismissed, the Court has no occasion to consider the Jones Parties' argument that Wayfarer failed to allege that it suffered any harm, or that the Speak Out Act bars enforcement of the confidentiality clause.

### B.    Breach of Professional Manner Provision

In its second counterclaim, Wayfarer alleges that the Jones Parties breached the obligation to provide services "in a professional manner and in accordance with the goals mutually established by [Wayfarer and Jones]." Counterclaims ¶¶ 74–80. Wayfarer argues that this provision was breached in several ways: (1) Jones was "in Europe and largely incommunicado . . . during the critical month of August when the Film premiered," (2) Jones "contacted a daily Mail reporter" about a story that they had published about Baldoni and Lively in violation of Wayfarer's directive and in "blatant disregard of Wayfarer's strategy," and (3) after Wayfarer "instructed Jones to cease all activities on behalf of Wayfarer and Baldoni," Jones insisted that she could do "whatever she wants to clear her name" and "emailed a number of key Sony executives working on the Film . . . placing all blame on her team." Dkt. No. 58 at 8. The Jones Parties argue that the complaint does not allege facts that would support the claim that they

12

acted in an unprofessional manner or failed to follow mutually established goals.  Dkt. No. 54 at 2, 11–12.

Wayfarer has failed to state a claim that Jonesworks breached the obligation in the Agreement to act in a "professional manner" and in accordance with the parties' mutually established goals.  A primary task of the Court in assessing whether a complaint has stated a claim for breach of contract is to interpret the contract and to assess whether the alleged facts, assumed to be true, violate the contract.  Under New York law, courts interpret contract provisions in accordance with their plain and ordinary meaning.  *See Phila. Indem. Ins. Co. v. Streb, Inc.*, 487 F. Supp. 3d 174, 184 (S.D.N.Y. 2020); *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014).  The court must "examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018) (quoting *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order)).  "[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'"  *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) (quoting *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996)).  At the motion to dismiss stage a court must resolve contractual ambiguities in favor of the plaintiff. *See Cisco Sys., Inc. v. Synamedia Ltd.*, 557 F. Supp. 3d 464, 471 (S.D.N.Y. 2021); *Mancuso v. L'Oreal USA Inc.*, 2021 WL 1240328, at *3 (S.D.N.Y. Apr. 2, 2021).

13

Jonesworks did not have a free-standing obligation under the Agreement to act "in a professional manner" in all respects. Dkt. No. 51-1 at 1. It had an obligation to act in "a professional manner" in connection with the required Services, *i.e.*, to "provide the Services in a professional manner." *Id.* "Services" is a defined term under the Agreement. The Agreement defines the Services as the "strategic communications services as described on the attached Schedule A." *Id.* The attached Schedule A describes five categories of Services. *Id.* at 5. They include, for example, managing "media and press communications" and "[a]dvis[ing] on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned." *Id.* If additional services were requested "(i.e., services other than those designated on Exhibit A)," Wayfarer was required to pay an additional negotiated fee. *Id.* at 1. The Services contemplated in the Agreement do not include crisis management. Moreover, the Agreement does not specify a particular employee of Jonesworks who is to devote their time and attention to provide services for Wayfarer. Indeed, the only specific reference to Jones in the Agreement relates to the covenant on the part of Wayfarer, and not Jonesworks, that if Jonesworks develops creative material to pitch to production companies, Jones will be attached as no less than a Co-Executive Producer. *Id.* at 2. Thus, under the Agreement, Jonesworks itself and not Jones specifically was required to provide each of the Services in a professional manner. As long as it provided the Services themselves in a professional manner, it would have satisfied that covenant even if—in the perception of Wayfarer—Jonesworks (or Jones herself) fell short in some other respect.

The term "professional" itself may be an "indefinite and subjective ter[m] with multiple potential meanings." *LoanCare, LLC v. Dimont & Assocs.*, LLC, 2025 WL 951585, at *8 (S.D.N.Y. Mar. 28, 2025). But, in order for Wayfarer to assert a claim that Jonesworks failed to

14

satisfy its obligation to perform a Service in a professional manner, it must allege that there was a service that Wayfarer failed to professionally perform. The Counterclaims do not identify any respect in which Jonesworks failed to perform the promised Services in a professional manner. Indeed, it does not identify any of the Services themselves.

