# Dkt. No. 158

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE JONES, JONESWORKS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10,<br><br>Defendants. | Civ. Action No. 1:25-cv-00779-LJL<br>rel. 1:24-cv-10049-LJL<br>(Consolidated for pretrial purposes with 1:25-cv-00449-LJL)<br><br>**DEFENDANT JENNIFER ABEL'S ANSWER TO COMPLAINT, SECOND AMENDED COUNTERCLAIMS, AND JURY TRIAL DEMAND** |

Defendant Jennifer Abel ("Abel" or "Defendant"), by and through her undersigned counsel, hereby answers, for herself alone and no others, the Complaint of Plaintiffs Stephanie Jones ("Jones") and Jonesworks LLC ("Jonesworks") (together with Jones, "Plaintiffs") as follows:

## THE COMPLAINT'S ALLEGATIONS

1. Answering the allegations in paragraph 1 of the Complaint, Defendant denies such allegations.

2. Answering the allegations in paragraph 2 of the Complaint, Defendant admits that Jones is engaged in the field of public relations; and that Jonesworks has represented Justin Baldoni ("Baldoni") and Wayfarer Studios LLC ("Wayfarer"). As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

3. Answering the allegations in paragraph 3 of the Complaint, Defendant admits that Baldoni produced, directed, and co-starred in the film *It Ends With Us* (the "Film"); that Defendant oversaw the Baldoni and Wayfarer accounts while employed at Jonesworks; and that Defendant

recommended the engagement of Melissa Nathan ("Nathan") for crisis public relations. As to all remaining allegations, Defendant denies such allegations.

4. Answering the allegations in paragraph 4 of the Complaint, Defendant admits the allegation that she received Nathan's communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

5. Answering the allegations in paragraph 5 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

6. Answering the allegations in paragraph 6 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

7. Answering the allegations in paragraph 7 of the Complaint, Defendant admits that she and Nathan were working to protect Baldoni from negative press attention; and that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

8. Answering the allegations in paragraph 8 of the Complaint, Defendant admits the allegation that she spoke with Katie Warren ("Warren") between July 30, 2024, and August 12, 2024; and that she sent communications containing the text set forth in that paragraph. Defendant

denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

9. Answering the allegations in paragraph 9 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

10. Answering the allegations in paragraph 10 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

11. Answering the allegations in paragraph 11 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

12. Answering the allegations in paragraph 12 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

13. Answering the allegations in paragraph 13 of the Complaint, Defendant denies such allegations.

14. Answering the allegations in paragraph 14 of the Complaint, Defendant denies such allegations.

15. Answering the allegations in paragraph 15 of the Complaint, Defendant states that no response is required because the allegations assert a legal conclusion, to the extent Plaintiffs allege that Defendant has defamed Jones. As to all remaining allegations, Defendant denies such allegations.

16. Answering the allegations in paragraph 16 of the Complaint, Defendant denies such allegations.

17. Answering the allegations in paragraph 17 of the Complaint, Defendant admits the allegation that Jonesworks is a Delaware limited liability company; and that it was founded in and has its principal place of business in New York, New York. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

18. Answering the allegations in paragraph 18 of the Complaint, Defendant admits such allegations.

19. Answering the allegations in paragraph 19 of the Complaint, Defendant admits the allegation that she resides in Beverly Hills, California; and that she was employed by Jonesworks from approximately July 2020 to August 2024. To the extent Plaintiffs allege that Abel was terminated for cause by Jonesworks, no response is required because the allegation asserts a legal conclusion. As to all remaining allegations, Defendant denies such allegations.

20. Answering the allegations in paragraph 20 of the Complaint, Defendant admits the allegation that Nathan offers crisis management and communications services. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

21. Answering the allegations in paragraph 21 of the Complaint, Defendant admits the allegation that Baldoni is a professional actor and director, and is a co-founder and co-chairman of Wayfarer; and that Baldoni was the director and co-star of the Film. Defendant denies that Baldoni was a producer of the Film and, as to all remaining allegations, lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

22. Answering the allegations in paragraph 22 of the Complaint, Defendant admits such allegations.

23. Answering the allegations in paragraph 23 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations except to the extent they merely state a legal conclusion and require no response.

24. Answering the allegations in paragraph 24 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

25. Answering the allegations in paragraph 25 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

26. Answering the allegations in paragraph 26 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

27. Answering the allegations in paragraph 27 of the Complaint, Defendant admits the allegation that Jones is engaged in the field of public relations and that Jones is the founder, president, and owner of Jonesworks. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

28. Answering the allegations in paragraph 28 of the Complaint, Defendant admits such allegations.

29. Answering the allegations in paragraph 29 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Abel NDA and its contents are characterized accurately in the Complaint.

30. Answering the allegations in paragraph 30 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Employment Agreement and its contents are characterized accurately in the Complaint.

31. Answering the allegations in paragraph 31 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Employment Agreement and its contents are characterized accurately in the Complaint.

32. Answering the allegations in paragraph 32 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

33. Answering the allegations in paragraph 33 of the Complaint, Defendant admits such allegations.

34. Answering the allegations in paragraph 34 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

35. Answering the allegations in paragraph 35 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

36. Answering the allegations in paragraph 36 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

37. Answering the allegations in paragraph 37 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

38. Answering the allegations in paragraph 38 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

39. Answering the allegations in paragraph 39 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations

in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

40. Answering the allegations in paragraph 40 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

41. Answering the allegations in paragraph 41 of the Complaint, Defendant admits that she worked on the Baldoni and Wayfarer accounts while employed at Jonesworks; and that she worked closely with Jamey Heath ("Heath"), who currently serves as Wayfarer's CEO. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

42. Answering the allegations in paragraph 42 of the Complaint, Defendant admits such allegations.

43. Answering the allegations in paragraph 43 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

44. Answering the allegations in paragraph 44 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

45. Answering the allegations in paragraph 45 of the Complaint, Defendant admits such allegations.

46. Answering the allegations in paragraph 46 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations.

47. Answering the allegations in paragraph 47 of the Complaint, Defendant admits that Baldoni began production on the adaptation of the Film in 2023; and that Baldoni was the director and male lead of the film. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

48. Answering the allegations in paragraph 48 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

49. Answering the allegations in paragraph 49 of the Complaint, Defendant admits that the Film was released in August 2024; and that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

50. Answering the allegations in paragraph 50 of the Complaint, Defendant denies such allegations.

51. Answering the allegations in paragraph 51 of the Complaint, Defendant denies such allegations.

52. Answering the allegations in paragraph 52 of the Complaint, Defendant admits the allegation that Baldoni was provided with the confidential scenario planning memorandum set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the document and its context are characterized accurately in the Complaint.

53. Answering the allegations in paragraph 53 of the Complaint, Defendant denies such allegations and specifically denies that the document and its context are characterized accurately in the Complaint.

54. Answering the allegations in paragraph 54 of the Complaint, Defendant admits the allegation that she sent a communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

55. Answering the allegations in paragraph 55 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph.

Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

56. Answering the allegations in paragraph 56 of the Complaint, Defendant denies such allegations.

57. Answering the allegations in paragraph 57 of the Complaint, Defendant denies such allegations.

58. Answering the allegations in paragraph 58 of the Complaint, Defendant denies such allegations.

59. Answering the allegations in paragraph 59 of the Complaint, Defendant admits the allegation that she received Tera Hanks's ("Hanks") communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

60. Answering the allegations in paragraph 60 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

61. Answering the allegations in paragraph 61 of the Complaint, Defendant denies such allegations.

62. Answering the allegations in paragraph 62 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

63. Answering the allegations in paragraph 63 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

64. Answering the allegations in paragraph 64 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

65. Answering the allegations in paragraph 65 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

66. Answering the allegations in paragraph 66 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

67. Answering the allegations in paragraph 67 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

68. Answering the allegations in paragraph 68 of the Complaint, Defendant admits that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

69. Answering the allegations in paragraph 69 of the Complaint, Defendant admits the allegation that she received Josh Greenstein's ("Greenstein") communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

70. Answering the allegations in paragraph 70 of the Complaint, Defendant admits that she denied being the source. Defendant denies all of the remaining allegations in this paragraph.

