# Dkt. No. 209_Part 1

**LINER FREEDMAN TAITELMAN + COOLEY, LLP**
ATTORNEYS AT LAW

**1801 CENTURY PARK WEST, 5TH FLOOR**
**LOS ANGELES, CALIFORNIA 90067-6007**
TEL: (310) 201-0005
FAX: (310) 201-0045
E-MAIL: bfreedman@lftcllp.com

BRYAN J. FREEDMAN

December 15, 2025

*Via ECF*
Hon. Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street, Room 1620
New York, NY 10007

**Re: *Jones et al. v. Abel et al.*, No. 1:25-cv-00779-LJL**

Dear Judge Liman:

As counsel for Wayfarer Studios LLC, Justin Baldoni, Melissa Nathan, and Jennifer Abel (collectively, the "Wayfarer Defendants"), and pursuant to Your Honor's Individual Rules, we move to seal portions of Exhibits 1, 2, 3, 6, 7, 8, 11, 13, 16, and 17 (Dkt. Nos. 195-1, 195-2, 195-3, 195-5, 195-6, 195-7, 195-8, 195-9, 195-10, and 195-11) to the Declaration of Kristin Tahler in support of Plaintiffs Stephanie Jones and Jonesworks LLC's (together "Jonesworks") Motion for Leave to Amend Their Complaint (Dkt. 191) (the "Motion").[1] The Wayfarer Defendants also move to permanently seal paragraphs 14 and 16 of the Declaration of Kristin Tahler and the redactions on pages 5 and 6 of the Memorandum of Law in support of the Motion that discuss the contents of these exhibits.

Exhibits 1, 2, 3, 6, 7, 8, 11, 13, 16, and 17 and the related redacted sections of Jonesworks' Memorandum of Law, and paragraphs 14 and 16 of the Declaration of Kristin Tahler each contain confidential and sensitive information relating to the relationships between The Agency Group PR LLC ("TAG") and its clients or potential clients not involved in this litigation. The Court has previously found this type of information to be appropriately maintained under seal in the related *Lively* case. *See, e.g.*, *Lively v. Wayfarer*, Case No. 1:24-cv-10049-LJL, Dkt. 1027 (Nov. 26, 2025), at 5 ("[I]nformation revealing the specific identity of clients and prospective clients who have used public-relations services is sufficiently sensitive to warrant continued sealing."). The Wayfarer Defendants submit their proposed redactions outlined in red herewith.

Further, Exhibits 7, 8, and 13 (Dkt. 195-7, 195-8, and 195-10) contain personally identifying information ("PII") such as private telephone numbers, email addresses, and usernames that should be redacted prior to the exhibits being unsealed. In addition to sealing the portions of these documents reflecting confidential and sensitive information, these documents should be redacted as indicated by Jonesworks to protect the confidential PII of parties, non-parties, and

[1] The Wayfarer Defendants join the motion to seal of non-parties Jed Wallace and Street Relations Inc. (Dkt. 203), which overlaps with the Wayfarer Defendants' motion, seeking to seal Exhibits 13 and 17.

counsel, pursuant to the Court's prior orders concerning the filing and redaction of PII. *See, e.g.*, *Lively v. Wayfarer Studios et al.*, Dkts. 485, 619, 736.

The Wayfarer Defendants respectfully request the Court grant this Motion and order the continued sealing of Exhibits 1, 2, 3, 6, 7, 8, 11, 13, 16, and 17 (Dkt. Nos. 195-1, 195-2, 195-3, 195-5, 195-6, 195-7, 195-8, 195-9, 195-10, and 195-11) as well as the portions of Jonesworks' Memorandum of Law that refer to these exhibits (including the redacted references of pages 5 and 6 thereof) and paragraphs 14 and 16 of the Declaration of Kristin Tahler. The Wayfarer Defendants further respectfully request the Court order the redaction of PII from Exhibits 7, 8, and 13 (Dkt. 195-7, 195-8, and 195-10).

Respectfully submitted,

*/s/ Bryan J. Freedman*

LINER FREEDMAN TAITELMAN + COOLEY, LLP
Bryan J. Freedman (*pro hac vice*)
Ellyn S. Garofalo (*pro hac vice*)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com

MEISTER SEELIG & FEIN PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@msf-law.com
kaf@msf-law.com

cc: all counsel of record (via electronic service)

# Exhibit 1
# Memorandum of Law
# Proposed Redactions

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Stephanie Jones, Jonesworks LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios LLC, and John Does 1-10<br>Defendants. | Civil Action No. 1:25-cv-779 |

# STEPHANIE JONES AND JONESWORKS LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR LEAVE TO AMEND THEIR COMPLAINT

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

BACKGROUND .......... 3

LEGAL STANDARD .......... 8

ARGUMENT .......... 9

I. THE JONES PARTIES HAVE GOOD CAUSE FOR THE PROPOSED AMENDMENT .......... 10

II. THE WAYFARER PARTIES CANNOT MEET THEIR BURDEN TO SHOW PREJUDICE, UNDUE BURDEN, OR FUTILITY .......... 13

A. The Proposed Amendments Do Not Prejudice the Wayfarer Parties Nor Cause Undue Burden .......... 13

B. The Proposed Amendments Are Not Futile .......... 15

1. Defamation .......... 16

2. Tortious Interference .......... 20

3. Violation of the Illinois Eavesdropping Statute .......... 21

CONCLUSION .......... 22

## TABLE OF AUTHORITIES

**Page**

**Cases**


*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir. 1993) ........................................ 13

*Bumpus v. N.Y.C. Transit Auth.*,
883 N.Y.S.2d 99 (2d Dep't 2009) ........................................ 17, 18

*Cruz v. Coach Stores, Inc.*,
202 F.3d 560 (2d Cir. 2000) ........................................ 15

*Enzymotec Ltd. v. NBTY, Inc.*,
754 F.Supp.2d 527 (E.D.N.Y. 2010) ........................................ 11, 12, 13

*Foman v. Davis*,
371 U.S. 178 (1962) ........................................ 8, 13

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
304 F.R.D. 170 (S.D.N.Y. 2014) ........................................ 9

*Ghost v. Wilson et al.*,
Case No. 24STCV17314 (Cal. Sup. Ct.) ........................................ 6

*Grant v. Citibank (S.D.) N.A.*,
2010 WL 5187754 (S.D.N.Y. Dec. 6, 2010) ........................................ 9

*Grochowski v. Phoenix Const.*,
318 F.3d 80 (2d Cir. 2003) ........................................ 8

*Hickey Freeman Tailored Clothing, Inc. v. Chargeurs, S.A.*,
2018 WL 5729297 (S.D.N.Y. Nov. 1, 2018) ........................................ 8, 9, 10

*Kassner v. 2nd Ave. Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007) ........................................ 9

*Kronos, Inc. v. AVX Corp.*,
81 N.Y.2d 90 (1993) ........................................ 21

*Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*,
2025 WL 2781280 (S.D.N.Y. Sept. 30, 2025) ........................................ 15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2014) ........................................ 8, 16

*MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*,
157 F.3d 956 (2d Cir. 1998) ....................................................................................9

*Mandala v. NTT Data, Inc.*,
88 F.4th 353 (2d Cir. 2023) ....................................................................................8

*Mason Tenders Dist. Council v. Phase Constr. Servs., Inc.*,
318 F.R.D. 28 (S.D.N.Y. 2016)................................................................................16

*Middle Atl. Utils. Co. v. S.M.W. Dev. Corp.*,
392 F.2d 380 (2d Cir. 1968) ...................................................................................12

*Molo Design, Ltd. v. Chanel, Inc.*,
2024 WL 2982924 (S.D.N.Y. June 12, 2024) ..............................................8, 9, 10

*Monex Fin. Servs. Ltd. v. Dynamic Currency Conversion, Inc.*,
859 N.Y.S.2d 904 (Sup. Ct. 2008) ....................................................................20, 21

*Morelli v. Alters*,
2020 WL 6508858 (S.D.N.Y. Nov. 5, 2020).........................................................12

*Olaf Soot Design, LLC v. Daktronics, Inc.*,
299 F. Supp. 3d 395 (S.D.N.Y. 2017).......................................................................9

*Oscar v. BMW of N. Am., LLC*,
2011 WL 6399505 (S.D.N.Y. Dec. 20, 2011) .........................................................12

*Parker v. Columbia Pictures Indus.*,
204 F.3d 326 (2d Cir. 2000) ...................................................................................12

*Permatex, Inc. v. Loctite Corp.*,
2004 WL 1354253 (S.D.N.Y. June 17, 2004) .........................................................11

*Richardson Greenshields Sec., Inc. v. Lau*,
825 F.2d 647 (2d Cir. 1987) ...............................................................................12, 13

*Soroof Trading Dev. Co. v. GE Microgen, Inc.*,
283 F.R.D. 142 (S.D.N.Y. 2012).............................................2, 8, 9, 10, 13, 14, 15

*State Teachers Ret. Bd. v. Fluor Corp.*,
654 F.2d 843 (2d Cir. 1981) ...................................................................................14

*This LLC v. HolaBelle, Inc.*,
2024 WL 4871688 (D. Conn. Nov. 22, 2024)..........................................................14

*VIP Pet Grooming Studio, Inc. v. Sproule*,
224 A.D.3d 78 (2d Dep't 2024)................................................................................16

*Whitehurst v. 230 Fifth, Inc.*,
998 F. Supp. 2d 233 (S.D.N.Y. 2014) ........ 21

*Williams v. Citigroup Inc.*,
659 F.3d 208 (2d Cir. 2011) ........ 8, 16

**<u>Rules / Statutes</u>**

Fed. R. Civ. P. 12(b)(6) ........ 15

Fed. R. Civ. P. 15 ........ 1, 13, 17

Fed. R. Civ. P. 15(a) ........ 8, 12, 16

Fed. R. Civ. P. 15(b)(2) ........ 15

Fed. R. Civ. P. 15(c) ........ 16, 17, 19

Fed. R. Civ. P. 16 ........ 1, 2, 8, 9, 12, 13

Ill. Comp. Stat. Ann. 5/14-2(a)(2) ........ 21

Ill. Comp. Stat. Ann. 5/14-6 ........ 21

Illinois Eavesdropping Act, 720 Ill. Comp. Stat. §§ 14-2(a) ........ 21

N.Y. C.P.L.R. § 1024 ........ 17, 18, 19

N.Y. C.P.L.R. § 215(3) ........ 17

Plaintiffs Stephanie Jones and Jonesworks LLC ("Jonesworks," and together with Jones, the "Jones Parties") respectfully submit this memorandum of law in support of their motion for leave to amend their complaint pursuant to Federal Rules of Civil Procedure ("Rules") 15 and 16.[1]

## INTRODUCTION

The Jones Parties respectfully move for leave to file an amended complaint to add newly identified defendants and assert narrow additional claims based on facts that have only recently been uncovered in discovery that were not available before the deadline to amend. The proposed amendments arise directly from documents and testimony obtained in the late stages of discovery, including evidence the Wayfarer Parties withheld despite their discovery obligations. The Jones Parties do not expect their proposed amendment, or the targeted new allegations and claims contained therein, to require any additional discovery, or to affect the existing case schedule or orderly administration of this case. To the contrary, the new allegations and claims are supported by discovery already taken on the Jones Parties' existing claims that has been thoroughly examined by the parties to date.

The proposed amendments arise directly from documents evidencing that Nathan shopped and placed the *Business Insider* article "Who's Afraid of Stephanie Jones" to harm Jones and Jonesworks, including by intending to use that article to try to convince a long-time Jonesworks' client to terminate its relationship with the agency. The September 2025 deposition of a former employee of Nathan revealed that she, at Nathan's instruction and in coordination with Jed Wallace, helped create the defamatory websites about the Jones Parties—just as she had done at least two other times, again at Nathan's instruction and in coordination with Wallace, against other

[1] A copy of the proposed amended complaint is attached as Exhibit 1 to the accompanying declaration of Kristin Tahler, and a redline comparing the proposed amended complaint to the original complaint is attached as Exhibit 2.

individuals. This evidence requires identification of Nathan as a previously-pled Doe Defendant, and supports the additional tortious interference claim against her. The narrow claim added against proposed defendant Jamey Heath (Wayfarer's CEO), who is already a named defendant in the *Lively* matter, arises from his production for the first time—just days before his October deposition and nearly three months after the deadline to substantially complete document production—of an illegal audio recording of a phone call between Heath and Jones about facts at issue in the parties' existing claims, which is the first time that Jones discovered that Heath had been surreptitiously recording her. At his October 9, 2025 deposition, Heath admitted that he was in Illinois at the time of the recording and had not informed Jones that she was being recorded, revealing new facts supporting a statutory eavesdropping claim under Illinois law.

The Jones Parties could not have known about this evidence or moved to amend before the April 18, 2025 deadline to amend the pleadings under the existing case schedule, and are moving now promptly after the close of fact discovery and before any other dispositive deadlines—including summary judgment or trial—have even been set. Under Rule 16, good cause exists where the moving party demonstrates diligence and shows that the deadline could not have been reasonably met despite good faith efforts. Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. And courts routinely grant leave to amend where, as here, the basis for amendment arises from facts learned in discovery that were not previously available to the moving party. *See, e.g.*, *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 149 (S.D.N.Y. 2012). While many of the newly added allegations and supporting evidence could fairly be encompassed and addressed within the existing Complaint, and indeed arose from discovery on that Complaint, they also give rise to new claims and against specific defendants that could not have been known before the supporting evidence was uncovered in discovery. The prudent and orderly administration of

the case weigh in favor of permitting this amendment at this stage of the case, and the Jones Parties have ample good cause to amend now.

With good cause satisfied, there is no basis to deny amendment. The Wayfarer Parties cannot meet their burden to show prejudice or futility. The proposed amendments are based on newly uncovered evidence, rather than new theories, and they conform the pleadings to the factual record as it now stands. Moreover, permitting amendment will not prejudice the Wayfarer Parties or unduly delay the proceedings (particularly given that the parties have neither summary judgment nor trial dates currently scheduled); rather, it will ensure that this case is adjudicated on its merits and in light of the complete evidentiary picture. Finally, the amendments are not futile: each new or refined claim is timely and supported by specific factual allegations developed in discovery and would withstand a motion to dismiss. The motion to amend should be granted.

## BACKGROUND

On December 24, 2024, the Jones Parties filed a complaint in New York State court against Jennifer Abel, Melissa Nathan, Justin Baldoni, and Wayfarer Studios LLC ("Wayfarer" and with Abel, Nathan, and Baldoni, the "Wayfarer Parties"). *See* ECF No. 1-1 (the "Complaint" or "Compl."). The Complaint alleges, among other things, that Abel and Nathan conspired to steal Jonesworks' clients and breached and tortiously interfered with Jonesworks' contracts. Compl. at Counts I-IV. The Complaint also includes a defamation claim against John Does 1-10 for creating and publishing two false and defamatory websites about the Jones Parties—www.stephaniejonesleaks.com and www.stephaniejoneslies.com—as well as more than a dozen follow-on disparaging social media accounts (together, the "Jones Defamatory Websites"). *Id.* at Count VIII. On December 31, 2024, Blake Lively filed a complaint against the Wayfarer Parties, Heath, and others for orchestrating a digital smear campaign against her, including in retaliation

for reporting Baldoni's misconduct on the set of the movie *It Ends With Us*. *Lively v. Wayfarer Studios LLC*, No. 1:24-cv-10049-LJL, ECF No. 1.

The Wayfarer Parties removed the Complaint to this Court. ECF No. 1. On February 3, 2025, the Court largely adopted the Case Management Plan and Scheduling Order filed in the related *Lively* matter, including an April 18, 2025 deadline for the amendment of pleadings. *Lively*, ECF No. 58.[2] The Court has not yet set dates for trial, the proposed joint pretrial order, or motions for summary judgment in this action. ECF No. 21. On March 20, 2025, Nathan answered the Jones Parties' complaint and denied any involvement in creating or publishing the Jones Defamatory Websites or in planting a *Business Insider* article hostile to Jones. ECF No. 37 ¶¶ 76, 92. That same day, Abel and Wayfarer filed counterclaims against the Jones Parties, ECF Nos. 36, 39, which the Jones Parties moved to dismiss, ECF Nos. 44, 46. The Jones Parties' motion to dismiss Wayfarer's counterclaims (ECF No. 46) remains pending.

The Jones Parties served requests for production on Nathan, including for Nathan's communications with Jed Wallace about Jones, documents relating to Nathan's knowledge or involvement in the *Business Insider* article "Who's Afraid of Stephanie Jones?", and documents pertaining to the Jones Defamatory Websites, including related to Nathan's "knowledge of or involvement in the creation, operation, or content" of those sites. Ex. 3 at RFP No. 7; Ex. 4 at RFP Nos. 38-39. The Wayfarer Parties, including Nathan, agreed to produce documents in response to all the Jones Parties' requests, but their resulting productions were largely belated and deficient.

By the July 1, 2025 deadline for the substantial completion of discovery (*Lively* ECF No. 58), for example, Nathan had produced only 144 documents. Ex. 5. That was by design. Nathan

---

[2] Docket entries to the *Lively* matter are prefaced by "*Lively*, ECF No." All other citations to "ECF No." are to the docket in this action.

used hyper-narrow search terms to artificially restrict her productions. Ex. 6 (including search terms that would identify only documents about the websites that used Jones' or Jonesworks' full name ***and*** the full website url ***and*** Baldoni's or Wayfarer's name). As a result, plainly responsive documents were never produced by Nathan in this action. On August 6, 2025, Nathan produced documents evidencing her involvement in a *Business Insider* article (that Nathan herself described as a "KILL STORY" about Jones), designated as attorneys' eyes only under the protective order in this action (ECF No. 30), so the Jones Parties' counsel could not share or discuss this information with their clients. Exs. 7-8; *see also* Ex. 1 at ¶ 74.

The Jones Parties promptly challenged the sufficiency of the Wayfarer Parties' productions and, on August 11 and August 15, 2025, entered into agreements with Nathan for her to run specific search terms, including terms related to the Jones Defamatory Websites. Exs. 9-10. At the time the Jones Parties negotiated these agreements, the only information they had about Nathan's involvement in the Jones Defamatory Websites was her answer denying involvement. Nathan then violated this agreement, failing to produce the agreed-upon documents timely or at all. *See* ECF No. 124 (describing Nathan failure as of September 17 to produce Signal messages as agreed).

On September 5, 2025, the Jones Parties deposed a third-party that was a former employee of both Jonesworks and Nathan. Ex. 11. That former employee testified under oath that she wrote the copy for what became the Jones Defamatory Websites as an employee of Nathan and at Nathan's request, and that Wallace assisted in creating social media posts related to those websites. *Id.* at 375:11-17, 386:14-387:19. That former employee further testified that, also at Nathan's request, she assisted Nathan and Wallace in "creat[ing] a website" for Alon, Oren, and Tal Alexander (the "Alexander Brothers"), *id.* at 375:22-24, who had been indicted for sex trafficking offenses, "in conjunction with their ongoing litigation." *Id.* at 505:8-21; *see also* Ex. 12.

That former employee also described writing copy for then-client celebrity Rebel Wilson, following Nathan's instruction that "Rebel wants [] one of those sites" incorporating specific information Nathan and Wallace provided, against producer Amanda Ghost who was in a dispute with Wilson. Ex. 11 at 156:13-159:11; Ex. 13. A website attacking Ghost later appeared online with substantially similar content as Nathan's and Wallace's instruction. *Compare*, Ex. 13, *with*, Ex. 14. Ghost, who was and remains in a legal dispute with Wilson over a film, has since sued Nathan for her role in creating the smear website against her. *Ghost v. Wilson et al.*, Case No. 24STCV17314 (Cal. Sup. Ct.).

Nathan designated all of this revealing testimony as attorneys' eyes only. On September 9, 2025, Nathan agreed to remove the attorneys' eyes only designation from the documents evidencing her involvement planting the *Business Insider* "kill story" about the Jones Parties. Ex. 15. In light of the former employee's testimony, on September 10, the Jones Parties requested that the Wayfarer Parties conduct supplemental searches of Nathan's files for documents relating to the Jones Defamatory Websites, including for documents reflecting payments made in connection with the Websites. Tahler Decl. ¶ 28. Nathan refused, claiming her production was complete. *Id.* The Jones Parties challenged Nathan's attorneys' eyes only designation of the former employee's deposition testimony, but Nathan refused to remove that designation. The Jones Parties subsequently moved, and the Court ordered the testimony de-designated over Nathan's opposition on September 19. ECF Nos. 113, 127.

The Jones Parties deposed Nathan on September 30 and Wallace on October 10. Despite the former employee's testimony otherwise, each denied any personal involvement in the Jones Defamatory Websites, the Alexander Brothers website, and the Ghost website. Ex. 16 at 131:20-135:4, 137:3-139:12, 142:15; Ex. 17 at 26:10-22, 38:16-40:10, 43:4-45:2, 75:8-76:3, 102:10-

104:1. Nathan went so far as to insist that the former employee had testified falsely under oath and perjured herself. Ex. 16 at 132:14-23, 231:21-233:13. On October 31, Nathan filed an affidavit in *Ghost v. Wilson* incredibly claiming that she had no involvement with that website. Ex. 21.

Meanwhile, the other Wayfarer Parties also made belated productions in violation of this Court's orders. For example, on October 5, 2025, days before his October 8 and 9 depositions, Heath produced for the first time—in the related *Lively* matter and not in response to the Jones Parties' requests for production—a surreptitiously made recording of a telephone conversation between himself and Jones. Ex. 18. On October 9, 2025, Heath admitted at his deposition that he recorded the call while in Illinois without Jones's knowledge or consent and that he had provided this recording to his counsel prior to September 1, 2025. Ex. 19 at 88:23-25, 106:3-109:19.

The Wayfarer Parties, including Nathan, continued to belatedly produce documents in the *Lively* matter, making thirteen productions since October 9, including a production of documents by Nathan on November 12. These productions post-date the substantial completion deadline by more than three and four months respectively. By stipulation among all of the parties, these tardy productions are also part of the discovery record in this matter. ECF Nos. 87-88.

While the Wayfarer Parties were continuing their late productions, the Jones Parties were also preparing expert reports, including a report that examined search engine optimization ("SEO") efforts of the Jones Defamatory Websites, the Alexander Brothers website, and the Amanda Ghost website, among others. That report found that the digital footprints for those sites reveal SEO efforts were likely created by the same author or authors. Ex. 20. The Jones Parties served this expert report on the Wayfarer Parties on November 21. The Wayfarer Parties' rebuttal report is due December 22, and the last day for expert depositions is January 16, 2026. ECF Nos. 152, 153. The Court has not set any deadlines for dispositive motions or a trial date. ECF No. 28.

## LEGAL STANDARD

Courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. Pro. 15(a)(2). This is a "permissive standard" that serves the court's "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2014) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011)). Consequently, leave to amend should be granted absent compelling reasons to the contrary, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party … [or] futility of amendment." *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 362 (2d Cir. 2023) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

When amendment is sought after a scheduling order deadline, Rule 16(b)(4) imposes an additional "good cause" requirement. *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 147 (S.D.N.Y. 2012). Rule 15(a) "must be balanced" against Rule 16(b)'s good cause requirement. *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003). "Good cause is demonstrated by a showing that despite its having exercised diligence, the applicable deadline could not have been reasonably met by the plaintiff." *Soroof Trading*, 283 F.R.D. at 147 (cleaned up); *see also Molo Design, Ltd. v. Chanel, Inc.*, 2024 WL 2982924, at *3 (S.D.N.Y. June 12, 2024) (same); *Hickey Freeman Tailored Clothing, Inc. v. Chargeurs, S.A.*, 2018 WL 5729297, at *3 (S.D.N.Y. Nov. 1, 2018) (same). Thus, where the proposed amendment relies on information that the party "did not know and could not reasonably have known" before the deadline, courts find good cause and permit amendment. *Soroof Trading*, 283 F.R.D. at 149; *Molo Design*, 2024 WL 2982924, at *5-6; *Hickey Freeman*, 2018 WL 5729297, at *5, 13.

Moreover, while the diligence inquiry is "the primary consideration" for whether good cause is met, it is not "the only consideration." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d

229, 244 (2d Cir. 2007). Rather, "in the exercise of its discretion under Rule 16(b), [the court] also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Id.* Accordingly, "in appropriate circumstances, a district court has discretion to grant a motion to amend even where the moving party has not shown diligence in complying with a deadline for amendments in a Rule 16 scheduling order." *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 176 (S.D.N.Y. 2014); *Olaf Soot Design, LLC v. Daktronics, Inc.*, 299 F. Supp. 3d 395, 397 (S.D.N.Y. 2017).

The party seeking leave to amend bears the burden to demonstrate good cause, *id.*, or "explain a[ny] delay," *Grant v. Citibank (S.D.) N.A.*, 2010 WL 5187754, at *6 (S.D.N.Y. Dec. 6, 2010) (quoting *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 962 (2d Cir. 1998)). "The non-movant bears the burden of showing prejudice, bad faith and futility of the amendment." *Id.*

## ARGUMENT

Here, the Jones Parties' proposed amended complaint relies on, and would not be possible without, evidence that emerged in late stages of fact discovery. It cannot be seriously disputed that the Jones Parties could not have made these amendments before April 18, 2025—months before they had the necessary information from Nathan, Heath and others to do so, and in light of Nathan's and others' denials in their filed answers. Moreover, the Wayfarer Parties cannot meet their burden of establishing that amendment at this stage in the proceedings—before any deadlines for dispositive motions or a trial date have even been set, and based on evidence disclosed and thoroughly addressed in discovery—would unjustly prejudice them. The motion should be granted.

## I. THE JONES PARTIES HAVE GOOD CAUSE FOR THE PROPOSED AMENDMENT

The Jones Parties have good cause to amend the Complaint. Good cause is satisfied when the party seeking leave to amend, "despite [] having exercised diligence[,] … could not have [] reasonably met" the applicable deadline. *Soroof*, 283 F.R.D. at 147 (cleaned up). Thus, where, as here, the "proposed amendment relies on information that the party did not know and could not reasonably have known" before the deadline, courts find good cause and permit amendment. *Id.* at 150; *see also Molo Design*, 2024 WL 2982924, at *5-6 (same); *Hickey Freeman*, 2018 WL 5729297, at *5, 13 (same).

At the time of the Court's April 18, 2025 amendment deadline, the Jones Parties possessed none of the information that underlies the proposed amended complaint. Nathan did not produce the documents showing her conspiring with others to place the *Business Insider* article until August 6, nearly four months after that deadline. *See* Tahler Decl. ¶¶ 9-10. Nathan did not agree to remove the attorneys' eyes only designation so that the Jones Parties could share those documents with their clients until September 9. Ex. 15.

The former employee did not testify that Nathan instructed her to draft the content for the Jones Defamatory Websites, or that Nathan and Wallace instructed and collaborated with her to create and publish other websites, until September 5, nearly five months after the deadline. Ex. 11, Dep. Tr. at 374:17-383:12. The Court did not remove the attorney eyes' only designation from that testimony and allow the Jones Parties' counsel to share it with their clients until two weeks after that on September 19. ECF No. 127.

