# EXHIBIT 11

FILED UNDER SEAL

** C O N F I D E N T I A L **
* CONTAINS ATTORNEYS' EYES ONLY MATERIAL *
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-CV-10049-LJL
(Consolidated with 1:25-cv-00449-LJL)
-----------------------------------x
BLAKE LIVELY,
Plaintiff,
- against -
WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, JED WALLACE, an individual, and STREET RELATIONS INC., a California Corporation,
Defendants.
-----------------------------------x
(Caption continued)
September 5, 2025
9:10 a.m.

Videotaped Deposition of KATHERINE CASE, taken by Plaintiff, pursuant to Subpoena, held at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civ. Action No. 1:25-cv-779

----------------------------------x

STEPHANIE JONES and JONESWORKS LLC,

Plaintiffs,

- against -

JENNIFER ABEL, MELISSA NATHAN,
JUSTIN BALDONI, WAYFARER STUDIOS LLC,
and JOHN DOES 1-10,

Defendants.

----------------------------------x

A P P E A R A N C E S :

WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington D.C. 20006
Attorneys for Blake Lively
BY: KRISTIN BENDER, ESQ.
kbender@willkie.com
MICHAEL GOTTLIEB, ESQ (Via Zoom)
mgottlieb@willkie.com

- and -

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
BY: MELISSA TAUSTINE, ESQ.
mtaustine@willkie.com
AARON E. NATHAN, ESQ.
anathan@willkie.com

MANATT, PHELPS & PHILLIPS LLP
2049 Century Park East
Suite 1700
Los Angeles, California 90067
Attorneys for Blake Lively
BY: STEPHANIE ROESER, ESQ. (Via Zoom)
sroeser@manatt.com

A P P E A R A N C E S: (Continued)

QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street
10th Floor
Los Angeles, California 90017
Attorneys for Stephanie Jones and Jonesworks, LLC
BY: KRISTIN N. TAHLER, ESQ.
kristintahler@quinnemanuel.com

- and -

QUINN EMANUEL URQUHART & SULLIVAN LLP
295 Fifth Avenue
9th Floor
New York, New York 10016
BY: MORGAN ANASTASIO, ESQ.
morgananastasio@quinnemanuel.com

MEISTER SEELIG & FEIN PLLC
125 Park Avenue
7th Floor
New York, New York 10017
Attorneys for Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, Jennifer Abel, and The Agency Group PR LLC
BY: MITCHELL SCHUSTER, ESQ.
ms@msf-law.com
KEVIN A. FRITZ, ESQ. (Via Zoom)
kf@msf-law.com

A P P E A R A N C E S: (Continued)

LINER FREEDMAN TAITELMAN + COOLEY, LLP
1801 Century Park West
5th Floor
Los Angeles, California 90067
Attorneys for Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, Jennifer Abel, and The Agency Group PR LLC
BY: BRYAN FREEDMAN, ESQ.
bfreedman@lftcllp.com
KIM S. ZELDIN, ESQ. (Via Zoom)
kzeldin@lftcllp.com
SUMMER BENSON, ESQ. (Via Zoom)
sbenson@lftcllp.com

AHOURAIAN LAW
9465 Wilshire Boulevard
Suite 300
Beverly Hills, California 90210
Attorneys for Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, Jennifer Abel, and The Agency Group PR LLC
BY: MITRA AHOURAIAN, ESQ. (Via Zoom)

JACKSON WALKER LLP
1401 McKinney Street
Suite 1900
Houston, Texas 77010
Attorneys for Jed Wallace and Street Relations Inc.
BY: TORY EMERY, ESQ.
temery@jw.com

A P P E A R A N C E S: (Continued)
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Attorneys for The Witness
BY: MAXWELL BREED, ESQ.
mbreed@pryorcashman.com
DANIEL POHLMAN, ESQ.
dpohlman@pryorcashman.com

ALSO PRESENT:

JUSTIN BALDONI (Via Zoom)

JENNIFER ABEL (Via Zoom)

JAMEY HEATH (Via Zoom)

ZACH CZERENDA, Concierge Tech (Via Zoom)

COREY WAINAINA, Videographer

K. CASE - CONFIDENTIAL

THE VIDEOGRAPHER: Good morning everyone. We are going on the record at 9:10 a.m. on Friday, September 5th, 2025. Please note that the microphones are sensitive and may pick up whispering and private conversations.

