# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

West District, Beverly Hills Courthouse, Department 207

**26SMCV00684**
**ALEXA NIKOLAS vs BRYAN FREEDMAN, et al.**

August 12, 2026
8:30 AM

Judge: Honorable Michael E. Whitaker
Judicial Assistant: J. Fletes
Courtroom Assistant: T. Anderson

CSR: Baila M. Strauss
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): David Christopher Fortney

For Defendant(s): Ellyn S Garofalo ; Brian Turnauer (via LACC)

**NATURE OF PROCEEDINGS:** Hearing on Special Motion to Strike under CCP Section 425.16 (Anti-SLAPP motion) submitted by defendant, Bryan Freedman

Pursuant to Government Code sections 68086, 70044, and California Rules of Court, rule 2.956, Baila M. Strauss, CSR#14251, certified shorthand reporter is appointed as an official Court reporter pro tempore in these proceedings, and is ordered to comply with the terms of the Court Reporter Agreement. The Order is signed and filed this date.

The matter is called for hearing.

The Court issues a tentative ruling:

****************TENTATIVE RULING********************

BACKGROUND

This case arises from allegations of defamation.

The operative First Amended Complaint ("FAC") filed by Plaintiff Alexa Nikolas ("Plaintiff") against Defendants Bryan Freedman ("Freedman") and Melissa Nathan ("Nathan") alleges two causes of action for (1) defamation and (2) intentional infliction of emotional distress.

Freedman has now filed a special motion to strike both causes of action pursuant to Code of Civil Procedure section 425.16. Plaintiff opposes the motion and Freedman replies.

REQUESTS FOR JUDICIAL NOTICE

1. Plaintiff's Request for Judicial Notice

Exhibit 1: the Declaration of Samuel Moniz dated March 9, 2026 filed in the lawsuit Amanda Ghost et al. v. Rebel Wilson et al., Los Angeles Superior Court Case No. 24STCV17314

Exhibit 2: excerpts from Exhibit B to the Declaration of Samuel Moiz (Exhibit 1 above) [deposition transcript of Katherine Case taken on March 5, 2026], filed in the lawsuit Amanda Ghost et al. v. Rebel Wilson et al., Los Angeles Superior Court Case No. 24STCV17314

Exhibit 3: Exhibits 11 to 13 of the deposition of Katherine Case taken on March 5, 2026 as attached to the Declaration of Samuel Moniz above, filed in the lawsuit Amanda Ghost et al. v. Rebel Wilson et al., Los Angeles Superior Court Case No. 24STCV17314

Exhibit 4: letter to Judge Lewis Liman regarding refiling certain documents publicly, and unredacted deposition of Katherin Case filed therewith on May 1, 2026, in Lively v. Baldoni, Southern District of New York Case No. 1:24-cv-10049-LJL, ECP Nos. 1429 and 1429-12

Exhibit 5: the Declaration of Kristin Tahler filed on December 8, 2025 in Stephanie Jones, et al. v. Jennifer Abel, et al., Southern District of New York Case No. 1:25-CV-00779-LJL, ECF No. 193

Exhibit 6: expert report of Brian Horton, filed on December 8, 2025 as Exhibit 20 to the Declaration of Kristin Tahler in Stephanie Jones, et al., v. Jennifer Abel, et al., Southern District of New York Case No. 1:25-CV-00779-LJL, ECF No. 193-20

Exhibit 7: Defendant and Counterclaimant Chirstian Lanng's counterclaims filed in Doe v. Tradeshift, Northern District of California Case No. 4:24-cv-00166, ECF No. 37

Exhibit 8: the Declaration of Diana Smith in support of Defendant/Counterclaimant Chirstian Lanng's opposition to Anti-SLAPP and Exhibit 1 thereto, filed on July 22, 2024 in Doe v. Tradeshift, Inc., et al., Northern District of California Case No. 4:24-cv-00166, ECF Nos. 67, 70

Exhibit 9: letter to Judge Lewis Liman attaching excerpt from the deposition of Blake Lively, filed on August 11, 2025 in Lively v. Wayfarer Studios LLC, Southern District of New York Case No. 1:24-cv-10049, ECF Nos. 596 and 596-1

Judicial notice may be taken of records of any court in this state or of any court of record of the United States or of any state of the United States. (Evid. Code, § 452, subd. (d)(1).) Because the above documents are all court records, the Court may take judicial notice of them. (Ibid.) However, "while courts are free to take judicial notice of the existence of each document in a court file, including the truth of results reached, they may not take judicial notice of the truth of hearsay statements in decisions and court files. Courts may not take judicial notice of allegations in affidavits, declarations and probation reports in court records because such matters are reasonably subject to dispute and therefore require formal proof." (Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort (2001) 91 Cal.App.4th 875, 882 [cleaned up].)

Accordingly, the Court takes judicial notice of the existence, filing, and legal consequences of the above documents as court records, but not the truth of the allegations or other hearsay statements contained therein. Notwithstanding, the Court may consider these documents as evidence, to the extent they withstand Freedman's evidentiary objections.

2. Freedman's Request for Judicial Notice

Exhibit 1: "Zoey 01 Alum Alexa Nikolas Settles Defamation Suit Against Former NBC News Reporter Kat Tenbarge, Kimberly Nordyke, The Hollywood Reporter (June 28, 2026), https://www.hollywoodreporter.com/business/business-news/alexanikolas-settles-defamation-suit-kat-tenbarge-1236632414/

Exhibit 2: "Memorandum and Order" in Blake Lively v. Wayfarer Studios, LLC, et al., SDNY Case No. 1:24-cv-10049 (the "Lively Action") attached as Exhibit 2

Exhibit 3: Settlement Agreement in the Lively Action

Exhibit 4: "Complaint" in the Stephanie Jones, et al. v. Jennifer Abel, et al, SDNY Case No. 1:25-cv-00779

Exhibit 5: "We Can Bury Anyone: Inside a Hollywood Smear Machine, Megan Twohey, The New York Times (Dec. 21, 2024), https://www.nytimes.com/2024/12/21/business/media/blake-lively-justin-baldoniit-ends-with-us.html

Regarding Exhibits 2, 3, and 4, as discussed above, judicial notice may be taken of the existence, filing, and legal consequences of court records, but not the truth of any allegations or other hearsay statements contained therein.

However, the Court notes that Exhibit 3 is not actually a court record, as it does not contain court filing stamps or any other indicia that it was ever actually filed with any court. Further, Exhibit 4 contains the following disclaimers:

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

[…]

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(Freedman's RJN No. 4.) Moreover, the Court notes that this exhibit does not actually contain the case number 1:25-cv-00779 as asserted.

In summary, the Court takes judicial notice of the existence, filing, and legal consequences of Exhibit 2 as a court record, but the Court denies judicial notice of Exhibit 3 and Exhibit 4. In addition, because Freedman has not provided a basis to take judicial notice of the articles identified as Exhibits 1 and 5, the Court denies judicial notice of Exhibits 1 and 5.

