**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| STEPHANIE JONES and JONESWORKS LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:25-cv-00779 (LJL) |
| | ) | |
| – against – | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| JENNIFER ABEL, MELISSA NATHAN, JUSTIN | ) | **SUPPORT OF PLAINTIFFS'** |
| BALDONI, WAYFARER STUDIOS LLC, and JOHN | ) | **MOTION FOR SANCTIONS** |
| DOES 1–10, | ) | **AGAINST DEFENDANT** |
| | ) | **MELISSA NATHAN FOR** |
| Defendants. | ) | **DISCOVERY MISCONDUCT** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 6

A. The Case Documents and Case's Sworn Account Establish That Nathan Was Behind the Defamatory Websites From the Beginning. ........ 6
B. The Jones Websites Were Only Two of Several Nathan Commissioned the Same Way. ........ 11
C. After Being Sued, Nathan Denied Everything and Buried Key Documents. ........ 11
D. When Case Told the Truth, Nathan Lied Under Oath, Refused *Again* to Search Her Files, and Obstructed Plaintiffs' Efforts to Get the Case Documents. ........ 13

LEGAL STANDARD ........ 16

ARGUMENT AND AUTHORITIES ........ 17

I. The Court Should Sanction Nathan for False Testimony and Concealment of Evidence. 17
A. The Court Should Sanction Nathan for Committing Perjury ........ 17
B. The Court Should Sanction Nathan for Withholding Material Evidence in Violation of Her Discovery Obligations ........ 18
1. Nathan Failed to Produce the Case Documents as Required by Rule 34. ........ 18
2. The Search-Term Qualifier Did Not Relieve Nathan of the Duty to Produce Documents She Knew Existed. ........ 19
3. Nathan Failed to Correct Her Discovery Responses as Required by Rule 26 ........ 20

II. The Court Should Enter Judgment for Plaintiffs, Strike Nathan's Defenses, and Allow Plaintiffs to Pursue Defamation and Tortious Interference Claims as a Sanction. ........ 21
A. The Court Should Enter Judgment Against Nathan and Strike her Defenses ........ 21
B. The Court Should Allow Plaintiffs to Pursue Their Defamation and Tortious Interference With Business Relations Claims Against Nathan ........ 22
C. At a Minimum, the Court Should Deem the Operative Facts Established and Preclude Nathan's Denials ........ 24

III. The Court Should Also Order a Sworn Accounting and Fees ........ 25

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ABF Freight Sys., Inc. v. NLRB*,
510 U.S. 317 (1994)....17

*Agiwal v. Mid Island Mortg. Corp.*,
555 F.3d 298 (2d Cir. 2009)....16, 21

*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir. 1993)....23

*Ceara v. Deacon*,
68 F. Supp. 3d 402 (S.D.N.Y. 2014)....22

*Cerruti 1881 S.A. v. Cerruti, Inc.*,
169 F.R.D. 573 (S.D.N.Y. 1996)....16, 20, 21, 24

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....16

*Conway v. Dunbar*,
121 F.R.D. 211 (S.D.N.Y. 1988)....16, 21

*DLC Mgmt. Corp. v. Town of Hyde Park*,
163 F.3d 124 (2d Cir. 1998)....16, 18

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
322 U.S. 238 (1944)....21

*Hogan v. Fischer*,
738 F.3d 509 (2d Cir. 2013)....23

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
191 F. Supp. 2d 440 (S.D.N.Y. 2002)....21

*Metro. Opera Ass'n v. Local 100*,
212 F.R.D. 178 (S.D.N.Y. 2003)....19

*Radecki v. GlaxoSmithKline*,
375 F. App'x 46 (2d Cir. 2010)....16, 17, 21

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002)....18

**Cases** **Page(s)**

*Rossbach v. Montefiore Med. Ctr.*,
81 F.4th 124 (2d Cir. 2023) ....................16

*S. New Eng. Tel. Co. v. Global NAPs Inc.*,
624 F.3d 123 (2d Cir. 2010)....................17

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
490 F.3d 130 (2d Cir. 2007)....................17

*United States v. Ben–Shimon*,
249 F.3d 98 (2d Cir. 2001)....................17

*United States v. Dunnigan*,
507 U.S. 87 (1993)....................17

**Rules** **Page(s)**

CPLR 1024....................22

Fed. R. Civ. P. 26 ....................16, 20

Fed. R. Civ. P. 26(b)(2)(B) ....................20

Fed. R. Civ. P. 26(e) ....................20

Fed. R. Civ. P. 26(e)(1)(A) ....................16

Fed. R. Civ. P. 26(g) ....................20

Fed. R. Civ. P. 26(g)(1)....................19

Fed. R. Civ. P. 26(g)(1)(B) ....................16

Fed. R. Civ. P. 26(g)(3)....................16, 25

Fed. R. Civ. P. 33 ....................20

Fed. R. Civ. P. 34 ....................18, 19

Fed. R. Civ. P. 34(a)(1) ....................19

Fed. R. Civ. P. 34(b)(2)(c) ....................20

Fed. R. Civ. P. 37 ....................16, 17, 20, 22

**Rules** **Page(s)**

Fed. R. Civ. P. 37(b)(2)(A)(i) ....................24

Fed. R. Civ. P. 37(b)(2)(A)(ii) ....................21, 24

Fed. R. Civ. P. 37(b)(2)(A)(iii) ....................21

Fed. R. Civ. P. 37(b)(2)(A)(vi) ....................21

Fed. R. Civ. P. 37(c)(1)(A) ....................25

Fed. R. Civ. P. 37(c)(1)(C) ....................21

## INTRODUCTION

A key question from the outset of this case has been the identity of the individual directing the creation of anonymous smear websites that appeared in May 2024 accusing Stephanie Jones of holding clients hostage and leaking client secrets (the "Websites").[1] Plaintiffs Stephanie Jones and Jonesworks ("Plaintiffs" or the "Jones Parties") have pursued discovery regarding the origins of those Websites from the very beginning of this lawsuit. Defendant Nathan has repeatedly denied any involvement in the Websites under oath.

