# "EXHIBIT F"

** C O N F I D E N T I A L **
* CONTAINS ATTORNEYS' EYES ONLY MATERIAL *
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-CV-10049-LJL
(Consolidated with 1:25-cv-00449-LJL)
-----------------------------------x
BLAKE LIVELY,
Plaintiff,
- against -
WAYFARER STUDIOS LLC, a Delaware Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, IT ENDS WITH US MOVIE LLC, a California Limited Liability Company, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, JED WALLACE, an individual, and STREET RELATIONS INC., a California Corporation,
Defendants.
-----------------------------------x
(Caption continued)
September 5, 2025
9:10 a.m.

Videotaped Deposition of KATHERINE CASE, taken by Plaintiff, pursuant to Subpoena, held at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

Page 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civ. Action No. 1:25-cv-779
-----------------------------------x
STEPHANIE JONES and JONESWORKS LLC,

Plaintiffs,

- against -

JENNIFER ABEL, MELISSA NATHAN,
JUSTIN BALDONI, WAYFARER STUDIOS LLC,
and JOHN DOES 1-10,

Defendants.

-----------------------------------x

Page 3

A P P E A R A N C E S :

WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington D.C. 20006
Attorneys for Blake Lively
BY: KRISTIN BENDER, ESQ.
kbender@willkie.com
MICHAEL GOTTLIEB, ESQ (Via Zoom)
mgottlieb@willkie.com

- and -

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
BY: MELISSA TAUSTINE, ESQ.
mtaustine@willkie.com
AARON E. NATHAN, ESQ.
anathan@willkie.com

MANATT, PHELPS & PHILLIPS LLP
2049 Century Park East
Suite 1700
Los Angeles, California 90067
Attorneys for Blake Lively
BY: STEPHANIE ROESER, ESQ. (Via Zoom)
sroeser@manatt.com

Page 4

A P P E A R A N C E S: (Continued)

QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street
10th Floor
Los Angeles, California 90017
Attorneys for Stephanie Jones and
Jonesworks, LLC
BY: KRISTIN N. TAHLER, ESQ.
kristintahler@quinnemanuel.com

- and -

QUINN EMANUEL URQUHART & SULLIVAN LLP
295 Fifth Avenue
9th Floor
New York, New York 10016
BY: MORGAN ANASTASIO, ESQ.
morgananastasio@quinnemanuel.com

MEISTER SEELIG & FEIN PLLC
125 Park Avenue
7th Floor
New York, New York 10017
Attorneys for Wayfarer Studios
LLC, Justin Baldoni, Jamey
Heath, Steve Sarowitz, It Ends With
Us Movie LLC, Melissa Nathan,
Jennifer Abel, and The Agency Group
PR LLC
BY: MITCHELL SCHUSTER, ESQ.
ms@msf-law.com
KEVIN A. FRITZ, ESQ. (Via Zoom)
kf@msf-law.com

Page 5

A P P E A R A N C E S: (Continued)

LINER FREEDMAN TAITELMAN + COOLEY, LLP
1801 Century Park West
5th Floor
Los Angeles, California 90067
Attorneys for Wayfarer Studios
LLC, Justin Baldoni, Jamey
Heath, Steve Sarowitz, It Ends With
Us Movie LLC, Melissa Nathan,
Jennifer Abel, and The Agency Group
PR LLC
BY: BRYAN FREEDMAN, ESQ.
bfreedman@lftcllp.com
KIM S. ZELDIN, ESQ. (Via Zoom)
kzeldin@lftcllp.com
SUMMER BENSON, ESQ. (Via Zoom)
sbenson@lftcllp.com

AHOURAIAN LAW
9465 Wilshire Boulevard
Suite 300
Beverly Hills, California 90210
Attorneys for Wayfarer Studios
LLC, Justin Baldoni, Jamey
Heath, Steve Sarowitz, It Ends With
Us Movie LLC, Melissa Nathan,
Jennifer Abel, and The Agency Group
PR LLC
BY: MITRA AHOURAIAN, ESQ. (Via Zoom)

JACKSON WALKER LLP
1401 McKinney Street
Suite 1900
Houston, Texas 77010
Attorneys for Jed Wallace and
Street Relations Inc.
BY: TORY EMERY, ESQ.
temery@jw.com

