**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE JONES and JONESWORKS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10,<br><br>Defendants. | Civ. Action No. 1:25-cv-00779-LJL<br>rel. 1:24-cv-10049-LJL |

# MEMORANDUM OF LAW IN SUPPORT OF THE WAYFARER PARTIES' MOTION FOR SUMMARY JUDGMENT

# Table of Contents

Page

I. INTRODUCTION ........ 1
II. STATEMENT OF FACTS ........ 3
A. Wayfarer's Agreement with Jonesworks ........ 3
B. Abel's Employment Agreements ........ 3
C. Abel Resigns. ........ 4
D. Wayfarer Hires Nathan. ........ 5
E. Jonesworks Terminates Abel Before Her Agreed Departure Date. ........ 6
F. Jones Defied Client Instructions and Aided the Opposing Side, Prompting Wayfarer's Termination. ........ 6
III. LEGAL STANDARD ........ 10
IV. NEW YORK LAW GOVERNS EVERY CAUSE OF ACTION IN THE COMPLAINT ........ 10
A. The Governing Choice-of-Law Framework ........ 10
B. New York Choice of Law Clauses Govern the Contract Claims. ........ 11
C. New York Law Governs the Tortious Interference Claims. ........ 11
D. New York Law Governs the Faithless Servant and Breach of Fiduciary Duty Claims. ........ 12
E. New York Law Governs the Defamation Claim Against Abel. ........ 12
V. JONES IS NOT A PROPER PLAINTIFF ON ANY OF THE CONTRACT-BASED OR DUTY-OF-LOYALTY CLAIMS ........ 13
VI. PLAINTIFFS CANNOT PROVE ABEL BREACHED HER EMPLOYMENT AGREEMENT ........ 14
A. The Non-Competition Provision Is Unenforceable. ........ 14
B. Jonesworks Waived the Non-Competition Clause. ........ 15
C. The Duty of Loyalty Provision Is Unenforceable as Patently Subjective. ........ 16
D. Abel Did Not Solicit or Attempt to Solicit Jonesworks' Employees. ........ 16
E. Abel Did Not Solicit or Attempt to Solicit Jonesworks' Clients. ........ 18
F. Plaintiffs Cannot Prove Causation and Damages. ........ 20
VII. PLAINTIFFS' FAITHLESS SERVANT AND BREACH OF FIDUCIARY DUTY CLAIMS DUPLICATE THEIR BREACH OF CONTRACT CLAIM ........ 22
VIII. ABEL IS ENTITLED TO SUMMARY JUDGMENT ON JONES' DEFAMATION CLAIM ........ 23
A. Jones Cannot Identify the Defamatory Words or Their Recipients. ........ 24

B. Plaintiffs Offer No Evidence of Damages Caused by Abel's Alleged Defamation. 25

C. Plaintiffs Cannot Prove Defamation Per Se. 25

IX. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE THIRD CAUSE OF ACTION FOR BREACH OF THE WAYFARER AGREEMENT 27

A. Baldoni Is Not a Proper Defendant Because He Is Not a Party to the Wayfarer Agreement 27

B. Jonesworks' Material Breach of the Wayfarer Agreement Relieved Wayfarer of Its Obligations Under the Agreement. 28

C. Wayfarer Did Not Breach the Wayfarer Agreement's Non-Solicitation Clause. 31

X. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE SECOND AND FOURTH CAUSES OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT 32

A. Wayfarer, Baldoni, and Nathan Are Entitled to Summary Judgment on the Second Cause of Action for Tortious Interference with Abel's Employment Agreement. 33

1. Plaintiffs Cannot Establish Actual Knowledge. 33

2. Plaintiffs Cannot Establish "But For" Causation. 36

3. Plaintiffs Cannot Show Intentional Procurement of a Breach. 37

4. Plaintiffs Cannot Show Breach or Disruption of an Enforceable Obligation. 39

B. Nathan and Abel Are Entitled to Summary Judgment on the Fourth Cause of Action for Tortious Interference with the Wayfarer Agreement. 40

XI. CONCLUSION 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*,
96 F. Supp. 3d 182 (S.D.N.Y. 2015)....................10

*Ahluwalia v. St. George's Univ., LLC*,
63 F. Supp. 3d 251 (E.D.N.Y. 2014), *aff'd*, *Ahluwalia v. St. George's Univ.*,
626 F. App'x 297 (2d Cir. 2015) ....................39

*Amalfi, Inc. v. 428 Co.*,
128 N.Y.S.3d 754 (4th Dep't 2020)....................37

*Ashland Mgmt. Inc. v. Janien*,
82 N.Y.2d 395 (1993) ....................21

*Awards.com, LLC v. Kinko's, Inc.*,
834 N.Y.S.2d 147 (1st Dep't 2007), *aff'd*, 14 N.Y.3d 791 (2010) ....................28

*BCRE 230 Riverside LLC v. Fuchs*,
874 N.Y.S.2d 34 (1st Dep't 2009) ....................25

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999) ....................14, 15

*Billauer v. Escobar-Eck*,
88 Cal. App. 5th 953 (2023) ....................13

*Bobulinski v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024)....................26

*Bogoni v. Friedlander*,
610 N.Y.S.2d 511 (1st Dep't 1994) ....................34

*Camac Fund, LP v. Nabors Energy Transition Sponsor II LLC*,
835 F. Supp. 3d 467 (S.D.N.Y. 2026)....................13

*Cardali v. Slater*,
57 N.Y.S.3d 342, 346 (N.Y. Sup. Ct.), *judgment entered*, (N.Y. Sup. Ct.
2017), and *aff'd*, 167 A.D.3d 476 (N.Y. App. Div. 2018) ....................24

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182 (2004) ....................13



535165.1

*Caulfield v. Imagine Advisors, Inc.*,
2007 WL 4615504 (S.D.N.Y. Dec. 27, 2007) ....................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................10

*Computer Possibilities Unlimited v. Mobil Oil Corp.*,
747 N.Y.S.2d 468 (1st Dep't 2002) ....................28

*Corvetti v. J & S Mills, Inc.*,
607 N.Y.S.2d 389 (2d Dep't 1994)....................17

*Davis v. Nadrich*,
174 Cal. App. 4th 1 (2009), *as modified* (May 21, 2009)....................34

*Dee v. Rakower*,
976 N.Y.S.2d 470 (2d Dep't 2013)....................14

*Denson v. Donald J. Trump for President, Inc.*,
530 F. Supp. 3d 412 (S.D.N.Y. 2021)....................15

*Empire Fin. Servs., Inc. v. Bellantoni*,
861 N.Y.S.2d 898 (4th Dep't 2008)....................15, 32

*Feiger v. Iral Jewelry, Ltd.*,
41 N.Y.2d 928 (1977) ....................12

*Fernandes v. Fernandes*,
227 N.Y.S.3d 642 (2d Dep't 2025)....................25, 26

*First Hill Partners LLC v. BlueCrest Cap. Mgmt. Ltd.*,
52 F. Supp. 3d 625 (S.D.N.Y. 2014)....................12, 33

*Forest Park Pictures v. Universal Television Network, Inc.*,
683 F.3d 424 (2d Cir. 2012)....................10

*FTI Consulting, Inc. v. Graves*,
2007 WL 2192200 (S.D.N.Y. July 31, 2007) ....................17

*Gallagher v. Savarese*,
2001 WL 1382581 (S.D.N.Y. Nov. 7, 2001) ....................35

*Gastineau v. ESPN, Inc.*,
2026 WL 734841 (S.D.N.Y. Mar. 16, 2026) . ....................28

*Geraci v. Probst*,
877 N.Y.S.2d 386 (2d Dep't 2009), *aff'd as modified and remanded*, 15
N.Y.3d 336 (2010) ....................12

*Glassdoor, Inc. v. Super. Ct.*,
9 Cal. App. 5th 623 (2017) ....24

*GMH Cap. Partners v. CBRE Cap. Adv.*,
2026 WL 851350 (S.D.N.Y. March 27, 2026) ....27

*Good Energy, L.P. v. Kosachuk*,
853 N.Y.S.2d 75 (1st Dep't 2008) ....15

*Great Am. Ins. Co. v. Gemstone Prop. Mgmt. LLC*,
2025 WL 2196886 (S.D.N.Y. Aug. 1, 2025) ....23

*Harsco Corp. v. Segui*,
91 F.3d 337 (2d Cir. 1996) ....27

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ....38

*Holcomb v. Iona Coll.*,
521 F.3d 130 (2d Cir. 2008) ....10

*Huong Que, Inc. v. Luu*,
150 Cal. App. 4th 400 (2007) ....12

*IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*,
40 N.Y.3d 277 (2023) ....23

*IME Watchdog, Inc. v. Gelardi*,
2024 WL 4350498 (E.D.N.Y. Sept. 30, 2024) ....34

*India.com, Inc. v. Dalal*,
412 F.3d 315 (2d Cir. 2005) ....13

*Int'l Minerals & Res., S.A. v. Pappas*,
96 F.3d 586 (2d Cir. 1996) ....38

*Int'l Shared Servs., Inc. v. McCoy*,
686 N.Y.S.2d 828 (2d Dep't 1999) ....15

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) ....10

*Jewelry 47, Inc. v. Biegler*,
2008 WL 4642903 (E.D. Cal. Oct. 16, 2008) ....34

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*,
797 N.Y.S.2d 883 (Sup. Ct. N.Y. Cnty. 2005) ....14

*Keystone Auto. Indus., Inc. v. Montalvo*,
2014 WL 3696266 (E.D.N.Y. July 24, 2014) ....................39

*Kirch v. Liberty Media Corp.*,
449 F.3d 388 (2d Cir. 2006) ....................33

*Kleeberg v. Eber*,
331 F.R.D. 302 (S.D.N.Y. 2019) ....................22

*Krock v. Lipsay*,
97 F.3d 640 (2d Cir. 1996) ....................12

*Krumme v. WestPoint Stevens Inc.*,
238 F.3d 133 (2d Cir. 2000) ....................10

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413 (1996) .................... *passim*

*Lee v. Bankers Tr. Co.*,
166 F.3d 540 (2d Cir. 1999) ....................13

*Lerner v. Amalgamated Clothing & Textile Workers Union*,
938 F.2d 2 (2d Cir. 1991) ....................13

*Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*,
776 F. App'x 1 (2d Cir. 2019) ....................13

