**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE JONES and JONESWORKS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10,<br><br>Defendants. | Civ. Action No. 1:25-cv-00779-LJL<br>rel. 1:24-cv-10049-LJL |

**DECLARATION OF JAMEY HEATH IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Jamey Heath, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Chief Executive Officer of Wayfarer Studios LLC ("Wayfarer"), a defendant in this action. I submit this declaration in support of the motion for summary judgment. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently to them.

2. I joined Wayfarer in December 2020. I became Interim Chief Operating Officer in or about March 2021 and then Wayfarer's President approximately three months later. I have been Wayfarer's CEO since March 2024.

3. Wayfarer was a client of Jonesworks LLC ("Jonesworks"). During that relationship, Jennifer Abel was the Jonesworks publicist who serviced the Wayfarer account and the Jonesworks publicist with whom I worked and whom I trusted.

4. Wayfarer paid Jonesworks $20,000 per month for its services. I expected Jonesworks, as Wayfarer's publicist, to protect Wayfarer and its reputation, to follow Wayfarer's instructions, and to keep Wayfarer informed and supported particularly during a public relations crisis.

5. Attached as Exhibit A is a true and correct copy of the agreement between Wayfarer and Jonesworks, effective May 7, 2020, produced as JONESWORKS_00041022–26 (the "Wayfarer Agreement"). [redacted]. Justin Baldoni was not a party to the Wayfarer Agreement in his individual capacity. Jonesworks invoiced Wayfarer, not Mr. Baldoni, for its services under the Wayfarer Agreement.

6. Prior to Jonesworks' termination of Ms. Abel's employment, I did not know that Ms. Abel had a written employment agreement with Jonesworks. I first learned of the employment agreement between Ms. Abel and Jonesworks after Plaintiffs filed their lawsuit on December 24, 2024. I had no knowledge of the terms of Abel's employment agreement with Jonesworks prior to December 24, 2024, including that it contained a non-competition, non-solicitation, or confidentiality provision.

7. Wayfarer is not in the public relations business, and I know nothing about terms which are typically included in agreements between public relations firms and their employees.

8. I first learned in late July 2024 that Ms. Abel had resigned from Jonesworks and would be leaving at the end of a transition period. Ms. Abel did not inform me or, to my knowledge anyone else at Wayfarer, of her resignation before she tendered it, nor did she ask Wayfarer to follow her to a new firm. I did not solicit, encourage, or ask Ms. Abel to leave Jonesworks.

9. I did not ask, encourage, or induce Ms. Abel to breach any obligation she owed to Jonesworks, including any duty of loyalty, non-competition, non-solicitation, or confidentiality obligation.

10. In or about late July or early August 2024, Ms. Abel informed me and Mr. Baldoni that Ms. Jones had texted her that she could take Mr. Baldoni as a client. I understood that Ms. Abel had obtained Ms. Jones' permission, and I relied on that understanding.

11. Jonesworks' work for Wayfarer and Mr. Baldoni included promoting *It Ends With Us* (the "Film"), starring Blake Lively and Mr. Baldoni, which premiered on August 6, 2024, and opened on August 9, 2024.

12. As the premiere approached, tensions between Ms. Lively and Mr. Baldoni escalated, and Wayfarer and Mr. Baldoni found themselves in a public relations crisis.

13. Wayfarer decided to bring in a crisis public relations expert. Wayfarer did not seek crisis recommendations until on or about July 24, 2024. In late July 2024, Wayfarer decided to hire The Agency Group ("TAG") to work with Jonesworks on crisis management. TAG was formally engaged on or about August 8 or 9, 2024.

14. In the run-up to the premiere, Wayfarer's goal was to quiet the growing public speculation over a dispute between Ms. Lively and Mr. Baldoni. Wayfarer told Ms. Jones and her team not to engage with the media about Ms. Lively and Mr. Baldoni. I believed that Wayfarer needed a coordinated effort aligned with the crisis strategy, and that Ms. Jones was not involved day-to-day in the real-time coordination of that effort.

15. On August 8, 2024, Josh Greenstein of Sony, the Film's distributor, called me and told me that Ms. Jones had contacted the Daily Mail. Attached as Exhibit B is a true and correct copy of the August 8, 2024 communications, produced as HEATH_000046697–711.

16. When Ms. Jones denied the allegation, I had a conversation with her in which I instructed her to stand down and cease all further communications concerning the Lively-Baldoni dispute. I was concerned about the damage that might be caused by someone from Jonesworks reaching out to the media to say something negative about Ms. Lively. Accordingly, I directed Ms. Jones to cease all work for Wayfarer and Mr. Baldoni and to let Ms. Abel and another Jonesworks employee handle the crisis in tandem with Melissa Nathan of TAG.

17. I made the initial decision on behalf of Wayfarer to terminate its contract with Jonesworks because I had lost confidence in Ms. Jones' ability to effectively serve Wayfarer's interests. I had concerns about Ms. Jones' professionalism, judgment, and approach to representing Wayfarer, which I believed were not aligned with Wayfarer's best interests. Moreover, without Ms. Abel, Wayfarer would have been working directly with Ms. Jones, with whom we had limited experience. My decision was based on these concerns and was independent of Ms. Abel's employment status, although it was made after Jonesworks terminated her employment on August 21, 2024.