Wayfarer appears to rest its claim on the allegation that prior to July/August 2024, Jones had been disengaged from the Wayfarer account and was not privy to its communications strategy or internal decision-making, having long claimed to be too busy with higher profile clients. Counterclaims ¶ 36. But, as noted, Wayfarer's contract was with Jonesworks and not with Jones personally. Jones was not required by the Agreement to devote any of her time and attention to Wayfarer. And, as to Jonesworks itself, the complaint suggests that Jonesworks was performing the Services in a professional manner. While Jones may not have been working on the Wayfarer account prior to August 2024, Abel was working on the Jonesworks' account and Wayfarer affirmatively alleges that it had developed "a close and trusting relationship" with her. *Id.* ¶ 27. Moreover, while Wayfarer alleges that, "at the time of the public relations crisis, [Jones] was on a lengthy vacation in Europe," *id.* ¶ 37, Wayfarer also alleges that as soon as Abel gave notice to Jonesworks, Jones started participating in meetings, calls, and written correspondence to reassert her authority over the account and convey her engagement to Wayfarer*, id.* ¶ 32. And, on August 21, 2024, when Abel's employment was terminated, Jones wrote that Jonesworks was prepared to support Wayfarer's public relations needs. *Id.* ¶ 48. In any event, Wayfarer identifies no provision that would have required Jones personally to have devoted substantially all of her time or even any particular amount of time to work on the Wayfarer accounts.

15

The Counterclaims do allege that Wayfarer was unhappy with Jones' ideas and unhappy with her services before and after August 21, 2024.  Wayfarer alleges that Jones' efforts on its behalf were "ham-fisted, unwelcome, and sporadic," *id.* ¶ 37, and that "Wayfarer and Baldoni now viewed Jones as a walking disaster who had demonstrated an astonishing degree of self-absorption, disloyalty, and insubordination during an existential crisis," *id.* ¶ 50.  The Counterclaims detail some of the conduct to which Wayfarer was opposed.  In mid-August 2024, Jones advised Wayfarer that it should "fight for every story" because Baldoni was not being represented in the stories that were being published and that it should "flood the zone" with "positive narratives [about Baldoni] that media outlets cannot ignore."  *Id.* ¶¶ 45–46.  She also advised that, in response to the negative stories that were being published about Baldoni, Jonesworks and PR should prepare "[a]lternate [s]tories" and "mobilize a robust network of supporters and third-party advocates" to make "clear that the claims being made are untrue and unfounded."  *Id.* ¶ 46.  Wayfarer chose not to "he[ed]" that advice.  *Id.* ¶ 45.  But Wayfarer does not allege what contractual provision Jones violated by providing that advice even if it was not accepted.  *See Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 WL 35439, at \*8 (S.D.N.Y. Jan. 6, 2004) ("A breach of contract claim will be dismissed . . . as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory fashion, the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated.") (internal citations and quotations omitted).  Jonesworks was being retained in part to provide advice.  Wayfarer need not have accepted that advice but, without more, its provision would not violate the Agreement.  *Cf. Rogers Enters., Inc. v. Hitachi Sols. Am., Ltd.*, 2022 WL 1410000, at \*6 (C.D. Cal. Jan. 18, 2022) (finding a provision to provide services in a "professional manner" to be breached where the Defendant "staffed the project with

unexperienced and incompetent employees, used solution-planning processes that diverged from . . . best practices, and caused damages to Plaintiff's core systems, falsely told Plaintiff the software was ready to be used . . . and encouraged Plaintiff to put it into operation despite ongoing issues, and providing misleading status reports and budget estimates" (internal quotations omitted)).

Wayfarer also does not allege facts that would support the claim that Jonesworks failed to act in accordance with the parties' mutually established goals. Wayfarer suggests that Jones violated an instruction of Wayfarer by contacting a Daily Mail reporter, Counterclaims ¶ 40, and by emailing "a number of key Sony executives" in an "attempt to save face," after Wayfarer told her not to contact them to clear her name, *id.* ¶ 43. But the contract required Jonesworks to act in accordance with the parties' mutually established goals not in accordance with Wayfarer's unilaterally set directives. Moreover, the allegations are telling for what they omit. Wayfarer alleges that it instructed Jones "not to talk to the press," but the Counterclaims do not allege that she did talk to the press. *Id.* ¶ 40. To the contrary, it states merely that Jones "[l]eft word" with the reporter, not that they were ever in direct communication about the matter. *Id.* The Counterclaims includes also a text sent from Jones to a Wayfarer representative noting that she "attached my phone record so you could see I did not call daily mail or receive/make calls to any media." *Id.* ¶ 45. There is no allegation that Wayfarer's instruction about talking to the press was ignored. Moreover, as Wayfarer admits, Dkt. No. 58 at 8–9, the Agreement on its face does not give Wayfarer the right to have Jonesworks or Jones follow any instructions it might give. It requires only that Jonesworks act in accordance with the goals "mutually established." *Id.* at 9; Dkt. No. 51-1 at 1. Wayfarer does not allege how Jones' emails to the Sony executives violated her obligation to perform the Services specified in the Agreement in a "professional manner" and

17

does not identify any provision that gave it the right to demand that she not take action to "clear her name" when she believed that such action was necessary.  Counterclaims ¶ 43.