71. Answering the allegations in paragraph 71 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

72. Answering the allegations in paragraph 72 of the Complaint, Defendant admits the allegation that she received Heath's and Jones's communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

73. Answering the allegations in paragraph 73 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

74. Answering the allegations in paragraph 74 of the Complaint, Defendant admits that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

75. Answering the allegations in paragraph 75 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph.

Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

76. Answering the allegations in paragraph 76 of the Complaint, Defendant denies such allegations.

77. Answering the allegations in paragraph 77 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

78. Answering the allegations in paragraph 78 of the Complaint, Defendant admits the allegation that she spoke with Warren between July 30, 2024, and August 12, 2024. Defendant denies all of the remaining allegations in this paragraph.

79. Answering the allegations in paragraph 79 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

80. Answering the allegations in paragraph 80 of the Complaint, Defendant denies encouraging the client to terminate their contract with Jones or intentionally interfering with Jones' relationship with the client. As to the remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

81. Answering the allegations in paragraph 81 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

82. Answering the allegations in paragraph 82 of the Complaint, Defendant admits the allegation that she received Warren's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

83. Answering the allegations in paragraph 83 of the Complaint, Defendant admits such allegations.

84. Answering the allegations in paragraph 84 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

85. Answering the allegations in paragraph 85 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

86. Answering the allegations in paragraph 86 of the Complaint, Defendant admits the allegation that she received Warren's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communication and its context are characterized accurately in the Complaint.

87. Answering the allegations in paragraph 87 of the Complaint, Defendant admits that she texted a link to Nathan to the *Business Insider* article referenced in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

88. Answering the allegations in paragraph 88 of the Complaint, Defendant admits that *Business Insider* published the article cited in that paragraph. As to all remaining allegations,

Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

89. Answering the allegations in paragraph 89 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

90. Answering the allegations in paragraph 90 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

91. Answering the allegations in paragraph 91 of the Complaint, Defendant admits that *Business Insider* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

92. Answering the allegations in paragraph 92 of the Complaint, Defendant denies that she acted in concert with John Does 1-10. As to the remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

93. Answering the allegations in paragraph 93 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

94. Answering the allegations in paragraph 94 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

95. Answering the allegations in paragraph 95 of the Complaint, Defendant admits that she filed articles of organization with the State of California, Office of the Secretary of State, on or about July 19, 2024. Defendant denies all of the remaining allegations in the paragraph.

96. Answering the allegations in paragraph 96 of the Complaint, Defendant admits that she made a jennifer@rwacommunications.com email account but denies all of the remaining allegations in the paragraph.

97. Answering the allegations in paragraph 97 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

98. Answering the allegations in paragraph 98 of the Complaint, Defendant admits that Jonesworks disabled her access to Jonesworks' servers; and that she and Alicia Jessop ("Jessop") sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

99. Answering the allegations in paragraph 99 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

100. Answering the allegations in paragraph 100 of the Complaint, Defendant admits that she was terminated by Jonesworks on or about August 21, 2024. Defendant denies all of the remaining allegations in the paragraph.

101. Answering the allegations in paragraph 101 of the Complaint, Defendant denies such allegations.

102. Answering the allegations in paragraph 102 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

103. Answering the allegations in paragraph 103 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph and specifically denies that the communications and their context are characterized accurately in the Complaint.

104. Answering the allegations in paragraph 104 of the Complaint, Defendant denies such allegations.

105. Answering the allegations in paragraph 105 of the Complaint, Defendant denies such allegations.

106. Answering the allegations in paragraph 106 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

107. Answering the allegations in paragraph 107 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

108. Answering the allegations in paragraph 108 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

109. Answering the allegations in paragraph 109 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

110. Answering the allegations in paragraph 110 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

111. Answering the allegations in paragraph 111 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

112. Answering the allegations in paragraph 112 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

113. Answering the allegations in paragraph 113 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

114. Answering the allegations in paragraph 114 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

115. Answering the allegations in paragraph 115 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

116. Answering the allegations in paragraph 116 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

117. Answering the allegations in paragraph 117 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

118. Answering the allegations in paragraph 118 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

119. Answering the allegations in paragraph 119 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

120. Answering the allegations in paragraph 120 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

121. Answering the allegations in paragraph 121 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

122. Answering the allegations in paragraph 122 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

123. Answering the allegations in paragraph 123 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

124. Answering the allegations in paragraph 124 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

125. Answering the allegations in paragraph 125 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

126. Answering the allegations in paragraph 126 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

127. Answering the allegations in paragraph 127 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

128. Answering the allegations in paragraph 128 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

129. Answering the allegations in paragraph 129 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

130. Answering the allegations in paragraph 130 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

131. Answering the allegations in paragraph 131 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

132. Answering the allegations in paragraph 132 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

133. Answering the allegations in paragraph 133 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

134. Answering the allegations in paragraph 134 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

135. Answering the allegations in paragraph 135 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

136. Answering the allegations in paragraph 136 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

137. Answering the allegations in paragraph 137 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

138. Answering the allegations in paragraph 138 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

139. Answering the allegations in paragraph 139 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

140. Answering the allegations in paragraph 140 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

141. Answering the allegations in paragraph 141 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

142. Answering the allegations in paragraph 142 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

143. Answering the allegations in paragraph 143 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

144. Answering the allegations in paragraph 144 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

145. Answering the allegations in paragraph 145 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

146. Answering the allegations in paragraph 146 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

147. Answering the allegations in paragraph 147 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

148. Answering the allegations in paragraph 148 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

149. Answering the allegations in paragraph 149 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

150. Answering the allegations in paragraph 150 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

151. Answering the allegations in paragraph 151 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

152. Answering the allegations in paragraph 152 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

153. Answering the allegations in paragraph 153 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

154. Answering the allegations in paragraph 154 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

155. Answering the allegations in paragraph 155 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

156. Answering the allegations in paragraph 156 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

157. Answering the allegations in paragraph 157 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

158. Answering the allegations in paragraph 158 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

159. Answering the allegations in paragraph 159 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

160. Answering the allegations in paragraph 160 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

161. Answering the allegations in paragraph 161 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

162. Answering the allegations in paragraph 162 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

163. Answering the allegations in paragraph 163 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

164. Answering the allegations in paragraph 164 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

165. Answering the allegations in paragraph 165 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

166. Answering the allegations in paragraph 166 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

167. Answering paragraph 167 of the Complaint, the paragraph requires no response as it states relief sought and is not an allegation. To the extent the paragraph requires a response, Defendant denies.

168. Answering paragraph 168 of the Complaint, the paragraph requires no response as it states relief sought and is not an allegation. To the extent the paragraph requires a response, Defendant denies.

## AFFIRMATIVE AND OTHER DEFENSES

By alleging the following affirmative and other defenses, Defendant is not in any way agreeing or conceding that she has the burden of proof or burden of persuasion on any of these issues. As separate and distinct defenses to Plaintiffs' Complaint, and each purported cause of action contained therein, Defendant alleges as follows:

### FIRST DEFENSE

169. The Complaint, and each claim alleged therein, fails to state facts sufficient to constitute any claim for relief against Defendant.

### SECOND DEFENSE

170. The Complaint, and each claim alleged therein, is barred as Plaintiffs lack standing to sue.

### THIRD DEFENSE

171. The Complaint, and each claim alleged therein, is barred as Plaintiffs have waived their claims.

**FOURTH DEFENSE**

172. The Complaint, and each claim alleged therein, is barred as Plaintiffs are estopped from asserting their claims.

**FIFTH DEFENSE**

173. The Complaint, and each claim alleged therein, is barred as Plaintiffs acted and continue to act with unclean hands.

**SIXTH DEFENSE**

174. The Complaint, and each claim alleged therein, is barred as Plaintiffs have not been damaged in any way or at all as a result of any alleged acts or omissions of Defendant.

**SEVENTH DEFENSE**

175. The Complaint, and each claim alleged therein, is barred in whole or in part by the First Amendment of the Constitution of the United States of America.

**EIGHTH DEFENSE**

176. The Complaint, and each claim alleged therein, is barred by reason of Plaintiffs' consent.

**NINTH DEFENSE**

177. The Complaint, and each claim alleged therein, is barred as Plaintiffs have failed to undertake reasonable measures to mitigate the damages they claim to have incurred. Any recovery by Plaintiffs must be diminished to the extent that any alleged damages could have been avoided if such measures had been undertaken.