Heath did not produce his unlawfully made recording of Jones until October 5, nearly six months after the deadline to amend and three months after the substantial completion deadline. Tahler Decl. ¶ 20. And Heath did not admit, until another three days later, that he made the

recording in Illinois, without Jones' knowledge and consent, and that he had provided it to his counsel months before it was produced. Ex. 19 at 88:23-25, 106:3-109:19. For their parts, Nathan and Wallace did not deny their involvement in creating the Jones Defamatory Websites and other websites until September 30 and October 10 respectively, over five months after the deadline, with Nathan's most recent denial coming another three weeks after that. Ex. 21. These denials—in the face of significant contrary evidence of a pattern and practice of creating smear websites against Jones and others—render all the more relevant the factual investigation that the Jones Parties undertook following discovery that forensically link these websites and others to the same creators (as further explained in the Jones Parties' expert report). Indeed, during the period leading up to and immediately following the April 18 amendment deadline, Nathan and Heath—not the Jones Parties—possessed documents and information that now provide the factual basis for the proposed amended claims but they did not produce them.

In the face of this record, there can be no serious dispute that the Jones Parties could not have brought these amendments prior to April 18. If that were not enough, the Jones Parties are also moving to amend within only a few months of even beginning to discover the facts underlying the amended claims and mere weeks after completing their investigation—a timeline that courts regularly find satisfy the good cause diligence standard. *See e.g., Permatex, Inc. v. Loctite Corp.*, 2004 WL 1354253, at *3 (S.D.N.Y. June 17, 2004) (approximately two months was diligent); *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) (plaintiff diligent where some facts relevant to amendment known for two years but all facts necessary to amendment not gathered until approximately two months before amendment); *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (noting liberality in granting leave to amend and cataloguing cases granting leave to amend following delays of three to five years); *Middle Atl.*

*Utils. Co. v. S.M.W. Dev. Corp.*, 392 F.2d 380, 384 (2d Cir. 1968) (even a "three-year delay from the filing of the initial complaint is an inadequate basis for denying a motion to amend" absent a showing of prejudice or bad faith). In sharp contrast, there is no good cause only where a party relies on facts it knew or should have known before the deadline, which is plainly not the case here. *Oscar v. BMW of N. Am., LLC*, 2011 WL 6399505, at *2 (S.D.N.Y. Dec. 20, 2011).

Permitting this amendment also accords with the purpose of Rule 16(b), which is to restrict amendment only where necessary "to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *Morelli v. Alters*, 2020 WL 6508858, at *1 (S.D.N.Y. Nov. 5, 2020) (*quoting Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (explaining the purpose of Rule 16); *see also Enzymotec*, 754 F. Supp. 2d at 536 (noting that the lenient standard under Rule 15(a) must be balanced against the good cause requirement under Rule 16(b)). That concern is not implicated here, and amendment would thus not run afoul of Rule 16(b)'s purpose.

Indeed, the pleadings in this case remain unfixed regardless of this motion, because the Jones Parties' motion to dismiss Wayfarer's counterclaims remains outstanding. In addition, the Court has not yet set a deadline for dispositive motions or a trial date, allowing the parties and the Court to adapt the schedule to the amended complaint without disruption to an existing case schedule. And no meaningful disruptions are expected here, as the Jones Parties do not anticipate any additional discovery will be made necessary by these amendments. Rather, the proposed amendments arise from the discovery already taken to date responsive to the Jones Parties' original claims and that would be admitted at trial to adjudicate those claims. Rule 16's interest in avoiding uncertainty in pretrial proceedings is no bar to amendment and can be readily addressed through ordinary case management processes after the amendment finalizes the pleadings.

## II. THE WAYFARER PARTIES CANNOT MEET THEIR BURDEN TO SHOW PREJUDICE, UNDUE BURDEN, OR FUTILITY

With good cause satisfied, there is no barrier to amendment. Indeed, it is the Wayfarer Parties' burden under Rule 15 to establish that the proposed amendment would cause them unjust prejudice or impose an undue burden, or be futile. *See Richardson Greenshields Sec.*, 825 F.2d at 653 n.6; *see also Enzymotec,* 754 F. Supp. 2d at 537 (quoting *Foman*, 371 U.S. at 182) (same). *Soroof*, 283 F.R.D. at 152 ("The defendants bear the burden of establishing prejudice.") (*citing Block v. First Blood Assocs.*, 988 F.2d 344, 250 (2d Cir. 1993)). They cannot do so.

### A. The Proposed Amendments Do Not Prejudice the Wayfarer Parties Nor Cause Undue Burden

The touchstone under Rule 15 is fairness, not rigidity. "Prejudice arises when the amendment would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Soroof*, 283 F.R.D. at 152 (quoting *Block*, 988 F.2d at 350). No such prejudice exists here.

*First*, the amendments the Jones Parties seek are narrowly tailored to facts that emerged and were thoroughly ventilated in discovery. The Jones Parties do not anticipate them requiring any additional factual discovery. And neither of the topics in the proposed amendment are new terrain: the Jones Defamatory Sites have always been a central aspect of the Jones Parties' claims in this action, and discovery was always intended to identify the Does responsible for creating, publishing, and disseminating those cites, as well as the defendants' (including Nathan's) involvement in the *Business Insider* article. Moreover, Heath has already been deposed about the produced recording that forms the basis of the narrow new claim against him—which he, but not the Jones Parties, had known about since before this litigation was filed—and thus similarly requires no additional factual discovery to proceed.

In addition, no extension of expert discovery will be required, as the Jones Parties have already served an expert report examining the commonality between the Jones Defamatory Websites and other websites the Jones Parties believe Nathan to have had a hand in creating. The Wayfarer Parties will respond to that report on December 22, and depose the Jones Parties' expert before January 16. On this record, the Wayfarer Parties cannot meet their burden to show that the amendments will require them to "expend significant additional resources to conduct discovery and prepare for trial." *Soroof*, 283 F.R.D. at 152; *see also This LLC v. HolaBelle, Inc.*, 2024 WL 4871688, at *4 (D. Conn. Nov. 22, 2024).

*Second*, allowing amendment will not delay resolution of this case. At present, there are no dates set for dispositive motions or trial. Allowing amendment, therefore, will not disrupt any existing case management order or require the Court to reset critical deadlines. Indeed, the Court noted at the initial scheduling conference that it intended to set this case for trial some time after the trial in the *Lively* case. That trial is currently scheduled to begin on March 9, 2026, and the parties in that case predict that the trial will take up to six weeks. *Lively*, ECF Nos. 45, 58. It has always been anticipated that this case will not proceed to trial until, at the earliest, summer 2026 There will thus be no delay of this date that could amount to undue prejudice. *See State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (partially reversing denial of motion to amend and finding that an amendment would cause delay, but not undue prejudice because "amended claim was obviously one of the objects of discovery and related closely to the original claim" and no trial date had been set).

*Third*, the Jones Parties seek only to conform the pleadings to the evidence already produced and examined in discovery, which the Rules allow "at any time." Fed. R. Civ. P. 15(b)(2). Rule 15(b)(2) allows a party to amend "at any time" to "conform [the pleadings] to the

evidence and to raise [an] unpleaded issue," when the amendment would not prejudice one's opponent by "disadvantag[ing] its opponent in presenting its case." *Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2025 WL 2781280, at *14-15 (S.D.N.Y. Sept. 30, 2025) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569-70 (2d Cir. 2000) (no prejudice where "the essential elements of the charge … appear[ed] in the complaint").

No defendant would be disadvantaged in presenting their case if the Jones Parties are permitted to amend because the facts and evidence underlying these claims are already a part of the record on the Jones Parties' existing claims. Nathan has long known that the Jones Defamatory Sites, as well as involvement in the *Business Insider* article, are issues that will be tried, and that the Jones Parties throughout discovery have sought to uncover the Doe identities. And Heath, who produced the recording that forms the basis of the new claim against him, was questioned about that incident at his deposition and was thus on notice of the potential claim against him. Rather than expand this action to include new issues unrelated to the existing claims, permitting amendment will simply conform the pleadings to case evidence that will be admitted at trial in support of the Jones Parties' existing claims.

### B. The Proposed Amendments Are Not Futile

The proposed amendments also are not futile. "Amendment is futile if the proposed amended complaint could not survive a motion to dismiss." *Soroof*, 283 F.R.D. at 147. "Assuming the original complaint was filed within the statute of limitations, a court must deny as futile any claims that would be otherwise barred … unless the claims 'relate back'… [and] a proposed amendment is also deemed futile if the proposed claim could not withstand a Rule 12(b)(6) motion to dismiss." *Mason Tenders Dist. Council v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 36 (S.D.N.Y. 2016). Here, all of the proposed claims are legally sufficient on their face, timely under applicable statutes of limitations, and arise from the same nucleus of operative facts already

pleaded in the original complaint. They are also backed by evidence already uncovered and tested in discovery. Allowing the Jones Parties to amend the complaint is necessary to ensure that the parties' dispute is fully resolved on the merits and conformed to the existing proof, which is the "strong preference" of courts in this Circuit. *Loreley*, 797 F.3d at 190 (quoting *Williams*, 659 F.3d at 212); Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

**1. *Defamation***

The Jones Parties seek to amend their defamation claim (original Count VIII) to identify one of the Doe Defendants as Melissa Nathan. "The elements of a cause of action [alleging] defamation are (a) a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion, or disgrace, (b) published without privilege or authorization to a third party, (c) amounting to fault as judged by, at a minimum, a negligence standard, and (d) either causing special harm or constituting defamation per se." *VIP Pet Grooming Studio, Inc. v. Sproule*, 224 A.D.3d 78, 90 (2d Dep't 2024) (cleaned up). The proposed Amended Complaint alleges that Nathan conspired with others to author and publish the Jones Defamatory Websites, which contained provably false statements of fact concerning Jones and Jonesworks. Ex. 1 ¶¶ 210-15. Those statements were published to third parties without privilege, and they exposed the Jones Parties to public contempt and ridicule, causing reputational and economic harm. *Id.* ¶¶ 211-12, 216-20. The allegations thus satisfy each required element of defamation under New York law.

The proposed amendments also relate back to the Jones Parties' original complaint and are therefore timely. As the Second Circuit recognized in *Hogan v. Fischer*, Rule 15(c)(1)(A) permits an amended pleading to relate back when "the law that provides the applicable statute of limitations allows relation back." 738 F.3d 509, 518-19 (2d Cir. 2013); Fed. R. Civ. P. 15(c)(1)(A). The Rules' Advisory Committee added this provision in 1991 to "make ... clear that [Rule 15] does not

apply to preclude any relation back that may be permitted under the applicable limitations law." *Id.* (quoting Fed. R. Civ. P. 15), Advisory Comm. Notes 1991. Critically, the Committee directed courts to look to the "controlling body of limitations law"—not merely the limitations law's test for relation back. *Id.* "[I]f that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim." *Id.*

Because defamation claims under New York law are subject to New York's one-year statute of limitations, *see* N.Y. C.P.L.R. § 215(3), the "controlling body of limitations law" is New York law. Accordingly, under Rule 15(c)(1)(A), this Court must determine whether New York law provides a "more forgiving principle of relation back" for John Doe defendants than the federal standard under Rule 15(c)(1)(C). *Hogan*, 738 F.3d at 518. It does.

New York's Civil Practice Law and Rules creates a special procedure for claims against John Doe defendants. N.Y. C.P.L.R. § 1024 provides:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

As the Second Circuit has recognized, "New York courts have interpreted this section to permit John Doe substitutions *nunc pro tunc*." *Hogan*, 738 F.3d at 518-19 (citing *Bumpus v. N.Y.C. Transit Auth.*, 883 N.Y.S.2d 99, 104 (2d Dep't 2009)). To take advantage of § 1024, a party must meet two requirements. First, the party must "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Hogan*, 738 F.3d at 519 (quoting *Bumpus*, 883 N.Y.S.2d at 104). Second, the party must describe the John Doe party "in such form as will fairly apprise the party that [he] is the intended defendant." *Id.*

The Jones Parties easily satisfy both requirements. *First*, the Jones Parties exercised due diligence prior to the running of the statute of limitations to identify Nathan by name. From the outset of this litigation in December 2024, the Jones Parties have diligently pursued discovery to uncover the identities of the John Doe defendants as well as the origination of the *Business Insider* article. Nathan denied involvement in both in her answer. ECF No. 37 at ¶ 87, 88, 91. Nevertheless, the Jones Parties served requests for production on Nathan, including for documents pertaining to Nathan's involvement in the *Business Insider* article, as well as "to the websites www.stephaniejonesleaks.com and www.stephaniejoneslies.com, as well as any related social media accounts, including but not limited to [Nathan's] knowledge of or involvement in the creation, operation, or content of the websites or accounts, or any involvement by The Agency Group PR LLC's employees." Ex. 4 at RFP Nos. 38-39. Despite agreeing to produce documents in response to all the Jones Parties' requests, Nathan's productions were deficient, excluding documents evidence her involvement in the Jones Defamatory Sites or any others. The Jones Parties' ongoing efforts to determine the identities of the Doe defendants continued unsuccessfully for months. But again, despite Nathan's discovery obligations, she systematically withheld responsive documents and used artificially narrow search terms to prevent the Jones Parties' from discovering her involvement and then designated critical deposition testimony as attorneys' eyes only to prevent the Jones Parties' counsel from sharing the results of their investigation with their clients.

The Jones Parties also served subpoenas on the platforms hosting the websites and social media pages. Because Nathan and her co-conspirators used the names of innocent third parties when registering and creating these defamatory sites, however, the documents the Jones Parties received could not have identified Nathan. Exs. 22-25. Thus, the Jones Parties could not have

identified Nathan earlier through any reasonable degree of diligence. *See Hogan*, 738 F.3d at 519 (finding due diligence where plaintiff "diligently sought to identify the John Doe defendants," "submitted multiple discovery requests," and defendants "failed to respond fully").

*Second*, the Complaint described the John Doe defendants "in such form as will fairly apprise" Nathan that she was the intended defendant. The Complaint alleged that certain John Doe defendants created and published two false and defamatory websites about the Jones Parties—www.stephaniejonesleaks.com and www.stephaniejoneslies.com—as well as more than a dozen follow-on disparaging social media accounts. ECF No. 1-1 at ¶ 88. The Complaint further alleged that these Doe Defendants published provably false statements of fact concerning Jones and Jonesworks, statements that were published to third parties without privilege and exposed the Jones Parties to public contempt and ridicule. *Id.* These allegations provided sufficient detail concerning the date, time, nature of the conduct, and role in the defamatory scheme to give Nathan notice that she was the intended defendant. *See Hogan*, 738 F.3d at 519 (finding sufficient notice where complaint "describe[d] with particularity the date, time, and location of the alleged [] incident").

Because the Jones Parties satisfy both requirements of N.Y. C.P.L.R. § 1024, the amendment substituting Nathan's true name for a John Doe designation relates back to the original Complaint and is timely under New York law. Under Rule 15(c)(1)(A), New York's relation-back principle applies, and the defamation claims against Nathan is therefore timely. *See Hogan*, 738 F.3d at 520. The amendment is therefore not futile.

### 2. *Tortious Interference*

The Jones Parties also seek to add one targeted claim against Nathan for tortious interference with the Jones Parties' prospective business relations, alleging that Nathan deliberately worked to place the negative *Business Insider* article against Jones, in order to use it to convince prospective and existing clients not to work with Jones. Under New York law, to state a claim for tortious interference with business relationships, "a plaintiff must show (1) the existence of a business relation with a third party, (2) defendant's interference with the relation by use of dishonest, unfair or improper means, and (3) plaintiff sustained damages." *Monex Fin. Servs. Ltd. v. Dynamic Currency Conversion, Inc.*, 859 N.Y.S.2d 904, at *6 (Sup. Ct. 2008), *aff'd as modified*, 62 A.D.3d 675 (2009).

The proposed Amended Complaints satisfies each element. First, it alleges that the Jones Parties had ongoing and prospective business relationships with existing and potential clients, including a shared client with Nathan. Ex. 1 ¶¶ 11, 56-57, 190. Second, it alleges that beginning in December 2023, Nathan orchestrated a calculated campaign to interfere with these relationships by: (a) shopping negative stories about the Jones Parties to media outlets, specifically targeting *Business Insider*; (b) arranging for former Jonesworks' employees and clients to provide negative information about the Jones Parties to reporters; (c) creating and disseminating derogatory the Jones Defamatory Websites; and (d) engaging in search engine optimization to maximize the Websites' visibility and impact. *Id.* at ¶¶ 186-90.

Third, the proposed Amended Complaint alleges that Nathan acted with wrongful purpose and through improper means. Discovery revealed that their goal was to "take[] down" Jones and use the *Business Insider* article to convince existing or prospective clients to terminate any relationship with Jonesworks. *Id.* ¶¶ 56-82, 190. Nathan and her co-conspirators obfuscated their

role in creating the Jones Defamatory Websites to make it look like they were created by an uninvolved former employee. Finally, the Jones Parties allege they were severely damaged, including reputational harm and lost client relations, because of Nathan's actions. *Id.* ¶¶ 190-91. The allegations thus satisfy each required element of tortious interference under New York law. *See Monex Fin. Servs.*, 859 N.Y.S.2d 904; *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90 (1993); *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 261 (S.D.N.Y. 2014).

### 3. *Violation of the Illinois Eavesdropping Statute*

Finally, the Jones Parties seek to assert a narrow claim against Heath for unlawfully recording a phone call with Jones without her consent. To state a claim under the Illinois Eavesdropping Act, a plaintiff must allege that the defendant intentionally recorded a conversation without the consent of all parties to the conversation. 720 Ill. Comp. Stat. Ann. 5/14-2(a)(2); 720 Ill. Comp. Stat. Ann. 5/14-6. The proposed Amended Complaint alleges that on or about August 8, 2024, Heath participated in a private telephone conversation with Jones while Heath was located in Chicago, Illinois. Ex. 1 ¶¶ 222-23. During that call, Heath intentionally recorded the conversation without informing Jones or obtaining her consent to be recorded. *Id.* ¶¶ 222-26. These allegations state a violation of the Illinois Eavesdropping Act, 720 Ill. Comp. Stat. §§ 14-2(a).

The Jones Parties further allege that they first learned of this violation only two months ago, on October 5, 2025, and that Heath validated the allegations in deposition a few days later. The claim is timely, adequately alleged, and arises from the same operative events already at issue in the case, including the relationship between Heath and Wayfarer on the one hand and Jones and Jonesworks on the other. The amendment is therefore not futile.

## CONCLUSION

For all these reasons, the Jones Parties respectfully request that the Court grant their motion for leave to file the proposed Amended Complaint.

DATED: December 8, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: */s/ Kristin Tahler*

Kristin Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com

Maaren A. Shah
Morgan L. Anastasio
295 5th Avenue
New York, New York 10016
(212) 849-7000
maarenshah@quinnemanuel.com
morgananastasio@quinnemanuel.com

Nicholas Inns (pro hac vice)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Plaintiffs Stephanie Jones and Jonesworks LLC*

# Exhibit 2
# Tahler Declaration
# Proposed Redactions

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Stephanie Jones, Jonesworks LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios LLC, and John Does 1-10<br><br>Defendants. | Civil Action No. 1:25-cv-779 |

**DECLARATION OF KRISTIN TAHLER IN SUPPORT OF STEPHANIE JONES AND JONESWORKS LLC'S MOTION FOR LEAVE TO AMEND THEIR COMPLAINT**

I, Kristin Tahler, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney admitted to practice before this Court, a partner in the law firm of Quinn Emanuel Urquhart and Sullivan LLP, 865 South Figueroa Street 10th Floor, Los Angeles, CA 90017, and counsel of record for Stephanie Jones and Jonesworks LLC ("Jonesworks" and with Jones the "Jones Parties") in the above-captioned action.

2. I respectfully submit this declaration in support of the Jones Parties' Motion for Leave to Amend Their Complaint.

3. Attached as **Exhibit 1** is a true and correct copy of the Jones Parties' proposed amended complaint.

4. Attached as **Exhibit 2** is a true and correct copy of a redline comparing the proposed amended complaint to the Jones Parties' original complaint.

5. Attached as **Exhibit 3** is a true and correct copy of the Jones Parties' first requests for production on Melissa Nathan, dated March 6, 2025.

6. Attached as **Exhibit 4** is a true and correct copy of the Jones Parties' second

requests for production on Melissa Nathan, dated July 16, 2025.

7. Attached as **Exhibit 5** is a true and correct copy of a letter to the Wayfarer Parties' counsel, dated July 18, 2025.

8. Attached as **Exhibit 6** is a true and correct copy of correspondence among counsel dated July 18, to 25, 2025.

9. Attached as **Exhibit 7** is a true and correct copy of correspondence among Melissa Nathan and others dated March 27, 2024, produced at NATHAN_000001746 on August 6, 2025.

10. Attached as **Exhibit 8** is a true and correct copy of correspondence among Melissa Nathan and others, dated March 28, 2024, produced at NATHAN_000001180 on August 6, 2025.

11. Attached as **Exhibit 9** is a true and correct copy of correspondence among counsel dated August 1, to August 11, 2025.

12. Attached as **Exhibit 10** is a true and correct copy of correspondence among counsel dated August 13, to August 15, 2025.

13. Attached as **Exhibit 11** is a true and correct copy of excerpts from the transcript of the deposition of Katie Case, taken on September 5, 2025.

14. Attached as **Exhibit 12** is a true and correct copy of the website https://web.archive.org/web/20250117083835/https://alexanderbrothersextorted.com/.

15. Attached as **Exhibit 13** is a true and correct copy of correspondence between Katie Case and Melissa Nathan, dated August 5, to 6, 2024, produced at KCASE-000004949.

16. Attached as **Exhibit 14** is a true and correct copy of the website https://web.archive.org/web/20241107161651 /https://amandaghostsucks.com/.

17. Attached as **Exhibit 15** is a true and correct copy of correspondence among counsel dated September 8, to September 9, 2025.

18. Attached as **Exhibit 16** is a true and correct copy of excerpts from the transcript of the deposition of Melissa Nathan, taken on September 30, 2025.

19. Attached as **Exhibit 17** is a true and correct copy of excerpts from the transcript of the deposition of Jed Wallace, taken on October 10, 2025.

20. Attached as **Exhibit 18** is a true and correct copy of an audio recording taken on or about August 8, 2024, produced at HEATH_000054034 on October 5, 2025.

21. Attached as **Exhibit 19** is a true and correct copy of excerpts from the transcript of the deposition of Jamey Heath taken on October 9, 2025.

22. Attached as **Exhibit 20** is a true and correct copy of the expert report of Brian W. Horton, dated November 21, 2025.

23. Attached as **Exhibit 21** is a true and correct copy of the declaration of Melissa Nathan filed in *Ghost, et al. v. Wilson*, in the Superior Court of the State of California, County of Los Angeles, No. 24STCV17314, dated October 30, 2025.

24. Attached as **Exhibit 22** is a true and correct copy of the response to the subpoena issued by the Jones Parties to Namecheap.

25. Attached as **Exhibit 23** is a true and correct copy of the response to the subpoena issued by the Jones Parties to Hostinger International Ltd.

26. Attached as **Exhibit 24** is a true and correct copy of the response to the subpoena issued by the Jones Parties to Pinterest.

27. Attached as **Exhibit 25** is a true and correct copy of the response to the subpoena issued by the Jones Parties to Meta Platforms (Facebook).

28. On September 10, 2025, the Jones Parties requested that the Wayfarer Parties conduct supplemental searches of Nathan's files for documents relating to the Jones Defamatory

Websites, including for documents reflecting payments made in connection with the Websites. The Wayfarer Parties declined and stood by Nathan's production as complete.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: December 8, 2025
Los Angeles, California

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By : *_/s/ Kristin Tahler_*

Kristin Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com

Maaren A. Shah
Morgan L. Anastasio
295 5th Avenue
New York, New York 10016
(212) 849-7000
maarenshah@quinnemanuel.com
morgananastasio@quinnemanuel.com

Nicholas Inns (*pro hac vice*)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Third-Party Defendant Jonesworks LLC*

# Exhibit 3
# Tahler Decl. Ex. 1
# Proposed Redactions

# EXHIBIT 1

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Stephanie Jones, Jonesworks LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios LLC, Jamey Heath, and JOHN DOES 1-10,<br><br>Defendants. | Civil Action No. 1:25-cv-779<br><br>**<u>AMENDED COMPLAINT</u>**<br><br>Jury Trial Demanded |

Plaintiffs Stephanie Jones and Jonesworks LLC, by and through their undersigned counsel, bring this Amended Complaint against Defendants Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios, LLC, Jamey Heath, and John Does 1-10, and respectfully allege as follows:

## NATURE OF THE CASE

1. Discovery has revealed a growing list of attack websites from the same band of conspirators. Among other revelations, discovery has uncovered that Melissa Nathan, her "hired gun" Jed Wallace, and others engage in a regular practice of creating highly offensive and negative online content against individuals—often influential women, including Jones and Jonesworks—with the clear intent of destroying those individuals' reputations. This Amended Complaint conforms to the recently-discovered evidence and identifies the Doe Defendant responsible for the smear websites and social media accounts targeting Jones and Jonesworks and scores more.

2. The Jones Parties now know that before Nathan and Abel engaged Wallace to run a retaliatory media smear campaign against Blake Lively surrounding the release of the film *It Ends With Us*, they had employed the same underhanded tactics against Jones, causing an astronomical and wholly unfounded spike in negative rumors, online chatter, and media articles unlike anything Jones had experienced in her career and resulting in severe reputational damage.

This lawsuit seeks to finally put a stop to their continued misconduct and to compensate Jones and Jonesworks for the damage Defendants' conduct and scheme has inflicted.

3. Stephanie Jones is a highly respected public relations expert who focuses on corporate and personal publicity. Through her company, Jonesworks, she has represented many high-profile celebrities, athletes, companies, and business people. Among Jonesworks' clients were Baldoni, a well-known actor, director, and producer, and Wayfarer, his movie production company. Among Jonesworks' former employees was Abel, who, unbeknownst to Jones, had been groomed by Nathan to turn against Jones. Together, Nathan and Abel conspired with others—including Roza Kalantari and her company Skyline Agency, and Wallace and his company Street Relations—to unlawfully disparage Jones and harm Jones.

4. The attacks against Jones and Jonesworks included the publication of multiple websites and social media accounts smearing Jones and placing traditional media articles amplifying these lies. Jones has consistently maintained that this smear campaign was a calculated and deliberate effort to severely damage her business and reputation. Suspicions have now been validated. Among other things, discovery has revealed that Nathan directed a then-employee (the "Former Employee") to write copy and coordinated with frequent collaborator Wallace to create and publish numerous websites and social media accounts containing ugly false statements about Jones and Jonesworks.