This is media unit one of the video-recorded deposition of Katherine Case in the matter of Blake Lively versus Wayfarer Studios LLC, et al. This is filed in the United States District Court, Southern District of New York, the case number is 1:24-CV-10049-LJL.

My name is Corey Wainaina representing Veritext Legal Solutions and I am the videographer. The court reporter is Todd DeSimone also from the firm Veritext Legal Solutions. I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

Please be aware that all

K. CASE - CONFIDENTIAL

appearances and affiliations will be noted on the stenographic record, and will the court reporter please swear in the witness.

* * *

K A T H E R I N E C A S E,

called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MS. BENDER:

Q. Good morning, Ms. Case.

A. Good morning.

Q. Can you please state your full name and address for the record.

A. Katherine Hastings Case, [redacted].

Q. And have you ever been deposed before?

A. No.

Q. And do you understand that you are under oath during this deposition?

A. Yes.

Q. Okay. Do you understand that your testimony today carries the same

K. CASE - CONFIDENTIAL

KCASE-000003856.

You can put that document aside. You are being handed what has been marked Case Exhibit 8.

(Case Exhibit 8 marked for identification.)

MR. FREEDMAN: Did you mark this as 7?

MS. BENDER: It was marked as 7, but we are going to discuss Case Exhibit 8.

Q. Okay. This is Bates stamped KCASE-000004949, a text ranging from August 5th to August 6th, 2024.

Ms. Case, do you recognize this document?

A. I do.

Q. What is it?

A. It seems to be a text thread between myself and Melissa.

Q. Do you have any reason to think this document is not as it was when it was created?

A. No.

K. CASE - CONFIDENTIAL

Q. If you turn a few pages to where the Bates stamp ends in 53. At 1:58 Melissa says to you "I have to drive to this fucking meeting. Do you think you'll have that copy for Jed today?"

Do you see that?

A. I do.

Q. Is that referring to Jed Wallace?

A. Yes.

Q. What copy were you drafting for Jed Wallace?

A. I believe this is in regards to a client.

Q. Which client?

MR. BREED: We will designate it as attorneys' eyes only, please.

THE VIDEOGRAPHER: Okay.

Q. Which client?

A. I believe this was for Rebel Wilson.

Q. Okay. On the next page, at 4:46 p.m., Melissa says "Jed and Bryan asking me for copy lol kill me."

Do you see that?

A. I do.

Q. Who is Bryan?

A. I believe Bryan Freedman.

Q. Bryan and Jed were working in collaboration with TAG on the Rebel Wilson account?

A. I didn't work on that account, so I'm not sure.

Q. You worked on the copy that Melissa was requesting for that account, correct?

A. This was a one-off request.

Q. So you did some work on that account, correct?

A. Specifically I assisted with this copy.

Q. And you knew that Jed and Bryan were working together asking for the copy that you were preparing for that account, correct?

MR. BREED: Objection.

MR. FREEDMAN: Objection.

A. Melissa alerted me at that

K. CASE - CONFIDENTIAL

time.

Q. You knew that both Jed and Bryan were to receive the copy, correct?

MR. BREED: Objection.

MS. EMERY: Objection.

A. I knew that Melissa needed the copy.

Q. For whom?

A. In her text message she said Jed and Bryan were looking for it.

Q. Did Mr. Freedman work with TAG and Jed on the Wayfarer account?

A. Not during the summer of 2024.

Q. When is your understanding that Mr. Freedman started that work?

A. It is my understanding that it was following Blake's CRD complaint, Civil Rights Department complaint in December.

Q. When TAG was looking to identify a subcontractor for digital services in connection with the Wayfarer account, did TAG receive multiple quotes for those services?

A. That was communicated to me by

K. CASE - CONFIDENTIAL

prep that they had spoken to anyone representing the Wayfarer parties prior to your preparation?

A. I can't say.

Q. Ms. Case, are you aware of various websites and social media accounts that are disparaging of Ms. Jones?

MR. BREED: Objection.

A. I am aware of websites about Ms. Jones.

Q. Did you create any of the websites that are disparaging of Ms. Jones?

A. No.

Q. Who did?

A. I don't know.

Q. How did you become aware of the websites that are disparaging of Ms. Jones?

MR. BREED: Objection.