EVIDENTIARY OBJECTIONS

The Court rules as follows with respect to Freedman's objections to the Declaration of Alexa Nikolas:

1. Overruled – offered to explain the impetus for Plaintiff's research of court records, not for the truth of the matter asserted

2. Overruled – offered to explain Plaintiff's perception, not for the truth of the matter asserted

3. Sustained

4. Sustained

5. Overruled

6. Sustained

7. Overruled – offered to explain Plaintiff's awareness/diligent efforts to discover the identity of the poster, not the absolute truth of the matter asserted

8. Overruled – offered to explain Plaintiff's awareness/the impetus for Plaintiff to access and download the report in question, not the truth of the matter asserted

9. Overruled – offered to explain Plaintiff's subjective belief, not the truth of the matter asserted

10. Overruled – offered to explain Plaintiff's subjective belief, not the truth of the matter asserted

11. Sustained

12. Overruled

13. Sustained as to the word "defamatory"

14. Overruled

The Court rules as follows with respect to Freedman's objections to Plaintiff's Request for Judicial Notice:

1. Sustained

2. Sustained

3. Sustained

4. Sustained

5. Sustained

6. Sustained

7. Sustained

8. Sustained

9. Sustained

LEGAL STANDARDS

"A cause of action arising from a person's act in furtherance of the 'right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike[….]'" (Monster Energy Co. v. Schechter (2019) 7 Cal.5th 781, 788 (hereafter Monster).) Such lawsuits are commonly known as "SLAPP" suits (Strategic Litigation Against Public Participation). (Id. at fn. 1.)

1. Background

The California Legislature enacted Code of Civil Procedure section 425.16, known as the "anti-SLAPP statute" to "allow[] defendants to seek early dismissal of unmeritorious claims arising from protected speech and petitioning activities." (Bonni v. St. Joseph Health System (2021) 11 Cal.5th 995, 1004 (hereafter Bonni).) "Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern." (Wilson v. Cable News Network, Inc. (2019) 7 Cal.5th 871, 883–884 (hereafter Wilson).) The anti-SLAPP statute is also designed to expedite the early dismissal of unmeritorious claims arising from protected activity. (Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism (2018) 4 Cal.5th 637, 642; Simpson Strong-Tie Co., Inc. v. Gore (2010) 49 Cal.4th 12, 21.) "The anti-SLAPP statute does not insulate defendants from any liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity." (Baral v. Schnitt (2016) 1 Cal.5th 376, 384, emphasis in original (hereafter Baral).)

"SLAPPs are unsubstantiated lawsuits based on claims arising from a defendant's constitutionally protected speech or petitioning activity." (Kurz v. Syrus Systems, LLC (2013) 221 Cal.App.4th 748, 757 (hereafter Kurz).) They "seek[] to chill rights to free speech or petition by dragging the speaker or petitioner through the litigation process, without genuine expectation of success in the suit." (Area 51 Productions, Inc. v. City of Alameda (2018) 20 Cal.App.5th 581, 591–592 (hereafter Area 51 Productions).) They are "generally brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the

plaintiff." (Grenier v. Taylor (2015) 234 Cal.App.4th 471, 479.)

"The Legislature enacted section 425.16 to provide a summary disposition procedure for SLAPP claims." (Area 51 Productions, supra, 20 Cal.App.5th at p. 592.) The statute "authorizes courts, upon motion by anyone who claims to be the target of a SLAPP suit, to probe the basis for any cause of action allegedly arising from protected communicative activities, and to strike it if the claimant cannot show minimal merit." (Ibid.) A special motion to strike may only be directed to a complaint, cross-complaint, or petition, but not to an answer or affirmative defenses. (Morris Cerullo World Evangelism v. Newport Harbor Offices & Marina, LLC (2021) 67 Cal.App.5th 1149, 1156-1157.)

2. Procedure

To determine whether an anti-SLAPP motion should be granted, courts engage in a two-step process and evaluate the merits of the claim(s) using a "summary-judgment-like procedure." (Baral, supra, 1 Cal.5th at p. 384.) "The procedures authorized in the statute allow a defendant to stay discovery before litigation costs mount, obtain early dismissal of the lawsuit, and recover attorney fees." (Kurz, supra, 221 Cal.App.4th at p. 757.) A special motion to strike "is not a substitute for a motion for a demurrer or summary judgment." (Belen v. Ryan Seacrest Productions, LLC (2021) 65 Cal.App.5th 1145, 1161.) And there is no meet and confer requirement prior to filing an anti-SLAPP motion. (Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc. (2021) 59 Cal.App.5th 995, 1008.)

a. First Step

In the first step, the moving defendant has the initial burden of showing that the challenged cause of action arises from protected free speech or petitioning activity. (Bonni, supra, 11 Cal.5th at p. 1009; Park v. Board of Trustees of California State University (2017) 2 Cal.5th 1057, 1061

(hereafter Park).) “The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute.” (Wilson, supra, 7 Cal.5th at p. 884.) When the defendant has not met this burden, the court may summarily deny the special motion to strike “without putting the plaintiff to the burden of establishing the probability of success on the merits.” (Whitehall v. County of San Bernardino (2017) 17 Cal.App.5th 352, 360 (hereafter Whitehall).)

“[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.” (Park, supra, 2 Cal.5th at p. 1063.) It is not enough that a claim was filed after or even “because of” protected activity, but rather the protected activity must “supply elements of the challenged claim.” (Id. at p. 1064.) Moreover, courts “must distinguish between speech or petitioning activity that is mere evidence related to liability, and liability that is based on speech or petitioning activity.” (Whitehall, supra, 17 Cal.App.5th at p. 361.)

Moreover, the anti-SLAPP statute does not require a defendant “to disprove allegations of illicit motive.” (Wilson, supra, 7 Cal.5th at p. 887.) Courts must distinguish between “allegations of conduct on which liability is based” and “allegations of motives for such conduct” because “the anti-SLAPP statute is triggered only when the alleged injury-producing conduct is protected activity, not merely the motivating conduct for that activity.” (Gaynor v. Bulen (2018) 19 Cal.App.5th 864, 887.)

However, a defendant’s motives are not “categorically off-limits in determining whether an act qualifies as protected activity under the anti-SLAPP statute” but “the plaintiff's allegations cannot be dispositive of the question.” (Wilson, supra, 7 Cal.5th at p. 889.) “[W]hether the defendant's act qualifies as one in furtherance of protected speech or petitioning will depend on whether the defendant took the action for speech-related reasons.” (Ibid.) “But there is an important difference between permitting the defendant to present evidence of its own motives in an effort to make out its prima facie case of protected activity and treating a plaintiff's allegations of illicit motive as a bar to anti-SLAPP protection,” which is not proper. (Ibid.)

b. Second Step

Once the court finds the defendant has made the threshold showing, the "the burden then shifts to the plaintiff to show a probability of prevailing on [the] claims." (De Havilland v. FX Networks, LLC (2018) 21 Cal.App.5th 845, 854.) To meet this burden, "the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." (Finton Construction, Inc. v. Bidna & Keys, APLC (2015) 238 Cal.App.4th 200, 211.) "[T]he plaintiff must then demonstrate its claims have at least 'minimal merit.' " (Park, supra, 2 Cal.5th at p. 1061.) "[A] plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" (Monster, supra, 7 Cal.5th at p. 788.) "[A] court must at the second step accept as true the evidence favorable to the plaintiff" but is not required to give "similar credence" to allegations in the complaint "in the face of contrary evidence." (Wilson, supra, 7 Cal.5th at p. 887.)