Plaintiffs subpoenaed Katherine Case, a former employee of both Jonesworks and TAG, in hopes of discovering more about the Websites' creation within the defamation claim's one-year limitations period. Ex. G (Feb. 17, 2025 Subpoena to Case)[2]. Plaintiffs asked Nathan to produce her communications about Jonesworks and served interrogatories on that topic in March 2025. Dkt. No. 193-3 (Pls.' First RFPs to Nathan) at ¶¶ 2, 5, and 10; Ex. B (Resp. to Pls.' First Rogs to Nathan). Plaintiffs asked Nathan for her communications about Jones and Jonesworks again in July. Dkt. 193-4 (Pls.' Second RFPs to Nathan) at ¶¶ 32 and 39.

In response, Nathan denied any involvement in the Websites and produced no documents evidencing any such involvement.

Nathan's July 30, 2025 verified supplemental response to Plaintiffs' Interrogatory No. 11 testified that she "has no personal knowledge of who was behind the [W]ebsites" and "had no involvement in either to any extent." *See* Ex. C at 21-22 (Supp. Resp. to Pls.' First Rogs to Nathan).

During her deposition on September 30, 2025, Nathan testified under oath:

> **Q.** Now, you had a role in the creation of the Stephanie Jones Leaks website that documented in Exhibit 54, right?
> **A. No.**

[1]The Websites are www.stephaniejonesleaks.com, www.stephaniejoneslies.com, and the social-media accounts marked as Exhibits 54 through 58 at Nathan's deposition. Ex. A (Nathan Dep.) at 130:1–24.

> **Q.** You asked Katie Case to write copy for that website; isn't that true?
> **A. That is not true.**
> **Q.** Is it your under-oath testimony that you had no involvement whatsoever in any shape or form in anything having to do with the website in Exhibit 54 and the X account in Exhibit 56?
> **A. It is, yes.**
> **Q.** And if Katie Case testified to the contrary, would she be lying?
> **A. Yes.**

Ex. A (Nathan Dep.) at 131:20–132:23.

She doubled down during the same deposition when asked about other websites:

> Q: Have you ever been involved in a matter where a website was built? ...
> **A: No, I have not built any websites.**
> Q: I'm not asking if you built websites –
> A: Uh-huh.
> Q: --I'm asking if you've been involved in a matter where a website was built?
> A: No.
> Q:Including Rebel Wilson?...
> **A: I have not been involved in that.**

*Id.* at 142:16-143:12.

A month later, Nathan swore the same denial in Los Angeles about a second website that she sold to Rebel Wilson as "untraceable." Dkt. 268 at 4-5.

In October of 2025, Plaintiffs again subpoenaed Katherine Case for documents related to the creation of the Websites. *See* Dkt. 168-5. Plaintiffs filed a motion to compel the production of documents from Case. Dkt. 166, which the Wayfarer Parties opposed. Dkt 177. On November 26, 2025, the Court issued an order denying the motion to compel. Dkt. 188. However, at the conclusion of the order, the Court held that there is "***nothing preventing the Jones Parties from asking Case to voluntarily share the documents at issue***…." *Id.* at 7 (emphasis added).

Plaintiffs were diligent. They did not give up, and were finally able to obtain the voluntary production of these documents from Ms. Case on September 16 and 17, 2026. This evidence reveals that Nathan repeatedly testified falsely about this issue, that she uses ghost websites to

falsely attack her enemies and her clients' enemies, and that Nathan and Jed Wallace worked together and paid Case thousands of dollars to attack Plaintiffs and others. *See* Ex. D (KC CASE 10028-10047).

Those documents confirm the veracity of Case's testimony: Melissa Nathan was ***directly involved*** in a scheme to utilize untraceable websites to destroy the reputation of her competitors and those adverse to her clients. Stephanie Jones and Jonesworks were among her victims.

In a text thread, Nathan tells Case she has "got [her] another three or four grand just write something."




Ex. E (2024-05-06-05-07 Text with Nathan-Website) at K CASE 00010004 (blue text is Case, white is Nathan). Nathan then calls Case and tells her that a website has been requested by a new TAG client (Ex. F (Case Dep.) at 374:21-375:17) and gives Case instructions about the specific language to use in the copy (*id.* at 376:7-378:14). After reviewing Case's first draft, Nathan responds by text, stating that the copy "needs to be a lot more meaty," that it must discuss "holding clients hostage" and how people are "scared of her," and that it "has to also be good enough for us to be able to point a journalist towards."




Ex. E (2024-05-06-05-07 Text with Nathan-Website) at K CASE 00010005 (blue text is Case, white is Nathan).[3]

Case's contemporaneous notes of the May 6, 2024 call, time-stamped 2:04 p.m., record instructions to "register sites where melissa can point journalists to" and write that Jones "takes clients hostage" and "leverages the bad information against them leaving." Ex. G (KCASE-000006159). On May 7, 2024, Nathan approved the copy by text: "Ok approved on your messaging lol" and "Looks really good." Ex. H (2024-05-07_05-08 Text with Nathan-Website) at K CASE 00010019. That night, after Case asked whether the copy would bear her name, Nathan sent her

[3] Lainey Wilson was a long time Jonesworks client; Goldberg was a Jonesworks employee.

the live link. *Id.* at K CASE 00010024. A Zelle record shows a payment to Case in the amount of $4,000 from Melissa E. Nathan; Case's bank statement shows that deposit on May 24, 2024. Ex. I (K CASE 00010000); Ex. I (K CASE 00010001). On August 10, Case told a colleague these were "takedown websites that Jed builds" and that she "helped write it." Ex. J (2024-08-10 Text with Butler-drafted website Jed builds) at KCASE-000006202. And three days after this suit was filed, Nathan called Case and told her not to worry because they could not be held liable for the sites. Ex. K at ¶ 5 (Case Aff.).

The evidence is undeniable: ***Nathan directed the formation of the website, instructed her employee to write it its content, and paid her employee for the work.***

Nathan, however, built a litigation strategy designed to make sure no one could prove her involvement by: (1) falsely denying her conduct under oath; and (2) withholding and preventing others from disclosing the documents that prove her guilt. Nathan perpetuated the faleshoods, including representing in pleadings that Case was a liar, representations that this Court cited in its orders: "Nathan and TAG have expressly denied that any work Case did on the websites or social media posts was on their behalf, going so far as to suggest that Case's testimony to the contrary was perjurious." Dkt. 188 at 2-3.