Page 154

K. CASE - CONFIDENTIAL
Ms. Lively?
A. It could just be referring to his experience as a director navigating working with a lot of personalities on set.
Q. Did you have Ms. Lively in mind when you suggested this language?
A. Given the situation, we were accounting for Ms. Lively.
Q. Do you see at 9:32 a.m. Ms. Abel refers to statements made by Mr. Baldoni in the junket and she says he used the word "friction." Do you see that?
A. I do.
Q. That's referring to Mr. Baldoni using the word "friction"?
A. I believe so. I wasn't with him at that interview.
Q. And she says "I think it's important to get ahead of it."
Do you see that?
A. I do.
Q. What did you understand that to mean?
A. Given the intentional

Page 155

K. CASE - CONFIDENTIAL
separation of Justin from the rest of the cast during the promotion and the supplemented mass unfollowing of Justin by the cast, it was our intention that he focus on positives during his own promotion. I believe that's what this refers to here.
Q. Experiencing friction on set was a positive in your mind?
A. I can't say what he experienced on set.
Q. In your mind?
A. In this text message, it seems Sony wasn't happy with the use of the word "friction."
Q. You were though, correct?
MR. BREED: Objection.
A. As you can see my text says friction is fine.
Q. You are being handed what has been marked as Case Exhibit 7.
(Case Exhibit 7 marked for identification.)
Q. This is Bates stamped

Page 156

K. CASE - CONFIDENTIAL
KCASE-000003856.
You can put that document aside. You are being handed what has been marked Case Exhibit 8.
(Case Exhibit 8 marked for identification.)
MR. FREEDMAN: Did you mark this as 7?
MS. BENDER: It was marked as 7, but we are going to discuss Case Exhibit 8.
Q. Okay. This is Bates stamped KCASE-000004949, a text ranging from August 5th to August 6th, 2024.
Ms. Case, do you recognize this document?
A. I do.
Q. What is it?
A. It seems to be a text thread between myself and Melissa.
Q. Do you have any reason to think this document is not as it was when it was created?
A. No.

Page 157

K. CASE - CONFIDENTIAL
Q. If you turn a few pages to where the Bates stamp ends in 53. At 1:58 Melissa says to you "I have to drive to this fucking meeting. Do you think you'll have that copy for Jed today?"
Do you see that?
A. I do.
Q. Is that referring to Jed Wallace?
A. Yes.
Q. What copy were you drafting for Jed Wallace?
A. I believe this is in regards to a client.
Q. Which client?
MR. BREED: We will designate it as attorneys' eyes only, please.
THE VIDEOGRAPHER: Okay.
Q. Which client?
A. I believe this was for Rebel Wilson.
Q. Okay. On the next page, at 4:46 p.m., Melissa says "Jed and Bryan asking me for copy lol kill me."

K. CASE - CONFIDENTIAL

Do you see that?

A. I do.

Q. Who is Bryan?

A. I believe Bryan Freedman.

Q. Bryan and Jed were working in collaboration with TAG on the Rebel Wilson account?

A. I didn't work on that account, so I'm not sure.

Q. You worked on the copy that Melissa was requesting for that account, correct?

A. This was a one-off request.

Q. So you did some work on that account, correct?

A. Specifically I assisted with this copy.

Q. And you knew that Jed and Bryan were working together asking for the copy that you were preparing for that account, correct?

MR. BREED: Objection.

MR. FREEDMAN: Objection.

A. Melissa alerted me at that



K. CASE - CONFIDENTIAL

time.

Q. You knew that both Jed and Bryan were to receive the copy, correct?

MR. BREED: Objection.

MS. EMERY: Objection.

A. I knew that Melissa needed the copy.

Q. For whom?

A. In her text message she said Jed and Bryan were looking for it.

Q. Did Mr. Freedman work with TAG and Jed on the Wayfarer account?

A. Not during the summer of 2024.

Q. When is your understanding that Mr. Freedman started that work?

A. It is my understanding that it was following Blake's CRD complaint, Civil Rights Department complaint in December.

Q. When TAG was looking to identify a subcontractor for digital services in connection with the Wayfarer account, did TAG receive multiple quotes for those services?

A. That was communicated to me by



K. CASE - CONFIDENTIAL

Melissa at the time.

Q. And do you know whether TAG received multiple quotes?

A. Melissa told me that there were two quotes.

Q. Do you know what the quotes were?

A. Offhand, I can't remember the specific amount, but my assumption is one was from Roza and one was from Jed, but I can't confirm that.