*Linkco, Inc. v. Fujitsu Ltd.*,
230 F. Supp. 2d 492 (S.D.N.Y. 2002) ....................34, 39

*Lively v. Wayfarer Studios LLC*,
2025 WL 2884407 (S.D.N.Y. Oct. 9, 2025) ....................11

*Lively v. Wayfarer Studios LLC*,
786 F. Supp. 3d 695 (S.D.N.Y. 2025) ....................10

*Lively v. Wayfarer Studios LLC*,
828 F. Supp. 3d 375 (S.D.N.Y. 2026) ....................10

*Looks Great Servs., Inc. v. Roosevelt*,
235 N.Y.S.3d 674 (2d Dep't 2025) ....................36, 40

*Luethke v. Seagram Co.*,
2000 WL 1880324 (S.D.N.Y. Dec. 28, 2000) ....................25

*Madeira v. Affordable Hous. Found., Inc.*,
469 F.3d 219 (2d Cir. 2006) ....................13

*Marzec v. Pub. Emps.' Ret. Sys.*, 236 Cal. App. 4th 889 (2015)....................................................12

*Medtronic, Inc. v. Walland*,
2021 WL 4131657 (S.D.N.Y. Sept. 10, 2021)............................................................................11

*Metito (Overseas) Ltd. v. Gen. Elec. Co.*,
2009 WL 399221 (S.D.N.Y. Feb. 18, 2009)..............................................................................36

*Ministers & Missionaries Benefit Bd. v. Snow*,
26 N.Y.3d 466 (2015) ..............................................................................................................11

*N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*,
2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013)............................................................................34

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*,
795 F.3d 1124 (9th Cir. 2015) ...........................................................................................33, 39

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
87 N.Y.2d 614 (1996) ..............................................................................................................39

*P.C. v. Skavina*,
780 N.Y.S.2d 675 (3d Dep't 2004)...........................................................................................15

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
50 Cal. 3d 1118 (1990) ......................................................................................................11, 36

*Padula v. Lilarn Props. Corp.*,
84 N.Y.2d 519 (1994) ........................................................................................................11, 12

*Panos v. Mid Hudson Med. Grp., P.C.*,
167 N.Y.S.3d 539 (2d Dep't 2022)...........................................................................................22

*Perella Weinberg Partners LLC v. Kramer*,
218 N.Y.S.3d 297 (1st Dep't 2024) ..........................................................................................17

*Permanens Cap. L.P. v. Bruce*,
2022 WL 3442270 (S.D.N.Y. July 22, 2022), *report and recommendation adopted*, 2022 WL 4298731 (S.D.N.Y. Sept. 19, 2022)........................................................15

*Point Prods. A.G. v. Sony Music Ent., Inc.*,
215 F. Supp. 2d 336 (S.D.N.Y. 2002), *opinion amended on reconsideration*, 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002) .........................................................................20

*Poller v. BioScrip, Inc.*,
974 F. Supp. 2d 204 (S.D.N.Y. 2013), *on reconsideration*, 2014 WL 13109132 (S.D.N.Y. Apr. 14, 2014)...........................................................................................12

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
813 F. Supp. 2d 489 (S.D.N.Y. 2011)....16

*Randall's Is. Aquatic Leisure, LLC v. City of New York*,
938 N.Y.S.2d 62 (1st Dep't 2012)....27

*Reach Music Publ'g, Inc. v. Warner/Chappell Music, Inc.*,
2014 WL 5861984 (S.D.N.Y. Nov. 10, 2014)....34

*Rebecca Broadway Ltd. P'ship v. Hotton*,
37 N.Y.S.3d 72 (1st Dep't 2016)....28

*Reed, Roberts Assocs., Inc. v. Strauman*,
40 N.Y.2d 303 (1976)....14

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024)....33, 36

*Ronald W. Freeman, P.C. v. Zhu*,
618 N.Y.S.2d 316 (1st Dep't 1994)....17

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*,
2020 WL 12948055 (C.D. Cal. Dec. 29, 2020), *aff'd*, 2022 WL 18906 (9th Cir. Jan. 3, 2022)....37, 38

*S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*,
2015 WL 4509425 (D. Conn. July 24, 2015)....34

*S. Pierre Assocs. v. Meyers*,
820 N.Y.S.2d 485 (Civ. Ct. N.Y. Cnty. 2006)....14

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
425 F.3d 119 (2d Cir. 2005)....13

*Travelsavers Enters., Inc. v. Analog Analytics Inc.*,
53 N.Y.S.3d 99 (2d Dep't 2017)....12

*Trindade v. Reach Media Grp., LLC*,
2013 WL 3977034 (N.D. Cal. July 31, 2013)....35

*Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*,
706 F. Supp. 3d 409 (S.D.N.Y. 2023), *aff'd*, 2025 WL 1374732 (2d Cir. May 13, 2025)....20

*VIP Pet Grooming Studio, Inc. v. Sproule*,
203 N.Y.S.3d 681 (2d Dep't 2024)....26

*Warburg Realty P'ship, Ltd. v. Aschheim*,
196 N.Y.S.3d 455 (1st Dep't 2023) ....................39

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
675 F. Supp. 2d 274 (E.D.N.Y. 2009) ....................39

*White Plains Coat & Apron Co. v. Cintas Corp.*,
460 F.3d 281 (2d Cir. 2006)....................11, 12

*Wolberg v. IAI N. Am., Inc.*,
77 N.Y.S.3d 348 (1st Dep't 2018) ....................25

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................10

N.Y. C.P.L.R. 3016(a) ....................24

# I. INTRODUCTION

In May 2020, Wayfarer Studios LLC ("Wayfarer") engaged Plaintiff Jonesworks LLC ("Jonesworks") and its principal Stephanie Jones (collectively, "Plaintiffs") to provide public relations and media services. A publicist's most basic duty is to protect her client and make the client look good. A written agreement reinforced that duty, obligating Jonesworks to provide its services in a professional manner, consistent with its client's goals. Instead, in August 2024, every step Jones took appeared designed to bring about Wayfarer's downfall. As Wayfarer worked to contain a brewing public relations nightmare over a dispute between Blake Lively and Justin Baldoni on the set of Wayfarer's film *It Ends With Us*, Jones tossed a grenade into those efforts. Rather than heed Wayfarer's explicit instructions not to communicate with anyone about the Lively-Baldoni rift, Jones contacted the Daily Mail to pour fuel on the simmering fire. Jones also contacted Lively's publicist Leslie Sloane, who had agreed to a truce in which each party would refrain from public comments, destroying the truce and opening the floodgates to a full-on public relations war. Jones then pulled the rug out from under Wayfarer by firing its day-to-day point of contact, taking the contents of that employee's phone to Sloane, and going silent, offering no communication or representation strategy for over a week while Wayfarer dealt with the fallout. Unable to control its rogue publicist, who was actively flouting Wayfarer's instructions and undermining its stated goal of chilling the furor, Wayfarer was left no choice but to terminate Jonesworks for materially breaching the Wayfarer Agreement.

Jones did not stop there. While Jonesworks was still Wayfarer's publicist—and while demanding payment of outstanding fees—Jones traded on information she obtained only through her position of trust, [redacted] After years of Jones' abusive and erratic behavior, Jennifer Abel resigned on July 10, 2024 to start her own

business, with a targeted departure date of August 23, 2024. On August 21, Jones ambushed Abel, seized her company-issued cell phone and laptop, summarily terminated Abel, and had her escorted from the building. Jones then downloaded Abel's text messages with Wayfarer about its public relations strategy in the Lively-Baldoni brush-up. Still in August 2024, before Wayfarer terminated Jonesworks, [redacted]. Lively later obtained those messages by subpoena and provided them to the New York Times for a story published simultaneously with the filing of Lively's complaint against Wayfarer and Baldoni. The selectively presented texts ultimately proved nothing, but they were harmful to Wayfarer simply by being shared: they served to poison public opinion against Wayfarer and Baldoni at the outset of the Lively litigation.

Every claim fails under New York law. *First*, Jones is not a proper plaintiff on any contract-based or duty-of-loyalty claim, because Jonesworks is the only contracting party on Plaintiffs' side of either agreement. *Second*, Plaintiffs cannot prove that Abel breached her employment agreement. The non-compete has no geographic limit and bars competition [redacted] so it is unenforceable, and Jonesworks waived it by allowing Abel to take clients. The [redacted] loyalty clause is subjective. No evidence shows that Abel solicited any employee or used confidential information to solicit any client. And Plaintiffs cannot show causation or damages. *Third*, the faithless servant and fiduciary duty claims against Abel duplicate the contract claim. *Fourth*, the defamation claim against Abel fails. Plaintiffs never identify the words used or the people who heard them, and their own damages expert attributes all reputational harm to anonymous websites, the subject of a claim the Court has already dismissed. *Fifth*, the

claim for breach of the Wayfarer Agreement fails because Baldoni was never a party to it and Jonesworks' own material breach relieved Wayfarer of any further obligation under it. *Finally*, both tortious interference claims fail on every disputed element. No Defendant knew of Abel's contract or its terms. Abel and Wayfarer each acted independently, so no Defendant was a but-for cause of any breach. No Defendant intentionally procured a breach. And there was no underlying breach of an enforceable obligation.

## II. STATEMENT OF FACTS

### A. Wayfarer's Agreement with Jonesworks

Effective May 7, 2020, Wayfarer and Jonesworks signed a written agreement under which [redacted] (the "Wayfarer Agreement"). R.56.1 ¶¶ 1-3. After an initial one-year term ending May 6, 2021, the Wayfarer Agreement [redacted] R.56.1 ¶¶ 4-5. Jonesworks agreed to serve as Wayfarer's [redacted]" R.56.1 ¶ 6. The Services included [redacted] R.56.1 ¶ 7. In a boilerplate section, each party agreed [redacted] R.56.1 ¶ 8. New York law governs. R.56.1 ¶ 9.

### B. Abel's Employment Agreements

On or about July 9, 2020, Jonesworks hired Abel, a publicist, as a Vice President in its Los Angeles office and made her the primary point person for Wayfarer and Baldoni. R.56.1 ¶ 10.