18. On behalf of Wayfarer, I repeated my instruction not to communicate on its behalf on August 9, 2024, and again on August 14, 2024. Attached as Exhibit C is a true and correct copy of my August 9, 2024 email, produced as JONESWORKS_00030241. Attached as Exhibit D is a true and correct copy of my August 14, 2024 email, produced as JONESWORKS_00030166. I also later learned that Ms. Jones had contacted Blake Lively's publicist. This contributed to my loss of confidence in Ms. Jones.

19. I believed that Ms. Jones was prioritizing her own interests over those of Wayfarer and, in doing so, undermining Wayfarer's coordinated crisis communications strategy.

20. On August 21, 2024, I learned that Jonesworks had fired Ms. Abel without warning to Wayfarer. [redacted] Attached as Exhibit E is a true and correct copy of my email exchange with Ms. Jones, produced as JONESWORKS_00038544–552, including my August 21, 2024 communication at JONESWORKS_00038550–51. Attached as Exhibit F is a true and correct copy of my August 21, 2024 communication [redacted], produced as JONESWORKS_00040618–19.

21. Ms. Abel had been Wayfarer's day-to-day point of contact at Jonesworks. After Jonesworks fired her in the middle of the public relations crisis surrounding the Film, Wayfarer could not reach Ms. Jones. For more than a week, Jonesworks provided Wayfarer with no communications and no representation strategy while Wayfarer dealt with the fallout of Ms. Abel's abrupt termination.

22. After repeatedly refusing to speak with me by phone, Ms. Jones would communicate with Wayfarer only by email with a lawyer copied. That arrangement did not reflect the trust I expected from a publicist Wayfarer was paying $20,000 per month. On August 29, 2024, Ms. Jones wrote that [redacted] Attached as Exhibit E is a true and correct copy of the email chain containing this communication, which appears at JONESWORKS_00038547–48.

23. On August 30, 2024, Wayfarer gave Jonesworks written notice of termination of the Wayfarer Agreement, effective September 1, 2024. [redacted] Attached as Exhibit E is a true and correct copy of the email chain containing this exchange, which appears at JONESWORKS_00038544–47.

24. After the termination, Ms. Jones threatened to sue, demanded payment for work she had not done, and insisted she had done a good job.

25. Jonesworks never informed Wayfarer that it received a subpoena for text messages that Ms. Jones had downloaded from Ms. Abel's phone or that it was producing Wayfarer's communications to the Lively parties.

26. I later learned that in August 2024, while Jonesworks was still representing Wayfarer and before Wayfarer terminated the Wayfarer Agreement, Ms. Jones communicated with Ms. Lively's friend Ashley Avignone about Wayfarer and offered to provide Ms. Lively with text messages taken from Ms. Abel's phone. Ms. Lively was the person at the center of the very media controversy Wayfarer had retained Jonesworks to help manage. Wayfarer did not authorize Ms. Jones to share any Wayfarer communications with Ms. Lively, Ms. Avignone, or anyone acting on Ms. Lively's behalf.

27. Selected Wayfarer text messages later appeared in a New York Times article published at the time Ms. Lively filed her California Civil Rights Department complaint against Wayfarer and Mr. Baldoni. The publication of those selectively presented messages harmed Wayfarer's reputation.

28. The decisions to end Wayfarer's relationship with Jonesworks and to engage Ms. Abel's new firm were separate and unrelated. Although I considered Ms. Abel's departure from Jonesworks, it did not motivate my decision to sever ties with Jonesworks. Because of Ms. Jones' conduct, not Ms. Abel's, Wayfarer would not have renewed or continued its relationship with Jonesworks beyond the then-current term of the Wayfarer Agreement.

29. I did not discuss with Ms. Abel, before Jonesworks terminated her employment, what Wayfarer would do once she left Jonesworks. Ms. Abel was not told of Wayfarer's decision regarding Jonesworks until after Jonesworks terminated her employment.

30. On September 27, 2024, Wayfarer entered into an agreement with Ms. Abel's new firm to provide public relations services. We chose to work with Ms. Abel because Wayfarer needed an experienced publicist whom we knew and trusted. Although we had terminated our relationship with Jonesworks nearly a month earlier for reasons unrelated to our decision to engage Ms. Abel, I understood that Ms. Jones had informed Ms. Abel that she could represent Wayfarer and Mr. Baldoni as clients.

31. Wayfarer retained Melissa Nathan's firm for crisis scenario planning, not to replace Jonesworks. I did not have any conversation with Ms. Nathan before Ms. Abel's termination about Ms. Abel's plans to leave Jonesworks. I do not recall Ms. Nathan ever telling me that Wayfarer should stay with Ms. Abel. Ms. Nathan played no role in my decision to terminate Wayfarer's relationship with Jonesworks.

32. Neither Ms. Abel nor Ms. Nathan asked, encouraged, or induced me or Wayfarer to stop paying Jonesworks, to terminate Wayfarer's agreement with Jonesworks, or to hire Ms. Abel or Ms. Nathan in place of Jonesworks.

33. Neither I nor, to my knowledge, anyone at Wayfarer had any role in Ms. Abel's alleged taking of Jonesworks' documents, and I am unaware of any solicitation of Jonesworks' employees or clients.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October ___, 2026
Los Angeles, CA

______________________________
Jamey Heath



535014.1