Accordingly, the motion to dismiss Count II of the Counterclaims is granted.

## II.      Breach of the Implied Covenant of Good Faith and Fair Dealing

Wayfarer's third claim alleges a breach of the covenant of good faith and fair dealing. Wayfarer alleges that "Jonesworks and Jones engaged in conduct that prevented Wayfarer from receiving the benefits contemplated under the Agreement, including by maliciously feeding its confidential information to hostile third parties for the specific purpose of harming Wayfarer and Baldoni, acting against Wayfarer's interests, and otherwise depriving Wayfarer of the benefit of its bargain." Dkt. No. 51 ¶ 84.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)); see *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 504 (S.D.N.Y. 2021).  "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983). Accordingly, "[n]o obligation can be implied . . . which would be inconsistent with other terms of the agreement of the parties." *Id.*  Additionally, "[i]f the defendant 'had a genuine and colorable business justification for its decision, then its actions will not have been arbitrary, and thus will not have violated the implied covenant.'" *Shweizer v. Sikorsky Aircraft Corp.*, 634 F.

App'x 827, 830 (2d Cir. 2015) (summary order) (quoting *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 820 (2d Cir. 2014)).

Wayfarer alleges that, in the wake of Jonesworks' termination of Abel and in the wake of Wayfarer's announcement that it would terminate its agreement with Jonesworks, Jonesworks set out to injure its departing client. Upon information and belief, Jonesworks told Lively's publicity team that Abel and Nathan had orchestrated a campaign to destroy Lively's reputation. Counterclaims ¶ 55. Prior to the termination of its contract with Wayfarer, Jonesworks also allegedly turned over private messages that would harm Wayfarer's relationship with Lively. *Id.* ¶¶ 56–57. Among the Services Jonesworks agreed to perform was to "[m]anage media and press communications" and to "[a]dvise on any marketing ad campaign strategies to ensure . . . opportunities are maximized, and the strongest press angles aligned." Dkt. No. 51-1 Sched. A. Jonesworks also agreed to "[p]osition and utilize Wayfarer Studios key executives as thought-leaders and change agents in the film and television industry." *Id.* It could be inferred that implicit within that obligation was the covenant not to destroy Wayfarer's existing opportunities. *See Paramount Pictures Corp. v. Puzo*, 2012 WL 4465574, at *5 (S.D.N.Y. Sept. 26, 2012) ("Under New York law, the implied covenant of good faith and fair dealing inheres in every contract and obligates contracting parties to refrain from conduct that would 'destroy or injure the right of the other party to receive the fruits of the contract.'" (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995))); *McDonald's Corp. v. Hinksman*, 1999 WL 441468, at *13 (E.D.N.Y. May 28, 1999)).

Jonesworks' primary argument in support of its motion to dismiss is that "when a complaint alleges both a breach of contract and of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v.*

19

*FXDirectorDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).  That argument misses the mark.

The redundancy restriction on implied covenant claims applies only where the facts alleged to

establish breach of the implied covenant actually go toward establishing a violation of one of the

express provisions in the contract.  "A claim for breach of the implied covenant will be

dismissed as redundant where the conduct allegedly violating the implied covenant is also the

predicate for breach of covenant of an express provision of the underlying contract."  *Harris v.*

*Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quoting *ICD Holdings S.A. v.*

*Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y.1997)).  "[A] plaintiff can plead a claim for breach

of the covenant of good faith and fair dealing where 'there is a dispute over the existence, scope,

or enforceability of the putative contract.'"  *Spencer-Smith*, 347 F.R.D. at 627 (quoting *Reilly v.*

*Natwest Markets Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999)).  Courts dismiss a breach of

covenant of good faith and fair dealing claim where it is "merely a substitute for a nonviable

breach of contract claim."  *Triton Partners LLC v. Prudential Sec., Inc.*, 752 N.Y.S.2d 870, 870

(1st Dep't 2003).  But that is just another way of saying that "[t]he covenant of good faith and

fair dealing cannot be construed so broadly as to effectively nullify other express terms of the

contract, or to create independent contractual rights."  *Nat'l Union Fire Ins. Co. of Pittsburgh,*

*PA v. Xerox Corp.*, 807 N.Y.S.2d 344, 346 (1st Dep't 2006); *see Geler v. Nat'l Westminister*

*Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991) (dismissing a breach of the covenant of good

faith and fair dealing claim where "th[e] allegations presuppose that the [defendant] breached the

express terms of the contract").  If the parties expressly bargained for one provision and not for

another, then it would contravene the contract to nevertheless recognize as implied an unstated

claim.  That is in contrast to a successful implied covenant claim, which exists only where a

20

party to a contract takes action that would destroy or injure the right of the counterparty to receive the fruits of the contract.  *See State St. Bank & Trust*, 374 F.3d at 169.