**TENTH DEFENSE**

178. Defendant is informed and believes, and on that basis alleges, that Plaintiffs would be unjustly enriched if recovery were to be had on this Complaint.

**ELEVENTH DEFENSE**

179. Plaintiffs have not been damaged in any amount alleged, or in any amount whatsoever, and are not entitled to any general, compensatory, statutory, punitive, or other damages or any other relief as a result of any of the allegations set forth in the Complaint.

**TWELFTH DEFENSE**

180. The acts and/or omissions of Plaintiffs excused any alleged act or alleged failure to act on the part of Defendant.

**THIRTEENTH DEFENSE**

181. If Defendant had any alleged obligations or legal dues, which Defendant hereby expressly denies, Defendant has appropriately, completely, and fully performed and discharged any alleged obligations and any alleged legal duties arising out of the matters alleged in the Complaint.

**FOURTEENTH DEFENSE**

182. The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the acts or omissions of individuals or entities other than Defendant. The acts and omissions of such other individuals or entities are superseding or intervening causes of loss or damages, if any, suffered by Plaintiffs. As a consequence thereof, Plaintiffs are barred from recovery against Defendant herein.

**FIFTEENTH DEFENSE**

183. The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the reckless, negligent, and wrongful conduct of individuals or entities other than Defendant. As a consequence thereof, Plaintiffs are barred from recovery herein.

**SIXTEENTH DEFENSE**

184. The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the intentional misconduct of individuals or entities other than Defendant. As a consequence thereof, Plaintiffs are barred from recovery herein.

**SEVENTEENTH DEFENSE**

185. The Complaint fails to state facts sufficient to permit an award of punitive damages, and any such award would violate due process.

**EIGHTEENTH DEFENSE**

186. The Complaint, and each and every cause of action alleged therein, fails to state any facts supporting any claim for punitive or exemplary damages.

**NINETEENTH DEFENSE**

187. The Complaint, and each and every cause of action alleged therein, is barred in whole or in part because at all material times, Defendant acted in good faith and without malice based upon all relevant facts and circumstances known by Defendant at the time.

**TWENTIETH DEFENSE**

188. Plaintiffs, and their agents, servants, and employees, have failed to bring the causes of action alleged in the Complaint in a timely manner and are therefore barred from recovery against Defendant, in whole or in part, by the equitable doctrine of laches.

**TWENTY-FIRST DEFENSE**

189. Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be solely based upon a derivative, vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of

others, and as such the legal liability of Defendant would be proximately caused by the acts or omissions of others and therefore Defendant is entitled to recover contribution from them.

**TWENTY-SECOND DEFENSE**

190. Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be based solely upon a derivative, vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of others, and as such the legal liability of Defendant would be proximately caused by acts or omissions of others and therefore, Defendant is entitled to recover total and complete implied and/or comparable indemnity from them.

**TWENTY-THIRD DEFENSE**

191. Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be based solely upon a derivative, vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of others, and as such the legal liability of Defendant would be proximately caused by acts or omissions of others and therefore, Defendant is entitled to recover total and complete equitable indemnity from them.

**TWENTY-FOURTH DEFENSE**

192. Any injury or damage to Plaintiffs, which Defendant specifically denies, was proximately caused by the negligence, recklessness, or intentional conduct of others who acted as one or more of the Plaintiffs' legal counsel, agents, or representatives. Accordingly, if any liability

is found on the part of Defendant, then Defendant's liability to Plaintiffs shall be reduced on the basis of comparative fault.

**TWENTY-FIFTH DEFENSE**

193. Any injury or damage to Plaintiffs, which Defendant specifically denies, was proximately caused by the negligence of Plaintiffs.

**TWENTY-SIXTH DEFENSE**

194. Plaintiffs' alleged damages are too speculative to permit recovery in this case.

**TWENTY-SEVENTH DEFENSE**

195. The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by the doctrine of *in pari delicto*.

**TWENTY-EIGHTH DEFENSE**

196. The Complaint, and each and every cause of action alleged against Defendant therein, fails to allege facts sufficient to allow recovery of attorneys' fees from Defendant.

**TWENTY-NINTH DEFENSE**

197. The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Labor Code Section 925.

**THIRTIETH DEFENSE**

198. The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Business & Professions Code Section 16600.

**THIRTY-FIRST DEFENSE**

199. The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Government Code Section 12964.5.

## RESERVATION OF ADDITIONAL DEFENSES

200. Defendant presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated affirmative or other defenses available. Defendant reserves the right to assert additional defenses in the event that discovery indicates they would be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Jennifer Abel prays for relief as follows:

1. That the Complaint be dismissed with prejudice, and Plaintiffs take nothing herein;
2. That judgment be entered in favor of Defendant and against Plaintiffs;
3. For costs of suit incurred in this action; and
4. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Defendant demands a jury trial on all causes of action so triable.

## COUNTERCLAIMS OF JENNIFER ABEL

Jennifer Abel ("Abel" or "Counterclaimant"), by and through undersigned counsel, as and for her second amended counterclaims against Stephanie Jones ("Jones") and Jonesworks LLC ("Jonesworks"), alleges as follows based on knowledge as to her own conduct and activities and on information and belief as to all other matters except where otherwise alleged:

## PARTIES

1. Defendant/Counterclaimant Jennifer Abel is, and at all times relevant was, an individual residing in Beverly Hills, California.

2. Plaintiff/Counterclaim-Defendant Stephanie Jones is, and at all times relevant was, an individual residing in Greenwich, Connecticut.

3. Plaintiff/Counterclaim-Defendant Jonesworks LLC is, and at all times relevant was, a Delaware limited liability company with its principal place of business in New York, New York. None of Jonesworks' members are citizens of California.

4. There exists, and at all times herein mentioned there existed, a unity of interest between Jonesworks and Jones such that any individuality and separateness has ceased, and Jonesworks is the alter ego of Jones.

5. At all relevant times herein, each of Jones and Jonesworks was the agent, servant, employee, employer, joint-venturer, partner, and/or alter ego of the other and was at all times operating and acting within the purpose and scope of said agency, service, employment, joint venture, partnership, and/or alter ego. Each of Jones and Jonesworks has rendered substantial assistance and encouragement to the other, acting in concert knowing that her/its conduct was wrongful and/or unlawful, and each of Jones and Jonesworks has ratified and approved the acts of the other.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over the claims for relief asserted in this counterclaim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no Counterclaim-Defendant is a citizen of the same state as Counterclaimant. This Court also has supplemental jurisdiction over the claims for relief asserted in this counterclaim pursuant to 28 U.S.C. § 1367(a) because such claims are so related to claims in the action that they form part of the same case or controversy under Article III of the U.S. Constitution.

7. This Court may exercise personal jurisdiction over the Counterclaim-Defendants pursuant to Section 301 of the New York Civil Practice Law and Rules because all of them systemically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York.

8. This Court may exercise personal jurisdiction over the Counterclaim-Defendants pursuant to CPLR 302 because all of them transact and solicit business within the State of New York and have committed the tortious acts described herein within the State of New York.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Counterclaim-Defendants are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

10. Jonesworks is a well-known New York-based public relations firm founded by Stephanie Jones, who serves as its CEO.

11. Long known within the public relations industry for her disarming Southern twang, brass-knuckle tactics, and high turnover of clients and employees, Stephanie Jones has had a

successful career in the entertainment industry. Her firm, Jonesworks, has represented, at various times, Dwayne "The Rock" Johnson, Jeff Bezos, Lauren Sanchez, Venus Williams, Tom Brady, and Chris Hemsworth.

12. Jones is married to Jason Hodes ("Hodes"), a partner at William Morris Endeavor ("WME"), Hollywood's most powerful talent agency. Between her perch atop Jonesworks and his partnership at WME, Jones and Hodes are a bona fide Hollywood power couple.

13. When Jones poached Jennifer Abel, Abel was an up-and-coming star publicist at R&CPMK, a storied 70-year-old public relations arm of Interpublic Group, a 53,000-employee publicly-traded multinational marketing behemoth. At the time of her departure from R&CPMK, Abel had worked there for nearly 12 years and held the title of Vice President.

14. In or around late spring 2020, at the height of the COVID-19 pandemic, Jones, through a recruiter, reached out to Abel via LinkedIn about joining Jonesworks. Although Abel was content at R&CPMK and not actively looking for a new job, Jones offered her a higher salary and, critically, the opportunity to lead her own team.