5. Defendants have denied their involvement in the Jones websites. But the pattern has repeated too many times to be coincidence. It is now apparent that Nathan and Wallace—and on information and belief, often in connection with litigation and sometimes with the assistance of Kalantari and her agency Skyline—run a clandestine cottage industry of creating false smear websites and social media accounts targeting their adversaries and those of their clients. The Jones

website is not an isolated incident. On information and belief, this pattern has repeated itself many times over. And their frequent collaborations to create and publish strikingly similar derogatory and offensive websites and social media handles about others only further corroborates their hand in the Jones website.

6. For example, Nathan and Wallace directed that the copy for the website amandaghostsucks.com be drafted for then-client Rebel Wilson against her litigation adversary Amanda Ghost, including explicit instructions from Wallace about the content of this smear website: "we need to create a path where we expose … Amanda Ghost as like the new Heidi Fleiss. … she's an absolute madam."

7. They did the same for brothers Alon, Oren, and Tal Alexander, in the form of an anonymous website entitled alexanderbrothersextorted.com, publicly attributing an extortionate motive to women accusing the Alexander Brothers of sexual misconduct.

8. The list goes on. Similarities in these and other websites corroborate that the creators of the Jones website and of the websites amandaghostsucks.com and alexanderbrothersextorted.com likely also created many more derogatory websites of a similar nature, including on information and belief:

a. https://www.alexanikolas.net attacking Alexa Nikolas, who had filed a sexual assault lawsuit against Michael Milosh.

b. https://lookbackfraud.com accusing Joe Dunn of conspiring to make accusations against Michael Milosh.

c. A social media account attacking Christian Lanng, whom a Jane Doe had sued for allegedly forcing her into a slave contract.

d. https://minheejin.net attacking Min Hee-jin, the former CEO of South Korean recording label ADOR.

e. https://paigejimenez.com attacking Paige Jimenez, an influencer and OnlyFans model.

f. https://www.leadsafemamaexposed.com attacking Tamara Rubin, also known as The Lead Safe Mama, an activist, researcher and filmmaker who was the executive director of Lead Safe America from 2011-2016.

9. At the same time, Nathan, Kalantari, and others—including later Abel—also coordinated closely with reporters at *Business Insider* to facilitate and plant a highly negative media story about Jones and Jonesworks, buoyed in part by the existence of the same false and defamatory websites that Nathan and Wallace had created. So strong was their desire to generate negative media coverage against Jones that once they managed to get a greenlit story in *Business Insider* against Jones, they celebrated:




[…]




10. Nathan and Kalantari conspired to feed the reporters cherry-picked adverse sources and negative information about Jones, and together with Abel worked to ensure that any positive information about Jones (including from Baldoni and Wayfarer, and dozens of other clients who spoke up on Jones's behalf) would be filtered out and omitted from the story.

11. Nathan and others in text messages discussed their intention to use the published article as a weapon to convince existing Jonesworks' clients to separate from Jonesworks. They plainly intended to use the publication of this negative article to harm Jones, with Nathan discussing "us[ing] the business insider thing" to convince a shared client to drop Jonesworks.

12. On the eve of the article's release, Nathan boasted about the destructive effect this story would have on Jones, mocking Jones in a text to Abel and jokingly suggesting that Abel should tell Jones:




13. Abel and Nathan's conspiracy to take down Jones was virulent and effective, which they themselves recognized, in connection with Lively, was fueled by society's natural willingness to tear down successful women, and they capitalized on this for their own gain:




[…]






14. Indeed, Abel and Nathan's animosity against Jones was so great that they joked about killing Jones and sending her dismembered head to each other as a gift:




[…]




15. Nor was this the only time Abel, Nathan, and Wallace had used these tactics to tear down female adversaries. In July 2024, behind Jones's back, Abel and Nathan also secretly coordinated with Baldoni and Wayfarer to implement an equally aggressive media smear campaign on Baldoni's and Wayfarer's behalf. In connection with the release of *It Ends With Us* (the "Film") in August 2024, Baldoni began to fear that the media might report on allegations of

misogynistic and toxic on-set behavior and that the fallout would be harmful to his reputation and career. Determined to protect his reputation, Baldoni and Wayfarer's CEO Jamey Heath turned to Abel, who had become the point person at Jonesworks on the Baldoni and Wayfarer account. Over Jones's express objections, Abel brought on crisis-fixer Melissa Nathan to help her manage the situation. Together, Abel and Nathan, with Heath's active encouragement, conspired to shut Jones out of the process and keep their strategy hidden from her.

16. Abel and Nathan sprang into action, scheming to "bury" and "destroy" co-star Blake Lively to protect Baldoni. Their plan was covert, deliberately concealed from Jones, and went far beyond the legitimate scope of Abel's employment. Indeed, discovery has revealed that Nathan and Abel offered to Baldoni and Wayfarer (without Jones's knowledge) a "website" and "full social take down" of Lively—exactly what Nathan, Wallace, and others had done to attack and disparage Jones and others including Amanda Ghost and the Alexander Brothers' accusers. At the same time, Abel and Nathan were pursuing a far more selfish purpose: Tearing down Jones's reputation to take her clients and enrich themselves upon Abel's planned departure from Jonesworks:


From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
I know.
And once you are gone - we will be on accounts together and make really good money and be happy
Priority: Normal
29/07/2024 15:03:05(UTC+0)

[…]

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Let's just keep it steering that way
And you take this fucking client and never talk to her again I swear to God

Priority: Normal

09/08/2024 17:21:54(UTC+0)

17. Avarice, not any sincere appreciation for Baldoni, was Nathan and Abel's motivation. Abel's candid communications revealed that she in fact held Baldoni personally in extremely low regard:

From: [redacted] Jennifer Abel (owner)
To: [redacted]

I can't stand him. He's so pompous. A men's retreat during release, is he crazy?! And being off the grid for the summer because he's just so overworked… like calm down. You're not that important and nobody gives a shit how hard your life is.

Priority: Normal

14/01/2024 18:57:29(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted]

He doesn't need a retreat. He needs to be humbled. When this movie flops, he's going to try to blame every person around him for it

Priority: Normal

14/01/2024 19:00:38(UTC+0)

[…]

From: [redacted] Jennifer Abel (owner)
To: [redacted]

He may fire us because even if we put together an amazing campaign, it's not going to change the fact that he's so unlikable and unrealistic as a leading man, there's no chemistry with him and Blake, you and I both know that she will be resistant to promote this movie, and press will be reluctant to do anything with Justin without Blake being part of it. So there. Those are my thoughts.

Priority: Normal

14/01/2024 19:02:38(UTC+0)

18. Abel had voiced the same opinion in connection with a filmed kissing scene between Baldoni and Lively, which was described to Abel as "so gross" and revealed that Abel was well aware of Lively's on-set complaints about Baldoni's behavior:


From: [redacted] Jennifer Abel (owner)
To: [redacted]
It's so cringy
Priority: Normal
13/01/2024 04:22:10(UTC+0)


From: [redacted] Jennifer Abel (owner)
To: [redacted]
His face
Priority: Normal
13/01/2024 04:22:12(UTC+0)

[…]


From: [redacted]
To: [redacted] Jennifer Abel (owner)
Blake was probably grossed out too.
Priority: Normal
13/01/2024 04:23:34(UTC+0)


From: [redacted] Jennifer Abel (owner)
To: [redacted]
Yeah and filed a cease and desist
Priority: Normal
13/01/2024 04:23:47(UTC+0)

19. Nathan and Abel then used the crisis as an opportunity to drive a wedge between Jones and Baldoni, and to publicly pin blame for this smear campaign on Jones—when Jones had no knowledge or involvement in it, conspiring to ensure that Wayfarer and Baldoni would leave Jonesworks and come with Abel to her planned new firm:

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and she needs to also not do anything and my last conversation with her was last Wednesday or so

And then I couldn't help myself

**Priority:** Normal

19/08/2024 04:49:55(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

I ended it with

**Priority:** Normal

19/08/2024 04:50:00(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her.

Don't kill me, okay bye

**Priority:** Normal

19/08/2024 04:50:28(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Hahahaha omg love you

**Priority:** Normal

19/08/2024 05:02:12(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Thanks for chatting with him

**Priority:** Normal

19/08/2024 05:02:19(UTC+0)

20. By the time Jones became aware of the plot in August 2024 and terminated Abel, it was too late and the damage was done. Abel had already stolen more than 70 proprietary and sensitive business documents and additional client leads from Jonesworks. Beyond those documents, Abel left Jonesworks with Baldoni and Wayfarer in tow and immediately opened shop at her own competing firm, which she had set up while still working at Jonesworks. She further sought to poach employees in violation of the noncompete and non-solicitation provisions in her contract. And for their part encouraging Abel and leaving with her, Wayfarer and Baldoni breached their own contract with Jonesworks and then poured salt in the wound by baselessly refusing to pay the remaining amount owed.

21. Abel and Nathan's covert take down and smear campaigns were revealed in black and white on Abel's company-issued phone following her termination, which Jonesworks forensically preserved and examined in detail after receiving a subpoena for the phone's contents. Jones discovered the breadth and intensity of Abel and Nathan's duplicity from these records, including that Abel was actively encouraging other Jonesworks clients and employees to leave Jonesworks while Abel was still employed there.

22. To this day, Abel and Nathan blame, attack, and disparage Jones in an effort to detract from their own misconduct as it continues to come to light. So, too, do Baldoni and Wayfarer, who have since parted ways with Jonesworks, have repudiated their contractual obligations with Jonesworks, and have enabled and encouraged Abel's and Nathan's rampant misconduct against Jones. Jones has tried in good faith to resolve this dispute out of court, but those efforts were met with a complete lack of accountability and stonewalling. And Defendants' finger pointing and smear campaign against Jones still continues. Jones has been subject to even more retaliation and negative attacks from Defendants for filing this lawsuit and revealing the

truth. But she has been left with no choice but to seek to vindicate her rights through this litigation and put a stop to Defendants' continued harassing and damaging behavior against her.

**PARTIES**

23. Plaintiff Jonesworks LLC is a Delaware limited liability company that is an internationally recognized public relations firm. It was founded in and has its principal place of business in New York, New York. All members of Jonesworks are citizens of the State of Connecticut.

24. Plaintiff Stephanie Jones is an individual who resides in Greenwich, Connecticut. Jones is the founder and CEO of Jonesworks.

25. Defendant Jennifer Abel is an individual who resides in Beverly Hills, California. From approximately July 2020 to August 2024, Abel was an employee of Jonesworks. Abel established RWA Communications, of which she is the founder and CEO, in July 2024, while still employed by Jonesworks. In August 2024, Abel was terminated for cause by Jonesworks.

26. Defendant Melissa Nathan is an individual who resides in Los Angeles, California. Nathan offers crisis management and communications services. During a portion of the relevant period, Nathan lived in Brooklyn, New York. In approximately January 2024, Nathan launched The Agency Group PR LLC.

27. Defendant Justin Baldoni is an individual who resides in Ojai, California. Baldoni is a professional actor and director, and is a co-founder and co-chairman of Wayfarer Studios, an independent studio and production company. Baldoni was the director, co-star, and producer of the film *It Ends With Us*.

28. Defendant Wayfarer Studios LLC is a Delaware limited liability company with its principal place of business in Beverly Hills, California. It operates as an independent entertainment production studio and develops, produces, and finances feature films and other

original media content. It was co-founded by current co-Chairman Baldoni and is led by Defendant CEO Jamey Heath.

29. Defendant Jamey Heath is an individual who resides in Los Angeles, California. Heath has been the Chief Executive Officer of Wayfarer since March 2024 and was President of Wayfarer during production of the Film.

30. John Does 1-10 are unknown additional individuals who created and published the defamatory websites www.stephaniejonesleaks.com and www.stephaniejoneslies.com, as well as more than a dozen fake social media accounts and dark web accounts that defamed Jones and Jonesworks.

## JURISDICTION AND VENUE

31. This Court has diversity jurisdiction over the claims for relief asserted in this complaint pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no defendant is a citizen of the same State as Plaintiffs.

32. This Court has personal jurisdiction over Defendants pursuant to New York's Civil Practice Law and Rules ("CPLR") Section 301 because each of the aforementioned systematically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York. This Court further has personal jurisdiction over each Defendant pursuant to CPLR Section 302, including because, upon information and belief, all Defendants transact and solicit business within the State, have committed the tortious acts described in this Complaint within the State, or have committed such acts outside of the State causing injury to Jonesworks and Jones within the State. As just one example, Baldoni and Heath met in person in New York with Lively regarding Baldoni's on-set misconduct that started the sequence of events leading to this suit. Abel and Nathan also targeted

New York by communicating with journalists based in New York City in their effort to damage the reputation of Jones and Jonesworks and conceal Baldoni's on-set behavior.

33. This Court also has jurisdiction over Defendants Abel, Baldoni, and Wayfarer Studios because each is a party to a contract with Jonesworks that requires that disputes will be resolved in New York, New York, subject to New York law.

34. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Jonesworks' principal offices are in this District and because a substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTUAL ALLEGATIONS

## I. BACKGROUND ON THE PARTIES AND THEIR CONTRACTS

### A. Jones and Jonesworks

35. Jones is a highly regarded leader in the field of public relations and the founder, president, and owner of Jonesworks, an Emmy award-winning marketing and communications agency.

### B. Jennifer Abel

36. In July 2020, Jonesworks hired Abel to work as a publicist with the title Vice President. On July 9, 2020, Abel and Jonesworks executed two contracts: an offer letter establishing Abel's compensation and a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "Abel NDA").

37. The Abel NDA contained several provisions relevant to this Complaint: Abel agreed to keep confidential any and all of Jonesworks' proprietary information, including strategies, plans, and financial information as well as information relating to Jonesworks' clients. Abel agreed that any Work Product she created was the property of Jonesworks. She also agreed that she would not prepare or assist in the preparation of any articles about Jonesworks without

Jonesworks' express permission, would not disparage Jonesworks in any communications with any reporter or any Jonesworks client, and would not attempt to persuade any Jonesworks client to stop doing business with Jonesworks.

38. On November 22, 2021, Jonesworks and Abel executed an Employment Agreement adjusting the terms of her employment. Under the Employment Agreement, Jonesworks granted Abel the title "Vice President, Talent" and provided her with compensation tied to the company's performance, including a bonus based on distributions made by the company and a payment equal to 1% of any net proceeds in the event of the sale of Jonesworks.

39. Under the Employment Agreement, Abel agreed again that she would not use any Jonesworks' proprietary information for any purpose other than benefiting the company, that the products of her work were the sole property of Jonesworks, that she would not directly or indirectly compete with Jonesworks for business during her employment or for a period of six months after her departure, that she would not solicit any business from Jonesworks' clients, that she would not solicit any Jonesworks employees to depart the company, and that she would only notify clients of her departure from Jonesworks with Jones' approval. Abel also expressly agreed that she owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of the Company."

40. The Employment Agreement included a New York choice of law provision and a New York forum selection clause. Abel expressly agreed to submit to the jurisdiction of any state or federal court sitting in New York, New York for any disputes under the Employment Agreement.

41. Shortly after executing the Employment Agreement, Jonesworks began referring to Abel as a "Partner," but Abel remained at all times an employee of Jonesworks and never held any partnership interest in the company.

**C. Wayfarer and Justin Baldoni**

42. Jonesworks began providing public relations services to Baldoni in approximately 2017. When Baldoni founded Wayfarer in 2019, Jonesworks also began representing that company.

43. In May 2020, Jonesworks executed a contract to memorialize the terms of its provision of public relations services to Wayfarer (the "Wayfarer Agreement"). The Wayfarer Agreement provided that Jonesworks would provide "strategic communications services" "in a professional manner." In exchange for these services, Wayfarer agreed to pay Jonesworks $20,000 per month plus expenses, a 20% commission for any speaking engagements Jonesworks procured, and a 10% commission for any third-party agreements Jonesworks facilitated. The Wayfarer Agreement provided that if Wayfarer requested additional services, the parties would negotiate an additional fee for those services.

44. Wayfarer agreed not to solicit any Jonesworks employees or attempt to induce any Jonesworks employees to terminate their employment during the term of the Wayfarer Agreement or for one year thereafter.

45. The Wayfarer Agreement provided that either party could terminate it only if the other party materially breached its terms and failed to cure those material breaches within ten days of receiving notice.

46. The Wayfarer Agreement is governed by New York law. Any disputes under the Wayfarer Agreement were to be resolved through binding arbitration in New York, New York. Wayfarer, through counsel, subsequently repudiated this arbitration provision.

47. The contract had a one-year term that automatically renewed for additional one-year periods unless either party gave notice ninety days before such a renewal. Neither Jonesworks nor Wayfarer ever gave notice under this provision. The contract most recently renewed for a one-year period on May 7, 2024, and expired on May 6, 2025.

48. In June 2020, a month after executing the Wayfarer Agreement, and upon Wayfarer and Baldoni's specific request, the parties thereto—including Baldoni—agreed to incorporate public relations services for Baldoni personally into that contract in exchange for an additional payment of $5,000 per month. Since that time (and through the end of the Agreement's term), at Wayfarer and Baldoni's request, Jonesworks issued a single invoice each month for $25,000 to both Wayfarer and Baldoni. Until the dispute described in this Complaint, Wayfarer and Baldoni paid those invoices each month.

49. Shortly after commencing employment at Jonesworks, Abel began working with Baldoni and Wayfarer. As time passed, Jones grew confident in Abel's abilities and Abel ultimately was entrusted as the primary Jonesworks point of contact for Baldoni and Wayfarer. In that capacity, Abel also worked closely with Jamey Heath, who previously served as Vice President of Impact and Culture and Co-Chief Operating Officer of Wayfarer, and currently serves as Wayfarer's Chief Executive Officer. In this capacity, Heath played a hands-on role in overseeing Wayfarer's projects and communications strategies. Baldoni, Wayfarer, Heath and others accepted Jonesworks' consistent performance of its contractual services.

### D. Melissa Nathan

50. Melissa Nathan is a long-time crisis manager who has previously worked at several public relations firms.

51. Jones and Nathan have worked alongside each other in the publicity industry for many years. At times, they have shared mutual clients, and for many years Jones would seek to work collaboratively with Nathan and refer her business.

52. Jones's goodwill towards Nathan went so far that in 2022, Nathan and Jonesworks engaged in negotiations regarding Nathan potentially joining Jonesworks. The negotiations progressed significantly, including Jonesworks agreeing to hire, and actually hiring, two of Nathan's colleagues upon Nathan's insistence. Ultimately, however, negotiations with Nathan failed and she was not retained by Jonesworks.

53. In 2023, Jones witnessed Nathan's approach to handling clients' crises when they worked for a mutual client. Nathan's tactics went far over the line. Jones recommended that the client terminate its relationship with Nathan, which was separate and independent from Jones and Jonesworks. Jones herself further resolved that she would not collaborate with Nathan for clients in the future. Nathan has seemed to harbor significant animus toward Jones and Jonesworks ever since.

54. In January 2024, Nathan launched her own firm, The Agency Group PR. The Agency Group provides crisis management services to celebrities and other high-profile individuals and companies.

## II. NATHAN CONSPIRES WITH OTHERS TO DISPARAGE JONES AND JONESWORKS

55. Jones and Nathan's once collegial relationship soured after the 2023 incident in which Jones experienced Nathan's unethical tactics. After that incident, Jones stopped referring clients to Nathan, and Nathan began expressing extreme animosity toward Jones, especially regarding clients the two shared.

56. By late 2023, shortly before the formal launch of Nathan's new agency, Nathan and Jones were working for a mutual client. During the course of that business relationship, Nathan had become increasingly frustrated regarding what she perceived as that mutual client's deference to Jones and refusal to permit Nathan to unilaterally determine strategy for that client.

57. Nathan regularly expressed her frustration regarding having to work with Jones for a mutual client and disparaged Jones and Jonesworks to others, including to Kalantari. For example, Nathan told Kalantari that Jones and Abel "are possibly the worst people ever and they need to be taken down." Kalantari responded that "No one is taking [the mutual client] away from us – nobody!!!!!"

### B. Nathan and Abel Conspire With Others to Place and Facilitate *Business Insider* "Kill Story" Against Jones and Jonesworks

58. Nathan and Kalantari then conceived a plan to publicly attack Jones's and Jonesworks' reputations for the purpose of causing a mutual client to terminate its relationship with Jonesworks and also causing other existing and potential clients to refuse to do business with Jones and Jonesworks.

59. In December 2023, Nathan enlisted her former colleague Michael Goldberg and together with Kalantari they began to shop a negative story about Jones and Jonesworks to the media.

60. To that end, Nathan asked Goldberg to find out information about Jonesworks' clients from a Jonesworks employee. Goldberg—who himself had briefly worked at Jonesworks at Nathan's request—complied, and began trying to solicit confidential client information from a Jonesworks' employee. But Goldberg did not fully trust his person inside Jonesworks not to tell Jones that he and Nathan were placing a story about her. So Nathan and Goldberg worked to find someone else they believed would talk to the media negatively about Jones and Jonesworks. Nathan suggested the Former Employee, who also had previously worked at Jonesworks at Nathan's request, and later worked for Nathan. Goldberg enthusiastically agreed with the suggestion, and Nathan recruited the Former Employee to their cause. Nathan, Kalantari, and Goldberg ultimately succeeded at getting *Business Insider* to publish a hostile article about Jones that was intended to damage Jonesworks' reputation and its current and future business prospects.

61. Specifically, on or about March 27, 2024, Nathan and Kalantari encouraged and facilitated the Former Employee in speaking with *Business Insider* reporter Jack Newsham and, masking the Former Employee's identity, provided Newsham with derogatory and degrading information about Jones and Jonesworks. When the Former Employee expressed hesitation in talking to the reporter, Nathan and Kalantari enthusiastically encouraged her to do so, with Kalantari urging the Former Employee that "we need to get this out."

62. Nathan also conspired with Kalantari and others to provide Warren and Newsham with information regarding certain current and former Jonesworks clients.

63. Nathan and Kalantari arranged to communicate with the reporters on Signal, and Kalantari provided much of the information to smear Jones to the reporters on Signal, in order deliberately to hide their tracks. The names, contact information, and other information that Nathan and the others provided to the *Business Insider* reporters concerning current or former

Jonesworks clients included confidential information that had been learned by current or former Jonesworks employees only as part of their employment at Jonesworks.

64. Leaving no doubt that they were responsible for generating the negative story against Jones, they celebrated once they managed to get *Business Insider* to greenlight their proposed story about Jones:




65. Later, in or around July 2024, Abel—while still employed at Jonesworks—joined Nathan and her co-conspirators' support and facilitation of the *Business Insider* article to attack Jones.

66. Indeed, as early as July 29, 2024, Abel and Nathan discussed their outreach to Katie Warren, the *Business Insider* reporter who eventually published the article attacking Jones.






67. In the subsequent two weeks, Abel and Nathan fed information to Warren to ensure that she moved forward with the article and that it was sufficiently critical of Jones. The contact between Abel and Warren included, at a minimum, a 27-minute phone call on July 30, and several phone calls on August 1 and August 12.

68. Abel also facilitated Warren's outreach to former clients of Jones to further disrupt Jonesworks' business:



From: [redacted] Jennifer Abel (owner)
To: [redacted]
Fyi… Katie is going to try you again by phone to confirm if [redacted] is a client.
Priority: Normal
30/07/2024 20:42:04(UTC+0)



From: [redacted] Jennifer Abel (owner)
To: [redacted]
I would definitely call her asap and say off record she's not and to not have her included in the piece
Priority: Normal
30/07/2024 20:42:24(UTC+0)

69. This client, with whom Jones had worked closely for years bringing her from obscurity to prominence, terminated her contract with Jones as a direct result of Abel's encouragement and deliberate interference.

70. For her part, Nathan used the *Business Insider* article to try and convince a mutual client to terminate his relationship with Jones. On August 6, 2024, Nathan and an employee discussed how they did not want to work with Jones for a mutual client and could use the forthcoming *Business Insider* article as a reason the mutual client should not work with Jones or Jonesworks, as it "really showcases how little she can be trusted."

71. In addition, on August 9, 2024, Abel suggested and asked for Heath's approval to try to get *Business Insider* to remove reference to a letter of support for Jones that Baldoni had previously written, and to falsely tell Warren that Baldoni and Wayfarer had terminated their relationship with Jonesworks (when they had not):

> From: [redacted] Jennifer Abel (owner)
> To: [redacted] Jamey Heath
> Just thought about something… should I try to get Justin's letter removed from business insider.
> Priority: Normal
> 09/08/2024 20:45:57(UTC+0)

> From: [redacted] Jennifer Abel (owner)
> To: [redacted] Jamey Heath
> I would need to tell her on background that both Justin and wayfarer have severed ties
> Priority: Normal
> 09/08/2024 20:46:23(UTC+0)

> From: [redacted] Jennifer Abel (owner)
> To: [redacted] Jamey Heath
> So not sure if your lawyers would recommend that as she would need to print that and not sure if that would cause any issues
> Priority: Normal
> 09/08/2024 20:46:56(UTC+0)

72. On August 12, 2024, just three days before the article was published, *Business Insider's* Warren asked Abel to call her back:

> From: [redacted] Katie Warren
> To: [redacted] Jennifer Abel (owner)
> Hi, would you mind giving me a call back when you have a minute? Just have a quick question
> Priority: Normal
> 12/08/2024 15:46:49(UTC+0)

73. Abel called Warren eleven minutes later.

74. The day before the article was published, Nathan texted Abel boasting about the destructive effect it would have on Jones and mockingly suggested that Abel should tell Jones:


From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
Stephanie
Are you aware there is a KILL STORY dropping this week on you and if you hadn't of blown us up we would not of been in such a bad place.
Priority: Normal
14/08/2024 01:23:15(UTC+0)

75. Immediately before the article was published, Nathan texted Abel that she "just got a text from my source to say that article is going live imminently." When Abel asked which article Nathan was referencing, Nathan responded, "I just shook my head at your response. The only article." Abel responded: "OH SHIT" "THAT ARTICLE."

76. Warren then texted Abel the minute the article was published to alert her that it had gone live:


From: [redacted] Katie Warren
To: [redacted] Jennifer Abel (owner)
Story is up! Thanks again for your help.
Priority: Normal
15/08/2024 16:22:35(UTC+0)


From: [redacted] Katie Warren
To: [redacted] Jennifer Abel (owner)
https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos
Priority: Normal
15/08/2024 16:22:36(UTC+0)

77. Immediately after the article was published, Abel texted Nathan a link to it. Abel also sent the article directly to numerous industry contacts including many of Jones's clients and employees, and several of Abel's industry friends and other industry publicists.

78. The article, published by *Business Insider* on August 15, 2024, was highly critical of Jones, including by referencing and amplifying the anonymous disparaging website "stephaniejonesleaks.com" which had been recently posted online by Nathan and Wallace, and accusing Jones of having a reputation for aggression and having recently been dropped by high-profile clients.[1] Given that Wayfarer and Baldoni were long-time clients of Jonesworks, the clear (and false) implication of the article was that Jones was responsible for the aggressive media tactics that were being employed by Baldoni against Lively.