MR. FREEDMAN: Objection.

Q. How did you become aware of the websites disparaging Ms. Jones?

A. I received a call from Melissa in early May. It was communicated to me that a website had been requested.

K. CASE - CONFIDENTIAL

Q. A website had been requested?

A. The creation of a website had been requested.

Q. By whom?

MR. FREEDMAN: Objection.

MR. BREED: Let's designate this AEO, please.

MS. TAHLER: We can go off.

THE VIDEOGRAPHER: Yeah.

A. Melissa represented to me that a potential new client had requested the formulation of a website.

Q. Who was that new client?

MR. FREEDMAN: Objection.

A. At the time it was represented to me that it was Dwayne Johnson.

Q. Melissa Nathan told you that Mr. Johnson had requested preparation of a website about Ms. Jones?

MR. FREEDMAN: Objection.

A. She represented to me that he had requested the creation of a website of this nature.

Q. Did she tell you anything else

K. CASE - CONFIDENTIAL

about what Mr. Johnson had requested?

A. Not what he had requested specifically.

Q. Generally what he had requested?

A. Not necessarily what he had requested, but specific language was communicated.

Q. What was that specific language?

A. That Stephanie holds clients hostage, that she leaks clients' secrets, and that she treats her employees poorly, amongst others.

Q. Ms. Nathan told you that Mr. Johnson had said the things that you just said to her?

A. No.

Q. Who did Ms. Nathan say said that Stephanie holds clients hostage?

MR. BREED: Objection.

A. I don't know who might have said that. This language was communicated to me.

K. CASE - CONFIDENTIAL
Q. By Ms. Nathan?
A. The conversation was with her, yes.
Q. It was a conversation?
A. Yes.
Q. Did Ms. Nathan send you any written communications about this?
A. Not about the language to be used, no.
Q. Generally about the websites?
A. At that time, no.
Q. At any time?
A. There was conversation about the copy that I had written based on the information provided, I redrafted and sent back to her.
Q. Did you draft the copy for the website about Ms. Jones?
A. Based on the conversation and the language provided to me, I provided copy.
Q. So yes, you provided -- you wrote the copy that was -- that became the website of Ms. Jones?

K. CASE - CONFIDENTIAL
MR. FREEDMAN: Objection.
A. Based on the language that I was instructed to use.
Q. Did anyone else provide you with that language besides Ms. Nathan?
MR. BREED: Objection.
A. No.
Q. And Ms. Nathan provided all of this language to you orally?
MR. FREEDMAN: Objection.
MR. BREED: Objection.
A. She provided language to reference over the phone, yes.
Q. Did she put anything in writing about the language to be used in the website?
A. No.
Q. What happened -- did she send an audio message?
MR. BREED: Objection.
A. No.
Q. What happened after you provided Ms. Nathan with the copy?
A. I don't know.

K. CASE - CONFIDENTIAL

Q. Did you come to understand that the copy that you had drafted became a website about Ms. Jones?

A. I was made aware of that, yes.

Q. Who made you aware of that?

A. Melissa.

Q. And what did Melissa tell you?

A. She sent me the link.

Q. The link to which website?

A. It might have been the leaks. I don't remember which came first.

Q. She sent it to you how?

A. In a text message.

Q. And that text message sending Stephanie Jones Leaks you recognized as the copy that you had drafted, correct?

A. That's correct.

Q. Did Mr. Johnson pay TAG to create this website?

MR. BREED: Objection.

A. I don't know.

Q. Did Mr. Johnson become a client of TAG?

A. He did not.

K. CASE - CONFIDENTIAL

Q. Do you know if Ms. Nathan had any other conversations with Mr. Johnson other than the one you have already discussed?

MR. BREED: Objection.

MR. FREEDMAN: Objection.

A. I don't know.

Q. Did Ms. Nathan report to you any other conversations with Mr. Johnson other than the one you have already discussed?

MR. FREEDMAN: Objection.

MR. BREED: Objection.

A. No.

Q. Do you recall anything else about that initial conversation with Mr. Johnson other than what you have already testified to?

MR. BREED: Objection. That wasn't the testimony.