This procedure is essentially a summary judgment motion in reverse. (Area 55, LLC v. Nicholas & Tomasevic, LLP (2021) 61 Cal.App.5th 136, 152.) "Rather than requiring the defendant to defeat the plaintiff's pleading by showing it is legally or factually meritless, the motion requires the plaintiff to demonstrate that he possesses a legally sufficient claim which is 'substantiated,' that is, supported by competent, admissible evidence." (Ibid.) "Consistent with this summary-judgment-like procedure, the court "must draw all reasonable inferences from the evidence in favor of [the party opposing the anti-SLAPP motion.'" (Ibid.) "Only a [cause of action] that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP suit, subject to being stricken under the statute." (Sheley v. Harrop (2017) 9 Cal.App.5th 1147, 1162.)

DISCUSSION

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**26SMCV00684** August 12, 2026
**ALEXA NIKOLAS vs BRYAN FREEDMAN, et al.** 8:30 AM

Judge: Honorable Michael E. Whitaker CSR: Baila M. Strauss
Judicial Assistant: J. Fletes ERM: None
Courtroom Assistant: T. Anderson Deputy Sheriff: None

1. Protected Activity

Code of Civil Procedure section 425.16, subdivision (b) prohibits a cause of action arising out of a person's right of petition or free speech in connection with a public issue, unless a court determines that the plaintiff has established there is a probability that the plaintiff will prevail on the claim.

Subdivision (e) provides: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: […] (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

The general facts underlying Plaintiff's claims are as follows:

2. Plaintiff Alexa Nikolas is a former actress turned fierce public advocate for survivors of sexual assault in the entertainment industry. Starting in 2022, Ms. Nikolas was the subject of a smear website and social media activity designed to discredit and defame her. It has come to light that the Defendants in this case, along with Does 1-100, were behind this website and social media activity.

4. Defendant Bryan Freedman is an attorney in Los Angeles, California who has built his decades-long career by representing high-profile individuals. Defendant Freedman presents himself as "one of the most powerful - and most feared - people in the media industry. […]

5. Ms. Nikolas herself is a survivor of abuse. She has admirably dedicated her life and career to amplifying the voices of survivors of sexual abuse against those in the entertainment industry. Ms. Nikolas now organizes this work through her company, Eat Predators. Due to the nature of her work, she is no stranger to combating false narratives disseminated about her, including that she fabricates claims of abuse. These false narratives were published in a smear website, Alexanikolas.net, that has fueled disdain against her for years.

7. Before Eat Predators, Ms. Nikolas had roles in The Walking Dead, Zoey 101 and various other television programs and movies from 1998-2013. Ms. Nikolas also had entered into a relationship with musical artist, Michael Milosh. Unfortunately, the relationship was sexually abusive. After some time trying to heal from the same, Ms. Nikolas eventually came forward with civil legal claims against her ex-husband accusing him of sexual abuse. Ms. Nikolas chose to do this in part to show other survivors that they could be brave enough to do the same.

8. Defendant Freedman was hired to represent Ms. Nikolas' ex-husband in response to her lawsuit. Ms. Nikolas wanted to understand who her ex-husband's attorney was, as well as why someone who had previously represented survivors of sexual abuse would represent her ex-husband.

9. To her disgust, Plaintiff then discovered that Bryan Freedman had also been accused of sexual assault. Specifically, of violent gang rape. She subsequently discovered that he had reportedly paid thousands of dollars to settle the claim.

10. After discovering the court documents detailing the allegations against Defendant Freedman, Ms. Nikolas organized an Eat Predators protest outside of Defendant Freedman's office in 2022. This protest was typical of her previous ones wherein she called out an individual in the entertainment industry accused of sexual assault, in addition to providing legal representation to individuals accused of the same. What was decidedly atypical is that Defendant Freedman had also represented and positioned himself to the public as a lawyer for survivors of abuse and assault in the entertainment industry.[1] In addition to protests at Defendant Freedman's office,

Plaintiff created YouTube videos and Instagram posts about the allegations against Defendant Freedman.

11. That same year, media outlets began taking interest in Ms. Nikolas' protests, including those about Defendant Freedman. Despite covering the rest of the Eat Predators protests, some media outlets suspiciously excluded reporting on her protests outside of Defendant Freedman's office. Around the same time that Ms. Nikolas was corresponding with various media outlets about her Freedman protests, a smear website was created about Ms. Nikolas: Alexanikolas.net. Somone wanted the story about Defendant Freedman buried. They also tried to bury Ms. Nikolas. The person(s) behind Alexanikolas.net failed.

12. Ms. Nikolas only learned that Defendant Freedman himself was a conspirator behind the PR machine that attacked her in December of 2025. The smear website and related content did not identify an owner nor an author. The individual(s) behind the smear campaign went to painstaking lengths to conceal their identities and prevent their defamatory conduct from being associated with those individuals responsible.

13. The smear website contained damaging lies about Ms. Nikolas, her family, her character, and her career. These same defamatory statements soon began circulating around Twitter. A Twitter Account with the username Alexanikolas21, created after the website, was to blame. At the time, Ms. Nikolas was unsuccessful in her attempts to identify the individual(s) responsible. She has only recently discovered the identity of the responsible parties behind it due to facts revealed during separate litigation stemming from events subsequent to the creation of Plaintiff's smear website.

14. In December of 2024, actress Blake Lively filed a lawsuit against Justin Baldoni and his production company, Wayfarer Studios, for claims of sexual harassment on the set of the movie It Ends With Us.[2] Ms. Lively's lawsuit included claims alleging a retaliation campaign waged against her by Baldoni and his PR team, led by Defendant Nathan, in response to Lively's coming forward with allegations of harassment. In her lawsuit, it is alleged that Justin Baldoni

retained Jennifer Abel, Melissa Nathan and a Texas-based contractor named Jed Wallace, among others, to engage in an online campaign intended to shift the narrative of events and public perception against Ms. Lively.

15. In her deposition, Ms. Lively specifically testified that Bryan Freedman, the opposing party's lawyer questioning Ms. Lively, was directly involved in the smear campaign against her.[3]

16. Ms. Lively's lawsuit sparked other lawsuits, including one filed by Stephanie Jones, a publicist who owns Jonesworks LLC. Jonesworks previously represented Justin Baldoni and Wayfarer Studios. In 2025, Ms. Jones sued Baldoni and Wayfarer Studios, among others, for breach of contract and tortious interference related to Abel's and Defendant Nathan's alleged actions in soliciting Baldoni and Wayfarer Studios as clients from Jonesworks in the wake of the press coming out about Ends With Us.[4] The parties in both the Lively and the Jones lawsuits engaged in discovery throughout 2025.

17. In December of 2025, Ms. Jones moved to amend her complaint to add causes of action against the Defendant Melissa Nathan and other defendants. Discovery allegedly revealed evidence that Defendant Nathan, in concert with other Doe defendants, engaged in a smear campaign against Jones. This campaign included websites similar to Alexanikolas.net that targeted Ms. Jones. Among other revelations, the discovery process uncovered that Defendant Nathan's contractor, Defendant Jed Wallace and his company Street Relations, Inc., engaged in a practice of creating highly offensive and negative online content against individuals. Their targets often included women that have accused powerful individuals of sexual assault with the clear intent of destroying those individuals' reputations.