The concealment efforts went beyond Nathan and TAG. Jed Wallace also denied his involvement under oath—the Case documents reveal this too was false. Ex. L (Wallace Dep.) at 39:15-41:6. ("Q: Were you involved in the creation of [the Jones Leaks Website]? A. No.").

While Nathan's deception made the knot difficult to untie, Plaintiffs have finally done so. Plaintiffs followed the path set forth by the Court at the close of its order denying Plaintiffs' motion to compel documents responsive to the October Case subpoena, never gave up, and were finally able to get these documents from Ms. Case voluntarily after a filing a lawsuit against her related

to violations of her employment agreement. Those documents prove what the Jones Parties have been seeking to find out all along: Nathan did not tell the truth.

Certainly, when a party argues against subpoenas and pleading amendments based on timeliness but, at the same time, conceals that she is carrying out an entire litigation strategy based upon false testimony as to a core fact, the consequences for such conduct must also be severe. Otherwise, litigants and witnesses will get away with gaming the system by lying about material facts and hiding clearly discoverable evidence. And our civil justice system will fail.

Accordingly, Plaintiffs Stephanie Jones and Jonesworks LLC ("Plaintiffs") respectfully ask the Court to sanction Nathan by issuing an order:

- Entering judgment for Plaintiffs on all of their claims against Nathan;
- Striking Nathan's defenses;
  Permitting Plaintiffs to pursue their defamation and tortious interference with prospective business relations claims against Nathan;
- Ordering Nathan to pay Plaintiffs' costs for having to retain an expert witness to examine the origin or source of the websites when Nathan knew all along the source was either Jed Wallace or directed by Jed Wallace; and
- Awarding Plaintiffs reasonable and necessary attorneys fees incurred as a result of Nathan's conduct.

## STATEMENT OF FACTS

### A. The Case Documents and Case's Sworn Account Establish That Nathan Was Behind the Defamatory Websites From the Beginning.

On the afternoon of May 6, 2024, Nathan texted Case, "got you another three or four grand just to write something." Ex. E (K CASE00010003). Case had come to Nathan's crisis-communications firm, The Agency Group PR, LLC ("TAG"), after working for Jonesworks from September 2021 to March 2022. Ex. F (Case Dep. at 291:18-292:6, 302:22-23). She was not a web

developer. Ex. K (Case Aff.) at ¶ 7. Her job was to write copy, "and only when I was directed to do so by Melissa Nathan." *Id.*

At 2:04 that afternoon, Nathan called. *Id.* at ¶ 2. Case took notes as they spoke. Ex. G (KCASE-000006159). Nathan "instructed [Case] on what was to be included in the website copy." Ex. K (Case Aff.) at ¶ 3. She told Case the website was to be used against Stephanie Jones and that a client "required a website to act as a tool" for "gathering information that they could use as part of their lawsuit without going through the legal process." Ex. K (Case Aff.) at ¶ 3(a)-(b). The site would be one Nathan "could point journalists towards." *Id.* at ¶ 3(c). Nathan instructed that the copy should "follow along the lines of a purported 'whistleblower' narrative." *Id.* at ¶ 3(d). And Case need not worry about the site being traced, because Nathan "and Jed Wallace would set up the site so that it tracks to 'other places,' and that it would live on a ghost server." *Id.* at ¶ 3(e). Case's notes set forth her contemporaneous understanding of the job Nathan tasked her to do.

register sites where melissa can point journalists to
someone to write up
copy for the website
along the lines of - i can't sit and watch this woman continue to do this, this is what she does
she takes clients hostage
chloe melas
it's now a time where I can speak my truth about what I saw there
first and foremost -- this is no secret
let me start with reviewing how SJ works -- the only reason we're able to have these discussions where people are now starting to take the power back
open up her model - she holds her clients hostage
good information / bad information - leverages the bad information against them leaving and if they do leave she lets leaks get out and offers to fix it OR when they get a new publicist, she leaks something to make them look bad
chloe melas - her best friend -- her best friend gives them to her ; she uses people like chloe while working under the auspices of NBC -- using their platform to do Stephanie Jones' bidding
this is just the beginning -- used this dynamic with pheople like clhloe to change the scope of culture of stock prices of everything you can imagine
this page will exist as somewhere we can post whatever we want to
chloe is under investigation for ruining Alec Baldwin's career
look at the negative stories "leaked" around the time celebs had a crisis and ask yourself if the're current or former clients etc etc -- chloe covered
objective is to exposed chloe and nbc to bring the hammer down on stephanie
set the site up that it tracks to other places
ghost server
i'm sure you have stories too -- share them here

Ex. G (KCASE-000006159).

Case wrote the copy that afternoon and emailed it to Nathan. At 7:33 p.m., Nathan sent her notes by text, telling Case the copy "needs to be longer, more meaty." Ex. E (K CASE 00010005). She instructed Case not to hold back. *Id.* The copy needed to be "really long and go into about holding clients hostage and how people are scared of [Stephanie]...." *Id.* That same day, stephaniejonesleaks.com went live—including the copy drafted by Case at Nathan's direction:

| **Case's Notes from 5/6/2024 Phone Call with Nathan** | **Actual Copy from "Stephanie Jones Leaks" Website – Published 5/8/2024** |
|---|---|
| "she takes clients hostage"<br>Ex. G (KCASE-000006159) at line 5.<br><br>"good information / bad information – leverages the bad information against them leaving and if they do leave she lets leaks get out and offers to fix it OR when they get new publicist, she leaks something to make them look bad"<br>*Id.* at line 12-13. | "Stephanie Jones takes clients hostage."<br>Ex. A at NATHAN_000003131.<br><br>"Stephanie is known to leak information about her clients to press, so that she can 'save the day' for them and inspire their gratitude."<br>*Id.* at NATHAN_000003132. |
| "along the lines of – i can't sit and watch this woman continue to do this, this is what she does"<br>*Id.* at line 4<br><br>"it's now a time where I can speak my truth about what I saw there"<br>*Id.* at line 7 | "After seeing articles about Stephanie Jones last week, I feel confident in finally coming forward and expressing the truth. Both in how she treats her clients, as well as how she treats her staff. Sadly none of what will be said is a secret, but it's gone on for too long."<br>Ex. A at NATHAN_000003131. |
| "chloe melas – her best friend – her best friend gives them to her ; she uses people like chloe while working under the auspices of NBC – using their platform to do Stephanie Jones' bidding"<br>*Id.* at lines14-15. | "And how does she get away with this? By utilizing close friendships with reporters like **Chloe Melas** who works under the auspices of NBC and formerly CNN. In doing so, Stephanie is able to utilize the network's platform to do her own bidding – not benefit her clients."<br>*Id.* at NATHAN_000003132. |

*Compare* Ex. A (KCASE-000006159) *with* Ex. A (Ex. 54 to Nathan Dep.). Nathan then paid Case $4,000 by Zelle. Ex. I (K CASE 00010000).