Q. What is Street Relations?

A. It's my understanding that that's Jed's company.

Q. And did you and TAG regularly work with Street Relations?

A. When appropriate, if a client required social or digital mediation, or remediation, rather, we would work with Jed as one of the contractors.

Q. And in this case, specifically with respect to the Wayfarer account?

A. We did work with Jed.

Q. Who else did TAG work with at



K. CASE - CONFIDENTIAL

Street Relations?

A. In my experience it was only Jed.

Q. Did Jed have any team?

A. I'm not sure.

Q. Did you think that he did?

A. I would -- I assumed, but I can't say for sure.

Q. Did Jed ever refer to a team?

A. I'm not sure.

Q. You don't remember?

A. No.

Q. Did Jed have any specialists that he worked with?

MS. EMERY: Objection.

A. I'm not sure.

Q. Did he ever refer to specialists to you?

A. I know that Jed had capabilities. I'm not sure of the exact means, but, for example, if a client's Wikipedia needed updating, I know it wasn't unusual for individuals in his area of expertise to have contacts at Twitter,

K. CASE - CONFIDENTIAL
A. I don't remember specifically. There was a lot of phone calls, but my guess would be Jen, Melissa, myself, Bree, and someone from Wayfarer.
Q. Who was most likely to have attended from Wayfarer?
A. I would say Jamey would be on more calls than Justin most likely.
Q. At 7:25 Ms. Butler texts "You have to prove malice. He can't get caught up with the defamation suit," and you emphasized that message.
What is this discussing?
A. At the time the team was discussing whether or not Justin should retain counsel. If Ms. Lively came forward with false allegations, it could potentially open her up for claims of defamation.
Q. And this potential of litigation was discussed on the calls involving TAG and the Wayfarer clients?
A. Nothing substantively. It was, in everyone's estimation, it was more of a


K. CASE - CONFIDENTIAL
PR issue than a legal one.
Q. Even though it was involving litigation?
MR. BREED: Objection.
A. It wasn't a substantive point.
Q. Getting caught up with defamation -- with a defamation suit was not a substantive point?
A. The conversation at that time was not substantive in terms of potential litigation.
Q. It was just discussed at a high level?
A. That's correct.
Q. Can you please turn to what's been previously marked Exhibit 7. This is Bates stamped KCASE-000003856, dated August 6th, 2024.
Do you recognize this document?
A. I do.
Q. What is it?
A. I believe this was our company text thread.
Q. Does this document look to be


K. CASE - CONFIDENTIAL
as it existed at the time?
A. I believe so.
Q. Did you ever ask Zoe Cate to assist in monitoring social conversations relevant to the Wayfarer account?
A. At a very high level, we would ask her to keep an eye on Twitter or Instagram, TikTok, just to see if any new conversations were being had that we should be made aware of for the purpose of whether or not those conversations would translate to traditional media.
Q. And would traditional media include tabloid media?
A. Yes.
Q. The page that ends in 3858, at the bottom Zoe says "uh-oh" and then sends a link. Do you see that?
A. I do.
Q. And then on the next page there is a screen shot. That appears to be a screen shot of a post or comment from social media, correct?
A. Yes.


K. CASE - CONFIDENTIAL
Q. And you respond to that and say "okay, so the comments are working excellent."
Do you see that?
A. I do.
Q. What did you mean by that?
A. I took a look at what people were saying underneath this, I think it was a tweet, and they were very much in line with things we had been discussing as a team.
Q. What do you mean, the comments were working?
A. They were very much in line with messaging we had been discussing.
Q. And if you skip down to 2:54 p.m., you say "that's all us lol."
What did you mean by that?
A. I think I was joking.
Q. What was the joke?
A. That the comments were aligned and messaging we had been discussing were also being discussed by the public.
Q. So where you said "the comments

K. CASE - CONFIDENTIAL
documents?
MR. FREEDMAN: Objection.
A. No.
Q. Did she explain what the basis was for her understanding about your testimony with respect to her phone number?
MR. BREED: Objection.
A. I don't understand the question.
Q. I think you had said something along the lines that her phone would be released back to her. Did she explain what the basis of that understanding was?
A. Again, this is my understanding, but the phone number had been hers for several years. I guess the physical phone was perhaps paid for by Jonesworks. But, again, this is what she told us, that it had been communicated to her during that meeting that once, I don't know, things had been checked, that they would release the personal phone number back to her so that she could maintain that number.