535165.1

When Jonesworks hired her, Abel signed two agreements: an offer letter and a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "Abel NDA"). R.56.1 ¶ 11. On or about November 22, 2021, Jonesworks and Abel entered into a modified employment agreement (the "Abel Employment Agreement"), which [redacted] Jonesworks and Abel. R.56.1 ¶¶ 13-14. Although the Abel Employment Agreement gave Abel a [redacted], it preserved [redacted] R.56.1 ¶¶ 15-16. The agreement barred Abel from [redacted]. R.56.1 ¶¶ 17, 20. The agreement contains a New York choice-of-law provision.

**C. Abel Resigns.**

By the summer of 2024, Abel viewed Jonesworks as a toxic workplace: morale was low, employees were quitting, and dissatisfied clients were taking their business elsewhere. R.56.1 ¶ 27. Abel worried about what she saw as Jones' "downward spiral," with Jones behaving erratically and pitting employees against one another, but she had no plans to leave because she ran the Los Angeles office with relative autonomy. R.56.1 ¶ 28. That changed on July 10, 2024, during a business Zoom call with Jones and Matthew Mitchell ("Mitchell"), a Jonesworks employee who reported to Abel. Jones bullied Mitchell, "making up scenarios" and pressing Abel to corroborate them "in an attempt to diminish [Mitchell's] work," and then turned "increasingly hostile" toward Abel in a call that "resulted in name calling." R.56.1 ¶ 29. Abel described "a tumultuous, scary conversation" that left her "emotional" and in tears. At her breaking point, she told Jones on the spot that she was resigning. R.56.1 ¶ 30. That same day, Abel confirmed by email to Jones and Jonesworks leadership that, [redacted] she had [redacted]

[redacted] and would [redacted] R.56.1 ¶¶ 31-32. On or about July 24, 2024, Jones begged Abel to stay, apologized for how she had treated her, and told Abel that she was back on her medication and was going to start going to therapy. R.56.1 ¶ 33. On July 26, 2024, Abel reconfirmed her decision in writing and told Jones she planned to start her own business. R.56.1 ¶ 34. Abel offered a six-week transition ending August 23, 2024, so that she could hand off her clients in an orderly way, and Jones accepted. R.56.1 ¶ 35.

In late July 2024, Wayfarer's CEO, Jamey Heath, Baldoni, and Nathan learned that Abel had given notice of her resignation from Jonesworks and would be leaving at the end of her transition period. R.56.1 ¶ 37. Abel did not tell Heath, Baldoni (or anyone else at Wayfarer), or Nathan of her resignation until after Jones had accepted it. R.56.1 ¶ 38. Before Abel left, Jones told her that she could take [redacted] with her as a client at her new public relations firm, RWA Communications ("RWA"), which Abel understood to mean both Baldoni and Wayfarer. R.56.1 ¶¶ 39-43. Jones also gave Abel permission to take Abel's long-time client Jameela Jamil with her to RWA. R.56.1 ¶¶ 44.

**D. Wayfarer Hires Nathan.**

Jonesworks' work for Wayfarer and Baldoni included promoting Wayfarer's film, *It Ends With Us* (the "Film"), starring Blake Lively and Baldoni, which premiered on August 6, 2024, and opened on August 9, 2024. R.56.1 ¶ 46. As the premiere approached, tensions between Lively and Baldoni escalated, and Baldoni and Wayfarer found themselves in a public relations crisis. R.56.1 ¶ 47. Heath decided to bring in a crisis public relations expert. R.56.1 ¶ 48. In late July 2024, Heath turned to Nathan and her firm, The Agency Group ("TAG"), to work with Jonesworks on crisis management, and TAG was formally engaged on August 8 or 9, 2024. R.56.1 ¶¶ 49-50, 52.

**E. Jonesworks Terminates Abel Before Her Agreed Departure Date.**

Abel worked through the agreed transition. R.56.1 ¶ 55. Abel's mobile device was Jonesworks' property. In her final week, Abel asked Jones and Jonesworks' chief of staff, Gordon Duren ("Duren"), to release her phone number and personal data when she left. Duren assured Abel that Jonesworks would release both her phone number and personal data when she left. R.56.1 ¶ 56. In reality [redacted] R.56.1 ¶ 57. On August 21, 2024, two days before her last day, Jonesworks brought Abel into a conference room at the Los Angeles office, where Duren, a technical extraction expert, a security guard, and an attorney were waiting. At the attorney's demand, Abel surrendered her personal laptop and the phone holding her personal data and the number Jonesworks had promised to release, and Jonesworks terminated her. R.56.1 ¶ 58. [redacted] R.56.1 ¶ 60.

**F. Jones Defied Client Instructions and Aided the Opposing Side, Prompting Wayfarer's Termination.**

Wayfarer paid Jonesworks to manage the press [redacted] and to ensure [redacted] R.56.1 ¶¶ 6-7. In the run-up to the premiere, Lively and Baldoni's teams negotiated an informal truce, or a "ceasefire," under which neither side would speak to the press about, or take part in negative coverage of, the other. R.56.1 ¶ 63. Wayfarer's goal was to quiet the growing public uproar over the dispute, and it told Jones and her team not to engage with the media about Lively and Baldoni. R.56.1 ¶ 64. On August 8, 2024, when a *Daily Mail* reporter called about the Lively-Baldoni dispute, Abel told the Jonesworks team to [redacted] R.56.1 ¶ 65. Jones did the

opposite: she wrote [redacted] then reported that she had [redacted] and was [redacted] with the reporter. R.56.1 ¶ 66.

Word reached Sony, the Film's distributor, almost immediately. Lively's publicist, Sloane, texted Sony's Josh Greenstein that [redacted] and Greenstein replied, [redacted] R.56.1 ¶¶ 67-68. Greenstein called Heath and told him Jones was [redacted] R.56.1 ¶ 70. Heath then wrote to Jones, Wayfarer's President Tera Hanks, and Abel: [redacted] R.56.1 ¶ 71. Heath instructed Jones: [redacted] and when Jones insisted, [redacted] Heath wrote: [redacted] R.56.1 ¶ 73. Later that day, Heath texted again, [redacted] and Hanks called Jones and told her [redacted] because Wayfarer [redacted] R.56.1 ¶ 74. Jones retorted that [redacted] and told her client, [redacted] R.56.1 ¶ 75. Hanks then reported to Heath that she had [redacted] and Heath replied: [redacted] R.56.1 ¶ 76. The damage, Heath explained, was that "someone from Jonesworks had reached out to the media and had said something negative about Blake Lively." R.56.1 ¶ 77.

Wayfarer then directed Jones to cease all work for Wayfarer and Baldoni, and repeated that

instruction on August 9 and August 14, 2024. R.56.1 ¶¶ 78-79. Nevertheless, Jones called Sloane on or about August 21, 2024 and told her [redacted] R.56.1 ¶¶ 80-82. [redacted] R.56.1 ¶ 83. Sloane understood that Jones [redacted] R.56.1 ¶ 84. Sloane told Jones [redacted] R.56.1 ¶ 85. Months later, Jones called Sloane again to say, [redacted] R.56.1 ¶ 86.

Jones' conduct undercut Wayfarer's crisis strategy; Heath objected to the [redacted] R.56.1 ¶¶ 87-88. That evening, a *Daily Mail* reporter wrote to Sloane that [redacted] R.56.1 ¶ 89. On August 21, 2024, the day Jonesworks took Abel's phone, Sloane called Nathan about Abel's text messages with Nathan and warned her to expect a lawsuit. R.56.1 ¶¶ 90-91.

Jonesworks fired Abel, Wayfarer's day-to-day point person, without warning, in the middle of a public relations crisis. R.56.1 ¶¶ 47, 61, 87. Wayfarer then could not reach Jones, its own publicist, during that critical period, and for over a week Jonesworks provided no communication or representation strategy while Wayfarer dealt with the fallout of Abel's abrupt termination.

R.56.1 ¶¶ 61-62, 92-93. When Jones did communicate, she would do so only by email with a lawyer copied. R.56.1 ¶¶ 94-95. That arrangement hardly reflects the trust a client paying $20,000 a month is entitled to expect from its publicist. By this point, Heath had "lost faith" in Jones, and Hanks testified that Wayfarer fired Jonesworks because of "Stephanie [Jones] being unprofessional[,] [e]motional instability and undermining what was in the best interest of Wayfarer." R.56.1 ¶¶ 96-98. Heath advised Jones on August 21, 2024 that Wayfarer had serious concerns; Jones responded that [redacted] R.56.1 ¶¶ 93-94. Even as she insisted on that exclusive relationship, Jones was dealing with the other side. On August 24, 2024—while Jonesworks was still representing Wayfarer and before Wayfarer terminated the Wayfarer Agreement—Jones [redacted] R.56.1 ¶¶ 106-107. Lively herself testified that [redacted] in August 2024, before the Wayfarer Agreement was terminated. R.56.1 ¶ 110. Avignone told Lively [redacted] R.56.1 ¶ 110. [redacted] R.56.1 ¶¶ 111-114. On August 30, 2024, Wayfarer gave written notice terminating the Wayfarer Agreement, and Baldoni ended his relationship with Jonesworks. R.56.1 ¶ 102. [redacted] R.56.1 ¶¶ 103-104.

On September 27, 2024, Lively's company, Vanzan, filed a New York state court action naming only Doe defendants and subpoenaed Jonesworks, [redacted]

[redacted]. R.56.1 ¶¶ 115-117. Vanzan never identified the Doe defendants and discontinued the action the day before Lively filed her federal complaint. R.56.1 ¶ 118.

## III. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant makes this initial showing, the *burden shifts* to the non-movant to establish a genuine dispute of fact. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted). In ruling on a motion for summary judgment, the Court considers only admissible evidence. *Lively v. Wayfarer Studios LLC*, 828 F. Supp. 3d 375, 400 (S.D.N.Y. 2026).

## IV. NEW YORK LAW GOVERNS EVERY CAUSE OF ACTION IN THE COMPLAINT

### A. The Governing Choice-of-Law Framework

A federal court sitting in diversity applies the forum state's choice-of-law rules. *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 734 (S.D.N.Y. 2025). Under New York law, the first step is to determine whether an actual conflict exists; if not, New York law applies. *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433-34 (2d Cir. 2012). The inquiry proceeds issue by issue. *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 200 (S.D.N.Y. 2015). And where the parties' submissions assume New York law controls, "such implied consent . . . is sufficient to establish choice of law." *Krumme v.*

*WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (citation omitted). Plaintiffs' Complaint pleads New York-law claims and was originally filed in New York Supreme Court. Where a conflict exists, New York enforces contractual choice-of-law clauses, *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 470 (2015), and for conduct-regulating tort rules applies the law of the place of injury. *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521–22 (1994); *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284-85 (2d Cir. 2006).