Here, in Part I the Court discussed at length that Wayfarer is incorrect that the conduct alleged in the Counterclaims constituted either the impermissible disclosure of Confidential Information or failure to perform the Services in a professional manner.  Thus, there is no contractual provision that would cover the conduct alleged in the count for breach of the implied covenant of good faith and fair dealing that "Jonesworks and Jones engaged in conduct that prevented Wayfarer from receiving the benefits contemplated under the Agreement, including by maliciously feeding confidential information to hostile third parties for the specific purpose of harming Wayfarer and Baldoni, acting against Wayfarer's interest, and otherwise depriving Wayfarer of the benefit of its bargain."  Counterclaims ¶ 84.  The fact that Wayfarer misguidedly attempted to use certain facts to bring a claim for breach of contract does not then preclude an implied covenant count where those express provisions do not cover the conduct at issue.  *See Fantozzi v. Axsys Techs., Inc.*, 2007 WL 2454109, at *3 (S.D.N.Y. Aug. 20, 2007) (declining to dismiss implied covenant of good faith and fair dealing count where "[i]t appears from the complaint that plaintiffs are alleging something more than what would amount to a simple breach of some specific provision or provisions of the Agreement").

The ultimate question that then remains is whether the Jones Parties' conduct violated the covenant.  "[W]here necessary so as not to deprive a contracting party of the 'fruits of the contract[,]' the court will not hesitate to infer an obligation to act in good faith."  *S. Telecom Inc.*, 520 F. Supp. 3d at 507..  At the motion to dismiss stage, it is plausible to infer that Wayfarer hired Jonesworks to develop relationships with other media figures like Lively and that the sharing of negative information about Wayfarer with Lively would undermine the object of the

Agreement.  The parties need not have expressly agreed that Jonesworks would not convey negative information to third parties about its client for "a reasonable person in the position of the promisee [to] be justified in understanding" that such a provision was included in the contract.  *Dalton*, 663 N.E.2d at 291 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978)).  There is no question that the actions Jonesworks is accused of having taken would have been viewed as defeating the object of the services to be provided if they were taken at the incipiency of the relationship.  Taken as true, they are not less destructive of the object of the relationship because they were taken in its twilight.

Accordingly, the motion to dismiss Count III of the Counterclaims is denied.

### III.     Defamation Per Se

Wayfarer's fourth claim is for "defamation per se."  Counterclaims ¶¶ 87–94.  Wayfarer alleges "on information and belief," that "Jones and Jonesworks made one or more statements to persons other than Wayfarer, including without limitation Leslie Sloane, Blake Lively, and Ryan Reynolds, to the effect that Wayfarer had retaliated against Lively and others for reporting alleged sexual misconduct, including orchestrating a 'smear campaign' by propagating false and misleading narratives about Lively for the purpose of damaging her image and reputation."  *Id.* ¶ 88.  The Jones Parties argue that Wayfarer has failed to state a claim for defamation because (i) the complaint does not allege falsity; (ii) the statement regarding a "smear campaign" is quintessential protected opinion; and (iii) Wayfarer has failed to allege actual malice.  Dkt. No. 54 at 3.

The Court first determines the law to apply to Wayfarer's claim for defamation.  The Jones Parties argue that the Court should apply New York law.  Wayfarer argues that the Court should apply California law.  "[A] federal court sitting in diversity borrows the forum State's choice-of-law rule."  *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115

(2022). Under New York's choice-of-law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Kenser v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 167 (S.D.N.Y. 2021) (quoting *Matter of Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993)). The elements of a claim of defamation are similar under New York and California law. "Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Under California law, "[t]he tort of defamation involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 151 P.3d 1185, 1209 (Cal. 2007) (citation and internal quotation marks omitted).[3] "Publication need not be to the 'public' at large; communication to a single individual is sufficient." *Smith v. Maldonado*, 85 Cal. Rptr. 2d 397, 402 (Cal. Ct. App. 1999).