15. When Abel announced her intention to join Jonesworks, she was met with a parade of concern from across her professional network. An array of well-respected public relations professionals from across the entertainment industry reached out to Abel to caution her against working for Stephanie Jones. Jones, they warned, had a well-deserved reputation for treating people horribly. Jones had recently become embroiled in a dispute with another public relations firm for stealing its clients using deceptive and unscrupulous means.

16. Excited by the new opportunity and not personally familiar with Jones or Jonesworks, Abel decided to make the jump in spite of the admonitions from her peers.

17. On or about July 9, 2020, Abel was hired by Jonesworks as Vice President. Her

mandate was to oversee Jonesworks' talent department and grow its nascent Los Angeles office, which at the time had only four employees.

18. In connection with and as a condition of her employment, Abel signed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "2020 Employment Agreement").

19. Abel was not represented by counsel in connection with the negotiation or execution of the 2020 Employment Agreement.

20. The 2020 Employment Agreement provided that Abel was an "at-will" employee whose employment was "exclusive" to Jonesworks during the period of her employment. It also contained a confidentiality clause pursuant to which Abel was required to maintain the confidentiality of and not disclose "Confidential Information," as the term is (expansively) defined therein, provisions purporting to restrict Abel's ability to speak truthfully about her experiences at Jonesworks, and a host of restrictive covenants, including non-competition and non-solicitation covenants.

21. The 2020 Employment Agreement also contained a California choice of law provision providing that "[it] has been made and shall be interpreted in accordance with the laws of the State of California without regard to conflicts of law principles."

22. Within a few weeks of Abel's onboarding, Jonesworks faced a mass exodus of employees in its New York office. While Abel was understandably concerned, Jones assured her that all the departing employees were "horrible" at their jobs and would be fired regardless. Little did Abel know that turnover of that magnitude was typical at Jonesworks, which routinely faced large-scale departures by disgruntled and demoralized employees. What Abel quickly realized was that morale amongst Jonesworks employees was outright abysmal, that such departures were

invariably acrimonious, and that departing employees and current employees alike were extremely tight-lipped and fearful of discussing their experience at Jonesworks.

23. Abel observed that morale among Jonesworks employees was inversely correlated with physical proximity to Jones. Thus, the Los Angeles office was generally a more positive environment than the New York office.

24. Abel was also surprised to learn that, despite its size, Jonesworks lacked any human resources department or dedicated human resources personnel. Jones instead relied on business affairs personnel and her various chiefs of staff to handle any personnel-related matters. In part due to the lack of a human resources department or grievance reporting structure and fear of backlash from Jones, Jonesworks had a toxic workplace culture in which employees, lacking an outlet or meaningful recourse, constantly gossiped and complained amongst themselves and leaned on senior employees for solutions to workplace issues.

25. Unlike most workplaces, Jonesworks also lacked written internal policies, including regarding the usage of electronic devices, or an employee handbook. At no point during Abel's employment did she see, hear about, or sign anything of the sort. The only terms governing Abel's employment were those set forth in her employment agreements.

26. Because public relations jobs require extensive mobile phone usage, public relations firms often assume the costs of their employees' phones and phone usage. Jonesworks was no exception. While Abel had an Android, Jones offered to switch her to a Jonesworks-issued iPhone, which required that she "port" her existing, long-time phone number to the Jonesworks company phone plan. Abel had no problem with this, so long as she could retain ownership of her phone number and bring it with her should she leave Jonesworks. Although Jonesworks owned the physical device, it was configured with Abel's personal Apple ID and populated with all of her

personal email accounts, photos, text messages, third-party apps, etc. Abel had no concerns about using her Jonesworks-issued cell phone freely and as her sole mobile device, as such practices are common in her industry (where pay can be low), and neither Jones nor anyone else at Jonesworks advised her against doing so. Jonesworks did not have any internal policies that prohibited such use, gave it the right to monitor such use, or divested employees of a reasonable expectation of privacy in relation to such use. Thus, Abel had no reason whatsoever to believe that Jonesworks' ownership of the physical device would, or could, in any way compromise her right to privacy in the personal data or accounts stored on or accessible from it. Jonesworks would not have any right to access or monitor, for example, her personal email accounts, text messages, photos, or bank accounts. In addition, Abel separately paid for additional storage for her personal data.

27. Notwithstanding the continued large-scale departures from the Jonesworks New York office, Abel quickly became a leader of the California operation. Within two years, Abel had grown the Los Angeles headcount from four employees to 12. All the while, Abel wore an array of hats, working tirelessly without a commensurate increase in compensation.

28. On or about November 22, 2021, Jonesworks required Abel to enter into a modified employment agreement (the "2021 Employment Agreement") changing her employment from at-will to a contractual term, adjusting her title and compensation, and subjecting her to a variety of novel restrictions intended to deter her from leaving Jonesworks and inhibiting her ability to remain in her chosen field if she were to do so.

29. Abel was not represented by counsel in connection with the negotiation or execution of the 2021 Employment Agreement.

30. The 2021 Employment Agreement, like its predecessor, contained an expansively drafted confidentiality provision as well as a host of restrictive covenants, including non-

competition and non-solicitation covenants.

31. Unlike the 2020 Employment Agreement, the 2021 Employment Agreement contained a New York choice of law provision providing as follows: "This Agreement and the performance of the Parties' obligations hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles."

32. At all times during Abel's employment at Jonesworks, Abel was a resident of the County of Los Angeles, State of California; was based out of Jonesworks' Los Angeles office; and performed the overwhelming majority of her work within the State of California. Abel has lived and worked in California for the entirety of her adult life. Since graduating from college, Abel has maintained virtually no connection to the State of New York. She has not lived there, maintained a residence there, performed any significant amount of work there, or even traveled there more than a handful of times. She was, at all times, a California resident and California employee entitled to the protections of the laws of the State of California. Apart from infrequent business travel, Abel performed no work for Jonesworks in the State of New York.

33. It is clear that Jonesworks required Abel to agree to a New York choice of law provision because it wanted the ability to bind her to restrictive covenants, such as non-competition and non-solicitation covenants, that would be void *ab initio* in California and to deprive Abel of the protections of California substantive law.

34. By Abel's second year, Jones appeared to be deteriorating. Abel began to harbor increasing concerns about Jones' mental stability and ability to manage client and employee relations.

35. At around this time, Jones started making FaceTime calls to Abel and other employees at notably odd hours. Jones' communications frequently tracked through the night and

into the next morning, suggesting that she had not been sleeping at all. Concurrently (and likely relatedly), Jones became noticeably more paranoid and irascible, often accusing Abel and others of plotting against her. It became more challenging to communicate with Jones, settle her nerves, or even track her train of thought.

36. Due to extremely draconian NDAs, Jones' threats, and the climate of fear pervading (past and present) Jonesworks employees and clients alike, Jones' worst excesses were largely hidden from view until in or around May 2024, when *Puck* reported that Sanchez and Johnson had dropped Jones as their publicist. While these were among the most prominent and publicly reported departures, a cascade of Jonesworks clients began cutting ties with Jones, especially after word spread that *Business Insider* was contacting Jones' former and current clients and employees about a forthcoming article about her sordid behavior.

37. On May 8, 2024, a website called "Stephanie Jones Leaks" went live, along with an X.com account, a Facebook page, a Reddit account, and a Pinterest page. These platforms disclosed a litany of alarming allegations about Jones' behavior and business practices, many concerning Jones' mistreatment of Jonesworks employees and clients.

38. Abel had no involvement of any kind in "Stephanie Jones Leaks."

39. These revelations caused a firestorm in Hollywood, resulting in a surge of negative publicity regarding Jones, including the publication of the *Business Insider* piece entitled "Who's Afraid of Stephanie Jones." *See* Katie Warren and Jack Newsham, "Who's Afraid of Stephanie Jones," *Business Insider* (Aug. 17, 2024), https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos.

40. Abel was not responsible for the *Business Insider* piece and learned of it for the first time from Jones herself in or around late May or early June 2024.

41. The *Business Insider* piece shed more light on the real Jones. Always a volatile personality, Jones had become noticeably more paranoid, erratic, and cruel in recent years.

42. The *Business Insider* story also shed light on the toxic workplace Jones had fostered at Jonesworks. At the office, Jones would regularly turn on deafening music so that she could berate her employees free from scrutiny. "I don't think there was one day in the office that someone wasn't crying," said a former employee.