79. Unsurprisingly, the negative article about Jones shared a strikingly similar tone with the negative coverage against Lively appearing in the press at the same time. In the same vein as the gendered "mean girl" coverage about Lively that followed the "weaponizing feminism" script set out in the strategy memo, the Jones article was premised on the same principles, manifesting an equally sexist critique of Jones, who was cast as a "tyrannical boss" who could "quickly turn combative," rather than a successful executive in a high-profile and high-pressure role.

80. Nathan, desperate to for the article to have maximum negative impact, then instructed one of her employees to contact other reporters to get them to pick up the article, so it would reach even more viewers.




[1] *See* Katie Warren and Jack Newsham, *Who's Afraid of Stephanie Jones?*, BUSINESS INSIDER, Aug. 15, 2024.

81. This article had serious negative repercussions on Jones's business and negatively impacted Jones's standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel.

82. To this day, despite notice of falsities contained in the article and despite the growing proof that the article was planted and deliberately slanted to harm Jones, the *Business Insider* article remains publicly available and has not been retracted or corrected.

**C. Nathan and Her Co-Conspirators Fabricate Defamatory Websites to Attack Jones and Jonesworks**

83. Nathan's tactics for attacking Jones and Jonesworks ran deeper and were more insidious than just the *Business Insider* "kill story."

84. In or around early May of 2024, Nathan, acting in concert with Wallace and, upon information and belief Kalantari and Skyline, published two false and defamatory websites about Jones and Jonesworks (the "Websites").

85. In May of 2024, Nathan instructed the Former Employee, who was by then working for Nathan, to draft the copy of the contemplated website attacking Jones. Nathan directed the Former Employee specifically as to what the website was to say: that "Stephanie [Jones] holds clients hostage, that she leaks clients' secrets and that she treats her employees poorly." The Former Employee did as instructed and sent the requested draft content back to Nathan and Wallace. On May 6, 2024, Wallace and Nathan published the false and defamatory website about Jones and Jonesworks at the webpage www.stephaniejonesleaks.com. After Jones objected to the website domain hosting service about the defamatory and abusive nature of the website, the service took the website down.

86. Then, just days later, Wallace and Nathan, created and posted identical content at the webpage www.stephaniejoneslies.com, which was hosted by a different company. This website remained online and accessible until the summer of 2025.

87. These individuals published the Websites under the name of an innocent uninvolved former Jonesworks employee in order to hide their tracks and to perpetuate a false narrative regarding the genesis of the Websites.

88. Knowing that the websites needed more to generate the desired traffic, Nathan and Wallace also instructed the Former Employee to write content for several disparaging social media posts about Jones and Jonesworks, that would promote the Websites and further disparage and defame Jones.

89. The Former Employee complied and provided draft language for those posts to Wallace via the disappearing messaging app Signal. This content was subsequently published on X (formerly known as Twitter) via the handle @LeakyStephJones. Additional derogatory X accounts were also created, as well as Pinterest, Reddit, Gab, AnyFlip, and Facebook accounts that all sought to boost traffic to the Websites.

90. The Websites contain or contained substantially identical false, harassing, and defamatory statements about Jones and Jonesworks including but not limited to statements that:

a. Jones bullied Jonesworks employees.

b. Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c. Jones and Jonesworks leaked confidential client information.

d. Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e. Jones and Jonesworks interfere with their clients' ability to do business.

91. Each of these statements is false. On information and belief, Nathan, Wallace, Kalantari, Skyline, and the Doe Defendants published the defamatory statements on the Websites with knowledge of their falsity or, at a minimum, with reckless disregard for the truth with the specific intent to harm Jones and Jonesworks in their business by causing them to incur reputational harm and lose clients.

92. On information and belief, Nathan, Wallace, Kalantari, Skyline, and the Doe Defendants then engaged in search engine optimization efforts to promote the Websites and drive web traffic to them, including through the use of backlinks. That is, links to the Jones Defamatory Websites were planted throughout the internet on seemingly unrelated websites, such as colibris-wiki.org and fleurslocales.eu, to influence search engine rankings and elevate the Jones Defamatory Websites in online search results for Stephanie Jones or Jonesworks.

93. Nathan specifically intended the Websites to be severely damaging to Jones and Jonesworks' reputation. She succeeded. Indeed, Nathan boasted in her filings before this Court that the Websites "severely damaged" Jones's reputation following a "surge of negative publicity" and left Jonesworks in "utter turmoil" that caused it to "bleed[] clients and personnel" (*Lively v. Wayfarer Studios, et al.*, Civ. Action No. 1:24-cv-10049-LJL, ECF No. 50 ¶¶ 202, 225).

94. In fact, Nathan used the Websites to drum up interest among reporters in the *Business Insider* article she had placed with Kalantari and others about Jones. For example, when discussing the Websites with one reporter, Nathan told the reporter there would be a *Business Insider* piece about Jones published soon that she was "very excited" for and that she "hope[s] that you pick it up." In that same conversation, Nathan further disparaged Jones to the reporter to encourage him to later pick up the forthcoming negative article, calling Jones "the worst human

ever" and asking the reporter that if she could ever ask him "for one favour in [her] entire life" it would be to pick up the *Business Insider* piece.




[…]




[…]




95. Nathan and Wallace have denied involvement in the Websites, however, the pattern has repeated too many times to be a coincidence. Indeed, Nathan and Wallace, working at times with others, appear to have developed a cottage industry of creating and publishing smear websites against adversaries (or adversaries of their clients), often attendant to actual or prospective litigation.

96. For example, Nathan and Wallace also directed copy to be drafted, created, and caused to be published on a website on behalf of celebrity Rebel Wilson called

amandaghostsucks.com, disparaging producer Amanda Ghost who was then in a legal dispute with Wilson over a film.

97. Wilson at the time was a client of Nathan and Wallace.

98. Following their Jones playbook, Nathan instructed the Former Employee to draft content for a website requested by Wilson in accordance with a voice note sent by Wallace, which described in detail the substance he wanted that website to include:

> Oh, also, um, talked about Rebel. Like here's the – here's the -- the deal with Rebel, and I think you, me, and, um, and Bryan and maybe [the Former Employee], since she'll write this thing, what we have to do is we … I was just, like so basically what we need to do is we need to create a path where we expose Amanda -- Amanda Ghost as like the new Heidi Fleiss. … She's a – she's a – she's an absolute madam, and that's why she's so lethal, blah, blah, but that's – he's right like we can't just do it like, oh, she's a bitch, she sucks. It's like, it's gotta be really, really heavy, and connected to something that heavy.

99. Nathan also sent the Former Employee a draft of the content that Nathan and Wallace wanted to appear in the website, in a document named "Amanda Ghost website.docx." That document began "[t]his website is dedicated to telling the world the truth about Amanda Ghost who has maliciously tried to destroy the lives of countless artists," and included four pages of draft content disparaging Ghost, calling Ghost the "Indian Ghislaine Maxwell" and accusing Ghost of "procuring young women for the pleasure of the extremely wealthy" and "withholding artist's work from release" to others including Rebel Wilson.

100. Amandaghostsucks.com launched shortly thereafter. That website included the information Nathan and Wallace said it should: that Ghost is the "Indian Ghislaine Maxwell," "procuring young women for the pleasure of the extremely wealthy," and highlighting her "lethalness." Like with Jones, multiple parallel social media profiles appeared online at the same time to promote web traffic to the website. And multiple backlinks also appeared—including from

the very same accounts responsible for the Jones backlinks. Ghost has since sued Nathan for her role in creating and publishing this derogatory and defamatory site.

101. Nathan, Wallace, and the Former Employee also created and caused to be published a website called alexanderbrothersextorted.com on behalf of the Alexander Brothers—brothers Alon, Oren, and Tal Alexander, who had been accused of and indicted for sex trafficking offenses—that disparaged their accusers and others in connection with related litigations. And once again, backlinks appeared in online content including ones authored by the same accounts that authored content highlighting the Jones and Amanda Ghost websites.

102. The connection between these websites is not speculative. To the contrary, recent forensic analysis of the Jones, Amanda Ghost, and Alexander Brothers websites has determined that those websites and the promotion of them share certain digital fingerprints, including boosting their placement in search engine results by using backlinks (that is, links to the websites from third party websites, social media accounts, and blogs) created by similar authors. This forensic evidence supports only one conclusion: these websites were created by the same individual or coordinated set of individuals, *i.e.*, Nathan and Wallace.

103. It doesn't end there. Further investigation reveals that a lengthy trail of other similar attack websites and social media pages, including on information and belief at least the following:

a. https://www.alexanikolas.net attacking Alexa Nikolas, who had filed a sexual assault lawsuit against Michael Milosh.

b. https://lookbackfraud.com accusing Joe Dunn of conspiring to make accusations against Michael Milosh.

c. A social media account attacking Christian Lanng, whom a Jane Doe had sued for allegedly forcing her into a slave contract.

d. https://minheejin.net attacking Min Hee-jin, the former CEO of South Korean recording label ADOR.

e. https://paigejimenez.com attacking Paige Jimenez, an influencer and OnlyFans model.

f. https://www.leadsafemamaexposed.com attacking Tamara Rubin, also known as The Lead Safe Mama, an activist, researcher and filmmaker who was the executive director of Lead Safe America from 2011-2016.

104. Upon information and belief, Nathan and Wallace and others acted in concert to create and publish numerous derogatory attack websites and social media sites and accounts that share identical features, playbook, and digital fingerprints with the derogatory websites and social media accounts they created and published to attack Jones.

## III. ABEL AND NATHAN'S SCHEME TO USE BALDONI'S CRISIS TO ATTACK JONES'S REPUTATION AND STEAL JONESWORKS' BUSINESS

105. Nathan's attacks against Jones, often in coordination with Abel, did not stop there. Instead, around the same time as Nathan was conspiring with Wallace and others to create defamatory websites and social media accounts against Jones, and was conspiring with Abel and others to ensure publication of the negative *Business Insider* article against Jones, Nathan and Abel began conspiring to undermine Jonesworks from within, and to steal Jonesworks clients and confidential information upon Abel's planned departure from Jonesworks.

106. Among the clients that Abel and Nathan conspired to steal from Jonesworks were Baldoni and Wayfarer.

107. In 2019, Baldoni and Wayfarer acquired the film rights to the bestselling novel *It Ends With Us*, written by Colleen Hoover, an author whose books enjoy a vast and devoted following, especially among young women.

108. In 2023, Baldoni began production on the film adaptation of *It Ends With Us* (the "Film"). Wayfarer was a co-producer of the Film and Baldoni owned the rights to its source material. Baldoni named himself as the director and male lead of the Film, an abusive partner to the female main character played by Lively. Later reports emerged that, during production, women on set, including Lively, made complaints about Baldoni's behavior toward them, including comments of a sexual nature and inappropriate touching.

109. Jones later learned that the tensions on-set had reached such a point that, after the Screen Actors Guild strike halted production from July to early November 2023, Lively had only agreed to return to production if Wayfarer implemented additional measures to prevent further improper behavior on set by Baldoni.

110. The Film was released in August 2024. In connection with the release, the press began reporting on tensions between Baldoni and the female cast and crew on set. According to reports, Baldoni had acted in a controlling, demeaning, and "borderline abusive" manner towards the cast and crew, especially toward women. The press specifically identified Lively and Hoover as having "clashed" with Baldoni during filming, and speculated on the unusual circumstance that neither Lively nor Hoover was photographed promoting the film together with Baldoni as evidence of tension.[2]

[2] *See, e.g.*, Sara Nathan, *Truth behind 'It Ends With Us' feud rumors: Justin Baldoni made Blake Lively 'uncomfortable,' sources say*, N.Y. POST, Aug. 9, 2024, https://www.pagesix.com/2024/

111. As the August 2024 release neared, Baldoni began to fear that the increased attention being paid to him and the Film would cause reports of allegations about his on-set misbehavior to come out. Abel and Nathan—with encouragement from Heath, and without Jones's knowledge or approval—began to formulate a no-holds-barred strategy to discredit and suppress any potential revelations about Baldoni's on set behavior.

112. Jones, having entrusted the management of the Baldoni and Wayfarer relationship to Abel, trusted that any plan Abel formulated on behalf of Jonesworks would appropriately reflect the company's integrity and ethos. Unfortunately, the opposite turned out to be true. Behind Jones's back, Abel went around Jones to arrange for Baldoni and Wayfarer to retain Nathan and launch a smear campaign against Lively. Baldoni and Wayfarer admittedly hired Nathan at Abel's recommendation and over Jones's objections and despite her warnings about Nathan.

113. On information and belief, Nathan took advantage of this opportunity to encourage Abel to leave Jonesworks, to conspire with Abel to steal Baldoni and Wayfarer as clients from Jonesworks, and to smear Jones and Jonesworks in the press. On information and belief, Nathan did so because she believed, among other things, that Abel would encourage Nathan's own burgeoning relationship with these and other Jonesworks clients, while Jones would not. This scheme ultimately inflicted serious damage on Jones and Jonesworks.

### A. Abel and Nathan Devise A Smear Campaign Against Lively To Benefit Baldoni and Wayfarer

114. Nathan and Abel's strategy for Baldoni was set forth, in part, in a four-page memorandum sent to Baldoni (but kept secret from Jones) that outlined "several potential scenarios

---

08/09/entertainment/justin-baldoni-made-blake-lively-uncomfortable-sources; James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.

at play here which we should be prepared for, should BL [Lively] and her team make her grievances public":

> **CONFIDENTIAL**
>
> **SCENARIO PLANNING – IT ENDS WITH US**
>
> **OBJECTIVE**
>
> Protect the reputation of Justin Baldoni, Jamey Heath, and Wayfarer Studios in the lead up, during, and following the premiere of It Ends with Us, underscore the achievement and efforts of the Wayfarer team in bringing this movie to life, and emphasize Justin and the studio's commitment to their team and making the broader industry a more inclusive space.
>
> **OVERVIEW**
>
> Though there are several potential scenarios at play here which we should be prepared for, should BL and her team make her grievances public – via a blatant story or subtle leak. Given she was made to compromise with the premiere, we feel she will move forward with doing so.

115. The memo—which, along with the overall strategy, was kept secret from Jones—explicitly recommended weaponizing Baldoni's perceived history as a "longtime activist and advocate of and for women in Hollywood" to be used against Lively, and at the same time sought to discredit Lively's negative on-set experiences with Baldoni by painting her in the press as the one who had "weaponized feminism" for her own benefit:

- JB has been a longtime activist and advocate of and for women in Hollywood, speaking out about challenges his colleagues faced before the Me Too movement even began (TED 2017).
- These pieces will likely come out following any potential hit piece and/or coverage from the premiere. Our recommended approach would be to provide reporters who reach out for comment, should it be obvious she's referring to you, with the appropriate background information (listed in Scenario 1) to ensure their stories are balanced and the speculation can be turned to another one of the many people she's had issues working with (Leighton Meester, Anna Kendrick, Ben Affleck, etc.).
- As part of this, our team can also explore planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to "bully" into getting what they want.

116. Yet this aggressive strategy was apparently still not tough enough for Baldoni, who texted Abel and Heath that he was: "Not in love with the document [Nathan] sent – Not sure I'm feeling the protection I felt on the call." Abel relayed Baldoni's concerns to Nathan, telling Nathan that Baldoni needed a stronger showing of strength, explaining:

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

You can of course do that but I do think he needs to know. I'm going to confidentially send you something he's texting me and Jamey on the side just to arm you before this call. I think you guys need to be tough and show the strength of what you guys can do in these scenarios. He wants to feel like she can be buried...

Priority: Normal

02/08/2024 13:47:25(UTC+0)

117. Nathan immediately responded:

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Of course- but you know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble

Priority: Normal

02/08/2024 13:47:55(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

We can't write it down to him
We can't write we will destroy her. We will go to this. We will do this. We will do this. We will do this.

**Priority:** Normal

02/08/2024 13:48:24(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Of course not. But I told him that's the point of talking through

**Priority:** Normal

02/08/2024 13:48:42(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

He has to look at it as an information document for us to be armed with
That's all . Imagine if a document saying all the things that he wants ends up in the wrong hands.

**Priority:** Normal

02/08/2024 13:49:03(UTC+0)

[. . .]

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

you know we can bury anyone
But I can't write that to him
I will, I'll be very tough

**Priority:** Normal

02/08/2024 13:50:10(UTC+0)

118. In the days that followed, Baldoni and Heath made clear to Abel that they expected Abel and Nathan's strategy to include a social media activation plan, and Abel and Nathan immediately complied in its implementation.[3] Nathan and Abel's behind-the-scenes efforts for Baldoni and Heath also included frantically working to squash emerging media reports about

[3] For example, on August 5, 2024, Baldoni sent Abel a screenshot of an attack campaign against Hailey Bieber painting her as having a "history of bullying many women," and told Abel, "This is what we would need" against Lively.

certain human resources complaints that had been filed against Baldoni in connection with the Film.

119. On information and belief, Nathan and Abel also used their industry connections to plant negative articles about Lively in press outlets including the *Daily Mail* and the *New York Post's Page Six*, and leveraged their teams to create and perpetuate negative content about Lively on social media platforms such as Reddit and TikTok.[4] For example, Abel closely coordinated with *Page Six* reporter Sara Nathan—Melissa Nathan's sister—to publish an article hostile toward Lively's role in the production of the Film.

120. Nathan and Abel enthusiastically supported the strategy that Baldoni and Heath wanted, and deliberately hid it from Jones, in order to ingratiate themselves with Baldoni and Heath, drive a wedge between Baldoni and Jones, and ultimately to steal Baldoni and Wayfarer from Jonesworks as clients.

121. All parties involved in this nefarious strategy have subsequently confirmed that Jones was intentionally excluded from the plan and was not privy to email, Signal, or other communications about it.

122. For her part, Jones—who was kept in the dark about this coordinated strategy and was not aware that Wayfarer had actively approved and participated in it—objected to Wayfarer's hiring of Nathan and advocated a positive press strategy instead. Wayfarer's President immediately reported Jones' comments to Abel:

---

[4] *See* Alanah Kholsa and Jo Tweedy, *Is Blake Lively set to be CANCELLED? String of 'hard to watch' videos that have surfaced following 'tone deaf' Q&A to promote It Ends With Us could tarnish 36-year-old star's golden Hollywood image for good*, DAILY MAIL, Aug. 16, 2024; Sara Nathan, *Blake Lively approved final cut of 'It Ends with Us' amid feud with co-star director Justin Baldoni*, PAGE SIX, Aug. 13, 2024, https://pagesix.com/2024/08/13/celebrity-news/blake-lively-approved-final-cut-of-it-ends-with-us-amid-feud/.



From: [redacted] Tera Hanks
To: [redacted] Jennifer Abel (owner)

Text from Stephanie about the HR article and us hiring Melissa for Crisis.

"This wasn't planted by Leslie. This is playbook by Melissa.

There was no NY Post story she kept at bay. Melissa sister works at Page 6.
we need to flood zones with positive press and push back on claims. there's no counter to claims in story.
his complementary soundbites of blake need to be covered on high seo sites"

Priority: Normal

14/08/2024 03:48:39(UTC+0)

123. Excluding Jones from the conversation, Heath flatly rejected any pivot to a positive strategy in a text to Abel. Suggesting that Jones should be shut out for "undermining" their strategy, he called Jones' influence on the situation "poison":



From: [redacted] Jamey Heath
To: [redacted] Jennifer Abel (owner)

I don't like the idea that there is continued cannibalization from within the same side. Meaning "Jonesworks" ie Stephanie, and the Crisis team. I only want us to be communicating with people who are working together and not with ones who are undermining others within our team. Stephanie is casting doubt and that can have an affect like poison.

I'm going to bed. A first for me in forever.
Let's chat more tomorrow about this.

Priority: Normal

14/08/2024 04:15:05(UTC+0)

**B. Abel and Nathan Drive a Wedge Between Jones and Baldoni, And Attack Jones's Reputation in the Press**

124. At the same time as pandering to Baldoni and Heath's desire to discredit Lively, Abel and Nathan were also furthering their own profit-driven agenda to attack and disparage Jones, using many of the same tactics they were using against Lively, in order to eliminate Jones as a competitor and siphon away her clients for themselves.

125. Ironically, Abel and Nathan recognized that their success on both fronts reflected a societal desire to tear down successful women like Lively and Jones, but they remained undeterred in their agenda:




126. Abel's trashing of women even extended to Nathan herself, whom she had privately bad-mouthed just months before cynically hitching her star to Nathan to steal from Jones:





From: [redacted] Jennifer Abel (owner)
To: [redacted]
She's a piece of shit
Priority: Normal
05/04/2024 18:03:50(UTC+0)



From: [redacted] Jennifer Abel (owner)
To: [redacted]
I honestly used to like her and now I see her for how she really is
Priority: Normal
05/04/2024 18:04:01(UTC+0)

127. Working together, Nathan and Abel's stated goal in all of this was to position themselves to be able to steal Wayfarer, Baldoni and other clients from Jonesworks to the new firm Abel was planning to form, so that those clients could then be serviced jointly by both Abel's and Nathan's new firms, instead of Jonesworks:



From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
I know.
And once you are gone - we will be on accounts together and make really good money and be happy
Priority: Normal
29/07/2024 15:03:05(UTC+0)

128. Abel and Nathan explicitly discussed their plan to steal Wayfarer and Baldoni away from Jonesworks:



From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
Let's just keep it steering that way
And you take this fucking client and never talk to her again I swear to God
Priority: Normal
09/08/2024 17:21:54(UTC+0)




129. As Nathan made plain, "really good money" was the motivating force behind this scheme, not any special affection for Baldoni or Wayfarer. Indeed, Abel's candid communications, outside of Baldoni's and Heath's view, made clear that at the same time as she was working to salvage Baldoni's reputation and steal his business, she actually held Baldoni personally in extremely low regard. For example, when a colleague described an article about a kissing scene between Baldoni and Lively as "so gross," Abel responded:







[…]



> From: [redacted] Jennifer Abel (owner)
> To: [redacted]
> Yeah and filed a cease and desist
> Priority: Normal
> 13/01/2024 04:23:47(UTC+0)

130. Abel was even more explicit in her disdain for Baldoni:

> From: [redacted] Jennifer Abel (owner)
> To: [redacted]
> I can't stand him. He's so pompous. A men's retreat during release, is he crazy?! And being off the grid for the summer because he's just so overworked… like calm down. You're not that important and nobody gives a shit how hard your life is.
> Priority: Normal
> 14/01/2024 18:57:29(UTC+0)

> From: [redacted] Jennifer Abel (owner)
> To: [redacted]
> And what covers he's doing? At this point, none. Because he's not a star.
> Priority: Normal
> 14/01/2024 18:57:55(UTC+0)

[…]

> From: [redacted] Jennifer Abel (owner)
> To: [redacted]
> He doesn't need a retreat. He needs to be humbled. When this movie flops, he's going to try to blame every person around him for it
> Priority: Normal
> 14/01/2024 19:00:38(UTC+0)

131. To further their plan, Abel and Nathan contrived to plant stories in media outlets including the *Daily Mail* and *Business Insider* to trash Jones's and Jonesworks' reputations publicly and to their clients. They also back-channeled with Wayfarer and Baldoni to paint Jones in a negative light. For example, following the premiere of the Film, the *Daily Mail* published an

article reporting on tensions between Baldoni and Lively.[5] That article relied exclusively on social media posts that had been identified for Abel earlier that same day: either a shocking coincidence or confirmation that Abel had planted the story. On information and belief, Abel and Nathan conspired to plant this story in the *Daily Mail* in pursuit of dual objectives. First, the negative story cemented Baldoni's need for Nathan's crisis management services, ensuring herself an ongoing paycheck. Second, they arranged for Baldoni and Wayfarer to believe that Jones was the cited "insider" and also created a false story that Jones had publicly blamed Lively for the article, thus sowing discord between Baldoni and Wayfarer on the one hand and Jones on the other.

132. The scheme worked. When the article was published, at first, key players in the Film's release—including Josh Greenstein, the President of Sony Pictures' Motion Picture Group—believed that Abel was the person responsible for the story:



From: [redacted] Josh Greenstein
To: [redacted] Jennifer Abel (owner)
Hi Jen - been informed you have been speaking to sites about bad blood between Blake and Justin. He was good on today show / if a negative story breaks it would hurt the movie.
Josh Greenstein
Priority: Normal
08/08/2024 16:00:56(UTC+0)

133. But Abel denied being the source and instead falsely insinuated to Sony's communications team that Jones was the leak.

134. This false allegation stuck. Rumors that Jones was behind the article began to make their way back to Wayfarer, causing Heath to respond with hostility:

5 Lillian Gissen, *It Ends With Us fans are convinced there's a huge feud between Blake Lively and Justin Baldoni - here's why*, DAILY MAIL, Aug. 8, 2024, https://www.dailymail.co.uk /femail/article-13723621/blake-lively-justin-baldoni-feud-drama.html.

From: [redacted] Jamey Heath
To: [redacted] Steph Jones
To: [redacted] Tera Hanks
To: [redacted] Jennifer Abel (owner)

I am hearing from Sony that quote "Someone named Stephanie jones" has responded out to daily mail saying that Blake is to blame and now this has escalated it all.
We were purposely not responding to anything as to not fuel. This has fueled it. Everyone stand down unless I am aware of any moves. I don't care who is supposed to do what. I'm most interested in that. I'm interested only in any strategy being run by me. I need all to understand that.

Priority: Normal

08/08/2024 16:16:45(UTC+0)

135. When Jones stated her intent to contact Sony to correct this misimpression, Heath instructed her to stand down:

From: [redacted] Steph Jones
To: [redacted] Jamey Heath
To: [redacted] Tera Hanks
To: [redacted] Jennifer Abel (owner)

To clarify again, I have not spoken to Daily Mail. The above isn't true.

I also don't believe Dani or Kim at Sony are saying that above. Quote also has spaces as if it was just being drafted.

Priority: Normal

08/08/2024 16:33:29(UTC+0)

From: [redacted] Steph Jones
To: [redacted] Jamey Heath
To: [redacted] Tera Hanks
To: [redacted] Jennifer Abel (owner)

i am not contacting press but is concerning if Dani or Kim are saying I have escalated this as I haven't even touched this. I am going to contact them.

Priority: Normal

08/08/2024 16:34:52(UTC+0)

From: [redacted] Jamey Heath
To: [redacted] Steph Jones
To: [redacted] Tera Hanks
To: [redacted] Jennifer Abel (owner)

Stephanie. As your client and the one pays for the services, I am stating to not contact anyone regarding wayfarer or Sony at this time. If you do after this text, it will be a major problem. This needs to be respected now.

Priority: Normal

08/08/2024 16:37:09(UTC+0)

136. Heath went a step further and threatened Jones directly that he would issue a public press release stating that Baldoni and Wayfarer had terminated Jonesworks if she took any steps to contact Sony or others to clear her name, menacingly reminding her that she didn't need that kind of negative publicity for herself or her business.

137. Abel facilitated and encouraged Heath's attacks and threats against Jonesworks—her then-current employer. On or about August 8, 2024, Abel surreptitiously participated in a phone call between Heath and Jones. Hiding her presence, Abel fed statements to Heath that he then repeated to Jones. Heath, who was in Illinois at the time of this phone call, secretly recorded the call, simultaneously violating Illinois criminal law and memorializing his abusive threats and Abel's treachery.