A. It wasn't a conversation with Mr. Johnson.

Q. What was it with Mr. Johnson?

A. I never spoke to Mr. Johnson.

K. CASE - CONFIDENTIAL

Q. I had understood that Ms. Nathan had spoken with Mr. Johnson and then Ms. Nathan reported that to you.

MR. BREED: Objection, that wasn't the testimony either.

MR. FREEDMAN: Objection.

MS. TAHLER: I'm asking for clarification.

A. I am not aware of whether or not Melissa spoke with Mr. Johnson. It was communicated to me that the site was at either his or someone affiliated with him's request.

Q. Did she tell you if she ever spoke to him directly?

A. No.

Q. Did she tell you who she spoke to about this?

A. No.

(Case Exhibit 35 marked for identification.)

Q. Ms. Case, you are now reviewing a document that has been marked as Case 35. It is a printout of the website

K. CASE - CONFIDENTIAL
StephanieJonesLeaks.com.
Do you recognize this as the copy that you drafted?
A. I believe so, yes.
Q. Do you know how this went from the copy that you drafted to becoming a website?
A. I do not.
Q. Did Melissa communicate anything to you about how this became a website after you provided her with the copy?
MR. FREEDMAN: Objection.
A. No.
Q. Do you understand there came a time where this website was shut down?
MR. BREED: Objection.
A. No.
Q. Did you understand that there came a time where there was a second website?
A. At the time I wasn't aware that there was a second website, no.
Q. After you provided Ms. Nathan

K. CASE - CONFIDENTIAL

with the copy for Exhibit 35, did you have any other discussions with Ms. Nathan about websites regarding Ms. Jones?

MR. FREEDMAN: Objection.

A. Websites, plural, no. I was asked to help alongside her to draft a handful of tweets for the Twitter page, and I was asked, again, based on language that I was provided to extrapolate that into updates to the website.

Q. You referred to the Twitter page. What is the Twitter page?

A. I don't recall the specific handle. I was told that at the time the site went public there was a corresponding Twitter page.

Q. Was that Twitter handle @LyingStephJones?

MR. FREEDMAN: Objection.

A. I'm not sure. I don't recall what the Twitter page was.

Q. Melissa told you that there was a corresponding Twitter handle?

A. She asked if I could assist in

K. CASE - CONFIDENTIAL

account.

Does this refresh your recollection that this is the Twitter account that you reviewed where your tweets were posted?

A. To my recollection, I was only aware of one of them. I believe it was Not a Stephanie Fan.

Q. You are aware of the Twitter account Not a Stephanie Fan?

A. To my recollection, that looks like the one that I was aware of.

Q. Your tweets were posted to Not a Stephanie Fan?

A. I don't know.

Q. But you weren't aware of any of the other Twitter accounts in Exhibit 36?

A. No.

MR. BREED: Objection.

Q. Did Melissa create Not a Stephanie Fan?

A. I don't know.

Q. Did she explain to you that a Twitter account was being created?

K. CASE - CONFIDENTIAL

A. There was never a formal explanation. I was simply asked to draft tweets.

Q. Do you know whether Melissa had any other assistance in this?

A. I don't know.

Q. Do you know whether she worked with Jed Wallace on this?

MR. FREEDMAN: Objection.

A. I spoke with Jed in conjunction to Melissa as it related to the tweets.

Q. And what did you and Jed discuss?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. The tweets.

Q. What about the tweets?

A. I provided them via Signal.

Q. Was it your understanding that Jed was going to post the tweets?

MR. FREEDMAN: Objection.

MR. BREED: Objection.

MS. EMERY: Objection.

A. I don't know.

K. CASE - CONFIDENTIAL

not exactly sure what she did; is that correct?

A. That's correct.

Q. Do you have any ill will of Melissa Nathan?

A. No.

Q. Earlier you testified that the Alexander brothers were turned down by TAG as clients?

A. That's my understanding.

Q. Isn't it true that you yourself personally worked for them on the side?

A. I wouldn't qualify it as working with them.

Q. Are you saying you didn't perform any services whatsoever for the Alexander brothers?

A. It was requested that I connect with them to create a website in conjunction with their ongoing litigation.

Q. And that was not for TAG, it was outside of TAG, right?

A. I'm not sure.

Q. Well, Melissa Nathan turned

## CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of September, 2025.

TODD DESIMONE