18. The websites identified in the Jones case included Alexanikolas.net as another one of Defendant Nathan and her team's smear campaigns. Data and activity reveal evidence of common authorship between Alexanikolas.net and the sites discussed in Jones.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**26SMCV00684** August 12, 2026
**ALEXA NIKOLAS vs BRYAN FREEDMAN, et al.** 8:30 AM

Judge: Honorable Michael E. Whitaker CSR: Baila M. Strauss
Judicial Assistant: J. Fletes ERM: None
Courtroom Assistant: T. Anderson Deputy Sheriff: None

22. These smear campaigns are created by a network of press relations personnel, attorneys and contractors including named Defendants and Does 1-100. These smear campaigns include social media activity, press coverage, litigation and, in some cases, defamatory websites.

27. The evidence uncovered in the Lively and Jones cases has revealed that Ms. Nikolas was a victim of a smear campaign taken from the playbook of Melissa Nathan, Bryan Freedman and Does 1-100. Ms. Nikolas has suffered severe damage caused by the lies published about her and only now has learned the identities of some of those responsible. Throughout discovery, Ms. Nikolas will identify anyone and everyone else involved in defaming her.

53. On November 23, 2022, a smear website targeting Ms. Nikolas, Alexanikolas.net was created. This website was created to discredit and defame Ms. Nikolas. On the same date, within seconds of Alexanikolas.net being purchased, the website domain Alexanikolaslies.com was also purchased from the same Registrar: Dynadot.com. The timing of this website is no coincidence. At this point, Defendant Freedman knew Ms. Nikolas was exposing his past allegations of gang-rape and the website explicitly sought to discredit her.

58. In January of 2024, another smear website was created that mentioned Ms. Nikolas: lookbackfraud.com. This website was connected to the Alexanikolas.net website through a Twitter account, Alexanikolas21, created in December 2022 that spread the Alexanikolas.net defamatory content.

59. Despite Ms. Nikolas' diligent efforts to determine who was responsible, it was not until December of 2025 that Ms. Nikolas learned of the identities of those involved in the creation of her smear campaign.

61. Upon information and belief, Bryan Freedman and Melissa Nathan either individually, or

though entities and individuals they retain, create and/or authorize the creation of smear websites, social media accounts, and the traffic around same to discredit individuals who speak out against their clients and/or engage in litigation against their clients. Defendant Freedman and Nathan, individually or by and through their agents, control the copy of those websites.

62. Among these websites are those directed at Ms. Nikolas. Ms. Nikolas' background disputes with Defendant Freedman indicate that Freedman launched and/or otherwise was involved in the creation and distribution of defamatory statements made against Ms. Nikolas. He sought to directly benefit from them. His clients, like Diplo, also sought to directly benefit from them as Ms. Nikolas was also organizing protests against the DJ due to allegations against him of sexual abuse in the summer of 2022.[5] While his clients may have been beneficiaries of the same, Defendant Freedman engaged and/or authorized smear campaigns for his own personal benefit, as Ms. Nikolas had publicized allegations of gang-rape against him around the time that the websites against her were launched.

67. There are multiple websites that have been identified in the Jones v. Baldoni matter which appear to have evidence of common authorship. This includes Alexanikolas.net, which accuses Ms. Nikolas of being a criminal, of extorting "multiple" ex-boyfriends and threatening to manufacture claims of sexual abuse. All of these statements are false and have damaged Ms. Nikolas.

68. Alexanikolas.net is a website unilaterally designed to publicize damaging lies about Ms. Nikolas. The website is titled "Alexa Nikolas: Exposed" and calls her a "sinister and criminal force." The website says that they have "personally watched her outright evil manipulation since seeing it firsthand almost a decade ago."

69. The website states that one of Ms. Nikolas's exes "specifically" shared that "Alexa viciously threatened him – if he didn't lie in court and say that their friend admitted to sexually assaulting multiple men and women in college." This claim is demonstrably false.

70. The website also claims that "several ex-boyfriends of Alexa's have come forward to share that Alexa threatened that either they had to pay Alexa (yes, pay her and support her), or she would start campaign of sexual abuse against them." This claim is demonstrably false.

71. The website claims that Ms. Nikolas's husband, a private individual, has married an "Alleged Sexual Assault Perpetrator!" The website says her husband has a "history" of "multiple reports" accusing him of sexually assaulting "five (5) victims." The website further asks "Do" her husband's "parents (Nick Gray) realize they are financing the agenda of someone as dangerous as Alexa… Do they know they are financing a sinister plot along with Joe Dunn?" To be clear, this entire allegation is demonstrably false. It merits noting that "Nick Gray" is not even the correct name of Ms. Nikolas's husband's father.

72. The website continued to be updated, including posting an update on 1/25/2023 that her child was being "used as a pawn." This is demonstrably false.

73. The website states that Joe Dunn finances her work with Eat Predators. This claim is demonstrably false.

74. The website states that Ms. Nikolas has "attacked" Brittany Spears threatening to expose information she has about Brittany as a parent. This is demonstrably false.

75. The false claims on Alexanikolas.net have damaged Ms. Nikolas.

76. Furthermore, much of the website's copy was also posted to a Twitter account,

Alexanikolas21, which was created in or around December 2022 and linked the Alexanikolas.net smear website, driving traffic to the same.

77. The Twitter account posted the same lies as Alexanikolas.net in a series of Tweets, some of which are identified here: [image omitted]

78. The Alexanikolas21 account interacted with other accounts with similar messaging about Nikolas between 2022 and present.

79. The Alexanikolas21 Twitter account linked another one of the smear websites on September 16, 2024: lookbackfraud.com.

80. The Twitter account remained active into 2025, making additional false statements including that she "comes out of the woodworks" when she needs new donations. This statement is demonstrably false.

81. The Lookbackfraud.com website appears to have been registered on January 02, 2024.

82. The website is titled "LOOKBACK FRAUD, THE MODERN DAY DIGITAL CRIME FAMILY."

83. The authors, creators, and owners of the websites, and those who created the copy on the websites, have concealed their identities. The website is authored such that it appears to come from a "whistleblower" where "[e]veryone involved (myself included) is a criminal and

complicit in one of the most elaborate organized crime efforts of the modern era, from my perspective." The website focuses in part on Joe Dunn, the former California State Senator and attorney.

84. Lookbackfraud.com attempts to connect Ms. Nikolas to some sort of alleged criminal scheme by Joe Dunn. Ms. Nikolas has no criminal history and has not participated in anything "criminal" with Joe Dunn. This website is yet another attempt to defame her. Furthermore, the connection of these two websites by the Alexanikolas21 Twitter account evidence of common authorship between the two, discussed in greater detail below.

(FAC ¶¶ 2, 4-5, 7-18, 22, 27, 53, 58-59, 61-62, 67-84.) The first cause of action for defamation further alleges:

123. Ms. Nikolas has been damaged by the lies perpetuated on Alexanikolas.net, the allegations that she has done something "criminal" from Lookbackfraud.com. The defamatory statements have subjected her to years of hatred and directly impacted her credibility and ability to scale her business.