In September 2024, after *Business Insider* and Hamptons.com published articles about Jones, Nathan called Case again—she wanted an update to the website. Nathan "instructed [Case] to use specific language and to reference the Hamptons.com article in the copy," and gave "examples of the copy she wanted [Case] to include." Ex. K (Case Aff.) at ¶ 4. Case took notes of that call as well. *Id.*

Re up it a little bit so we know the vibe – LMDV
25k for TAG / 10k for Jed

After the holidays, let's chat
Let's talk about the bullshit
PR 101 trying to hide – should have gotten someone better to do this for you but you can't
Different copy – a lot easier
Let's take this apart line by line
Every person trying to leave you in LA
Name two things about London
Take it apart
Jeff bezos – didn't he fire you? Him and his wife fired you for the shit work you did or my favorite, quietly grotstque work
40 people where? 20 of your multiple personalities
Have fun with it
Screenshot images as well – in this day and age you think with people suffering you tink it's right o talk about 5k tops in hamptons article – you don't live in the hamptons it was just the only magazine
Connecticut

Ex. M (K CASE 00010025). On October 21, 2024, this update went live, once again parroting the copy Nathan instructed Case to write.

| **Case's Notes from 9/4/2024 Phone Call with Nathan** | **Actual Copy from "Stephanie Jones Leaks" Website – UPDATE 10/21/24** |
|---|---|
| "PR 101 trying to hide – should have gotten someone better to do this for you but you can't"<br>Ex. M (KCASE-00010025) at line 5.<br><br>"--you don't live in the hamptons it was just the only magazine"<br>*Id.* at line 16-17. | "So, let's move onto the most hysterical part, which is Stephanie trying to actually do PR, and mask the bad press article by trying to do positive press. Here we have the comedic pay-to-play fluff piece that was Hamptons.com."<br>Ex. A at 4.<br><br>"It's important to note before we really dive in, Stephanie does not live in the Hamptons, and that Hamptons.com, was likely the only magazine she could organize something this fake in."<br>*Id.* |

| | |
|---|---|
| "40 people where? 20 of your multiple personalities"<br>*Id.* at line 13.<br><br>"Have fun with it"<br>*Id.* at 14. | "Another stunning falsehood in the illustrious Hamptons.com feature, is that Stephanie has over 40 people working for her firm – we assume this includes 25 assorted personalities, and is simply clerical mistake on her part."<br>*Id.* at 5. |
| "Jeff Bezos – didn't he fire you? Him and his wife firec you for the shit work you did or my favorite quietly grotesque work"<br>*Id.* at 11-12. | "We did personally enjoy that epithet about Jeff Bezos and his philosophy regarding work life balance – given he fired her many, many, many months ago. We suspect the Vogue feature, which was described as "quietly grotesque," might have had something to do with this, as well as charging him non-stop to attend all his rocket launches."<br>*Id.* |

*Compare* Ex. M (KCASE-00010025) *with* Ex. A (Ex. 55 to Nathan Dep.).

The third call came on December 27, 2024, three days after Plaintiffs filed this lawsuit and named Nathan as a defendant. Ex. K (Case Aff.) at ¶ 5. Case had told Nathan she was worried about the suit and had hired her own lawyer. *Id.* at ¶ 5(a). Nathan was "annoyed that [Case] had done that," and told Case she "was being stupid and … was worrying about nothing." *Id.* at ¶ 5(b). There was no cause for concern, Nathan said "emphatically," because "we can't be held liable for work products for a client." *Id.* This statement by Nathan raises a multitude of questions, including, if Nathan was working for a legal team, which lawyers directed Nathan to take these steps?

Nathan's confidence had a basis. Nathan made sure these websites would point away from her and TAG. She told Case that she and Jed Wallace "would set up the site so that it tracks to 'other places,'" on "a ghost server." *Id.* at ¶ 3(e). The site that went live on May 8, 2024 was registered under the name of a different former Jonesworks employee who had nothing to do with it. Dkt. 193-23 (Hostinger Subpoena). When the host took it down, it was re-registered under the

same stolen name at a new host, and a second site, www.stephaniejoneslies.com, followed with identical content. Dkt. 193-22 (Namecheap Subpoena). Nothing on either site led back to Nathan.

### B. The Jones Websites Were Only Two of Several Nathan Commissioned the Same Way.

The Jones Websites were not a one-off. Smear websites were a product Nathan leveraged and sold. Three months after the Jones Websites went live, Nathan texted actress Rebel Wilson, who was in a dispute with producer Amanda Ghost, asking "Are you on Signal?" Nathan quoted Wilson $110,000 for an "untraceable site" with a "satellite, ghost server, ghost hosting, full build, maintaining, and full algorithmic push across all platforms...for 3 months." Ex. N (Ex. 7 to Moniz Decl., *Ghost v. Wilson*). The next day Nathan texted Case, "Rebel wants a one of those sites," and attached a file named "Amanda Ghost website.docx." Ex. O (KCASE-000004949). Case wrote the copy for the Ghost website at Nathan's direction, and did the same for a site targeting the Alexander brothers. Ex. F (Case Dep.) at 156:13–159:11, 505:8–21. A voice note from Wallace about the Ghost site describes the team as "you, me, Bryan[4] and maybe Katie." Ex. P. Plaintiffs' forensic expert found that the Jones, Ghost, and Alexander sites were promoted by the same online contributor. Dkt. 192 at 7. The "ghost server" Nathan promised Case in May was the same one she quoted Wilson in August.