K. CASE - CONFIDENTIAL
Q. You said that's based on your understanding. Is it based on what she said during that call or is it some other understanding?
A. Based on what was said, what I took from that conversation.
Q. After that call where she described what had -- or her recollection of what had happened in August, have you had any other discussions with her?
A. No.
Q. Ms. Case, we talked during your -- or you testified in your earlier testimony about your previous work at Jonesworks. I'm going to return to that and hopefully not repeat too much.
You started in Jonesworks in September 2021; is that right?
A. I believe so.
Q. What was your title there?
A. I think I might have been a director.
Q. Did your title also involve crisis management?


K. CASE - CONFIDENTIAL
A. It did.
Q. Were you a director of strategic communications and crisis management?
A. Yes.
Q. When you joined, did you expect Melissa Nathan to start working there too?
A. I did.
Q. Did Ms. Nathan end up working there?
A. She did not.
Q. Why not?
A. I'm not sure.
Q. Did Ms. Nathan ever explain to you why she was not coming to Jonesworks?
A. Nothing substantial. It was -- basically it was communicated to me that it was a breakdown in the negotiations.
Q. Communicated by Ms. Nathan?
A. To me, yes.
Q. Where was Ms. Nathan when you were at Jonesworks?
A. She was still at Hiltzik Strategies.


K. CASE - CONFIDENTIAL
Q. Do you recall what accounts you worked on while you were at Jonesworks?
A. Yes.
MS. TAHLER: I'm going to designate this AEO for now.
THE VIDEOGRAPHER: All right.
Q. What accounts did you work on while you were at Jonesworks?
A. I primarily worked on Jeff Bezos and his subsidiary affiliations, Blue Origin, Bezos Earth Fund, Day One Fund. I also worked on two of the Tom Brady accounts, Autograph and TB12. And I also assisted on the Joe Gebbia account, as he was working I believe at the time with Airbnb.org. There was a handful of other accounts that I assisted on as needed. For example, I helped send out messaging as it related to Dwayne Johnson, I believe his wife's project she was working on.
Q. And did you do strategic communications and crisis management on each of those accounts?
A. My original title reflected at

Page 302

K. CASE - CONFIDENTIAL

Q. Were you asked to communicate with him at that time about Ms. Jones?

A. There was a conversation between me and Melissa. She told me he was working on a potential story. She asked if I would speak to him and I said I would not.

Q. Did she ask why she wanted you to speak with him?

MR. FREEDMAN: Objection.

A. Probably because I had worked there.

Q. Did she explain to you why she wanted you to speak with him?

A. She communicated that he was working on a story. She asked if I would talk to him, and I said no.

Q. Why wouldn't you talk to him?

A. I didn't think it was necessary.

Q. You left Jonesworks in March of 2022; is that right?

A. I believe so, yes. Yes, March.

Q. And at the time that you left

Page 303

K. CASE - CONFIDENTIAL

what was your opinion of Ms. Jones?

A. I personally didn't have a very good experience with Ms. Jones.

Q. Did you communicate that to anyone at the time of your leaving?

A. I believe so.

Q. Who did you communicate that to?

A. My parents, my now husband, then boyfriend.

Q. Ms. Nathan?

A. Yes.

Q. Anyone else?

A. Not that I can recall.

Q. Why did you not have a very high opinion of her?

A. It is not that I didn't have a high opinion. Unfortunately I just didn't have a very good experience. She was incredibly volatile to work for. She had very sudden spurts of extreme aggression. It seemed like there was nothing that really I could do to produce quality work in her eyes.

Page 304

K. CASE - CONFIDENTIAL

Q. Did she tell you that you were not producing quality work?

A. She did.

Q. What did she say about that?

A. There were many instances of that.

Q. Did you disagree?

A. I wasn't really aware of the basis that my work was being judged.

Q. Did you ask?

A. I did.

Q. And what did she say?

A. Conversations were not usually handled evenly. Oftentimes it was extremely combative, so after a while I did stop asking.

Q. Are you saying that she didn't give you any basis for why she felt like your work was not up to standard?

A. I didn't necessarily feel that the basis at the time reflected reality. Unfortunately when the discussions with Melissa fell through, her tone towards me shifted entirely, so even if I did the same

Page 305

K. CASE - CONFIDENTIAL

work five days in a row, it could be received differently on each of those days.