**B. New York Choice of Law Clauses Govern the Contract Claims.**

The First Cause of Action alleges that Abel breached her employment agreement with Jonesworks. That agreement includes a New York choice of law provision. The Third Cause of Action alleges that Wayfarer and Baldoni breached the Wayfarer Agreement, which also has a New York choice of law provision. R.56.1 ¶ 9. New York enforces such clauses as written. *Ministers & Missionaries*, 26 N.Y.3d at 470. Accordingly, for purposes of this motion,[1] Defendant will apply New York law to the First and Third Causes of Action.

**C. New York Law Governs the Tortious Interference Claims.**

The Second and Fourth Causes of Action allege interference with the Abel Employment Agreement and the Wayfarer Agreement, contracts Plaintiffs allege are governed by New York law. Compl. ¶¶ 25, 32, 38, 113–21, 131–37. Under both New York and California law, the tort requires a valid contract, knowledge, intentional procurement of breach without justification, causation, and damages. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996); *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). The only difference is that

[1] In *Medtronic, Inc. v. Walland*, 2021 WL 4131657, at *7 (S.D.N.Y. Sept. 10, 2021), the court invalidated non-compete agreements based on California's public interest despite a New York choice-of-law provision. This Court has held to the contrary finding that the New York choice-of-law provision in Abel's employment contract is enforceable. *Lively v. Wayfarer Studios LLC*, 2025 WL 2884407, at *5 (S.D.N.Y. Oct. 9, 2025).

California permits recovery for "disruption" absent actual breach. *First Hill Partners LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 635 (S.D.N.Y. 2014).

New York law resolves that conflict. The contracts are New York contracts between New York-based Jonesworks and its counterparties, and whether a valid contract existed and was breached cannot sensibly be decided under a different body of law; the parties' choice of New York law also reflects their expectations. Compl. ¶¶ 17, 25, 32, 38; *see Padula*, 84 N.Y.2d at 522. And Plaintiffs allege their injury occurred in New York, the locus of the tort. Compl. ¶¶ 24, 26; *White Plains Coat & Apron*, 460 F.3d at 284–85; *Travelsavers Enters., Inc. v. Analog Analytics Inc.*, 53 N.Y.S.3d 99, 105-06 (2d Dep't 2017).

**D. New York Law Governs the Faithless Servant and Breach of Fiduciary Duty Claims.**

The Fifth and Sixth Causes of Action rest on the duty of loyalty Abel undertook in the Abel Employment Agreement. Compl. ¶¶ 138-47 (quoting Abel Employment Agreement § 9.2). A duty created by a New York-law contract is governed by New York law. *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). Nor is there any material conflict: both states require a duty, breach, and resulting damages, and both permit an employee to prepare to compete so long as she does not misuse confidential information or solicit clients before leaving. *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013), *on reconsideration*, 2014 WL 13109132 (S.D.N.Y. Apr. 14, 2014); *Marzec v. Pub. Emps.' Ret. Sys.*, 236 Cal. App. 4th 889, 915 (2015); *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 929 (1977); *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007).

**E. New York Law Governs the Defamation Claim Against Abel.**

The Seventh Cause of Action alleges that Abel defamed Plaintiffs to participants in the public relations industry. Compl. ¶¶ 148–55. New York and California do not conflict on the elements material here. *Compare Geraci v. Probst*, 877 N.Y.S.2d 386, 388 (2d Dep't 2009), *aff'd*

*as modified and remanded*, 15 N.Y.3d 336 (2010), *with Billauer v. Escobar-Eck*, 88 Cal. App. 5th 953, 966 (2023). In any event, the plaintiff's domicile "will usually have the most significant relationship" to a multistate defamation claim, *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (citation omitted), and Jonesworks is headquartered in New York. Compl. ¶ 17.

## V. JONES IS NOT A PROPER PLAINTIFF ON ANY OF THE CONTRACT-BASED OR DUTY-OF-LOYALTY CLAIMS

Jones improperly joins Jonesworks in the First through Sixth Causes of Action. Abel's employment agreements were between Abel and Jonesworks, and the Wayfarer Agreement is between Wayfarer and Jonesworks. R.56.1 ¶¶ 1-3, 13-14. Jones signed only in a representative capacity, which does not make her a party. *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991). A non-party cannot sue for breach unless she is an intended third-party beneficiary, which Jones does not plead. *Camac Fund, LP v. Nabors Energy Transition Sponsor II LLC*, 835 F. Supp. 3d 467, 474 (S.D.N.Y. 2026); *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005). The Abel Employment Agreement's [redacted] clause independently bars her. R.56.1 ¶ 23; *India.com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005). Nor is Jones a third-party beneficiary of the Wayfarer Agreement. The alleged injury—unpaid fees, lost clients, and misused information—belongs to the LLC. Her label as "Jonesworks designee" changes nothing; a designee acts for the contracting party. Compl. ¶ 123; *see Lerner*, 938 F.2d at 5. As an LLC member, Jones lacks standing to sue for a wrong to Jonesworks and is at most an incidental beneficiary. *Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*, 776 F. App'x 1, 3 (2d Cir. 2019); *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006).

Jones lacks standing on the interference claims for the same reason: the tort protects only "the plaintiff's enforceable legal rights," and Jones cannot enforce either agreement. *Carvel Corp.*

*v. Noonan*, 3 N.Y.3d 182, 189 (2004) (citation omitted). And the faithless servant and fiduciary duty claims fail as to Jones because Abel owed her no duty. Those claims rest on an agent's duty to her principal, *S. Pierre Assocs. v. Meyers*, 820 N.Y.S.2d 485, 488 (Civ. Ct. N.Y. Cnty. 2006), and the contractual fiduciary provision runs to the "Company," defined as Jonesworks. Compl. ¶¶ 139, 145–47; R.56.1 ¶¶ 1, 14, 22.

## VI. PLAINTIFFS CANNOT PROVE ABEL BREACHED HER EMPLOYMENT AGREEMENT

Plaintiffs appear to rely on the Abel Employment Agreement's confidentiality, non-competition, non-solicitation, and loyalty provisions, alleging that Abel misused confidential information, competed with Jonesworks within six months of leaving, solicited clients and employees, and worked against Jonesworks' interests. Compl. ¶ 110. Plaintiffs must prove a contract, their performance, the defendant's breach, and resulting damages. *Dee v. Rakower*, 976 N.Y.S.2d 470, 474 (2d Dep't 2013).

### A. The Non-Competition Provision Is Unenforceable.

The agreement bars Abel, for six months after termination, from participating in any business "in direct competition in any manner whatsoever with the Company." R.56.1 ¶ 17. "New York courts are generally reluctant to enforce restrictive covenants contained in employment agreements…." *Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*, 797 N.Y.S.2d 883, 886 (Sup. Ct. N.Y. Cnty. 2005). New York enforces such covenants only if the restriction "(1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999) (emphasis added). A non-compete may not prevent ordinary competition, *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307–08 (1976) and is unreasonable where it lacks a tailored geographic scope or reaches the employer's entire client

base. *Good Energy, L.P. v. Kosachuk*, 853 N.Y.S.2d 75, 77 (1st Dep't 2008); *Permanens Cap. L.P. v. Bruce*, 2022 WL 3442270, at *11 (S.D.N.Y. July 22, 2022), *report and recommendation adopted*, 2022 WL 4298731 (S.D.N.Y. Sept. 19, 2022).

The provision in Abel's employment agreement lacks a geographic limit despite Jonesworks' offices in only New York and Los Angeles, bars competition [redacted] and reaches Jonesworks' entire client base rather than the clients Abel served. R.56.1 ¶¶ 17-19. It would effectively bar Abel, a publicist, from earning a living and is far greater than needed to protect any legitimate interest. *BDO Seidman*, 93 N.Y.2d at 391. Nor should the Court invoke the blue-pencil clause, because doing so would require "wholesale re-drafting." *Denson v. Donald J. Trump for President, Inc.*, 530 F. Supp. 3d 412, 436 (S.D.N.Y. 2021); *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 780 N.Y.S.2d 675, 677-78 (3d Dep't 2004). Plaintiffs seek to impose liability for simply "directly competing with Jonesworks," Compl. ¶ 110—an ordinary-competition theory New York does not protect.

**B. Jonesworks Waived the Non-Competition Clause.**

Where an employer knowingly consents to conduct that would otherwise violate a restrictive covenant in an employment agreement, it waives its right to seek enforcement of those restrictive covenants. *Empire Fin. Servs., Inc. v. Bellantoni*, 861 N.Y.S.2d 898, 900 (4th Dep't 2008) (affirming summary judgment on breach of contract and tortious interference claims where employer knowingly waived restrictive covenant); *see also Int'l Shared Servs., Inc. v. McCoy*, 686 N.Y.S.2d 828, 829 (2d Dep't 1999) (employer "waived its right to enforce the restrictive covenant by knowingly aiding the defendant in his efforts to obtain competing employment").

As set forth above, [redacted] *See* Section II.C, *supra*.

Those clients included [redacted] R.56.1 ¶ 44. Jones also testified that [redacted] R.56.1 ¶ 40. Having consented to Abel's taking those clients, Plaintiffs waived enforcement of the non-compete and cannot recover for the very conduct they authorized.

### C. The Duty of Loyalty Provision Is Unenforceable as Patently Subjective.

The agreement also provides that Abel breaches her duty of loyalty if she [redacted] during her employment. R.56.1 ¶ 22. The agreement does not define [redacted] a standard that is inherently subjective and therefore unenforceable. *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 516 (S.D.N.Y. 2011) (holding clause in employment agreement requiring defendants to "'devote [his or her] skills and best efforts to [the company]'" and "[] work to further the best interests of [the company]" unenforceable as "patently subjective" because "no objective criteria or standards against which Defendants' [] efforts can be measured are set forth in the Employment Agreement"). The agreement offers no objective criteria for deciding whether any action Abel takes is in Jonesworks' "best interests." Indeed, Duren, Jonesworks' former Chief of Staff and Vice President, could not say whether Abel ever worked against the interests of Jones or Jonesworks and had never seen any document showing that she had. R.56.1 ¶ 140. The clause is patently subjective and unenforceable.