Where the two bodies of law differ is on their approach to the distinction between facts and opinions. The New York Constitution provides independent protection for statements of opinion. *See Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1277–1280 (N.Y. 1991). The factors to be considered in determining whether a statement is one of fact or of opinion are: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and

---

[3] Defamation under California law includes both slander and libel. Slander, which is "restricted to oral statements and gestures," is not at issue here. 5 Witkin, Summary of Cal. Law (11th ed. 2025) Torts, § 624.

surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Davis v. Boeheim*, 22 N.E.3d 999, 1005 (N.Y. 2014) (quoting *Mann v. Abel*, 885 N.E.2d 884, 886 (N.Y. 2008)).  New York courts adopt "a holistic approach" to determining whether a statement is fact or opinion, including consideration of "the content of the communication as a whole, its tone and apparent purpose." *Boeheim*, 22 N.E.3d at 1005.  California defamation law incorporates and follows the more limited speech protections required by the First Amendment to the United States Constitution.  *See Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 753 (S.D.N.Y. 2025).  Given that there is a conflict in defamation law that could have an impact on the outcome of the motion, the Court must determine which law to apply.

Although there is a choice-of-law provision in the Agreement, it does not control the Court's choice of law determination.  The choice-of-law provision states that the Agreement is "governed by, construed under and enforced in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein." Dkt. No. 51-1 at 4.  The Court applies the law of the forum, here New York, to determine the validity and scope of a contractual law provision.  *AEI Life LLC v. Lincoln Ben. Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018).  Under New York law, the court applies "the law selected in contractual choice-of-law clauses only to causes of action sounding in contract unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties." *Stevens & Co. LLC v. Espat*, 2025 WL 950989, at *10 (S.D.N.Y. Mar. 28, 2025) (quoting *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *16 (S.D.N.Y. June 6, 2022)).  The Agreement's choice-of-law provision is narrow and not broad.  It applies only to the construction and enforcement of the Agreement.  It does not address tort

24

claims that may arise between the parties as a result of or during the relationship formed by the Agreement.

"In the absence of an applicable choice of law provision, 'New York has adopted an interest analysis, which requires that the law of the jurisdiction having the greatest interest in the litigation be applied.'" *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quoting *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993)).  To make that determination, New York courts ask "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss." *Id.* (quoting *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994)).  A conduct-regulating law is one that "people use as a guide to govern their primary conduct." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012).  In *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176–78 (2d Cir. 2021), the Second Circuit drew a distinction between defamation cases involving a targeted publication and "multistate defamation cases."  Ordinarily, "[u]nder New York choice-of-law rules in defamation cases the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern." *Id.*; *see also Celle v. Filipino Reporter Enterps. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("New York assumes that the state of the plaintiff's domicile will usually have the most significant interest in the case and that its law should therefore govern"); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) ("[u]nder New York choice-of-law rules in defamation cases 'the state of the plaintiff's domicile will usually have the most significant relationship to the case,' and its law will therefore govern" (quoting *Reeves v. American Broad. Co.*, 719 F.2d 602, 605 (2d Cir. 1983))).  "[I]n cases where an allegedly defamatory statement is published nationally, there is only a presumptive rule that the law of [the] plaintiff's domicile applies, which does not hold

25

true . . . if with respect to the particular issue, some other state has a more significant relationship to the issue or the parties." *Kinsey*, 991 F.3d at 177 (quoting *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014)). Wayfarer does not allege a statement published nationally, but rather a single set of utterances made privately by Jones to Sloane about Wayfarer and Baldoni. Counterclaims ¶ 55. Wayfarer is domiciled in California. Therefore, California law applies.

Wayfarer alleges, upon information and belief, that Jones falsely told Lively's publicist that Abel and Nathan had orchestrated a malicious smear campaign to destroy Lively's reputation as retaliation for complaints Lively had purportedly made about sexual harassment on set. Counterclaims ¶¶ 55, 88. It alleges too that Jones "continued discussions with the Lively Parties over the subsequent months, reiterating the false allegation that Wayfarer had orchestrated a retaliatory 'smear campaign.'" *Id.* ¶ 59. As explained above, under California law, "[t]he tort of defamation involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus*, 151 P.3d at 1209. Something is "defamatory" in California if it "exposes any person to hatred, contempt, ridicule, or obloquy, or [if it] causes him to be shunned or avoided, or [if it] has a tendency to injure him in his occupation." Cal. Civ. Code § 45. Furthermore, "[a] libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be libel on its face." Cal. Civ. Code § 45a. When a defamatory statement is libelous on its face, the plaintiff is not required to prove that he has "suffered special damages as a proximate result thereof." *Id.*; *see also Sideshow, Inc. v. Damon*, 2022 WL 1694775, at *3 (C.D. Cal. Mar. 9, 2022); *Am. Heritage Railways, Inc. v. Hirou*, 2025 WL 3124340, at *4 (S.D. Cal. Nov. 7, 2025) ("In an action for defamation per se, damages can be presumed.").