43. Jones also pried into her employees' private lives without invitation. As detailed by *Business Insider*, when employees called in sick, Jones would FaceTime them to confirm they were actually sick. In at least one instance, an employee who had taken a personal day to attend a funeral received a FaceTime call from Jones during the ceremony. Jones was apparently suspicious of his whereabouts.

44. As discussed above but disclosed publicly by *Business Insider*, turnover rates at Jonesworks were extraordinary. These departures included not only junior employees—who often left after less than a year—but also senior executives who managed client accounts. Jones seldom allowed them to go amicably, often enlisting attorneys to threaten and intimidate them into agreeing not to disparage Jones.

45. In April 2023, Dwayne "The Rock" Johnson dropped Jonesworks after clashes between Jones and Johnson's team. Jonesworks had handled Johnson's personal PR, as well as that of his production company, tequila brand, clothing company, and business partner, Dany Garcia. This was a big loss for Jones and one that she kept under wraps from the media in order to leverage opportunities for other clients. In the following months, Jones was also dropped by Bezos, Sanchez, Lainey Wilson, Chris Hemsworth, Wheels Up, Ocean Spray, and Partake Foods.

46. Through it all, Abel remained loyal to Jones, sticking with her through thick and

thin despite growing doubts about Jones' ability to function professionally.

47. By 2024, however, Jones had become increasingly embittered and hostile towards Abel. Jones frequently criticized Abel's management, manifested extreme paranoia about Abel's close relationships with clients and partners, and went out of her way to reprimand, demean, and embarrass Abel in front of junior employees she oversaw.

48. Over time, Abel's concern about Jones' obvious downward spiral was heightened by the reality that there was no bottom in sight. In the final months of Abel's tenure, Jones had become even more erratic, clearly not sleeping, calling at all hours of the night in a frenzied state, senselessly pitting her own employees against each other, focusing her energy on "catching" employees in perceived acts of disloyalty, lowering morale still further, and torching her relationships with remaining Jonesworks clients.

49. Although Jones had always been volatile, she now appeared to be actively unraveling. Abel was frequently on the receiving end of her (often bizarre) outbursts. In one instance, Jones announced to Abel's subordinates that she had learned through psychic readings that Abel was an alcoholic and a gambling addict. Even if these statements were true, Jones' public announcement would be (at best) highly inappropriate. Here, however, the accusations are not remotely true! They have literally no basis in reality, and the employees to whom Jones made her pronouncement were well aware of that. While Jones presumably intended to undermine Abel's credibility, she had actually significantly undermined her own and raised alarm about whether Jones was in the midst of a mental breakdown. On a different occasion, Jones announced, again per her psychic, that Abel would soon be pregnant with twins, humiliating and infuriating Abel, who—Jones knew—had struggled with fertility issues.

50. Abel was also disgusted by Jones' pattern and practice of creating fake social media

accounts to troll former employees and journalists she deemed hostile, including *Puck*'s Matt Belloni. Jones was obsessed with Belloni, in particular. Abel also witnessed Jones working with journalists to plant and contribute to negative stories about former Jonesworks clients who had fired Jonesworks/Jones.

51. When Abel requested that Jonesworks offer its Los Angeles employees a modest 2% cost-of-living raise, Jones—who spent obscene amounts of Jonesworks money on lunches, champagne, and manicures—told her that if that were to happen, it would have to come from Abel's paycheck.

52. Already pushed to the brink, Abel finally had enough when Jones demanded she corroborate falsified accusations about a senior Jonesworks employee in an effort to drive him out. When Abel refused to go along with it, Jones responded with mockery, calling her a "12-year-old drama queen."

53. On or about July 10, 2024, Abel notified Jones of her departure from Jonesworks. Abel later confirmed her decision on July 26, 2024, and communicated her intention to start her own business. Abel offered a six-week transition period ending on August 23, 2024, which Jonesworks accepted.

54. On August 7, 2024, Abel contacted Jones' chief of staff, Gordon Duren ("Duren"), to coordinate the release of her phone number, as Jones had promised when Abel had first joined Jonesworks several years before. Duren agreed, stating: "Regarding your phone [number] we can give it back to you your last week."

55. Jones and Jonesworks knew that Abel had used the same phone number since high school and used the phone for both personal matters and business. She used the phone to exchange personal text messages with friends and family, personal photographs, and confidential financial

data.

56. At no point during her tenure did Abel consent to allowing Jonesworks to access, review, or monitor the contents of the phone. Jonesworks did not have a policy in place giving it the right to do so. Abel's willingness to let Jonesworks port her personal cell phone number to its Verizon phone plan when she joined Jonesworks was predicated on her reasonable expectation that she would retain sole and exclusive access to its contents and her private data and accounts. Had there been any reason to believe otherwise, Abel would not have agreed to the arrangement.

57. In early August 2024, Jones directed Duren to investigate how to gain access to Abel's text messages and call history on her telephone from Jonesworks' provider, Verizon. Duren was only able to obtain Abel's call and text logs for the prior six months.

58. Jones instructed Duren to make sure that Abel could not port her phone number away from the Jonesworks plan without Jonesworks' permission.

59. By mid-August 2024, Jones had hatched a plan to seize Abel's phone outright. She sent Duren to California on August 19, 2024, and set the plan in motion.

***Jones and Jonesworks Steal All of Abel's Private Data and Communications***

60. On August 21, 2024, two days before Abel's last scheduled day of employment, Duren, a security guard, a forensic data technician employed by Edgeworth Security Services ("Edgeworth"), and an attorney with Frankfurt Kurnit Klein & Selz, LLP confronted Abel at Jonesworks' Beverly Hills office to terminate her Jonesworks employment early.

61. Jones had insisted on a security presence so they could "take" Abel's phone, which Jones suspected she would refuse to turn over. "She is not going to hand over her cell" warned Jones. "You'll need to grab it[.]" Duren later testified that he would have called the Beverly Hills Police Department if Abel had not complied.

62. During the August 21 meeting, Duren demanded that Abel hand over her phone and provide her passcode. In a ruse to induce Abel's compliance, Duren falsely claimed that Jonesworks needed the passcode to facilitate the release of the phone number and reset the phone. Believing Duren's representations and intimidated by the presence of a large security guard, an attorney, and a forensic data technician, Abel complied with the demands.

63. Abel did not consent to, and was not asked to consent to, a search of the iPhone's contents. Abel had no reason to believe Jonesworks would attempt to access her personal data, or she would not have turned the device over without making prior arrangements to secure it.

64. Abel sought and received express confirmation from Duren and the Jonesworks attorney that her phone number would be released immediately thereafter. After handing her iPhone to the Jonesworks attorney, Abel was escorted out of the office by the security guard.

65. Abel went directly to a nearby Verizon store and called Duren with the Verizon representative to coordinate the transfer of her phone number. Duren told Abel that Jonesworks had commenced the transfer and would call back. After four hours of waiting, Abel left the Verizon store in panic and despair. She never heard from him again. Jonesworks never released the phone number.

66. Through their promise to release Abel's number upon her (August 23, 2024) departure, Jonesworks had lulled Abel into a false sense of security. Believing she had two days remaining, Abel had not taken any steps to remove her personal data and information from the iPhone. When she arrived at the office on August 21, she did so with a fully loaded personal iPhone—logged into all of her accounts, registered to her iCloud, and containing all of her photos, text messages, and emails.

67. By refusing to release Abel's phone number, Jonesworks usurped Abel's digital

identity and cut off her access to critical accounts protected by two-factor authentication. As a result, Abel lost access to bank accounts, utilities, insurance, and virtually every other sensitive account. In effect, Jones had orchestrated a wholesale theft of Abel's phone number and personal data. It took months of endless phone calls and in-person visits for Abel to regain access to her checking and savings accounts, credit cards, investment and retirement accounts, as well as her internet, gas, and electricity accounts. In fact, Abel still does not have access to her Empower 401(k) account. She also lost 20 years of contacts, including those of her old friends, former clients and colleagues, and extended family. Abel had to reset all her airline loyalty, rideshare, and food-delivery accounts. And for each social media account, Abel had to go through an arduous identity verification process. In short, it was a nightmare.