138. On August 9, 2024, the *Daily Mail* published another article, this time reporting on Baldoni's abusive on-set behavior, citing "insiders" as the source for the article.[6] On information and belief, Abel and Nathan conspired to plant this story (or at minimum, knew it was forthcoming and allowed it to be published) in further pursuit of their goal to cement Baldoni's and Wayfarer's needs for Nathan's services and turn them against Jones.

139. Heath and Abel bragged about the success of this strategy, jokingly referring to Abel—who was sitting 20 rows away from Heath on the airplane on a press junket trip that they and Nathan attended without Jones—as "the Leak" that was "the best decision of this whole trip":

---

6 James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.




140. In parallel with their efforts in the *Daily Mail*, Abel joined in Nathan's longstanding effort to plant negative stories about Jones, including in *Business Insider* as detailed above at Paragraphs 59-78.

141. Just days after the "kill story" against Jones that Nathan and Abel had facilitated, on August 25, 2024, *Business Insider* turned the media storm surrounding Baldoni and Jones more pointedly to Nathan's advantage, publishing a second article that favorably touted Baldoni's hiring of Nathan to shepherd him through this crisis. The article, which on information and belief was again orchestrated by Nathan, noted that the negative attention on Lively was a "gift" to Baldoni.[7]

142. All the while, Abel had been making arrangements to leave Jonesworks with confidential information and clients in tow. On July 19, 2024, while still employed by Jonesworks, Abel filed paperwork to create RWA Communications LLC, the competing public relations agency she intended to start upon her departure from Jonesworks. Abel had also created a website and social media accounts for her new competing firm, all while still employed by and under contract with Jonesworks.

143. At least as early as July 22, 2024, Abel had created a new email account, jennifer@rwacommunications.com, to which she forwarded dozens of proprietary messages from Jonesworks, including client information, Jonesworks' work product, and information specifically

[7] Eve Crosbie, *The Blake Lively backlash has been 'a gift' for Justin Baldoni after he was forced to hire a PR-crisis manager amid rumored 'It Ends With Us' feud, PR expert says*, BUSINESS INSIDER, Aug. 25, 2024, https://www.businessinsider.com/blake-lively-justin-baldoni-it-ends-with-us-crisis-pr-2024-8.

regarding Jonesworks' work for Wayfarer and Baldoni. Abel successfully hid her theft of confidential documents and information. Abel surreptitiously continued stealing documents and client information while also secretly contacting Jonesworks' clients to pave the way for her departure.

144. Indeed, when Jonesworks' information technology personnel disabled Abel's access to Jonesworks' servers after discovering her unauthorized downloading activity, Abel boasted that she was still able to steal all of the documents and information she needed to form her own competing firm:




145. Abel further coordinated with Nathan and Baldoni to ensure that Wayfarer and Baldoni would leave Jonesworks and come with her as clients for her newly created RWA Communications:

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and she needs to also not do anything and my last conversation with her was last Wednesday or so

And then I couldn't help myself

**Priority:** Normal

19/08/2024 04:49:55(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

I ended it with

**Priority:** Normal

19/08/2024 04:50:00(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her.

Don't kill me, okay bye

**Priority:** Normal

19/08/2024 04:50:28(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Hahahaha omg love you

**Priority:** Normal

19/08/2024 05:02:12(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Thanks for chatting with him

**Priority:** Normal

19/08/2024 05:02:19(UTC+0)

146. On or about August 21, 2024, Jones learned about Abel's ongoing efforts to steal dozens and dozens of Jonesworks proprietary documents, including sensitive client and business information that Abel had no legitimate reason to access, including for major brand and clients that Abel had never worked on. Abel went so far as to download and copy the Jonesworks client contract form, except that she replaced the Jonesworks logo with the logo for her own newly-formed business. Jonesworks immediately terminated Abel.

147. As part of her termination paperwork, Abel falsely signed a statement purporting to confirm that she had not removed any electronic confidential information from Jonesworks. But, of course, she had, and this signed statement was untrue.

148. The damage was done. With the encouragement and assistance of Nathan, Baldoni, and Heath, Abel stole Wayfarer and Baldoni as clients, targeted other Jonesworks clients to leave, and launched the long-planned and competing RWA Communications. As a result, Wayfarer and Baldoni ceased working with Jonesworks and, despite being under contract with Jonesworks, refused to pay Jonesworks what they contractually owed for its services. Even on the day she departed Jonesworks, Abel proudly admitted to Nathan that she was shaking Jones down to extract as much as she could from the company before her departure.


From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Btw I'm having my off boarding this morning with our chief of staff (a joke) because Steph won't face me. And you should see the list I made of things to bring up

Priority: Normal

21/08/2024 15:26:17(UTC+0)

[…]


From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
I need the list
Priority: Normal
21/08/2024 15:26:30(UTC+0)


From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
Holding them hostage
Priority: Normal
21/08/2024 15:26:32(UTC+0)


From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
It's WILD
Priority: Normal
21/08/2024 15:27:04(UTC+0)


From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
Exactly . How business should be done
Priority: Normal
21/08/2024 15:27:05(UTC+0)

149. Nor was Abel content only to steal documents, clients, and confidential information from Jonesworks. On August 14, 2024, Abel also attempted to encourage Nathan to poach a valuable Jonesworks' employee:


From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
[redacted] wants 200k
Priority: Normal
14/08/2024 19:45:31(UTC+0)



From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
He will come work for you
Priority: Normal
14/08/2024 19:45:36(UTC+0)



From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
Told you he's pricey
Priority: Normal
14/08/2024 19:45:41(UTC+0)

[…]



From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
Do you think you serious and he would do it?
Priority: Normal
14/08/2024 19:46:20(UTC+0)

150. Abel also encouraged at least six other Jonesworks employees working for her in the Los Angeles office—almost half of Jonesworks' employees at that office—to leave the company, including by bad-mouthing Jones to those employees and sending the employees' resumes to competing public relations firms. As a direct result of these actions, two of these employees ended their contracts with Jonesworks and left to work for competitors.

151. Since being terminated from Jonesworks, Abel has continued attacking Jones within the industry, using her tried-and-true playbook to preemptively discredit any sources that might shed light on her own misdeeds. Abel has falsely stated to other participants in the public relations industry that Jones was attempting to distribute doctored text messages purporting to be from Abel as retaliation for Abel's departure. She has also tried again to point the finger at Jones as cover for her own role in the campaign against Lively becoming public. But Jones has never

doctored any text messages, and has no reason to do so. Abel's text messages were forensically extracted directly from that company phone that Abel used during her employment at Jonesworks and voluntarily returned to Jonesworks upon her termination in the presence of an employment lawyer, and have been preserved in their original state. And as has become glaringly apparent, the text messages are themselves enough to condemn Abel and Nathan without any need for doctoring.

152. So desperate were Nathan, Abel and the Wayfarer Parties to discredit the text messages that they cannot deny they wrote, that immediately after the filing of a legal complaint against them by Lively, they reactivated their publicity smear machine to discredit Jones and turn focus away from the damning content of the text messages by fabricating a wholly concocted story that they were obtained illicitly. On information and belief, they sent these false statements to reporters, some of whom published them in substance or idea, furthering their longstanding defamation against Jones.

153. As intended, the misconduct by Defendants has had a significant negative effect on Jones's and Jonesworks' business and reputation. And the campaign of misinformation against her has not stopped. As a result, Jones and Jonesworks have been left with no choice but to bring this lawsuit to seek redress for this misconduct and to remedy the damage done.

## FIRST CAUSE OF ACTION
## Breach of Contract – Abel Employment Agreement
## (Against Defendant Jennifer Abel)

154. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

155. Jonesworks and Abel are parties to the Abel Employment Agreement, which is a valid and enforceable contract.

156. Under the Abel Employment Agreement, Abel agreed, among other things, that: (1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential

and proprietary information, and that all business and plans made known to her while employed by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any Company proprietary information to solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts; (3) during her employment and for six months following the date of any termination, she would not compete with Jonesworks, or engage in or participate in any business that is in direct competition in any manner whatsoever with Jonesworks; and (4) during the employment term, Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

157. Abel breached the Abel Employment Agreement through her actions as described in this complaint, including by, among other things: (1) failing to hold in confidence confidential information for the sole benefit of Jonesworks, and by soliciting confidential information from at least one Jonesworks employee after her termination; (2) using confidential information to solicit, induce, or attempt to solicit or induce, business from Jonesworks clients and business contacts; (3) directly competing with Jonesworks in the six months following her departure from Jonesworks, including by starting a competing company and poaching and attempting to poach Jonesworks clients; (4) soliciting and inducing, and using confidential information to solicit or induce, other Jonesworks employees to leave Jonesworks and/or become employed by her or other competing firms; and (5) breaching her duty of loyalty to Jonesworks by working against the interests of Jones and Jonesworks during her period of employment.

158. Jones and Jonesworks have substantially performed the Abel Employment Agreement or were excused from doing so because of the actions of Abel.

159. Abel's breaches of the Abel Employment Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Tortious Interference With Contract – Abel Employment Agreement**
**(Against Defendants Melissa Nathan, Wayfarer and Justin Baldoni)**

160. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

161. Jonesworks and Abel are parties to the Abel Employment Agreement, which is a valid and enforceable contract.

162. Under the Abel Employment Agreement, Abel agreed, among other things, that: (1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential and proprietary information, and that all business and plans made known to her while employed by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any Company proprietary information to solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts; (3) during her employment and for six months following the date of any termination, she would not compete with Jonesworks, or engage in or participate in any business that is in direct competition in any manner whatsoever with Jonesworks; and (4) during the employment term, Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

163. Nathan, Wayfarer, and Baldoni were aware that Abel was employed by Jonesworks and, on information and belief, were aware that Abel's employment was governed by a contract containing industry-standard terms such as those described above.

164. Nathan, Baldoni, and Wayfarer induced, encouraged, and procured Abel's breach of the Abel Employment Agreement without justification, including by, among other things: (1) breaching her duty of loyalty to Jonesworks by working against the best interest of Jones and Jonesworks during her period of employment; and (2) encouraging and inducing Abel to violate the non-compete, non-solicitation, and confidentiality provisions of the Agreement.

165. Nathan, Baldoni, and Wayfarer, in bad faith, intentionally procured, caused, and facilitated Abel's breaches of the Abel Employment Agreement. But for the misconduct of Nathan, Baldoni, and Wayfarer, Abel would not have breached the Abel Employment Agreement.

166. Jones and Jonesworks have substantially performed the Abel Employment Agreement or were excused from doing so because of the actions of Nathan, Wayfarer, and Baldoni.

167. The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

168. The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Breach of Contract – Wayfarer Agreement**
**(Against Defendants Wayfarer Studios and Justin Baldoni)**

169. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

170. Jonesworks, Wayfarer, and Baldoni are parties to the Wayfarer Agreement, which is a valid and enforceable contract. Jones is Jonesworks' designee under the Wayfarer Agreement.

171. Under the Wayfarer Agreement, in exchange for services provided by Jonesworks, Wayfarer and Baldoni agreed to pay Jonesworks a sum of $25,000 per month.

172. Additionally, Wayfarer and Baldoni agreed, among other things, that during the term of the contract, and for one year following its expiration or termination they would not solicit or attempt to solicit for employment any officer, employee or agent of Jonesworks, or to employ or attempt to employ, or otherwise induce or attempt to induce any employee of Jonesworks to

terminate such employee's employment or engagement with Jonesworks, without prior written consent.

173. In May 2024, the Wayfarer Agreement automatically renewed. At no time in the required 90 days before the automatic renewal did either party provide notice of termination. Nor did Wayfarer or Baldoni provide notice of any material breach of the Wayfarer Agreement. The agreement has therefore not validly terminated, and Wayfarer and Baldoni are obligated to pay Jonesworks $25,000 per month through May 6, 2025, and are similarly obligated to comply with the full terms of the Wayfarer Agreement through May 2025.

174. On or about August 30, 2024, a representative of Wayfarer informed Jones that Wayfarer and Baldoni would no longer require Jonesworks' services, and thereafter refused to pay all amounts owed under the Wayfarer Agreement.

175. Wayfarer and Baldoni have breached the Wayfarer Agreement through their actions as described in this complaint, including by, among other things: (1) failing to pay the amounts contractually owed under the Agreement, (2) soliciting and inducing Abel to depart Jonesworks, and (3) employing Abel following her departure from Jonesworks.

176. Jonesworks has substantially performed the Wayfarer Agreement or was excused from doing so because of the actions of Wayfarer and Baldoni.

177. Wayfarer and Baldoni's breaches of the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Tortious Interference With Contract – Wayfarer Agreement**
**(Against Defendants Jennifer Abel and Melissa Nathan)**

178. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

179. Jones, Jonesworks, Baldoni, and Wayfarer are parties to the Wayfarer Agreement, which is a valid and enforceable contract. Among other things, the Wayfarer Agreement requires Wayfarer and Baldoni to pay Jonesworks $25,000 per month, including from May 2024 through May 2025.

180. Additionally, Wayfarer and Baldoni agreed that during the term of the contract, and for one year following its expiration or termination, they would not solicit or attempt to solicit for employment any Jonesworks employee.

181. Abel and Nathan were aware of the Wayfarer Agreement, and each induced, encouraged, and procured Wayfarer's and Baldoni's breach of the Wayfarer Agreement without justification, including by encouraging Wayfarer and Baldoni to cease paying Jonesworks and, instead, hire Abel and Nathan, and by encouraging Wayfarer and Baldoni to violate the non-solicitation provision of the Agreement.

182. Abel and Nathan, in bad faith, intentionally procured and facilitated Wayfarer's and Baldoni's breaches of the Wayfarer Agreement. But for the misconduct of Abel and Nathan, Wayfarer and Baldoni would not have breached the Wayfarer Agreement.

183. Abel's and Nathan's intentional interference with the Wayfarer Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

184. Abel's and Nathan's intentional interference with the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Tortious Interference With Prospective Business Relations**
**(Against Defendant Melissa Nathan)**

185. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

186. Beginning in at least December 2023, Nathan acted in concert with others, including Kalantari, Skyline, and former employees, including Goldberg, to place negative stories about Jones and Jonesworks in the media. They succeeded in getting *Business Insider* to publish a hostile article about Jones that was intended to damage Jonesworks' reputation and its current business and future business prospects, including intending for a mutual client to terminate his relationship with Jones and Jonesworks.

187. Nathan and her co-conspirators arranged for numerous former Jonesworks employees and clients to speak to *Business Insider* and provide *Business Insider* with confidential Jonesworks' information—including about its clients—and specifically identified people who they expected would speak negatively of Jones and Jonesworks.

188. Nathan and her co-conspirators (and acting in concert with Wallace) further created and disseminated derogatory attack websites and social media pages about Jones and Jonesworks and then engaged in search engine optimization efforts to drive maximum traffic to the Websites.

189. Nathan in particular used the Websites to spur interest in the forthcoming *Business Insider* article, which itself referenced and amplified the disparaging website "stephaniejonesleaks.com," and worked to have the *Business Insider* article picked up by other reporters and have maximum negative impact in the public relations industry and beyond.

190. Nathan and her co-conspirators engaged in the aforementioned conduct with the sole purpose to harm Jones and Jonesworks, including but not limited to persuade a mutual client to end its relationship with Jones and Jonesworks. The mutual client ultimately and as a result did

not renew or enter into an agreement with Jones and Jonesworks that he would have but-for the aforementioned conduct.

191. Jones and Jonesworks were severely damaged as a result of Nathan's and her co-conspirators' conduct. Among other harm, the *Business Insider* article and derogatory attack Websites negatively impacted Jones's standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel. As a result, Jonesworks' lost client relationships, including with a mutual client, that would have renewed or entered into agreements with Jonesworks if not for Defendants' wrongful conduct.

**SIXTH CAUSE OF ACTION**
**Faithless Servant**
**(Against Defendant Jennifer Abel)**

192. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

193. Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks a duty of loyalty.

194. Abel breached her duty of loyalty to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting, inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

195. This conduct was intended to, and did in fact, advance Abel's own interests to the detriment of Jones and Jonesworks.

196. The foregoing breaches were willful, wanton, and in bad faith.

197. Abel's faithless service proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against Defendant Jennifer Abel)**

198. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

199. Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of [Jonesworks]." Abel Employment Agreement ¶ 9.2.

200. Abel breached her fiduciary duties to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting, inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

201. Abel's breaches of her fiduciary duties proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**Defamation**
**(Against Defendant Jennifer Abel)**

202. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

203. Between September and December 2024, Abel made statements to certain third parties, including participants in the public relations industry in which she and Jones work,

asserting, among other things, that Jones had doctored and falsified text messages purporting to be from Abel and was attempting to distribute them to third parties in order to harm Abel and paint Abel in a false light.

204. These statements are false and untrue.

205. These statements are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

206. Abel made these statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at a minimum, negligently.

207. Abel's statements enjoyed no privilege or authorization.

208. Abel's false and defamatory statements caused harm to Jones and Jonesworks' reputation in the public relations industry and among potential clients.

209. The defamatory statements made by Abel proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

## NINTH CAUSE OF ACTION
## Defamation
## (Against Defendants Melissa Nathan and John Doe 1-10)

210. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

211. John Does 1-10 and Nathan published or caused to be published the Websites.

212. The Websites were viewed by numerous third parties, including, on information and belief, residents of New York County and in the Southern District of New York.

213. The Websites included numerous false statements regarding Jones and Jonesworks, including the following:

a. Jones bullied Jonesworks employees.

b. Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c. Jones and Jonesworks leaked confidential client information.

d. Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e. Jones and Jonesworks interfere with their clients' ability to do business.

214. These false statements included:

a. Accusing Jones of "years of non-stop verbal and emotional abuse" and "horrific treatment in the workplace;"

b. Jones "doesn't understand how to truly do PR outside of leaking her own clients' secrets;"

c. Jones "does not fight for her clients but, she does fight with them. Crying, screaming, keeping them hostage;"

d. "Stephanie Jones takes clients hostage;"

e. "Not only does she break confidentiality, she willingly does regardless of the possible damage this kind of behavior might cause;"

f. Implying that Jones was "hacking" the defamatory websites.

215. These statements are false.

216. The false statements published on the Websites are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

217. John Does 1-10 and Nathan made these statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at a minimum, negligently.

218. The false statements published on the Websites enjoyed no privilege or authorization.

219. The false statements published on the Websites caused harm to the reputations of Jones and Jonesworks in the public relations industry and among potential clients.

220. The defamatory statements published on the Websites proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

## TENTH CAUSE OF ACTION
## Violation of Illinois Consolidated Statutes Chapter 720 §§ 5/14-2 and 5/14-6
## (Against Defendant Heath)

221. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

222. On or about August 8, 2024, Heath was a party to a telephone conversation with Stephanie Jones.

223. During the phone call, Heath was located in Chicago, Illinois.

224. The phone call was a private conversation between Heath and Jones.

225. Heath recorded this phone call with Jones.

226. Heath did not inform Jones that he was recording the conversation and did not request or receive her consent to record the conversation.

## PRAYER FOR RELIEF

## WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:

227. Entry of judgment in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including:

a. In respect of each of the First Cause of Action, Second Cause of Action, Third Cause of Action, Fourth Cause of Action, Fifth Cause of Action, Sixth Cause of Action, Seventh Cause of Action, Eighth Cause of Action, Ninth Cause of Action, and Tenth Cause of

Action, entry of judgment in favor of Plaintiffs awarding damages in an amount to be proven at trial;

b. Reasonable attorneys' fees and costs for this action as allowed by law and the parties' contracts;

c. Punitive damages, including but not limited to pursuant to Illinois Consolidated Statutes 14-6;

d. Pre-judgment and post-judgment interest; and

e. Such other and further relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

228. Jones and Jonesworks request a jury trial on all issues so triable.

DATED: December 8, 2025 By: Kristin Tahler

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kristin Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com

Maaren A. Shah
Morgan L. Anastasio
295 5th Avenue
New York, New York 10016
(212) 849-7000
maarenshah@quinnemanuel.com
morgananastasio@quinnemanuel.com

Nicholas Inns (admitted *pro hac vice*)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Plaintiffs Stephanie Jones and Jonesworks LLC*

# Exhibit 4
# Tahler Decl. Ex. 2
# Proposed Redactions

# EXHIBIT 2

FILED UNDER SEAL

**SUPREMEUNITED STATES DISTRICT COURT OF THE STATE OF NEW YORK**
**COUNTYSOUTHERN DISTRICT OF NEW YORK**

Stephanie Jones, Jonesworks LLC,

Plaintiffs,

-against-

Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios LLC, Jamey Heath, and JOHN DOES 1-10,

Defendants.

IndexCivil Action No. 1:25-cv-779

**AMENDED COMPLAINT**

Jury Trial Demanded

Plaintiffs Stephanie Jones and Jonesworks LLC, by and through their undersigned counsel, bring this Amended Complaint against Defendants Jennifer Abel, Melissa Nathan, Justin Baldoni, Wayfarer Studios, LLC, Jamey Heath, and John Does 1-10, and respectfully allege as follows:

**NATURE OF THE CASE**

1. Discovery has revealed a growing list of attack websites from the same band of conspirators. Among other revelations, discovery has uncovered that Melissa Nathan, her "hired gun" Jed Wallace, and others engage in a regular practice of creating highly offensive and negative online content against individuals—often influential women, including Jones and Jonesworks—with the clear intent of destroying those individuals' reputations. This Amended Complaint conforms to the recently-discovered evidence and identifies the Doe Defendant responsible for the smear websites and social media accounts targeting Jones and Jonesworks and scores more.

2. ~~1. Defendants Abel and Nathan secretly conspired for months to publicly and privately attack Jones and Jonesworks, to breach multiple contracts and induce contractual breaches, and to steal clients and business prospects. Behind Jones's back, they secretly coordinated with Baldoni and Wayfarer to implement an aggressive media smear campaign against Baldoni's film co-star, and then used the crisis as an opportunity to drive a wedge between Jones and Baldoni, and to publicly pin blame for this smear campaign on Jones – when Jones had no knowledge or involvement in it. To this day, Abel and Nathan continue to point the finger falsely at Jones now that their own misconduct is coming to light, and to defame and attack Jones in the industry. Baldoni and Wayfarer, who have since parted ways with Jonesworks, have repudiated their contractual obligations with Jonesworks and rebuffed Jones's efforts to settle this dispute privately in arbitration. Defendants will not stop attacking Jones, and have refused any efforts to resolve these issues out of court~~The Jones Parties now know that before Nathan and Abel engaged Wallace to run a retaliatory media smear campaign against Blake Lively surrounding the release of the film *It Ends With Us*, they had employed the same underhanded tactics against Jones, causing an astronomical and wholly unfounded spike in negative rumors, online chatter, and media articles unlike anything Jones had experienced in her career and resulting in severe reputational damage. This lawsuit seeks to finally put a stop to their continued misconduct and to compensate Jones and Jonesworks for the damage Defendants' conduct and scheme has inflicted.

3. ~~2.~~ Stephanie Jones is a highly respected public relations expert who focuses on corporate and personal publicity. Through her company, Jonesworks, she has represented many high-profile celebrities, athletes, companies, and business people. Among ~~Jonesworks's~~Jonesworks' clients were Baldoni, a well-known actor, director, and producer, and

Wayfarer, his movie production company. Among Jonesworks' former employees was Abel, who, unbeknownst to Jones, had been groomed by Nathan to turn against Jones. Together, Nathan and Abel conspired with others—including Roza Kalantari and her company Skyline Agency, and Wallace and his company Street Relations—to unlawfully disparage Jones and harm Jones.

4. The attacks against Jones and Jonesworks included the publication of multiple websites and social media accounts smearing Jones and placing traditional media articles amplifying these lies. Jones has consistently maintained that this smear campaign was a calculated and deliberate effort to severely damage her business and reputation. Suspicions have now been validated. Among other things, discovery has revealed that Nathan directed a then-employee (the "Former Employee") to write copy and coordinated with frequent collaborator Wallace to create and publish numerous websites and social media accounts containing ugly false statements about Jones and Jonesworks.

5. Defendants have denied their involvement in the Jones websites. But the pattern has repeated too many times to be coincidence. It is now apparent that Nathan and Wallace—and on information and belief, often in connection with litigation and sometimes with the assistance of Kalantari and her agency Skyline—run a clandestine cottage industry of creating false smear websites and social media accounts targeting their adversaries and those of their clients. The Jones website is not an isolated incident. On information and belief, this pattern has repeated itself many times over. And their frequent collaborations to create and publish strikingly similar derogatory and offensive websites and social media handles about others only further corroborates their hand in the Jones website.

6. For example, Nathan and Wallace directed that the copy for the website amandaghostsucks.com be drafted for then-client Rebel Wilson against her litigation adversary Amanda Ghost, including explicit instructions from Wallace about the content of this smear website: "we need to create a path where we expose … Amanda Ghost as like the new Heidi Fleiss. … she's an absolute madam."

7. They did the same for brothers Alon, Oren, and Tal Alexander, in the form of an anonymous website entitled alexanderbrothersextorted.com, publicly attributing an extortionate motive to women accusing the Alexander Brothers of sexual misconduct.

8. The list goes on. Similarities in these and other websites corroborate that the creators of the Jones website and of the websites amandaghostsucks.com and alexanderbrothersextorted.com likely also created many more derogatory websites of a similar nature, including on information and belief:

a. https://www.alexanikolas.net attacking Alexa Nikolas, who had filed a sexual assault lawsuit against Michael Milosh.

b. https://lookbackfraud.com accusing Joe Dunn of conspiring to make accusations against Michael Milosh.

c. A social media account attacking Christian Lanng, whom a Jane Doe had sued for allegedly forcing her into a slave contract.

d. https://minheejin.net attacking Min Hee-jin, the former CEO of South Korean recording label ADOR.

e. https://paigejimenez.com attacking Paige Jimenez, an influencer and OnlyFans model.

f. https://www.leadsafemamaexposed.com attacking Tamara Rubin, also known as The Lead Safe Mama, an activist, researcher and filmmaker who was the executive director of Lead Safe America from 2011-2016.

9. At the same time, Nathan, Kalantari, and others—including later Abel—also coordinated closely with reporters at *Business Insider* to facilitate and plant a highly negative media story about Jones and Jonesworks, buoyed in part by the existence of the same false and defamatory websites that Nathan and Wallace had created. So strong was their desire to generate negative media coverage against Jones that once they managed to get a greenlit story in *Business Insider* against Jones, they celebrated:




[…]




10. Nathan and Kalantari conspired to feed the reporters cherry-picked adverse sources and negative information about Jones, and together with Abel worked to ensure that any positive information about Jones (including from Baldoni and Wayfarer, and dozens of other clients who spoke up on Jones's behalf) would be filtered out and omitted from the story.

11. Nathan and others in text messages discussed their intention to use the published article as a weapon to convince existing Jonesworks' clients to separate from Jonesworks. They

plainly intended to use the publication of this negative article to harm Jones, with Nathan discussing "us[ing] the business insider thing" to convince a shared client to drop Jonesworks.