126. Defendants Freedman, Nathan and Doe Defendants 1-100 published or caused to be published by and through others the Website Alexanikolas.net, the Twitter account Alexanikolas21 and Lookbackfraud.com and engaged in activity designed to bring traffic to the Websites and Twitter account. These websites and social media account identify Ms. Nikolas by name and intended to make those statements about Ms. Nikolas.

127. The Websites were viewed by numerous third parties.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

West District, Beverly Hills Courthouse, Department 207

**26SMCV00684**
**ALEXA NIKOLAS vs BRYAN FREEDMAN, et al.**

August 12, 2026
8:30 AM

Judge: Honorable Michael E. Whitaker
Judicial Assistant: J. Fletes
Courtroom Assistant: T. Anderson

CSR: Baila M. Strauss
ERM: None
Deputy Sheriff: None

---

128. The Websites included numerous false statements of fact regarding Ms. Nikolas, including the following:

a. Ms. Nikolas is a "criminal force."

b. Ms. Nikolas demanded that a protester "manufacture and perpetuate misinformation for the sake of the movement." And that "(t)hose who questioned the merit of the claims were also threatened."

c. Ms. Nikolas told close friends she would "manufacture 'me too' narratives" even though she was "kidding."

d. That Ms. Nikolas had an ex-boyfriend who she "viciously threatened" if "he didn't lie in court and say that their friend admitted to sexually assaulting multiple men and women in college."

e. That Ms. Nikolas has "threatened to 'leak' and outright manufacture claims of sexual assault against people, execs and executives since the Nickelodeon days."

f. That "several ex-boyfriends of Alexa's have come forward to share that Alexa threatened that either they had to pay Alexa (yes, pay her and support her), or she would start campaign of sexual abuse against them."

g. That Ms. Nikolas's husband is an "Alleged Sexual Assault Perpetrator!" who has a "history" of "multiple reports" accusing him of sexually assaulting "five (5) victims." That her husband's

"parents (Nick Gray) realize they are financing the agenda of someone as dangerous as Alexa." And that "the entire situation" was "buried by his lawyers."

h. That her child was being "used as a pawn."

i. That Joe Dunn "financed" Eat Predators.

j. That Ms. Nikolas has "attacked" Brittany Spears threatening to expose information she has about Brittany as a parent.

k. That Ms. Nikolas "pops out of the woodworks" when she "needs more donations."

l. That Ms. Nikolas could be described as a "Nazi" or has anything affiliation with that term whatsoever.

129. Defendants engaged in this conduct intentionally, knowingly, and willfully.

130. Defendants actually knew these statements of fact were false or had serious doubts about the truth of them and nevertheless made the with reckless disregard.

131. The statements caused Ms. Nikolas to experience hatred, contempt and ridicule.

132. Defendants conduct proximately caused injury to Plaintiff. Plaintiff has sustained and will sustain pain and suffering and psychological and emotional distress, mental anguish, lost income, embarrassment, and humiliation.

(FAC ¶¶ 123, 126, 128-132.) The second cause of action for intentional infliction of emotional distress further alleges:

134. In creating, controlling and maintaining a defamatory website, online posts and social media accounts against Ms. Nikolas for years, while simultaneously concealing any affiliations with the same, Defendants engaged in conduct towards Plaintiff, including publicly alleging and promoting that she is a "criminal," that she manufactures fake claims of sexual assault and that her husband was accused of raping five women that is extreme and outrageous so as to exceed the bounds of decency in a civilized society.

(FAC ¶ 134.)

Both causes of action arise from Defendants' alleged publication of false and defamatory statements on various websites.

"In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants and whether the activity occurred in the context of an ongoing controversy, dispute or discussion or affected a community in a manner similar to that of a governmental entity." (FilmOn.com Inc. v. DoubleVerify Inc. (2019) 7 Cal.5th 133, 145-146 [cleaned up] (hereafter FilmOn).) Further, there must be " 'some degree of closeness' between the challenged statements and the asserted

public interest.” (Id. at p. 150.)

Freedman argues that the alleged statements concern the public interest because Plaintiff is a limited purpose public figure who organizes public protests against sexual misconduct by celebrities and other high-profile men, and the statements concern Plaintiff’s motives for such public advocacy. In particular, the allegedly defamatory statements about Plaintiff concern whether her own public advocacy is genuine or itself a disingenuous smear campaign motivated by personal animus and/or profit.

Plaintiff argues in opposition that the statements do not concern the public interest because at the time the statements were made, she was just beginning her advocacy journey, and therefore not yet a public figure and personal attacks, such as accusing Plaintiff of being a criminal or putting her children at risk are not in the public interest or in furtherance of the public interest debate.

“A limited purpose public figure is one who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.” (Balla v. Hall (2021) 59 Cal.App.5th 652, 676.)

“Three elements must be present to characterize someone as a limited purpose public figure. First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue. […] And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy.” (Bui v. Ngo (2024) 101 Cal.App.5th 1061, 1073.)

In support of her argument that such personal attacks are not in the public interest, Plaintiff cites to Albanese v. Menounos (2013) 218 Cal.App.4th 923, 937 (hereafter Albanese) and Wilson v. Cable News Network, Inc. (2019) 7 Cal.5th 871, 902 (hereafter Wilson).

In Albanese, the trial court found, and the appellate court affirmed, that the plaintiff, who was a well-known celebrity stylist and fashion consultant, did not rise to the level of being in the public eye for purposes of the anti-SLAPP statute. (Albanese, supra, 218 Cal.App.4th at p. 934-937.) In so holding, the trial court distinguished two cases: one in which the plaintiff's voluntary appearance on Who Wants to Marry a Multimillionaire had invited public comment regarding her appearance on that program, and another case where an advisor, who urged prominent political candidates to campaign against domestic violence, had thereby invited public comment regarding his own alleged abusive conduct toward his ex-wives. By contrast, there was no evidence the celebrity stylist plaintiff in Albanese "was involved in a public controversy" or that her fame alone was sufficient enough that her purported theft of property from the defendant and/or Dolce and Gabbana was a matter of public interest. (Id. at pp. 936-937.)

In Wilson, the plaintiff was a former field producer for the television news network, CNN. The Court held that he was not a figure so prominently in the public eye that any remark about him would qualify as speech on a matter of public concern. Nor was Wilson's evidence of his awards make him a person of such notoriety that a statement about the reason for his termination from the network would necessarily concern an issue of public interest. Nor was the notoriety the lawsuit itself sufficient to elevate him to that level because "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." (Wilson, supra, 7 Cal.5th at pp. 901-902.)

Here, Plaintiff is more of a public figure in general than a celebrity stylist or field producer, by virtue of her appearances on the nationally televised shows Zoey 101 and The Walking Dead. (See FAC ¶ 7.) Plaintiff then further put herself in the public eye through her advocacy work. Thus, like the woman who voluntarily appeared on Who Wants to Marry a Multimillionaire, Plaintiff has invited public comment about her public work or public advocacy on a matter of significant concern – sexual abuse of others.