### C. After Being Sued, Nathan Denied Everything and Hid Key Documents.

Plaintiffs filed this lawsuit on December 24, 2024. The complaint named Nathan as a Defendant and alleged that she "worked in concert with" John Does 1–10 "to publish" both Websites. Dkt. 1-1 at ¶ 92. Three days later, Nathan was on the phone with Case explaining why "we can't be held liable" for the website. Ex. K(Case Aff.) at ¶ 5(b). Three months after that, on

---

[4] "Bryan" refers to Bryan Freedman, the attorney representing the Wayfarer Parties, including Nathan, in this case.

March 20, 2025, Nathan filed an Answer denying that she had "worked in concert with" anyone "to publish" the Websites. Dkt. No. 37 at ¶ 92.

Nathan had countless opportunities for candor. On March 6, 2025, Plaintiffs served document requests on Nathan, including Request No. 2 for "[a]ll Documents and Communications pertaining to Jonesworks LLC." Dkt. 193-3. A text thread with a former Jonesworks employee asking her to write copy for a website attacking Jonesworks's founder is squarely relevant to that request. By the July 1, 2025 substantial-completion deadline, Nathan had produced 144 documents. Dkt. 192 at 4. Not one was a communication with Case about the Websites.

The second opportunity came in April 2025, when Plaintiffs asked Nathan directly about her role in the Websites. Ex. B (Resp. to Pls.' First Rogs to Nathan) at Rog. No. 11. Nathan first refused to answer at all. *Id.* at 15-16. On July 30, 2025, she supplemented, and swore that she "has no personal knowledge of who was behind the [W]ebsites." Ex. C (Supp. Resp. to Pls.' First Rogs to Nathan) at 21-22.

The third opportunity came on July 16, 2025, when Plaintiffs served a second set of document requests. Request No. 32 sought all documents "relating to or with any current or former employees of Jonesworks." *See* Dkt. 193-4 at 10. Request No. 39 sought all documents "pertaining to the websites www.stephaniejonesleaks.com and www.stephaniejoneslies.com...including but not limited to Your knowledge of or involvement in the creation, operation, or content of the websites...or any involvement by [TAG's] employees including but not limited to Katherine Case." *Id.* at 19. Nathan's amended responses, served August 22, 2025 promised to produce responsive documents "located in response to the agreed-upon search terms, if any." *Id.* at 11, 19–20. Those agreed terms included terms aimed at the Websites. Dkt. 192 at 5. Still, Nathan failed to produce documents revealing her involvement in the Jones websites.

Nathan had been asked for the Case Documents three ways: a general request that reached them, an interrogatory that asked her outright, and a targeted request that named the writer and the sites. Plaintiffs have diligently pursued these documents throughout discovery. Nathan deliberately and strategically obstructed Plaintiffs' efforts.

### D. When Case Told the Truth, Nathan Lied Under Oath, Refused *Again* to Search Her Files, and Obstructed Plaintiffs' Efforts to Get the Case Documents.

Case was deposed on September 5, 2025, when Nathan's counsel, Bryan Freedman, was present and objecting on Nathan's behalf. Case testified:

> **Q.** How did you become aware of the websites disparaging Ms. Jones?
> **A.** I received a call from Melissa in early May. It was communicated to me that a website had been requested. . . .
> **Q.** By whom?
> **A.** Melissa represented to me that a potential new client had requested the formulation of a website.
> **Q.** Who was that new client?
> **A.** At the time it was represented to me that it was Dwayne Johnson. . .
> **Q.** What was that specific language?
> **A.** That Stephanie holds clients hostage, that she leaks clients' secrets, and that she treats her employees poorly, amongst others. . . .
> **Q.** Did you come to understand that the copy that you had drafted became a website about Ms. Jones?
> **A.** I was made aware of that, yes.
> **Q.** Who made you aware of that?
> **A.** Melissa.

Ex F (Case Dep.) at 374:21–379:7; *see also id.* at 375:11–17, 386:14–387:19. Nathan designated this testimony attorneys'-eyes-only, which the Court lifted on September 19. Dkt. 127.

Following this testimony, on September 10, 2025, Plaintiffs asked Nathan to search her files again for documents about the Websites, "including for documents reflecting payments made in connection with the Websites." Dkt. 193 at ¶ 28. Nathan said her production was complete. *Id.* Plaintiffs now know the Zelle receipt was in her account. The texts were on her phone.

Nathan was deposed on September 30, 2025. But Plaintiffs did not have these documents then. Before Nathan testified, she read "the entirety" of Case's transcript. Ex. A (Nathan Dep.) at

133:14–21, 135:22–25. Nathan knew exactly what Case had said and that documents in *Nathan's own possession* would confirm it. When confronted with Case's testimony, this was Nathan's response under oath:

> **Q.** Now, you had a role in the creation of the Stephanie Jones Leaks website that documented in Exhibit 54, right?
> **A. No.**
> **Q.** You asked Katie Case to write copy for that website; isn't that true?
> **A. That is not true.**
> **Q.** Is it your under-oath testimony that you had no involvement whatsoever in any shape or form in anything having to do with the website in Exhibit 54 and the X account in Exhibit 56?
> **A. It is, yes.**
> **Q.** And if Katie Case testified to the contrary, would she be lying?
> **A. Yes.**

*Id.* at 131:20–132:23.

Nathan testified that she knew of the Websites only "from being sent them." *Id.* at 129:3–9. Asked whether she had ever been involved "in a matter where a website was built," she named only TAG's own site and a site tied to the *Lively* litigation, *id.* at 142:16–143:1. She specifically denied involvement in the website Rebel Wilson requested targeting Amanda Ghost *Id.* But eight weeks before Nathan built the Ghost site, Nathan texted her client Rebel Wilson a price of $110,000 for an "untraceable site" with a "ghost server, ghost hosting, full build, maintaining, and full algorithmic push across all platforms." Dkt. 268 at 4-5. Shown, in this case, the August 6, 2024 text in which she told Case "Rebel wants a one of those sites" and attached "Amanda Ghost website.docx," Nathan denied her involvement: "I did not write this. I did not send this." Ex. A (Nathan Dep.) at 228:25–229:1. Asked whether Case was "a huge liar," Nathan answered: "Apparently so, yes." *Id.* at 233:12-13.

On October 17, 2025, Plaintiffs served a supplemental subpoena on Case. Dkt. 168-5 (Ntc. of Subpoena to Case). Case did not object. Case's and Plaintiffs' counsel agreed on the scope;

Case gathered the responsive documents and was ready to produce them on November 11. But that morning, Nathan and the Wayfarer Parties objected, asserting "proprietary and potentially other interests" of Nathan and TAG in Case's files. Dkt. No. 168-6. The objection stopped the production. In doing so, Nathan again accused Case of committing perjury.