Q. Okay. But, again, did she give you any basis for why she felt like your work was not up to standard?

MR. FREEDMAN: Objection.

MR. BREED: Objection.

A. No.

Q. What is your opinion of Ms. Jones now?

A. I think that she's a challenging individual.

Q. Is it right to say that you have a very negative opinion of Ms. Jones?

A. No.

Q. Other than being a challenging individual, would you say -- what would you say your opinion is?

A. I don't have an opinion.

Q. Do you harbor animosity towards her?

A. No.

Q. Would you agree with me that Ms. Nathan has a negative view of

K. CASE - CONFIDENTIAL

prep that they had spoken to anyone representing the Wayfarer parties prior to your preparation?

A. I can't say.

Q. Ms. Case, are you aware of various websites and social media accounts that are disparaging of Ms. Jones?

MR. BREED: Objection.

A. I am aware of websites about Ms. Jones.

Q. Did you create any of the websites that are disparaging of Ms. Jones?

A. No.

Q. Who did?

A. I don't know.

Q. How did you become aware of the websites that are disparaging of Ms. Jones?

MR. BREED: Objection.

MR. FREEDMAN: Objection.

Q. How did you become aware of the websites disparaging Ms. Jones?

A. I received a call from Melissa in early May. It was communicated to me that a website had been requested.



K. CASE - CONFIDENTIAL

Q. A website had been requested?

A. The creation of a website had been requested.

Q. By whom?

MR. FREEDMAN: Objection.

MR. BREED: Let's designate this AEO, please.

MS. TAHLER: We can go off.

THE VIDEOGRAPHER: Yeah.

A. Melissa represented to me that a potential new client had requested the formulation of a website.

Q. Who was that new client?

MR. FREEDMAN: Objection.

A. At the time it was represented to me that it was Dwayne Johnson.

Q. Melissa Nathan told you that Mr. Johnson had requested preparation of a website about Ms. Jones?

MR. FREEDMAN: Objection.

A. She represented to me that he had requested the creation of a website of this nature.

Q. Did she tell you anything else



K. CASE - CONFIDENTIAL

about what Mr. Johnson had requested?

A. Not what he had requested specifically.

Q. Generally what he had requested?

A. Not necessarily what he had requested, but specific language was communicated.

Q. What was that specific language?

A. That Stephanie holds clients hostage, that she leaks clients' secrets, and that she treats her employees poorly, amongst others.

Q. Ms. Nathan told you that Mr. Johnson had said the things that you just said to her?

A. No.

Q. Who did Ms. Nathan say said that Stephanie holds clients hostage?

MR. BREED: Objection.

A. I don't know who might have said that. This language was communicated to me.



K. CASE - CONFIDENTIAL

Q. By Ms. Nathan?

A. The conversation was with her, yes.

Q. It was a conversation?

A. Yes.

Q. Did Ms. Nathan send you any written communications about this?

A. Not about the language to be used, no.

Q. Generally about the websites?

A. At that time, no.

Q. At any time?

A. There was conversation about the copy that I had written based on the information provided, I redrafted and sent back to her.

Q. Did you draft the copy for the website about Ms. Jones?

A. Based on the conversation and the language provided to me, I provided copy.

Q. So yes, you provided -- you wrote the copy that was -- that became the website of Ms. Jones?

Page 378

K. CASE - CONFIDENTIAL
MR. FREEDMAN: Objection.
A. Based on the language that I was instructed to use.
Q. Did anyone else provide you with that language besides Ms. Nathan?
MR. BREED: Objection.
A. No.
Q. And Ms. Nathan provided all of this language to you orally?
MR. FREEDMAN: Objection.
MR. BREED: Objection.
A. She provided language to reference over the phone, yes.
Q. Did she put anything in writing about the language to be used in the website?
A. No.
Q. What happened -- did she send an audio message?
MR. BREED: Objection.
A. No.
Q. What happened after you provided Ms. Nathan with the copy?
A. I don't know.