### D. Abel Did Not Solicit or Attempt to Solicit Jonesworks' Employees.

Abel's agreement provides that she shall not [redacted]

[redacted] R.56.1 ¶ 20. Plaintiffs claim that Abel breached this provision by [redacted]. R.56.1 ¶ 137. However, Abel never solicited, employed, or offered jobs to any of these employees. R.56.1 ¶ 138. Plaintiffs provide no evidence to support their unfounded theory that Abel induced these employees to leave Jonesworks. R.56.1 ¶¶ 139-140. Moreover, although [redacted] R.56.1 ¶ 141.

Summary judgment is proper where a plaintiff fails to present any evidence that the defendant solicited employees or clients. *See FTI Consulting, Inc. v. Graves*, 2007 WL 2192200, at *8 (S.D.N.Y. July 31, 2007). Courts applying New York law routinely dismiss restrictive-covenant claims where the employer offers no evidence of actual solicitation. *See Corvetti v. J & S Mills, Inc.,* 607 N.Y.S.2d 389, 390 (2d Dep't 1994) (dismissing non-solicitation counterclaims where "[t]here is no evidence in the record that either plaintiff solicited the mill's business other than the defendants' non-specific and conclusory allegations"); *Ronald W. Freeman, P.C. v. Zhu*, 618 N.Y.S.2d 316, 316 (1st Dep't 1994) (affirming summary judgment for former employee where employer failed to produce "evidentiary proof, in admissible form, sufficient to establish the existence of material issues of fact" regarding alleged breach of non-solicitation clause); *Perella Weinberg Partners LLC v. Kramer*, 218 N.Y.S.3d 297, 299 (1st Dep't 2024) (summary judgment

should have been granted dismissing non-solicitation claims where employer failed to raise an issue of fact as to whether defendants solicited).

### E. Abel Did Not Solicit or Attempt to Solicit Jonesworks' Clients.

The agreement provides that Abel shall not use Jonesworks' confidential information [redacted] R.56.1 ¶ 21. Plaintiffs accuse Abel of soliciting six former Jonesworks clients: [redacted] R.56.1 ¶¶ 21, 142. But Jonesworks' former Chief of Staff, Duren, [redacted] R.56.1 ¶ 143. The client-by-client evidence confirms that Abel solicited no one. Nor has Jonesworks produced any evidence to show otherwise.

Jamie Miller Projects, LLC [redacted] R.56.1 ¶ 144. On August 5, 2024, Jamie Miller's team notified Jonesworks that [redacted] R.56.1 ¶ 145. [redacted] R.56.1 ¶ 146. Abel signed Miller to Jonesworks in 2024 and managed his account with almost no involvement from Jones. R.56.1 ¶ 147. RWA has not been retained by Jamie Miller Projects. R.56.1 ¶ 148. And Duren [redacted] R.56.1 ¶ 149.

Lainey Wilson [redacted] R.56.1 ¶ 150. Wilson [redacted] R.56.1 ¶ 151. Wilson has not retained RWA since leaving Jonesworks. R.56.1 ¶ 152.

Neon Carnival [redacted] R.56.1 ¶ 153. [redacted] R.56.1 ¶ 153. [redacted] R.56.1 ¶ 153. Former Jonesworks employee Johnny Gines signed Neon Carnival to Jonesworks. R.56.1 ¶ 154. When Gines left Jonesworks in October 2024, Neon Carnival followed him. R.56.1 ¶ 154. Neon Carnival left Jonesworks because it wanted to stay with Gines, not because of any conduct of Abel. R.56.1 ¶ 154. Neon Carnival has not retained RWA since leaving Jonesworks, although Abel performed freelance work for Neon Carnival's 2025 Coachella event. R.56.1 ¶ 155.

Jameela Jamil was Abel's client for years before Abel went to work for Jonesworks. R.56.1 ¶ 156. Jamil [redacted] R.56.1 ¶ 157. [redacted] R.56.1 ¶ 157. Jamil left Jonesworks because she was not satisfied with the lack of attention from Jones and the high cost. R.56.1 ¶ 159. Jamil notified Jonesworks she was going on hiatus in May 2024, two months before Abel gave notice of her resignation. R.56.1 ¶ 158. In any event, Jones gave Abel permission to take Jamil with her to her new public relations company, waiving any claim based on Jamil's move. R.56.1 ¶¶ 44, 158. *See* Section VI.B, *supra*.

Den of Thieves [redacted] R.56.1 ¶ 160. [redacted] R.56.1 ¶ 160. [redacted]. R.56.1 ¶ 161. Abel had almost no involvement with Den of Thieves while at Jonesworks and has not spoken to anyone from the company since she left. R.56.1 ¶ 162. [redacted] R.56.1 ¶ 161. Den of Thieves has not retained RWA since leaving Jonesworks. R.56.1 ¶ 162.

Wayfarer [redacted] *See* Section II.A, *supra*; R.56.1 ¶¶ 1, 4. Abel did not tell Heath, Baldoni, or anyone else at Wayfarer of her resignation until after Jones accepted it, and she did not ask them to follow her to a new firm. R.56.1 ¶ 38. Plaintiffs gave Abel consent to take Wayfarer as a client and thus waived their right to seek damages for Wayfarer leaving Jonesworks. R.56.1 ¶¶ 41-43; *see* Sections II.C, VI.B, *supra*. And, as shown above, Wayfarer terminated Jonesworks on August 30, 2024 because of Jones' own conduct. *See* Section II.F, *supra*; R.56.1 ¶¶ 97-102. Wayfarer would not have renewed its agreement with Jonesworks because of Jones' conduct, not Abel's. R.56.1 ¶ 105.

**F. Plaintiffs Cannot Prove Causation and Damages.**

A plaintiff asserting breach of contract must prove that the "defendant's breach directly and proximately caused his or her damages." *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, 706 F. Supp. 3d 409, 441 (S.D.N.Y. 2023), *aff'd*, 2025 WL 1374732 (2d Cir. May 13, 2025) (citation omitted). Plaintiffs bear the burden "to prove that the defendant's breach was a significant, if not the exclusive, cause of the injury." *Point Prods. A.G. v. Sony Music Ent., Inc.*,

215 F. Supp. 2d 336, 343 (S.D.N.Y. 2002), *opinion amended on reconsideration*, 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002). Consequential damages are available only to the extent they were foreseeable to the parties when they contracted. *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993) ("The rule that damages must be within the contemplation of the parties is a rule of foreseeability. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made").

Plaintiffs cannot show that any alleged breach proximately caused their damages. Plaintiffs seek damages from Abel for [redacted] R.56.1 ¶¶ 163, 170. As shown above, Plaintiffs fail to meet their burden to show that Abel solicited or encouraged any employees to leave Jonesworks, or that she used Jonesworks' proprietary information to encourage any client to leave. Thus, Plaintiffs cannot prove damages related to the Wayfarer Agreement, lost profits from allegedly solicited clients, or the costs to replace allegedly solicited employees. In addition, Plaintiffs have presented no evidence of lost profits because their expert simply assumed, without any evidence, that certain clients would have stayed with Jonesworks for two additional years after their contracts terminated. R.56.1 ¶ 166. Indeed, Wayfarer would not have stayed with Jonesworks past its contractual term because it was dissatisfied with Jones' conduct, not Abel's. R.56.1 ¶ 105.

Nor are the costs of replacing Abel contract damages. Abel gave notice of her resignation on July 10, 2024, and Jonesworks fired her two days before her agreed departure date (August 23, 2024). *See* Sections II.C, II.E, *supra*. Yet Plaintiffs cannot keep their story straight: they say both

[redacted] R.56.1 ¶ 59. Either way, Plaintiffs do not explain how the cost of replacing Abel flows from the breach of any contractual obligation, and their own expert attributes these damages solely to the tortious interference claim. R.56.1 ¶ 167. Nor can Jonesworks support the number. It claims [redacted] to replace Abel, but its corporate designee [redacted] R.56.1 ¶ 168. Jonesworks' former Chief of Staff [redacted] R.56.1 ¶ 169. Disgorgement of Abel's compensation relates to Plaintiffs' faithless servant claim, and no breach of contract caused it. *Kleeberg v. Eber*, 331 F.R.D. 302, 319 (S.D.N.Y. 2019) ("An employer who successfully raises a claim under the faithless servant doctrine is entitled to seek the disgorgement of any compensation paid to that employee during his or her period of disloyalty that directly relates to their disloyal acts").

Finally, Plaintiffs attribute all of their reputational harm to statements on anonymous websites, the subject of the now-dismissed Eighth Cause of Action. R.56.1 ¶ 170. Therefore, Plaintiffs cannot show causation or damages based on the breach of any contractual obligation.

## VII. PLAINTIFFS' FAITHLESS SERVANT AND BREACH OF FIDUCIARY DUTY CLAIMS DUPLICATE THEIR BREACH OF CONTRACT CLAIM

"The faithless servant doctrine holds that '[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his [or her] services is generally disentitled to recover his [or her] compensation, whether commissions or salary.'" *Panos v. Mid Hudson Med. Grp., P.C.*, 167 N.Y.S.3d 539, 541 (2d Dep't 2022) (citation omitted). To the extent Plaintiffs seek disgorgement of Abel's compensation in their breach of contract cause of action, the faithless

servant claim is duplicative, and the Court should dismiss it. *See IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 290-91 (2023) (dismissing duplicative causes of action).

Similarly, "[w]here a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract and must be dismissed." *Great Am. Ins. Co. v. Gemstone Prop. Mgmt. LLC*, 2025 WL 2196886, at *12 (S.D.N.Y. Aug. 1, 2025) (citation omitted). "A breach of fiduciary duty claim is duplicative when it is based on allegations of fiduciary wrongdoing that are expressly raised in plaintiff's breach of contract claim." *Id.* (citation omitted).

Plaintiffs' First Cause of Action asserts that Abel breached her employment agreement, in part, by "breaching her duty of loyalty to Jonesworks by working against the interests of Jones and Jonesworks during her period of employment." Compl. ¶ 110. The Sixth Cause of Action cites Section 9.2 of the agreement and alleges that "Abel was an employee at Jonesworks from July 2020 through August 21, 2024, and during that period owed Jonesworks 'a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of [Jonesworks].' Abel Employment Agreement ¶ 9.2." Compl. ¶ 145. Plaintiffs do not allege that Abel owed any fiduciary duty beyond her contractual obligations. Moreover, Abel's alleged breaches involve the same conduct that constitutes her alleged breach of contract, including acting against Jonesworks' interests, accessing proprietary information, and inducing Jonesworks' employees to leave the company. *Id.* ¶ 146. The claim therefore duplicates Plaintiffs' breach of contract claim, and the Court must dismiss it. Even if the fiduciary duty claim were not duplicative, it would fail because it rests on the same patently subjective [redacted] language. *See* Section VI.C, *supra*.