26

"It is the province of the court to determine whether a statement is actionable as a statement of fact susceptible of a defamatory meaning, versus a nonactionable statement of opinion privileged under the First Amendment." *John Doe 2 v. Superior Court*, 206 Cal. Rptr. 3d 60, 68–69 (Cal. Ct. App. 2016); *see Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1086 (S.D. Cal. 2021). "To determine whether a statement is actionable fact or nonactionable opinion, [courts] apply a totality of the circumstances test pursuant to which [they] consider both the language of the statement itself and the context in which it is made." *Summit Bank v. Rogers*, 142 Cal. Rptr. 3d 40, 60 (Cal. Ct. App. 2012); *see also Gallagher*, 563 F. Supp. 3d at 1086; *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Loc. 996*, 302 F.3d 998, 1005 (9th Cir. 2002). Courts look to "the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." *Baker v. Los Angeles Herald Examiner*, 721 P.2d 87, 91 (Cal. 1986); *see also Knievel v. ESPN*, 393 F.3d 1068, 1074–78 (9th Cir. 2005). "[T]he publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in law, but by the natural and probable effect upon the mind of the average reader." *Baker*, 721 P.2d at 90 (quoting *MacLeod v. Trib. Pub. Co.*, 343 P.2d 36, 41–42 (Cal. 1959)); *see Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 754–55 (S.D.N.Y. 2025); *Collins v. Wal-Mart Stores, Inc.*, 2026 WL 232364, at *3 (S.D. Cal. Jan. 28, 2026) (finding that "he should be more respectful," "I don't care about that guy," and "I'm glad you're not a manager" could not be "interpreted as stating provably false factual assertions").

Distinguishing fact from opinion "can be difficult, and 'what constitutes a statement of fact in one context may be treated as a statement of opinion in another[.]'" *Summit Bank*, 142 Cal. Rptr. 3d at 62 (quoting *Gregory v. McDonnell Douglas Corp.*, 552 P.2d 425, 428 (Cal.

27

1976)). For example, the statement that the plaintiff has engaged in blackmail may convey a different meaning when it is uttered by the disappointed counterpart to a tough business negotiation than when it is pronounced by a prosecutor. *See Greenbelt Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) ("It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized."). Or the accusation that a person is a traitor may mean one thing in the context of a heated debate in a union hall and another thing entirely in the context of a national security briefing. *See Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 284 (1974). "[A]ssertions that a person is guilty of 'blackmail,' 'fraud,' 'bribery' and 'corruption' could, in certain contexts, be understood as mere, nonactionable 'rhetorical hyperbole' or 'vigorous epithet[s].'" *Gross v. New York Times Co.*, 623 N.E.2d 1163, 1169 (NY. 1993) (internal citations omitted); *see also Summit Bank*, 142 Cal. Rptr. 3d at 62 ("comments that are no more than rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt, and language used in a loose, figurative sense have all been accorded constitutional protection" (cleaned up)). In other contexts, such assertions also could be understood to be a statement of fact or to imply the existence of undisclosed underlying facts. *Gross*, 623 N.E.2d at 1168. There is no safe harbor. Context matters.

So too with the use of the word "smear," or "smear campaign." In common vernacular, it may be a hyperbolic way of responding that an accusation is untrue. The victim of a false public campaign may respond that she has been publicly "smeared" or been the victim of a "smear campaign" without necessarily opening herself to a suit for slander. Her statement could only be understood as a loose response to what she perceives to have been said against her. In context,

28

the statement would not be understood as one of fact or to convey the existence of undisclosed facts. It would be a strong way of vigorously denying the accusation. *See Broughty v. Bouzy*, 2023 WL 5013654, at *7 (D.N.J. Aug. 7, 2023). Political opponents can accuse one another of engaging in smear campaigns based on their public statements without a trial on whether their respective statements were a "smear" or simply untrue. *Cf. Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693, 718 (D. Md. 2021) (addressing use of that term in a televised political program). The term, however, can also be understood as "[a] plan to discredit someone or something, or to destroy a reputation, by means of smears," that is, by "slanderous or defamatory remark; an attempt to defame by slander." The Oxford English Dictionary (2d ed. 1989). So understood, it may be "reasonably susceptible of an interpretation which implies a provably false assertion of actual fact." *John Doe 2*, 206 Cal. Rptr. 3d at 69 (quoting *Kahn v. Bower*, 284 Cal. Rptr. 244, 250 (Cal. Ct. App. 1991)). The statement may connote that the subject has intentionally executed an undisclosed plan to knowingly spread false and defamatory remarks about another for some impermissible purpose.