68. By contrast, Jones gained unrestricted access to everything stored on Abel's phone—her text messages, emails, and personal photos. Jones could read her communications with her fiancé, parents, friends—everyone. To ensure she would retain Abel's data under any eventuality, Jones directed Edgeworth, her digital forensics contractor, to download "everything" off the phone, including the contents of all Abel's messaging apps. Jones received a share link and a flash drive of this data to peruse and exploit at will.

69. The next day, using her new phone number, Abel begged Duren and Jones to relent.

[redacted] Jennifer Abel (Owner)
Steph, Gordon— this is Jen Abel. My new cell. I'm writing you both as a personal plea to please release my cell phone number. This is the same number I've had since high school. This isn't a work related thing, this is my personal number that is linked to all of my bills, my medical, Chris's dads living facility, all of my personal emails and accounts and due to two factor authentication I can't access anything. Gordon, you wrote me numerous times you were going to release this and then when Verizon was calling you during the four hours I was there yesterday you never picked up. They said you never even started the process after you told me you did. The lawyer I was ambushed with yesterday even said this was fine to do. I've been nothing but good to you both but this is just mean and egregious and I'm begging you to please release it before I travel tomorrow. Please. You have no use for a 904 number that has been my personal number before you took on the billing. It takes one phone call. Please. 🙏
8/22/2024 9:50:00 AM

70. After usurping control of Abel's private communications, Jones began exploiting them to harm Abel further. Specifically, Jones scoured Abel's text messages to find instances where Abel had (privately) been critical of or gossiped about any former Jonesworks colleagues and shared them with those individuals and others. As a result, Abel saw long-term professional and personal relationships fracture.

[redacted] Jennifer Abel (Owner)
Just know that whatever she is telling you guys about me, or what I've done, it's not true. I've enjoyed working with you both and wish you nothing but the best. ❤
8/29/2024 2:39:16 PM

[redacted] Former Jonesworks Colleague
Unfortunately your company phone says otherwise.
8/29/2024 2:49:49 PM

71. Jonesworks' senior executives were positively gleeful as they watched Abel's

closest colleagues turn against her.

72. Among the communications reviewed, discussed, and disseminated by Jones and her cohorts were highly intimate messages between Abel and her friends about their sex lives. One particular exchange between Abel and her best friend and attorney was used as a deposition exhibit in this case. This exchange, along with many others of a similar personal nature, are no longer in the exclusive possession, custody, and control of Abel and those she intended to communicate with, as they should have remained; instead, they were widely distributed by Jones to her team, to Lively, to the press, and to untold others and ultimately Bates stamped and captured for posterity in this and the related litigation.

73. Also stolen by Jones were Abel's communications with her long-term partner and fiancé, as well as her parents. These include discussions between Abel and her fiancé about Abel's fertility, and between Abel and her parents about her mother's serious health challenges. Some of these messages—which Abel does not even have due to the theft of her phone number—were produced by Jonesworks in this litigation. Reams of other sensitive messages were excluded from Jonesworks' document production but clearly are or at least were in Jones' possession. This cannot be reasonably disputed, given that Jones directed her digital forensics team to copy Abel's phone in its entirety, which they did. Based on the evidence thus far in this case, Jones closely—even maniacally—inspected these materials. In so doing, Jones attained unvarnished visibility into the most sensitive and private aspects of Abel's life: her fertility struggles, her fiancé's father's neurological decline, and her financial situation. Jones also obtained all of Abel's personal photos, which run the gamut in subject matter but were (almost) invariably not intended for the consumption of Jones, Lively, or any other hostile actors.

74. Not only did Jones steal communications of a personal nature, but she also stole

privileged communications between Abel and Jessop regarding Abel's new business. Jones did so knowing full well that Jessop was Abel's attorney. Duren explicitly informed Jones of the attorney-client relationship no later than August 9, 2024. That was all the more enticing to Jones, who directed Duren to delve deeper.

75. In sum, Abel was subjected to a boundless and disgraceful invasion of her privacy by Jones and Jonesworks. She has been left aghast, humiliated, and terrified.

76. Having torched Abel's privacy and dignity, Jones started boasting internally that Abel's business would not last long.

***The Wayfarer/Baldoni Account***

77. For almost four years, Abel largely managed Jonesworks' work for Wayfarer Studios and Justin Baldoni out of its Los Angeles office. Over time, Abel developed a close, trusting relationship with Baldoni, Wayfarer CEO Jamey Heath, and the rest of the Wayfarer team, particularly as their strategic communications needs around *It Ends With Us* became increasingly complex.

78. At all times during Wayfarer's four-year engagement with Jonesworks, Abel was the point person on the account. It was very clear to Wayfarer—and Jones largely did not hide—that Jones considered them to be a "lower prestige" client and devoted her attention to clients such as Jeff Bezos and Tom Brady.

79. But Jonesworks was in utter turmoil by July 2024. Already bleeding clients and personnel, Jones learned that *Business Insider* was working on an unflattering story about her set to be published sometime in August. Jones felt that her reputation had been severely damaged by the "Stephanie Jones Leaks" website and social media accounts. Jones was desperate to keep her remaining clients.

80. At the time, Wayfarer and Baldoni were in the midst of a massive PR crisis, as news stories began to trickle out speculating about possible tension between Lively and Baldoni (mainly due to the cast no longer following him on social media) just as the Film was about to premiere. Jones started participating in meetings, calls, and written correspondence to reassert her authority over the account and convey her engagement to Wayfarer.

81. Wayfarer and Baldoni asked Abel to recommend a crisis management specialist. After consulting with Jones, who had no viable ideas, Abel recommended three firms to help navigate these choppy waters, one of which was Melissa Nathan's The Agency Group PR LLC. Abel had particular confidence in Nathan, as they had worked together extensively in connection with a different Jonesworks client. The need for crisis PR expertise was particularly acute due to Lively's demand that Baldoni not be permitted to attend the premiere and the threat that Baldoni would be excluded from the press junket with the rest of the cast. Abel learned during her initial discussion with Nathan that, per her media contacts, a negative story was already being "shopped" around to multiple outlets, positioning Baldoni's religion as a "cult" and accusing Baldoni of having "fat shamed" Lively after he asked her personal trainer in private about her weight due to his history of severe back pain.

82. Even though Abel felt strongly that Nathan was the right choice, she knew that Jones would be unhappy with the recommendation. Jones viewed Nathan as a competitor and had a history of bad-mouthing her to anyone who would listen, including to Nathan's own clients. Out of sensitivity to these considerations, Abel advised the Wayfarer team to remain open to other possible options and to decide after meeting Nathan themselves. Abel feared backlash from Jones but felt strongly that Nathan was the best option. When Jones learned that Wayfarer was considering retaining Nathan, she was furious and immediately lashed out at Abel, pressuring her

to disparage Nathan as a demonstration of loyalty to Jones. After initially pushing back, Abel eventually relented after Jones called her, crying and screaming, and engaged in some "light" disparagement of Nathan to placate Jones. Jones then attempted to derail the engagement and exploited confidential client information to dissuade Wayfarer from moving forward with Nathan.

83. While Heath, Wayfarer's CEO, acknowledged Jones' position, he told her Wayfarer would make its own decision after meeting Nathan.

84. Jones inserted herself into the mix in early August 2024, seeking to box out Nathan and Abel. The problem, however, was that Jones had chosen not to pay attention to Wayfarer leadership's communications strategy or internal decision-making, having long claimed to be too busy with higher-profile clients. Wayfarer was fine with Jones' disengagement, as Abel was their trusted advisor, and they had no interest in being a pawn in Jonesworks office politics. In addition, Jones chose to take a lengthy vacation in Europe during this critical period of the press campaign and premiere of the Film. Even from afar, Jones' efforts were ham-fisted, unwelcome, and sporadic given her distance from Wayfarer's day-to-day business. As Jones tried to stir up drama and undermine Abel's authority, Wayfarer and Baldoni focused solely on managing the crisis at hand.

85. Notwithstanding Jones' general disengagement, it is not true that she was kept in the dark. To the extent she was out of the loop, it was by choice. Jones was copied on virtually all communications during this period and was privy to Wayfarer's predicament and its chosen strategy of non-confrontation. Had there been a "smear campaign," as was later alleged by her and the Lively Parties,[1] Jones would undoubtedly have known about it in real time. "I have been deeply involved in strategy, planning, account management and high level PR and media comms as well as crisis[,]" admitted Jones in an email on August 21, 2024.