12. On the eve of the article's release, Nathan boasted about the destructive effect this story would have on Jones, mocking Jones in a text to Abel and jokingly suggesting that Abel should tell Jones:




13. Abel and Nathan's conspiracy to take down Jones was virulent and effective, which they themselves recognized, in connection with Lively, was fueled by society's natural willingness to tear down successful women, and they capitalized on this for their own gain:




[…]






14. Indeed, Abel and Nathan's animosity against Jones was so great that they joked about killing Jones and sending her dismembered head to each other as a gift:




[…]




15. ~~3. Baldoni produced, directed, and co-starred in the film~~ Nor was this the only time Abel, Nathan, and Wallace had used these tactics to tear down female adversaries. In July 2024, behind Jones's back, Abel and Nathan also secretly coordinated with Baldoni and Wayfarer to implement an equally aggressive media smear campaign on Baldoni's and

Wayfarer's behalf. In connection with the release of *It Ends With Us* (the "Film")~~. In connection with the Film's release~~ in August 2024, Baldoni began to fear that the media might report on allegations of misogynistic and toxic on-set behavior and that the fallout would be harmful to his reputation and career. Determined to protect his reputation, Baldoni and Wayfarer's CEO Jamey Heath turned to Abel, who had become the point person at Jonesworks on the Baldoni and Wayfarer account. Over Jones's express objections, Abel brought on crisis-fixer Melissa Nathan to help her manage the situation. Together, Abel and Nathan, with Heath's active encouragement, conspired to shut Jones out of the process and keep their strategy hidden from her.

16. ~~4.~~ Abel and Nathan sprang into action, scheming to "bury" and "destroy" co-star Blake Lively to protect Baldoni. Their plan was covert, deliberately concealed from Jones, and went far beyond the legitimate scope of Abel's employment. Indeed, discovery has revealed that Nathan and Abel offered to Baldoni and Wayfarer (without Jones's knowledge) a "website" and "full social take down" of Lively—exactly what Nathan, Wallace, and others had done to attack and disparage Jones and others including Amanda Ghost and the Alexander Brothers' accusers. At the same time, Abel and Nathan were pursuing a far more selfish purpose: Tearing down Jones's reputation to take her clients and enrich themselves upon Abel's planned departure from Jonesworks:




[…]


From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Let's just keep it steering that way
And you take this fucking client and never talk to her again I swear to God

Priority: Normal

09/08/2024 17:21:54(UTC+0)

17. ~~5.~~ Avarice, not any sincere appreciation for Baldoni, was Nathan and Abel's motivation. Abel's candid communications revealed that she in fact held Baldoni personally in extremely low regard:


From: [redacted] Jennifer Abel (owner)
To: [redacted]

I can't stand him. He's so pompous. A men's retreat during release, is he crazy?! And being off the grid for the summer because he's just so overworked… like calm down. You're not that important and nobody gives a shit how hard your life is.

Priority: Normal

14/01/2024 18:57:29(UTC+0)


From: [redacted] Jennifer Abel (owner)
To: [redacted]

He doesn't need a retreat. He needs to be humbled. When this movie flops, he's going to try to blame every person around him for it

Priority: Normal

14/01/2024 19:00:38(UTC+0)

[…]


From: [redacted] Jennifer Abel (owner)
To: [redacted]

He may fire us because even if we put together an amazing campaign, it's not going to change the fact that he's so unlikable and unrealistic as a leading man, there's no chemistry with him and Blake, you and I both know that she will be resistant to promote this movie, and press will be reluctant to do anything with Justin without Blake being part of it. So there. Those are my thoughts.

Priority: Normal

14/01/2024 19:02:38(UTC+0)

18. ~~6. Months earlier~~ Abel had voiced the same opinion in connection with a filmed kissing scene between Baldoni and Lively, which was described to Abel as "so gross" and revealed that Abel was well aware of Lively's on-set complaints about Baldoni's behavior:







[…]







~~7. At the same time as Abel and Nathan were working to protect Baldoni from negative press attention, they were actively working their media contacts to plant negative stories about Jones and Jonesworks. Central to Abel and Nathan's personal vendetta against Jones was an August 2024 *Business Insider* article titled, "Who's Afraid of Stephanie Jones?" that Abel and~~

Nathan coordinated with a friendly reporter. Indeed, as early as July 29, 2024, Abel and Nathan were coordinating their outreach to Katie Warren, the *Business Insider* reporter who eventually published the article attacking Jones:







8. Conversations between Abel and Nathan show close coordination with Warren, including, numerous lengthy phone calls between Abel and Nathan between July 30 and August 12. Abel also facilitated Warren's outreach to former clients of Jones in order to further disrupt Jonesworks' business and negatively influence the coverage. This included putting Warren in touch with a client with whom Jones had worked closely for years, bringing her from obscurity to prominence, and who terminated her contract with Jones as a direct result of Abel's encouragement and deliberate interference:



> From: [redacted] Jennifer Abel (owner)
> To: [redacted]
> I would definitely call her asap and say off record she's not and to not have her included in the piece
> Priority: Normal
> 30/07/2024 20:42:24(UTC+0)

~~9. On the eve of the article's release, Nathan boasted about the destructive effect this story would have on Jones, mocking Jones in a text to Abel and jokingly suggesting that Abel should tell Jones:~~

> From: [redacted] Melissa Nathan
> To: [redacted] Jennifer Abel (owner)
> Stephanie
> Are you aware there is a KILL STORY dropping this week on you and if you hadn't of blown us up we would not of been in such a bad place.
> Priority: Normal
> 14/08/2024 01:23:15(UTC+0)

~~10. Abel and Nathan's conspiracy to take down Jones was virulent and effective, which they themselves recognized was fueled by society's natural willingness to tear down successful women, and they capitalized on this for their own gain:~~

> From: [redacted] Melissa Nathan
> To: [redacted] Jennifer Abel (owner)
> It's actually sad because it just shows you have people really want to hate on women
> Priority: Normal
> 10/08/2024 16:41:38(UTC+0)

> From: [redacted] Jennifer Abel (owner)
> To: [redacted] Melissa Nathan
> I know it is sad
> Priority: Normal
> 10/08/2024 16:43:16(UTC+0)




~~11. As her planned departure neared, Abel boasted to Nathan about the damage she was doing to Jonesworks, her then-current employer, and Nathan goaded her on:~~










19. ~~12. Abel and Nathan also conspired~~ Nathan and Abel then used the crisis as an opportunity to drive a wedge between Jones and Baldoni, and to publicly pin blame for this smear campaign on Jones—when Jones had no knowledge or involvement in it, conspiring to ensure that Wayfarer and Baldoni would leave Jonesworks and come with Abel to her planned new firm:

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and she needs to also not do anything and my last conversation with her was last Wednesday or so

And then I couldn't help myself

**Priority:** Normal

19/08/2024 04:49:55(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

I ended it with

**Priority:** Normal

19/08/2024 04:50:00(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her.

Don't kill me, okay bye

**Priority:** Normal

19/08/2024 04:50:28(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Hahahaha omg love you

**Priority:** Normal

19/08/2024 05:02:12(UTC+0)




20. ~~13.~~ By the time Jones became aware of the plot in August 2024 and terminated Abel, it was too late and the damage was done. Abel had already stolen more than 70 proprietary and sensitive business documents and additional client leads from Jonesworks. Beyond those documents, Abel left Jonesworks with Baldoni and Wayfarer in tow and immediately opened shop at her own competing firm, which she had set up while still working at Jonesworks. She further sought to poach employees in violation of the noncompete and non-solicitation provisions in her contract. And for their part encouraging Abel and leaving with her, Wayfarer and Baldoni breached their own contract with Jonesworks and then poured salt in the wound by baselessly refusing to pay the remaining amount owed.

21. ~~14.~~ Abel and Nathan's covert take down and smear campaigns were revealed in black and white on Abel's company-issued phone following her termination, which Jonesworks forensically preserved and examined in detail after receiving a subpoena for the phone's contents. Jones discovered the breadth and intensity of Abel and Nathan's duplicity from these records, including that Abel was actively encouraging other Jonesworks clients and employees to leave Jonesworks while Abel was still employed there.

~~15. Abel continues to this day to defame and point the finger at Jones, seeking to dodge the inevitable fallout from her own actions and behavior coming to light.~~

22. ~~16.~~ To this day, Abel and Nathan blame, attack, and disparage Jones in an effort to detract from their own misconduct as it continues to come to light. So, too, do Baldoni and

Wayfarer, who have since parted ways with Jonesworks, have repudiated their contractual obligations with Jonesworks, and have enabled and encouraged Abel's and Nathan's rampant misconduct against Jones. Jones has tried in good faith to resolve this dispute out of court, but those efforts ~~have been~~were met with a complete lack of accountability and stonewalling. And Defendants' finger pointing and smear campaign against Jones still continues. Jones ~~anticipates that she will be~~has been subject to even more retaliation and negative attacks from Defendants for filing this lawsuit and revealing the truth. But she has been left with no choice but to seek to vindicate her rights through this litigation and put a stop to Defendants' continued harassing and damaging behavior against her.

**PARTIES**

23. ~~17.~~ Plaintiff Jonesworks LLC is a Delaware limited liability company that is an internationally recognized public relations firm. It was founded in and has its principal place of business in New York, New York. All members of Jonesworks are citizens of the State of Connecticut.

24. ~~18.~~ Plaintiff Stephanie Jones is an individual who resides in Greenwich, Connecticut. Jones is the founder and CEO of Jonesworks.

25. ~~19.~~ Defendant Jennifer Abel is an individual who resides in Beverly Hills, California. From approximately July 2020 to August 2024, Abel was an employee of Jonesworks. ~~In August 2024, Abel was terminated for cause by Jonesworks and~~Abel established RWA Communications, of which she is the founder and CEO, in July 2024, while still employed by Jonesworks. In August 2024, Abel was terminated for cause by Jonesworks.

26. ~~20.~~ Defendant Melissa Nathan is an individual who resides in Los Angeles, California. Nathan offers crisis management and communications services. During a portion of

the relevant period, Nathan lived in Brooklyn, New York. In approximately January 2024, Nathan launched The Agency Group PR LLC.

27. ~~21.~~ Defendant Justin Baldoni is an individual who resides in Ojai, California. Baldoni is a professional actor and director, and is a co-founder and co-chairman of Wayfarer Studios, an independent studio and production company. Baldoni was the director, co-star, and producer of the film *It Ends With Us*.

28. ~~22.~~ Defendant Wayfarer Studios LLC is a Delaware limited liability company with its principal place of business in Beverly Hills, California. It operates as an independent entertainment production studio and develops, produces, and finances feature films and other original media content. It was co-founded by current co-Chairman ~~Justin~~ Baldoni and is led by Defendant CEO Jamey Heath.

29. Defendant Jamey Heath is an individual who resides in Los Angeles, California. Heath has been the Chief Executive Officer of Wayfarer since March 2024 and was President of Wayfarer during production of the Film.

30. ~~23.~~ John Does 1-10 are unknown additional individuals who created and published the defamatory websites www.stephaniejonesleaks.com and www.stephaniejoneslies.com, as well as more than a dozen fake social media accounts and dark web accounts that defamed Jones and Jonesworks.

**JURISDICTION AND VENUE**

31. This Court has diversity jurisdiction over the claims for relief asserted in this complaint pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no defendant is a citizen of the same State as Plaintiffs.

32. ~~24.~~ This Court has personal jurisdiction over ~~this dispute and over~~ Defendants ~~Abel, Nathan, Baldoni, and Wayfarer Studios~~ pursuant to New York's Civil Practice Law and Rules ("CPLR") Section 301 because ~~all Defendants~~each of the aforementioned systematically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York. This Court further has personal jurisdiction over each Defendant pursuant to CPLR Section 302, including because, upon information and belief, all Defendants transact and solicit business within the State, have committed the tortious acts described in this Complaint within the State, or have committed such acts outside of the State causing injury to Jonesworks and Jones within the State. As just one example, Baldoni and Heath met in person in New York with Lively regarding Baldoni's on-set misconduct that started the sequence of events leading to this suit. Abel and Nathan also targeted New York by communicating with journalists based in New York City in their effort to damage the reputation of Jones and Jonesworks and conceal Baldoni's on-set behavior.

33. ~~25.~~ This Court also has jurisdiction over Defendants Abel, Baldoni, and Wayfarer Studios because each is a party to a contract with Jonesworks that requires that disputes will be resolved in New York, New York, subject to New York law.

34. ~~26.~~ Venue is proper in this ~~Court~~District pursuant to ~~CPLR Section 503,~~28 U.S.C. §§ 1391(b) and (c) because Jonesworks' principal offices are in ~~New York County~~this District and because a substantial part of the events giving rise to the claims at issue occurred in ~~New York County~~this District.

## FACTUAL ALLEGATIONS

## I. BACKGROUND ON THE PARTIES AND THEIR CONTRACTS

### A. Jones and Jonesworks

35. ~~27.~~ Jones is a highly regarded leader in the field of public relations and the founder, president, and owner of Jonesworks, an Emmy award-winning marketing and communications agency.

### B. Jennifer Abel

36. ~~28.~~ In July 2020, Jonesworks hired Abel to work as a publicist with the title Vice President. On July 9, 2020, Abel and Jonesworks executed two contracts: an offer letter establishing Abel's compensation and a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "Abel NDA").

37. ~~29.~~ The Abel NDA contained several provisions relevant to this Complaint: Abel agreed to keep confidential any and all of Jonesworks' proprietary information, including strategies, plans, and financial information as well as information relating to Jonesworks' clients. Abel agreed that any Work Product she created was the property of Jonesworks. She also agreed that she would not prepare or assist in the preparation of any articles about Jonesworks without Jonesworks' express permission, would not disparage Jonesworks in any communications with any reporter or any Jonesworks client, and would not attempt to persuade any Jonesworks client to stop doing business with Jonesworks.

38. ~~30.~~ On November 22, 2021, Jonesworks and Abel executed an Employment Agreement adjusting the terms of her employment. Under the Employment Agreement, Jonesworks granted Abel the title "Vice President, Talent" and provided her with compensation

tied to the company's performance, including a bonus based on distributions made by the company and a payment equal to 1% of any net proceeds in the event of the sale of Jonesworks.

39. ~~31.~~ Under the Employment Agreement, Abel agreed again that she would not use any Jonesworks' proprietary information for any purpose other than benefiting the company, that the products of her work were the sole property of Jonesworks, that she would not directly or indirectly compete with Jonesworks for business during her employment or for a period of six months after her departure, that she would not solicit any business from Jonesworks' clients, that she would not solicit any Jonesworks employees to depart the company, and that she would only notify clients of her departure from Jonesworks with Jones' approval. Abel also expressly agreed that she owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of the Company."

40. ~~32.~~ The Employment Agreement included a New York choice of law provision and a New York forum selection clause. Abel expressly agreed to submit to the jurisdiction of any state or federal court sitting in New York, New York for any disputes under the Employment Agreement.

41. ~~33.~~ Shortly after executing the Employment Agreement, Jonesworks began referring to Abel as a "Partner," but Abel remained at all times an employee of Jonesworks and never held any partnership interest in the company.

**C. Wayfarer and Justin Baldoni**

42. ~~34.~~ Jonesworks began providing public relations services to Baldoni in approximately 2017. When Baldoni founded Wayfarer in 2019, Jonesworks also began representing that company.

43. ~~35.~~ In May 2020, Jonesworks executed a contract to memorialize the terms of its provision of public relations services to Wayfarer (the "Wayfarer Agreement"). The Wayfarer Agreement provided that Jonesworks would provide "strategic communications services" "in a professional manner." In exchange for these services, Wayfarer agreed to pay Jonesworks $20,000 per month plus expenses, a 20% commission for any speaking engagements Jonesworks procured, and a 10% commission for any third-party agreements Jonesworks facilitated. The Wayfarer Agreement provided that if Wayfarer requested additional services, the parties would negotiate an additional fee for those services.

44. ~~36.~~ Wayfarer agreed not to solicit any Jonesworks employees or attempt to induce any Jonesworks employees to terminate ~~her~~their employment during the term of the Wayfarer Agreement or for one year thereafter.

45. ~~37.~~ The Wayfarer Agreement provided that either party could terminate it only if the other party materially breached its terms and failed to cure those material breaches within ten days of receiving notice.

46. ~~38.~~ The Wayfarer Agreement is governed by New York law. Any disputes under the Wayfarer Agreement were to be resolved through binding arbitration in New York, New York. Wayfarer, through counsel, subsequently repudiated this arbitration provision.

47. ~~39.~~ The contract had a one-year term that automatically renewed for additional one-year periods unless either party gave notice ninety days before such a renewal. Neither Jonesworks nor Wayfarer ever gave notice under this provision. The contract most recently renewed for a one-year period on May 7, 2024, and ~~will expire~~expired on May 6, 2025.

48. ~~40.~~ In June 2020, a month after executing the Wayfarer Agreement, and upon Wayfarer and Baldoni's specific request, the parties thereto—including Baldoni—agreed to

incorporate public relations services for Baldoni personally into that contract in exchange for an additional payment of $5,000 per month. Since that time (and through the end of the Agreement's term), at Wayfarer and Baldoni's request, Jonesworks has issued a single invoice each month for $25,000 to both Wayfarer and Baldoni. Until the dispute described in this Complaint, Wayfarer and Baldoni paid those invoices each month.

49. 41. Shortly after commencing employment at Jonesworks, Abel began working with Baldoni and Wayfarer. As time passed, Jones grew confident in Abel's abilities and Abel ultimately was entrusted as the primary Jonesworks point of contact for Baldoni and Wayfarer. In that capacity, Abel also worked closely with Jamey Heath, who previously served as Vice President of Impact and Culture and Co-Chief Operating Officer of Wayfarer, and currently serves as Wayfarer's President and Chief Executive Officer. In this capacity, Heath played a hands-on role in overseeing Wayfarer's projects and communications strategies. Baldoni, Wayfarer, Heath and others accepted Jonesworks' consistent performance of its contractual services.

**D. Melissa Nathan**

50. 42. Melissa Nathan is a long-time crisis manager who has previously worked at several public relations firms.

51. Jones and Nathan have worked alongside each other in the publicity industry for many years. At times, they have shared mutual clients, and for many years Jones would seek to work collaboratively with Nathan and refer her business.

52. 43. InJones's goodwill towards Nathan went so far that in 2022, Nathan and Jonesworks engaged in negotiations regarding Nathan potentially joining Jonesworks. The

negotiations progressed significantly, including Jonesworks agreeing to hire, and actually hiring, two of Nathan's colleagues upon Nathan's insistence. Ultimately, however, negotiations with Nathan failed and she was not retained by Jonesworks.

53. ~~44.~~ In 2023, Jones witnessed Nathan's approach to handling clients' crises when they worked for a mutual client. Nathan's tactics went far over the line. Jones recommended that the client terminate its relationship with Nathan, which was separate and independent from Jones and Jonesworks. Jones herself further resolved that she would not collaborate with Nathan for clients in the future. Nathan has seemed to harbor significant animus toward Jones and Jonesworks ever since.

54. ~~45.~~ In January 2024, Nathan launched her own firm, The Agency Group PR. The Agency Group provides crisis management services to celebrities and other high-profile individuals and companies.

## II. NATHAN CONSPIRES WITH OTHERS TO DISPARAGE JONES AND JONESWORKS

55. Jones and Nathan's once collegial relationship soured after the 2023 incident in which Jones experienced Nathan's unethical tactics. After that incident, Jones stopped referring clients to Nathan, and Nathan began expressing extreme animosity toward Jones, especially regarding clients the two shared.

56. By late 2023, shortly before the formal launch of Nathan's new agency, Nathan and Jones were working for a mutual client. During the course of that business relationship, Nathan had become increasingly frustrated regarding what she perceived as that mutual client's deference to Jones and refusal to permit Nathan to unilaterally determine strategy for that client.

57. Nathan regularly expressed her frustration regarding having to work with Jones for a mutual client and disparaged Jones and Jonesworks to others, including to Kalantari. For example, Nathan told Kalantari that Jones and Abel "are possibly the worst people ever and they need to be taken down." Kalantari responded that "No one is taking [the mutual client] away from us – nobody!!!!!"

### B. Nathan and Abel Conspire With Others to Place and Facilitate *Business Insider* "Kill Story" Against Jones and Jonesworks

58. Nathan and Kalantari then conceived a plan to publicly attack Jones's and Jonesworks' reputations for the purpose of causing a mutual client to terminate its relationship with Jonesworks and also causing other existing and potential clients to refuse to do business with Jones and Jonesworks.

59. In December 2023, Nathan enlisted her former colleague Michael Goldberg and together with Kalantari they began to shop a negative story about Jones and Jonesworks to the media.

60. To that end, Nathan asked Goldberg to find out information about Jonesworks' clients from a Jonesworks employee. Goldberg—who himself had briefly worked at Jonesworks at Nathan's request—complied, and began trying to solicit confidential client information from a Jonesworks' employee. But Goldberg did not fully trust his person inside Jonesworks not to tell Jones that he and Nathan were placing a story about her. So Nathan and Goldberg worked to find someone else they believed would talk to the media negatively about Jones and Jonesworks. Nathan suggested the Former Employee, who also had previously worked at Jonesworks at Nathan's request, and later worked for Nathan. Goldberg enthusiastically agreed with the suggestion, and Nathan recruited the Former Employee to their cause. Nathan, Kalantari, and Goldberg ultimately succeeded at getting *Business Insider* to publish a hostile article about Jones

that was intended to damage Jonesworks' reputation and its current and future business prospects.

61. Specifically, on or about March 27, 2024, Nathan and Kalantari encouraged and facilitated the Former Employee in speaking with *Business Insider* reporter Jack Newsham and, masking the Former Employee's identity, provided Newsham with derogatory and degrading information about Jones and Jonesworks. When the Former Employee expressed hesitation in talking to the reporter, Nathan and Kalantari enthusiastically encouraged her to do so, with Kalantari urging the Former Employee that "we need to get this out."

62. Nathan also conspired with Kalantari and others to provide Warren and Newsham with information regarding certain current and former Jonesworks clients.

63. Nathan and Kalantari arranged to communicate with the reporters on Signal, and Kalantari provided much of the information to smear Jones to the reporters on Signal, in order deliberately to hide their tracks. The names, contact information, and other information that Nathan and the others provided to the *Business Insider* reporters concerning current or former Jonesworks clients included confidential information that had been learned by current or former Jonesworks employees only as part of their employment at Jonesworks.

64. Leaving no doubt that they were responsible for generating the negative story against Jones, they celebrated once they managed to get *Business Insider* to greenlight their proposed story about Jones:



65. Later, in or around July 2024, Abel—while still employed at Jonesworks—joined Nathan and her co-conspirators' support and facilitation of the *Business Insider* article to attack Jones.

66. Indeed, as early as July 29, 2024, Abel and Nathan discussed their outreach to Katie Warren, the *Business Insider* reporter who eventually published the article attacking Jones.




67. In the subsequent two weeks, Abel and Nathan fed information to Warren to ensure that she moved forward with the article and that it was sufficiently critical of Jones. The contact between Abel and Warren included, at a minimum, a 27-minute phone call on July 30, and several phone calls on August 1 and August 12.

68. Abel also facilitated Warren's outreach to former clients of Jones to further disrupt Jonesworks' business:







69. This client, with whom Jones had worked closely for years bringing her from obscurity to prominence, terminated her contract with Jones as a direct result of Abel's encouragement and deliberate interference.

70. For her part, Nathan used the *Business Insider* article to try and convince a mutual client to terminate his relationship with Jones. On August 6, 2024, Nathan and an employee discussed how they did not want to work with Jones for a mutual client and could use the forthcoming *Business Insider* article as a reason the mutual client should not work with Jones or Jonesworks, as it "really showcases how little she can be trusted."

71. In addition, on August 9, 2024, Abel suggested and asked for Heath's approval to try to get *Business Insider* to remove reference to a letter of support for Jones that Baldoni had previously written, and to falsely tell Warren that Baldoni and Wayfarer had terminated their relationship with Jonesworks (when they had not):


From: [redacted] Jennifer Abel (owner)
To: [redacted] Jamey Heath
Just thought about something… should I try to get Justin's letter removed from business insider.
Priority: Normal
09/08/2024 20:45:57(UTC+0)


From: [redacted] Jennifer Abel (owner)
To: [redacted] Jamey Heath
I would need to tell her on background that both Justin and wayfarer have severed ties
Priority: Normal
09/08/2024 20:46:23(UTC+0)


From: [redacted] Jennifer Abel (owner)
To: [redacted] Jamey Heath
So not sure if your lawyers would recommend that as she would need to print that and not sure if that would cause any issues
Priority: Normal
09/08/2024 20:46:56(UTC+0)

72. On August 12, 2024, just three days before the article was published, *Business Insider's* Warren asked Abel to call her back:


From: [redacted] Katie Warren
To: [redacted] Jennifer Abel (owner)
Hi, would you mind giving me a call back when you have a minute? Just have a quick question
Priority: Normal
12/08/2024 19:46:49(UTC+0)

73. Abel called Warren eleven minutes later.

74. The day before the article was published, Nathan texted Abel boasting about the destructive effect it would have on Jones and mockingly suggested that Abel should tell Jones:


From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
Stephanie
Are you aware there is a KILL STORY dropping this week on you and if you hadn't of blown us up we would not of been in such a bad place.
Priority: Normal
14/08/2024 01:23:15(UTC+0)

75. Immediately before the article was published, Nathan texted Abel that she "just got a text from my source to say that article is going live imminently." When Abel asked which article Nathan was referencing, Nathan responded, "I just shook my head at your response. The only article." Abel responded: "OH SHIT" "THAT ARTICLE."

76. Warren then texted Abel the minute the article was published to alert her that it had gone live:


From: [redacted] Katie Warren
To: [redacted] Jennifer Abel (owner)
Story is up! Thanks again for your help.
Priority: Normal
15/08/2024 16:22:35(UTC+0)


From: [redacted] Katie Warren
To: [redacted] Jennifer Abel (owner)
https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos
Priority: Normal
15/08/2024 16:22:36(UTC+0)

77. Immediately after the article was published, Abel texted Nathan a link to it. Abel also sent the article directly to numerous industry contacts including many of Jones's clients and employees, and several of Abel's industry friends and other industry publicists.

78. The article, published by *Business Insider* on August 15, 2024, was highly critical of Jones, including by referencing and amplifying the anonymous disparaging website "stephaniejonesleaks.com" which had been recently posted online by Nathan and Wallace, and accusing Jones of having a reputation for aggression and having recently been dropped by high-profile clients.[1] Given that Wayfarer and Baldoni were long-time clients of Jonesworks, the clear (and false) implication of the article was that Jones was responsible for the aggressive media tactics that were being employed by Baldoni against Lively.

79. Unsurprisingly, the negative article about Jones shared a strikingly similar tone with the negative coverage against Lively appearing in the press at the same time. In the same vein as the gendered "mean girl" coverage about Lively that followed the "weaponizing feminism" script set out in the strategy memo, the Jones article was premised on the same principles, manifesting an equally sexist critique of Jones, who was cast as a "tyrannical boss" who could "quickly turn combative," rather than a successful executive in a high-profile and high-pressure role.