In this regard, Plaintiff also argues there is no functional relationship between the alleged defamatory statements about Plaintiff and discussions of the broader public interest issues. In

support, Plaintiff cites to Dual Diagnosis Treatment Center, Inc. v. Buschel (2016) 6 Cal.App.5th 1098, 1105 (hereafter Dual). There, statements that a rehabilitation facility was unlicensed to practice were not of widespread public interest, because they pertained only to a single facility, and to the extent they were of interest to a limited group of clients, neighbors, and industry professionals, there was no ongoing controversy, dispute or discussion.

Here, there is an ongoing controversy, dispute, and discussion concerning widespread and pervasive sexual assault, both more broadly and in the entertainment industry specifically. That broader discussion concerns both the abuse of power by men in charge and the credibility of those who accuse them of such misconduct. Thus, taken in a vacuum, statements about Plaintiff's personal dynamics with her ex-husband and her purported use of her child as a "pawn" might seem unrelated to her advocacy work, But when considered in the broader context, which includes the fact that Plaintiff has publicly accused her ex-husband of abuse and her public advocacy work accusing others of the same, her credibility and motives in making such public statements are directly connected.

Therefore, the Court determines that the alleged defamatory statements are made in connection with a public interest. As such, Freedman has met his burden to establish the alleged defamatory statements arise from protected free speech, shifting the burden to Plaintiff to establish the probability of prevailing on her claims.

2. Probability of Prevailing

Freedman argues that Plaintiff is unlikely to prevail because (1) Plaintiff's claims are untimely and (2) Plaintiff's claims are deficient. Specifically, Freedman argues Plaintiff's claims fail on the merits because (i) Plaintiff cannot prove falsity, (ii) the alleged defamatory statements constitute mere opinion as opposed to actionable defamation, (iii) Plaintiff cannot prove which statements were allegedly made by which Defendants, and (iv) Plaintiff cannot prove actual malice.

a. Timeliness

Freedman first argues Plaintiff's claims are time-barred because the allegedly defamatory statements were published online on or before January 2024, yet Plaintiff did not file the instant lawsuit until more than a year later, on February 5, 2026. The statute of limitations for defamation is one year. (Code Civ. Proc., § 340, subd. (c).)

However, the FAC alleges that Plaintiff was unable to discover the identities of the publishers until December 2025, when the websites that had allegedly defamed Plaintiff were listed in publicly filed documents in other high profile cases involving online smear campaigns.

Notwithstanding, Freedman argues that the identity of the defendant is not essential to a defamation claim. In support, Freedman cites to Bernson v. Browning-Ferris Industries (1994) 7 Cal.4th 926, 932 (hereafter Bernson). There, the high court explained that while the general rule is that ignorance of the identity of a wrongdoer is insufficient to toll the statute of limitations, since the plaintiff can simply sue them as a Doe defendant, that general rule does not apply when, "as a result of the defendant's intentional concealment, the plaintiff is not only unaware of the defendant's identity, but is effectively precluded as a practical matter from ascertaining it through normal discovery procedures." (Id. at p. 933.) "[A]s long as the plaintiff is duly diligent, the inability to discover [the wrongdoer] invokes the doctrine of fraudulent concealment and tolls the running of the statute of limitations[.]" (Id. at pp. 933-934.) This is because "the primary interest served by statutes of limitations is that of repose" to "ensure that plaintiffs proceed diligently with their claims and mitigate the difficulties faced by defendants in defending stale claims, where factual obscurity through the loss of time, memory or supporting documentation may present unfair handicaps." (Id. at p. 935.) But "where the bar becomes a sword rather than a shield, wielded by a party that has intentionally cloaked its identity, factors of fairness and unjust enrichment come into play, which courts are bound to consider in equity and good conscience." (Ibid.)

"A statute of limitations barring relief to victims before the defendant is, or could be, discovered violates this equitable guarantee of fairness." (Bernson, supra, 7 Cal.4th at p. 934.) Thus, "a defendant who intentionally conceals his or her identity may be equitably estopped from asserting the statute of limitations to defeat an untimely claim[.]" (Ibid.) In this regard, Plaintiff advances her own declaration which provides as follows:

14. I had no idea at the time, and never would have imagined, that alexanikolas.net or the Twitter account Alexanikolas21 were connected to Freedman. Neither the website nor the Twitter account contained any information regarding its author or owner. The website also did not appear to be "polished" enough to be created by anyone like Freedman or acting at his direction. Freedman was, moreover, a high-profile and serious attorney and I did not expect he would have been behind either.

15. At this time in late 2022, I had a stalker who had escalated his obsessive activity, including physically stalking me and making serious threats of physical assault, including death threats. I assumed that the website and Twitter account were his (although he later denied in sworn testimony that he had created it).

16. In late 2022 I also was pregnant with my second child at the time and concerned about my health and safety. I obtained a restraining order against my stalker, but was advised by my stalker victims' counselor and others not to pursue legal action against my stalker based on the website for fear of escalating the situation. A true and correct copy of the restraining order I obtained is attached hereto as Exhibit C.

17. I had no idea who, other than my stalker, would have created the anonymous website and Twitter account. I performed WHOIS searches and made other attempts to determine the owner and author, but could find nothing.

18. Adding to my impression that my stalker was behind the site, activity on the alexanikolas website died down after I obtained a final restraining order.

19. In mid to late 2023, I aired two YouTube episodes on Bryan Freedman, including a discussion of the allegations of rape made against him and my experience with media controlled by his clients.

20. Around this same time, on July 12, 2023, an “update” was posted to alexanikolas.com claiming that I falsely accused Jonah Hill of abuse.

21. In January 2024, a second smear website about me was created: lookbackfraud.com. This website included false and defamatory content that former California senator Joe Dunn and I engaged in criminal activity and encouraged others to make false claims of sexual assault. As with alexanikolas.net, I was unable to determine the website’s author or ownership. All of the content on lookbackfraud.com was completely anonymous. A true and correct copy of screenshots of lookbackfraud.com is attached as Exhibit D.

22. Compounding the problem of the anonymity of the author or owner of either website, I also discovered after the fact (through Stephanie Jones) that payments for those websites had been made in cryptocurrency rather than through a traditional credit card or bank account (which would have at least been traceable).

(Nikolas Decl. ¶¶ 14-22.)

Plaintiff has established that whoever made the posts did so anonymously, intentionally

obscuring their identities. Further, by timing the posts to die down in tandem with Plaintiff's restraining order proceedings against a stalker, the anonymous posters further obscured their identities by making it appear as though the stalker was responsible. Even further, when Plaintiff investigated into the ownership of the domain names, she received information that the websites were paid for with cryptocurrency, which information further prevented her from uncovering the true identities of the individuals behind the posts, despite diligent efforts.

Even further, no matter how diligently she searched, Plaintiff could not have discovered the connections between the websites smearing Plaintiff and the websites smearing Stephanie Jones and Amanda Ghost sooner because those latter websites did not even exist until 2024. This all came to public light in December 2025 when the expert report of Brian Horton was publicly filed in the Stephanie Jones case. According to that report, Mr. Horton was able to "connect the dots" between websites smearing his client Stephanie Jones in 2024 with prior websites that had smeared Amanda Ghost in 2024 and Plaintiff in 2022-2023. Mr. Horton would have been able to connect those dots because at the time he conducted his investigation into the websites smearing Ms. Jones, the prior websites smearing Ms. Ghost and Plaintiff already existed. By contrast, in 2022-2023 when the websites first popped up smearing Plaintiff, those other websites did not yet exist. Thus, no matter how diligently Plaintiff investigated, there were no dots to connect yet.