It is one thing to use the shop-worn tactic of whataboutism to throw someone off your trail; it is entirely another to use it in a federal court pleading when you are attempting to block a party from obtaining documents that would show that you, yourself, committed perjury.

A month after she testified in this case, Nathan filed an affidavit in the *Ghost v. Wilson* case, denying any involvement in the Ghost Websites:

> 2. I understand Ms. Ghost alleges in her Cross-Complaint that I and my company, TAG, were somehow involved in the creation of websites that were published at amandaghost.com and amandaghostsucks.com (the "Websites"). That is false:
>
> a. Neither I nor anyone working on behalf of TAG registered or created either of the Websites.
>
> b. Neither I nor anyone working on behalf of TAG wrote any of the content appearing on the Websites.
>
> c. Neither I nor anyone working on behalf of TAG had any communications about the creation or content of the Websites with "Jed" or whomever was actually responsible for registering or creating those Websites.
>
> d. As a public relations firm, TAG only provides earned media services; it does not create websites.

Ex. Q (Nathan Decl. from *Ghost v. Wilson*). Two sworn denials, a month apart, about the same kind of website built with the same writer, both now contradicted by text messages and other documents Nathan never produced in this Court. Yet when confronted with this in Plaintiffs' Response to Defendants' motion to dismiss, Nathan again claimed ignorance. *See* Dkt. 269 at 5 (Nathan Reply ISO Mot. to Dismiss) ("Unproven allegations about Nathan's conduct in other proceedings cannot establish that she is one of the unidentified and unserved Doe Defendants.").

## LEGAL STANDARD

Federal courts possess inherent authority to protect the integrity of their proceedings and to sanction litigation conduct that abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991). Inherent-power sanctions may be imposed where clear evidence establishes bad-faith litigation conduct. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135–36 (2d Cir. 1998). That includes both discovery abuses, *id.* at 136, and false sworn testimony. *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 139–42 (2d Cir. 2023). A showing of "willfulness, bad faith, or fault on the part of the sanctioned party" justifies harsh sanctions, *Radecki v. GlaxoSmithKline*, 375 F. App'x 46, 47-48 (2d Cir. 2010), including entering judgment against the offending party, *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583–84 (S.D.N.Y. 1996) (entering judgment for plaintiffs and dismissing defendants' claims as a sanction for defendants' discovery abuse); *Radecki.* 375 F. App'x 46, 47-48 (holding district court did not abuse discretion in dismissing plaintiff's claims with prejudice where plaintiff committed perjury). They also include striking a party's affirmative defenses and precluding the party from offering evidence on liability. *See Conway v. Dunbar*, 121 F.R.D. 211, 214 (S.D.N.Y. 1988).

Rules 26 and 37 independently authorize sanctions for the concealment of responsive evidence. Every discovery response must be signed, certifying that the response complies with the Rules and is not interposed for an improper purpose. Rule 26(g)(1)(B), 26(g)(3). And the rules require a party to timely supplement or correct its discovery responses upon learning that the response is materially incomplete or incorrect. Fed. R. Civ. P. 26(e)(1)(A). In choosing a sanction, the Second Circuit weighs the willfulness of the noncompliance, the efficacy of lesser sanctions, the duration of the noncompliance, and whether the party was warned. *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302–03 (2d Cir. 2009). District Courts have "wide discretion" in selecting a

Rule 37 sanction. *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135, 140 (2d Cir. 2007); *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144–49 (2d Cir. 2010).

## ARGUMENT AND AUTHORITIES

### I. The Court Should Sanction Nathan for False Testimony and Intentional Concealment of Evidence.

This Court should impose appropriate sanctions for Melissa Nathan's abuse of the judicial process. Melissa Nathan has lied under oath, concealed the very evidence that would have exposed the truth, and should be sanctioned accordingly.

#### A. The Court Should Sanction Nathan for Committing Perjury.

A witness testifying under oath who "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory" commits perjury. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Perjury is committed with willful intent when "made 'with the specific purpose of obstructing justice,'" and the material matter must be "material to the proceeding in which it is given." *United States v. Ben–Shimon*, 249 F.3d 98, 102 (2d Cir. 2001). Courts have the power to sanction perjury. *Radecki v. GlaxoSmithKline*, 375 F. App'x 46, 48 (2d Cir. 2010) ("[F]alse testimony in a formal proceeding is intolerable and therefore perjury should be severely sanctioned in appropriate cases." (quoting *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323 (1994) (cleaned up)). Nathan has committed perjury on multiple occasions and should be appropriately sanctioned.

*First*, Nathan lied under oath *numerous* times about her involvement in the creation of the Websites—a question directly relevant to Plaintiffs' claims. Ex. A (Nathan Dep.) at 131:20–132:23; *id.* at 142:16-143:12; Ex. C at 21-22 (Supp. Resp. to Pls.' First Rogs to Nathan); Dkt. No. 37 at ¶ 92. Nathan testified that she had no "role in the creation of the Stephanie Jones Leaks website" and that she did not ask "Katie Case to write copy for that website." Ex. A (Nathan Dep.)

at 131:20–132:23. This was a lie. Nathan directed, edited, and paid for the Website copy and facilitated the sites' "untraceable" construction. *See* Ex. E (K CASE 00010003-00010011); Ex. G (2024-05-06 Case Notes); Ex. M (2024-09-04 Case's Note re Conversation with Nathan-Revise Jones Site); Ex. I (2024-05-24 Zelle Pmt); Ex. I (2024-05-24 4K Zelle Deposit).

*Second*, Nathan lied under oath about her involvement in the defamatory scheme underlying the creation of other websites like the ones at issue in this case. Ex. A (Nathan Dep.) at 142:16-143:12. Asked whether she had ever been involved "in a matter where a website was built," she named only TAG's own site and a site tied to the *Lively* litigation, and asked about the website Rebel Wilson requested, she testified that she had no involvement in that one either, *id.* That was a lie too. Dkt. 268 at 4-5. Asked whether Case, who had described the Ghost and Alexander sites in detail, was "a huge liar," Nathan answered: "Apparently so, yes." Ex. A (Nathan Dep.) at 233:12-13. Not so.