Page 379

K. CASE - CONFIDENTIAL
Q. Did you come to understand that the copy that you had drafted became a website about Ms. Jones?
A. I was made aware of that, yes.
Q. Who made you aware of that?
A. Melissa.
Q. And what did Melissa tell you?
A. She sent me the link.
Q. The link to which website?
A. It might have been the leaks. I don't remember which came first.
Q. She sent it to you how?
A. In a text message.
Q. And that text message sending Stephanie Jones Leaks you recognized as the copy that you had drafted, correct?
A. That's correct.
Q. Did Mr. Johnson pay TAG to create this website?
MR. BREED: Objection.
A. I don't know.
Q. Did Mr. Johnson become a client of TAG?
A. He did not.

Page 380

K. CASE - CONFIDENTIAL
Q. Do you know if Ms. Nathan had any other conversations with Mr. Johnson other than the one you have already discussed?
MR. BREED: Objection.
MR. FREEDMAN: Objection.
A. I don't know.
Q. Did Ms. Nathan report to you any other conversations with Mr. Johnson other than the one you have already discussed?
MR. FREEDMAN: Objection.
MR. BREED: Objection.
A. No.
Q. Do you recall anything else about that initial conversation with Mr. Johnson other than what you have already testified to?
MR. BREED: Objection. That wasn't the testimony.
A. It wasn't a conversation with Mr. Johnson.
Q. What was it with Mr. Johnson?
A. I never spoke to Mr. Johnson.

Page 381

K. CASE - CONFIDENTIAL
Q. I had understood that Ms. Nathan had spoken with Mr. Johnson and then Ms. Nathan reported that to you.
MR. BREED: Objection, that wasn't the testimony either.
MR. FREEDMAN: Objection.
MS. TAHLER: I'm asking for clarification.
A. I am not aware of whether or not Melissa spoke with Mr. Johnson. It was communicated to me that the site was at either his or someone affiliated with him's request.
Q. Did she tell you if she ever spoke to him directly?
A. No.
Q. Did she tell you who she spoke to about this?
A. No.
(Case Exhibit 35 marked for identification.)
Q. Ms. Case, you are now reviewing a document that has been marked as Case 35. It is a printout of the website

K. CASE - CONFIDENTIAL

account.

Does this refresh your recollection that this is the Twitter account that you reviewed where your tweets were posted?

A. To my recollection, I was only aware of one of them. I believe it was Not a Stephanie Fan.

Q. You are aware of the Twitter account Not a Stephanie Fan?

A. To my recollection, that looks like the one that I was aware of.

Q. Your tweets were posted to Not a Stephanie Fan?

A. I don't know.

Q. But you weren't aware of any of the other Twitter accounts in Exhibit 36?

A. No.

MR. BREED: Objection.

Q. Did Melissa create Not a Stephanie Fan?

A. I don't know.

Q. Did she explain to you that a Twitter account was being created?



K. CASE - CONFIDENTIAL

A. There was never a formal explanation. I was simply asked to draft tweets.

Q. Do you know whether Melissa had any other assistance in this?

A. I don't know.

Q. Do you know whether she worked with Jed Wallace on this?

MR. FREEDMAN: Objection.

A. I spoke with Jed in conjunction to Melissa as it related to the tweets.

Q. And what did you and Jed discuss?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. The tweets.

Q. What about the tweets?

A. I provided them via Signal.

Q. Was it your understanding that Jed was going to post the tweets?

MR. FREEDMAN: Objection.

MR. BREED: Objection.

MS. EMERY: Objection.

A. I don't know.



K. CASE - CONFIDENTIAL

Q. Did you speak with him other than over Signal?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. No.

Q. Did you speak with him other than with regard to sending him these tweets?

MR. BREED: Objection.

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. I don't recall.

Q. Did you speak to him at all in connection with the first website?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

A. I don't recall.

Q. Were all of your communications with Jed Wallace regarding Stephanie Jones done via Signal?

MR. FREEDMAN: Objection.

A. Yes.

Q. Did Jed Wallace communicate to you that he would like communications to be



K. CASE - CONFIDENTIAL

done over Signal?

MR. BREED: Objection.

MS. EMERY: Objection.

A. No.

Q. How did you understand that you were to communicate over Signal?

A. It's where the thread was.

Q. Was the thread among you, Jed, and Melissa?

MR. FREEDMAN: Objection.

A. Yes.

Q. Was anyone else on this thread?

A. No.

Q. Was that your only thread with Jed?

A. I don't recall, no.

Q. Did you have any other threads related to this topic -- strike that.

Did you have any other Signal threads related to this topic of the Twitter accounts or the websites generally with Melissa Nathan and anyone else?