## VIII. <u>ABEL IS ENTITLED TO SUMMARY JUDGMENT ON JONES' DEFAMATION CLAIM</u>

### A. Jones Cannot Identify the Defamatory Words or Their Recipients.

"Under New York law, a claim for libel or slander must set forth the defamatory words with particularity and state what was said by whom, to whom, and when." *Caulfield v. Imagine Advisors, Inc.*, 2007 WL 4615504, at *10 (S.D.N.Y. Dec. 27, 2007); N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the particular words complained of shall be set forth in the complaint…"). "In defamation cases California follows a similar pleading rule, under which 'the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.'" *Glassdoor, Inc. v. Super. Ct.*, 9 Cal. App. 5th 623, 635 (2017).

A court cannot decide whether words are actionable without knowing what they are because the "words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Cardali v. Slater*, 57 N.Y.S.3d 342, 346 (N.Y. Sup. Ct.), *judgment entered*, (N.Y. Sup. Ct. 2017), and *aff'd*, 167 A.D.3d 476 (N.Y. App. Div. 2018) (citation omitted).

Plaintiffs fail to allege with particularity, or provide any evidence of (1) the allegedly defamatory words stated by Abel and (2) to whom Abel allegedly made the statements. Plaintiffs allege that "[b]etween September and December 2024, Abel made statements to certain third parties, including participants in the public relations industry asserting, among other things, that Jones had doctored and falsified text messages purporting to be from Abel and was attempting to distribute them to third parties in order to harm Abel and paint Abel in a false light." Compl. ¶ 149. Plaintiffs do not identify specific statements for which they seek relief. As to the statements regarding Jones' doctoring or falsifying text messages, Plaintiffs do not indicate whether their allegations represent the actual words allegedly uttered by Abel or merely paraphrase her

statements rendering the claim facially deficient. *BCRE 230 Riverside LLC v. Fuchs*, 874 N.Y.S.2d 34, 36 (1st Dep't 2009). Because Plaintiffs offer no evidence that the statements identified in the Complaint were the particular words Abel used, the trier of fact cannot determine whether they were "[l]oose, figurative or hyperbolic statements." *Wolberg v. IAI N. Am., Inc.*, 77 N.Y.S.3d 348, 351 (1st Dep't 2018) (citation omitted).

Even if Plaintiffs identified the allegedly defamatory statements, they do not identify the recipients, other than unnamed "participants" in the public relations industry. Compl. ¶ 149; *Luethke v. Seagram Co.*, 2000 WL 1880324, at *3 (S.D.N.Y. Dec. 28, 2000) (dismissing defamation claim where plaintiff failed to allege "to whom [the defamatory statements] were made"). The Court should grant summary judgment on the defamation claim.

### B. Plaintiffs Offer No Evidence of Damages Caused by Abel's Alleged Defamation.

Plaintiffs claim reputational harm from Defendants' conduct. R.56.1 ¶ 163. But their expert attributed Plaintiffs' reputational harm and lost profits solely to the allegedly false statements on anonymous websites (the "Websites") and in an August 2024 Business Insider article, all of which predate any statement Abel allegedly made about doctored text messages. See Section VI.F, *supra*; R.56.1 ¶¶ 170-171. Plaintiffs offer no evidence, through experts or otherwise, that any other allegedly defamatory statements caused any amount of lost profits or reputational harm. Thus, the Court should grant summary judgment on the defamation claim against Abel.

### C. Plaintiffs Cannot Prove Defamation Per Se.

New York law provides that a defamation plaintiff need not prove actual damages if the defamation qualifies as "defamation per se." *Fernandes v. Fernandes*, 227 N.Y.S.3d 642, 643 (2d Dep't 2025). However, "defamation per se 'is limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made

with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities.'" *Id.* at 644. Nor may a plaintiff establish defamation per se based on a single instance of alleged misconduct: "The single instance rule is an exception to the general per se rule, pertaining to language that charges a party with a single dereliction in connection with the conduct of a business, trade, or profession. In such instances, because the 'statement does not accuse a party of general ignorance or lack of skill, it is not deemed actionable unless special damages are pleaded and proven.'" *VIP Pet Grooming Studio, Inc. v. Sproule*, 203 N.Y.S.3d 681, 691 (2d Dep't 2024) (citation omitted). "The New York Court of Appeals has held that, for a statement to qualify as defamation *per se* under the professional conduct exception, the statement must specifically reference conduct that is incompatible with a person's profession, 'rather than a more general reflection upon the plaintiff's character or qualities.'" *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 180 (S.D.N.Y. 2024) (citation omitted).

Abel's alleged statement that Jones falsified and doctored Abel's text messages does not qualify as defamation per se. First, Plaintiffs do not contend that the statements accuse them of a crime. Compl. ¶ 151. Second, the statements are not directly tied to Plaintiffs' profession and do not reference conduct incompatible with working in the public relations industry. Rather, they are a general reflection on Jones' character, i.e., her alleged willingness to alter text messages to make a former employee look bad. Third, because Plaintiffs have not identified how many times Abel made the allegedly defamatory statements, the Court cannot determine whether the single instance rule applies, even if the statements referenced conduct incompatible with Plaintiffs' profession. *VIP Pet Grooming Studio*, 203 N.Y.S.3d at 691. Plaintiffs therefore must prove special damages,

which they cannot do, given that they have attributed all "defamation" damages to the statements made by the Doe defendants on the Websites and in the *Business Insider* article.

## IX. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE THIRD CAUSE OF ACTION FOR BREACH OF THE WAYFARER AGREEMENT

Jonesworks' Third Cause of Action alleges that Wayfarer and Baldoni breached the Wayfarer Agreement by failing to pay Jonesworks' fees after Wayfarer terminated Jonesworks, inducing Abel "to depart" Jonesworks and "employing Abel following her departure from Jonesworks." Compl. ¶¶ 123, 128. The evidence is to the contrary.

### A. Baldoni Is Not a Proper Defendant Because He Is Not a Party to the Wayfarer Agreement

New York law requires Jonesworks to establish: (1) a valid contract; (2) Jonesworks' performance; (3) Wayfarer's breach; and (4) resulting damages. *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). A non-party to an agreement cannot be liable for its breach. *Randall's Is. Aquatic Leisure, LLC v. City of New York*, 938 N.Y.S.2d 62, 63 (1st Dep't 2012) ("There can be no breach of contract claim against a non-signatory to [a] contract"). Baldoni is not a signatory to the Wayfarer Agreement and therefore, Jonesworks cannot establish a valid contract or breach by Baldoni. R.56.1 ¶ 3. The Wayfarer Agreement [redacted], was signed by Wayfarer's prior CEO on Wayfarer's behalf and provides that [redacted] *Id.* Wayfarer paid Jonesworks' invoices. Simply put, Baldoni is not a party to the Wayfarer Agreement, and as a non-party, Baldoni is not bound by the Wayfarer Agreement and cannot be liable for its breach.[2] *See GMH Cap. Partners v. CBRE Cap. Adv.*, 2026 WL 851350, at *3-4 (S.D.N.Y. March 27, 2026) (dismissing breach of contract claim

---

[2] Baldoni had a pre-existing, separate oral agreement with Jonesworks for public relations services personal to Baldoni, at a rate of $5,000 per month.

against non-party); *Gastineau v. ESPN, Inc.*, 2026 WL 734841, at *6 (S.D.N.Y. Mar. 16, 2026) (same). Accordingly, the Third Cause of Action should be dismissed against Baldoni.

### B. Jonesworks' Material Breach of the Wayfarer Agreement Relieved Wayfarer of Its Obligations Under the Agreement.

The Wayfarer Agreement obligated Jonesworks to provide strategic communications services [redacted] *See* Section II.A, *supra*; R.56.1 ¶¶ 1-2, 6. In exchange, Jonesworks agreed to [redacted] R.56.1 ¶ 6. "A party to a bilateral contract, when faced with a breach by the other party, must make an election between declaring a breach and terminating the contract or, alternatively, ignoring the breach and continuing to perform under the contract." *Rebecca Broadway Ltd. P'ship v. Hotton*, 37 N.Y.S.3d 72, 80–81 (1st Dep't 2016); *see also Computer Possibilities Unlimited v. Mobil Oil Corp.*, 747 N.Y.S.2d 468, 477 (1st Dep't 2002); *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 155-56 (1st Dep't 2007), *aff'd*, 14 N.Y.3d 791 (2010). The Wayfarer Agreement incorporates this concept [redacted] In the event of a termination based on a material breach, the [redacted] R.56.1 ¶ 5. Jonesworks seeks approximately $200,000 in fees allegedly owed for the eight months between Wayfarer's termination of the Wayfarer Agreement on August 30, 2024 and the expiration of the Wayfarer Agreement. Jonesworks is not entitled to these post-termination fees or any other relief for an alleged breach of the Wayfarer Agreement.[3]

[3] Jonesworks' expert glancingly mentions [redacted] However, these damages are not identified as breach of contract damages in the Complaint, [redacted] R.56.1 ¶ 164.

Uncontroverted evidence establishes that Jonesworks breached material provisions of the Wayfarer Agreement by failing to act in a professional manner, failing to advance and indeed undermining Wayfarer's goals and trading information obtained through its position of trust to an adverse party, without notice to Wayfarer. Hanks summed it up, testifying that Wayfarer terminated Jonesworks because of "Stephanie [Jones] being unprofessional[,] [e]motional instability and undermining what was in the best interest of Wayfarer." R.56.1 ¶ 98. As detailed in Section II.F, *supra*, Jones defied Wayfarer's repeated instructions not to engage with the media about the Lively-Baldoni dispute during the tense period leading up to the release of the Film, contacted the *Daily Mail*, called Sloane and destroyed the truce, and passed Wayfarer's communications to Lively's camp. R.56.1 ¶¶ 66-85.