The complaint pleads facts that make it plausible that a jury could construe Jones' comments in the latter fashion. Wayfarer alleges that Jones made comments to Sloane that Wayfarer, Abel, and Nathan had orchestrated a malicious "smear campaign" to destroy Lively's reputation as retaliation for Lively's complaints about purported sexual harassment on set. Counterclaims ¶ 55. The statement could be understood to convey that Jones was in possession of some undisclosed underlying facts. Jones was Wayfarer's publicist. She would have been privy to Wayfarer's plans and to its actions. It was her job to understand and implement Wayfarer's public relations strategy. The statement thus carries a "clear or natural indication" that Jones had actual knowledge of the activities of her client and former employee. *Baker*, 721

P.2d at 94.  Jones' statement would "carry a ring of authenticity and reasonably might be understood as being based in fact."  *Slaughter v. Friedman*, 649 P.2d 886, 889 (Cal. 1982).  She would know the source of the allegedly defamatory statements about Lively and if the source was Wayfarer even if Lively and Lively's publicist did not know the source.  A jury could determine whether, in fact, Wayfarer had executed a plan to destroy Lively's reputation and career by means of false and defamatory statements.

Moreover, as alleged, Jones did not simply accuse Wayfarer of engaging in a campaign to destroy Lively's reputation through false statements.  Jones allegedly told Sloane that Wayfarer undertook to discredit and destroy Lively's reputation because she had complained about sexual discrimination on the set of the Film.  Counterclaims ¶ 55.  That too is a statement that can be subject to the test of factual truth.  Assuming that Wayfarer engaged in a secret campaign to spread false information about Lively to destroy her reputation, a jury could determine affirmatively whether it did so because she had complained about sexual discrimination or for some other reason.  That Wayfarer would undertake any kind of negative campaign against Lively for complaining about sexual harassment on set could be understood to be defamatory, regardless of the extremity of what that smear campaign did actually entail.  *See* Cal. Civ. Code § 45 (a statement is defamatory if it "exposes any person to hatred, contempt, ridicule, or obloquy, or [if it] causes him to be shunned or avoided, or [if it] has a tendency to injure him in his occupation.").

The Jones Parties argue that even if the statement is actionable as defamation, the count must be dismissed because it is not false.  Dkt. No. 54 at 21–22.  To be defamatory, a plaintiff is ultimately required to prove that the alleged fact is false.  *See Gregory*, 552 P.2d at 427.  Wayfarer alleges that "[t]he statements made by Jones and Jonesworks about Wayfarer were

30

false," Counterclaims ¶ 91, as "not only was [Jones] well aware that Lively had not actually been harassed on set, she also knew that there had not been a 'smear campaign,'" *id.* ¶ 55. That is sufficient to survive a motion to dismiss. Additionally, the Jones Parties' contention that the fact that the "smear campaign" is demonstrably true by reference to other allegations in the complaint is unavailing. The assertions they cite to do not prove that Wayfarer engaged in a smear campaign. The Jones Parties point only to allegations that Nathan was hired as PR expert, and that persons in the Wayfarer circle "held Lively in deep disdain." Dkt. No. 5 at 22 (citing Counterclaims ¶¶ 33, 57). It is clear that neither of those statements admit the execution of a "smear campaign" in retaliation for Lively's actions.

Finally, the Jones Parties argue that because Wayfarer is a public figure, it is required to plead actual malice to state a claim for defamation. Actual malice requires that the statement be made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Kaelin v. Globe Comm. Corp.*, 162 F.3d 1036, 1039 (9th Cir. 1998). "The reckless disregard standard requires a 'high degree of awareness of probable falsity." *Reed v. Gallagher*, 204 Cal. Rptr. 3d 178, 193 (Cal. Ct. App. 2016) (cleaned up). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* "For defamation purposes, a person can be a 'general' public figure (who has 'achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts') or a 'limited purpose' public figure who has 'voluntarily' injected themself or been 'drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Goldberg v. TeachBK, Inc.*, 2025 WL 296143, at *9 (N.D. Cal. Jan. 24, 2025) (quoting *Cabrera v. Alam*, 129 Cal. Rptr. 3d 74, 85 (Cal. Ct. App. 2011)). Regardless of whether one is an all-purpose or limited purpose public figure, pleading actual malice is

31

required.  *Montanez v. PepsiCo, Inc.*, 784 F. Supp. 3d 1369, 1382 (C.D. Cal. 2025).  The determination is one made "based on the totality of the circumstances," and "there is no bright-line level of notoriety that one must achieve to be deemed an all-purpose public figure." *Hyphy Music, Inc. v. Sena*, 2025 WL 842893, at *7 (E.D. Cal. Mar. 18, 2025) (citing *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 888 (9th Cir. 2016)).  Ultimately, actual malice "can be proved by circumstantial evidence," and "[c]onsiderations such as anger and hostility toward the plaintiff, reliance on sources known to be unreliable or known to be biased against the plaintiff, and failure to investigate may, in an appropriate case, indicate" such malice.  *Balla v. Hall*, 273 Cal. Rptr. 3d 695, 722 (Cal. Ct. App. 2021).