[1] Blake Lively, Ryan Reynolds, Leslie Sloane, and Vision PR.

86. At the time, Lively's and Baldoni's teams had negotiated an uneasy truce in which neither side would participate in negative coverage of the other. Lively's team had already broken that truce, but the Wayfarer team did not know that then. As far as they were concerned, it was best for Baldoni, Lively, and the Film if both sides agreed to keep the peace, though Wayfarer's team had to date been acting only defensively in responding to press inquiries.

87. But on August 8, 2024, Jones, in another desperate attempt to re-insert herself, contacted a *Daily Mail* reporter about a story they had published about Baldoni and Lively. She did so in direct violation of Wayfarer's instruction not to talk to the press, given the truce with Lively's team. Nonetheless, Jones bragged to Wayfarer about "trading calls" with the *Daily Mail* in an effort to appear engaged on the account. Nathan and Abel were left to deal with the fallout.

88. This blatant disregard of Wayfarer's strategy sparked a chain of unfortunate developments. Sloane and Sony learned that, purportedly, "someone from Baldoni's team had been communicating negatively to media." The *Daily Mail* later confirmed to Leslie Sloane that it was Jones. When Wayfarer's leadership found out, they were livid. As was Sony. All parties were desperate to prevent an all-out slugfest between Lively and Baldoni just as the Film was about to be released to the world. With her reckless and unauthorized activities, Jones had made that scenario much more likely. In response, Wayfarer instructed Jones to cease all activities on its and Baldoni's behalf for the time being and to let Abel and another Los Angeles-based Jonesworks employee, Matthew Mitchell, handle the crisis alongside Nathan.

89. At this time, Nathan started hearing from other journalists that Sloane was planting negative stories about Baldoni and was under the impression that Baldoni's camp had broken the truce. Anxious Sony executives began reaching out to Wayfarer seeking clarity.

90. Yet Jones, panicked about being blamed, refused to be sidelined, insisting that she

*needed* to contact Sony's and Lively's PR teams to clarify that she had not planted any negative stories about Lively. Heath told her not to do that, to which Jones responded that she could do "whatever she wants" to clear her name and that Wayfarer could not stop her from making calls. Desperate to salvage her reputation with Lively and Sony, Jones emailed several key Sony executives working on the Film to declare that she was in Europe with "her husband, partner at WME Jason Hodes" and to place all blame on "her team." In her attempt to save face, Jones ruptured her relationship with Wayfarer and Baldoni.

91. Although Jones ultimately agreed to stand down, Wayfarer and Baldoni expressed that they had lost all trust in her. After parachuting in for self-interested reasons, nearly blowing up the truce with Lively's team, and lashing out when told to stop, Jones became a magnet for drama when it was least needed.

92. As September drew near, Wayfarer and Baldoni—with the assistance of Abel and Nathan—continued their tireless efforts to promote the Film, put out fires, and see the project through to the finish line. Stewing in jealousy towards Abel and resentment towards Wayfarer/Baldoni, Jones clearly saw the writing on the wall. Knowing she would soon be terminated, Jones started taking steps transparently intended to make it harder to cut her loose. Those steps included sending email after unwelcome email to Heath and others—long after their relationship had irrevocably ruptured—to lay the groundwork to contest that she had been detached and nonresponsive for years. This was especially galling, as Jones had been in Europe and largely incommunicado—save for a few texts of support to Baldoni prior to the premiere and then her disastrous efforts at self-preservation—for weeks during the critical month of August when the Film premiered.

93. In contrast with Abel, who was loyal, trusted, and even-tempered while working

around the clock through the crisis, Jones was a walking disaster whose self-absorption, disloyalty, and insubordination had become a significant headache.

94. Rather than accept the end of the Wayfarer relationship with professionalism and decorum, Jones started threatening to sue, demanding exorbitant payment for work not done, and protesting that she had done an amazing job.

95. Jones stewed in resentment and indignity, unable to bear the loss of another Jonesworks client. She set out to take revenge on Abel, Wayfarer, Baldoni, and Nathan.

96. Jones disclosed at least some of Abel's private communications to the Lively Parties no later than August 21, 2024. Sloane, Lively's publicist, confirmed as much to Nathan on a phone call that evening. Despite lacking Abel's consent to access, review, or disseminate these communications, Jones and Jonesworks were able to do so without difficulty because, with the iPhone in hand, they could bypass the password protection that would otherwise bar their access.

97. On or about August 24, 2024, Jones took things a step further and attempted to contact Lively directly through a mutual connection, stylist Ashley Avignone. Jones told Avignone that she was sick of waiting for Sloane to follow up with her and complained that she was being "framed for putting out bad information about [Lively]." A few days later, Jones again reached out to Avignone, reiterating that she still had not heard back from Sloane and wanted to set the record straight as soon as possible. Avignone then connected Jones and Lively directly. In advance of the call, Avignone advised Lively that she had been in contact with a publicist client who represented Baldoni and Wayfarer and had "information."

98. Reeling from a storm of negative publicity, Lively instructed Avignone to connect her with Jones. Lively and Jones spoke by phone approximately a week later. Jones told Lively that she was being "framed" by an "ex-employee" who had conspired against them both. A few

days later, Lively followed up with Avignone, asking whether she had heard from Jones and what the next steps were. Avignone connected them once more, then removed herself from the situation. However, it is now well known that Jones transmitted the contents of Abel's iPhone to Lively, who in turn disseminated them more widely, including to the *New York Times*.

99. While the contents of Abel's communications do not support the existence of an "untraceable smear campaign," they do show that by the time of the Film's premiere, Abel and others in Wayfarer's circle held Lively in deep disdain and vented acerbically amongst themselves. These sentiments were the natural result of the Wayfarer Parties' first-hand knowledge of Lively's vicious behavior and malignant persona and the high-stress situation in which they found themselves.

100. In turning over these materials to Lively, Jones knew full well how they would be used. With slicing, dicing, cherry-picking, massaging, and in some cases outright alteration, the Lively Parties exploited Abel's text messages to great effect. Joining forces with the *New York Times*, the Lively Parties commissioned the hit.

101. However, for different reasons, the Lively Parties, on the one hand, and Jones and Jonesworks, on the other hand, needed to create a veneer of legitimacy. The Lively Parties likely anticipated—or were told directly—that the *New York Times* would not traffic in stolen communications under these circumstances and needed the color of law. Jones and Jonesworks, for their part, wanted to insulate themselves from legal exposure to Wayfarer for breaches of confidentiality.

102. Accordingly, on September 27, 2024, working hand in glove with Jones and Jonesworks, the Lively Parties and their counsel at Manatt, Phelps & Phillips, LLP ("Manatt") initiated a sham legal proceeding in New York state court, *Vanzan, Inc. v. Does 1-10, inclusive*,

Index No. 655130/2024. The sham lawsuit was nothing more than a transparent ploy to obtain subpoena power. The Plaintiff, Vanzan, Inc. ("Vanzan"), is a corporate entity affiliated with Lively and Reynolds and entirely unrelated to the Film or the Wayfarer Parties. The lawsuit asserted three causes of action: breach of contract, breach of the implied covenant of good faith and fair dealing, and faithless servant against Doe defendants only. It does not explain how or why Vanzan was unable to identify the proper defendants, which is especially notable in the context of a *breach of contract action*.

103. Instead, Vanzan (Lively and Reynolds) and Manatt implausibly claim not to be privy to the identities of its own contractual counterparties or its own "employees, contractors, agents, or representatives[.]" The lawsuit is devoid of specific allegations against anyone, much less Abel, and relies exclusively on boilerplate legal jargon. Notably, Vanzan never requested the assignment of a judge, substituted the Doe defendants for named parties, or served the complaint on any defendant. The only docket entries are the complaint and a notice of dismissal filed on December 19, 2024, the day before Lively filed her CRD Complaint against the Wayfarer Parties.

104. *The same day the lawsuit was filed*, September 27, 2024, Jones warned a departing employee not to work for Abel because "her business wouldn't be around much longer."

105. Once the lawsuit was filed, the Lively Parties used it to issue a subpoena to Jonesworks for data stored on Abel's phone, including troves of private emails and text messages picked up via the application of highly generic search terms. The information turned over to Lively included communications that were plainly protected by the attorney-client privilege. Since there were no identifiable parties and no party had been served, the subpoenas were issued without notice, depriving Abel of any knowledge of the subpoena, much less the opportunity to object.