80. Nathan, desperate to for the article to have maximum negative impact, then instructed one of her employees to contact other reporters to get them to pick up the article, so it would reach even more viewers.




[1] *See* Katie Warren and Jack Newsham, *Who's Afraid of Stephanie Jones?*, BUSINESS INSIDER, Aug. 15, 2024.

81. This article had serious negative repercussions on Jones's business and negatively impacted Jones's standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel.

82. To this day, despite notice of falsities contained in the article and despite the growing proof that the article was planted and deliberately slanted to harm Jones, the *Business Insider* article remains publicly available and has not been retracted or corrected.

### C. Nathan and Her Co-Conspirators Fabricate Defamatory Websites to Attack Jones and Jonesworks

83. Nathan's tactics for attacking Jones and Jonesworks ran deeper and were more insidious than just the *Business Insider* "kill story."

84. In or around early May of 2024, Nathan, acting in concert with Wallace and, upon information and belief Kalantari and Skyline, published two false and defamatory websites about Jones and Jonesworks (the "Websites").

85. In May of 2024, Nathan instructed the Former Employee, who was by then working for Nathan, to draft the copy of the contemplated website attacking Jones. Nathan directed the Former Employee specifically as to what the website was to say: that "Stephanie [Jones] holds clients hostage, that she leaks clients' secrets and that she treats her employees poorly." The Former Employee did as instructed and sent the requested draft content back to Nathan and Wallace. On May 6, 2024, Wallace and Nathan published the false and defamatory website about Jones and Jonesworks at the webpage www.stephaniejonesleaks.com. After Jones objected to the website domain hosting service about the defamatory and abusive nature of the website, the service took the website down.

86. Then, just days later, Wallace and Nathan, created and posted identical content at the webpage www.stephaniejoneslies.com, which was hosted by a different company. This website remained online and accessible until the summer of 2025.

87. These individuals published the Websites under the name of an innocent uninvolved former Jonesworks employee in order to hide their tracks and to perpetuate a false narrative regarding the genesis of the Websites.

88. Knowing that the websites needed more to generate the desired traffic, Nathan and Wallace also instructed the Former Employee to write content for several disparaging social media posts about Jones and Jonesworks, that would promote the Websites and further disparage and defame Jones.

89. The Former Employee complied and provided draft language for those posts to Wallace via the disappearing messaging app Signal. This content was subsequently published on X (formerly known as Twitter) via the handle @LeakyStephJones. Additional derogatory X accounts were also created, as well as Pinterest, Reddit, Gab, AnyFlip, and Facebook accounts that all sought to boost traffic to the Websites.

90. The Websites contain or contained substantially identical false, harassing, and defamatory statements about Jones and Jonesworks including but not limited to statements that:

a. Jones bullied Jonesworks employees.

b. Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c. Jones and Jonesworks leaked confidential client information.

d. Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e. Jones and Jonesworks interfere with their clients' ability to do business.

91. Each of these statements is false. On information and belief, Nathan, Wallace, Kalantari, Skyline, and the Doe Defendants published the defamatory statements on the Websites with knowledge of their falsity or, at a minimum, with reckless disregard for the truth with the specific intent to harm Jones and Jonesworks in their business by causing them to incur reputational harm and lose clients.

92. On information and belief, Nathan, Wallace, Kalantari, Skyline, and the Doe Defendants then engaged in search engine optimization efforts to promote the Websites and drive web traffic to them, including through the use of backlinks. That is, links to the Jones Defamatory Websites were planted throughout the internet on seemingly unrelated websites, such as colibris-wiki.org and fleurslocales.eu, to influence search engine rankings and elevate the Jones Defamatory Websites in online search results for Stephanie Jones or Jonesworks.

93. Nathan specifically intended the Websites to be severely damaging to Jones and Jonesworks' reputation. She succeeded. Indeed, Nathan boasted in her filings before this Court that the Websites "severely damaged" Jones's reputation following a "surge of negative publicity" and left Jonesworks in "utter turmoil" that caused it to "bleed[] clients and personnel" (*Lively v. Wayfarer Studios, et al.*, Civ. Action No. 1:24-cv-10049-LJL, ECF No. 50 ¶¶ 202, 225).

94. In fact, Nathan used the Websites to drum up interest among reporters in the *Business Insider* article she had placed with Kalantari and others about Jones. For example, when discussing the Websites with one reporter, Nathan told the reporter there would be a *Business Insider* piece about Jones published soon that she was "very excited" for and that she "hope[s] that you pick it up." In that same conversation, Nathan further disparaged Jones to the

reporter to encourage him to later pick up the forthcoming negative article, calling Jones “the worst human ever” and asking the reporter that if she could ever ask him “for one favour in [her] entire life” it would be to pick up the *Business Insider* piece.




[…]




[…]




95. Nathan and Wallace have denied involvement in the Websites, however, the pattern has repeated too many times to be a coincidence. Indeed, Nathan and Wallace, working at times with others, appear to have developed a cottage industry of creating and publishing smear websites against adversaries (or adversaries of their clients), often attendant to actual or prospective litigation.

96. For example, Nathan and Wallace also directed copy to be drafted, created, and caused to be published on a website on behalf of celebrity Rebel Wilson called amandaghostsucks.com, disparaging producer Amanda Ghost who was then in a legal dispute with Wilson over a film.

97. Wilson at the time was a client of Nathan and Wallace.

98. Following their Jones playbook, Nathan instructed the Former Employee to draft content for a website requested by Wilson in accordance with a voice note sent by Wallace, which described in detail the substance he wanted that website to include:

> Oh, also, um, talked about Rebel. Like here's the – here's the -- the deal with Rebel, and I think you, me, and, um, and Bryan and maybe [the Former Employee], since she'll write this thing, what we have to do is we … I was just, like so basically what we need to do is we need to create a path where we expose Amanda -- Amanda Ghost as like the new Heidi Fleiss. … She's a – she's a – she's an absolute madam, and that's why she's so lethal, blah, blah, but that's – he's right like we can't just do it like, oh, she's a bitch, she sucks. It's like, it's gotta be really, really heavy, and connected to something that heavy.

99. Nathan also sent the Former Employee a draft of the content that Nathan and Wallace wanted to appear in the website, in a document named "Amanda Ghost website.docx." That document began "[t]his website is dedicated to telling the world the truth about Amanda Ghost who has maliciously tried to destroy the lives of countless artists," and included four pages of draft content disparaging Ghost, calling Ghost the "Indian Ghislaine Maxwell" and accusing Ghost of "procuring young women for the pleasure of the extremely wealthy" and "withholding artist's work from release" to others including Rebel Wilson.

100. Amandaghostsucks.com launched shortly thereafter. That website included the information Nathan and Wallace said it should: that Ghost is the "Indian Ghislaine Maxwell," "procuring young women for the pleasure of the extremely wealthy," and highlighting her "lethalness." Like with Jones, multiple parallel social media profiles appeared online at the

same time to promote web traffic to the website. And multiple backlinks also appeared—including from the very same accounts responsible for the Jones backlinks. Ghost has since sued Nathan for her role in creating and publishing this derogatory and defamatory site.

101. Nathan, Wallace, and the Former Employee also created and caused to be published a website called alexanderbrothersextorted.com on behalf of the Alexander Brothers—brothers Alon, Oren, and Tal Alexander, who had been accused of and indicted for sex trafficking offenses—that disparaged their accusers and others in connection with related litigations. And once again, backlinks appeared in online content including ones authored by the same accounts that authored content highlighting the Jones and Amanda Ghost websites.

102. The connection between these websites is not speculative. To the contrary, recent forensic analysis of the Jones, Amanda Ghost, and Alexander Brothers websites has determined that those websites and the promotion of them share certain digital fingerprints, including boosting their placement in search engine results by using backlinks (that is, links to the websites from third party websites, social media accounts, and blogs) created by similar authors. This forensic evidence supports only one conclusion: these websites were created by the same individual or coordinated set of individuals, *i.e.*, Nathan and Wallace.

103. It doesn't end there. Further investigation reveals that a lengthy trail of other similar attack websites and social media pages, including on information and belief at least the following:

a. https://www.alexanikolas.net attacking Alexa Nikolas, who had filed a sexual assault lawsuit against Michael Milosh.

b. https://lookbackfraud.com accusing Joe Dunn of conspiring to make accusations against Michael Milosh.

c. A social media account attacking Christian Lanng, whom a Jane Doe had sued for allegedly forcing her into a slave contract.

d. https://minheejin.net attacking Min Hee-jin, the former CEO of South Korean recording label ADOR.

e. https://paigejimenez.com attacking Paige Jimenez, an influencer and OnlyFans model.

f. https://www.leadsafemamaexposed.com attacking Tamara Rubin, also known as The Lead Safe Mama, an activist, researcher and filmmaker who was the executive director of Lead Safe America from 2011-2016.

104. Upon information and belief, Nathan and Wallace and others acted in concert to create and publish numerous derogatory attack websites and social media sites and accounts that share identical features, playbook, and digital fingerprints with the derogatory websites and social media accounts they created and published to attack Jones.

## III. ~~II.~~ ABEL AND NATHAN'S SCHEME TO USE BALDONI'S CRISIS TO ATTACK JONES'S REPUTATION AND STEAL ~~JONESWORKS'S~~JONESWORKS' BUSINESS

105. Nathan's attacks against Jones, often in coordination with Abel, did not stop there. Instead, around the same time as Nathan was conspiring with Wallace and others to create defamatory websites and social media accounts against Jones, and was conspiring with Abel and others to ensure publication of the negative *Business Insider* article against Jones, Nathan and Abel began conspiring to undermine Jonesworks from within, and to steal Jonesworks clients and confidential information upon Abel's planned departure from Jonesworks.

106. Among the clients that Abel and Nathan conspired to steal from Jonesworks were Baldoni and Wayfarer.

107. ~~46.~~ In 2019, Baldoni and Wayfarer acquired the film rights to the bestselling novel *It Ends With Us*, written by Colleen Hoover, an author whose books enjoy a vast and devoted following, especially among young women.

108. ~~47.~~ In 2023, Baldoni began production on the film adaptation of *It Ends With Us* (the "Film"). Wayfarer was a co-producer of the Film and Baldoni owned the rights to its source material. Baldoni named himself as the director and male lead of the Film, an abusive partner to the female main character played by Lively. Later reports emerged that, during production, women on set, including Lively, made complaints about Baldoni's behavior toward them, including comments of a sexual nature and inappropriate touching.

109. ~~48.~~ Jones later learned that the tensions on-set had reached such a point that, after the Screen Actors Guild strike halted production from July to early November 2023, Lively had only agreed to return to production if Wayfarer implemented additional measures to prevent further improper behavior on set by Baldoni.

110. ~~49.~~ The Film was released in August 2024. In connection with the release, the press began reporting on tensions between Baldoni and the female cast and crew on set. According to reports, Baldoni had acted in a controlling, demeaning, and "borderline abusive" manner towards the cast and crew, especially toward women. The press specifically identified Lively and Hoover as having "clashed" with Baldoni during filming, and speculated on the unusual circumstance that neither Lively nor Hoover was photographed promoting the film together with Baldoni as evidence of tension.[~~1~~2]

[~~1~~2] *See, e.g.*, Sara Nathan, *Truth behind 'It Ends With Us' feud rumors: Justin Baldoni made Blake Lively 'uncomfortable,' sources say*, N.Y. POST, Aug. 9, 2024,

111. ~~50.~~ As the August 2024 release neared, Baldoni began to fear that the increased attention being paid to him and the Film would cause reports of allegations about his on-set misbehavior to come out. Abel and Nathan—with encouragement from Heath, and without ~~Jones'~~Jones's knowledge or approval—began to formulate a no-holds-barred strategy to discredit and suppress any potential revelations about Baldoni's on set behavior.

112. ~~51.~~ Jones, having entrusted the management of the Baldoni and Wayfarer relationship to Abel, trusted that any plan Abel formulated on behalf of Jonesworks would appropriately reflect the company's integrity and ethos. Unfortunately, the opposite turned out to be true. Behind Jones's back, Abel went around Jones to arrange for Baldoni and Wayfarer to retain Nathan and launch a smear campaign against Lively. Baldoni and Wayfarer admittedly hired Nathan at Abel's recommendation and over Jones's objections and despite her warnings about Nathan.

113. On information and belief, Nathan took advantage of this opportunity to encourage Abel to leave Jonesworks, to conspire with Abel to steal Baldoni and Wayfarer as clients from Jonesworks, and to smear Jones and Jonesworks in the press. On information and belief, Nathan did so because she believed, among other things, that Abel would encourage Nathan's own burgeoning relationship with these and other Jonesworks clients, while Jones would not. This scheme ultimately inflicted serious damage on Jones and Jonesworks.

*Blake Lively 'uncomfortable,' sources say*, N.Y. POST, Aug. 9, 2024, https://www.pagesix.com/2024/08/09/entertainment/justin-baldoni-made-blake-lively-uncomfortable-sources; James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.

### A. Abel and Nathan Devise A Smear Campaign Against Lively To Benefit Baldoni and Wayfarer

114. ~~52.~~ Nathan and Abel's strategy for Baldoni was set forth, in part, in a four-page memorandum sent to Baldoni (but kept secret from Jones) that outlined "several potential scenarios at play here which we should be prepared for, should BL [Lively] and her team make her grievances public":

> ****CONFIDENTIAL****
>
> **SCENARIO PLANNING – IT ENDS WITH US**
>
> **OBJECTIVE**
>
> Protect the reputation of Justin Baldoni, Jamey Heath, and Wayfarer Studios in the lead up, during, and following the premiere of It Ends with Us, underscore the achievement and efforts of the Wayfarer team in bringing this movie to life, and emphasize Justin and the studio's commitment to their team and making the broader industry a more inclusive space.
>
> **OVERVIEW**
>
> Though there are several potential scenarios at play here which we should be prepared for, should BL and her team make her grievances public – via a blatant story or subtle leak. Given she was made to compromise with the premiere, we feel she will move forward with doing so.

115. ~~53.~~ The memo—which, along with the overall strategy, was kept secret from Jones—explicitly recommended weaponizing Baldoni's perceived history as a "longtime activist and advocate of and for women in Hollywood" to be used against Lively, and at the same time sought to discredit Lively's negative on-set experiences with Baldoni by painting her in the press as the one who had "weaponized feminism" for her own benefit:

- JB has been a longtime activist and advocate of and for women in Hollywood, speaking out about challenges his colleagues faced before the Me Too movement even began (TED 2017).

- These pieces will likely come out following any potential hit piece and/or coverage from the premiere. Our recommended approach would be to provide reporters who reach out for comment, should it be obvious she's referring to you, with the appropriate background information (listed in Scenario 1) to ensure their stories are balanced and the speculation can be turned to another one of the many people she's had issues working with (Leighton Meester, Anna Kendrick, Ben Affleck, etc.).

- As part of this, our team can also explore planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to "bully" into getting what they want.

116. ~~54.~~ Yet this aggressive strategy was apparently still not tough enough for Baldoni, who texted Abel and Heath that he was: "Not in love with the document [Nathan] sent – Not sure I'm feeling the protection I felt on the call." Abel relayed Baldoni's concerns to Nathan, telling Nathan that Baldoni needed a stronger showing of strength, explaining:

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

You can of course do that but I do think he needs to know. I'm going to confidentially send you something he's texting me and Jamey on the side just to arm you before this call. I think you guys need to be tough and show the strength of what you guys can do in these scenarios. He wants to feel like she can be buried...

**Priority:** Normal

02/08/2024 13:47:25(UTC+0)

117. ~~55.~~ Nathan immediately responded:

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Of course- but you know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble

**Priority:** Normal

02/08/2024 13:47:55(UTC+0)










[. . .]




118. ~~56.~~ In the days that followed, Baldoni and Heath made clear to Abel that they expected Abel and Nathan's strategy to include a social media activation plan, and Abel and Nathan immediately complied in its implementation.[~~2~~3] Nathan and Abel's behind-the-scenes efforts for Baldoni and Heath also included frantically working to squash emerging media

[~~2~~3] For example, on August 5, 2024, Baldoni sent Abel a screenshot of an attack campaign against Hailey Bieber painting her as having a "history of bullying many women," and told Abel, "This is what we would need" against Lively.

reports about certain human resources complaints that had been filed against Baldoni in connection with the Film.

119. 57. On information and belief, Nathan and Abel also used their industry connections to plant negative articles about Lively in press outlets including the *Daily Mail* and the *New York Post's Page Six*, and leveraged their teams to create and perpetuate negative content about Lively on social media platforms such as Reddit and TikTok.[34] For example, Abel closely coordinated with *Page Six* reporter Sara Nathan—Melissa Nathan's sister—to publish an article hostile toward Lively's role in the production of the Film.

120. 58. Nathan and Abel enthusiastically supported the strategy that Baldoni and Heath wanted, and deliberately hid it from Jones, in order to ingratiate themselves with Baldoni and Heath, drive a wedge between Baldoni and Jones, and ultimately to steal Baldoni and Wayfarer from Jonesworks as clients.

121. All parties involved in this nefarious strategy have subsequently confirmed that Jones was intentionally excluded from the plan and was not privy to email, Signal, or other communications about it.

122. 59. For her part, Jones—who was kept in the dark about this coordinated strategy and was not aware that Wayfarer had actively approved and participated in it—objected to Wayfarer's hiring of Nathan and advocated a positive press strategy instead. Wayfarer's President immediately reported Jones' comments to Abel:

[34] *See* Alanah Kholsa and Jo Tweedy, *Is Blake Lively set to be CANCELLED? String of 'hard to watch' videos that have surfaced following 'tone deaf' Q&A to promote It Ends With Us could tarnish 36-year-old star's golden Hollywood image for good*, DAILY MAIL, Aug. 16, 2024; Sara Nathan, *Blake Lively approved final cut of 'It Ends with Us' amid feud with co-star director Justin Baldoni*, PAGE SIX, Aug. 13, 2024, https://pagesix.com/2024/08/13/celebrity-news/blake-lively-approved-final-cut-of-it-ends-with-us-amid-feud/.

From: [redacted] Tera Hanks
To: [redacted] Jennifer Abel (owner)

Text from Stephanie about the HR article and us hiring Melissa for Crisis.

"This wasn't planted by Leslie. This is playbook by Melissa.

There was no NY Post story she kept at bay. Melissa sister works at Page 6.
we need to flood zones with positive press and push back on claims. there's no counter to claims in story.
his complementary soundbites of blake need to be covered on high seo sites"

Priority: Normal

14/08/2024 03:48:39(UTC+0)

123. ~~60.~~ Excluding Jones from the conversation, Heath flatly rejected any pivot to a positive strategy in a text to Abel. Suggesting that Jones should be shut out for "undermining" their strategy, he called Jones' influence on the situation "poison":

From: [redacted] Jamey Heath
To: [redacted] Jennifer Abel (owner)

I don't like the idea that there is continued cannibalization from within the same side. Meaning "Jonesworks" ie Stephanie, and the Crisis team. I only want us to be communicating with people who are working together and not with ones who are undermining others within our team. Stephanie is casting doubt and that can have an affect like poison.

I'm going to bed. A first for me in forever.
Let's chat more tomorrow about this.

Priority: Normal

14/08/2024 04:15:05(UTC+0)

**B. Abel and Nathan Drive a Wedge Between Jones and Baldoni, And Attack Jones's Reputation in the Press**

124. ~~61.~~ At the same time as pandering to Baldoni and Heath's desire to discredit Lively, Abel and Nathan were also furthering their own profit-driven agenda to attack and disparage Jones, using many of the same tactics they were using against Lively, in order to eliminate Jones as a competitor and siphon away her clients for themselves.

125. ~~62.~~ Ironically, Abel and Nathan recognized that their success on both fronts reflected a societal desire to tear down successful women like Lively and Jones, but they remained undeterred in their agenda:




126. ~~63.~~ Abel's trashing of women even extended to Nathan herself, whom she had privately bad-mouthed just months before cynically hitching her star to Nathan to steal from Jones:









127. ~~64.~~ Working together, Nathan and Abel's stated goal in all of this was to position themselves to be able to steal Wayfarer, Baldoni and other clients from Jonesworks to the new firm Abel was planning to form, so that those clients could then be serviced jointly by both Abel's and Nathan's new firms, instead of Jonesworks:




128. ~~65.~~ Abel and Nathan explicitly discussed their plan to steal Wayfarer and Baldoni away from Jonesworks:






129. ~~66.~~ As Nathan made plain, "really good money" was the motivating force behind this scheme, not any special affection for Baldoni or Wayfarer. Indeed, Abel's candid communications, outside of Baldoni's and Heath's view, made clear that at the same time as she was working to salvage Baldoni's reputation and steal his business, she actually held Baldoni personally in extremely low regard. For example, when a colleague described an article about a kissing scene between Baldoni and Lively as "so gross," Abel responded:







[…]






130. ~~67. Then, months later,~~ Abel was even more explicit in her disdain for Baldoni:







[…]




131. ~~68.~~ To further their plan, Abel and Nathan contrived to plant stories in media outlets including the *Daily Mail* and *Business Insider* to trash ~~Jones'~~ Jones's and Jonesworks' reputations publicly and to their clients. They also back-channeled with Wayfarer and Baldoni to paint Jones in a negative light. For example, following the premiere of the Film, the *Daily*

*Mail* published an article reporting on tensions between Baldoni and Lively.[45] That article relied exclusively on social media posts that had been identified for Abel earlier that same day: either a shocking coincidence or confirmation that Abel had planted the story. On information and belief, Abel and Nathan conspired to plant this story in the *Daily Mail* in pursuit of dual objectives. First, the negative story cemented Baldoni's need for Nathan's crisis management services, ensuring herself an ongoing paycheck. Second, they arranged for Baldoni and Wayfarer to believe that Jones was the cited "insider" and also created a false story that Jones had publicly blamed Lively for the article, thus sowing discord between Baldoni and Wayfarer on the one hand and Jones on the other.

132. ~~69.~~ The scheme worked. When the article was published, at first, key players in the Film's release—including Josh Greenstein, the President of Sony Pictures' Motion Picture Group—believed ~~(correctly)~~ that Abel was the person responsible for the story:




133. ~~70.~~ But Abel denied being the source and instead falsely ~~told~~insinuated to Sony's communications team that Jones was the leak.

134. ~~71.~~ This false allegation stuck. Rumors that Jones was behind the article began to make their way back to Wayfarer, causing Heath to respond with hostility:

[45] Lillian Gissen, *It Ends With Us fans are convinced there's a huge feud between Blake Lively and Justin Baldoni - here's why*, DAILY MAIL, Aug. 8, 2024, https://www.dailymail.co.uk /femail/article-13723621/blake-lively-justin-baldoni-feud-drama.html.



From: [redacted] Jamey Heath
To: [redacted] Steph Jones
To: Tera Hanks
To: Jennifer Abel (owner)

I am hearing from Sony that quote "Someone named Stephanie jones" has responded out to daily mail saying that Blake is to blame and now this has escalated it all.
We were purposely not responding to anything as to not fuel. This has fueled it. Everyone stand down unless I am aware of any moves. I don't care who is supposed to do what. I'm most interested in that. I'm interested only in any strategy being run by me. I need all to understand that.

Priority: Normal

08/08/2024 16:16:45(UTC+0)

135. ~~72.~~ When Jones stated her intent to contact Sony to correct this misimpression, Heath instructed her to stand down:



From: [redacted] Steph Jones
To: [redacted] Jamey Heath
To: Tera Hanks
To: Jennifer Abel (owner)

To clarify again, I have not spoken to Daily Mail. The above isn't true.

I also don't believe Dani or Kim at Sony are saying that above. Quote also has spaces as if it was just being drafted.

Priority: Normal

08/08/2024 16:33:29(UTC+0)



From: [redacted] Steph Jones
To: [redacted] Jamey Heath
To: Tera Hanks
To: Jennifer Abel (owner)

I am not contacting press but is concerning if Dani or Kim are saying I have escalated this as I haven't even touched this. I am going to contact them.

Priority: Normal

08/08/2024 16:34:52(UTC+0)



From: [redacted] Jamey Heath
To: [redacted] Steph Jones
To: Tera Hanks
To: Jennifer Abel (owner)

Stephanie. As your client and the one pays for the services, I am stating to not contact anyone regarding wayfarer or Sony at this time. If you do after this text, it will be a major problem. This needs to be respected now.

Priority: Normal

08/08/2024 16:37:09(UTC+0)

136. ~~73.~~ Heath went a step further and threatened Jones directly that he would issue a public press release stating that Baldoni and Wayfarer had terminated Jonesworks if she took any steps to contact Sony or others to clear her name, menacingly reminding her that she didn't need that kind of negative publicity for herself or her business.

137. Abel facilitated and encouraged Heath's attacks and threats against Jonesworks—her then-current employer. On or about August 8, 2024, Abel surreptitiously participated in a phone call between Heath and Jones. Hiding her presence, Abel fed statements to Heath that he then repeated to Jones. Heath, who was in Illinois at the time of this phone call, secretly recorded the call, simultaneously violating Illinois criminal law and memorializing his abusive threats and Abel's treachery.

138. ~~74.~~ On August 9, 2024, the *Daily Mail* published another article, this time reporting on Baldoni's abusive on-set behavior, citing "insiders" as the source for the article.[56] On information and belief, Abel and Nathan conspired to plant this story (or at minimum, knew it was forthcoming and allowed it to be published) in further pursuit of their goal to cement Baldoni's and Wayfarer's needs for Nathan's services and turn them against Jones.

139. ~~75.~~ Heath and Abel bragged about the success of this strategy, jokingly referring to Abel—who was sitting 20 rows away from Heath on the airplane on a press junket trip that they and Nathan attended without Jones—as "the Leak" ~~as being~~that was "the best decision~~"~~ of ~~a press trip that Abel and Nathan were accompanying Heath and Wayfarer on, and which Jones did not attend~~this whole trip":

[56] James Vituscka and Lillian Gissen, *Disturbing TRUTH behind why Blake Lively and her It Ends With Us stars are feuding with Justin Baldoni*, DAILY MAIL, Aug. 9, 2024, https://www.dailymail.co.uk/tvshowbiz/article-13727789/it-ends-blake-lively-justin-baldoni-feud.html.




140. ~~76.~~ In parallel with their efforts in the *Daily Mail*, ~~on information and belief, Abel and Nathan contrived to have~~ Abel joined in Nathan's longstanding effort to plant negative stories about Jones, including in *Business Insider* ~~publish a hostile article about Jones which was intended to encourage Wayfarer and Baldoni (and other Jonesworks clients) to want to end their relationship with Jonesworks and to weaken Jonesworks' business.~~ as detailed above at Paragraphs 59-78.