Further, Plaintiff would not necessarily have known that the websites smearing Ms. Jones and/or Ms. Ghost contained false information or were otherwise connected to the websites smearing Plaintiff until that information was made public by way of Ms. Jones' lawsuit. Thus, there is no evidence suggesting that a deep forensics dive in 2022 or 2023, as Freedman urges Plaintiff should have done, would have uncovered the connections necessary to tie her own websites to Freedman, since those connections did not yet exist.

It was not until websites were made about Ms. Ghost and Ms. Jones in 2024, which Ms. Jones subsequently investigated and uncovered the connections between those websites, the Blake Lively case, and the earlier websites smearing Plaintiff that the parties were able to uncover Defendants' connection to the websites smearing Plaintiff. As Plaintiff explains:

26. That report detailed the connections between a number of "smear websites" made by Defendants. Data and activity revealed evidence of common authorship between Alexanikolas.net, lookbackfraud.com, and other sites discussed in Jones including Stephaniejoneslies.com, Stephaniejonesleaks.com, https://minheejin.net, https://paigejimenez.com, Amandaghostsucks.com, and alexanderbrothersextorted.com

27. Moreover, the Lively, Jones, Ghost and other lawsuits involving Defendants each described similar underlying facts: a client of Bryan Freedman desired to wage a hostile PR war against an opponent. Websites were then created to spread false and malicious lies about those opponents, which were not only spread to the media but which were also cited by Freedman himself in court filings on his clients' behalf.

28. As soon as I became aware of the Horton Report, the connections between the smear websites attacking me, and the connection to those involved in the litigations described above, I sought counsel and filed this lawsuit.

29. Without anything to go on previously – given the complete anonymity of the sites, and no other traceable leads including but not limited to payment histories for the websites – I could not have discovered the role of Defendants in creating the smear websites.

30. Alexanikolas.net, after remaining on the internet for years, was taken offline right after the Jones lawsuit was filed – along with other victim websites including Amanda Ghost's. Thereafter, in the time period between when my attorneys filed the original complaint in this action and when the file-stamped copy became available, my website briefly became a cryptocurrency casino website. It has now been taken offline altogether.

(Nikolas Decl. ¶¶ 26-30.) Thus, Plaintiff has demonstrated a reasonable probability that she will

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**26SMCV00684**
**ALEXA NIKOLAS vs BRYAN FREEDMAN, et al.**

August 12, 2026
8:30 AM

Judge: Honorable Michael E. Whitaker
Judicial Assistant: J. Fletes
Courtroom Assistant: T. Anderson

CSR: Baila M. Strauss
ERM: None
Deputy Sheriff: None

prevail on the statute of limitations issue.

b. Falsity of the Statements

Freedman argues that Plaintiff will be unable to prove the falsity of the statements. Plaintiff has provided her own declaration indicating that these statements are false:

12. The website alexanikola.net contained extensive false and defamatory material. Among other things, it described me as a "sinister and criminal force," stated that I "destroy[ed] lives and hurt[] families," that I "outright manufacture" claims of sexual assault against people, and that I extorted ex-boyfriends, among other malicious falsehoods. None of these things are true.

13. Shortly after alexanikolas.net went live, the same type of defamatory[6] material began circulating around Twitter. A Twitter account with the username "Alexanikolas21" was created after the website. Its owner / user was anonymous, although it used my name and likeness. Among other things, the Tweets accused me of "using my child as a pawn"

21. In January 2024, a second smear website about me was created: lookbackfraud.com. This website included false and defamatory content that former California senator Joe Dunn and I engaged in criminal activity and encouraged others to make false claims of sexual assault.

(Nikolas Decl. ¶¶ 12, 13, 21.)

Freedman argues that a plaintiff's own denial of a statement's truth is insufficient to establish

falsity for defamation purposes. In support, Freedman cites to Nizam-Aldine v. City of Oakland (1996) 47 Cal.App.4th 364, 377 as standing for the proposition that a plaintiff's own denial of a statement's truth, standing alone, is insufficient to establish falsity for defamation purposes. But neither the pincite nor the case generally stands for that proposition. The pincite addresses whether the statement concerns a public issue for purposes of statutory protection, not the veracity of a sworn declaration indicating that the statements are false.

Freedman also cites to Campanelli v. Regents of Univ. of Cal. (1996) 44 Cal.App.4th 572, 582 as stating "[T]he plaintiff has the burden to produce evidence of falsity sufficient to permit a reasonable jury to conclude the statement is false[.]" That quote appears nowhere in that case. Rather, the appellate court indicated "Campanelli's complaint does not deny the truth of any of these statements" and found that the complaint, coupled with Campanelli's own assertions of fact demonstrating that he engaged in verbally abusive and profane temper tantrums directed at his players tended to concede the accuracy of the underlying statements that the players were "in trouble psychologically." It does not stand for the proposition Freedman asserts that a sworn declaration denying the truth of the statements is insufficient.[7]

Even further, Plaintiff's declaratory statements are further corroborated by the court records of which the Court takes judicial notice, demonstrating allegations by multiple plaintiffs of a similar modus operandi and common website traffic optimization tactics.

Therefore, the Court finds Plaintiff has adequately demonstrated a probability of proving the falsity of the statements.

c. Unactionable Opinions

Freedman next argues that many of the allegedly defamatory statements are actually non-actionable opinions.

"Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected." (McGarry v. University of San Diego (2007) 154 Cal.App.4th 97, 112.) Notwithstanding, "expressions of opinion may imply an assertion of objective fact, and a statement that implies a false assertion of fact, even if couched as an opinion, can be actionable." (Ibid.) Thus, "the question is not strictly whether the published statement is fact or opinion, but is instead whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." (Id. at p. 113.)

Here, Freedman challenges assertions that Plaintiff was a "criminal force" and a "Nazi" as well as assertions that Plaintiff worked with a team to "shape false legal claims against celebrities" in exchange for a percentage of any recovery in connection with her 2021 rape lawsuit against Michael Milosh. These assertions further called Plaintiff part of a "Modern Day Crime Family."

These allegations all imply provably false assertions of fact. Plaintiff is either a criminal who has committed criminal acts, or she is not. Similarly, Plaintiff either harbors Nazi beliefs or she does not. She either worked with the Dunns to manufacture false allegations against Michael Milosh or she did not. These are not generalized, amorphic opinions about whether the anonymous posters like Plaintiff. These statements create specific implications that can either be proven true or false.

Therefore, the Court determines that it is reasonably probable that Plaintiff will prevail in demonstrating that the statements are more than unactionable opinions.

d. Conflating Defendants

Freedman argues that Plaintiff's complaint conflates the actions of multiple defendants and fails to allege which Defendant was responsible for which particular postings, when those postings occurred, or how they were disseminated. The Court disagrees.