### B. The Court Should Sanction Nathan for Withholding Material Evidence in Violation of Her Discovery Obligations.

In the Second Circuit, courts have the inherent power to sanction deliberate deception and discovery abuse. The Second Circuit has affirmed sanctions where the record demonstrated a "conscious disregard" of discovery obligations and a pattern reasonably understood as a bad-faith effort to thwart discovery. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998). A prior discovery order is not necessary: "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002). Nathan either withheld responsive documents or failed to retain them in a bad-faith effort to conceal the truth. This abuse of the discovery process should be sanctioned as well.

#### 1. Nathan Failed to Produce the Case Documents as Required by Rule 34.

Rule 34 requires a party to produce responsive documents "in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Request No. 39 asked, by name, for documents showing Nathan's "involvement in the creation...or content" of the Websites and "any involvement by" Case. Dkt. 193-4. A text from Nathan to Case directing the content of the Websites, and a payment for writing it, are the paradigm of responsive documents. Request No. 32 separately reaches every communication with Case, a former Jonesworks employee. *Id.*. And Request No. 2, served in March 2025, reached "[a]ll Documents and Communications pertaining to Jonesworks LLC." Dkt. 193-3. A thread with a former Jonesworks employee about writing an attack site on Jonesworks's founder, in which Nathan sends a link to the Jonesworks website, pertains to Jonesworks LLC on any reading. Either these documents were intentionally withheld or note retained; in either case, Nathan cannot escape her discovery failures.

**2. The Search-Term Qualifier Did Not Relieve Nathan of the Duty to Produce Documents She Knew Existed.**

Nathan may point to her promise to produce only documents located in response to agreed-upon search terms. This would be unavailing. Most critically, these documents *were* responsive to the agreed search terms. *See* Ex. R (Search Term Agreement).

But even if they were not, Rule 26(g)(1) required her counsel to certify, "after a reasonable inquiry," that her responses were "complete and correct as of the time … made." Counsel must take affirmative steps to locate responsive material, rather than rely on a client's assurance that none exists. *Metro. Opera Ass'n v. Local 100*, 212 F.R.D. 178, 221–22 (S.D.N.Y. 2003). Search terms help locate responsive documents, but they do not permit withholding documents a party knows about. A party who limits production to search-term hits, knowing that responsive communications exist outside them must "state whether any responsive materials are being

withheld," Rule 34(b)(2)(C), and a party who knows responsive material has been lost from a searched source must identify it, Rule 26(b)(2)(B). Nathan did neither.

### 3. Nathan Failed to Correct Her Discovery Responses as Required by Rule 26.

The duty to correct under Rule 26(e) is continuing and self-executing; it does not wait for a request or a court order, and knowledge triggers it. Fed. R. Civ. P. 26(e), Advisory Committee Note to 1993 Amendment; *Cerruti*, 169 F.R.D. at 583. Nathan's July 30, 2025 verified supplemental response to Plaintiffs' Interrogatory No. 11 that she "has no personal knowledge of who was behind the [W]ebsites" and "had no involvement in either to any extent" was false when she signed it. *See* Ex. C at 21-22 (Supp. Resp. to Pls.' First Rogs to Nathan). A sworn answer the party knows to be false is a violation of Rule 33 and Rule 26(g) on the day it is served. The duty to correct that response attached at once.

And Nathan was reminded of the truth when Nathan read Case's deposition transcript, in which Case described the May 2024 call and Nathan's instructions to write copy for the Websites. Rule 26(e) again required her to supplement her production and correct her responses. She did not do so on September 30, or when she objected to the Case subpoena in November, or when she opposed amendment in January, or after the Court ruled her way. Nathan's bad-faith conduct is exactly the kind of conduct Rule 37 and the Court's inherent power exist to reach.[5]

---

[5] The Court need not find perjury to grant this motion, although the record of perjury here is clear. Rules 26(e) and 37(c) ask whether a party knew her responses were materially incomplete and failed to correct them. The inherent power asks whether she acted in bad faith. She did.

## II. The Court Should Enter Judgment for Plaintiffs, Strike Nathan's Defenses, and Allow Plaintiffs to Pursue Defamation and Tortious Interference Claims as a Sanction.

### A. The Court Should Enter Judgment Against Nathan and Strike her Defenses.

Rule 37(b)(2)(A)(ii) authorizes the Court to prohibit a disobedient party from supporting or opposing designated claims or defenses; Rule 37(b)(2)(A)(iii) authorizes striking pleadings in whole or in part; and Rule 37(b)(2)(A)(vi) authorizes rendering a default judgment against the disobedient party. Rule 37(c)(1)(C) makes those remedies available when a party fails to supplement a materially incomplete response. This record warrants the harshest sanctions. Nathan's answer and affirmative defenses are the instruments through which she has sought to preserve the benefits of her concealment, including her denial that she directed the Websites. The Court should strike them and enter judgment for Plaintiffs.

The Court's inherent power independently supports entering judgment against Nathan on Plaintiffs' claims against her and striking her defenses. A court may impose the harshest sanctions when a litigant commits deliberate fraud on the court. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46 (1944); *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445, 461 (S.D.N.Y. 2002). Nathan did not merely conceal documents. She affirmatively lied under oath and shaped the record by withholding the documents that would have exposed those lies. That is the paradigm case for the harshest sanctions.

In *Cerruti*, 169 F.R.D. at 583–84, the court entered judgment for plaintiffs and dismissed defendants' counterclaims as a sanction for discovery abuse. In *Radecki v. GlaxoSmithKline*, 375 F. App'x 46, 47–48 (2d Cir. 2010), the Second Circuit affirmed dismissal with prejudice for perjury. And in *Conway v. Dunbar*, 121 F.R.D. 211, 214 (S.D.N.Y. 1988), the court struck affirmative defenses and precluded evidence on liability. Nathan's deliberate concealment and sworn falsehoods justify the same relief here. The *Agiwal* factors are informative as well: "(1) the

willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of ... noncompliance." 555 F.3d at 302.