MR. FREEDMAN: Objection.

MS. EMERY: Objection.

K. CASE - CONFIDENTIAL
A. Yes.
Q. So as you sit here today, you don't know for 100 percent fact that this was being done either to try to get Dwayne Johnson or because Dwayne Johnson was a client, correct?
MS. TAHLER: Objection.
A. That was my belief then, but today I can't be sure.
Q. But it was your belief then because Melissa Nathan told you that although you knew that he wasn't a client, correct?
A. It was communicated to me that this was for Dwayne Johnson, so I was under the assumption that he either had hired us or would hire us.
Q. But you have never spoken to him, right?
A. No.
Q. You have never seen anything in writing from him?
A. No.
Q. You have never seen Melissa,



K. CASE - CONFIDENTIAL
you know, communicate directly or indirectly with Dwayne Johnson, correct?
A. That's correct.
Q. You have never seen a text message or an e-mail from Melissa to Dwayne Johnson discussing anything about business, correct?
A. That's correct.
MS. TAHLER: Objection.
Q. So really this could have been created, if it was, for any client or potential client or someone else, you don't have personal knowledge of that, do you?
MS. TAHLER: Objection.
A. I didn't have any reason at the time to believe differently, but I suppose so.
Q. You know what personal knowledge is, right?
A. Yes.
Q. Putting aside what Melissa Nathan, what you believe that she told you at the time, and I guess I will ask you, because it has been a long time, do you



K. CASE - CONFIDENTIAL
remember the exact words that she used, like the exact words?
A. She said that potential litigation was being prepared by Dwayne Johnson's team and that this site would be used in conjunction with that.
Q. That's what she said, potential litigation?
A. From my recollection, yes.
Q. Did she tell you that Scooter Braun had asked for the website to be created?
A. No.
Q. Did she mention anyone else that she was asking you to create the copy for?
A. No.
Q. Did you actually physically see Melissa Nathan do something with your copy, meaning did you see her send it to like a website company or somebody that would prepare a website?
A. No.
Q. So as you sit here today you're



K. CASE - CONFIDENTIAL
not exactly sure what she did; is that correct?
A. That's correct.
Q. Do you have any ill will of Melissa Nathan?
A. No.
Q. Earlier you testified that the Alexander brothers were turned down by TAG as clients?
A. That's my understanding.
Q. Isn't it true that you yourself personally worked for them on the side?
A. I wouldn't qualify it as working with them.
Q. Are you saying you didn't perform any services whatsoever for the Alexander brothers?
A. It was requested that I connect with them to create a website in conjunction with their ongoing litigation.
Q. And that was not for TAG, it was outside of TAG, right?
A. I'm not sure.
Q. Well, Melissa Nathan turned

Page 518

E X H I B I T S

| CASE | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 31 | NATHAN_000001746-000001755 | 330 |
| Exhibit 32 | NATHAN_000001180-000001213 | 347 |
| Exhibit 33 | NATHAN_000002842-000002925 | 360 |
| Exhibit 34 | NATHAN_000001719-000001729 | 363 |
| Exhibit 35 | NATHAN_000003131-000003142 | 381 |
| Exhibit 36 | Document from Twitter | 385 |
| Exhibit 37 | Letter dated 3/21/25 | 403 |
| Exhibit 38 | Letter dated 3/21/25 | 403 |
| Exhibit 39 | NATHAN_00000141-000000151 | 406 |
| Exhibit 40 | KCASE-000002257-000002264 | 410 |
| Exhibit 41 | NATHAN_000002938-000002940 | 414 |
| Exhibit 42 | NATHAN_000003319 | 434 |
| Exhibit 43 | NATHAN_000003950-000003968 | 445 |
| Exhibit 44 | KCASE-000001891-000001897 | 465 |

DIRECTIONS NOT TO ANSWER

Page Line
(NONE)

REQUESTS

Page Line
274 11

Page 519

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of September, 2025.

TODD DESIMONE

Page 520

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: LIVELY v. WAYFARER
DATE OF DEPOSITION: 9/5/25
WITNESS' NAME: KATHERINE CASE

PAGE/LINE(S)/ CHANGE REASON
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________
____/______/_______________/__________

_____________________
KATHERINE CASE

SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF______________, 2025.

__________________
NOTARY PUBLIC

MY COMMISSION EXPIRES________________