In direct contravention of Wayfarer's instruction and stated goal of quieting the public uproar, Jones contacted the Daily Mail to [redacted] the situation. R.56.1 ¶ 66. Sony advised Wayfarer that [redacted] R.56.1 ¶ 71. When Jones denied the allegation, Heath had a heated conversation with Jones in which he ordered her to stand down and cease all further communications concerning the Lively-Baldoni dispute. R.56.1 ¶¶ 73-76. On August 9, 2024, following the Daily Mail episode, Wayfarer repeated its directive to Jones to stop communicating or acting on its behalf. R.56.1 ¶ 79. Jones subsequently [redacted] R.56.1 ¶¶ 80-85.

On or about August 21, 2024, Sloane contacted Nathan, to inform her that Sloane had seen text messages between Abel and Wayfarer that Jones had downloaded after seizing Abel's phone on the day of her departure. R.56.1 ¶ 90. Jones was the only person who had possession and control of Abel's texts and therefore was the only possible source of the messages provided to Sloane. This was the last straw. That same day, Heath advised Jones that he was [redacted]

about Jonesworks' conduct. R.56.1 ¶ 93. On August 29, 2024, Jones told Heath: [redacted] R.56.1 ¶ 95. On August 30, 2024, Wayfarer gave written notice of termination of the Wayfarer Agreement, effective September 1, 2024. R.56.1 ¶ 102. Jones replied that [redacted] R.56.1 ¶ 103.

Refusing to accept the termination, or take any responsibility for Jones' actions, Jonesworks did not cure the breaches identified by Wayfarer. Nor could it, as the damage was done and could not be reversed. Nor was this the end of Jonesworks' efforts to sabotage its client. While Jonesworks was still representing Wayfarer, Jones [redacted]. *See* Section II.F, *supra*; R.56.1 ¶¶ 106-118. Lively caused Vanzan, a shell entity she controlled, to file that complaint, which had no purpose but to facilitate Jones' transfer of the messages to Lively under the protection of the litigation privilege. R.56.1 ¶ 115. Those cherry-picked texts later featured in a New York Times story. They ultimately proved nothing in *Lively v. Wayfarer*, but they harmed Wayfarer simply by being shared—exactly the result a publicist is retained to prevent.

This Court has already observed that "[t]here is no question that the actions Jonesworks is accused of having taken would have been viewed as defeating the object of the services to be provided if they were taken at the incipiency of the relationship. Taken as true, they are not less destructive of the object of the relationship because they were taken in its twilight." Dkt. No. 233 at 22. Still, Jonesworks is demanding post-termination fees. However, Jonesworks' material

breach relieved Wayfarer of all obligations under the Wayfarer Agreement as a matter of law and under the express terms of the Wayfarer Agreement which provided for Wayfarer to terminate the Wayfarer Agreement for a material breach without any obligation to pay post-termination fees.

In sum, the evidence unequivocally establishes that Jonesworks materially breached the Wayfarer Agreement by failing to provide public relations services in a professional manner, failing to execute on Wayfarer's instructions and goals, betraying its client's trust by passing information obtained through its position as Wayfarer's publicist to Wayfarer's adversary and, in fact, sabotaging Wayfarer's stated goal of chilling the public controversy. A publicist's fundamental duty is to protect its client; Jonesworks did the opposite, all while demanding payment of its fees. Jonesworks' material breach extinguished Wayfarer's obligations under the Wayfarer Agreement including the obligation to pay post-termination fees, as well as any perceived obligation not to retain Abel's services.

### C. Wayfarer Did Not Breach the Wayfarer Agreement's Non-Solicitation Clause.

Plaintiffs allege that Wayfarer and Baldoni breached the Wayfarer Agreement by soliciting and inducing Abel "to depart" Jonesworks and "employing Abel, who was already handling Wayfarer's account, following her departure from Jonesworks." Compl. ¶¶ 123, 128. The Wayfarer Agreement provides:

[redacted]

R.56.1 ¶ 8.

As shown above, Wayfarer terminated the Wayfarer Agreement in response to Jonesworks' material breaches. The termination released Wayfarer from any obligation under the Wayfarer

Agreement including the prohibition against employing Abel. Moreover, even absent termination, the evidence (or lack thereof) defeats Jonesworks' claim that Wayfarer breached the Wayfarer Agreement by soliciting or inducing Abel to resign from Jonesworks. Abel announced her resignation on July 10, 2024, on the heels of an extremely abusive conference call with Jones. R.56.1 ¶¶ 29-31. The decision was hers alone. R.56.1 ¶ 32. Abel had been unhappy at Jonesworks for some time due to frequent disagreements with Jones and Jones' notoriously abusive and erratic behavior. R.56.1 ¶¶ 27-28.

Wayfarer and Baldoni did not know that Abel intended to resign before Abel gave notice. R.56.1 ¶ 36. There is not a whit of evidence that Wayfarer, Baldoni, or any other defendant encouraged or otherwise induced Abel to resign. Given the lack of any admissible evidence that any defendant by word or deed induced or encouraged Abel to resign before July 10, 2024, Wayfarer is entitled to summary adjudication on the issue of whether Wayfarer breached the Wayfarer Agreement by soliciting or encouraging Abel to resign from Jonesworks And Jones did not object to Abel's departure or Abel's decision to start a competing agency. Demonstrating Jones' consent, on July 26, 2024 Jones texted Abel: [redacted] R.56.1 ¶ 42. Although Jones characterized the text as sent [redacted] she acknowledged that at the time [redacted] R.56.1 ¶ 43. That written consent falls within the covenant's own exception for conduct with "such party's prior written consent." *See Empire Fin. Servs.*, 861 N.Y.S.2d at 900 (affirming summary judgment dismissing breach of restrictive covenants where employer encouraged employees to obtain employment with competitor, and "[n]othing in the record" supported a claim that the waiver was temporary").

## X. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE SECOND AND FOURTH CAUSES OF ACTION FOR TORTIOUS INTERFERENCE WITH

**CONTRACT**

Under New York law, "[t]ortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding*, 88 N.Y.2d at 424; *accord Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006). The plaintiff also must show "that the contract would not have been breached but for the defendant's conduct." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 343 (2d Cir. 2024) (citation omitted). California law is materially the same, with one exception: California permits recovery for either an actual breach or a disruption of the contract, while New York requires an actual breach. *First Hill Partners*, 52 F. Supp. 3d at 635; *Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1133-34 (9th Cir. 2015).

Plaintiffs cannot establish four of these elements, and each failure is independently fatal. No defendant knew of Abel's contract or its restrictive covenants. Abel resigned on her own, before any defendant was involved, so no defendant was the but-for cause of any breach. No defendant did anything for the purpose of inducing a breach. And there was no actionable breach of an enforceable obligation (or, under California law, disruption of the contract). The Court should enter summary judgment on both interference claims.

**A. Wayfarer, Baldoni, and Nathan Are Entitled to Summary Judgment on the Second Cause of Action for Tortious Interference with Abel's Employment Agreement.**

**1. Plaintiffs Cannot Establish Actual Knowledge.**

The tortious interference claim fails at the first element: Plaintiffs have no evidence that any defendant knew Abel had a written employment agreement, let alone what it said. A defendant cannot interfere with a contract it does not know exists. Plaintiffs must prove that, at the time of



535165.1

the alleged interference, the defendant had "actual knowledge of the specific contract" at issue. *Linkco, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 495 (S.D.N.Y. 2002) (citation omitted); *Bogoni v. Friedlander*, 610 N.Y.S.2d 511, 514-16 (1st Dep't 1994) (reversing jury verdict for tortious interference because defendants were unaware of the plaintiff's joint venture agreement when they contracted with the co-venturer). Plaintiffs must also prove that defendants knew of the "specific provision[s] with which [they were] alleged to have interfered," because no one can intentionally procure the breach of a covenant he does not know about. *Reach Music Publ'g, Inc. v. Warner/Chappell Music, Inc.*, 2014 WL 5861984, at *10–11 (S.D.N.Y. Nov. 10, 2014); *see*, *e.g.*, *N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 2013 WL 1500333, at *4 (S.D.N.Y. Apr. 12, 2013); *Davis v. Nadrich*, 174 Cal. App. 4th 1, 10-11 (2009), *as modified* (May 21, 2009).

No Defendant knew that Abel had a written employment agreement with Jonesworks, much less that it contained the non-compete, non-solicitation, and confidentiality provisions Plaintiffs claim were breached. R.56.1 ¶ 119. Plaintiffs have no contrary evidence. [redacted] R.56.1 ¶ 121.

Plaintiffs are left with speculation. They allege, "on information and belief," that defendants knew Abel's employment was governed by "a contract containing industry-standard terms." Compl. ¶ 116. That is not enough. "[C]onclusory allegations that a defendant knew or should have known of a contract are insufficient to plead a tortious interference with contract claim"—let alone to survive summary judgment. *IME Watchdog, Inc. v. Gelardi*, 2024 WL 4350498, at *9 (E.D.N.Y. Sept. 30, 2024) (citation omitted); *Jewelry 47, Inc. v. Biegler*, 2008 WL 4642903, at *3-4 (E.D. Cal. Oct. 16, 2008). And "general knowledge of the industry cannot substitute for 'actual knowledge of a specific contract.'" *S. Home Care Servs., Inc. v. Visiting*

*Nurse Servs., Inc. of S. Conn.*, 2015 WL 4509425, at *11 (D. Conn. July 24, 2015); *see also Gallagher v. Savarese*, 2001 WL 1382581, at *6 (S.D.N.Y. Nov. 7, 2001) (evidence of defendant's knowledge that plaintiff sometimes hired co-defendant to train him for boxing matches insufficient to show defendant knew plaintiff and co-defendant had entered an exclusive training contract); *Trindade v. Reach Media Grp., LLC*, 2013 WL 3977034, at *15-16 (N.D. Cal. July 31, 2013). Even if industry custom mattered (it does not), it could not be imputed to Wayfarer or Baldoni, who are not in the public relations business. R.56.1 ¶ 122.

The theory fails as to Nathan too. There is no "industry standard" public relations employment contract. R.56.1 ¶ 123. Even Jonesworks' own contracts with Abel were not uniform. The November 2021 agreement [redacted] R.56.1 ¶¶ 13, 17, 24. And the NDA Abel signed when she was hired in July 2020 [redacted] R.56.1 ¶ 12. Nor did Nathan ever see the Abel Employment Agreement; she has never seen any Jonesworks contract. R.56.1 ¶ 124.