As to Wayfarer, the "standards for determining whether a party is a public figure apply equally to individuals and business entities." *LaMarca v. Cappella Univ.*, 2009 WL 10698387, at *5 (C.D. Cal. Jan. 6, 2009); *see Isuzu Motors Ltd. v. Consumers Union of the U.S., Inc.*, 66 F. Supp. 2d 1117, 1122 (C.D. Cal. 1999) ("California and Ninth Circuit courts have tended to apply the same standards to determining public figure status for corporations as . . . respecting individual persons.").  Wayfarer is at least a limited purpose public figure.  An entity may become a limited purpose public figure where it "voluntarily injects [itself] or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gopher Media LLC v. Melone*, 2024 WL 5442826, at *12 (S.D. Cal. 2024) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).  Wayfarer was founded by Justin Baldoni, a well-known actor, and acquired the rights to the Film, financed and distributed it, and was responsible for casting.  Counterclaims ¶¶ 18–23.  This suit arises out of the fallout from the "massive PR crisis" in which Wayfarer was involved following production and distribution of the film.  *Id.* ¶ 32.  It is precisely because Wayfarer was a public facing entity that those services

32

were required.  The fallout from the dispute between Jones and Wayfarer was similarly public. *Id.* ¶¶ 57–58.

Because it is at least a limited purpose public figure, Wayfarer is required to allege actual malice.  It has done so here.  Wayfarer alleges that Jones knew the statement she made to Sloane was false "as not only was she well aware that Lively had not actually been sexually harassed on set, she also knew that there had been not been a 'smear campaign.'  This is clear because Jones was copied on many of Wayfarer's email and text threads during the relevant period and knew full well that Wayfarer was scarcely engaging with the press at all in August 2024, much less carrying out offensive tactics in retaliation for something that never happened." *Id.* ¶ 55.  Those allegations, accepted as true, clarify that Jones made the statements knowing they were false or with at least reckless disregard of whether they were false. *See Kluwe v. Huntington Beach Union High Sch. Dist.*, 2025 WL 3691896, at *14 (C.D. Cal. Nov. 4, 2025); *Huml v. Servis One, Inc.*, 2021 WL 6103544, at *3 (C.D. Cal. Oct. 15, 2021).  It is plausible that as Wayfarer's publicist, Jones was in a position to know the veracity of her statements at that time.

Accordingly, Plaintiff has stated a claim for defamation, and the Jones Parties' motion to dismiss Count IV is denied.[4]

---

[4] The Jones Parties argue in their motion to dismiss that they are entitled to attorneys' fees under New York's anti-SLAPP law on the premise that the complaint fails to state a claim for defamation.  Because the premise is faulty, the conclusion also is faulty.  Moreover, the Court notes that anti-SLAPP attorneys' fees are not available by motion in an action in federal court, and must be brought as a distinct cause of action. *See Wang v. Sussman*, 2025 WL 2607155, at *6 (S.D.N.Y. Sept. 9, 2025) (explaining that in order to pursue attorneys' fees under New York's anti-SLAPP law, a party is required to either "assert a counterclaim" or "file a follow-on case seeking fees"); *Merrill v. Onondaga Cty.*, 2026 WL 747093, at *6 (N.D.N.Y. Mar. 17, 2026); *Heilbut v. Cassava Sciences, Inc.*, 778 F. Supp. 3d 551, 567–69 (S.D.N.Y. 2025); *see also Brady v. NYP Holdings, Inc.*, 2022 WL 992631, at *11 (S.D.N.Y. Mar. 31, 2022)  (denying application for SLAPP sanctions made by way of motion).  The fact that Wayfarer's defamation claim has survived the Jones Parties' motion to dismiss does not preclude a future action for attorney's fees under New York's anti-SLAPP law if it is ultimately determined to be baseless.

**CONCLUSION**

The motion to dismiss is GRANTED IN PART and DENIED IN PART.  Counts I and II of the Counterclaims are dismissed with prejudice.  The motion to dismiss Counts III and IV is denied.  The Clerk of Court is respectfully directed to close Dkt. No. 53.


SO ORDERED.


Dated: March 26, 2026
      New York, New York                  LEWIS J. LIMAN
                                     United States District Judge