106. Abel is informed and believes, and based thereon alleges, that the sham lawsuit was

contrived by the Lively Parties and Jones, acting in concert, to facilitate and cover up Jones' release of the data extracted from Abel's phone and personal accounts under the guise of legal process, without risking detection by interested parties, such as Abel, who could have intervened to stop the flagrant abuse of process.

107. As planned by the parties, upon receipt of the sham subpoena, on or about October 1, 2024, Jones and Jonesworks blithely surrendered the entire contents of Abel's iPhone communications for a second time, creating a veneer of legitimacy and affording Jones and Jonesworks plausible deniability once the *New York Times* came through for Lively. It is on this pretext that Jones' and Jonesworks' counsel later described responding to a "court-ordered subpoena." *See* Tatiana Siegel et al., "How Did Blake Lively's Lawyers Obtain Bombshell Texts from Justin Baldoni's PR Team," *Variety* (Dec. 23, 2024), https://variety.com/2024/film/news/blake-lively-justin-baldoni-bombshell-text-messages-subpoena-1236258665/.

108. As a result of Jones' malicious scheme, Abel's life has been turned upside down. Her career and reputation have been destroyed, her private information leaked, and her email inbox and social media pages filled with a daily stream of death threats and abuse. She has watched her client list evaporate and the viability of her once-promising business cast into doubt. Abel lost control of her longtime phone number and, along with it, access to her most sensitive accounts and decades worth of contacts. Only after months of chaos and hundreds of calls with untold numbers of customer support representatives did Abel restore some semblance of order in her life.

109. The backlash against Wayfarer and Baldoni has been equally devastating, with Baldoni wrongfully labeled as a sex pest, his accolades rescinded, and his future projects thrown into doubt.

110. In an unimaginable invasion of Abel's privacy and dignity, Jones possesses and controls the full contents of Abel's iPhone, including her text messages, emails, and photos. Abel lives in fear of what is to come, given the vast troves of personal data in the possession of this hostile and vengeful actor.

111. As a result of Jones' and Jonesworks' tortious conduct, Abel has suffered enormous harm to her personal and professional life. All of this harm has accrued in the State of California, where Abel lives and works.

## FIRST CAUSE OF ACTION

### (Violations of California Penal Code § 502)

### *Against Jones and Jonesworks*

112. Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

113. Jones and Jonesworks violated the provisions of California Penal Code § 502(c) by doing the following acts:

a. Knowingly accessing and without permission obtaining, altering, disseminating, or otherwise using Abel's data, computer, computer system, and computer network in order to devise and execute a scheme and artifice to defraud and deceive and wrongfully control and obtain property and data.

b. Knowingly and without permission accessing and causing to be accessed, taking and causing to be taken, copying and causing to be copied, using and causing to be used computer services, namely Abel's personal Gmail account, the email account maintained by Abel's business, RWA Communications, and Abel's iCloud data, including her text messages and photos.

114. As a direct and proximate result of Jones' and Jonesworks' acts in violation of California Penal Code § 502(c), Abel has suffered damages in an amount to be proven at trial.

115. In doing the acts herein alleged, Jones and Jonesworks acted with oppression, fraud, malice, and in conscious disregard of Abel's rights, and Abel is therefore entitled to punitive and exemplary damages.

116. In violation of California Penal Code §502(c), Jones and Jonesworks are liable to Abel for her attorneys' fees and costs.

**SECOND CAUSE OF ACTION**

**(Conversion)**

***Against Jones and Jonesworks***

117. Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

118. Abel owns and/or has a possessory interest in the phone number (904) 742-2954. When she joined Jonesworks in 2020, she had owned, controlled, and used the phone number for approximately 20 years. She agreed to port it to Jonesworks' phone plan with the express understanding that she would retain ownership and that it would revert to her upon her departure.

119. Upon Abel's termination from Jonesworks, Jones and Jonesworks substantially interfered with Abel's ownership and/or possessory interest in the phone number by knowingly or intentionally taking possession of it and refusing to release it to Abel after she demanded its return.

120. Abel did not consent to Jones' and Jonesworks' conversion of the phone number and suffered harm, which Jones' and Jonesworks' conduct was a substantial factor in causing.

121. As a direct and proximate result of said conduct by Jones and Jonesworks, Abel has suffered damages in an amount to be proven at trial.

122. Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## **THIRD CAUSE OF ACTION**

**(Promissory Fraud)**

***Against Jonesworks and Jones***

123. Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

124. On August 21, 2024, Jonesworks, through its agent Gordon Duren and its attorney, and at Jones' direction, promised Abel that if she gave up her Jonesworks-issued iPhone and provided her passcode, Jonesworks would release her number and ensure she had exclusive access to the private data stored on and the accounts accessible from the iPhone.

125. Abel reasonably relied on the promise made by Jonesworks.

126. However, Jonesworks never intended to perform the promise when it was made. Instead, Jonesworks, through its agent and attorney, intended to—and did—dupe Abel into giving up the iPhone and passcode so as to access, copy, and disseminate without authorization the private data stored on the device and information from accounts accessible from the device. Jonesworks also intended to—and did—retain possession of Abel's phone number to cause chaos in her life and harm her personal and professional interests.

127. Jonesworks did not perform in accordance with its promise.

128. As a direct and proximate result of the above-described conduct, Abel was harmed, and her reliance on Jonesworks' false promise was a substantial factor in causing her harm.

129. Specifically, Abel lost access to every sensitive account protected by two-factor

authentication linked to her phone number. These included, but were not limited to:

a. Checking and savings accounts (Chase Bank and Citizens Bank);

b. Retirement accounts (Fidelity, Vanguard, and Empower);

c. Microsoft 365 and Gmail;

d. Utilities (Spectrum, SoCal Edison, SoCal Gas);

e. Patient portals for medical care and prescription drugs;

f. Rideshare apps (Uber and Lyft);

g. Food delivery (Instacart, Postmates, Grubhub, Uber Eats);

h. Loyalty accounts (Delta, United Airlines, American Airlines);

i. Social media accounts (Instagram, Facebook, TikTok, X).

130. It took Abel multiple months and hundreds of hours to regain control over these accounts. She was forced to hire two separate IT experts to restore access to Microsoft 365 and Gmail. She still does not have access to her Empower 401(k).

131. Abel also lost two decades' worth of contacts, including her childhood friends, former clients and colleagues, extended family members, and others.

132. The practical impact (financially and otherwise) on Abel's personal and professional life was enormous.

133. Jones and Jonesworks were aware that the other planned to defraud Abel, agreed with one another, and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the fraud by reason of their conspiracy to commit the tort.

134. Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages

in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant Jennifer Abel prays for the following relief:

1. For monetary damages in an amount according to proof;

2. For pre- and post-judgment interest;

3. For punitive and exemplary damages according to proof;

4. For attorneys' fees and costs incurred by Abel, as applicable; and

5. For such other legal and equitable relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Abel demands a jury trial on all causes of action so triable.

Respectfully submitted,

Dated: October 31, 2025
Los Angeles, CA

LINER FREEDMAN TAITELMAN +
COOLEY, LLP

*/s/ Bryan Freedman*

Bryan J. Freedman (admitted *pro hac vice*)
Ellyn S. Garofalo (admitted *pro hac vice*)
Kim S. Zeldin (admitted *pro hac vice*)
Amir Kaltgrad (admitted *pro hac vice*)
Theresa M. Troupson (admitted *pro hac vice*)
Summer Benson (admitted *pro hac vice*)
Jason Sunshine
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com
kzeldin@lftcllp.com
akaltgrad@lftcllp.com
ttroupson@lftcllp.com
sbenson@lftcllp.com
jsunshine@lftcllp.com

MEISTER SEELIG & FEIN PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@msf-law.com
kaf@msf-law.com

AHOURAIAN LAW
Mitra Ahouraian (admitted *pro hac vice*)
2029 Century Park East, 4th Floor
Los Angeles, CA 90076
Tel: (310) 376-7878
Email: mitra@ahouraianlaw.com

SHAPIRO ARATO BACH LLP
Alexandra A. E. Shapiro
Jonathan Bach
Alice Buttrick
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: (212) 257-4881
Email: ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com

*Attorneys for Jennifer Abel*