~~77. Indeed, as early as July 29, 2024, Abel and Nathan were coordinating their outreach to Katie Warren, the *Business Insider* reporter who eventually published the article attacking Jones.~~







~~78. On information and belief, in the subsequent two weeks, Abel and Nathan fed information to Warren to ensure that she moved forward with the article and that it was~~

~~sufficiently critical of Jones. The contact between Abel and Warren included, at a minimum, a 27-minute phone call on July 30, and several phone calls on August 1 and August 12.~~

~~79. Abel also facilitated Warren's outreach to former clients of Jones to further disrupt Joneswerks' business:~~







~~80. This client, with whom Jones had worked closely for years bringing her from obscurity to prominence, terminated her contract with Jones as a direct result of Abel's encouragement and deliberate interference.~~

~~81. In addition, on August 9, 2024, Abel suggested and asked for Heath's approval to try to get *Business Insider* to remove reference to a letter of support for Jones that Baldoni had previously written, and to falsely tell Warren that Baldoni and Wayfarer had terminated their relationship with Jonesworks (when they had not):~~










~~82. On August 12, 2024, just three days before the article was published, *Business Insider's* Warren asked Abel to call her back:~~




~~83. Abel called Warren eleven minutes later.~~

~~84. The day before the article was published, Nathan texted Abel boasting about the destructive effect it would have on Jones and mockingly suggested that Abel should tell Jones:~~




~~85. Immediately before the article was published, Nathan texted Abel that she "just got a text from my source to say that article is going live imminently." When Abel asked which article Nathan was referencing, Nathan responded, "I just shook my head at your response. The only article." Abel responded: "OH SHIT" "THAT ARTICLE."~~

~~86. Warren then texted Abel the minute the article was published to alert her that it had gone live:~~







~~87. Immediately after the article was published, Abel texted Nathan a link to it. Abel also sent the article directly to numerous industry contacts including many of Jones's clients and employees, and several of Abel's industry friends and other industry publicists.~~

88. The article, published by *Business Insider* on August 15, 2024, was highly critical of Jones, including by referencing and amplifying the anonymous disparaging website "stephaniejonesleaks.com" which had been recently posted online by the John Doe Defendants, and accusing Jones of having a reputation for aggression and having recently been dropped by high-profile clients.[6] Given that Wayfarer and Baldoni were long-time clients of Jonesworks, the clear (and false) implication of the article was that Jones was responsible for the aggressive media tactics that were being employed by Baldoni against Lively.

89. Unsurprisingly, the negative article about Jones shared a strikingly similar tone with the negative coverage against Lively appearing in the press at the same time. In the same vein as the gendered "mean girl" coverage about Lively that followed the "weaponizing feminism" script set out in the strategy memo, the Jones article was premised on the same principles, manifesting an equally sexist critique of Jones, who was cast as a "tyrannical boss" who could "quickly turn combative," rather than a successful executive in a high-profile and high-pressure role.

90. This article had serious negative repercussions on Jones' business and negatively impacted Jones' standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel.

141. 91. Just days laterafter the "kill story" against Jones that Nathan and Abel had facilitated, on August 25, 2024, *Business Insider* turned the media storm surrounding Baldoni and Jones more pointedly to Nathan's advantage, publishing a second article that favorably touted Baldoni's hiring of Nathan to shepherd him through this crisis. The article, which on

[6] *See* Katie Warren and Jack Newsham, *Who's Afraid of Stephanie Jones?*, BUSINESS INSIDER, Aug. 15, 2024.

information and belief was again orchestrated by Nathan, noted that the negative attention on Lively was a "gift" to Baldoni.[7]

92. In parallel with these articles, John Does 1-10, who, on information and belief, were acting in concert with Abel and Nathan, published two false and defamatory websites about Jones and Jonesworks (the "Websites"). First, in the summer of 2024, the Doe Defendants created and posted the webpage www.stephaniejonesleaks.com, which was hosted by Hostinger International Ltd. Then, after that website was taken down, in or around September 2024, the Doe Defendants created and posted the webpage www.stephaniejoneslies.com, which is hosted by NameCheap, Inc., and still remains publicly available. Both Websites were viewed, and continue to be viewed, by numerous third parties, including residents of New York County.

93. Both Websites contain or contained substantially identical false, harassing and defamatory statements about Jones and Jonesworks, including but not limited to statements that:

a. Jones bullied Jonesworks employees.

b. Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c. Jones and Jonesworks leaked confidential client information.

d. Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e. Jones and Jonesworks interfere with their clients' ability to do business.

[7] Eve Crosbie, *The Blake Lively backlash has been 'a gift' for Justin Baldoni after he was forced to hire a PR-crisis manager amid rumored 'It Ends With Us' feud, PR expert says*, BUSINESS INSIDER, Aug. 25, 2024, https://www.businessinsider.com/blake-lively-justin-baldoni-it-ends-with-us-crisis-pr-2024-8.

~~94. Each of these statements is false. On information and belief, the Doe Defendants published the defamatory statements on the Websites with knowledge of their falsity or, at a minimum, with reckless disregard for the truth with the specific intent to harm Jones and Jonesworks in their business by causing them to incur reputational harm and lose clients.~~

142. ~~95.~~ All the while, Abel had been making arrangements to leave Jonesworks with confidential information and clients in tow. On July 19, 2024, while still employed by Jonesworks, Abel filed paperwork to create RWA Communications LLC, the competing public relations agency she intended to start upon her departure from Jonesworks. Abel had also created a website and social media accounts for her new competing firm, all while still employed by and under contract with Jonesworks.

143. ~~96.~~ At least as early as July 22, 2024, Abel had created a new email account, jennifer@rwacommunications.com, to which she forwarded dozens of proprietary messages from Jonesworks, including client information, ~~Jonesworks's~~Jonesworks' work product, and information specifically regarding ~~Jonesworks's~~Jonesworks' work for Wayfarer and Baldoni. Abel successfully hid her theft of confidential documents and information. Abel surreptitiously continued stealing documents and client information while also secretly contacting ~~Jonesworks's~~Jonesworks' clients to pave the way for her departure.

~~97. As her planned departure neared, Abel boasted to Nathan about the damage she was doing to Jonesworks, her then-current employer, and Nathan goaded her on:~~









144. ~~98.~~ Indeed, when Jonesworks' information technology personnel disabled Abel's access to Jonesworks' servers after discovering her unauthorized downloading activity, Abel boasted that she was still able to steal all of the documents and information she needed to form her own competing firm:







145. ~~99.~~ Abel further coordinated with Nathan and Baldoni to ensure that Wayfarer and Baldoni would leave Jonesworks and come with her as clients for her newly created RWA Communications:

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

Just had a nice conversation with Justin just him and me.
I explained to him a few things
And my conversations with Leslie
He's like don't help her. I'm like I'm not helping her. I'm telling her what we're not doing and she needs to also not do anything and my last conversation with her was last Wednesday or so

And then I couldn't help myself

**Priority:** Normal

19/08/2024 04:49:55(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

I ended it with

**Priority:** Normal

19/08/2024 04:50:00(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)

And I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her.

Don't kill me, okay bye

**Priority:** Normal

19/08/2024 04:50:28(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan

Hahahaha omg love you

**Priority:** Normal

19/08/2024 05:02:12(UTC+0)




146. ~~100.~~ On or about August 21, 2024, Jones learned about Abel's ongoing efforts to steal dozens and dozens of Jonesworks proprietary documents, including sensitive client and business information that Abel had no legitimate reason to access, including for major brand and clients that Abel had never worked on. Abel went so far as to download and copy the Jonesworks client contract form, except that she replaced the Jonesworks logo with the logo for her own newly-formed business. Jonesworks immediately terminated Abel.

147. ~~101.~~ As part of her termination paperwork, Abel falsely signed a statement purporting to confirm that she had not removed any electronic confidential information from Jonesworks. But, of course, she had, and this signed statement was untrue.

148. ~~102.~~ The damage was done. With the encouragement and assistance of Nathan, Baldoni, and Heath, Abel stole Wayfarer and Baldoni as clients, targeted other Jonesworks clients to leave, and launched the long-planned and competing RWA Communications. As a result, Wayfarer and Baldoni ceased working with Jonesworks and, despite being under contract with Jonesworks, refused to pay Jonesworks what they contractually owed for its services. Even on the day she departed Jonesworks, Abel proudly admitted to Nathan that she was shaking Jones down to extract as much as she could from the company before her departure.

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
Btw I'm having my off boarding this morning with our chief of staff (a joke) because Steph won't face me. And you should see the list I made of things to bring up
Priority: Normal
21/08/2024 15:26:17(UTC+0)

[…]

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
I need the list
Priority: Normal
21/08/2024 15:26:30(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
Holding them hostage
Priority: Normal
21/08/2024 15:26:32(UTC+0)

From: [redacted] Jennifer Abel (owner)
To: [redacted] Melissa Nathan
It's WILD
Priority: Normal
21/08/2024 15:27:04(UTC+0)

From: [redacted] Melissa Nathan
To: [redacted] Jennifer Abel (owner)
Exactly . How business should be done
Priority: Normal
21/08/2024 15:27:05(UTC+0)

149. ~~103.~~ Nor was Abel content only to steal documents, clients, and confidential information from Jonesworks. On August 14, 2024, Abel also attempted to encourage Nathan to poach a valuable Jonesworks' employee:










[…]




150. ~~104.~~ Abel also encouraged at least six other Jonesworks employees working for her in the Los Angeles office—almost half of ~~Jonesworks's~~Jonesworks' employees at that office—to leave the company, including by bad-mouthing Jones to those employees and sending

the employees' resumes to competing public relations firms. As a direct result of these actions, two of these employees ended their contracts with Jonesworks and left to work for competitors.

151. ~~105.~~ Since being terminated from Jonesworks, Abel has continued attacking Jones within the industry, using her tried-and-true playbook to preemptively discredit any sources that might shed light on her own misdeeds. Abel has falsely stated to other participants in the public relations industry that Jones was attempting to distribute doctored text messages purporting to be from Abel as retaliation for Abel's departure. She has also tried again to point the finger at Jones as cover for her own role in the campaign against Lively becoming public. But Jones has never doctored any text messages, and has no reason to do so. Abel's text messages were forensically extracted directly from that company phone that Abel used during her employment at Jonesworks and voluntarily returned to Jonesworks upon her termination in the presence of an employment lawyer, and have been preserved in their original state. And as has become glaringly apparent, the text messages are themselves enough to condemn Abel and Nathan without any need for doctoring.

152. So desperate were Nathan, Abel and the Wayfarer Parties to discredit the text messages that they cannot deny they wrote, that immediately after the filing of a legal complaint against them by Lively, they reactivated their publicity smear machine to discredit Jones and turn focus away from the damning content of the text messages by fabricating a wholly concocted story that they were obtained illicitly. On information and belief, they sent these false statements to reporters, some of whom published them in substance or idea, furthering their longstanding defamation against Jones.

153. ~~106. The~~As intended, the misconduct by ~~Abel, Nathan, Baldoni, and Wayfarer~~Defendants has had a significant negative effect on Jones's and

~~Jonesworks's~~Jonesworks' business and reputation. And ~~Jones's good-faith efforts to resolve this out of court have been met with resistance, and~~ the campaign of misinformation against her has not stopped. As a result, Jones and Jonesworks have been left with no choice but to bring this lawsuit to seek redress for this misconduct and to remedy the damage done.

**FIRST CAUSE OF ACTION**
**Breach of Contract – Abel Employment Agreement**
**(Against Defendant Jennifer Abel)**

154. ~~107.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

155. ~~108.~~ Jonesworks and Abel are parties to the Abel Employment Agreement, which is a valid and enforceable contract.

156. ~~109.~~ Under the Abel Employment Agreement, Abel agreed, among other things, that: (1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential and proprietary information, and that all business and plans made known to her while employed by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any Company proprietary information to solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts; (3) during her employment and for six months following the date of any termination, she would not compete with Jonesworks, or engage in or participate in any business that is in direct competition in any manner whatsoever with Jonesworks; and (4) during the employment term, Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

157. ~~110.~~ Abel breached the Abel Employment Agreement through her actions as described in this complaint, including by, among other things: (1) failing to hold in confidence

confidential information for the sole benefit of Jonesworks, and by soliciting confidential information from at least one Jonesworks employee after her termination; (2) using confidential information to solicit, induce, or attempt to solicit or induce, business from Jonesworks clients and business contacts; (3) directly competing with Jonesworks in the six months following her departure from Jonesworks, including by starting a competing company and poaching and attempting to poach Jonesworks clients; (4) soliciting and inducing, and using confidential information to solicit or induce, other Jonesworks employees to leave Jonesworks and/or become employed by her or other competing firms; and (5) breaching her duty of loyalty to Jonesworks by working against the interests of Jones and Jonesworks during her period of employment.

158. ~~111.~~ Jones and Jonesworks have substantially performed the Abel Employment Agreement or were excused from doing so because of the actions of Abel.

159. ~~112.~~ Abel's breaches of the Abel Employment Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Tortious Interference With Contract – Abel Employment Agreement**
**(Against Defendants Melissa Nathan, Wayfarer and Justin Baldoni)**

160. ~~113.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

161. ~~114.~~ Jonesworks and Abel are parties to the Abel Employment Agreement, which is a valid and enforceable contract.

162. ~~115.~~ Under the Abel Employment Agreement, Abel agreed, among other things, that: (1) she would hold in strict confidence and trust for the sole benefit of Jonesworks all confidential and proprietary information, and that all business and plans made known to her

while employed by Jonesworks are the permanent and exclusive property of Jonesworks; (2) she would not use any Company proprietary information to solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts; (3) during her employment and for six months following the date of any termination, she would not compete with Jonesworks, or engage in or participate in any business that is in direct competition in any manner whatsoever with Jonesworks; and (4) during the employment term, Jonesworks was entitled to her loyalty, including acting in the best interests of Jonesworks.

163. ~~116.~~ Nathan, Wayfarer, and Baldoni were aware that Abel was employed by Jonesworks and, on information and belief, were aware that Abel's employment was governed by a contract containing industry-standard terms such as those described above.

164. ~~117.~~ Nathan, Baldoni, and Wayfarer induced, encouraged, and procured Abel's breach of the Abel Employment Agreement without justification, including by, among other things: (1) breaching her duty of loyalty to Jonesworks by working against the best interest of Jones and Jonesworks during her period of employment; and (2) encouraging and inducing Abel to violate the non-compete, non-solicitation, and confidentiality provisions of the Agreement.

165. ~~118.~~ Nathan, Baldoni, and Wayfarer, in bad faith, intentionally procured, caused, and facilitated Abel's breaches of the Abel Employment Agreement. But for the misconduct of Nathan, Baldoni, and Wayfarer, Abel would not have breached the Abel Employment Agreement.

166. ~~119.~~ Jones and Jonesworks have substantially performed the Abel Employment Agreement or were excused from doing so because of the actions of Nathan, Wayfarer, and Baldoni.

167. ~~120.~~ The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

168. ~~121.~~ The intentional interference by Nathan, Baldoni, and Wayfarer with the Abel Employment Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Breach of Contract – Wayfarer Agreement**
**(Against Defendants Wayfarer Studios and Justin Baldoni)**

169. ~~122.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

170. ~~123.~~ Jonesworks, Wayfarer, and Baldoni are parties to the Wayfarer Agreement, which is a valid and enforceable contract. Jones is ~~Jonesworks's~~Jonesworks' designee under the Wayfarer Agreement.

171. ~~124.~~ Under the Wayfarer Agreement, in exchange for services provided by Jonesworks, Wayfarer and Baldoni agreed to pay Jonesworks a sum of $25,000 per month.

172. ~~125.~~ Additionally, Wayfarer and Baldoni agreed, among other things, that during the term of the contract, and for one year following its expiration or termination they would not solicit or attempt to solicit for employment any officer, employee or agent of Jonesworks, or to employ or attempt to employ, or otherwise induce or attempt to induce any employee of Jonesworks to terminate such employee's employment or engagement with Jonesworks, without prior written consent.

173. ~~126.~~ In May 2024, the Wayfarer Agreement automatically renewed. At no time in the required 90 days before the automatic renewal did either party provide notice of termination. Nor did Wayfarer or Baldoni provide notice of any material breach of the Wayfarer Agreement. The agreement has therefore not validly terminated, and Wayfarer and Baldoni are obligated to pay Jonesworks $25,000 per month through May 6, 2025, and are similarly obligated to comply with the full terms of the Wayfarer Agreement through May 2025.

174. ~~127.~~ On or about August 30, 2024, a representative of Wayfarer informed Jones that Wayfarer and Baldoni would no longer require Jonesworks' services, and thereafter refused to pay all amounts owed under the Wayfarer Agreement.

175. ~~128.~~ Wayfarer and Baldoni have breached the Wayfarer Agreement through their actions as described in this complaint, including by, among other things: (1) failing to pay the amounts contractually owed under the Agreement, (2) soliciting and inducing Abel to depart Jonesworks, and (3) employing Abel following her departure from Jonesworks.

176. ~~129.~~ Jonesworks has substantially performed the Wayfarer Agreement or was excused from doing so because of the actions of Wayfarer and Baldoni.

177. ~~130.~~ Wayfarer and Baldoni's breaches of the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Tortious Interference With Contract – Wayfarer Agreement**
**(Against Defendants Jennifer Abel and Melissa Nathan)**

178. ~~131.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

179. ~~132.~~ Jones, Jonesworks, Baldoni, and Wayfarer are parties to the Wayfarer Agreement, which is a valid and enforceable contract. Among other things, the Wayfarer Agreement requires Wayfarer and Baldoni to pay Jonesworks $25,000 per month, including from May 2024 through May 2025.

180. ~~133.~~ Additionally, Wayfarer and Baldoni agreed that during the term of the contract, and for one year following its expiration or termination, they would not solicit or attempt to solicit for employment any Jonesworks employee.

181. ~~134.~~ Abel and Nathan were aware of the Wayfarer Agreement, and each induced, encouraged, and procured Wayfarer's and Baldoni's breach of the Wayfarer Agreement without justification, including by encouraging Wayfarer and Baldoni to cease paying Jonesworks and, instead, hire Abel and Nathan, and by encouraging Wayfarer and Baldoni to violate the non-solicitation provision of the Agreement.

182. ~~135.~~ Abel and Nathan, in bad faith, intentionally procured and facilitated Wayfarer's and Baldoni's breaches of the Wayfarer Agreement. But for the misconduct of Abel and Nathan, Wayfarer and Baldoni would not have breached the Wayfarer Agreement.

183. ~~136.~~ Abel's and Nathan's intentional interference with the Wayfarer Agreement was willful, wanton, malicious, and/or in bad faith, or undertaken through improper means, warranting an award of punitive damages in an amount to be determined at trial.

184. ~~137.~~ Abel's and Nathan's intentional interference with the Wayfarer Agreement proximately and directly caused monetary damages to Jones and Jonesworks in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## Tortious Interference With Prospective Business Relations
## (Against Defendant Melissa Nathan)

185. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

186. Beginning in at least December 2023, Nathan acted in concert with others, including Kalantari, Skyline, and former employees, including Goldberg, to place negative stories about Jones and Jonesworks in the media. They succeeded in getting *Business Insider* to publish a hostile article about Jones that was intended to damage Jonesworks' reputation and its current business and future business prospects, including intending for a mutual client to terminate his relationship with Jones and Jonesworks.

187. Nathan and her co-conspirators arranged for numerous former Jonesworks employees and clients to speak to *Business Insider* and provide *Business Insider* with confidential Jonesworks' information—including about its clients—and specifically identified people who they expected would speak negatively of Jones and Jonesworks.

188. Nathan and her co-conspirators (and acting in concert with Wallace) further created and disseminated derogatory attack websites and social media pages about Jones and Jonesworks and then engaged in search engine optimization efforts to drive maximum traffic to the Websites.

189. Nathan in particular used the Websites to spur interest in the forthcoming *Business Insider* article, which itself referenced and amplified the disparaging website "stephaniejonesleaks.com," and worked to have the *Business Insider* article picked up by other reporters and have maximum negative impact in the public relations industry and beyond.

190. Nathan and her co-conspirators engaged in the aforementioned conduct with the sole purpose to harm Jones and Jonesworks, including but not limited to persuade a mutual client to end its relationship with Jones and Jonesworks. The mutual client ultimately and as a result did not renew or enter into an agreement with Jones and Jonesworks that he would have but-for the aforementioned conduct.

191. Jones and Jonesworks were severely damaged as a result of Nathan's and her co-conspirators' conduct. Among other harm, the *Business Insider* article and derogatory attack Websites negatively impacted Jones's standing and connection with Jonesworks' clients, making them more vulnerable to poaching by competitors like Nathan and Abel. As a result, Jonesworks' lost client relationships, including with a mutual client, that would have renewed or entered into agreements with Jonesworks if not for Defendants' wrongful conduct.

## ~~FIFTH~~SIXTH CAUSE OF ACTION
## Faithless Servant
## (Against Defendant Jennifer Abel)

192. ~~138.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

193. ~~139.~~ Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks a duty of loyalty.

194. ~~140.~~ Abel breached her duty of loyalty to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting,

inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

195. ~~141.~~ This conduct was intended to, and did in fact, advance Abel's own interests to the detriment of Jones and Jonesworks.

196. ~~142.~~ The foregoing breaches were willful, wanton, and in bad faith.

197. ~~143.~~ Abel's faithless service proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

## ~~SIXTH~~SEVENTH CAUSE OF ACTION
## Breach of Fiduciary Duty
## (Against Defendant Jennifer Abel)

198. ~~144.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

199. ~~145.~~ Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of [Jonesworks]." Abel Employment Agreement ¶ 9.2.

200. ~~146.~~ Abel breached her fiduciary duties to Jonesworks through her actions as described in this complaint, including by, among other things: (1) acting against the best interests of Jonesworks, including by working to undermine and damage Jones' and Jonesworks' business and reputation; (2) accessing, using and taking for her own purposes and against the company's interests Jonesworks' propriety documents and information; and (3) soliciting, inducing and encouraging Jonesworks employees and clients to terminate their relationships with Jonesworks.

201. ~~147.~~ Abel's breaches of her fiduciary duties proximately and directly caused monetary damages to Jonesworks in an amount to be proven at trial.

**~~SEVENTH~~EIGHTH CAUSE OF ACTION**
**Defamation**
**(Against Defendant Jennifer Abel)**

202. ~~148.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

203. ~~149.~~ Between September and December 2024, Abel made statements to certain third parties, including participants in the public relations industry in which she and Jones work, asserting, among other things, that Jones had doctored and falsified text messages purporting to be from Abel and was attempting to distribute them to third parties in order to harm Abel and paint Abel in a false light.

204. ~~150.~~ These statements are false and untrue.

205. ~~151.~~ These statements are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

206. ~~152.~~ Abel made these statements with knowledge that they were false, with reckless disregard for their truth ~~of~~or falsity, or, at a minimum, negligently.

207. ~~153.~~ Abel's statements enjoyed no privilege or authorization.

208. ~~154.~~ Abel's false and defamatory statements caused harm to Jones and Jonesworks' reputation in the public relations industry and among potential clients.

209. ~~155.~~ The defamatory statements made by Abel proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

## ~~EIGHTH~~NINTH CAUSE OF ACTION
## Defamation
## (Against Defendants Melissa Nathan and John Doe 1-10)

210. ~~156.~~ Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

211. ~~157.~~ John Does 1-10 and Nathan published or caused to be published the Websites.

212. ~~158.~~ The Websites were viewed by numerous third parties, including, on information and belief, residents of New York County and in the Southern District of New York.

213. ~~159.~~ The Websites included numerous false statements regarding Jones and Jonesworks, including the following:

a. Jones bullied Jonesworks employees.

b. Jones and Jonesworks interfered with the employment prospects of former Jonesworks' employees.

c. Jones and Jonesworks leaked confidential client information.

d. Jones and Jonesworks coerce clients into taking actions that are not in those clients' best interests.

e. Jones and Jonesworks interfere with their clients' ability to do business.

214. ~~160.~~ These false statements included:

a. Accusing Jones of "years of non-stop verbal and emotional abuse" and "horrific treatment in the workplace;"

b. Jones "doesn't understand how to truly do PR outside of leaking her own clients' secrets;"

c. Jones "does not fight for her clients but, she does fight with them. Crying, screaming, keeping them hostage;"

d. "Stephanie Jones takes clients hostage;"

e. "Not only does she break confidentiality, she willingly does regardless of the possible damage this kind of behavior might cause;"

f. Implying that Jones was "hacking" the defamatory websites.

215. ~~161.~~ These statements are false.

216. ~~162.~~ The false statements published on the Websites are defamatory per se in that they tended to cause harm to Jones' and Jonesworks' reputations and business interests.

217. ~~163.~~ John Does 1-10 and Nathan made these statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at a minimum, negligently.

218. ~~164.~~ The false statements published on the Websites enjoyed no privilege or authorization.

219. ~~165.~~ The false statements published on the Websites caused harm to the reputations of Jones and Jonesworks in the public relations industry and among potential clients.

220. ~~166.~~ The defamatory statements published on the Websites proximately and directly caused harm to the reputations and business interests of Jones and Jonesworks.

## TENTH CAUSE OF ACTION
## Violation of Illinois Consolidated Statutes Chapter 720 §§ 5/14-2 and 5/14-6
## (Against Defendant Heath)

221. Jones and Jonesworks incorporate each and every allegation set forth above as if they were fully set forth herein.

222. On or about August 8, 2024, Heath was a party to a telephone conversation with Stephanie Jones.

223. During the phone call, Heath was located in Chicago, Illinois.

224. The phone call was a private conversation between Heath and Jones.

225. Heath recorded this phone call with Jones.

226. Heath did not inform Jones that he was recording the conversation and did not request or receive her consent to record the conversation.

## PRAYER FOR RELIEF

## WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:

227. ~~167.~~ Entry of judgment in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including:

a. In respect of each of the First Cause of Action, Second Cause of Action, Third Cause of Action, Fourth Cause of Action, Fifth Cause of Action, Sixth Cause of Action, Seventh Cause of Action, ~~and~~ Eighth Cause of Action, Ninth Cause of Action, and Tenth Cause of Action, entry of judgment in favor of Plaintiffs awarding damages in an amount to be proven at trial;

b. Reasonable attorneys' fees and costs for this action as allowed by law and the parties' contracts;

c. Punitive damages, including but not limited to pursuant to Illinois Consolidated Statutes 14-6;

d. Pre-judgment and post-judgment interest; and

e. Such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

228. ~~168.~~ Jones and Jonesworks request a jury trial on all issues so triable.

~~DATED: December 24, 2024~~ ~~QUINN EMANUEL URQUHART & SULLIVAN, LLP~~

DATED: December 8, 2025

By:





QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kristin Tahler
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
kristintahler@quinnemanuel.com
~~NY State Bar No. 4147039~~
Maaren A. Shah
~~NY State Bar No. 4621611~~

Morgan L. Anastasio
295 5th Avenue
New York, New York ~~10017~~10016
(212) 849-7000
maarenshah@quinnemanuel.com
morgananastasio@quinnemanuel.com

Nicholas Inns (admitted *pro hac vice*)
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000
nicholasinns@quinnemanuel.com

*Attorneys for Plaintiffs Stephanie Jones and Jonesworks~~,~~ LLC*