The FAC alleges the defendants, including Freedman, are co-conspirators engaged in smear campaigns together:

20. The Amended Jones Complaint alleges that the evidence revealed during discovery connected the smear websites and social media accounts targeting Jones and Jonesworks to other sites that appear to be authored by Defendant Nathan's team and contractors, including Defendant Jed Wallace. These websites followed a pattern highly suggestive of common authorship between the Jones websites and other websites identified in the amended complaint briefing. Expert testimony was used to identify this pattern, carefully linking the websites between each other and noting common authorship. Deposition testimony supported the connections between the websites. The evidence in the Jones case concerned websites primarily made after Ms. Nikolas' website was created. Without this evidence, the Defendants' concealment efforts and identities would not have been revealed.

21. Lookbackfraud.com is a website targeted at individuals who have allegedly falsely accused individuals in the entertainment industry of sexual abuse. The website identifies Ms. Nikolas as some sort of criminal participant with California Attorney Joe Dunn as individuals bringing forward civil claims of sexual assault. As stated above, Defendant Freedman represented Ms. Nikolas' ex-husband when she brought claims of sexual assault against him. Ms. Nikolas has not engaged in any sort of criminal activity with Joe Dunn, but the baseless accusation has followed her and Eat Predators for years.

23. For example, the Jones websites target publicist Stephanie Jones and suggest she "leaks" client information. Bryan Freedman represents Justin Baldoni, who Jones is currently suing.

Melissa Nathan also represents Mr. Baldoni.

24. Another website, Amandaghostsucks.com, horrifically accuses entertainment executive Amanda Ghost of being the "Indian Ghislaine Maxwell." Ms. Ghost is in ongoing litigation against Rebel Wilson that includes claims of defamation stemming from the smear websites taken out against her. Ms. Wilson is represented by Bryan Freedman and Melissa Nathan. Ghost v. Wilson et al., Case No. 24STCV17314 (Cal. Sup. Ct.). In that case, the overseeing Judge just ordered a deposition of one of Defendant Nathan's employees, Katie Case, as it appeared from her testimony that a relevant "pattern and practice" of creating websites at Defendant Nathan's direction exists. Ms. Nikolas' website was part of this pattern and practice.

25. Paigejimenez.com accuses Ms. Jimenez, an influencer, of being connected to Matthew Perry's death. These allegations are not only preposterous but inherently harmful and obviously designed to "bury" Ms. Jimenez. Upon information and belief, Ms. Jimenez was targeted because she was simply dating one of Defendant Freedman's clients' sons and they wanted the relationship to end. So emboldened by his ability to get away with threatening and smearing individuals in the past, Defendant Freedman directly sent Ms. Jimenez a copy of her website, cementing his connection to her site.

26. The Jones motion to amend the complaint included an Exhibit A, an expert report by Brian Horton of Breadcrumb Cybersecurity. This report indicates that evidence of common authorship exists between Ms. Nikolas' site, pages mentioning the Alexander Brothers, and Jed Wallace. Previously the Alexander Brothers had retained Defendant Melissa Nathan. Some of the Alexander Brothers and Jed Wallace content appeared to have common authorship with some of the Stephanie Jones content. The Jones content appears to have common authorship evidence with the Amanda Ghost content. There is a tangled web of connections between these sites and numerous others in addition to that authored about Plaintiff.

(FAC ¶¶ 20-21 & 23-26; see also FAC ¶¶ 12, 14-18, 22 & 27.)

Thus, the Court finds that Plaintiff alleges Defendants were engaged in a conspiracy to smear various individuals, including Plaintiff, each having an adversarial connection to one of Freedman's clients, which not only alleges a motive, but also suggests that Freedman was involved in directing or otherwise effectuating all of those alleged smear campaigns. That Plaintiff does not allege which specific Doe Defendants personally "pressed the button" to publish which specific defamatory articles is not fatal to Plaintiff's claims, which otherwise adequately allege a conspiracy to defame various individuals.

e. Actual Malice

A limited purpose public figure must prove actual malice with respect to allegedly defamatory statements that relate to their role in the public controversy. (See, e.g. Annette F. v. Sharon S. (2004) 119 Cal.App.4th 1146, 1166.) As discussed above, Plaintiff is a limited purpose public figure with respect to her advocacy work speaking out against sexual assault. As such, Plaintiff must prove actual malice with respect to statements made relating to Plaintiff's role in the public controversy.

Freedman argues for the same reasons, because Plaintiff does not allege which Defendant is alleged to have specifically done what, Plaintiff cannot demonstrate actual malice.

The Court disagrees. "The existence of actual malice turns on the defendant's subjective belief as to the truthfulness of the allegedly false statement. Actual malice may be proved by direct or circumstantial evidence." (Mitchell v. Twin Galaxies, LLC (2021) 70 Cal.App.5th 207, 221.)

As discussed above, Plaintiff has adequately articulated a pattern of Defendants conspiring together to push out and optimize online smear campaigns against individuals (primarily

actresses) adversarial to Freedman's clients. As to Plaintiff specifically, Freedman represented Plaintiff's ex-husband in a lawsuit Plaintiff initiated, accusing him of sexual assault. Further, Freedman himself later faced protests and public backlash after Plaintiff and her Eat Predators organization publicly protested Freedman and brought public attention to a prior case where he was accused of sexual assault.

In response, a series of optimized online postings following the same modus operandi and potentially having direct ties to other websites connected to Defendants attacked Plaintiff's motives and credibility in raising public awareness about sexual assault in the entertainment industry.

All of that suffices to demonstrate Plaintiff has a probability of producing sufficient circumstantial evidence to establish actual malice.

In reply, Freedman argues that Plaintiff's evidence primarily consists of unproven allegations, and therefore does not satisfy her burden of proving a probability of success on the merits. But the allegations of the FAC are reiterated and corroborated by Plaintiff's own declaratory statements, involving her own research, and making the same connections between and among the various smear campaigns discussed. Further, the fact that an expert submitted an expert report detailing all these connections in the Jones case is some evidence that Plaintiff will be able to submit a similar expert report in this action.

In sum, the Court finds that Plaintiff has met her burden of demonstrating a probability of succeeding on the merits to withstand Freedman's special motion to strike.

3. Attorneys' Fees

---

"[A] prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5." (Code Civ. Proc., § 426.16, subd. (c)(1).)

Here, because Freedman does not prevail on his motion, the Court denies his request for attorneys' fees.

CONCLUSION AND ORDER

Finding that Plaintiff is a limited public interest figure and that the alleged statements arise in connection with her role in that public interest dialog, but that Plaintiff has established a probability of prevailing on the merits, the Court denies Freedman's special motion to strike and request for attorneys' fees in its entirety.

*****************END OF TENTATIVE RULING*******************

The motion is heard, argued and the Court rules as follows:

The Court takes the Hearing on Special Motion to Strike under CCP Section 425.16 (Anti-SLAPP motion) submitted by defendant, Bryan Freedman under submission.

Clerk to give notice of ruling once it becomes available.

The Court inquires from moving party as to the erroneous citations issued.

The Court will issue a separate minute order scheduling an Order to Show Cause Re Sanctions-Erroneous Citations.