*First*, the violation here was willful. Nathan wrote the texts and sent payments that demonstrate her involvement in creating the Websites, yet she swore to the opposite. This was not negligence or a failure to understand a request. It was deliberate concealment followed by deliberate falsehoods. *Second*, lesser sanctions are inadequate. Neither monetary penalties, adverse inferences nor preclusion of specific evidence would remedy the misconduct that infected this entire proceeding. Nathan wasted Plaintiffs' time and money, and gained an unfair advantage in pleadings with the Court. Only judgment on the defamation claim and striking her affirmative defenses can remedy the full scope of the damage. *Third*, the noncompliance has lasted approximately seventeen months—from the March 2025 production deadline through the present. Nathan withheld the Case Documents through multiple discovery requests, a request for a supplemental search, Case's deposition, the subpoena fight, Plaintiffs' Motion to Amend, and the Court's March 26 Order Denying Plaintiffs leave to amend. Each event gave Nathan another opportunity to correct the record, and each time she chose not to, putting Plaintiffs behind. The Court should enter judgment against Nathan on Plaintiffs' claims against her and strike her defenses under Rule 37 and the Court's inherent power.

**B. The Court Should Allow Plaintiffs to Pursue Their Defamation and Tortious Interference With Business Relations Claims Against Nathan.**

The Court should also allow Plaintiffs to plead and pursue their defamation and tortious interference with prospective business relations claims against Nathan.

Diligence under CPLR 1024 asks whether the plaintiff "made timely efforts to identify the correct party before the statute of limitations expired." Dkt. No. 234 at 12 (quoting *Ceara v.*

*Deacon*, 68 F. Supp. 3d 402, 409 (S.D.N.Y. 2014)). Plaintiffs did so. Plaintiffs subpoenaed Katherine Case in February of 2025, seeking to learn the origins of the defamatory Websites. Plaintiffs served discovery requests on Nathan in March of 2025 that should have uncovered Nathan's involvement. Ex S.. A defendant who "failed to respond fully" to those discovery requests cannot rely on the gaps she created. *Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013).

When Plaintiffs moved to amend their complaint to add a tortious interference with prosepective business relations claim against Nathan and name her as a Defendant in their defamation claim, the Court denied leave, holding that Plaintiffs did not have good cause for the late amendment because they did not exercise diligence. Dkt. 234 at 7-12. That Order assumed Nathan's production and sworn denials reflected the true state of the evidence. They did not.

The Court found no diligence before April 18, 2025, because the March 2025 requests did not name the Websites. Dkt. No. 234 at 9–10. But the Court also recognized that Request No. 2 "touched on" the subject, *id.* at 9, and the Case Documents were responsive to that request. They are communications with a former Jonesworks employee about attacking Jonesworks's founder. Nathan's response was due in April 2025, before the limitations period ran. Had she produced the thread, Plaintiffs would have known Nathan was the Doe defendant a month before the statute purportedly expired. The interrogatories served that same month asked her the same. She refused to answer until the statute had run, and even then answered falsely.

The Court found that Nathan "would have had no reason to know that the Jones Parties would seek damages from her in her personal capacity for … defamation" when depositions were taken. Dkt. No. 234 at 10–11. Prejudice in this setting means the need for significant additional discovery or delay in resolving the case, *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993), and neither is present. The Case Documents show Nathan knew what she had done, and

¶ 92 of the complaint told her the Jones Parties had alleged it. The only "prejudice" the amendment imposes is that Nathan must defend a claim she knew was true while she swore it was not. That is not prejudice. And further discovery is unnecessary. Nathan has the documents, she has been deposed on the subject, and the Jones Parties will take the record as it stands.

Absent Nathan's concealment, Plaintiffs would have identified her before the statute ran and added the defamation claim on time. This was all part of Nathan and others' scheme to throw Plaintiffs off her trail—something Plaintiffs have finally untied through diligent efforts. Therefore, as a sanction, this Court should give Plaintiffs' back what Nathan's concealment took from them: the opportunity to pursue their defamation and tortious interference with prospective business relations claims. Indeed, if Rule 60 gives the Court the ability to set aside a judgment procured by fraud or misrepresentation a year after it is entered, undoubtedly, the Court's inherent powers allow the Court to reconsider a prior ruling as a sanction when that prior ruling was procured, even if only in part, based on fraud or a misrepresentation.

### C. At a Minimum, the Court Should Deem the Operative Facts Established and Preclude Nathan's Denials.

Alternatively, under Rule 37(b)(2)(A)(i), the Court should direct that the following facts are established: that Nathan requested, directed the content of, edited, and paid for the copy that became www.stephaniejonesleaks.com and the associated social-media accounts; and that Nathan knew, from May 2024 on, that she was among the persons the complaint described as John Does 1–10. Under Rule 37(b)(2)(A)(ii), the Court should bar Nathan from offering testimony, declarations, or argument at summary judgment or trial that she had no role in creating, directing, or funding the Websites. A party who withholds the documents on a subject and testifies falsely about it may not litigate that subject on her own say-so. *Cerruti*, 169 F.R.D. at 583–84.

### III. The Court Should Also Order a Sworn Accounting and Fees.

Rule 37(c)(1)(A) authorizes "the reasonable expenses, including attorney's fees, caused by the failure" to supplement, and Rule 26(g)(3) authorizes the same for an improper certification. Nathan's violation caused Plaintiffs expenses that Nathan's production would have made unnecessary, including fees on this motion; on the motion to compel Case (Dkt. 166); in retaining expert Brian Horton to uncover the origin of the Websites (Dkt. 193-20 (Horton Report)); in deposing Case and Jed Wallace to uncover who was behind Websites (Ex. F (Case Dep.); Ex, K (Wallace Dep.)); in seeking leave to amend; and in obtaining the Case Documents through *Jonesworks LLC v. Case*. Plaintiffs will submit a fee application within fourteen days of the Court's order.

## CONCLUSION

Plaintiffs respectfully request that the Court should grant the motion and enter the relief set out in the Notice of Motion and proposed order.

Dated: September 19, 2026 | Austin, Texas

Respectfully submitted,

By: /s/ Brad Beckworth

Bradley E. Beckworth, pro hac vice
New York State Bar No. 5151071
Christina Yarnell, pro hac vice
Texas State Bar No. 24071973
NIX PATTERSON, LLP
8701 Bee Cave Road
Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
Telecopier: (512) 328-5335
bbeckworth@nixlaw.com
cyarnell@nixlaw.com

*Attorneys for Plaintiffs Stephanie Jones and Jonesworks LLC*