Asked whether Nathan ever saw the Abel Employment Agreement, Jones conceded, [redacted] and speculated that because Nathan [redacted] during Nathan's unsuccessful negotiations to join [redacted] R.56.1 ¶ 125; *see* Compl. ¶ 43. But that earlier contract concerned the terms on which Nathan herself would join Jonesworks, R.56.1 ¶ 126, not the Abel Employment Agreement executed in November 2021. A guess about what Jonesworks

contracts generally [redacted] is not evidence of actual knowledge of a specific contract. Plaintiffs have nothing else.

### 2. Plaintiffs Cannot Establish "But For" Causation.

Plaintiffs cannot prove "that the contract would not have been breached *but for* the defendant's conduct." *Regeneron*, 96 F.4th at 343 (emphasis added) (citation omitted). Where the third party acted independently, before the defendant became involved, there is no causation. *Looks Great Servs., Inc. v. Roosevelt*, 235 N.Y.S.3d 674, 676 (2d Dep't 2025); *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126. Abel had no plans to leave until the July 10, 2024 Zoom call in which Jones bullied a Jonesworks employee and turned hostile toward Abel; at her breaking point, Abel told Jones on the spot that she was resigning and confirmed it by email that day. R.56.1 ¶¶ 29-32. Abel's spontaneous decision to resign from Jonesworks was hers alone, no one persuaded her to leave and start her own company. R.56.1 ¶ 32. No defendant can have procured a decision Abel made herself. *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, 2009 WL 399221, at *8 (S.D.N.Y. Feb. 18, 2009) (where employee testified that he was "unhappy" working for his employer, it could not be said that his new employer induced him to leave or was the proximate cause of any breach).

Further, no Defendant learned of Abel's resignation until late July 2024. R.56.1 ¶ 37. Nathan was not even in the picture when Abel resigned on July 10, 2024. Wayfarer did not seek crisis recommendations until July 24, Abel did not call Nathan until late July, and TAG was not formally engaged until August 8 or 9. R.56.1 ¶¶ 49-52. Nathan could not have caused a resignation that preceded her involvement. Plaintiffs fare no better with the six-month non-compete. Jones told Abel she could take clients, including Baldoni and Wayfarer. R.56.1 ¶¶ 41-44. Jones does not dispute that she gave Abel permission. R.56.1 ¶ 43. Nor can she dispute that Abel relied on Jones' authorization and told Wayfarer that she had obtained it. R.56.1 ¶ 45.

The August 19, 2024 text that Plaintiffs feature in the Complaint does not help them. Compl. ¶ 12. Nathan reported telling Baldoni that Abel was [redacted] R.56.1 ¶ 128. The text shows that Baldoni had already decided to stay with Abel; no one induced him. R.56.1 ¶ 129. Baldoni went with Abel for the same reason a client follows a trusted agent to a new agency: his day-to-day relationship was with her. R.56.1 ¶ 129. Even so, Wayfarer and Baldoni did not decide to engage Abel's new company until after she left Jonesworks on August 21, 2024. R.56.1 ¶ 130. And Wayfarer did not contract with Abel's new firm until September 27, 2024, more than a month later. R.56.1 ¶ 131.

As for the remaining alleged breaches (taking documents, soliciting employees, and Abel's private communications), Plaintiffs have no evidence that Wayfarer, Baldoni, or Nathan played any role. R.56.1 ¶ 136. Jones herself, testifying as Jonesworks' corporate designee, attributed that conduct solely to Abel. R.56.1 ¶ 135. Plaintiffs are left with the conclusory "but for" allegation in the Complaint, which is not evidence. Compl. ¶¶ 118, 135. Without proof of but-for causation, the claim fails.

**3. Plaintiffs Cannot Show Intentional Procurement of a Breach.**

Plaintiffs cannot point to a single act any defendant took for the purpose of inducing Abel to breach. Plaintiffs must show the "defendant's intentional procurement of the third-party's breach of the contract without justification." *Lama Holding*, 88 N.Y.2d at 424. It is not enough that the defendant intended the act that caused the interference; the defendant must have intended the interference itself. *Amalfi, Inc. v. 428 Co.*, 128 N.Y.S.3d 754, 758-59 (4th Dep't 2020); *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*, 2020 WL 12948055, at *5 (C.D. Cal. Dec. 29, 2020), *aff'd*, 2022 WL 18906 (9th Cir. Jan. 3, 2022).

Plaintiffs' witnesses confirm that they have no evidence of inducement. Asked separately whether Nathan, Wayfarer, and Baldoni each "induce[d], encourage[d] or procure[d]" Abel's alleged breach of the Abel Employment Agreement, her duty of loyalty, or her non-compete, [redacted] R.56.1 ¶ 133. [redacted] R.56.1 ¶ 139; see Section VI.D, *supra*. Like Duren, [redacted] R.56.1 ¶ 134. That is precisely the "should have known" inference that cannot support a finding of intentional procurement. *Rosenthal & Rosenthal*, 2020 WL 12948055, at *5.

Finally, nothing in the record shows that Wayfarer, Baldoni or Nathan acted without justification. The justification inquiry weighs "the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant interferes, the interests the defendant seeks to advance, … [and] the relations between the parties." *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996) (citation omitted). Wayfarer and Baldoni were advancing a legitimate interest: keeping a publicist they knew and trusted. R.56.1 ¶ 132. And they hired Abel's new company only after Jones consented to their following Abel to her new firm. *See* Sections II.C, VI.B, *supra*; R.56.1 ¶¶ 44, 131. A client that follows its publicist after the employer has released that very client acts with justification, not malice. Defendants did not even try to persuade anyone; they made their own business decisions.[4] Plaintiffs have no evidence of inducement, and none of improper motive.

[4] Similarly, "[u]nder California law, a legitimate business purpose can indeed justify interference with contract." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1192 (9th Cir. 2022).

### 4. Plaintiffs Cannot Show Breach or Disruption of an Enforceable Obligation.

Nor can Plaintiffs prove a predicate breach. Abel did not breach her agreement, and an at-will agreement is not an enforceable contract that can support this tort. Plaintiffs must prove an "actual breach of the contract." *Lama Holding*, 88 N.Y.2d at 424; *see NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996) (recovery for tortious interference with contract available where "defendant's deliberate interference results in a breach of that contract"). "The existence of a valid contract is an essential element of the cause of action, and the courts have consistently rejected claims of tortious interferences in its absence." *Linkco*, 230 F. Supp. 2d at 495 (internal citation omitted). Without an underlying breach, there is no claim for tortious interference. *Ahluwalia v. St. George's Univ., LLC*, 63 F. Supp. 3d 251, 266 (E.D.N.Y. 2014), *aff'd*, *Ahluwalia v. St. George's Univ.*, 626 F. App'x 297 (2d Cir. 2015). As shown in Section VI, *supra*, Abel did not breach her contract. That ends the inquiry. Independently, because the Abel Employment Agreement preserved Jonesworks' right to fire her at any time, with or without cause, her employment was at will (R.56.1 ¶ 16)[5], and there was no enforceable contract to interfere with. *Watts v. Jackson Hewitt Tax Serv. Inc.*, 675 F. Supp. 2d 274, 281-82 (E.D.N.Y. 2009).[6]

California's more lenient standard does not change the result. California still requires an "actual breach or disruption" of the contractual relationship. *Name.Space*, 795 F.3d at 1133-34. The only "disruption" Plaintiffs identify is conduct the contract could not lawfully prohibit or that Jonesworks itself authorized. That is no disruption at all, and Plaintiffs identify nothing more.

---

[5] Even where the employment agreement contains a fixed term as Abel's did, courts have found the employment was at-will where there was also a provision allowing the employer to terminate the employee for any reason. *Keystone Auto. Indus., Inc. v. Montalvo*, 2014 WL 3696266, at *3-5 (E.D.N.Y. July 24, 2014).

[6] Moreover, Jonesworks terminated Abel on August 21, 2024, two days before her agreed departure date (R.56.1 ¶ 58), and thus there is no actionable breach supporting the tortious interference claim. *See Warburg Realty P'ship, Ltd. v. Aschheim*, 196 N.Y.S.3d 455, 456 (1st Dep't 2023).

**B. Nathan and Abel Are Entitled to Summary Judgment on the Fourth Cause of Action for Tortious Interference with the Wayfarer Agreement.**

Plaintiffs' proof on the Fourth Cause of Action is as empty as their proof on the Second. Causation fails because Wayfarer acted independently, and New York courts reject tortious interference claims where the counterparty acted independently. *Looks Great Servs.*, 235 N.Y.S.3d at 676; *see* Section X.A.2, *supra*. Heath alone made the decision to terminate Jonesworks. R.56.1 ¶ 99. Wayfarer terminated Jonesworks on or about August 30, 2024 because Jones defied its repeated instructions not to engage with the media, dealt with the opposing side, fired Abel—Wayfarer's day-to-day point person—without warning, and left Wayfarer without any reachable publicist or representation strategy during a critical period. *See* Section II.F, *supra*; R.56.1 ¶ 92. A client that loses faith in an agency principal who defies its instructions needs no one's inducement to leave. Plaintiffs offer nothing beyond the conclusory "but for" allegation in paragraph 135 of the Complaint. Summary judgment is required. Nor can Plaintiffs identify any conduct by Abel or Nathan that could constitute intentional procurement of a breach of the Wayfarer Agreement. *See Lama Holding*, 88 N.Y.2d at 424. Neither Nathan nor Abel suggested that Wayfarer terminate its agreement with Jonesworks. R.56.1 ¶ 100.

The claim fails for two additional reasons. Wayfarer did not breach the agreement, so there is no predicate breach. *See* Section IX, *supra*. And Nathan had no knowledge of the Wayfarer Agreement or its terms, R.56.1 ¶ 127, and no reason to know them, because she never worked at Jonesworks. R.56.1 ¶ 54. On every element, Plaintiffs' record is empty.

## XI. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Wayfarer Parties on all of Plaintiffs' claims.

Dated: October 15, 2026
Los Angeles, CA

**LINER FREEDMAN TAITELMAN + COOLEY**

By: _/s/ Ellyn S. Garofalo_
Bryan J. Freedman
Ellyn S. Garofalo
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com

MEISTER SEELIG & SCHUSTER PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@mss-pllc.com
kaf@ mss-pllc.com